```
Approved:  /s/ _____        ORIGINAL
           ANDREW C. ADAMS / SARAH E. PAUL
           Assistant United States Attorneys   15 MAG    1073

Before:    THE HONORABLE JAMES L. COTT
           United States Magistrate Judge
           Southern District of New York
                                                DOC #   1
- - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA         :    COMPLAINT

       - v. -                    :    Violation of
                                      18 U.S.C. §§ 1028A,
                                      1343, 1349 & 2
HARVEY NEWKIRK,                  :

              Defendant.         :    COUNTY OF OFFENSE:

- - - - - - - - - - - - - - - - - X   NEW YORK
```

SOUTHERN DISTRICT OF NEW YORK, ss.:

PAUL B. DEAL, being duly sworn, deposes and says that he is a Special Agent with the United States Secret Service ("Secret Service") and charges as follows:

### COUNT ONE
### (Wire Fraud Conspiracy)

1. From at least in or about August 2013, up to and including on or about February 11, 2014, in the Southern District of New York and elsewhere, HARVEY NEWKIRK, the defendant, and others known and unknown, knowingly and willfully did combine, conspire, confederate and agree together and with each other to commit an offense against the United States, to wit, to violate Title 18, United States Code, Section 1343.

2. It was a part and an object of the conspiracy that HARVEY NEWKIRK, the defendant, and others known and unknown, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, and attempting to do so, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the

U.S. DISTRICT COURT FILED APR 01 2015 D.S. S.D. OF N.Y.

purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

## OVERT ACTS

3. In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a. On or about October 26, 2013, HARVEY NEWKIRK, the defendant, in an email sent from New York, New York to the representative of a lender based in California ("Victim-1"), made materially false representations regarding the existence and availability of certain assets that Victim-1 relied upon as collateral in agreeing to extend approximately $3,000,000 in financing toward the purchase of a nationally circulated magazine and related assets (the "Magazine").

b. On or about November 11, 2013, NEWKIRK, in an email sent from New York, New York to a lender based in New Jersey ("Victim-2"), made materially false representations regarding the availability of collateral that had previously been promised to Victim-2 as consideration for a loan to fund the purchase of the Magazine.

c. On or about November 12, 2013, NEWKIRK initiated a wire transfer of $4.9 million of Victim-2's money from an attorney escrow account held in New York, New York to a bank account maintained in Detroit, Michigan.

d. On or about November 16, 2013, NEWKIRK, in an email to a representative of an investment advisor based in New York, New York working on behalf of a lender ("Victim-3"), materially misrepresented that NEWKIRK and others had secured approximately $8,000,000 in funding toward the purchase of the Magazine when, in fact, NEWKIRK knew that those funds had been obtained in part through fraud on Victim-2 and were then subject to claims by Victim-1.

e. On or about December 23, 2013, NEWKIRK, while in New York, New York, spoke via telephone with an executive located in Georgia (the "Executive"), who is the father of a co-conspirator not charged herein ("CC-1"), and, during that telephone call, NEWKIRK falsely represented to the Executive that the Magazine had been acquired by a third-party, when in truth and in fact NEWKIRK continued

2

to use the Executive's identity in order to solicit funds for the acquisition of the Magazine.

(Title 18, United States Code, Section 1349.)

## COUNT TWO
## (Wire Fraud)

4. From at least in or about August 2013, up to and including on or about February 11, 2014, in the Southern District of New York and elsewhere, HARVEY NEWKIRK, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money or property by means of false and fraudulent pretenses, representations, and promises, and attempting to do so, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, NEWKIRK, through the use of interstate emails, among other means, made materially false representations to lenders in order to induce those lenders to provide funding toward the acquisition of the Magazine.

(Title 18, United States Code, Sections 1343 & 2.)

## COUNT THREE
## (Aggravated Identity Theft)

5. From at least in or about August 2013, up to and including on or about February 11, 2014, in the Southern District of New York and elsewhere, HARVEY NEWKIRK, the defendant, during and in relation to a felony enumerated in Title 18, United States Code, Section 1028A(c), to wit, the offenses alleged in Counts One and Two, did knowingly transfer, possess, and use, without lawful authority, a means of identification of another person, to wit, NEWKIRK used the name of the Executive without authorization as part of a scheme to obtain financing from lenders in the attempted purchase of the Magazine.

