UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------
UNITED STATES OF AMERICA,

                    *Plaintiff,*

                                            S2 14 Cr. 534 (JSR)

     v.

HARVEY NEWKIRK,

                    *Defendant.*
--------------------------------------------------------

## DEFENDANT HARVEY NEWKIRK'S
## MEMORANDUM OF LAW IN SUPPORT OF OMNIBUS MOTION

HARRIS, O'BRIEN, ST. LAURENT,
& CHAUDHRY LLP
111 Broadway, Suite 1502
New York, New York 10006
*Attorneys for Defendant Harvey Newkirk*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................... 1

STATEMENT OF FACTS ............................................................................................... 3

   Introduction.................................................................................................................. 3

      Overview of the Case.............................................................................................. 3

      Newkirk's Statements ............................................................................................ 4

         a. February 12, 2014: Newkirk is first interviewed by law enforcement .............. 5

         b. February 14, 2014: Follow-up by law enforcement........................................... 6

         c. March 2014: Bryan Cave's Communications with Newkirk............................. 7

      Bryan Cave's Betrayal of the Attorney-Client Privilege. ......................................... 10

         a. Bryan Cave's disclosure to the government of Newkirk's privileged
         statements................................................................................................................. 10

         b. Bryan Cave's coordination with Alston & Bird ............................................... 11

ARGUMENT .................................................................................................................. 15

   Point I: The Court Should Exclude Newkirk's Statements to the Government
   and to Bryan Cave ...................................................................................................... 15

   Point II: The Court Should Allow the Defense to Inspect the Grand Jury Minutes
   Pursuant to Federal Rule of Criminal Procedure 6(E)(3)(E)(Ii).................................. 17

   Point III: If the Court Finds That Outrageous Government Occurred in
   Connection With Charging Newkirk, then Dismissal of the Indictment is
   the Proper Remedy ..................................................................................................... 18

   Point IV: Newkirk Is Entitled to Unredacted Copies of the Government's Notes
   of Its Discussions With Bryan Cave Attorneys............................................................ 20

   Point V: Newkirk Is Entitled to Whatever Additional *Brady* Material is in Bryan
   Cave's Possession....................................................................................................... 21

   Point VI: The Government Should Be Precluded From Introducing Any
   Statements or Testimony of Calvin Darden, Sr........................................................... 22

Point VII: The Court Should Conduct a Hearing to the Extent Necessary
to Resolve Any of the Issues that this Motion Raises ................................................... 23

CONCLUSION .............................................................................................................. 23

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Flagg v. Yonkers Sav. & Loan Ass'n,*
   396 F.3d 178 (2d Cir.2005)........................................................................................... 20

*Hampton v. United States,*
   425 U.S. 484 (1976).................................................................................................... 18

*Newmarkets Partners, LLC v. Sal. Oppenheim Jr. & Cie. S.C.A.,*
   258 F.R.D. 95 (S.D.N.Y. 2009) ...................................................................................... 21

*U.S. v. Daugerdas,*
   757 F.Supp.2d 364  (S.D.N.Y. 2010) ............................................................................ 17

*U.S. v. International Broth. Of Teamsters, Chauffeurs, Warehousemen and Helpers
of America, AFL-CIO,*
   119 F.3d 210 (2d Cir. 1997)........................................................................................... 16

*United States v. Carmichael,*
   216 F.3d 224 (2d Cir. 2000)........................................................................................... 19

*United States v. Dornau,*
   356 F.Supp. 1091 (S.D.N.Y. 1978) .............................................................................. 17

*United States v. Hogan,*
   712 F.2d 757 (2d Cir. 1983)........................................................................................... 18

*United States v. Stein,*
   541 F.3d 130 (2d Cir. 2007)............................................................................... 18, 19, 20

*United States v. Vetere,*
   663 F.Supp. 381 (S.D.N.Y. 1987) ................................................................................ 19

*Upjohn Co. v. United States,*
   449 U.S. 383 (1981)..................................................................................................... 8, 9

**Statutes**

Federal Rule of Criminal Procedure 6(e)(3)(E)(ii) ............................................................ 17

Federal Rule of Evidence 403 .......................................................................................... 22

Federal Rules of Criminal Procedure, Rule 16 ................................................................ 21

New York Rule of Professional Conduct 1.7(b) .......................................................... 8, 10

## PRELIMINARY STATEMENT

Defendant Harvey Newkirk ("Newkirk") respectfully submits this Memorandum of Law in support of his omnibus motion. In further support of this motion, Newkirk respectfully submits his affidavit, sworn to July 9, 2015 ("Newkirk Aff."), and the declaration of Priya Chaudhry, Esq. also executed on July 9, 2015 ("Chaudhry Decl.").

