UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. –                                            S2 14 Cr. 534 (JSR)

HARVEY NEWKIRK,

                    Defendant.

## GOVERNMENT'S OPPOSITION TO
## DEFENDANT'S OMNIBUS MOTION

PREET BHARARA
United States Attorney for the
Southern District of New York
One Saint Andrew's Plaza
New York, New York 10007

Andrew C. Adams
Sarah E. Paul
Assistant United States Attorneys
*Of Counsel*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. –                                                    S2 14 Cr. 534 (JSR)

HARVEY NEWKIRK,

                Defendant.

# GOVERNMENT'S OPPOSITION TO
## DEFENDANT'S OMNIBUS MOTION

The Government respectfully submits this Memorandum of Law in response to defendant Harvey Newkirk's Omnibus Motion filed July 10, 2015, which seeks to suppress and preclude the presentation of certain evidence at the upcoming trial of this matter.  Newkirk's motion accuses multiple attorneys at the law firm Bryan Cave LLP ("Bryan Cave") of serious violations stemming from the disclosure of materials and information purportedly subject to the attorney-client and work product privileges.  The premise for this allegation is that, as of February 12, 2014, Newkirk was a client of Bryan Cave, his former employer, and that subsequent actions taken by Bryan Cave constituted a breach of Bryan Cave's duties to its "client," Newkirk.  For the reasons described below, this premise is false and, for that reason among others, the defendant's motion should be denied in its entirety.

Newkirk identifies two categories of communications and information that he wishes the Court to suppress on the ground that those communications and information were obtained in violation of Bryan Cave's purported duties to Newkirk.  First, Newkirk seeks to suppress "all statements Newkirk made to government agents."  (Def. Mem. at 2

(Item 1).)  Second, Newkirk seeks to suppress "all statements Newkirk made . . . to Bryan Cave."  (*Id.*)  Newkirk also seeks certain relief ancillary to his suppression motion and premised on the same privilege arguments:  inspection of grand jury minutes (Def. Mem. at 2 (Item 2)); dismissal of the indictment (Def. Mem. at 2 (Item 3)); and early access to 3500 material for certain Bryan Cave attorneys (Def. Mem. at 2 (Item 4)).  Newkirk further seeks an order directing Bryan Cave "as an arm of the Government" to provide Newkirk with any undisclosed *Brady* material.  (Def. Mem. at 2 (Item 5).)  Finally, Newkirk seeks to preclude all testimony of Calvin Darden, a/k/a "Calvin Darden, Sr." ("Senior"), under Federal Rule of Evidence 403.  (Def. Mem. at 2 (Item 6).)

Newkirk has failed to allege facts that would, if true, establish that Newkirk made clear to Bryan Cave that he wished for the law firm to act as his legal counsel. Accordingly, Newkirk has failed to carry his burden of establishing an applicable privilege and the motion can be denied without the need for an evidentiary hearing. Alternatively, and assuming *arguendo* that the Court finds that Newkirk's affidavit has set forth facts that, taken as true, would establish that Newkirk made clear to Bryan Cave that he was seeking legal representation from the firm in his individual capacity, the Government agrees that an evidentiary hearing limited to the resolution of a discrete portion of Newkirk's requested relief, as set forth below, would be warranted.  For the reasons described below, however, the Government respectfully submits that the evidence at the hearing will show that Bryan Cave, in fact, expressly *disclaimed* to Newkirk any representation of Newkirk in his individual capacity.

Specifically, the Government expects the evidence to show that:  (1) Bryan Cave partner Mary Beth Buchanan and other partners, who were present before and during an

3

interview of Newkirk by law enforcement agents on February 12, 2014 (the "February 12 Interview"), specifically recall providing Newkirk with an express warning that Bryan Cave was not participating in the February 12 Interview to represent Newkirk in his individual capacity, but rather in order to protect privileged information on behalf of the entities and individuals that Bryan Cave believed it represented in the course of the attempted acquisition of Maxim Magazine; (2) law enforcement agents who conducted the February 12 Interview also recall Bryan Cave providing this express warning to Newkirk; (3) Buchanan memorialized this warning in a memorandum that she prepared immediately after the February 12 Interview; and (4) Newkirk voluntarily met with law enforcement agents on multiple subsequent occasions without counsel, including for a meeting that occurred two days later, and without suggesting at any point that he was represented by anyone, including any attorneys associated with Bryan Cave.

