SUPREME COURT OF THE STATE OF NEW YORK
NEW YORK COUNTY

_____

HARVEY NEWKIRK,                        :
                                       :     Index No.:
              Plaintiff,               :
                                       :
       v.                              :     **Affidavit of Harvey K. Newkirk**
                                       :
BRYAN CAVE, LLP                        :
                                       :
              Defendants.              :
_____:

STATE OF NEW YORK      )
                       ) ss.:
COUNTY OF NEW YORK     )

       Harvey K. Newkirk, being duly sworn, says:


## BACKGROUND

       1.     I am the plaintiff in this action.

       2.     I graduated from Hunter College High School in May 1994 and from the
School of Industrial and Labor Relations at Cornell University in 1998. I graduated from
Columbia Law School in 2001 and was admitted to the bar of the State of New York in
2003. After graduating from law school, I started work in September 2001 as a corporate
associate at a firm then known as Thelen Reid & Priest LLP. While at Thelen Reid, my
practice focused on general corporate law, corporate securities and licensing and
intellectual property related matters.

       3.     In October 2005, I left Thelen Reid & Priest and joined K&L Gates LLP
as a corporate associate. My work at K&L Gates focused on private equity and venture
capital, mergers and acquisitions and licensing and intellectual property related matters.
While at K&L Gates LLP in 2011, I was named a Leadership Council on Legal Diversity

Fellow.

4.      In late 2012, I began a search for a new position.  As a result of that search, I received offers of partnership from multiple firms as well as multiple offers for "of counsel" or "counsel" positions.  In addition, I also had opportunities for employment at companies in legal and non-legal roles. Ultimately, I chose to accept the offer of employment from Bryan Cave LLP ("Bryan Cave" or the "firm") and started there in June 2013 as Counsel.

### Interviewing With Bryan Cave

5.      As part of the interview process, I met with, among others, Vincent Alfieri, managing partner of Bryan Cave's New York office, Kenneth Henderson and Beth Johnson on April 25, 2013 at Bryan Cave's offices in New York City. During that interview process we talked extensively about Bryan Cave's practice areas, its firm culture, including numerous references to Bryan Cave's practice of treating every attorney and staff member like you treat your best client, and the role that I would play at the firm should I be offered and accept a position there.

6.      I also met or videoconferenced with, among others, Dennis Fleischmann, Jay Dorman and Tara Newell on May 2, 2013 at Bryan Cave's offices in New York City at which substantially the same subjects were discussed.

7.      In addition, I had two or three other meetings with Bryan Cave personnel in May 2013, either individual attorneys or firm administrators as part of the interview process, including with Beth Johnson and Cecilia Kochanowski, as well as with a manager in the Human Resources Department at Bryan Cave's New York office.

8.      During one of those meetings in May 2013, as part of a general discussion

about the benefits for Counsel and Partners at Bryan Cave, one or more Bryan Cave personnel told me that the firm maintained professional malpractice insurance for its attorneys.

9.      Following my hiring at Bryan Cave in June 2013, I attended an orientation for new hires at Bryan Cave.  I also separately attended a lunch meeting around the same time for partners at Bryan Cave the focus of which was risk management and a new client intake policy, in which committee approval and a more thorough review process would be required for new clients. Following the meeting, I participated in an informal discussion about past litigation against the firm and one of its individual attorneys.

10.      After I joined Bryan Cave, the firm made available for my review its employee handbook, which indicated that Bryan Cave had a professional malpractice policy provided by a third party insurer that was managed by the firm's general counsel.

11.      No one told me during any of these meetings, or at any other time prior to my separation from Bryan Cave, that Bryan Cave believed it had the discretion to deny funds for the defense of its attorneys for claims that arose from those attorneys' work for the firm.  No one told me during these conversations, or at any other time prior to my separation from Bryan Cave, that the malpractice insurance policy Bryan Cave maintained required the payment of a $500,000 retention on a per-claim basis and the payment of a $5,000,000 retention on an aggregate basis by Bryan Cave before any coverage would be available for Bryan Cave's individual attorneys under the policy.  I only learned these facts about Bryan Cave's insurance coverage after I was separated from the firm. Neither the terms of Bryan Cave's policies concerning the defense of its individual attorneys nor a copy of its malpractice insurance policy were ever made

available prior to or during my employment there.

12.     Consistent with legal industry practice at law firms of the type and size of Bryan Cave, at the time I accepted Bryan Cave's offer of employment, and based on my conversations with Bryan Cave's attorneys and my own examination of the firm's employee handbook, I understood that the firm maintained malpractice insurance and that the firm would advance me legal fees sufficient to cover any deductible or self-insured retention if necessary.

13.     Bryan Cave's representations concerning its malpractice coverage for claims made against its individual attorneys were material to my decision to join Bryan Cave. I would not have joined Bryan Cave had I known that Bryan Cave effectively maintained no malpractice insurance coverage for its individual attorneys and that the firm paid the required retention amounts for defense of such attorneys at its discretion. Had I known these facts at the time, I would have demanded that Bryan Cave provide me with such insurance coverage or accepted an offer of employment elsewhere. I never would have undertaken the risks of practicing law without malpractice insurance at Bryan Cave or any other firm. Had I discovered during my employment at Bryan Cave the true nature of the coverage available to individual attorneys, I would have demanded malpractice insurance coverage from the firm or sought employment elsewhere.   If necessary, I would have acquired such protection from my own policy. In making the decision to accept employment at Bryan Cave and not to obtain my own malpractice insurance, I relied on Bryan Cave's representation that its malpractice coverage would inure to my benefit.