(Title 18, United States Code, Sections 1028A & 2.)

The bases for my knowledge of the foregoing charges are, in part, as follows:

6. I have been a Special Agent with the Secret Service since approximately October 2010. I am currently assigned to the Electronic Crimes Task Force in the New York Field Office as a network

intrusion response agent. I have received extensive training regarding computer fraud, white-collar crimes, and computer hacking. I have participated in the execution of multiple search warrants involving electronic evidence. I am familiar with the facts and circumstances set forth below from my personal participation in the investigation, my examination of reports and records, and my conversations with other law enforcement officers and witnesses. This affidavit is based upon my investigation, my conversations with witnesses and other law-enforcement agents, and my examination of reports and records. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated. Where amounts are reported herein, they are reported in approximate terms, except where otherwise indicated.

7.  As described in more detail below, HARVEY NEWKIRK, the defendant, who was counsel at a law firm located in New York, New York (the "Law Firm") during the relevant time period, participated in a fraudulent scheme (the "Magazine Scheme") in which NEWKIRK, along with CC-1, made material misrepresentations to multiple different individuals and entities who were involved in lending money to a media company associated with CC-1 (the "Media Company") to finance the purchase of the Magazine. The purpose of the Magazine Scheme was to induce the lenders into loaning millions of dollars to a media company (the "Media Company"), so that the Media Company could purchase the Magazine. CC-1 was subsequently arrested in connection with the Magazine Scheme and ultimately pleaded guilty to charges relating to the scheme.

8.  In the course of the Magazine Scheme, which took place from at least in or about August 2013, up to and including on or about February 11, 2014, HARVEY NEWKIRK, the defendant, obtained, and helped CC-1 to obtain, more than $8 million from Victim-1 and Victim-2, and attempted to obtain approximately $20 million from Victim-3. As described in more detail below, NEWKIRK and CC-1, who have attempted various unsuccessful business ventures together since at least in or about 2010, executed the Magazine Scheme by, among other things, having CC-1 pose as the Executive, who, as noted above, is CC-1's father, and misleading the lenders into believing that the Executive, who had substantial financial means, would be pledging his own assets as collateral for the lenders' loans. In truth and in fact, and as NEWKIRK and CC-1 well knew, the Executive was not pledging any of his own assets as collateral for the Magazine deal.

4

### NEWKIRK'S FRAUD ON VICTIM-1

**A.  Overview**

9.  HARVEY NEWKIRK, the defendant, and CC-1 initially approached Victim-1 for a loan in connection with the purchase of the Magazine in or about September 2013. Victim-1 agreed to provide a loan of approximately $3,000,000 (the "Victim-1 Loan"), and obtained as collateral for that loan a pledge of certain assets of the Executive, including interest in three stocks purportedly owned by the Executive (the "Purported Collateral"). Shortly thereafter, NEWKIRK and CC-1 defaulted on the Vicitm-1 Loan. Then, in an effort to forestall a lawsuit by Victim-1 against the Executive for the Purported Collateral- a lawsuit that would have brought publicity to NEWKIRK's fraud and the existence of which NEWKIRK never revealed to the Executive, NEWKIRK continued to mislead Victim-1 regarding the Purported Collateral and NEWKIRK's authority to represent the Executive.

**B.  September to November 2013:  The Default on Victim-1's Loan and Victim-1's Threatened Lawsuit**

10.  I have spoken with representatives of Victim-1 and reviewed documents received from Victim-1, and have learned, in substance and in part, that:

a.  Victim-1 believed that the Victim-1 Loan was secured by the Purported Collateral. The same assets were later pledged, without the knowledge of Victim-1, to Victim-2 as collateral for separate loans provided by Victim-2 (the "Victim-2 Loan"), Victim-3, and another lender ("Victim-4"), as described below.

b.  The Media Company failed to deliver the Purported Collateral as promised for the Victim-1 Loan.

c.  In or about October 2013, the Media Company defaulted on the loan provided by Victim-1, and has never repaid the loan.

d.  NEWKIRK told Victim-1 that NEWKIRK and the Law Firm represented the Executive. However, as discussed in more detail below, neither NEWKIRK nor the Law Firm ever represented the Executive, and NEWKIRK subsequently admitted to law enforcement agents that NEWKIRK never represented the Executive.