In this motion, Newkirk seeks to remedy gross misconduct by his former employer, the prominent, internationally known law firm of Bryan Cave. When the investigation preceding this prosecution commenced, Bryan Cave attorneys represented Newkirk, a corporate and transactional lawyer throughout his career, in his interactions with law enforcement and obtained from Newkirk confidential information through privileged attorney-client communications. Nevertheless, when it suited Bryan Cave's own interests, the firm not only abandoned its own representation of Newkirk (and refused to advance fees for him to obtain separate representation), but also breached its obligations to Newkirk by disclosing privileged information to government investigators by providing extensive interviews.

Bryan Cave also breached its obligations to Newkirk by communicating by email with counsel for Calvin Darden, Sr. ("Darden, Sr.") (a witness in the case) to make sure Bryan Cave's and Darden Sr.'s stories inculpating Newkirk meshed, and by failing to disclose to Newkirk exculpatory information that it obtained from Darden, Sr. and his counsel.

Moreover, Bryan Cave committed these ethical transgressions either at the impetus of, or at least with the approval of, the government. Bryan Cave's conduct severely damaged Newkirk's Fifth Amendment rights, and significantly interfered with

1

his Sixth Amendment rights, but Newkirk cannot yet ascertain the complete extent of that damage, because the government has provided drastically redacted copies of its interview notes and memos with Bryan Cave attorneys. Consequently, Newkirk seeks the following relief:

1. exclusion of all statements Newkirk made to government agents and/or to Bryan Cave;

2. inspection of the grand jury minutes to determine whether the government presented Newkirk's privileged communications with Bryan Cave, or any work-product material, to the grand jury

3. dismissal of the indictment with prejudice in the event it is determined that outrageous government conduct occurred with respect to the grand jury presentation;

4. an order directing the government to turn over ***unredacted*** copies of the notes of interviews with other Bryan Cave attorneys in which those attorneys' privileged discussions with Newkirk were divulged;

5. an order directing that all *Brady* material that Bryan Cave obtained while acting as an arm of the government be turned over immediately to Newkirk;

6. an order precluding Darden, Sr. from testifying at trial; and

7. a hearing to the extent necessary to resolve any of these issues.

## STATEMENT OF FACTS

**Introduction**

**Overview of the Case.**

Following his April 1, 2015, arrest, Newkirk was indicted on or about April 21,

2015, for Conspiracy to Commit Wire Fraud, Wire Fraud, and Aggravated Identity Theft.

The charges relate to Newkirk's legal representation of Reign Entertainment Group

("Reign,") an entity controlled by Calvin Darden, Jr. ("Darden Jr.") and Darden, Sr., in

connection with Reign's unsuccessful proposal to purchase the parent company of

Maxim Magazine in late 2013. Darden, Jr. was arrested on February 11, 2014 and

pleaded guilty on November 4, 2014.

The government's theory is that Newkirk and Darden. Jr. conspired, without the

knowledge of Darden, Sr., to obtain funding from four sources to facilitate the purchase

of Maxim, by agreeing to pledge the same collateral owned by Darden, Sr. to each of the

four funding sources. The linchpin of this is the allegation in paragraph 19 of the

indictment, that Darden, Sr. "has never retained HARVEY NEWKIRK, or [Bryan Cave]

as legal counsel in any matter."(Chaudhry Decl. Ex. A). This allegation is squarely

contradicted by public and private statements made by Darden Sr. and his lawyers on this

topic.  For example, a September 12, 2013 Wall Street Journal article, "Maxim Magazine

Sold, With Plans to Create a TV Channel," reports that Calvin Darden "and his Newly-

formed Darden Media Group" were purchasing the magazine and starting a Maxim-based

TV channel.  In addition, the article states that Darden, Sr., "a real-estate developer and

former executive at the United Parcel Service, is a newcomer to the media industry, but

says he has "definitely done my homework" in deciding to purchase the title. "I really see a way to expand outside of the [current] brand." (Chaudhry Decl. Ex. B).

Darden, Sr.'s lawyers have also made statements in open court which call the government 's allegations into question. Opengate Group, LLC, which apparently advanced $3.5 million toward the purchase of Maxim has sued Darden, Sr. in New York State Supreme Court, New York County. During an October 21, 2014 court appearance before Justice Jeffrey Oing of the Commercial Division, Mike Brown, an Alston & Bird partner representing Darden, Sr., states, "there was a meeting in New York that Mr. Darden attended . . . that meeting was with the folks at Maxim Magazine." (Chaudhry Decl.Ex. E at 14).

And, in communications with Bryan Cave that are discussed at greater length below, Brown confirmed that Newkirk and Bryan Cave had represented Darden, Sr. Specifically, on February 25, 2014, Brown wrote an email to Mary Beth Buchanan of Bryan Cave, "I have confirmed that he [Darden, Sr.] retained your firm to represent him and his son in the attempted acquisition of Maxim magazine. He had discussions with Mr. Newkirk and attended several meeting [sic] with him as part of that attempt." (Chaudhry Decl. Ex. D).

### Newkirk's Statements

Before addressing the issue of Newkirk's statements, it is important to note that since his graduation from Columbia Law School in 2001, Newkirk has practiced corporate and transactional law exclusively. (Newkirk Aff. ¶ 3).