In sum, because Newkirk never made clear his desire to receive personal legal counsel from Bryan Cave, because he was never, in fact, represented by Bryan Cave, and because he was expressly informed that he was not represented by that firm in his individual capacity, the motion should be denied with respect to Newkirk's Requested Items 1 through 3. Moreover, even if Bryan Cave had represented Newkirk, which it did not, Newkirk seeks in Items 1 through 3 the suppression of materials and information that would nevertheless not be subject to any applicable privilege. To that extent, the requested relief in Items 1 through 3 can be denied without the need for a hearing, as described in more detail below. Finally, for the reasons set forth below, the Court should deny Requested Items 4, 5, and 6, without the need to hold a hearing on those requests.

## A.    Background

### 1.  *Newkirk's Affidavit*

In support of his motion, Newkirk has submitted a sworn affidavit.  The affidavit begins by explaining that Newkirk graduated from Columbia Law School in 2001, and has since practiced as a transactional attorney for a number of New York based law firms. (Aff. ¶¶ 2-3.)  The affidavit admits that Newkirk, as counsel for Bryan Cave, was the primary attorney with responsibility for the attempted acquisition of Maxim Magazine and related assets by the Reign Entertainment Group and its affiliates (the "Maxim Scheme").  (Aff. ¶ 4.)  The affidavit refers to an interview that occurred at the offices of Bryan Cave on or about February 12, 2014 (*i.e.,* the February 12 Interview), which was conducted by federal law enforcement agents in connection with the Maxim Scheme. (Aff. ¶ 5.)  Newkirk states that he "cannot presently recall" the names of each of the Bryan Cave attorneys present during the interview, but he notes the presence of Mary Beth Buchanan (a Bryan Cave partner and former United States Attorney for the Western District of Pennsylvania), Jay Dorman (a Bryan Cave partner), and a third Bryan Cave litigation partner, as well as Special Agent Paul Deal of the United States Secret Service and Special Agent James Hilliard of the Federal Bureau of Investigation.  (Aff. ¶ 6.)

Newkirk states that he agreed to an interview by the agents regarding the Maxim Scheme.  (Aff. ¶ 6.)  Newkirk provides no statement regarding anything that he said to any of the Bryan Cave partners at the interview, nor does he assert that he made any request for personal representation by any attorney associated with Bryan Cave – a firm

that was, even as of February 12, 2014, obviously conflicted from representing Newkirk in his personal capacity in connection with a criminal investigation of the Maxim Scheme, in light of Bryan Cave's representation of the prospective purchaser during the course of the deal.  (Aff. ¶ 6.)  Rather, Newkirk states that he has no memory of any statements made by Bryan Cave regarding the status of Newkirk's representation, Aff. ¶ 6, but claims that he had "the understanding that Ms. Buchanan was present at this meeting to represent [Newkirk]."  (Aff. ¶ 6.)  Further, Newkirk claims that his undescribed "interactions" with Buchanan "confirmed to [Newkirk] that she was there to act as my counsel."  (Aff. ¶ 6.)  Newkirk claims that "most of the consultations" that he had with Buchanan dealt with the attorney-client privilege belonging to the purported clients of Bryan Cave in the Maxim acquisition – *i.e.*, Reign Entertainment Group and its purported principals – but that Newkirk also consulted with Buchanan regarding issues that "impacted [Newkirk] personally."  (Aff. ¶ 6.)  Newkirk also claims that "at no time either before or during the [February 12 Interview] did Mr. Dorman, the Bryan Cave litigator, or Ms. Buchanan indicate to me that Ms. Buchanan was present for any purpose other than to represent me."  (Aff. ¶ 6.)

Newkirk then alleges facts regarding a subsequent meeting with law enforcement officials.  (Aff. ¶ 8.)  Newkirk states that he reached out to Bryan Cave for contact information for the relevant law enforcement agent, and that, in an email from a Bryan Cave partner, Newkirk received that contact information and no statement regarding his representation by Bryan Cave.  (Aff. ¶ 8.)