14.     In the press release the firm issued concerning my decision to join the

4

firm, Bryan Cave highlighted the fact that I had "more than 10 years' experience advising both public and private companies with respect to M&A transactions, private placements, public offerings and other equity and debt financings." As the release continues: "'[w]e are pleased to welcome Harvey to the firm,' said Alfieri. 'The breadth of experience that he brings to Bryan Cave will make him an asset to our M&A, venture capital, emerging companies and securities practices.'"

## Bryan Cave Advanced Defense Costs To Its Attorneys

15.     Further cementing my understanding that Bryan Cave provided effective malpractice coverage to its attorneys was that Bryan Cave attorneys were in fact defended by the firm or its malpractice insurance carrier. To take one example, a trustee of a bankrupt entity filed suit in 2011 against Bryan Cave and one of its attorneys in connection with an alleged Ponzi scheme.  The attorney was alleged to have discovered that the bankrupt entity was breaking numerous laws and regulations, but informed the client that it should continue to do "business as usual" in order to garner large fees for the firm.  As a result, investors allegedly lost $100 million in the illegal scheme.  Bryan Cave continued to advance this attorney's legal fees in the long-running dispute during my employment there and, upon information and belief, continues to do so now.

## Reign Entertainment Group Retains Bryan Cave

16.     In the summer of 2013, Bryan Cave was retained by Reign Entertainment Group and affiliated entities (collectively, "Reign") to act as legal counsel in a proposed acquisition of Maxim magazine by Reign.  I received origination credit on this matter because the matter arose from my relationships with Calvin Darden, Sr. ("Darden, Sr."), a former executive at United Parcel Services, Inc. and the managing member of Reign, and

his son, Calvin Darden, Jr. ("Darden, Jr."). The engagement letter was executed by Reign on or about July 19, 2013.

17.    To work on this engagement for Reign, Bryan Cave assembled a large team of lawyers, which, in addition to me, included five associates, four counsel, and two partners, Dorman and Jeffrey Chavkin. Noah Weissman, a litigation partner at Bryan Cave, also assisted on certain issues that arose in the latter stages of the transaction.

18.    As the matter progressed, Darden, Jr. became my main point of contact on behalf of Reign; however, I met with and communicated with numerous other individuals on the Reign acquisition team, including Darden, Sr., I attended meetings with Darden Sr., had phone calls with Darden, Sr. and received numerous email communications from Darden, Sr., including emails on which other Bryan Cave attorneys were copied. It was my understanding then and it is my understanding now that Darden, Sr. was an active and involved participant, at least in the beginning, in the proposed acquisition of Maxim by Reign.

19.    Darden, Sr.'s involvement was also reported in the press. For example, the *Wall Street Journal* reported in a September 12, 2013 article that Darden, Sr. and the owner of Maxim magazine had agreed on the financial terms of the acquisition: "Mr. Darden, a real-estate developer and former executive at the United Parcel Service, is a newcomer to the media industry, but says he has 'definitely done my homework' in deciding to purchase the title. 'I really see a way to expand outside of the [current] brand.'"

## Release of Escrow Funds and Subsequent Investigation

20.    As part of the transaction, Bryan Cave received and held funds in escrow

from a potential investor in the deal, Mark Weinberg, that would be used as part of the acquisition.   On November 12, 2013, I received an email that appeared to be from Weinberg authorizing the release of part of those escrowed funds to Maxim's counsel to be held in escrow by them to fund the purchase of Maxim by Reign.  I then began the process for Bryan Cave to release the funds, during the course of which or shortly following its completion I emailed Weinberg a reply, acknowledging receipt of his instruction for Bryan Cave to release the funds.

21.     However, after that release of part of the escrowed funds to Maxim's counsel, Weinberg sent a new email to me saying that he had not sent the authorization email.

22.     I immediately obtained a freeze of the released funds, which were still held by Maxim's counsel. I also cancelled a second wire of another amount of the Weinberg funds from the escrow account to Comvest, a potential investor in the transaction, to pay for fees associated with the transaction.  I subsequently learned that, according to a government complaint against Darden, Jr., the email that was sent to me, apparently by Weinberg, authorizing the release of the escrowed funds was a "spoofed" email that, while appearing to be an email from Weinberg, was actually originated by Darden, Jr. through a Russian company.  This email was apparently sent to deceive me and Bryan Cave into releasing the funds held in escrow to Maxim's counsel.   The government also claims there were a series of allegedly "spoofed" emails sent by Darden, Jr. to me, and others, purporting to originate from Darden, Sr. related to collateral for loans that Reign intended to use to fund the purchase of Maxim.

## **Newkirk is Arrested and Prosecuted**

23.     Following the arrest of Darden, Jr. in February 2014, I was placed on administrative leave by Bryan Cave while the firm addressed the government's investigation into Reign's bid for Maxim magazine.

24.     Several months later, Bryan Cave told me that it believed our relationship should come to an end.  I resigned from Bryan Cave on June 11, 2014.

25.     I was arrested on April 1, 2015. I retained criminal defense counsel shortly before the arrest.

26.     On April 21, 2015, I was indicted and charged with conspiracy to commit wire fraud, wire fraud, and aggravated identify theft for my alleged involvement in Darden, Jr.'s alleged scheme.

27.     Bryan Cave has since refused to advance defense costs to me or pay them towards the retention required by its malpractice policy.

28.     I do not have funds sufficient to pay for my defense in the criminal case, which my lawyers have estimated to require between $1,500,000 and $2,500,000. I currently possess approximately $10,000 in liquid assets.

_____
Harvey K. Newkirk

Sworn to before me this
25 day of August, 2015


Notary Public

MARILYN YUAN
Registration #01YU6290610
Qualified in Kings County
My Commission Expires
October 7, 20__