11.  From my interview of a representative of Victim-1, I have also learned, among other things, that:

    a. Following the Media Company's default on the Victim-1 Loan, Victim-1 prepared to sue the Executive and, in or about October 2013, Victim-1 served notice of the loan's default on HARVEY NEWKIRK, the defendant, who purported to accept process on behalf of the Executive.  In an email sent by NEWKIRK on or about November 8, 2013, NEWKIRK claimed that he and the Law Firm were authorized to accept service of process for the Executive (even though they were not).

    b. NEWKIRK, still purporting to act as the attorney for the Executive, then attempted to negotiate forbearance and settlement of Victim-1's threatened lawsuit, again purporting to act on the Executive's behalf and pledging, without authorization from the Executive, still more assets of the Executive in order to achieve a settlement with Victim-1.

    c. In or about the third week of November 2013, NEWKIRK represented to Victim-1 that NEWKIRK had discussed these settlement negotiations with the Executive.  As set forth below, from law enforcement interviews of the Executive, I have learned, in substance and in part, that NEWKIRK had no such discussions with the Executive, and that NEWKIRK was not, in fact, acting on the Executive's behalf or with the Executive's authorization.  Moreover, on or about March 17, 2015, NEWKIRK admitted to law enforcement that he never represented the Executive in connection with the Magazine acquisition or negotiations or litigation with Victim-1.

## C. December 2013 through January 2014: Victim-1's Attempt to Serve Process

  12. From my interview of a representative of Victim-1, and my review of documents provided by Victim-1, I have also learned, among other things, that in or about December 2013, Victim-1 served process of a complaint initiating a civil lawsuit concerning the Victim-1 Loan (the "Lawsuit") against the Executive by delivering that complaint to HARVEY NEWKIRK, the defendant, who again acknowledged receipt and claimed acceptance on behalf of the Executive.  Victim-1 requested confirmation from NEWKIRK that the Law Firm was representing the Executive and related entities with respect to the Lawsuit, and NEWKIRK responded that the Law Firm intended to provide that representation subject to an internal review for any conflicts of interest.

  13. As set forth below, from my review of law enforcement interviews of the Executive, I have learned, in substance and in part, that the Executive was unaware that HARVEY NEWKIRK, the defendant,

or the Law Firm had accepted service of process of the complaint in December 2013, or the notice of default in October 2013, or that NEWKIRK or the Law Firm were taking any actions, such as negotiating the Magazine acquisition or settling lawsuits on the Executive's behalf. Moreover, on or about March 17, 2015, NEWKIRK admitted to law enforcement that he had never represented the Executive in connection with negotiating the Magazine acquisition or settling related lawsuits.

## NEWKIRK'S FRAUD ON VICTIM-2

### A.  Overview

15. Victim-2 is a company based in Fort Lee, New Jersey that provides investment financing, including financing for the purpose of the purchase of entities such as the Magazine. From speaking with a principal of Victim-2, and from reviewing emails and other documents provided by Victim-2 to law enforcement, I have learned, in substance and in part, that Victim-2 agreed to provide a $5.5 million loan to help fund the Media Company's purchase of the Magazine (the "Victim-2 Loan"), subject to the posting of the Purported Collateral. However, in the course of Victim-2's dealings with NEWKIRK and CC-1, Victim-2 was provided with fabricated stock holding statements, had a portion of the Victim-2 Loan fraudulently transferred by NEWKIRK, and received false answers from NEWKIRK in response to Victim-2's questions regarding the Magazine deal.