4

**a. February 12, 2014: Newkirk is first interviewed by law enforcement.**  On

February 12, 2014, the day of Darden Jr.'s arrest, Newkirk had just left Bryan Cave's

Manhattan offices for the day when Jay Dorman, who was then a partner at the firm,

called and asked him to come back to the office. (Newkirk Aff. ¶ 5).  When Newkirk

arrived, he was directed to a conference room, where United States Secret Service

Special Agent Paul Deal and FBI Special Agent James Hilliard were waiting for him.

Also present was someone whom Newkirk recognized as a Bryan Cave litigator (but

whose name Newkirk could not recall), and possibly one other person.  Mary Beth

Buchanan, a white-collar defense and investigations partner at Bryan Cave, then entered

the room.  The litigator introduced Newkirk to Buchanan.  From the introduction,

Newkirk understood that Buchanan was there in order to represent him in his interview

with Special Agents Deal and Hilliard. (Newkirk Aff. ¶ 6).

Throughout the interview, Newkirk believed that Buchanan was present to

represent him.  Indeed, it is difficult to understand how Buchanan could have been

representing anyone other than Newkirk at the February 12th meeting.  If she were not

representing Newkirk, it is highly unlikely the agents would have allowed her to remain

in the room. And, significantly, the agents' notes from the February 12th meeting do not

reflect anything regarding Buchanan's representative status. (Chaudhry Decl.  Ex. C).

Presumably if she were there representing someone other than Newkirk, the notes would

have reflected that fact.

On several occasions during the interview, Newkirk consulted privately with

Buchanan, mostly regarding issues of attorney-client privilege with respect to Newkirk's

representation of the Dardens' entity, as well as on other issues. (Newkirk Aff. ¶ 6).

5

During those consultations, Buchanan gave Newkirk no indication that she was representing anyone other than him. (Newkirk Aff. ¶ 6).

In addition, during the interview Buchanan asked the agents if Newkirk was a subject or target of their investigation. (Newkirk Aff. ¶ 6).   After one of the agents responded that Newkirk was a subject, Buchanan allowed the agents' interview of Newkirk to continue and did not stop the interview to advise Newkirk that he could put an end to the interview and could retain counsel of his own choosing. (Newkirk Aff. ¶ 6). If Buchanan attended Newkirk's interview in a capacity other than as Newkirk's counsel, she certainly would have done this.  But she did not, thus confirming Newkirk's reasonable belief that she was his lawyer.

After the interview ended, Vincent Alfieri, the managing partner of Bryan Cave's New York office, spoke to Newkirk about what had transpired during the interview. (Newkirk Aff.¶ 7).  At the end of their discussion, Alfieri told Newkirk that he would be placed on indefinite, paid, administrative leave. (Newkirk Aff. ¶ 7).  However, Alfieri *did not* tell Newkirk that Bryan Cave would no longer represent him, nor did he advise Newkirk to get his own lawyer. (Newkirk Aff. ¶ 7).

**b. February 14, 2014:  Follow-up by law enforcement.** On or about February 13, 2014, Special Agent Deal left a voice message for Newkirk and asked him to come to the Secret Service's offices in New York for a follow-up interview.  (Newkirk Aff. ¶ 8). Deal did not leave contact information for Newkirk, so Newkirk called Alfieri, who gave Newkirk Deal's phone number. (Newkirk Aff. ¶ 8).   Newkirk met with Special Agents Deal and Hilliard the next day, February 14, 2014.  Newkirk was not accompanied by counsel to the meeting.  Alfieri did not tell Newkirk to contact Buchanan first; Alfieri

6

also did not ask Newkirk if he had retained separate counsel, which would have been a
natural question to ask if Alfieri did not already believe that Buchanan was representing
Newkirk. (Newkirk Aff. ¶ 8). Indeed, throughout this time, no one at Bryan Cave had
told Newkirk that Bryan Cave could not represent him, or advise him to seek separate
counsel. (Newkirk Aff. ¶ 8).

    **c. March 2014: Bryan Cave's Communications with Newkirk.** Throughout
March 2014, Newkirk received telephone calls and emails from various Bryan Cave
attorneys with questions regarding his representation of Reign. (Newkirk Aff. ¶ 9).
Among the attorneys who corresponded or spoke with Newkirk were Jay Dorman,
Vincent Alfieri, Noah Weissman, a Bryan Cave litigator, and Katherine Porter, a Bryan
Cave litigation associate. (Newkirk Aff. ¶ 9). From these calls and emails, Newkirk
understood that Bryan Cave was conducting its own investigation into what had occurred.
(Newkirk Aff. ¶ 9). Newkirk further understood that the impetus for the investigation
was the institution and threat of civil litigation regarding the failed attempt to acquire
Maxim. (Newkirk Aff. ¶ 9). No one at Bryan Cave told Newkirk that the firm was not
continuing to represent him. (Newkirk Aff. ¶ 9).