The affidavit contains no statements regarding the content of any requests for individual counsel purportedly made by Newkirk.  The affidavit contains no statements

regarding the content of any of the advice purportedly rendered by Bryan Cave attorneys to Newkirk during the February 12 Interview, apart from the general statement that such advice pertained mostly to issues not personal to Newkirk, but partly to issues that "impacted" Newkirk personally.  The affidavit contains no statement regarding the basis on which Newkirk might reasonably have believed that Bryan Cave – as undisputed counsel for the would-be purchaser of Maxim Magazine – could have provided counsel to an individual who was then a subject of an investigation regarding a fraud involving that client.  The affidavit contains no statements regarding the multiple meetings that Newkirk had with law enforcement in the days, weeks, and months following February 12, 2014, at which he was never accompanied by counsel (from Bryan Cave or elsewhere).  And neither the affidavit nor Newkirk's legal memorandum submitted in support of his motion acknowledges the contemporaneous memorandum memorializing Buchanan's warning to Newkirk, on February 12, 2014, that Bryan Cave did not represent Newkirk in his individual capacity.

**2.** *Expected Evidence at a Hearing*

Newkirk fails to present facts sufficient to establish that he made clear to Bryan Cave that he was seeking personal legal counsel at the February 12 Interview or at any time thereafter, and therefore the motion may be denied as a matter of law and without the need for an evidentiary hearing.  Alternatively, and in the event that the Court finds that Newkirk's affidavit presents facts sufficient to warrant a hearing, the Government expects the evidence to show the following.

During the evening of February 12, 2014, Harvey Newkirk was interviewed by Special Agent Paul Deal of the United States Secret Service and Special Agent James

Hilliard of the Federal Bureau of Investigation in connection with the on-going investigation of Calvin R. Darden, a/k/a "Calvin Darden, Jr." ("Junior") and the Maxim Scheme. Newkirk was the primary attorney at Bryan Cave with responsibility for that transaction, and the agents were present at Bryan Cave in order to question Newkirk about the transaction and his interactions with Junior.

In contrast to Newkirk's attested lack of memory, the Government expects that the agents will testify that Mary Beth Buchanan provided Newkirk with an explanation that Buchanan and other Bryan Cave attorneys would attend the February 12 Interview to protect the interests of the firm's clients (*i.e.*, the parties to the Maxim acquisition), but that they were expressly not attending the interview as counsel for Newkirk in his individual capacity. The agents are further expected to testify that in the days, weeks, and months following that initial interview, Newkirk voluntarily attended several interviews regarding the Maxim Scheme. Newkirk was never accompanied by counsel at any of those interviews. Indeed, the Government expects that the agents will testify that, on or about February 14, 2014, just two days after the February 12 Interview, Newkirk expressly confirmed that he was not being represented by counsel and agreed to be interviewed despite not being represented.

Finally, the Government further expects that one or more partners of Bryan Cave who attended the February 12 Interview will confirm that Newkirk was expressly informed that Bryan Cave did not represent him in an individual capacity in connection with the Government's investigation of the Maxim Scheme. The Government expects this testimony will be consistent with the memorandum prepared by Mary Beth Buchanan immediately following the February 12 Interview, which memorialized that warning and

which goes unmentioned in Newkirk's memorandum in support of his motion.  *See*

Chaudhry Decl., Ex. H.

**B.     Applicable Law**

      1.     *Attorney-Client Privilege for Individual Employees in the Context of Corporate Investigations.*

      It is well established that any privilege that attaches to communications on corporate matters between corporate employees and corporate counsel belongs to the corporation, not to the individual employee, and that employees generally may not prevent a corporation from waiving the attorney-client privilege arising from such communications.  *See United States* v. *Int'l Bhd. of Teamsters*, 119 F.3d 210, 217 (2d Cir.1997).  Whether in the individual or corporate context, the criteria for the applicability of the attorney-client privilege are the same:  "(1) where legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal advisor, (8) except the protection be waived."  *Int'l Bhd. of Teamsters*, 119 F.3d. at 214 (quoting *In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983*, 731 F.2d 1032, 1036 (2d Cir.1984) (internal quotation marks omitted)).  Communications that are made to other parties not within the scope of an applicable attorney-client privilege are not "confidential," and, therefore, not subject to protection.  *See, e.g.*, *In re Horowitz*, 482 F.2d 72, 81-82 (2d Cir. 1973) ("[I]t is vital to a claim of privilege that the communications between client and attorney were made in confidence and have been maintained in confidence.").