### B.  November 6, 2013: The Fabricated October Account Statement

15. From reviewing documents provided by Victim-2, I have learned that on or about November 6, 2013, that Victim-2 received an email (the "November 6 Email") that purported to be from the Executive at an email address ending in "THEREIGNINC.COM" (the "Reign Email Address"). The November 6 Email contained a PDF attachment that purported to be a financial account statement for the Executive from a particular bank ("Bank-1") reflecting the Purported Collateral and banking transactions for the month of October 2013 (the "Fabricated October Account Statement"). The November 6 Email also attached an email purportedly forwarded from Bank-1 regarding those holdings (the "Fabricated Bank-1 Email"). The investigation has revealed that, in truth and in fact, the November 6 Email was sent not by the Executive, but by CC-1, and that both the Fabricated October Account Statement and the Fabricated Bank-1 Email were fake documents.

16. From speaking with representatives of Bank-1, I have learned, in substance and in part, the following information, which

demonstrates that both the Fabricated October Account Statement and the Fabricated Bank-1 Email were fake:

    a. The account number on the Fabricated October Account Statement belonged to an account held by a business, not by CC-1 or the Executive.

    b. The Fabricated October Account Statement reflects transactions purportedly occurring during October 2013, but the true account with the account number appearing on the Fabricated October Account Statement was closed prior to October 2013.

    c. While the Fabricated Bank-1 Email purports to be from an employee of Bank-1 at a particular email address, and suggests that Bank-1 will transfer the securities reflected in the Fabricated October Account Statement to another account as directed, Bank-1 has no record of any such employee with any such email address.

17. Based on my review of emails and other documents obtained in this investigation to date, I have learned the following, among other things, about HARVEY NEWKIRK's, the defendant's, knowledge that CC-1, rather than the Executive, sent the November 6 Email, and that both the Fabricated October Account Statement and the Fabricated Bank-1 Email were fraudulent documents:

    a. From my review of emails provided by a particular email service provider, which maintained the records for the Reign Email Address, I have learned that NEWKIRK corresponded regularly with CC-1 at the Reign Email Address since at least in or about 2011. Accordingly, NEWKIRK knew that CC-1 was the true user of the Reign Email Address, which is the address from which the November 6 Email was sent.

    b. On or about November 6, 2013, shortly after Victim-2 received the November 6 Email, Victim-2 emailed NEWKIRK and noted the facial implausibility of the Fabricated October Account Statement. Moreover, I have reviewed the October Account Statement, as well as another account statement purporting to demonstrate the Executive's holdings at Bank-1 (the "Fabricated September Account Statement"). These documents, with which Victim-2 confronted NEWKIRK on or about November 6, 2013, are easily recognizable as forgeries in several ways. For example, the Fabricated October Account Statement purports to reflect the Executive's transaction history for October 2013, and the Fabricated September Account Statement purports to reflect the Executive's transaction history for the prior month, September 2013. For both months, however, the

8

transaction history and amounts are identical, and only the month of each individual transaction has been altered.

### C. November 8 to 11, 2013: Newkirk's Lies to Victim-2 and Unlawful Acts Concerning Victim-4

18. From my review of records provided by the Law Firm, I have learned, in substance and in part, that HARVEY NEWKIRK, the defendant, engaged in additional misconduct with respect to the Purported Collateral for the Victim-2 Loan. For example:

   a. On or about November 8, 2013, Victim-4, another potential lender to the Media Company for the Magazine purchase, executed a letter of interest (the "Letter of Interest"), which was purportedly signed by the Executive. On or about the same date, NEWKIRK received by email the Letter of Interest. According to the Letter of Interest: (i) Victim-4 would provide approximately $14,500,000 in funding for the purchase of the Magazine; (ii) in return, the Executive was obligated to provide the Purported Collateral to secure the loan; and (iii) Victim-4 was to receive $535,000 upon the execution of the Letter of Interest. The Purported Collateral that the Executive had purportedly pledged to Victim-4 was the same collateral pledged to Victim-1, Victim-2, and Victim-3.