    On or about March 28th, 2014, Newkirk was called into Bryan Cave's offices for
an in-person interview. (Newkirk Aff. ¶ 10). Newkirk recalls that among the Bryan
Cave attorneys present were Mary Beth Buchanan, Jay Dorman, and Noah Weissman.
(Newkirk Aff. ¶ 10). Some of the attorneys present took notes. During this interview,
Noah Weissman spoke to Newkirk about the possibility of civil litigation occurring, and
emphasized the need for Newkirk to be vigilant about preserving the attorney-client
privilege that existed between Bryan Cave, Reign and/or Darden, Sr. in the event

Newkirk was called to testify. (Newkirk Aff. ¶ 10). The interview was cordial and non-adversarial. When Newkirk left the meeting, he believed Bryan Cave represented him. (Newkirk Aff. ¶ 10).

In these circumstances, an employee who is the subject of law enforcement scrutiny and who is interviewed by his employer would typically be given what are customarily called "*Upjohn* warnings." Such warnings take their name from *Upjohn Co. v. United States,* 449 U.S. 383 (1981), in which the Supreme Court held that communications between a company's employees and the company's counsel were privileged communications and that the company held the privilege, and the counsel's writings reflecting those communications constituted attorney work product. 449 U.S. at 397-98. *Upjohn* warnings make clear that the company, and not the individual employee, is the client.

*Upjohn* warnings are required by applicable rules of ethics. New York Rule of Professional Conduct 1.13(a) states:

> When a lawyer employed or retained by an organization is dealing with the organization's directors, officers, employees, members, shareholders or other constituents, and it appears that the organization's interests may differ from those of the constituents with whom the lawyer is dealing, the lawyer shall explain that the lawyer is the lawyer for the organization and not for any of the constituents.

Bryan Cave's attorneys were unquestionably familiar with best practices regarding *Upjohn* warnings. For example, in a presentation that is available through its website, *Successfully Managing Internal Investigations*, Bryan Cave teaches that when a law firm is representing the employer in an internal investigation or responding to a governmental inquiry it is essential to issue "Corporate Miranda Warnings" to any

8

employees that are interviewed. The presentation also explains how this warning should
be delivered to the particular employee so as to avoid creating an attorney-client
relationship.  The attorney is supposed to inform the employee as follows:

- The company is the client

- Not the employee or executive

- Interviews are conversations for the purpose of giving legal advice to the
company

- The company controls the privilege and may choose to waive it

The lawyer is also supposed to "properly document the warning" (*id.*), which
oftentimes is done by having the employee sign a written acknowledgement.

The presentation illustrates the danger of not giving such a warning by pointing to
a well-known case in which the outside law firm failed to properly to a CFO, and the firm
turned over an interview with the CFO to the Department of Justice.  According to Bryan
Cave's presentation, the evidence was suppressed by the trial court and there was a
"referral of lawyer to state bar (Awk!)." (*Id.*)

Thus, if Bryan Cave were **not** representing Newkirk during this period, the Bryan
Cave lawyers would certainly have provided Newkirk with such an explanation as part of
an *Upjohn* warning. They did not do so at any time during the period in which they
continued to interview him and to permit him to be interviewed by law enforcement.
(Newkirk Aff. ¶ 11).  Newkirk thus reasonably believed that Bryan Cave was his legal
counsel.

Likewise, Bryan Cave never disclosed to Newkirk that there was a potential
conflict of interest because either the firm was also representing (i) itself or (ii) Darden,
Sr., either individually or in his capacity with Reign. Along those same lines, Bryan Cave

9

never asked Newkirk to give his informed consent to any joint representation, as required by New York Rule of Professional Conduct 1.7(b). (Newkirk Aff. ¶ 12). Rule 1.7(b) states:

> Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if: (1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client; (2) the representation is not prohibited by law; (3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and (4) each affected client gives informed consent, confirmed in writing.

In late April or early May of 2014, Alfieri contacted Newkirk and told him that Bryan Cave would not continue its relationship with him. Newkirk resigned from Bryan Cave in June 2014. (Newkirk Aff. ¶ 13). Further, Bryan Cave has refused to advance Newkirk any funds toward his defense.

Newkirk was interviewed by agents on two other occasions, without counsel, on January 22, 2015, and March 17, 2015. (Newkirk Aff. ¶ 13).

**Bryan Cave's Betrayal of the Attorney-Client Privilege.**

**a. Bryan Cave's disclosure to the government of Newkirk's privileged statements.** On June 12, 2015, at a status conference in this case, the government acknowledged that Bryan Cave had disclosed information from Newkirk during his discussions with the firm's attorneys, and which Newkirk believed were privileged. The government stated that it did not have any Bryan Cave interview memos or other documents regarding the firm's discussions with Newkirk but, in response to defense counsel's inquiry, the government conceded that Bryan Cave had orally informed the

10

government of the substance of the firm's interviews of Newkirk. Chaudhry Decl. Ex. G, pp. 18-21).