9

"The burden of establishing the existence of an attorney-client privilege, in all of its elements, rests with the party asserting it," and since the attorney-client privilege "stands in derogation of the public's right to every man's evidence it ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle." *Int'l Bhd. of Teamsters*, 119 F.3d. at 214 (internal citations and quotation marks omitted). Conforming to the limited scope of the privilege, Courts have required that individual employees claiming a privilege over communications made to corporate counsel must "make it clear to corporate counsel that [the individual] seeks legal advice on personal matters," as opposed to matters relating to their role as employees. *Id.* 119 F.3d at 215.[1] Although the definition of "personal matters" has not been definitively addressed by the Second Circuit, at least one decision from this Court has assumed "that 'personal matters' are not limited to matters unrelated to the corporate entity and are broad enough to include an individual's *explicit request* for legal advice concerning his personal liability for the actions of the corporation." *Szulik* v. *TAG Virgin Islands, Inc.*, 12 Civ. 1827 (PKC), 2013 WL 3989045, *2 (S.D.N.Y. Aug. 1, 2013) (emphasis added).

---

[1] The Second Circuit in *Teamsters* cited, but did not adopt, the Third Circuit's five-prong analysis for determining the existence of an individual privilege, set forth in *In re Bevill, Bresler & Schulman Asset Mgmt Corp.*, 805 F.2d 120, 123 (3d Cir.1986) and quoted in Newkirk's memorandum in support of his motion. *Compare* Def. Mem. at 16, *with United States* v. *Stein*, 463 F. Supp. 2d 459, 463 n.21 (S.D.N.Y. 2006) ("*Teamsters* did not adopt *Bevill* as its holding."). Although never adopted, the *Bevill* analysis informed the Second Circuit's own analysis in *Teamsters* and is consistent with the *Teamsters* requirement that an individual seeking to claim a personal privilege over communications with corporate counsel must "make clear" to corporate counsel that he or she seeks individual representation. For example, the first and second of the *Bevill* factors require that the individual demonstrate that he or she "approached [corporate counsel] for the purpose of seeking legal advice," and that the individual have "made it clear" to corporate counsel that the individual was seeking legal advice in "their individual rather than in their representative capacities." *Bevill*, 805 F.2d at 123.

Further conforming to the same principle of strict construal of the privilege, the Second Circuit has expressly rejected an individual employee's claim of personal privilege based on a purported "reasonable belief" that the individual was represented by his employer's counsel in the individual's personal capacity. *Int'l Bhd. of Teamsters*, 119 F.3d at 216 ("Appellant's 'reasonable belief' standard is not only not supported by the case law, but, as the district court observed, it is also unwise. This standard would provide employees seeking to frustrate internal investigations with an exceedingly powerful weapon, and would stray quite far from the principle that the attorney-client privilege should be 'strictly confined.' in order to allow public access to 'every man's evidence.'" (citations omitted)). Finally, "a lack of clarity as to the nature of the advice [] sought . . . , i.e., it was "fudgy," does not satisfy the *Teamsters* test," *S.E.C.* v. *Credit Bancorp, Ltd.*, 96 F.Supp.2d 357, 359 (S.D.N.Y. 2000), rather, the employee must have "made clear" that he sought advice in his personal capacity.

2.      *Attorney Work Product Privilege*.

"The attorney work product doctrine, now codified in part in Rule 26(b)(3) of the Federal Rules of Civil Procedure and Rule 16(b)(2) of the Federal Rules of Criminal Procedure, provides qualified protection for materials prepared by or at the behest of counsel in anticipation of litigation or for trial. [T]he work product doctrine permits discovery of documents and tangible things prepared by or for counsel in anticipation of civil litigation only upon a showing that the party seeking discovery has substantial need of the materials  . . . and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means, Fed.R.Civ.P. 26(b)(3). In the context of a pending criminal prosecution, the doctrine is stricter, precluding discovery of

documents made by a defendant's attorney or the attorney's agents except with respect to scientific or medical reports. Fed.R.Crim.P. 16(b)(2)." *In re Grand Jury Subpoenas Dated March 19, 2002 and August 2, 2002*, 318 F.3d 379, 383 (2d Cir. 2003) (internal quotation marks omitted). "The work product doctrine does not extend to documents in an attorney's possession that were prepared by a third party in the ordinary course of business and that would have been created in essentially similar form irrespective of any litigation anticipated by counsel." *In re Grand Jury Subpoenas Dated March 19, 2002 and August 2, 2002*, 318 F.3d at 384-85. Work product protection belongs to, and may be invoked by, the client for whom such product was created. *See e.g., In re Grand Jury Subpoenas*, 561 F.3d 408, 411 (5th Cir. 2009); *see also In re Sealed Case*, 29 F.3d 715 (D.C. Cir. 1994).