   b. On or about November 9, 2013, Victim-2 sent NEWKIRK an email requesting clarification and confirmation of certain issues regarding the participation of Victim-4 in the Magazine purchase. Specifically, Victim-2 asked NEWKIRK to confirm that "[Victim-4] will NOT be taking the 3 stocks [i.e., the Purported Collateral] as security and thus they will be available as collateral for my loan . . . ." In a reply email to Victim-2, sent on or about November 11, 2013, three days after the execution of the Letter or Interest and weeks after pledging the same collateral to Victim-1, NEWKIRK falsely stated, "[Victim-4] is not taking a security interest in the three stocks [i.e., the Purported Collateral]." On or about March 17, 2015, during my interview of NEWKIRK, NEWKIRK admitted that he had read the Letter of Interest and was familiar with its contents.

   c. On or about November 12, 2013, NEWKIRK prepared a request for the issuance of Victim-2's funds from an attorney escrow account at the Law Firm (the "Escrow Account") to Victim-4 in the amount of $535,000. That is, NEWKIRK took steps to use Victim-2's funds (provided for the purpose of acquiring the Magazine)[1] to satisfy

---

[1] From my review of notes of an interview of Victim-2 conducted by law enforcement

a debt owed to a separate investor, Victim-4, even as NEWKIRK guaranteed Victim-4's financing with the same collateral previously promised as security for the Victim-2 Loan.

### D. November 12, 2013: The Forged Victim-2 Email and Attempted Misappropriation of the Victim-2 Loan

19. From speaking with Victim-2 and from reviewing documents received from Victim-2, I have learned, in substance and in part, the following:

   a. On or about November 12, 2013, Victim-2 declined to provide the proceeds of the Victim-2 Loan directly to the Media Company because Victim-2 had not yet received confirmation of the existence and receipt of the Purported Collateral, as reflected in the Fabricated October Account Statement).

   b. In particular, on or about November 12, 2013, Victim-2 sent an email to HARVEY NEWKIRK, the defendant, stating, in substance and in part, that Victim-2 was not willing to proceed with the deal without verifiable proof of the Purported Collateral, which the Fabricated October Account Statement and the Fabricated September Account Statement failed to provide. Victim-2 agreed, however, to transfer $5.5 million to the Escrow Account at the Law Firm, and directed NEWKIRK to hold the funds in the Escrow Account until Victim-2 received satisfactory confirmation of the collateral.

   c. Shortly thereafter and on the same day, CC-1 caused a forged email, i.e., an email sent from an email "spoofing" service bearing a forged sender address purporting to be from Victim-2 (the "Forged Victim-2 Email"), to be sent to NEWKIRK. The Forged Victim-2 Email, in sum and substance, fraudulently claimed that Victim-2 was authorizing NEWKIRK to release the funds in the Escrow Account.

   d. Within minutes, NEWKIRK did, in fact, release to an agent of the sellers of the Magazine $4.9 million of the $5.5 million held in the Escrow Account, and, as noted above, NEWKIRK had separately prepared a wire transfer order directing that the Law Firm

---

on or about March 23, 2015, I have learned, in substance and in part, that Victim-2 never authorized the use of the Victim-2 Loan funds for the purpose of payment to Victim-4, and that neither HARVEY NEWKIRK, the defendant, nor anyone else, informed Victim-2 that a portion of the Victim-2 Loan funds would be used to pay a debt owed to Victim-4.

10

send $535,000 of the remaining funds to Victim-4 without Victim-2's knowledge or authorization.

    e. Approximately one hour after releasing Victim-2's funds from the Escrow Account, NEWKIRK sent an email to Victim-2 informing Victim-2 of the wire transfer. That email from NEWKIRK to Victim-2 was sent at a time that NEWKIRK knew, based on a prior email from Victim-2, that Victim-2 would be flying and likely without the ability to receive or send emails or telephone calls.[2]

### THE EXECUTIVE CONFRONTS NEWKIRK

    20. From my review of law enforcement interviews of the Executive, my review of notes of an interview of the Executive conducted by an Investigator with the United States Attorney's Office ("Investigator-1") and by a Special Agent of the Federal Bureau of Investigation ("Agent-1"), and from my review of the telephone call history of the cellular telephone subscribed to the Executive, I have learned, among other things, the following:

    a. The Executive has never retained NEWKIRK or the Law Firm as legal counsel in any matter. Further, the Executive recalls having met HARVEY NEWKIRK, the defendant, for the first time in or about September 2013.