Thereafter, the government produced notes of conversations it had with Katherine Porter, Mary Beth Buchanan, Noah Weissman, Jay Dorman, and Vincent Alfieri. (Chaudhry Decl. Ex. F). These five Bryan Cave attorneys chose to breach their obligations to their client, Newkirk, and disclosed privileged conversations they had with him, in an apparent effort to curry favor with the government. The produced versions of the handwritten notes of the Weissman, Dorman and Alfieri conversations are extensively redacted.

Newkirk never authorized Bryan Cave to divulge to the government (or any other third party) the contents of any of its discussions with him.  Those discussions were privileged, and any notes or memos generated as a result of those discussions were work product created in the course of Bryan Cave's representation of him. Bryan Cave chose to divulge the contents of those discussions to the government without even bothering to ask Newkirk's permission, putting its own interests above its client's.

**b. Bryan Cave's coordination with Alston & Bird.**  In addition to using the privileged information it obtained from Newkirk to protect itself with respect to the government, Bryan Cave collaborated with Alston & Bird, another firm that represents Darden Sr., in an effort to come up with a story for Darden, Sr. to tell the government that would protect both his interests and Bryan Cave's. That joint effort began in February 2014, shortly after Newkirk met with government agents.  Bryan Cave did this without consulting with its client, Newkirk.

11

Evidence suggests that, on February 25, 2014, Mike Brown of Alston & Bird, called Mary Beth Buchanan and requested a copy of the retainer agreement pertaining to the attempt to acquire Maxim.  On Tuesday, February 25th at 6:36 p.m., Buchanan wrote to Brown, saying, "Here is a copy of the engagement letter we talked about this morning. Can you please confirm whether Calvin Darden Sr. entered into this agreement with Bryan Cave." At 10:10 p.m. that same evening, Brown wrote back to Buchanan, in pertinent part: "I have not yet been able to determine whether our client signed this letter. But, regardless of whether he signed the letter, I have confirmed that he retained your firm to represent him and his son in the attempted acquisition of Maxim magazine. He had discussions with Mr. Newkirk and attended several meeting [sic] with him as part of that attempt." Buchanan and Brown then exchanged emails discussing a possible meeting later that week.

On Wednesday, February 26th, Brown wrote to Noah Weissman of Bryan Cave, ccing Buchanan and Bernard Taylor of Alston & Bird, and stated in pertinent part, "We represent Calvin Darden, Sr. in his individual capacity and in his capacity as an officer of DMG. He did not sign the engagement letter that you provided. He did, however, understand that his son retained Newkirk to represent him and his son (through DMG) in the acquisition of Maxim. When he became involved, he accepted and participated in that representation. Our client -- as the Chairman of DMG -- met with Newkirk and others to discuss the acquisition. During those meetings, he understood that Newkirk was his lawyer and Newkirk acknowledged that fact. He also spoke to Newkirk on the phone, again as a client speaking to his attorney. He would expect Newkirk to maintain the confidentiality of their communications."

Weissman acknowledged receipt of this information from Alston & Bird. Subsequently, Brown requested an in-person meeting with Weissman because "I think we have a short time frame to help our *respective client*."  It seems that Brown was attempting to use their collective representation of Darden, Sr. to encourage Weissman to promptly assist him in gathering Bryan Cave's internal files related to the representation.

In the same email chain, Brown relates to Weissman and Buchanan that Alston & Bird have a timeline of the relevant events, which include meetings and telephone calls between Darden, Sr. and Newkirk.  According to Brown, they believe "that there were a series of meetings on September 17 and 18, 2013 in New York and several phone calls with Darden, Sr. following that. We also think that there was a phone call on November 19 between Newkirk and Darden, Sr. and several phone calls in the subsequent weeks."

Further, an email from Mike Brown of Alston & Bird to Noah Weissman on February 28th (with ccs to Buchanan, Bernard Taylor, and James Altman of Bryan Cave), refers to a meeting between Bryan Cave and Alston & Bird attorneys on February 27, 2014: "Thanks for meeting with us yesterday. From our discussion, it is clear that Harvey Newkirk believed that he represented Darden Media Group and was taking direction in that capacity from Calvin Darden, Sr. This is consistent with Mr. Darden's belief then and now that Mr. Newkirk represented Darden Media Group (of which Mr. Darden was the Chairman) in the attempted acquisition of Maxim. For that reason, I want to reiterate our request for immediate access to the entire client file, including all electronic documents. We need this information in order to represent Mr. Darden in discussion with the U.S. Attorney's Office scheduled for early next week."  (All of these emails are set forth in a single email chain attached as Ex. D to the Chaudhry Decl.).

13

This information was unquestionably beneficial to Newkirk in connection with the government's investigation and any potential civil actions, since it confirmed that Newkirk represented Darden, Sr. in connection with the attempted purchase of Maxim. But no one at Bryan Cave ever informed Newkirk of the communications or meeting with Alston & Bird, even during Newkirk's later interviews with Bryan Cave attorneys. No one at Bryan Cave disclosed the emails quoted above to Newkirk. Rather, Bryan Cave hid all of this activity from Newkirk and then disclosed it to the government, without consulting Newkirk first.