**C.    Discussion**

    *1.    Newkirk Fails to Assert that He "Made Clear" to Bryan Cave that He Sought Legal Advice in His Personal Capacity*

    Newkirk's affidavit does not come close to satisfying his burden of demonstrating that he "made clear" to Bryan Cave attorneys that he sought legal advice in an individual capacity, or that those attorneys agreed to provide such advice. *See Int'l Bhd. of Teamsters*, 119 F.3d. at 215. Indeed, Newkirk fails to allege anything regarding his statements or purported requests to Bryan Cave attorneys during or before the February 12 Interview. Newkirk simultaneously claims not to have any recollection of what Bryan Cave attorneys told him regarding the identity of their client during that meeting, but then contends that he is certain, despite having no present recollection regarding this very fact, that "at no time either before or during the [February 12 Interview] did [Bryan Cave

attorneys] indicate to [Newkirk] that Ms. Buchanan was present for any purpose other than to represent me."  (Aff. ¶ 6.)

Furthermore, Newkirk admits that "most of" the advice that he received from Bryan Cave attorneys during that meeting pertained to the protection of the attorney-client privilege belonging to entities and individuals other than Newkirk.  The closest that Newkirk comes to alleging any fact suggesting that he wanted personal representation is his claim that some portion of advice received from Bryan Cave during that meeting "impacted" Newkirk "personally."  (Aff. ¶ 6.)  But Newkirk makes no allegations regarding any action that he took to "make clear" to Bryan Cave that he sought individual representation.

These insubstantial assertions are made against the following backdrop.  The February 12 Interview pertained to an overt criminal investigation into a fraudulent attempt to raise funds for the purchase of Maxim Magazine, efforts for which Newkirk was admittedly the principal attorney.  (Aff. ¶ 4.)  The interview was of Newkirk as the principal attorney for an individual whom Newkirk understood to have been arrested in connection with the Maxim Scheme earlier on the same day.  (Aff. ¶ 6.)  That Bryan Cave, having served as the attorney for a party at the heart of an alleged fraud, would have been conflicted from representing a Bryan Cave employee who was then a subject in the investigation of that very fraud would be obvious to any lawyer, especially one who has practiced law in New York for over ten years prior to the February 12 Interview. (Aff. ¶¶ 2-3.)

The Newkirk affidavit simply fails to present facts sufficient to satisfy the requirements of *Teamsters*.  Newkirk does not allege any fact that would, if true,

establish that he "made clear" to the Bryan Cave attorneys present during the February 12 Interview that Newkirk sought legal advice on personal matters. *Int'l Bhd. of Teamsters*, 119 F.3d. at 215.  At best, Newkirk's assertion that certain of the advice provided to him during consultations with Bryan Cave attorneys in the course of the February 12 Interview pertained to issues that "impacted" Newkirk "personally" amount to vague and non-specific claims that cannot satisfy Newkirk's burden of demonstrating that he made clear his desire to seek and receive individual counsel. *See S.E.C.* v. *Credit Bancorp, Ltd.*, 96 F.Supp.2d 357, 359 (S.D.N.Y. 2000) (rejecting "fudgy" claims regarding the nature of advice sought by a corporate employee).  Moreover, Newkirk's affidavit is premised, at most, on a purported belief that he was personally represented, which is insufficient as a matter of law. *See Int'l Bhd. of Teamsters*, 119 F.3d at 216 (an employee's "reasonable belief" that he was personally represented is not sufficient). Finally, the insufficiency of these allegations is only exacerbated by Newkirk's failure to allege anything at all regarding his multiple, un-counseled meetings with law enforcement in the days, weeks, and months after the February 12 Interview, or regarding the contemporaneous memorandum of Buchanan, attached to his counsel's declaration, which expressly records the warnings that Newkirk was given regarding the nature of Bryan Cave's representation.  Accordingly, Newkirk is not entitled to an evidentiary hearing.