    b. The Executive was aware of CC-1's desire to arrange financing for the purchase of the Magazine, and had offered to act as a board member for the Magazine in the event that CC-1 successfully closed the Magazine purchase, but the Executive never agreed to finance any portion of the Magazine deal or to provide collateral in support of financing.

    c. On or about November 19, 2013, following the fraud on Victim-1 and Victim-2, the Executive received a telephone call from a representative of Victim-1 regarding the default on Victim-1's loan, about which the Executive was unaware. Victim-1's loan, as discussed above, had been purportedly guaranteed by the

---

[2] From my review of documents provided by the Law Firm, I know that the $535,000 that HARVEY NEWKIRK, the defendant, prepared to send to Victim-4 was not ultimately released by the Law Firm as the result of Victim-2's quick intervention. Although in-flight at the time of the fraudulent wire transfer, Victim-2 nevertheless received NEWKIRK's email stating that the Victim-2 Loan funds had been released; Victim-2 then quickly responded to stop any remaining funds from leaving the Escrow Account.

11

Executive's assets, through the scheme perpetrated by NEWKIRK and CC-1.

    d. On or about November 20, 2013, the Executive contacted NEWKIRK to state that the Executive was not providing financial backing, support, or guarantees in connection with a purchase of the Magazine. In response, NEWKIRK assured the Executive that the Executive would not be included as a guarantor for any financing relating to the Magazine purchase. NEWKIRK, in fact, continued to represent to Victim-1 and Victim-3 that the Executive would guarantee debts owed to each of those victims.

    e. On or about December 23, 2013, NEWKIRK falsely stated to the Executive that the Magazine purchase attempts by NEWKIRK and CC-1 were no longer ongoing and that the Magazine was to be acquired by a third-party. NEWKIRK and CC-1 in fact continued to attempt to purchase the Magazine, up through February of 2014, including through an attempted fraud on Victim-3.

    f. The Executive was unaware, until approximately the date of CC-1's arrest on or about February 11, 2014, that NEWKIRK was claiming to others that the Executive was offering a personal guarantee in support of obtaining financing from at least Victim-3 or that NEWKIRK or the Law Firm had accepted service of process in a lawsuit filed against the Executive and was negotiating a settlement of that same lawsuit. At no point during the Executive's conversation with NEWKIRK on or about November 20, 2013, December 23, 2013, or at any other time did NEWKIRK inform the Executive of the claims of default or lawsuit against the Executive.

    g. The Executive did not speak to NEWKIRK at any point after on or about December 23, 2013.

## NEWKIRK CONTINUES TO MISREPRESENT HIS AUTHORITY TO ACT FOR THE EXECUTIVE AND TO LIE TO VICTIM-3

    21. From my review of emails provided by the Law Firm, I have also learned that up until February of 2014, HARVEY NEWKIRK, the defendant, repeatedly represented to representatives of Victim-3, who negotiated with NEWKIRK for the provision of approximately $20,000,000 in financing toward the purchase of the Magazine, that collateral for Victim-3's loan in connection with the Magazine purchase would be secured by a personal guarantee by the Executive,

including a pledge of the Purported Collateral previously pledged to Victim-1, Victim-2, and Victim-4.

22. From my review of documents provided by the Law Firm, I have learned, in substance and part, that, on or about November 16, 2013, *i.e.*, weeks after NEWKIRK acknowledged receipt of Victim-1's notice of default on the Victim-1 Loan and four days after Victim-2 protested the fraudulent wire transfer of funds relating to the Victim-2 Loan, NEWKIRK emailed a representative of Victim-3 in furtherance of securing financing from Victim-3, stating, in part, "$3.1 million has been paid in to the seller and another $4.9 million is currently being held in the trust account of seller's attorneys pending negotiation over the terms of an extension of the closing date." This statement was materially false insofar as:

　　a. The "$3.1 million" represented the Victim-1 Loan that was in default and that was actively subject to claims by Victim-1 of which NEWKIRK was aware; and

　　b. The "$4.9 million" represented the transferred portion of the Victim-2 Loan, which, as NEWKIRK was aware, NEWKIRK had transferred without Victim-2's authorization and which was then the subject of active attempts by Vicitm-2 to recover those misappropriated funds.