If Newkirk had been aware of this significant admission he could have used it to support his innocence in discussions with the government prior to his indictment or could have otherwise incorporated it into his criminal defense strategy.

Bryan Cave also did not reveal to Newkirk that Alston & Bird's timeline of events demonstrates that Darden, Sr. was in direct contact with Newkirk through November 19, 2013 and the period thereafter. This fact would have been similarly valuable to Newkirk as it corroborates his version of what transpired. Moreover, there is likely other valuable information that is known to Bryan Cave but has been withheld from Newkirk, contrary to its duty of loyalty to him. There were a number of meetings between attorneys from Bryan Cave and attorneys from Alston & Bird, and the former almost certainly learned additional information that would assist Newkirk's legal defense. The existence of these meetings was not made known to Newkirk at the time, and Bryan Cave has not disclosed what it learned in them.

Thus, as this Court noted during the June 12th status conference, Bryan Cave acted as an arm of the government, amassing evidence for, and providing it to, the government,

14

in connection with the case against its own client.  Newkirk was kept unaware of these communications until the emails between the firms were obtained in discovery.

Bryan Cave also betrayed its ethical obligations to Newkirk by collaborating with Alston & Bird to ensure that Darden, Sr. would be furnished with a story that would protect his, and Bryan Cave's, interests. Thus, on February 28th, Weissman wrote to Brown:

> Thank you for clarifying yesterday and today Mr. Darden's view that Bryan Cave represented Darden Media Group and the firm's Interactions with Mr. Darden Sr. were in his capacity as Chairman of DMG. It was also informative to hear Mr. Darden's view that he was not aware of and had not engaged Bryan Cave to represent him on the guarantee in the transaction or any related financing. *This is certainly helpful information in our effort to determine the scope and nature of the firm's representation given the accusations made in the criminal complaint filed against Calvin Darden Jr.*[emphasis added].

### ARGUMENT

### POINT I

### THE COURT SHOULD EXCLUDE NEWKIRK'S STATEMENTS TO THE GOVERNMENT AND TO BRYAN CAVE

Based on his belief that Bryan Cave represented him in the investigation, Newkirk made numerous statements, both directly to law enforcement agents, and to Bryan Cave attorneys, who then conveyed his statements to law enforcement. These statements should be suppressed. At the very least, Newkirk is entitled to an evidentiary hearing to determine the extent to which those statements were obtained in violation of his Constitutional rights.

Newkirk believed that Mary Beth Buchanan was his lawyer when she sat with him during the February 12, 2014 interview.  That ultimately turned out not to be the case

– either Bryan Cave never intended to represent him, but didn't tell Newkirk, or it made a subsequent decision to betray the attorney-client relationship. Regardless of which scenario is correct, Newkirk spoke to the agents while under a false impression, rendering his statements to them involuntary.

Courts have addressed the issue of attorney-client privilege in situations where any employee asserts the existence of an attorney-client privilege between the employee and counsel representing the employer. In *U.S. v. International Broth. Of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL-CIO,* ("*Teamsters*") the Second Circuit adopted a five-step standard for determining whether the employee held the privilege:

> First, they must show they approached [counsel] for the purpose of seeking legal advice. Second, they must demonstrate that when they approached [counsel] they made it clear that they were seeking legal advice in their individual rather than in their representative capacities. Third, they must demonstrate that the [counsel] saw fit to communicate with them in their individual capacities, knowing that a possible conflict could arise. Fourth, they must prove that their conversations with [counsel] were confidential. And, fifth, they must show that the substance of their conversations with [counsel] did not concern matters within the company or the general affairs of the company.

119 F.3d 210, 215 (2d Cir. 1997).

Newkirk satisfies all of *Teamsters'* criteria. It is clear that Newkirk believed that Buchanan was present at the meeting with the government agents to protect his interests and render advice. He was being interviewed in his individual capacity, and not as a Bryan Cave representative. He sought advice in that individual capacity as a subject of an investigation, and not in his role as a Bryan Cave lawyer. Buchanan counseled Newkirk in that regard, and did so confidentially. And, while arguably some of the advice

Buchanan rendered regarding privileged information on the Dardens was pertinent to

Bryan Cave, she advised Newkirk on other issues as well.  Moreover, when Newkirk was

told he was a subject, Buchanan continued to represent Newkirk at the meeting with the

agents, and to render advice.  It is clear that Newkirk was represented by Buchanan in a

personal capacity.

The remedy for this basic violation of Newkirk's rights is exclusion of his

statements. See *U.S. v. Daugerdas,* 757 F.Supp.2d 364, 371-72  (S.D.N.Y. 2010)

(granting in part and denying in part defendant's motion to preclude the government from

introducing statements made to counsel).

## POINT II

### THE COURT SHOULD ALLOW THE DEFENSE TO INSPECT THE GRAND JURY MINUTES PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 6(e)(3)(E)(ii)

Federal Rule of Criminal Procedure 6(e)(3)(E)(ii) provides that a court "may

authorize disclosure – at a time, in a manner, and subject to any other conditions that it

directs – of a grand-jury matter: . . .(ii) at the request of a defendant who shows that a

ground may exist to dismiss the indictment because of a matter that occurred before the

grand jury."