> 2.    *Newkirk Has Failed to Allege a Valid Claim of Privilege with Respect to the Vast Majority of Materials Produced in this Case*

Even if, however, a hearing were to be held, the scope of material at issue at a hearing can nevertheless be substantially narrowed from what is presented in Newkirk's

motion.  Newkirk alleges that he became a client of his employer Bryan Cave (or that he

"reasonably believed" that he had become a client), only as of February 12, 2014.  To the

extent that Newkirk seeks to suppress email correspondence, communications,

documents, or other material created before that date, no attorney-client privilege attaches

to those materials and Newkirk's request should be denied.  *See Int'l Bhd. of Teamsters*,

119 F.3d. at 214 ("(1) where legal advice of any kind is sought (2) from a professional

legal advisor in his capacity as such, (3) the communications relating to that purpose, (4)

made in confidence (5) *by the client*, (6) are at his instance permanently protected (7)

from disclosure by himself or by the legal advisor, (8) except the protection be waived.")

(emphasis added).

Moreover, the vast majority of the email communications produced by Bryan

Cave to the Government, and then by the Government to Newkirk, is also not covered by

an attorney-client privilege because they include third parties beyond the scope of

Newkirk's purported representation.  *Id.* (" . . . (4) made in confidence . . . .").  For

example, and as alleged in paragraph 15 of the Superseding Indictment, on or about

November 9, 2013, Newkirk emailed a potential lender (referred to as "Victim-2") stating

that assets intended as collateral for a loan from Victim-2 in furtherance of the Maxim

acquisition would not be posted as collateral to a separate victim, "Victim-3."  Newkirk's

statement to Victim-2 was demonstrably false, as the Government will establish at trial;

for purposes of the present motion however, the Government simply notes that Victim-2

was not a Bryan Cave attorney, a representative of Newkirk, or any other manner of

individual or entity that might be considered to share in Newkirk's purported privilege.

*See also* S2 Indictment, ¶ 10 (referring to emails from Newkirk to "Victim-1," another

lender, containing false statements regarding Victim-1's loan); ¶ 11 (same); ¶ 14 (referring to the provision of fabricated financial statements to Victim-2); ¶ 17 (describing the forged email purportedly from Victim-2 sent to Newkirk by Junior); ¶ 24 (describing materially false statements made via email to Victim-4).

Similarly, Newkirk provides no basis for suppressing statements made in the presence of law enforcement agents, including at the February 12 Interview, and at all such interviews thereafter.  Even presuming that Newkirk "reasonably believed" that he was represented by counsel as of February 12, 2014 (which is insufficient, in any event, in light of *Teamsters*), he nevertheless consented to be interviewed by law enforcement agents, thereby destroying any semblance of confidentiality with respect to statements made during those interviews.

Furthermore, substantially all of the documents that Newkirk seeks to suppress have nothing to do with seeking legal advice from a legal professional.  *Teamsters*, 119 F.3d. at 214 ("(1) where legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such . . . .").  For example, and as described in paragraph 18 of the Superseding Indictment, on or about November 12, 2013, Newkirk prepared a funds-transfer request for Victim-2's funds (then held in a Bryan Cave escrow account), which included an order to provide $535,000 from Victim-2 to Victim-3 in satisfaction of a debt owed to Victim-3 and without the knowledge of Victim-2.  That document, and others of its kind, cannot colorably be said to represent a search for legal advice from a legal advisor.

Finally, any and all statements by any witnesses, including Bryan Cave attorneys or employees, regarding communications or work product predating February 12, 2014,

cannot plausibly fall within any purported privilege belonging to Newkirk. As noted above, Newkirk, having purportedly become a client of his employer on February 12, 2014, lacks standing to raise a challenge to pre-February 12, 2014, information.[2]

Although Newkirk's motion may be denied without a hearing, to the extent that the Court wishes to hear testimony on the present motion, the potential relief afforded to Newkirk in the event that he carries his burden of establishing that he made clear his intent to seek individual counsel – which he will be unable to do – should be substantially limited as set forth above.

3.   *Should An Evidentiary Hearing Be Granted, the Government Expects the Evidence to Show that Newkirk was Never a Client of Bryan Cave*

As discussed above, the vast majority of the material contested by Newkirk cannot fall within an applicable privilege, even were Newkirk's assertions true. With respect to the remaining portion of material – statements and communications purportedly made in confidence to Bryan Cave attorneys for the purpose of seeking legal advice on personal matters on or after February 12, 2014, and any work product generated in connection therewith – the Government contends, as set forth above, that

---

[2] In apparent recognition of the fact that statements and materials pre-dating February 12, 2014, cannot be subject to a privilege belonging to a person who became a client on that date, defense counsel asked the Government, for the purposes of drafting the present motion, to disclose statements by Bryan Cave attorneys regarding Newkirk's interviews by (or in the presence of) Bryan Cave attorneys only on February 12, 2014 and thereafter. The Government, in compliance with the Court's order directing such disclosure, *see* Chaudhry Decl., Ex. 7 at 22, provided those statements. Newkirk's complaint in his motion that the notes are redacted stems from the fact that most of the information reflected in those notes, and which will be produced as appropriate and in due course as § 3500 material, relates to statements made by Bryan Cave personnel regarding events pre-dating February 12, 2014. For this reason, and those set forth in this opposition, generally, the Court should deny Newkirk's request for unredacted notes at this time.