23. In the course of this investigation, I have interviewed a representative of a consulting firm retained by CC-1 to assist with dealing with Victim-3 in connection with the Magazine deal ("Advisor-1"). Advisor-1 has informed me, in substance and in part, that Advisor-1 believed that the purchase of the Magazine was to be financed in large part by the personal funds, and funds secured by the personal assets of, the Executive. Advisor-1 has further informed me, in substance and in part, that HARVEY NEWKIRK, the defendant, repeatedly represented to Advisor-1 that approximately $12,000,000, representing funds provided by, or secured by the personal assets of, the Executive had been placed in an escrow account at the Law Firm.

24. Documents provided by the Law Firm, however, which I have reviewed, demonstrate that no funds other than those relating to the fraudulent wire transfer described above – which were funds contributed by Victim-2, rather than the Executive, and which were far less than $12,000,000 – were ever held in escrow at the Law Firm in connection with the attempted the Magazine purchase.

25. Moreover, in contradiction of the statement by HARVEY NEWKIRK, the defendant, to the Executive that the Magazine deal was no longer being pursued as of December 23, 2013, the following documents provided by the Law Firm demonstrate, among other things, that:

    a. On or about December 23, 2013, in contradiction to his false representation to the Executive that the Magazine was to be purchased by another entity, NEWKIRK actively continued to pursue the Magazine deal, including on the very day of this false representation to the Executive. For example, in an email dated December 23, 2013, sent by NEWKIRK to Advisor-1 with respect to pursuing Victim-3, among other potential sources of financing, NEWKIRK stated, in part, "[o]nce we can provide [the Executive's stock] statements . . . we can tell [the sellers] that we are ready to close and the money is in escrow."

    b. Through in or about February 2014, NEWKIRK sought to obtain financing for the Magazine acquisition from Victim-3.

    c. NEWKIRK's files at the Law Firm included a blank template letter purporting to be from the Executive (the "Template"). The Template's header reads, "Personal Letterhead of [the Executive]"; the addressee lines read, "[Name of Issuer] / [Address] / [City, State Zip] / Attention: [_____]"; and the date of this document reads, "February [__], 2014." From my interview of the Executive, I have learned that the Executive never authorized NEWKIRK to use any such document.

### NEWKIRK'S FALSE STATEMENTS TO FEDERAL LAW ENFORCEMENT

26. On or about January 22, 2015, I interviewed HARVEY NEWKIRK, the defendant. During the course of that interview, NEWKIRK made, in substance and in part, the following statements: (i) that the Executive was his client for purposes of the attempted purchase of the Magazine; and (2) that following the initiation of Victim-1's lawsuit against the Executive, NEWKIRK and the Executive discussed the Executive retaining separate litigation counsel, which the Executive did. However, the Executive has informed law enforcement that he and NEWKIRK never discussed the retention of separate litigation counsel in connection with Victim-1's lawsuit. Indeed, the Executive has informed law enforcement that he was entirely unaware of the existence of that lawsuit until he learned of its existence in the course of speaking with law enforcement agents during this investigation in or about February 2014.

14

27. On or about March 17, 2015, I again interviewed HARVEY NEWKIRK, the defendant. During the course of that interview, and when confronted with the fact that the Executive had never been informed of the lawsuit filed by Victim-1, NEWKIRK stated, in substance and in part, that the Executive was *not* NEWKIRK's client, in contradiction to NEWKIRK's claim made during my interview of him on or about January 22, 2015, and in contradiction to multiple representations made by NEWKIRK to various lenders throughout the course of the Magazine deal.

WHEREFORE, deponent respectfully requests that HARVEY NEWKIRK, the defendant, be imprisoned, or bailed, as the case may be.

*[signature]*

SPECIAL AGENT PAUL B. DEAL
UNITED STATES SECRET SERVICE

Sworn to before me this
1st day of April 2015

*[signature]*

THE HONORABLE JAMES L. COTT
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

15