The defense should have the opportunity to inspect the grand jury minutes in this

case to determine whether the indictment against Newkirk was obtained by the

government's presentation of evidence that it wrongfully obtained by way of Bryan

Cave's breach of the attorney-client and work product privileges. See *United States v.*

*Dornau*, 356 F.Supp. 1091, 1098 (S.D.N.Y. 1978), *rev'd on other grounds,* 491 F.2d 473

(2d Cir. 1974). In *Dornau,* Judge Metzner granted the defendants' motion to inspect the

17

grand jury minutes to determine whether the defendants' immunized testimony in a bankruptcy proceeding had been presented to the grand jury. In denying the government's motion for reconsideration, Judge Metzner explained, "we are dealing here with a right of constitutional dimension and not of competency or adequacy of testimony before a grand jury." 356 F.Supp. at 1098.

Likewise, here Newkirk does not seek to determine whether the evidence before the grand jury was sufficient, but rather, whether the government knowingly relied on evidence that was improperly turned over to the government in violation of Newkirk's attorney-client and work product privileges.

Alternatively, if the Court does not find that the defense is entitled to inspect the Grand Jury minutes, we request that the Court inspect them *in camera*.

## POINT III

### IF THE COURT FINDS THAT OUTRAGEOUS GOVERNMENT OCCURRED IN CONNECTION WITH CHARGING NEWKIRK, THEN DISMISSAL OF THE INDICTMENT IS THE PROPER REMEDY

If, upon review of the grand jury minutes, this Court determines that the government introduced evidence to the grand jury which it knew to have been procured in violation of Newkirk's attorney-client and work product privileges, then dismissal of the indictment would be the proper remedy, as it would have been a direct and intentional violation of Newkirk's 5th and 6th Amendment rights. *United States v. Stein,* 541 F.3d 130, 146 (2d Cir. 2007) ( See *Hampton v. United States,* 425 U.S. 484, 490 (1976); *United States v. Hogan*, 712 F.2d 757, 761 (2d Cir. 1983) ("The law of this Circuit is that dismissal of an indictment is justified to achieve either of two objectives: to eliminate prejudice to a defendant; or, pursuant to our supervisory power, to prevent prosecutorial

18

impairment of the grand jury's independent role."); *United States v. Vetere*, 663 F.Supp.

381, 386 (S.D.N.Y. 1987) (indictment dismissed after guilty verdict where, in grand jury,

prosecutor elicited inaccurate testimony regarding defendant's criminal record).

In *Stein*, the Second Circuit upheld Judge Kaplan's dismissal of the indictment

against thirteen employees of KPMG, finding that the government had unjustifiably and

impermissibly interfered with the defendants' Sixth Amendment rights by coercing

KPMG into refusing to advance the legal fees of defendants, and conditioning the

advancement of fees on an individual's cooperation with the government.  In upholding

dismissal as the proper remedy, the Court explained:

> The appropriate remedy for a constitutional violation is "one that
> as much as possible restores the defendant to the circumstances
> that would have existed had there been no constitutional error."
> [citing *United States v. Carmichael*, 216 F.3d 224, 227 (2d Cir.
> 2000)].
> Since it has been found that, absent governmental interference,
> KPMG would have advanced unlimited legal fees unconditionally,
> only the unconditional, unlimited advancement of legal fees would
> restore defendants to the status quo ante. The government's in-
> court statement and the ensuing 16–month delay were not enough.
> If there was a Sixth Amendment violation, dismissal of the
> indictment is required.

541 F.3d at 146.

In upholding Judge Kaplan's dismissal, the Second Circuit in *Stein* also noted

how, by interfering in the relationships between their employees and the employees'

counsel, KPMG effectively acted as an arm of the government:

> 'A nexus of state action exists between a private entity and the
> state when the state exercises coercive power, is entwined in the
> management or control of the private actor, or provides the private
> actor with *significant encouragement,* either overt or covert, or
> when the private actor operates as a *willful participant in joint
> activity* with the State or its agents, is controlled by an agency of

19

the State, has been delegated a public function by the state, or
is *entwined with governmental policies.*'

541 F.3d at 147, quoting *Flagg v. Yonkers Sav. & Loan Ass'n,* 396 F.3d 178, 187 (2d

Cir.2005) [emphasis added and internal quotation marks omitted in *Stein*]...

Here, it appears that Bryan Cave, desiring to curry favor with the government so it

would avoid what it perceived as a potentially embarrassing situation, chose to ignore the

privilege that existed between itself and Newkirk and provided its privileged

communications with Newkirk to the government.  And it further appears that the

government, at the very least by accepting those communications, essentially ratified –

that is, it encouraged – Bryan Cave's unethical behavior, all to Newkirk's detriment.