Newkirk's affidavit fails to raise any question of material fact.  However, to the extent that the Court orders a hearing on this motion, the Government submits that it will demonstrate at an evidentiary hearing that Newkirk was expressly informed that the Bryan Cave attorneys at the February 12 Interview did not represent him in his personal capacity, and that Newkirk's actions thereafter were entirely consistent with his proceeding without counsel.  Because Newkirk will fail to carry his burden of demonstrating that he is entitled to any attorney-client or work product protections, he will lack any basis for this omnibus motion and the Court should deny the motion in full.

    4.    *Newkirk's Ancillary Requests Relating to Privileged Materials*

In addition to requesting the exclusion of statements made to Government agents and to Bryan Cave, and the production of unredacted notes of interviews with Bryan Cave personnel (requests which should be denied for the reasons set forth above, *see supra* Note 4), Newkirk requests two related items, each of which should also be denied.

First, Newkirk requests the inspection of grand jury minutes "to determine whether the Government presented Newkirk's privileged communications with Bryan Cave, or any work-product material, to the grand jury."  (Def. Mem. at 2.)  This request rests on the false premise that Newkirk enjoyed personal representation by Bryan Cave. Because the premise is false, no such material exists, and Newkirk fails to state a basis for the production of grand jury material.  Moreover, even if there were merit to Newkirk's claim of privilege, review of grand jury minutes would be inappropriate in this case.  "It is well-settled that a defendant seeking disclosure of grand jury minutes has the burden of showing a 'particularized need' that outweighs the default 'need for secrecy' in grand jury deliberations." *United States* v. *Forde*, 740 F.Supp.2d 406, 413 (S.D.N.Y.

2010) (citing *United States* v. *Moten*, 582 F.2d 654, 662 (2d Cir.1978)).  Here, despite the Government having provided Newkirk with copies of notes of interviews of Bryan Cave personnel containing descriptions of statements by Newkirk, including the small percentage of colorably confidential statements  made after February 12, 2014, Newkirk cites nothing among these statements that might have influenced the Grand Jury's decision to indict.   Newkirk, therefore, falls well short of demonstrating a "particularized need" to review grand jury minutes.

Second, Newkirk requests the dismissal of the Superseding Indictment with prejudice "in the event it is determined that outrageous government conduct occurred with respect to the grand jury presentation."  (*Id.*)  This request is premised on the same assertion that underlies the request for a review of the grand jury minutes, and Newkirk's omnibus motion, generally.  Because no privileged materials exist, this request relief must also be denied.  Moreover, even had the narrow category of purportedly privileged materials been presented to the Grand Jury, dismissal of the indictment would be a disproportionately extreme remedy.  *See United States* v. *Martinez*, No. 10–CR–233S (1)(2)(4), 2014 WL 1794934, at *2 (W.D.N.Y. May 6, 2014) ("Dismissal of an indictment because of a defect in the grand jury proceedings is a drastic remedy that is rarely used." (internal quotation marks omitted)); *see also United States* v. *Fields*, 592 F.2d 638, 647 (2d Cir.1978) (noting that dismissal of an indictment is an "extreme sanction"); *United States* v. *Bellomo*, 944 F.Supp. 1160, 1168 (S.D.N.Y. 1996) ("Dismissal of the indictment for prosecutorial misconduct is an exceedingly rare sanction.").  In this case, where Newkirk alleges no facts that demonstrate that he made clear to Bryan Cave, let alone to the Government, that he was seeking personal legal

counsel from Bryan Cave, there is no basis for dismissal of the Superseding Indictment on the ground that the Government relied in part on the presentation Newkirk's purportedly privileged materials.