And, as in *Stein*, Bryan Cave then refused to advance Newkirk any legal fees, even

though at all times he was acting in his capacity as a Bryan Cave lawyer. If, indeed, that

is what happened to Newkirk, then, as in *Stein*, dismissal is appropriate.

### POINT IV

### NEWKIRK IS ENTITLED TO UNREDACTED COPIES OF THE GOVERNMENT'S NOTES OF ITS DISCUSSIONS WITH BRYAN CAVE ATTORNEYS

As we have stated throughout this Memorandum, Newkirk believed at all times

relevant to this motion that Bryan Cave was representing him in this investigation.  After

having interviewed Newkirk in what he thought was a privileged setting, Bryan Cave's

attorneys spoke with government agents regarding the investigation and what Newkirk

had told them in those interviews.  However, in spite of the fact that Bryan Cave was

Newkirk's counsel, the government has provided Newkirk with severely redacted copies

of its notes of its conversations with the Bryan Cave lawyers.

20

Newkirk is entitled to clean, unredacted copies of those notes. The notes of those conversations are not merely Rule 16 discovery, consisting of Newkirk's statements to Bryan Cave, combined with possible 3500 material (which the government has redacted). It is work product material generated by Newkirk's attorneys at Bryan Cave. Bryan Cave breached its obligation to Newkirk to keep its communications with him confidential, as well as the work product it amassed during that representation. Newkirk is entitled to know the full extent of that breach, and to that work product, so that he can adequately defend himself in this case. See *Newmarkets Partners, LLC v. Sal. Oppenheim Jr. & Cie. S.C.A.*, 258 F.R.D. 95, 105 (S.D.N.Y. 2009).

## POINT V

## NEWKIRK IS ENTITLED TO WHATEVER ADDITIONAL *BRADY* MATERIAL IS IN BRYAN CAVE'S POSSESSION

As noted above, when Bryan Cave decided to violate its attorney-client relationship with Newkirk, it also collaborated with Darden, Sr.'s lawyers at Alston & Bird to exchange information without consulting Newkirk. Further, in the course of exchanging that information, Bryan Cave obtained information that runs directly contrary to a major thread of the government's case – that Darden, Sr. never retained Newkirk and Bryan Cave to represent him in the Maxim transaction. However, when Bryan Cave and Alston & Bird lawyers conferred, Mike Brown of Alston & Bird confirmed "Mr. Darden's belief then and now that Mr. Newkirk represented Darden Media Group (of which Mr. Darden was the Chairman) in the attempted acquisition of Maxim."

Bryan Cave never gave this information to Newkirk. It came to Newkirk as part of the government's discovery in this case. It is clearly *Brady* material.

Bryan Cave acted as an agent and arm of the government. If it has obtained other, exculpatory information regarding Newkirk, but has not made it available to Newkirk, it should do so now. The government, having utilized Bryan Cave as its agent in this case, should be ordered to obtain all *Brady* information in the firm's possession, and provide it to Newkirk immediately.

## POINT VI

## THE GOVERNMENT SHOULD BE PRECLUDED FROM INTRODUCING ANY STATEMENTS OR TESTIMONY OF CALVIN DARDEN, SR.

As described above, Bryan Cave betrayed its duty to Newkirk by divulging his attorney-client conversations with the firm to the government, and by working with Alston & Bird to help Darden, Sr. tailor his statements to the government. As with its disclosure of attorney-client communications, Bryan Cave not only betrayed its obligations to Newkirk, it attempted to improve its standing with the government by delivering a fully prepped Darden, Sr., presumably to incriminate Newkirk. And, as is the case with the privileged information that Bryan Cave disclosed, the government should not be allowed to benefit from Bryan Cave's transgression. The appropriate remedy is for the Court to exercise its broad discretion under Federal Rule of Evidence 403 to preclude Darden, Sr. from testifying at Newkirk's trial, or from otherwise introducing any of Darden, Sr.'s statements.

22

## POINT VII

## THE COURT SHOULD CONDUCT A HEARING TO THE EXTENT NECESSARY TO RESOLVE ANY OF THE ISSUES THAT THIS MOTION RAISES

Finally, Newkirk acknowledges that many of the issues raised in this motion – the voluntariness of his statements, the existence of an attorney-client relationship and Bryan Cave's behavior in that regard, whether the government has acted properly in obtaining evidence and presenting it to the grand jury, and what information Bryan Cave might still be withholding from Newkirk – cannot be resolved on papers submitted to the Court. Thus, Newkirk is prepared to have an evidentiary hearing at the Court's convenience to determine these crucial issues before trial.

## CONCLUSION

For all the reason stated, defendant Harvey Newkirk respectfully requests that the Court grant all the relief requested in his omnibus motion, together with such other and further relief as the Court deems appropriate.

DATED:    New York, New York
           July 10, 2015

Respectfully submitted:

Priya Chaudhry
HARRIS, O'BRIEN, ST. LAURENT,
& CHAUDHRY LLP
111 Broadway, Suite 1502
New York, New York 10006
(212) 785-5550

*Attorneys for Defendant Harvey Newkirk*

23