     5.     *Newkirk's Request for* Brady *Material and to Preclude Testimony*

Finally, Newkirk alleges that Bryan Cave breached a duty to Newkirk, a purported client, by "collaborat[ing] with Alston & Bird, another firm that represents [Senior], in an effort to come up with a story for [Senior] to tell the government that would protect both his interest and Bryan Cave's."  (Def. Mem. at 11.)  Newkirk asserts that Bryan Cave did this "without consulting its client, Newkirk."  (*Id.*)  On that basis, Newkirk seeks to have Bryan Cave (as an "agent" of the Government) disclose any further similar emails, which Newkirk characterizes as *Brady* material.  Further, Newkirk seeks to preclude entirely the testimony of Senior under the Court's "broad discretion under Federal Rule of Evidence 403."  (Def. Mem. at 22.)

On August 25, 2014, the Government served a grand jury subpoena on Bryan Cave, pursuant to which Bryan Cave produced, *inter alia*, the very emails that Newkirk quotes as examples of exculpatory material.  To the extent that the Government has material from Bryan Cave (which is not an "agent" of the Government, but rather, a subpoena recipient and employer of multiple witnesses to Newkirk's crimes), and to the extent that such material falls within the ambit of *Brady*, the Government has complied with its obligations to disclose the material to Newkirk.[3]  To the extent that Newkirk wishes to issue his own compulsory process on Bryan Cave, he is of course entitled to do

---

[3] Indeed, and as Newkirk concedes, the emails that Newkirk quotes in his memorandum were produced to Newkirk by the Government.

so.[4]  In any event, there is no legal basis for ordering that the Government take further steps with respect to these materials.

As an evidentiary matter, moreover, each of the emails quoted in Newkirk's memorandum constitute multiple levels of hearsay with respect to statements purportedly made by Senior.  The Government, by contrast, expects to call Senior as a witness at trial, in part to establish the various lies that Newkirk told Senior throughout the course of the Maxim Scheme.  (*E.g.*, S2 Indictment, ¶¶ 21, 22.)  The Government fully expects that Senior will testify that he did not knowingly and personally retain Newkirk or Bryan Cave to represent him at any time; that he was entirely unaware of Newkirk's promises to victim lenders to extend them loan collateral based on Senior's personal assets; that Newkirk never informed Senior of claims and lawsuits filed against Senior and accepted by Newkirk; that Newkirk expressly told Senior that none of Senior's assets would be posted as collateral for loans related to the attempted acquisition of Maxim Magazine; and that Senior intended that any role that Senior might play with respect to his son, Junior's, potential acquisition of Maxim Magazine would be as a non-officer "figurehead."

Newkirk's motion fails to present any logical basis on which to conclude that Senior's testimony has somehow been tainted through collaboration with Bryan Cave.  At most, Newkirk presents a potential ground for challenging, at trial, the substance of some of Senior's expected testimony.  To the extent that any of the emails quoted by Newkirk

---

[4] In light of Newkirk's claim to have been a client of Bryan Cave, the Government would expect that his current counsel has already requested this material as part of the Newkirk client file.  Newkirk's motion and supporting papers make no reference to any such request, the timing of any such request, or the content of any response to such a request.

in his motion – none of which were authored by Senior – constitute  admissible evidence, Newkirk may attempt to introduce the emails at trial or to cross-examine Senior on the topics described in the emails.  However, Newkirk articulates no basis for the preclusion of testimony by Senior on any topic, including on the demonstrable falsehoods told to Senior by Newkirk in the course of the Maxim Scheme.  To the contrary, the opportunity for cross-examination, coupled with the strong relevance and probative value of Senior's expected testimony, counsels definitively in favor of the admission of Senior's testimony under Rule 403.  *See, e.g., Katt* v. *City of New York*, 151 F. Supp. 2d 313, 363 (S.D.N.Y. 2001) (applying Rule 403 balancing test and finding that probative value of testimony "well outweighed any prejudicial effect" where witness would be available for vigorous cross examination and witness's testimony provided useful information); *see also United States* v. *Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980) ("Evidence is prejudicial only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence.").

**CONCLUSION**

For the foregoing reasons, the Government respectfully requests that the Court

deny Newkirk's motion in its entirety.


Dated:          New York, New York
                July 22, 2015


                                Respectfully submitted,
                                PREET BHARARA
                                United States Attorney for the
                                Southern District of New York


                          By:      /s/ Andrew C. Adams
                                Andrew C. Adams
                                Sarah E. Paul
                                Assistant United States Attorneys