Fbn6new1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                          14 CR 534(JSR)

HARVEY NEWKIRK,

                Defendant.

------------------------------x

                                        New York, N.Y.
                                        November 23, 2015
                                        9:20 a.m.


Before:

                    HON. JED S. RAKOFF,

                                        District Judge


                        APPEARANCES
PREET BHARARA
     United States Attorney for the
     Southern District of New York
ANDREW C. ADAMS
SARAH E. PAUL
     Assistant United States Attorneys

HARRIS, O'BRIEN, ST. LAURENT & CHAUDHRY, LLP
     Attorneys for Defendant Newkirk
JONATHAN A. HARRIS
PRIYA CHAUDHRY
JARED FOLEY

Also present:  Stephan Francois, paralegal
               Chloe Marmet, paralegal
               Paul Deal, Secret Service
               James Hilliard, FBI
```

Fbn6new1                    Wolf - direct

1          (In open court; jury not present)

2          THE COURT:  Good morning.  Let's get the next witness

3     on the stand and let's bring in the jury.

4          (In open court; jury present)

5          THE COURT:  Please be seated.

6          Good morning, ladies and gentlemen.  I hope you had a

7     good weekend.  I want to know whether I can get the scarf like

8     Juror No. 2.

9          We're ready to continue.

10          MS. PAUL:  Thank you, your Honor.  The government

11     calls Robert Wolf.

12          THE DEPUTY CLERK:  Will you please rise and raise your

13     right hand.

14      ROBERT WOLF,

15          called as a witness by the Government,

16          having been duly sworn, testified as follows:

17          THE DEPUTY CLERK:  Please be seated and state your

18     name and spell it for the record.

19          THE WITNESS:  Robert Wolf, R-o-b-e-r-t, W-o-l-f.

20          MS. PAUL:  May I inquire, your Honor?

21          THE COURT:  Yes.

22     DIRECT EXAMINATION

23     BY MS. PAUL:

24     Q.  Good morning, Mr. Wolf.

25     A.  Good morning.

Fbn6new1                    Wolf - direct

1   Q.  Where are you employed?

2   A.  32 Advisors.

3   Q.  What type of business is that?

4   A.  It's a cross-border advisory, slash, consulting firm.

5   Q.  What is your role there?

6   A.  I am a CEO.

7   Q.  Are you affiliated with any other companies?

8   A.  Yes.

9   Q.  What else?

10  A.  Measure, which is a service company where I am chairman.

11  And I think now it is called Mitel Securities, it was part of

12  Forefront, and that is where I have my broker dealer license.

13  Q.  How did you become associated with Forefront?

14  A.  When I left UBS in 2012, I went to Forefront because I

15  needed the space for renting and I used their space and it is

16  also where I decided to keep my broker dealer license.

17  Q.  I would like to direct your attention now to November 2013.

18  Did there come a time in November of 2013 when you became

19  involved in the potential acquisition of Maxim Magazine?

20  A.  Yes.

21  Q.  Briefly how did you first become involved in the Maxim

22  deal?

23  A.  The CEO of Forefront and I used to speak fairly often about

24  some of the deals that 32 Advisors was working on and some of

25  the deals Forefront was working on and he mentioned that they

Fbn6new1                          Wolf - direct

```
1    were working on a deal on the acquisition of Maxim and I found
2    it intriguing and thought I may have some possible people that
3    would be interested in participating in that deal.
4    Q.  Who was the CEO of Forefront at that time?
5    A.  Brad Reifler.
6    Q.  Did you reach out in anyone who you thought would be
7    interested in participating in the deal?
8    A.  Yes.
9    Q.  Who was going to be purchasing Maxim Magazine as far as you
10   understood it?
11   A.  Calvin Darden Senior and Darden -- I think it was called
12   Darden Media Group.
13   Q.  Did you ever meet Calvin Darden Senior?
14   A.  No.
15   Q.  Who, if anyone, did you understand to be representing
16   Mr. Darden Senior and the Maxim deal?
17   A.  Harvey Newkirk.
18   Q.  Based on your observations what was Mr. Newkirk's deal in
19   the role?
20   A.  Both as legal advisor and what I would say quasi like
21   banker.
22   Q.  Can you explain what you mean by that?
23   A.  Yes.  They were working on the purchase -- they were
24   working on the purchase and financing of the asset Maxim and
25   Harvey acted as the legal representative to the buyer but he
```

1    was also acting as what I would say was the lead negotiator

2    with respect to people that I and my guess Forefront but

3    certainly that I was bringing in to possibly finance the deal

4    and involved in what I would say the structuring of the

5    possible purchase and that is more of what a banker would do.

6    Q.  Did you ever meet Mr. Newkirk in person?

7    A.  Not to my knowledge.

8    Q.  Did you ever speak with Mr. Newkirk over the phone?

9    A.  Yes.

10   Q.  About how many times?

11   A.  I would say during that three-month period fairly often.

12   Multiple times per week would be my guess.

13   Q.  And did you exchange e-mails with Mr. Newkirk?

14   A.  Yes.  And by the way when you meant calls, I meant calls

15   and/or e-mails.  When I meant multiple times per week, I meant

16   calls and/or e-mails.

17   Q.  Understood.

18          You mentioned you were looking for other people to

19   potentially provide financing for the deal.  Was one of offers

20   for financing a loan to fund the purchase?

21   A.  Yes.

22   Q.  Did Mr. Newkirk tell you whether a loan extended for the

23   purchase would be secured by any collateral?

24   A.  Yes.

25   Q.  What collateral?

1    A.   The personal guaranty and all of the assets of Calvin

2    Darden Senior.

3    Q.   What did you understand Mr. Darden Senior's assets to

4    include?

5    A.   If I can recall there were four stocks -- UPS, Coca-Cola,

6    Target, and Cardinal Health.   There was, I think, an Atlanta

7    home.   It was Georgia, but I think it was an Atlanta home.

8    There may have been another piece of real estate elsewhere, I

9    may recall Tennessee or somewhere.   Plus life insurance policy.

10   I think that was the gist.

11   Q.   Had you learned that Mr. Darden Senior was not involved in

12   this deal, would you have continued to be involved in any way?

13   A.   No.

14   Q.   Why not?

15   A.   Because, one, that when I looked at the background of

16   Calvin Darden Senior it was quite impressive and I thought some

17   of the people that I would go to to join in partnering on the

18   deal would find that he would be a very respected partner to be

19   a partner of.   I actually use the phrase I think Jordan Vernon.

20   If you are in the banking business, you would know who Jordan

21   Vernon is incredibly well respected.   That would be one.

22           Number two, part of the excitement to the deal was

23   possibly working with Comcast on doing a minority channel and

24   to do a minority channel, it needed to be owned by a minority

25   of which I think most of the people I was talking to would have

1    been fine with Calvin Darden Senior as that partner.

2    Q.  During the course of this deal were you aware that

3    Mr. Darden Senior had a son Calvin Darden Junior?

4    A.  Yes.

5    Q.  What, if anything, did Mr. Newkirk tell you regarding what

6    Mr. Darden Junior's role would be in the transaction?

7    A.  I don't recall exactly what Harvey said Calvin Darden

8    Junior's role would be.  I can only tell you what I was clear

9    what the role would be.

10   Q.  Did you want Mr. Calvin Darden Junior to be involved in the

11   transaction?

12   A.  I was okay that he would be involved in the transaction

13   with respect to -- if the transaction went forward with respect

14   to marketing and -- marketing but not a role at what I would

15   say is the board or the executive committee.  It would have to

16   be a secondary responsibility.

17   Q.  Why was that?

18   A.  Because Calvin Darden Junior did not have a great track

19   record and I think had either a civil or criminal suits against

20   him in the past and so not someone that I think any of the

21   people that I would bring the deal to would want as he or her

22   partner.

23   Q.  Is that something you communicated to Mr. Newkirk?

24   A.  Yes.

25   Q.  Turning to the different groups that you reached out to

Fbn6new1                        Wolf - direct

1    about financing, who did you show this deal to first?

2    A.  I have showed it to three people.  I don't recall who was

3    first.  I showed it to the Rizvi Traverse, which was the

4    largest shareholder and owner of Playboy Magazine who passed

5    immediately.  I showed it to Melody Partners who was quasi

6    private equity, slash, health fund who is very, very

7    knowledgeable in the media space.  That would possibly look at

8    this and I showed it to Shane McMahon who is formerly of

9    Woldwide Wrestling Federation and the McMahon family who are

10   the owners.

11   Q.  Turning to Melody Partners first, did they initially

12   express and interest in the deal?

13   A.  They expressed enough interest to do due diligence and show

14   a term sheet.

15            MS. PAUL:  May I approach, your Honor?

16            THE COURT:  Yes.

17   Q.  Mr. Wolf, I have handed you a binder of documents.  They

18   are all exhibits that are in evidence in this case.  I will be

19   asking you to turn to each of them individually starting with

20   Government Exhibit 401 in your binder.

21            MS. PAUL:  One moment, your Honor.

22            (Pause)

23   Q.  Mr. Wolf, if you could turn to Government Exhibit 401 in

24   evidence.  Do you recognize that document?

25   A.  Yes.

Fbn6new1                          Wolf - direct

1    Q.  What is it?

2    A.  So this document is an indicative term sheet from Melody

3    Partners to Calvin Darden Senior, Darden Media Group for the

4    purchase of Maxim.

5    Q.  What is the date of the cover e-mail here?

6    A.  November the 15th.

7    Q.  What is an indicative term sheet?

8    A.  It means that assuming that all diligence goes well that in

9    all likelihood this would be a deal that they would have

10   interest in pursuing under these terms knowing that on an

11   indicative deal sheet terms can change.

12   Q.  So if we can turn to page 1 of the term sheet.  They will

13   be coming and on your screen as well.

14   A.  Okay.

15   Q.  If you can, take a look at the section of the term sheet on

16   page 1 that says "collateral."

17   A.  Yes.

18   Q.  According to this term sheet what was going to be the

19   collateral for the loan for Melody Partners?

20   A.  It was going to be shares of Target, Cardinal Health,

21   Coca-Cola, first lien on the Maxim assets, a pledge of the

22   Maxim equity, Calvin Darden's real estate, his fuels business

23   and land development business in parenthesis, meaning they are

24   uncertain what that is, and then the personal guaranty of

25   Calvin Darden Senior.

1          MS. PAUL:  Can we turn to page 2 of the term sheet,

2     the top section.

3     Q.  Who had shares in Target, Cardinal Health and Coca-Cola as

4     far as this exhibit?

5     A.  Calvin Darden Senior.

6     Q.  What is the real estate that was going to be used as

7     collateral?

8     A.  Definitely his house and then there was this other asset,

9     like a said earlier, that I believe may have been in Tennessee,

10    but the disproportion among the assets was going be his house.

11    Q.  What would this personal guarantee of Calvin Darden Senior

12    consist of?

13    A.  Just about everything else that is under his name.  And so

14    one idea would be the cash value of his life insurance policy,

15    bank accounts, everything that he owned.

16    Q.  And was Melody Partners according to this term sheet going

17    to have a first priority interest in this collateral?

18         MS. PAUL:  Turn back to page 1 of the term sheet.

19    A.  Yes.

20         MS. PAUL:  If we can highlight the collateral section,

21    please.

22    Q.  What does it mean to have a first -- perfected first

23    priority or security interest in collateral?

24    A.  That they would have a lien on these assets to any other

25    individual and/or company that he could be using.  This is

Fbn6new1                          Wolf - direct

1   collateral, too.

2   Q.  If we can go back to the cover e-mail, please, of the

3   document.  Focusing on the e-mail from you at the top,

4   Mr. Wolf.  Who did you send this term sheet to?

5   A.  I sent this to Harvey and Brad Reifler.

6   Q.  Why did you send to Mr. Newkirk?

7   A.  Because he was representing Calvin Darden Senior on this

8   transaction.

9   Q.  Please take a look at Government Exhibit 402 in your

10  binder.  Do you recognize that document?

11  A.  Yes.

12  Q.  What is it?

13  A.  These are -- this is questions between the various parties

14  on understanding the term sheet and specifically to the

15  collateral.

16  Q.  What is the date of this e-mail exchange?

17  A.  From November, I think, 15th or 17th.

18  Q.  Please go to page 2 of the document, focusing on the e-mail

19  from you there.

20  A.  Yes.

21  Q.  What is an indicative counter?

22  A.  So Melody Partners gave an indicative term sheet and this

23  would be a counter to the term sheet from Calvin Darden

24  Senior's camp.

25  Q.  In coming up this counter, did you speak with Mr. Newkirk

1    about it?

2    A.  I believe so.

3    Q.  Taking a look at page 1 of the document, the e-mail from

4    Josh Oboler, he is from Melody Partners; is that right?

5    A.  Yes, he is.

6    Q.  What is he indicating in this e-mail that Melody Partners

7    would better like to understand?

8    A.  The value of the real estate and whether there was a loan

9    or a mortgage on it, the nature of the stock, i.e., does Calvin

10   Darden Senior own them, the vesting schedule, are they

11   redirected, understanding the Maxim licenses and the assets of

12   Maxim, and understanding the working capital needs of Maxim.

13   So if that was one of the assets that would be -- they would

14   have a first lien on, they would want to understand how much

15   money needs to go in to make it a vibrant company.

16   Q.  At this point in time did you have an understanding of

17   whether Mr. Darden Senior's stock was restricted or not?

18   A.  At this -- I do not believe so.

19   Q.  What did it mean for the stock to be restricted?

20   A.  Well, there is a lot of definitions of what it means to be

21   restricted.  But with Calvin Darden Senior being on the board

22   of these companies, there could be a vesting schedule to it.

23   It could be where he is not allowed to sell them while he is on

24   the board.  These could be restricted units in various

25   different ways, which means that the lender would not

Fbn6new1                      Wolf - direct

1   necessarily be able to value the value of the stock because if

2   the company did not do well, i.e., Maxim and the loan -- if the

3   loan was not repaid and they needed to go after the collateral,

4   then there was a possibility they couldn't go after this

5   collateral because it truly wasn't in Calvin Darden Senior's

6   net worth -- true net worth statement.

7   Q.  What real estate was Mr. Oboler referring to in this

8   e-mail?

9   A.  I believe --

10             MR. HARRIS:  Objection, your Honor.

11  A.  I believe primarily the Georgia house.

12             THE COURT:  Overruled.

13             Counsel, come to the side bar.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

Fbn6new1                      Wolf - direct

1              (At the side bar)

2              THE COURT:  It seems to me we're getting bogged down

3     in a lot of technicalities that seem to me to be, unless you

4     tell me otherwise, irrelevant.  For example, when you asked him

5     about what is restrictive stock.  And I am glad to say I

6     couldn't follow his answer, but maybe some wiser head could.

7     Who cares?

8              MS. PAUL:  It is important, your Honor.  The question

9     whether the stock is restricted is important in this case.

10             THE COURT:  Because?

11             MS. PAUL:  It was something that was material to these

12    lenders.  It turned out to be material to Melody Partners.

13             THE COURT:  He has already said he wouldn't have

14    entered into this deal but for Calvin Darden Senior.  So I

15    thought your position was that Calvin Darden Senior was

16    involved except as an advisor and Mr. Newkirk knew that.

17             MS. PAUL:  Yes, your Honor.  That is true.  I am happy

18    to move it along.

19             THE COURT:  All right.

20             (Continued on next page)

21

22

23

24

25

```
 1                  (In open court; jury present)
 2    BY MS. PAUL:
 3    Q.  Mr. Wolf, please turn to Government Exhibit 403.  Please
 4    take a look at that document and tell me if you recognize it.
 5    A.  Yes.
 6    Q.  What is it?
 7    A.  It is Harvey Newkirk responding to the Melody e-mail and my
 8    e-mail that he will try to respond to the diligence request and
 9    questions.
10    Q.  These are the questions from Mr. Oboler in the previous
11    document we looked at?
12    A.  Correct.
13    Q.  Who did you expect Mr. Newkirk to speak with in order to
14    answer those questions?
15                  MR. HARRIS:  Objection.
16                  THE COURT:  Overruled.
17    A.  Calvin Darden Senior.
18    Q.  Please look at Government Exhibit 405.  Let me know if you
19    recognize that document?
20    A.  Yes.
21    Q.  What is it?
22    A.  This is questions still being asked with respect to the
23    valuation of the real estate.  So questions on the collateral,
24    the valuation to the real estate and trying to get an
25    understanding of the restrictions of the shares -- the stock
```

1    shares of Cardinal, Coca-Cola and Target.

2    Q.  So focusing on your e-mail to Mr. Newkirk on the bottom

3    there, what were you asking him for?

4    A.  I am asking him for whether the collateral put up as shares

5    were restricted or not and asking him on the collateral

6    put-up -- the real estate collateral put-up whether there was

7    debt on it, i.e., a mortgage of some sort, and where did they

8    get the valuation.

9    Q.  Taking a look at Mr. Newkirk's response to you at the top

10   there.

11   A.  Yep.  He responded that the real estate was valued --

12   appraised at eight million with a mortgage of 1.8.  So net 6.2

13   million, and that he was going to pull together the rest of the

14   information on the stock and any other outstanding real estate.

15   Q.  And he states at the bottom of this e-mail, Mr. Darden is

16   pulling together the rest of the requested info in real estate

17   and stock.

18           Do you see that?

19   A.  Yes.

20   Q.  Do you know whether Mr. Newkirk ever spoke to Mr. Darden

21   Senior about pulling that information together?

22           MR. HARRIS:  Objection.

23   A.  I do --

24           THE WITNESS:  I didn't answer.

25           THE COURT:  No.

Fbn6new1                           Wolf - direct

1              Ground?

2                   MR. HARRIS:  Speculation, hearsay.

3                   THE COURT:  We don't know yet.  Contingently

4     overruled, but let's see what the next question and answer are.

5     Q.  Do you know whether Mr. Newkirk eve spoke to Mr. Darden

6     Senior about pulling that information together?

7     A.  I do not know.

8     Q.  Please take a look at Government Exhibit 407.  Do you

9     recognize that document?

10    A.  Yes.

11    Q.  What is it?

12    A.  It's an e-mail exchange between myself, Brad Reifler,

13    Harvey Newkirk and Calvin Darden Junior.

14    Q.  What is the date on this e-mail exchange?

15    A.  November 18th.

16    Q.  Focusing on Mr. Reifler's e-mail at the bottom there, he

17    indicates that there has been a delay in getting information

18    that should be readily available.  Was there in fact a delay in

19    getting information?

20    A.  Yes.

21    Q.  What information?

22    A.  On the collateral specifically to the shares and the

23    valuation of them and the restrictions.

24    Q.  Please take a look at Government Exhibit 408.  Do you

25    recognize that document?

Fbn6new1                    Wolf - direct

1    A.  Yes.

2    Q.  What is it?

3    A.  So this is a more Senior person at Melody Partners stepping

4    in and asking for more information on the collateral and this

5    is Harvey responding that he apologizes for the delay but

6    Calvin Darden Senior is having surgery and that he is working

7    on the accountant -- working with the Calvin Darden Senior's

8    accountant to send some information.  And the information that

9    is being asked is mainly on the shares but also in general some

10   questions with respect to Calvin Darden's personal net worth

11   statement on his assets and liabilities.

12   Q.  Do you know who Mr. Darden Senior's accountant was at this

13   time?

14   A.  No.

15   Q.  Did you ever get any information from that person?

16   A.  I don't recall.

17   Q.  Please take a look at Government Exhibit 410.

18        Do you recognize that document?

19   A.  Yes.

20   Q.  What is it?

21   A.  This is a e-mail from Harvey to Melody Partners giving them

22   more information on the shares via sending statements of --

23   from a Bank of America account, some sort of Coca-Cola

24   Enterprises Co. statement, a Cardinal Health care equity

25   statement and a Fidelity account.

Fbn6new1                        Wolf - direct

1    Q.   What is the date on this e-mail from Mr. Newkirk?

2    A.   November the 19th.

3    Q.   Turning to the first attachment to this e-mail, what is it?

4    What is that first document that is the attachment to

5    Mr. Newkirk's e-mail?

6    A.   It's a bank account statement from Bank of America of

7    Calvin Darden Senior.

8    Q.   For what month?

9    A.   For the period -- for the period of September 1st, 2013

10   through September 30th, 2013.

11   Q.   Please take a look at Government Exhibit 411.

12          Do you recognize that document?

13   A.   Yes.  This is a response from me to Harvey after the share

14   information.  This is now asking for real estate information.

15   Q.   What is the real estate information you were asking

16   Mr. Newkirk for here?

17   A.   On his primary home in Georgia and the vacation home in

18   Tennessee where the appraisals come from, where the mortgage --

19   how much is the mortgage.  And the reason this was asked was it

20   seemed that the valuation given was incredibly high versus some

21   of our own work we did.

22   Q.   Did Mr. Newkirk tell you that both of these homes of

23   Mr. Darden Senior were available to be pledged as collateral?

24   A.   Yes.

25   Q.   Please take a look at Government Exhibit 412.  Do you

Fbn6new1                          Wolf - direct

1    recognize that document?

2    A.  Yes.

3    Q.  What is it?

4    A.  It's me telling Harvey that the information provided -- I

5    was questioning whether it was concise and whether it was even

6    accurate.

7    Q.  Why were you questioning that?

8    A.  Because -- because how it came back to us in just broad

9    based statements didn't really answer the questions of how you

10   can value the shares, what was restrictive, what wasn't.  It

11   was relatively disjointed.

12   Q.  What is the date of your e-mail here?

13   A.  November the 19th.

14   Q.  You write in this e-mail, Honestly this is ridiculous.  We

15   don't know the collateral.

16        What do you mean by that?

17   A.  Well, at inception what was always being offered was the

18   collateral -- really a personnel guarantee and all the

19   collateral under Cal Darden Senior's estate, which includes

20   shares, stock, real estate, insurance policy.  So the idea they

21   were offering this up as the collateral for a loan and we're

22   still now a week plus into not knowing what the collateral was,

23   that seemed off-market to how deals are being done.  Usually if

24   you are offering collateral, you would know the collateral.

25   Q.  Please take a look at Government Exhibit 413.

1          Do you recognize that document?

2   A.  Yes.

3   Q.  What is it.

4   A.  It's me challenging the real estate valuation by asking,

5   Has any appraiser made this valuation.

6   Q.  Please turn to --

7          MR. HARRIS:  Objection.

8          MS. PAUL:  -- page 2 of the document.

9          MR. HARRIS:  I think it misstates the document.

10         It is 413; right?

11         MS. PAUL:  413.

12         MR. HARRIS:  Your Honor I think he just misspoke is

13   all.  I can clean it up on cross.

14         THE COURT:  I am sorry.  Forgive me.

15         Sustained.

16         MS. PAUL:  Can we turn to the bottom e-mail of the

17   first page for Mr. Newkirk.  It continues on to page 2.

18   Q.  What is the information that Mr. Newkirk --

19   A.  Sorry.  What section?

20   Q.  Sorry.  Page 2 of Exhibit 413.

21   A.  Okay.

22   Q.  What information is Mr. Newkirk providing to you here?

23   A.  He is providing to us information on the primary home in

24   Georgia of Calvin Darden Senior.

25         (Continued on next page)

1    BY MS. PAUL:

2    Q.  Looking at the top email on page 1 there, what's

3    Mr. Reifler's response?

4    A.  It wasn't my response; it was Brad asking if any appraiser

5    has made this valuation.

6    Q.  And can you turn to Government Exhibit 414.  Do you

7    recognize that document?

8    A.  414?  Hang on a second.

9            Yes, I recognize it.

10   Q.  What is it?

11   A.  It's an email from me to Harvey and Cal, Jr. giving an

12   action plan to keep -- giving an action plan to keep the term

13   sheet from Melody Partners and our deal transaction ongoing.

14   Q.  What's the date of your email?

15   A.  November 21.

16   Q.  You asked Mr. Newkirk in this email to send you accurate

17   information on Mr. Darden's, Sr.'s personal wealth.  Do you see

18   that?

19   A.  Yes.

20   Q.  Why did you ask him for that?

21   A.  Because that was the collateral that was being used for the

22   lien on the loan.

23   Q.  And you also make a reference in your email to the amount

24   of equity that Calvin is putting into Maxim.  Do you see that?

25   A.  Yes.

1   Q.  Did Mr. Newkirk tell you that Mr. Darden, Sr. was putting

2   his own money into the Maxim acquisition?

3   A.  I don't recall.

4   Q.  Please turn to Government Exhibit 415.

5           Do you recognize that document?

6   A.  Yes.

7   Q.  What is it?

8   A.  This is an answer from Harvey Newkirk to the Melody Group

9   and others representing what the stock actually is.

10  Q.  What's the date on Mr. Newkirk's email?

11  A.  November 21st.

12  Q.  And what information is Mr. Newkirk providing to you here?

13  A.  He is providing the amount of shares that Cal Darden, Sr.

14  has in Coca-Cola, Target, and Cardinal Health.  He is agreeing

15  that they would have a first recourse on Maxim and its assets,

16  and that there would be a pledge agreement since some of these

17  shares are restricted units.

18  Q.  What's the pledge agreement that Mr. Newkirk describes

19  here?

20  A.  A springing pledge with power of attorney.

21  Q.  There is a reference here to resignation from the board of

22  one or more companies to trigger release of the restrictions.

23  Do you see that?

24  A.  Yes.

25  Q.  Did Mr. Newkirk tell you that Mr. Darden, Sr. had agreed to

1      resign from the boards of these companies to trigger the

2      release of the restrictions?

3      A.   That's what this email states.

4                MR. HARRIS:  Objection; it's nonresponsive.

5                THE COURT:  Sustained.

6      BY MS. PAUL:

7      Q.   What did Mr. Newkirk say here in his email about the value

8      of Mr. Darden, Sr.'s real estate?

9      A.   That the value of the real estate was 5.75 million and that

10     there was a mortgage of 1.8 million, which would -- I'm not

11     sure if that value was gross or net but we would assume that

12     therefore the net value would be 3 million 950, if I did the

13     math right.

14     Q.   How does this differ, if at all, from what Mr. Newkirk told

15     you previously about the value of the real estate?

16     A.   I believe at the inception there was a value of something

17     like 10 million, then it moved from 8 million with a 1.8 loan

18     so that became 6.2 net.  This one was 3 million 950 net, so it

19     continued to go down.

20     Q.   Apart from this email, do you recall whether, based on your

21     conversations with Mr. Newkirk, you understood that

22     Mr. Darden, Sr. had agreed to resign from the boards of these

23     companies?

24     A.   Based on this email, it states that he would resign if they

25     needed to take the collateral, take the stock as collateral.

1    Q.   Ultimately --

2    A.   I'm sorry, to make the stock unrestricted.

3    Q.   And ultimately, did Melody Partners lend money to the Maxim

4    deal?

5    A.   No.

6    Q.   Please take a look at Government Exhibit 416.

7         Do you recognize that document?

8    A.   Yes.

9    Q.   What is it?

10   A.   Me asking permission to show two other possible lenders

11   and/or buyers for the Maxim deal.

12   Q.   What's the date on your email here?

13   A.   November the 22nd.

14   Q.   Who are you asking for permission to send management

15   presentations to?

16   A.   Shane McMahon and Suhail Rizvi.

17   Q.   What happened with Suhail Rizvi?

18   A.   They passed.

19   Q.   With respect to Shane McMahon, did he express an interest

20   in the deal?

21   A.   Yes.

22   Q.   Did negotiations with Mr. McMahon commence?

23   A.   Yes.

24   Q.   Please take a look at Government Exhibit 417.

25        Do you recognize that document?

1    A.  Yes.

2    Q.  What is it?

3    A.  This is me forwarding -- this is me reforwarding the email

4    I received from Harvey back to him, questioning the stock

5    amounts to the statements.

6    Q.  What's the date on this email exchange?

7    A.  Well, the exchange is December the 1st.

8    Q.  Taking a look at the bottom email on page 1, which is from

9    you to Mr. Newkirk, why did you send this email to Mr. Newkirk?

10   A.  I was asking him to confirm the accuracy of the holding,

11   the stockholdings, as well as the value because they were

12   different, the statements were different than his email, which

13   was different than previous statements.

14   Q.  Please turn to the next page of the document.

15           MS. PAUL:  If we could have that up.  Actually, the

16   next page after that.

17   A.  Are we talking 419?

18   Q.  No, same document, same document.

19   A.  What page?

20   Q.  417.

21   A.  417?  Okay, what page?

22   Q.  It's up on your screen as well.

23   A.  I know.  I can't go back.  What page?

24   Q.  The third page of the document.

25           Is this the information from Mr. Newkirk that you were

1    asking him to confirm the accuracy of?

2    A.  Yes.

3    Q.  For what purpose?

4    A.  Because when I was going to have discussions with them,

5    with Shane McMahon on the possibility of participating in the

6    transaction and it was -- the loan was predicated on a first

7    lien of Cal Darden, Sr.'s net worth, I wanted to -- and a

8    disproportion amount of that net worth came from the real

9    estate and the three companies' stock shares, I wanted to make

10   sure that I understood the value and how they were getting it.

11   Q.  So please go back to the first page of the document.

12   Looking at the top email from you, do you see that?

13   A.  Yes.

14   Q.  Do you recall how you got a copy of Cal Darden's, Sr.'s

15   financial statement?

16   A.  Yes.

17   Q.  I believe --

18              MR. HARRIS:  Objection.

19              THE COURT:  Ground?

20              MR. HARRIS:  Speculation, belief.

21              THE COURT:  No, I think that's a common form of

22   speech.  We will see what he says and the substance and then I

23   will rule but I am not sure he's suggesting uncertainty but

24   we'll see.

25              MR. HARRIS:  Thank you, your Honor.

1            THE WITNESS:  I believe the original statement was

2     given to me by Forefront.  When I discussed being involved in

3     the deal, I believe they sent it to me.

4            THE COURT:  So when you say, "I believe," are you

5     saying you have an actual memory of that?  Are you saying

6     that's your best construction of the events?  What are you

7     saying when you use the term "I believe" there?

8            THE WITNESS:  A very high probability.

9            THE COURT:  Okay.

10           Overruled.

11           MR. HARRIS:  Thank you, your Honor.

12    BY MS. PAUL:

13    Q.  In your email here, what did you mean when you wrote that

14    the stock amounts listed below did not align with the

15    statement?

16    A.  That the financial statement that we were using for Cal

17    Darden, Sr.'s net worth had a value of a stockholdings that was

18    not the same as the value of these stockholdings.

19    Q.  When you're referring to the stock amounts listed below,

20    are those the stock amounts listed by Mr. Newkirk in the below

21    email?

22    A.  Yes.

23    Q.  Based on the personal financial statement that you were

24    provided for Mr. Darden, Sr., what did you believe

25    Mr. Darden, Sr.'s net worth to be?

1    A.  I would have to go back to the original statement.

2    Q.  Take a look at the statement, which is the attachment to

3    this email, and specifically, page 1 of this statement.

4    A.  Page 1?

5    Q.  Of the attachment.

6    A.  Is that page 6 of my book?

7    Q.  Yes.

8    A.  Can you repeat the question?

9    Q.  Yes.  Based on the personal financial statement, what did

10   you believe Mr. Darden, Sr.'s net worth to be?

11   A.  56,419,000.

12   Q.  Please turn now to Government Exhibit 419.

13           Do you recognize that document?

14   A.  What's the question?

15   Q.  Do you recognize that document?

16   A.  Yes.

17   Q.  What is it?

18   A.  It's an exchange between myself and Harvey Newkirk and

19   others cc'd, getting an understanding of the stock shares and

20   how to value them based on being restricted, deferred,

21   restricted units.

22   Q.  Focusing on the bottom email on page 1 from you, dated

23   December 1st, 2013, what were you asking Mr. Newkirk to confirm

24   here?

25   A.  I was asking Harvey to confirm that if the loan was -- if

1   the loan defaulted, was it still accurate that the lender would

2   have access to the stock collateral.

3   Q.  Looking at the top email on the first page, the email from

4   Mr. Newkirk dated December 1st, 2013, how did he respond?

5   A.  He responded, yes, it was still accurate.

6   Q.  Please take a look at Government Exhibit 420.  Do you

7   recognize that document?

8   A.  Yes.

9   Q.  What is it?

10  A.  It is me forwarding Harvey Newkirk's email on the

11  collateral and the explanation of the types of shares and the

12  valuation of the Atlanta home, to Shane McMahon.

13  Q.  On what date?

14  A.  December the 1st.

15  Q.  When you say you're forwarding Mr. Newkirk's email, what do

16  you mean?

17  A.  Meaning I took the information from Harvey, I cut and

18  pasted it, and I sent it to Shane.  I guess I wouldn't use the

19  word "forward."

20  Q.  In your email here, you make a specific reference at the

21  beginning to Mr. Newkirk being Calvin Darden, Sr.'s attorney.

22  Do you see that?

23  A.  Yes.

24  Q.  Why did you do that?

25  A.  Because when I brought the deal to Shane McMahon, I was

1   very clear that his counterparty would be Cal Darden, Sr., that

2   it would be Cal Darden, Sr.'s collateral on the loan, that his

3   partner, if they proceeded on this transaction and decided to

4   proceed on a minority -- Calvin's channel, that it would be Cal

5   Darden, Sr., and I wanted just to reiterate that his partner

6   was not going to be Cal Darden, Jr., based on prior

7   conversations of it being very transparent of Cal Darden, Jr.'s

8   past deal.

9   Q.  Did Mr. Newkirk ever tell you that he was not

10  Mr. Darden, Sr.'s attorney?

11  A.  No.

12  Q.  Was there any point in time when you did not think

13  Mr. Newkirk was representing Mr. Darden, Sr.?

14  A.  No.

15  Q.  Please take a look at Government Exhibit 423.

16          Do you recognize that document?

17  A.  Yes.

18  Q.  What is it?

19  A.  This is an email going to Shane McMahon and his lawyers at

20  K&L Gates, giving him more information on the collateral of Cal

21  Darden, Sr.

22  Q.  And the email at the top there, if we could focus on that,

23  for Mr. Newkirk, do you see that?

24  A.  Yes, I do.

25  Q.  What's the date on that email?

1   A.   December the 10th.

2   Q.   What did Mr. Newkirk tell you in this email regarding

3   collateralizing the loan?

4   A.   He was telling the possible lender, Shane McMahon, and his

5   legal team that the loan collateral would be the personal

6   guarantee of Cal Darden, Sr., and in the agreement, if there

7   was a loan default, that they would sell the shares and/or Cal

8   Darden, Sr. would resign from the board to be able to sell the

9   shares, there would be a pledge agreement that would allow

10  restrictions of these shares to go to -- I'm not sure at that

11  time if it was a trust account but an account that would

12  eventually end up being to the lender, Shane McMahon, and that

13  if Cal Darden, Sr. did any sales of the stock between the time

14  of the close and anytime thereafter, that the value, the

15  proceeds of that stock would go into a separate account.  And

16  six is, affidavit and confession of judgment will be in place

17  in the event of a default.

18  Q.   What's the reference to the power of attorney there, number

19  5?

20  A.   Oh, I'm sorry, the power of attorney will be granted to the

21  lender, meaning that he would be able to have the right to sell

22  shares if needed.

23  Q.   Please take a look at Government Exhibit 424.

24       Do you recognize that document?

25  A.   Yes.

FBNKNEW2                          Wolf - direct

1    Q.   What is it?

2    A.   This is me asking Harvey where we stand as he was

3    negotiating and having conversations directly with K&L Gates.

4    Q.   Looking at the top email from Mr. Newkirk here, what is the

5    date on this?

6    A.   December 23.

7    Q.   What is Mr. Newkirk say in this email?

8    A.   That Shane McMahon, the lender, has agreed on all the items

9    except for two, and that once they provide the statements,

10   they're willing to put money in escrow, and that they would be

11   able to tell Alpha Media, the owner of Maxim, that they're

12   ready to close and they would be able to put the money in

13   escrow.

14   Q.   Please take a look at Government Exhibit 425.

15            Do you recognize that document?

16   A.   Yes.

17   Q.   What is it?

18   A.   It's exchanges between myself and Harvey and Cal

19   Darden, Jr. and Shane McMahon and his lawyers and Forefront on

20   the possibility of the transaction continuing between Cal

21   Darden, Sr. and Shane McMahon.

22   Q.   Cal Darden -- and Shane McMahon.

23            Focusing on the email on the top there from you, do

24   you see that?  On the top of the first page.

25   A.   Yes.

1   Q.   What's the date of the email from you?

2   A.   December 28th.

3   Q.   You write in your email, "Assume the below is not new to

4   Harvey nor Calvin.  Shane is also asking that Calvin, Sr., with

5   the appropriate witnesses, sign the personal guarantee and the

6   power of attorney."

7            What were you referring to there?

8   A.   Shane and his group was asking for a witness to see Cal

9   Darden, Sr. sign the document of his personal guarantee as well

10  as the power of attorney.  And I'm not exactly sure what the

11  power of attorney is referencing, which part of the deal.

12  Q.   Did Mr. Newkirk tell you that Mr. Darden, Sr. was willing

13  to sign the personal guarantee?

14  A.   Yes.  All along, that was the deal.

15  Q.   Please take a look at Government Exhibit 427.

16           Do you recognize that document?

17  A.   Yes.

18  Q.   What is it?

19  A.   Well, the attachment is a closing checklist between Shane

20  McMahon and Darden Media, and it assigns actionable plans.

21  Q.   What's the cover email here?

22  A.   The cover email is an email from Shane McMahon to the

23  group -- Harvey, K&L Gates, Forefront -- and saying that if the

24  other buyer who came in, if their deal fell through, once the

25  exclusivity period is over, i.e., Shane would like to -- Shane

FBNKNEW2                          Wolf - direct

1   and Darden Media would like to go back to try to consummate

2   this deal and this was the closing action plan.

3   Q.  So what's the date of this email from Mr. McMahon?

4   A.  January the 7th.

5   Q.  What was happening with the deal at this point?

6   A.  The original seller, Alpha Media, theoretically, we called

7   it, pulled the deal from Darden Media, being the buyer, gave it

8   to another possible buyer called the Infinity Group.  The

9   Infinity Group had a period of exclusivity to consummate the

10  deal.  And during this time period, K&L Gates or Shane and

11  Darden were continuing to peripherally keep this deal in the

12  mix.  In case the exclusivity period ended, they would try to

13  jump in and resurrect the deal.

14  Q.  So were you still hoping to have an opportunity to close

15  the deal?

16  A.  Yes, I would say there's always -- until the deal is

17  closed, there's always an opportunity.

18  Q.  Was Mr. Newkirk, to your observation, still working to

19  close the deal?

20  A.  I would say all parties were peripherally still involved to

21  close the deal but at that point it was not as -- the same

22  rapid pace we had before.

23  Q.  Please take a look at Government Exhibit 428.

24          THE COURT:  Counsel, come to the sidebar.

25          (Continued on next page)

FBNKNEW2                          Wolf – direct

1              (At the sidebar)

2              THE COURT:  How much more do you have on your direct?

3              MS. PAUL:  Not much more; 10, 15 minutes.

4              THE COURT:  Fifteen minutes is the max.

5              MS. PAUL:  Okay.  Thank you, your Honor.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (In open court)

2    BY MS. PAUL:

3    Q.   Please turn to Government Exhibit 428.

4         Do you recognize that document?

5    A.   Yes.

6    Q.   What is it?

7    A.   This is an exchange between Harvey and Shane and his

8    lawyers.

9    Q.   What date is the email from Mr. Newkirk?

10   A.   January 11th.

11   Q.   By January 11th, did you still believe that Mr. Darden, Sr.

12   was willing to put up collateral to secure this loan?

13   A.   Yes.

14   Q.   Had Mr. Newkirk told you anything to the contrary?

15   A.   No.

16   Q.   Please take a look at Government Exhibit 429.  Focusing

17   just on the email at the top, which is from you, do you

18   recognize that email?

19   A.   Oh, yes, sorry, yes.

20   Q.   What is it?

21   A.   It's an email from me to a senior lawyer at Bryan Cave.

22   Q.   Is that Jay Dorman?

23   A.   Correct.

24   Q.   What's the date of your email?

25   A.   February the 6th.

1   Q.  Of February 2014?

2   A.  Yes.

3   Q.  Why did you send this email to Mr. Dorman?

4   A.  Say it again, the question.

5   Q.  Why did you send this email to Mr. Dorman?

6   A.  Because I was very concerned that this whole deal -- this

7   deal did not make sense for Cal, Sr. to proceed unless he was

8   actively engaged.  That was one part.  The other part was that

9   although the price of the acquisition was originally in the

10  30-plus million range, that I still think the seller would

11  possibly entertain a price in the 25 million range.

12  Q.  Why did you reach out to Mr. Dorman in particular?

13  A.  Because I don't believe Harvey was doing a good job at this

14  point for his client.

15  Q.  You state in your email, "We have not been able to validate

16  Cal, Sr.'s financial statement."  What did you mean by that?

17  A.  Meaning to this date, which is near three months later, we

18  were still not able to validate Cal Darden's financial

19  statement, the value of the stock, the value of the real

20  estate, the life insurance policy, actually most of the things

21  on it.

22  Q.  You also ask in your email why Mr. Darden, Sr. would let

23  this unravel if he understood the risk v. reward scenario by

24  not willing to even have a phone call with the McMahon side.

25  What did you mean by that?

A.   That the McMahons would not proceed unless that they

started to engage directly with Cal Darden, Sr., it seemed

unconscionable to me that Cal Darden sooner would let this deal

unravel when he had his life savings and his reputation on the

deal of this -- if it did not close, it just seemed to be

common sense.

Q.   And you also wrote at the bottom, "Everyone except Cal, Jr.

and Harvey are questioning the logic and/or knowledge of

Cal, Sr."

        What did you mean by that?

A.   It seemed incredibly illogical to me that Cal Darden, Sr.,

who was personally guaranteeing everything on this deal, would

not want to engage in it at least at this point, if not before.

Q.   Finally, you write, "I highly recommend that you and Harvey

are comfortable with all aspects and representations made in

this deal and that Cal, Sr. understands his risk."

        Why did you write that?

A.   Because I ran a firm in my past experience and had

supervisory overall risk and reputational issues while I was

president of the UBS investment bank, and I wanted to make sure

that Jay, as a senior person at his firm, understood that this

deal seemed incredibly strange to me, at the point of starting

not to make sense, and I wasn't sure if they were giving good

representation to their client and I wanted to give them my

feeling --

1              MR. HARRIS:  Objection.

2              THE COURT:  Sustained.

3    Q.  Please take a look at Government Exhibit 430.  Focusing

4    just on the top email from you to Mr. Newkirk, dated

5    February 7, 2014, do you see that?

6    A.  I see it.

7    Q.  Why did you send this email?

8    A.  Let me read it.

9              Well, there's a lot of things I said in this email.

10   What's the question?

11   Q.  Why did you send this email?

12   A.  I sent this email to -- since I was not going to fly in for

13   a meeting, that I could not confirm whether it would or would

14   not be held, that I thought I would give a synopsis of the

15   deal, my concerns, reiterate, you know, how this all began and

16   how it's unraveled.

17   Q.  Do you summarize in this email a call that you had with

18   Mr. Newkirk?

19   A.  Yes.

20   Q.  And you made reference to a meeting that you couldn't

21   confirm.  What are you referring to?

22   A.  So I was in Las Vegas giving a speech and I was willing to

23   fly in on the -- I believe it may have been the red

24   eye/overnight flight to get back to a meeting if Cal, Sr., Cal

25   Darden, Sr., was going to be able to attend.  That would

1    include Harvey, Jay, Shane McMahon, his lawyers, Cal

2    Darden, Sr. and myself.

3    Q.  What happened with the meeting?

4    A.  It never prevailed.

5    Q.  Just focusing on your email here, you write in this email,

6    "All parties are astonished that Mr. Darden, Sr. has been be a

7    wallflower in this deal, at least to most of us."  What did you

8    mean by that?

9            MR. HARRIS:  Objection; speaks for itself.

10           THE COURT:  Sustained.

11   Q.  Please take a look at Government Exhibit 432.  Just

12   focusing on the email from you to Mr. Dorman dated February 8th

13   of 2014, do you see that?

14   A.  Yes.

15   Q.  Briefly, why did you send this email to Mr. Dorman?

16   A.  I wanted to be clear to Jay as what I thought he was a

17   supervisor of Harvey --

18           MR. HARRIS:  Objection.

19           THE COURT:  Hang on.

20           Overruled.

21   Q.  So, please continue.

22   A.  I wanted to be clear to Jay, as I thought he was a

23   supervisor to Harvey, that he needs to understand the facts of

24   this deal and the concerns I have, how Harvey represented his

25   client, Cal Darden, Sr., and what has been wrong with this deal

1    from inception, and now that it's over, it felt like to me that

2    things were not done in a kosher fashion.

3              MR. HARRIS:  Objection.

4              THE COURT:  Overruled.

5    BY MS. PAUL:

6    Q.  Did you lay out the facts of this deal and your concerns

7    here for Mr. Dorman?

8    A.  I laid out the facts of the deal from my perspective and

9    everything that went wrong with this deal all along, yes.

10   Q.  Had Shane McMahon pulled out of the deal at this point?

11   A.  Yes.

12   Q.  I'd like you just to focus for a moment towards the bottom

13   of the email.

14   A.  Page 1 or 2?

15   Q.  On the first page there, where it says, "(C)  Validity of

16   doctor's note of Cal, Sr.'s health."  Do you see that?

17   A.  Yes.

18   Q.  And what, if anything, did Mr. Newkirk tell you about

19   Mr. Darden, Sr.'s health during the course of this deal?

20   A.  I don't recall whether it was actually Harvey that told me

21   or not, but it was clear that it came back to me --

22             MR. HARRIS:  Objection.

23             THE COURT:  Sustained.

24   Q.  Just focusing back on the entire email again, do you list

25   in this email the reasons why it had been your understanding

FBNKNEW2                    Wolf - cross

1   Mr. McMahon was pulled from the deal?

2   A.  Yes.

3   Q.  And when you wrote in this email -- I believe it's on page

4   2, if we can go to that, yes, at the bottom there -- when you

5   wrote, "The way this deal has been run by Harvey and Cal, Jr.

6   has not made much sense to me," what did you mean by that?

7          MR. HARRIS:  Objection; speaks for itself.

8          THE COURT:  Sustained.

9          MS. PAUL:  One moment, your Honor?

10         No further questions.

11         THE COURT:  Cross-examination?

12         MR. HARRIS:  Thank you, your Honor.

13  CROSS-EXAMINATION

14  BY MR. HARRIS:

15  Q.  Good morning, Mr. Wolf.  My name is Jonathan Harris.  I

16  represent Harvey Newkirk.  We met briefly outside last week and

17  again today, correct?

18  A.  Yes.

19  Q.  Am I correct, Mr. Wolf, that your role in the transaction

20  was as an advisor to Forefront?

21  A.  I'm not sure I would use the word "advisor."

22  Q.  Subadvisor?

23  A.  Subadvisor, subcontractor.

24  Q.  And how would you describe that role?

25  A.  That if -- since this was a broker-dealer transaction, that

FBNKNEW2                      Wolf - cross

if I was able to bring in a possible lender and/or partner for
the deal, that I would be paid, as would Forefront be paid, for
bringing in a transaction to close.

Q.  You testified that you're currently CEO of 32 Advisors,
correct?

A.  Correct.

Q.  And that's a firm you founded after leaving UBS?

A.  Yes.

Q.  And in your last -- you briefly mentioned -- at your last
position at UBS, you were chairman and CEO of UBS Americas,
correct?

A.  Correct.

Q.  At UBS, that position put you in charge of some 24,000
employees?

A.  I would say put in charge in quotes, but, yes, roughly in
the Americas, I think there may have been 27,000 employees, but
my day-to-day role was more as president of the investment
bank, which was the global investment bank in 30-plus
countries.

Q.  In 2013, you were named as one of the most, as one of the
hundred most powerful people in finance by Worth Magazine; is
that right?

A.  Yes.

Q.  And it's fair to say you've done many deals in your career?

A.  Yes.

FBNKNEW2                    Wolf - cross

1  Q.  This deal, you were brought into by Brad Reifler, the head

2  of Forefront, correct?

3  A.  I wouldn't say brought in; I would say that I offered to

4  participate if I could find a buyer.  I thought the asset Maxim

5  was a quite fascinating asset and I thought that I would have,

6  based on my network, a bunch of people who may be interested in

7  buying it or lending to it.

8  Q.  And you thought Maxim had -- the potential acquisition of

9  Maxim presented a business opportunity potential up side for

10 people you were bringing the deal to, right?

11 A.  Yes.

12 Q.  And Forefront was an advisor to the Dardens, correct?

13 A.  I don't know the exact relationship between Forefront and

14 the Dardens.

15 Q.  Do you know if Forefront was acting was as the Dardens'

16 bankers in the deal?

17           MS. PAUL:  Objection; relevance.

18           THE COURT:  Well, overruled on relevance but

19 sustained, given the previous answer.  In effect, it was

20 answered.  Sustained.

21 BY MR. HARRIS:

22 Q.  Do you know who the bankers were for the Dardens in the

23 deal?

24 A.  When you use the word "bankers," if you're asking me -- can

25 I phrase it how I would in my business?

1   Q.  Sure.

2   A.  I would say that Forefront was a broker-dealer on a

3   possible transaction financing Dardens on the acquisition of

4   Maxim.

5   Q.  Do you know if Forefront gave a commitment letter for

6   $31 million on this acquisition?

7   A.  I am not aware of that.

8   Q.  In addition to Mr. Reifler, did you also work with Mr. Alan

9   Feldman from Forefront on this deal?

10  A.  Yes.

11  Q.  Also a Chris Thomas?

12  A.  That name doesn't ring a bell.

13  Q.  You testified that in your role as, and I will use the word

14  "subadvisor" of Forefront, you introduced the Maxim deal to

15  some of your contacts.  Does that summarize your testimony?

16  A.  Yes.

17  Q.  And you also testified --

18  A.  And I would use the word "subcontractor," not "subadvisor."

19  I think it's a little different.  I wasn't advising Forefront;

20  I was advising possible buyers from my network.

21  Q.  So you did not view yourself as representing the Dardens,

22  you viewed yourself as representing the folks to whom you

23  introduced the Dardens; is that right?

24  A.  I would say that my engagement was if I could help bring a

25  deal together, then I would be paid by Forefront Capital for

1    helping them get financing, but my view was to try to do --

2    bring a deal together.

3    Q.  Am I right that had the deal gone through, you were going

4    to receive performance warrants for 1.5 percent of the

5    acquiring company?

6    A.  I don't recall exactly what I would receive, but if the

7    deal went through, because there was limited cash available, I

8    would have taken warrants as compensation, correct.

9    Q.  And that's warrants in the company making the acquisition?

10   A.  No, that would have been warrants on the end company.

11   Q.  Yes, the company that ended up owning Maxim?

12   A.  Correct.

13   Q.  That's what I'm --

14   A.  Yes, whatever that final company was, I would have had

15   warrants in that company, which would have been, my guess,

16   called Maxim.

17   Q.  And you also had a verbal commitment from Shane McMahon and

18   Calvin Darden, Jr. that you would have received an advisory

19   contract for $30,000 a month?

20   A.  Yes, if the deal was to proceed, it was clear that Shane

21   would have wanted me involved because of my financial

22   capability, to help them during a period of time when they were

23   having what I would say is a restructuring of the company.

24   Q.  And you were not personally -- can you please explain for

25   the jury what warrants are in a company?

1  A.  Warrants are literally the ability to buy stock in a

2  company by exercising at some amount, usually less than where

3  the stock would be trading in the public market, the ability to

4  buy shares in the company at some future date.

5  Q.  And you did not personally loan any money or provide any

6  financing in this transaction, correct?

7  A.  Correct.

8  Q.  And neither did your company, 32 Advisors, right?

9  A.  Correct.

10  Q.  You answered a lot of questions about Harvey Newkirk

11  before.  Did you ever meet Harvey Newkirk?

12  A.  No.

13  Q.  Today in this courtroom is the first time you're ever

14  seeing Harvey Newkirk?

15  A.  I don't even know if I'm seeing him today.

16  Q.  Okay.

17        Mr. Newkirk -- I want to be very precise on this, I'm

18  going to look at the documents, but I'm going to be very

19  precise.  We talked about pledges of shares --

20        THE COURT:  Counsel, put a question.

21        MR. HARRIS:  Thank you.

22  Q.  Mr. Newkirk was not pledging any stock; is that correct?

23  A.  No.

24  Q.  Mr. Newkirk was not borrowing any money, correct?

25  A.  I have no idea.

FBNKNEW2                    Wolf - cross

1   Q.  Mr. Newkirk was not giving any guarantees, correct?

2          MS. PAUL:  Objection; relevance.

3          THE WITNESS:  Are we -- I don't know --

4          THE COURT:  Wait, wait, wait.  When there's an

5   objection, you have to wait, sir.

6          THE WITNESS:  Oh, I'm sorry.

7          THE COURT:  Well, overruled on relevance grounds but I

8   think, Counsel, you should confine yourself on these questions

9   to those where you have any reasonable belief to know that he

10  would know the answer to those questions.

11  BY MR. HARRIS:

12  Q.  Mr. Wolf, in the deal that was being contemplated with the

13  McMahons, that required Calvin Darden, Sr. to give guarantees,

14  correct?

15  A.  Correct.

16  Q.  It required Calvin Darden, Sr. to pledge stock, correct?

17  A.  Correct.

18  Q.  It did not require Mr. Newkirk to pledge any of his stock,

19  did it?

20  A.  Not to my knowledge.

21  Q.  It did not require Mr. Newkirk to give any guarantees,

22  correct?

23  A.  No.

24  Q.  I'm going to show you some exhibits that the government has

25  shown you.  Do you have that book still?

FBNKNEW2                    Wolf - cross

1   A.  Yes, I do.

2          MR. HARRIS:  Could we please put up Government Exhibit

3   402.  Could we please flip to the second page of Government

4   Exhibit 402.

5   Q.  Do you recall the government asked you some questions about

6   an indicative term sheet and an indicative counter?

7   A.  Yes.

8   Q.  On this page 2, it is you who are providing the indicative

9   counter to the folks at Melody, correct?

10  A.  Yes.

11  Q.  And then at the top of page 402 --

12         MR. HARRIS:  Page 1, please.

13  Q.  What has happened, am I correct that Melody has asked for

14  some due diligence information?  Correct?

15  A.  Correct.

16  Q.  And they want to understand the real estate and the stock?

17  A.  Correct.

18  Q.  And you're saying, "Harvey, please try to respond to

19  diligence questions below since it is critical," correct?

20  A.  Correct.

21  Q.  And you've also copied Brad Reifler of Forefront on that,

22  correct?

23  A.  Correct.

24  Q.  Do you know what role, if any, Mr. Reifler played in doing

25  the due diligence?

1    A.  Repeat that, please.

2    Q.  Do you know what role Forefront had in doing due diligence?

3    A.  No.

4    Q.  Mr. Wolf, when this deal was being done, were you

5    physically housed -- were you still physically housed in

6    Forefront's offices?

7    A.  Yes.

8    Q.  You discussed this on direct.  Melody was not going to make

9    any loan, am I correct, until it was satisfied as to its due

10   diligence on the underlying collateral, correct?

11   A.  Correct.

12   Q.  If we could just turn very quickly to Government Exhibit

13   404, just look at the front page.

14   A.  I don't believe I have a 404.  I have a 403 and a 405.

15           MR. HARRIS:  404 is in evidence, so if it could please

16   be put up.

17           May I approach, your Honor?

18           THE COURT:  Yes.

19           THE WITNESS:  Thank you.

20   BY MR. HARRIS:

21   Q.  This is an email from yourself to Mr. Newkirk saying,

22   "Still needed whether there are any restrictions on the shares

23   and the valuation and debt information on the real estate

24   portfolio.  These are the two most important pieces for

25   Melody's underwriting."

FBNKNEW2                    Wolf - cross

1              Is that right?

2   A.  Correct.

3   Q.  If we could turn to 405, please, do you have that one,

4   Mr. Wolf?

5   A.  I do.

6              MR. HARRIS:  Can we put that up, please.

7   Q.  At 405, that is Mr. Newkirk -- we saw this before --

8   Mr. Newkirk provides you some information on the residents,

9   right?

10  A.  Yes.

11  Q.  And the real estate and he says, "Mr. Darden is pulling

12  together the rest of the requested info re real estate and

13  stock," right?

14  A.  Correct.

15              (Continued on next page)

16

17

18

19

20

21

22

23

24

25

Fbn6new3                    Wolf – cross

1    BY MR. HARRIS:

2    Q.  So Mr. Newkirk is telling you he is getting the stock

3    information from his client; correct?

4    A.  Correct.

5    Q.  And then please skip to Exhibit 410.

6    A.  Excuse me, 410?

7    Q.  Yes.  Please skip to 410, please.

8            You were shown this exhibit by the government;

9    correct?

10   A.  Correct.

11   Q.  And this is Mr. Newkirk saying, Attached for your review,

12   please find the following statements and summaries, which I

13   have been provided; correct?  That is on page 1.

14   A.  Correct.

15   Q.  Mr. Newkirk is saying this has been provided to me, right,

16   this information?

17   A.  That is what the e-mail states.

18   Q.  Can we look at Exhibit 409.

19   A.  What?  I am sorry.

20   Q.  Actually can we go back to 410, please.  I apologize.

21   A.  I don't have 409.

22   Q.  Can we go back to 409.

23   A.  To what?

24   Q.  Can we go back to 410?

25   A.  410.

Fbn6new3                          Wolf - cross

1    Q.  And then what Harvey Newkirk wrote after that was, Please

2    note the following:  The Bank of America statement included

3    81,420 shares of Coca-Cola.

4           And then it talks about there is 34,640 DSUs that are

5    not listed; correct?

6    A.  Correct.

7    Q.  Can we look at 409?

8    A.  I don't have 409.

9    Q.  It is in evidence.  I will give you my copy.

10   A.  Okay.  Thank you.

11   Q.  409, this is an e-mail at 4:17 p.m. from Bradley Reifler of

12   Forefront to you saying, The bank of America statement includes

13   81,420 shares of Coca-Cola that is duplicated in the Coca-Cola

14   statement, and that there are 34,654 Coca-Cola shares not

15   listed on the Bank of America statement, and then more

16   diligence is being done on the Cardinal Health shares; correct?

17   A.  Yes.

18   Q.  That is coming from Brad Reifler.

19          Then up above that at 4:36 p.m. on the 19th Brad

20   Reifler writes to Harvey Newkirk, Can you write or copy

21   something similar and send to all, please?

22          Do you see that?

23   A.  I do.

24   Q.  Now can we flip back to 410, please.

25   A.  Okay.

Fbn6new3                    Wolf - cross

1   Q.  Can you look at the time on that e-mail, which is --

2   A.  4:59.

3   Q.  -- 4:59.

4          So it is just a few minutes after Mr. Reifler's

5   e-mail; correct?

6   A.  Correct.

7   Q.  Mr. Newkirk is sending out the e-mails that Mr. Reifler

8   asked him to send out; correct?

9   A.  Appears that way.

10  Q.  Can we please turn to 411, please.  This is an e-mail you

11  were shown and it talks about at the top and we also get

12  information on a primary home in Georgia and vocation home in

13  Tennessee; correct?

14  A.  Correct.

15  Q.  You testified on direct that you were concerned that the

16  valuations that had been provided were high; correct?

17  A.  Correct.

18  Q.  That is because you said -- I think you said we had done

19  our own diligence or something like that.  I don't want to put

20  words in your mouth.

21  A.  Do you want me to answer that?

22  Q.  Yes.

23  A.  If I recall Melody Partners looked into the Georgia home --

24  and I was using "we" as at that point Melody -- and came back

25  and said that, and I forget exactly, but in the conversations

Fbn6new3                    Wolf - cross

1   that I had with them it appeared that the house was more valued

2   at like three and a half to four million, not the I forget what

3   it was on the financial statement, but not anywhere near that,

4   eight to 10 million.

5   Q.  If we look at 412, which you were shown --

6   A.  Yes.

7   Q.  -- this is the, Fellas, we need to get more information in

8   a more concise and accurate form; correct?

9   A.  Correct.

10  Q.  You testified you were worried you weren't sure whether

11  shares were restricted or not?  That was part of the genesis of

12  this.

13  A.  I think on this I am referring to all of the collateral.

14  Q.  You also had a concern about whether the shares were

15  restricted and whether there was a good handle on that;

16  correct?

17  A.  I was -- yes.

18  Q.  So then can we go to Exhibit 4.

19          By the way, your e-mail 412 is on 11-19 at 5:15 p.m.?

20  A.  Yes.

21  Q.  Can we go to 415, which was shown to you, please.  This is

22  an e-mail from Harvey Newkirk saying, Based upon the

23  information that we have been provided -- right, this

24  information that has been provided to Mr. Newkirk; correct?

25  A.  Yes.

Fbn6new3                          Wolf - cross

1    Q.  -- please find below a summary of certain collateral.

2             And if you look at the first thing it talks about is

3    the Coca-Cola Enterprises; correct?

4    A.  Correct.

5    Q.  It marks certain shares as restricted and certain shares as

6    deferred?

7             MS. PAUL:  Objection.  The document speaks for itself.

8             THE COURT:  I assume this is foundational to a

9    followup question?

10            MR. HARRIS:  It is, your Honor.

11            THE COURT:  Overruled.

12            MR. HARRIS:  There is another foundational one coming.

13            THE COURT:  Pardon?

14            MR. HARRIS:  There is another foundational one coming.

15            THE COURT:  Okay.

16            THE WITNESS:  Should I answer it?

17            THE COURT:  Yes.

18   A.  Yes.

19   Q.  If you go to the next page, please, the second page, we see

20   that now the real estate is listed at 5.75 million; is that

21   correct?

22   A.  That is what it says.

23   Q.  This e-mail is sent on 11-21-2013 at 1:00; correct?

24   A.  Yes.

25   Q.  So in two days between the 19th and 21st there has been an

Fbn6new3                         Wolf - cross

1   effort made to get more precise value of the real estate and

2   more precise document information?

3   A.  Appears that way.

4   Q.  That information has been provided by Mr. Newkirk to the

5   folks at Melody Partners; correct?

6   A.  Yes.

7   Q.  And you are copied on that e-mail; right?

8   A.  Yes.

9           MR. HARRIS:  Your Honor, I don't know if you want me

10  to go through or--

11          THE COURT:  How much more do you have?

12          MR. HARRIS:  Probably halfway down.

13          THE COURT:  Go ahead.

14          MR. HARRIS:  Excuse me?

15          THE COURT:  Go ahead.

16          MR. HARRIS:  Fine.

17          THE COURT:  I think one of our jurors is indicating

18  that he would like to take a break.  We'll take a 15-minute

19  break at this time.

20          MR. HARRIS:  Thank you, your Honor.

21          THE WITNESS:  What do I do?

22          THE COURT:  You just go outside and be back in 15

23  minutes.

24          (Jury excused)

25          (Continued on next page)

Fbn6new3                          Wolf — cross

 1                (In open court; jury not present)

 2                THE COURT:  Please be seated.

 3                So who is the next witness?

 4                MR. ADAMS:  Laurence Deitch, your Honor.

 5                THE COURT:  How long is she going to be?

 6                MR. ADAMS:  He'll be I think shorter than this

 7      witness.

 8                THE COURT:  Better be.

 9                MR. ADAMS:  Yes, sir.

10                THE COURT:  Much shorter.  We're reaching the point

11      with these witnesses of severely diminishing returns and I am

12      close to striking witnesses as cumulative.  So keep that in

13      mind, counsel.

14                (Recess)

15                (Continued on next page)

16

17

18

19

20

21

22

23

24

25

Fbn6new3                    Wolf - cross

1              (In open court; jury present)

2              THE COURT:  Please be seated.

3              Counsel.

4    BY MR. HARRIS:

5    Q.  Mr. Wolf, Melody passed on the deal; correct?

6    A.  Yes.

7    Q.  And was that because they couldn't get comfortable with the

8    collateral?

9    A.  Yes.

10   Q.  And even though Melody wouldn't get comfortable with the

11   collateral, you went ahead and then you took the deal to

12   Mr. McMahon?

13   A.  Correct.

14   Q.  Mr. McMahon, was he a friend of yours or a business

15   associate?

16   A.  Both.

17   Q.  And you thought it important to take what you considered to

18   be a good deal to Mr. McMahon?

19   A.  Yes.

20   Q.  I would like to show you, please, Exhibit 423, which is in

21   evidence that the government showed to you.  If we can look at

22   the bottom.  The government showed you the top e-mail.  I would

23   like to show you the bottom e-mail.  It is a collateral

24   worksheet.

25              Do you see that?  I want to make sure you are in the

Fbn6new3                        Wolf - cross

1   same place I am.  It is, Subject:  Collateral worksheet.

2   A.  Yes.

3   Q.  It is from Adam Feldman at Forefront?

4   A.  Yes.

5   Q.  And what was Mr. Feldman's job at Forefront if you know?

6   A.  He worked for Forefront as a broker dealer.

7   Q.  This is being circulated by Mr. Feldman and says, All

8   please review before we circulate this to Shane's team.

9   Attached is the new collateral Worksheet 1 and the K&L Gates

10  share collateral breakdown.  I think what we have achieved

11  today is that we have confirmed general availability of $18

12  million restricted deferred shares.  Please define the location

13  of most if not all of the shares, and then he goes on; correct?

14          Sorry.  The document is not up?

15  A.  I have it in front of me.

16  Q.  So we'll go on.

17          This e-mail is from Alan Feldman to Brad Reifler,

18  Harvey Newkirk and Calvin Darden Junior; correct?

19  A.  Yes.

20  Q.  Then it concludes upon your review, we should forward along

21  to Jack, Shane and Robert.  Do you see that?

22  A.  Yes.

23  Q.  Shane is Shane McMahon?

24  A.  Yes.

25  Q.  Do you know who Jack is?

Fbn6new3                    Wolf - cross

1   A.   Jack is Shane's lawyer from K&L Gates.

2   Q.   Jack Vonn?

3   A.   Yes.

4   Q.   Robert, that would be you?

5   A.   I believe so.  Although there could be other Roberts.

6   Q.   You knew that Calvin Darden Junior was involved in the

7   deal; correct?

8   A.   Involved in what way?

9   Q.   He came to meetings?

10  A.   Yes.

11  Q.   You had phone calls with him?

12  A.   Yes.

13  Q.   You had e-mails with him on multiple occasions?

14  A.   Yes.

15  Q.   You relied on Calvin Darden Junior to provide information

16  about the deal?

17  A.   Infrequently.

18  Q.   But from time to time?

19  A.   I would have to see what you are referring to.

20  Q.   I am happy to show you to see if it will refresh your

21  recollection.

22  A.   Sure.

23           MR. HARRIS:  Your Honor, may I approach?

24           THE COURT:  Yes.

25  A.   Thank you.

1          MR. HARRIS:  Your Honor, I have shown Mr. Wolf what

2     has been marked for identification as Defendant's Exhibits 340

3     and 349.

4     Q.  Mr. Wolf, I ask you to take a look at those for a moment.

5     A.  Okay.  What is the question?

6     Q.  This is a simple question.  Do those refresh your

7     recollection that you relied upon Calvin Darden Junior to

8     provide you information about the deal, including stock

9     holdings?

10    A.  No.  I would say I didn't rely on Calvin Darden Junior to

11    provide it.  I would say I relied on Harvey, which is why I

12    said that these seem to be different than -- I am getting

13    different information from different people.  I would not say I

14    relied on this information.

15    Q.  You didn't rely on it, but you got information from him?

16    A.  Yes.  I received e-mails from him.

17    Q.  And, Mr. Wolf, isn't it the case that when you were working

18    on the deal with the McMahons that you believed Calvin Darden

19    Junior and Shane McMahon would run the combined company?

20    A.  No, not run.

21          I would say --

22          THE COURT:  No, there is no pending question.

23          THE WITNESS:  Sorry.

24          MR. HARRIS:  May I approach, your Honor?

25          THE COURT:  Yes.

Fbn6new3                        Wolf - cross

1   Q.  I am showing you what has been marked for identification as

2   Defense Exhibit 342.  Do you see that?

3   A.  Yes.

4   Q.  Is it an e-mail chain between yourself, Mr. McMahon, and

5   Mr. Darden Junior.  Do you see that?

6   A.  I do.

7   Q.  And does that refresh your recollection that in

8   December 2013 you believed that at the end of the day it would

9   be the two of you, meaning Mr. Darden Junior and Mr. McMahon,

10  the future operators of the business who would be running the

11  business?

12  A.  The e-mail says that, but I don't view it as running the

13  company day-to-day.  As I said --

14          MS. PAUL:  Objection.  Move to strike.

15          THE COURT:  Which part of it are you objecting to?

16          MS. PAUL:  The part where he is reading the document

17  into the record, which is not in evidence.

18          THE COURT:  Are you offering this?

19          MR. HARRIS:  I am happy to, your Honor.

20          THE COURT:  Well, are you or are you not?

21          MR. HARRIS:  I will offer it.

22          MS. PAUL:  Objection, hearsay.

23          THE COURT:  Received for the witness's state of mind

24  but only for that purpose.

25          MR. HARRIS:  Thank you, your Honor.

Fbn6new3                    Wolf - cross

1          (Defendant's Exhibit 342 received in evidence)

2          MR. HARRIS:  Can we please publish Defendant's

3    Exhibit 342 to the jury.

4    BY MR. HARRIS:

5    Q.  Mr. Wolf, this is the e-mail chain between yourself and

6    Mr. Cal Darden Junior and Mr. McMahon; correct?

7    A.   342?

8    Q.  I will just move on.

9          If you go -- one, two, three, four, five -- six lines

10   down at the end it says -- Actually, five lines down it says, i

11   Implored both lawyers in making sure the appropriate diligence

12   is done and accurate information shared.  Let's be blunt:

13   There is not a lot to this deal.  At the end of the day, it

14   will be the two of you -- the future operators of the

15   business -- and not the lawyers running and reviving the

16   business.

17          You wrote that e-mail, didn't you?

18   A.  Yes, I did.

19   Q.  Mr. Wolf, the government showed you Exhibit 429, which was

20   an e-mail that you had sent to Mr. Jay Dorman.  Do you recall

21   that exhibit?

22   A.  I will have to look at it.

23          Yes.

24   Q.  Mr. Dorman was a corporate lawyer at Bryan Cave; correct?

25   A.  I believe so.

Fbn6new3                    Wolf - cross

1   Q.  I think you testified he was a supervisor or senior lawyer?

2   A.  I thought he was.

3   Q.  Do you know if Mr. Dorman was in fact the head of Bryan

4   Cave's M and A group in New York?

5   A.  I was not aware of his title.

6   Q.  Do you know if Mr. Dorman got involved in the Maxim deal in

7   mid-November of 2013?

8   A.  I am not aware whether he did or did not.

9   Q.  Do you know if Mr. Dorman was in contact with the seller's

10  counsel -- frequent contact?

11              MS. PAUL:  Objection.

12              THE COURT:  Sustained.

13  Q.  Do you know if Vincent Alfieri -- do you know who Vincent

14  Alfieri is?

15  A.  No.

16  Q.  Do you know if the head of Bryan Cave's New York office

17  also got involved in the deal in November?

18              MS. PAUL:  Objection.

19              THE COURT:  Sustained.

20  Q.  Mr. Wolf, when you sent this e-mail in February of 2006,

21  you were still willing to fly or come back from I think it was

22  Vegas to work on this deal; correct?

23  A.  Correct.

24  Q.  Do you know if Forefront at the same time was offering to

25  fund $15 million of this deal on more favorable terms than the

1   McMahons?

2   A.  I am not aware.

3           MR. HARRIS:  Your Honor, may I take one moment,

4   please?

5           THE COURT:  Yes.

6           (Pause)

7   Q.  Just one more question hopefully.

8           Mr. Wolf, that exhibit you were just looking at,

9   429 --

10  A.  Yes.

11  Q.  -- you're still willing -- I just want to get the timing

12  right.  You are still willing even after that e-mail to get on

13  a plane and come back to New York to work on the deal; correct?

14  A.  Predicated on Calvin Darden Senior being at the meeting.

15  Q.  That's right.

16          The answer is yes?

17  A.  Yes.

18          MR. HARRIS:  I have no further questions, your Honor.

19          THE COURT:  Redirect.

20          MS. PAUL:  Briefly, your Honor.

21  REDIRECT EXAMINATION

22  BY MS. PAUL:

23  Q.  Mr. Wolf, I believe you testified on cross-examination that

24  you relied on information from Mr. Newkirk during the course of

25  this deal.  Do you recall that testimony?

Fbn6new3                        Deitch - direct

1    A.  Yes.

2    Q.  Did you expect Mr. Newkirk to provide you with accurate

3    information?

4    A.  Yes.

5              MS. PAUL:  Nothing further.

6              THE COURT:  Anything else?

7              MR. HARRIS:  One moment, your Honor, please.

8              (Pause)

9              MR. HARRIS:  Nothing further, your Honor.

10             THE COURT:  Thank you very much.  You may step down.

11             (Witness excused)

12             THE COURT:  Please call your next witness.

13             MR. ADAMS:  Your Honor, the government calls Laurence

14   Deitch, who is walking in momentarily.

15             THE DEPUTY CLERK:  Please take the witness stand,

16   remain standing, raise your right hand.

17    LAURENCE DEITCH ,

18        called as a witness by the Government,

19        having been duly sworn, testified as follows:

20             THE DEPUTY CLERK:  State your name and spell it slowly

21   for the record.

22             THE WITNESS:  My name is Laurence.  That is spelled

23   with a U.  Deitch, D-e-i-t-c-h.

24   DIRECT EXAMINATION

25   BY MR. ADAMS:

Fbn6new3                        Deitch - direct

1   Q.   Good morning, Mr. Deitch.

2        Could you please tell us where you work?

3   A.   Bodman, PLC.

4   Q.   What Bodman, PLC?

5   A.   It is a law firm.

6   Q.   In 2013 were you involved in the sale of Maxim Magazine?

7   A.   Yes.

8   Q.   What was your role in that sale?

9   A.   I was the lead transactional counsel.

10  Q.   Who was your client?

11  A.   Alpha Media, which was the owner of Maxim Magazine and

12  related businesses.

13  Q.   Directing you to August of 2013, did there come a time that

14  Darden Media Group won the right to purchase Maxim Magazine?

15  A.   Yes.

16  Q.   Do you recall what their winning bid was?

17  A.   Yes.

18  Q.   What was it?

19  A.   $31 million.

20  Q.   And with whom on the Darden side were you principally

21  negotiating the sale?

22  A.   Harvey Newkirk.

23  Q.   What did you understand the role of Mr. Newkirk to be?

24  A.   I understood Mr. Newkirk to be lead transactional counsel

25  for Darden Media.

Fbn6new3                           Deitch - direct

1   Q.  Had you met Mr. Newkirk in person?

2   A.  Yes.

3   Q.  Do you see him in the courtroom today?

4   A.  Yes.

5   Q.  Can you please point to Mr. Newkirk and just describe

6   briefly an article of clothing.

7   A.  I cannot see an article OF clothing because of the -- I

8   believe he is wearing a blue shirt and he is --

9           MS. CHAUDHRY:  Your Honor, we stipulate.

10          THE COURT:  Yes.

11          MR. ADAMS:  Thank you, your Honor.

12  Q.  Mr. Deitch, what role, if any, did you understand Calvin

13  Darden Senior to have with respect to this potential purchase?

14  A.  I understood Calvin Darden Senior to be the principal of

15  Darden Media.

16  Q.  And at the time that you first became aware of Darden

17  Media, were you aware of an individual named Calvin Darden

18  Junior?

19  A.  I was aware of his existence but did not think he had any

20  involvement with Darden Media.

21  Q.  If you would, please, open the binder sitting in front of

22  you.  It has a number of exhibits in it.  If you just turn to

23  the first one, which is marked for identification as government

24  Exhibit 187.

25  A.  Yes.

Fbn6new3                    Deitch – direct

1   Q.  Do you recognize that document, sir?

2   A.  Yes.

3   Q.  What is it?

4   A.  There are two e-mails on it.  One is from me to Harvey

5   Newkirk copies to Lee Ann Gliha who, who is with the firm of

6   Houlihan Lokey, and was an investment banker for Alpha Media,

7   and then a response e-mail from Mr. Newkirk to me and to Lee

8   Ann Gliha.

9           MR. ADAMS:  The government offers 187.

10          MR. HARRIS:  I have no objection to the e-mail.

11          THE COURT:  Received.

12          (Government's Exhibit 187 received in evidence)

13  BY MR. ADAMS:

14  Q.  Mr. Deitch, what was Mr. Newkirk confirming for you in this

15  e-mail?

16  A.  In the first e-mail I had sent him a revised form of

17  financing commitment from a firm called Forefront Capital.  He

18  acknowledged his receipt of that draft.

19  Q.  Can you explain what the purpose of the form of commitment

20  was with respect to Forefront Capital?

21  A.  Earlier in the preceding week we had gotten a commitment

22  letter from Forefront Capital in which Forefront was committing

23  to provide debt and equity financing to Darden Media to

24  complete the acquisition.  We found what was presented to us to

25  be vague and I participated in a phone call with Mr. Darden and

Fbn6new3                          Deitch - direct

1    Lee Ann Gliha and Bradley Reifler, who is the principal of

2    Forefront, on Saturday the 17th.  Following that conversation I

3    revised the commitment and that is what I said.

4    Q.  Why was this commitment letter important to you and your

5    client?

6    A.  Darden Media was not an operating business.  While Calvin

7    Darden Senior had a great reputation as a businessperson, there

8    was no operating history to Darden Media.  So we were concerned

9    about whether or not it had the ability to perform the

10   transaction.

11              MR. HARRIS:  Objection to weight.

12              THE COURT:  Sorry.

13              MR. HARRIS:  Objection to weight, your Honor.

14              THE COURT:  Overruled.

15   Q.  Mr. Deitch, was your client willing to go forward with

16   Darden Media without such a commitment letter from Forefront?

17   A.  No.

18   Q.  Let me ask you to turn to what has been marked as

19   Government Exhibit 188.

20   A.  Yes, sir.

21   Q.  Do you recognize that document?

22   A.  Yes.

23   Q.  What is it?

24   A.  That is an e-mail from Harvey Newkirk to me and also copied

25   on it is Forrest Dillon, who is my partner.

1          MR. ADAMS:  Your Honor, the government offers Exhibit

2     188.

3          MR. HARRIS:  No objection, your Honor.

4          THE COURT:  Received.

5          (Government's Exhibit 188 received in evidence)

6     BY MR. ADAMS:

7     Q.  What is attached to this e-mail?

8     A.  A signed copy of the commitment that I had tendered on

9     August 19th.

10    Q.  Was this the final version of the commitment letter you

11    just described?

12    A.  Yes.

13         MR. HARRIS:  Can we publish what is already in

14    evidence as Government Exhibit 709, please.

15    Q.  Mr. Deitch, you can find that at the end of your folder as

16    well.

17    A.  I see that.

18         (Continued on next page)

19

20

21

22

23

24

25

FBNKNEW4                         Deitch - direct

1    BY MR. ADAMS:

2    Q.  Looking at the attachment to the email at 709 titled

3    "General Release and Indemnification Agreement," when was the

4    first time you saw that document?

5    A.  Within the last two weeks.

6             MR. HARRIS:  Objection, your Honor.

7             (Record read)

8             THE COURT:  Overruled.

9    BY MR. ADAMS:

10   Q.  Mr. Deitch, had you ever heard of such a document prior to

11   approximately two weeks ago?

12   A.  No.

13   Q.  Have you had a chance to review this document since you

14   first saw it?

15   A.  Yes.

16            MR. HARRIS:  Objection, your Honor.

17            THE COURT:  I think you're objecting to the follow-up

18   question, which hasn't yet occurred.

19            MR. HARRIS:  I am, your Honor.

20            THE COURT:  And it hasn't occurred for the last four

21   questions, so wait until it occurs and then we'll hear your

22   objection.

23            Go ahead.

24   BY MR. ADAMS:

25   Q.  Mr. Deitch, had you been aware of the existence of this

FBNKNEW4                          Deitch - direct

1    document --

2              MR. HARRIS:  Objection, your Honor.

3              THE COURT:  Let me see the exhibit, please.  Do you

4    have it in front of you?

5              THE WITNESS:  I don't have it; only on the screen.

6              THE COURT:  All right.

7              Come to the sidebar.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

789

1        (At the sidebar)

2        THE COURT:  What's the nature of the objection?

3        MR. HARRIS:  Your Honor, I'm pretty confident the

4   government's about to ask a hypothetical, if you had known

5   about this document, would you have done the deal?

6        THE COURT:  He's going to say no.

7        MR. HARRIS:  First of all, it's a hypothetical.

8   Second of all, it's not Mr. Deitch's place to say yes or no;

9   it's his client's.

10       THE COURT:  Well, first of all, with a hypothetical,

11  that objection is overruled.  This is the classic way you show

12  materiality.  How else can you show it?  But I'm having a

13  little trouble hearing your second objection.

14       MR. HARRIS:  The second objection is, Mr. Deitch is

15  just lawyer on the deal, he's not the client, and we don't know

16  what Cerberus would say or not say or do or not do.

17       THE COURT:  So, what about that?

18       MR. ADAMS:  Your Honor, I'm happy to ask instead,

19  would you have recommended that your client go forward with the

20  deal, knowing that this document had been drafted without being

21  shared with you?

22       THE COURT:  Sustained.

23       MR. ADAMS:  Your Honor, I'm sorry, if I could ask just

24  one variant on the same question:  Would you have recommended

25  to the board that they go forward?

FBNKNEW4                    Deitch - direct

1            THE COURT:  The point is, the reason the hypothetical

2     is allowed is so that the person who actually parted with money

3     or property or otherwise made the decision can say, this was

4     material to me, I never would have done it without that.  But

5     now you're one step removed.  You're saying would you, as

6     someone who was advising the party that made the decision,

7     would have recommended or not.  I think that's too remote at

8     that point.

9            You're of course free to argue, since the document is

10    in evidence without objection, to argue on summation that by

11    the very nature of the document it would have been material.

12    That's a different story, but the question to him, I think, is

13    objectionable.

14            So, sustained.

15            MR. ADAMS:  Thank you.

16            MR. HARRIS:  Thank you.

17            (Continued on next page)

1             (In open court)

2    BY MR. ADAMS:

3    Q.  Mr. Deitch, in addition to the Forefront commitment that

4    you described, did you also have any understanding as to

5    whether Calvin Darden, Sr. was providing any sort of personal

6    guarantee for the maximum purchase?

7    A.  Yes.  It was our intent that he provide a complete personal

8    guarantee.

9    Q.  Would you please now turn to what's been marked as

10   Government Exhibit 189.

11   A.  Yes.

12   Q.  Do you recognize that document?

13   A.  I do.

14   Q.  What is it?

15   A.  It's an email from Harvey Newkirk to me, copy to Forrest

16   Dillon, and also to a woman named Chaeri Tornay, who was an

17   associate at the Bryan Cave law firm.  And it enclosed a letter

18   on the letterhead of Merrill Lynch, signed by a man named

19   Roderick A. Jones.

20           MR. ADAMS:  Your Honor, the government offers

21   Government Exhibit 189.

22           MR. HARRIS:  No objection, your Honor.

23           THE COURT:  Received.

24           (Defendant's Exhibit 189 received in evidence)

25   Q.  Mr. Deitch, on the first page on the email itself, who did

FBNKNEW4                        Deitch - direct

you understand Mr. Darden's assets -- who did you understand

Mr. Darden to refer to?

        MR. HARRIS:  Objection, your Honor; speaks for itself.

        THE COURT:  Overruled.

        THE WITNESS:  Calvin Darden, Sr.

Q.  For what purpose was Mr. Newkirk sending this letter to

you?

A.  Well, over the preceding weeks, as we were negotiating and

moving forward finalizing the agreement, tightening the

commitment, I was asking repeatedly for financial statements

from Mr. Darden, Sr.  Those financial statements were never

produced.  Instead, this letter from Merrill Lynch was

produced, indicating that he had sufficient personal assets to

execute a transaction in excess of $31 million.

Q.  You mentioned making a request for personal financial

statement.  To whom did you make those requests?

A.  Mr. Newkirk.

Q.  What was Mr. Newkirk's reaction or response to your request

for the personal financial statement of Mr. Darden?

A.  He refused and indicated to me that it was really offensive

on my part to be asking for a financial statement for -- from

an executive of Mr. Darden, Sr.'s stature, renown, and so

forth.

Q.  Let me direct your attention to September 9th, 2013.

A.  Yes.

FBNKNEW4                         Deitch - direct

1    Q.  Did you finalize a purchase agreement for Maxim on that

2    day?

3    A.  Yes, we did.

4    Q.  Approximately when was the closing date for the sale

5    originally scheduled?

6    A.  We provided for a first closing date of September 20, but

7    in the contract we provided for the possibility of two

8    extensions.  The first extension, which would be available to

9    Darden Media, Mr. Darden, Sr., took the closing to

10   September 30, simply by notice.  Thereafter, there was the

11   possibility of another extension from September 30 to

12   October 18; however, this extension required the payment of

13   $1,500,000, 1 million of which would have been applied to the

14   transaction purchase price at closing, 500,000 of which was a

15   fee.  The entire million five if paid, if closing did not

16   occur, would have been non refundable.

17   Q.  With respect to the extension for which the 1.5 million had

18   to be paid, what was that extension date going to be?

19   A.  The outside date?

20   Q.  Yes, sir.

21   A.  October 18, 2013.

22   Q.  Let me ask you to take a look at what's been marked as

23   Government Exhibit 190 for identification.

24   A.  Yes.

25   Q.  Do you recognize that document?

1    A.  Yes, I do.  That's an email from me to Mr. Newkirk, with a

2    copy to Forrest Dillon.

3              MR. ADAMS:  Your Honor, the government offers

4    Exhibit 190.

5              MR. HARRIS:  No objection.

6              THE COURT:  Received.

7              (Government's Exhibit 190 received in evidence)

8    Q.  Mr. Deitch, where you say, "Second, could you please send

9    me the fed reference number when Mr. Darden has completed the

10   payment," what payment were you referring to?

11   A.  The payment of the $1,500,000 extension fee.

12   Q.  So had there been a point when they elected to make that

13   appointment and receive of the extension?

14   A.  Yes.  They sent notice, I don't know, the 27th or 28th but

15   before the 30th of September, but they did not send the money

16   and hadn't sent it by the 30th.

17             MR. HARRIS:  Your Honor, clarification on "they"?

18             THE COURT:  Okay.  You want to clarify?

19             MR. ADAMS:  Sure.

20   BY MR. ADAMS:

21   Q.  Mr. Deitch, when you say they had not sent the money, who

22   do you mean had not sent the money?

23   A.  Darden Media or Calvin Darden, Sr.

24   Q.  Thank you.

25             Can I ask, could you briefly just explain what you

1    mean by the reference to a fed reference number?

2    A.  Yes.  In lieu of sending a check, one may send money by

3    from bank to bank electronically.  That's called a wire

4    transfer.  And across America, every day there are a gigantic

5    number of transactions, and so in order to keep track of it,

6    and to be able to check with your bank that money has arrived

7    or in case that money gets lost, once money is sent from one

8    bank --

9            MR. HARRIS:  Objection.

10   A.  -- there is a number --

11           THE COURT:  Hold on a second.

12           MR. HARRIS:  702, narrative.

13           THE COURT:  Well, 702 is overruled, but I agree that

14   it's going well beyond the scope of the question asked.

15           The question was:  Could you briefly just explain what

16   you mean by the reference to a fed reference number?

17           So let's try that again.

18           THE WITNESS:  A fed reference number is what one gets

19   after wiring money from a bank to another bank.

20   Q.  At the time that you receive a fed reference number, does

21   that indicate that money has arrived in the intended bank

22   account?

23   A.  It should, or that it's coming shortly.

24   Q.  Let me ask you to turn to Government Exhibit 191.

25   A.  Yes.

FBNKNEW4                    Deitch - direct

1    Q.  Do you recognize that document?

2    A.  I do.

3    Q.  What is it?

4    A.  It's an email from me to Harvey Newkirk, copy to

5    CDarden@TheReignInc.com.  I understood that to be Calvin

6    Darden, Sr.  Also copied were Lee Ann Gliha, Forrest Dillon,

7    and a copy to myself.

8              MR. ADAMS:  Your Honor, the government offers

9    Government Exhibit 191.

10             MR. HARRIS:  Object; hearsay.

11             THE COURT:  Let me see it.

12             It's clearly hearsay unless you think it falls within

13    an exception.  What exception, if any, would you argue for?

14             MR. ADAMS:  Your Honor, we were offering it for the

15    effect on Mr. Newkirk rather than the truth of any particular

16    assertion.  And in particular, I'm looking --

17             THE COURT:  So notice to Mr. Newkirk of the

18    concerns --

19             MR. ADAMS:  Yes, your Honor.

20             THE COURT:  -- raised by Mr. Deitch?

21             For that limited purpose, it is received.

22             MR. ADAMS:  Thank you, your Honor.

23             (Government's Exhibit 191 received in evidence)

24    BY MR. ADAMS:

25    Q.  Mr. Deitch, by October 6, 2013, had you received the

1    1.5 million that had been promised?

2    A.  No.

3    Q.  Were you seeking that 1.5 million in the form of cash or in

4    some other form?

5    A.  We were seeking it in the form of cash, but given that

6    approximately a week had passed, discussions began about an

7    alternative form of security.

8    Q.  Let me ask you to turn to Government Exhibit 192.

9         Do you recognize this document?

10   A.  Yes.

11   Q.  What is it?

12   A.  It's an email from me to Mr. Newkirk, copies to Lee Ann

13   Gliha, a man named Christopher Holt -- Christopher Holt is a

14   lawyer with Cerebus Capital Management, which was a shareholder

15   of Alpha Media -- Forrest Dillon, and a copy to myself.

16           MR. ADAMS:  Your Honor, the government offers 192.

17           MR. HARRIS:  No objection, your Honor.

18           (Government's Exhibit 192 received in evidence)

19           THE COURT:  I'm sorry, received.

20           MR. ADAMS:  Thank you, your Honor.

21   BY MR. ADAMS:

22   Q.  Mr. Deitch, what is it that you were sending to Mr. Newkirk

23   in this email?

24   A.  I was sending a draft of a document entitled "Securities

25   Account Control Agreement," which I had prepared.

FBNKNEW4                          Deitch - direct

1   Q.  What was the purpose of your sending this to Mr. Newkirk?

2   A.  We had discussions about our taking a security interest in

3   marketable securities at Merrill Lynch.

4   Q.  How did you come to understand that there were any such

5   securities at Merrill Lynch?

6   A.  Well, we had received a letter that was actually attached

7   to the guarantee, speaking to the 31 million in assets.

8   Q.  What, if anything, did Mr. Newkirk tell you about Merrill

9   Lynch's ability to provide such a security agreement?

10  A.  He told me that Merrill Lynch wouldn't sign this as a

11  matter of policy.

12  Q.  And did you dispute that assertion with Mr. Newkirk?

13  A.  I did.

14  Q.  What evidence, if any, of Merrill Lynch's ability to enter

15  into such an account did you provide to Mr. Newkirk?

16  A.  Our law firm represents a lot of financial institutions.  I

17  went to the head of our banking group and said, is this true?

18  And I was told, no, no, it was ridiculous.

19          MR. HARRIS:  Objection.

20          THE COURT:  Sustained.

21  Q.  Mr. Deitch, did you send anything to Mr. Newkirk as proof

22  of Merrill Lynch's ability to enter into a control agreement?

23          MR. HARRIS:  Objection.

24          THE COURT:  Ground?

25          MR. HARRIS:  Related to this deal.

1            THE COURT:  Overruled.

2            THE WITNESS:  I did.

3  Q.  Would you please turn to what's been marked as Government's

4  Exhibit 193 for identification.

5  A.  Yes.

6  Q.  Do you recognize that document?

7  A.  I do.

8  Q.  What is it?

9  A.  An email from me to Harvey Newkirk, Lee Ann Gliha,

10 Christopher Holt, Forrest Dillon, in which I send a redacted

11 form of securities account control agreement which somebody had

12 given to Merrill Lynch.

13           MR. ADAMS:  Your Honor, the government offers

14 Exhibit 193.

15           MR. HARRIS:  Your Honor, object on --

16           THE COURT:  Received, for the same limited purpose of

17 notice as previously given.

18           (Government's Exhibit 193 received in evidence)

19 Q.  Mr. Deitch, did you discuss the attached sample pledge

20 collateral account control agreement with Mr. Newkirk?

21 A.  Yes.

22 Q.  And can you describe that discussion?

23 A.  I indicated to him that we were presenting an example of

24 something Merrill Lynch had done in another transaction and

25 therefore I saw no reason why it couldn't be done here.

FBNKNEW4                         Deitch - direct

1    Q.  What was Mr. Newkirk's response?

2    A.  It was kind of a nonresponse.  I mean he didn't argue with

3    it but it never happened.

4    Q.  Did you ever receive any pledge of shares from Merrill

5    Lynch that you were expecting?

6    A.  No.

7    Q.  And since you didn't receive any shares from Merrill Lynch,

8    were you offered any other collateral -- any other assets in

9    furtherance of that 1.5 million extension fee?

10   A.  Yes.

11   Q.  What were you offered?

12   A.  Mr. Darden, Sr. was, and is, I believe, a director of three

13   major public corporations -- Coca-Cola Enterprises, Target, and

14   Cardinal Health -- and we were told that he had around

15   $10 million of securities of those three companies.

16   Q.  And what discussions, if any, with Mr. Newkirk did you have

17   about the ability of those shares to be pledged to your client?

18   A.  I first took a look at the Coca-Cola Enterprises supposed

19   shares, the proxy and other publicly filed documents, and I

20   learned that those were not marketable securities; rather, they

21   were in the form of deferred compensation or incentive

22   compensation and the shares would be available to

23   Mr. Darden, Sr. on his retirement as a director, to his estate

24   on his death and other similar occurrences but they were not

25   marketable securities that you could take and sell today, and,

FBNKNEW4                    Deitch - direct

1   in fact, they were not assignable.

2   Q.  Did you share what you had learned with Mr. Newkirk?

3   A.  I did.

4   Q.  What was his reaction?

5   A.  The same kind of reaction; not argumentative but almost

6   like a verbal shrug of the shoulders.

7   Q.  Can I ask you to turn, please, to what's been marked for

8   identification as Government Exhibit 194.

9   A.  Yes.

10  Q.  Do you recognize that document?

11  A.  Yes.  That's an email from Harvey Newkirk to me dated

12  October 11, 2013, copied to Forrest Dillon.  And it encloses a

13  bank statement addressed to -- sent to Calvin Darden in

14  Roswell, Georgia, by Bank of America.

15          MR. ADAMS:  Your Honor, the government offers

16  Government Exhibit 194.

17          MR. HARRIS:  No objection, your Honor.

18          THE COURT:  Received.

19          (Government's Exhibit 194 received in evidence)

20  Q.  Mr. Deitch, looking first at the email itself, for what

21  purpose was Mr. Newkirk sending you this email and this

22  attachment?

23  A.  Well, as he writes, we had already had our discussion about

24  the Coke shares.  He goes, "As we know, the Coke shares are not

25  available based on your review but please let me know if the

1   other shares are acceptable."  He also mentions that Mr. Darden

2   was planning to call me.

3           MR. HARRIS:  Objection; just to the end.

4           THE COURT:  Pardon?

5           MR. HARRIS:  Just to the last bit, your Honor.

6           THE COURT:  Yes.

7           Well, overruled.

8   BY MR. ADAMS:

9   Q.  Mr. Deitch, again, what's the date on this email?

10  A.  October 11.

11  Q.  After discussing the issues with the Coke shares, were you

12  offering any other shares reflected in the attached statement?

13  A.  Yeah.  At the end of the statement, there's a heading

14  toward the end called "Mutual Funds and Holdings," and it lists

15  Coca-Cola Enterprises, Target and Cardinal Health.  So,

16  Mr. Newkirk's inquiry was about Target and Cardinal Health.

17  Q.  What was being offered to you with respect to Target and

18  Cardinal Health?

19  A.  The same kind of nonmarketable securities.

20  Q.  If we could turn, please, to what's been marked as

21  Government Exhibit 195 for identification.

22  A.  Yes.

23  Q.  Do you recognize that document?

24  A.  Yes.  It is an email from me to Mr. Newkirk dated

25  October 11, 2013, in which I tell him that it doesn't work.

1          MR. HARRIS:  Sorry, what exhibit is this?

2          MR. ADAMS:  195.

3          MR. HARRIS:  That's not my 195.

4          Thank you.

5          MR. ADAMS:  Your Honor, may I approach?

6          THE COURT:  Yes.

7          MR. ADAMS:  Thank you.  Your Honor, the government

8   offers Government Exhibit 195.

9          MR. HARRIS:  May I take one moment and look at it,

10  your Honor?

11         THE COURT:  Yes.

12         (Pause)

13         MR. HARRIS:  Your Honor, for the record, we have the

14  same objection.

15         THE COURT:  Pardon?

16         MR. HARRIS:  For the record, we have the same hearsay

17  objection.

18         THE COURT:  Yes, same ruling; received.

19         MR. HARRIS:  Thank you.

20         (Government's Exhibit 195 received in evidence)

21  BY MR. ADAMS:

22  Q.  Mr. Deitch, what restrictions, if any, had you discovered

23  with respect to the Target and Cardinal Health shares?

24  A.  The restrictions were the same.

25  Q.  And what problems, generally, did you have with the Bank of

FBNKNEW4                    Deitch - direct

1    America account statement as sufficient proof of the existence

2    of their shares?

3    A.  Well, it purported to indicate that there were -- there was

4    over $10 million of value in those three securities, but since

5    we were looking for a security that could have been foreclosed

6    on, realized on, in the event of default on October 18, they

7    did nothing for us.

8    Q.  And what response did you receive from Mr. Newkirk with

9    respect to these further problems with the shares?

10   A.  The same kind of nonresponse -- he didn't engage in telling

11   me I was wrong -- and we moved on.

12   Q.  Let me direct your attention to October 17th, 2013.

13   A.  Yes, sir.

14   Q.  Did there come a time on that day when you were at the

15   offices of Bryan Cave LLP here in New York?

16   A.  Yes.

17   Q.  And for what purpose were you there on October 17th?

18   A.  We had come to Bryan Cave on October 17 to preclose the

19   transaction.  When, by the 11th, it became clear that the

20   million five, or security, wasn't coming --

21             MR. HARRIS:  Objection; nonresponsive, narrative.

22             THE COURT:  Sustained.

23   Q.  Mr. Deitch, as of October 17th, had you received the

24   1.5 million that had been promised to Alpha Media?

25   A.  No.

FBNKNEW4                         Deitch – direct

1   Q.  I'm sorry, sir?

2   A.  No.

3   Q.  Given that you had not yet received that money, why were

4   you willing to attend a preclosing on the 17th?

5           MR. HARRIS:  Objection to "you."

6           THE COURT:  Overruled.

7   A.  We had decided that there was a lot of sunk cost and that

8   they would either complete the transaction or they would not.

9   Q.  So what was supposed to happen on the 17th?

10  A.  On the 17th, we were to finalize the papers, the closing

11  papers, the closing statement, and so forth, and then have the

12  documents signed with a view toward funding the next morning on

13  the 18th.

14  Q.  Did you in fact receive signatures on the deal documents on

15  the 17th?

16  A.  As I recall, yes.

17  Q.  Did you meet with Calvin Darden, Sr. in person on that day?

18  A.  No.

19  Q.  Do you recall how you received signatures on deal

20  documents?

21  A.  The lawyers at Bryan Cave had them, either Mr. Newkirk or

22  his younger associate, Chaeri Tornay.

23  Q.  And apart from receiving signatures on the deal documents,

24  what was left to finalize the closing?

25  A.  Just the funding and receipt of a fed reference number to

1    prove funding.

2    Q.   When was that scheduled to happen?

3    A.   The morning of October 18.

4    Q.   So, on the morning of October 18th, did you return to Bryan

5    Cave?

6    A.   Yes.

7    Q.   Where was Mr. Newkirk on that day, if you know?

8            MR. HARRIS:   Objection.

9            THE COURT:   Sustained.

10   Q.   Did you see Mr. Newkirk on October 18?

11   A.   Yes.

12   Q.   In what circumstance did you see Mr. Newkirk on that day?

13   A.   Well, he was at Bryan Cave as our counterparty to complete

14   the transaction.

15   Q.   At any point, did the money for the closing arrive?

16   A.   It never arrived.

17   Q.   Did closing take place on October 18th?

18   A.   It did not.

19   Q.   What, if anything, did Mr. Newkirk explain about why the

20   money had not been sent?

21   A.   Ultimately, he explained two things:  One, Calvin

22   Darden, Sr. had cancer and was hospitalized and incapacitated.

23   He also told us that all the arrangements necessary for funding

24   with Forefront Capital had not been completed at that time.

25   Q.   Did you ask, given the explanation about Mr. Darden, Sr.'s

1    health, how it was that he had been able to provide signatures

2    just one day before?

3              MR. HARRIS:  Objection.

4              THE COURT:  Sustained.

5    Q.  Can you please describe Mr. Newkirk's demeanor while he was

6    giving you an explanation about Calvin Darden, Sr.?

7              MR. HARRIS:  Objection.

8              THE COURT:  Well, I think you have to narrow it and

9    we'll see if we permit it or not.

10   Q.  Mr. Deitch, you described Mr. Newkirk's explanation of

11   Calvin Darden, Sr.'s health status on the 18th, correct?

12   A.  Yes.

13   Q.  Can you describe Mr. Newkirk's demeanor while he was

14   providing you that particular explanation?

15             MR. HARRIS:  Objection.

16             THE COURT:  Let me hear the answer and then I'll

17   decide.

18             THE WITNESS:  Nervous.

19             THE COURT:  Sustained.

20   BY MR. ADAMS:

21   Q.  As a result of failing to close the deal on the 18th, what

22   sort of liabilities did Calvin Darden, Sr. face?

23   A.  Pursuant to his guarantee, he was liable for the entire

24   $31 million.

25   Q.  Did the Darden Media Group parties continue to express an

FBNKNEW4                          Deitch - direct

1    interest in closing the deal at that point?

2    A.   Yes.

3    Q.   Did they obtain further extensions of the closing deadline?

4    A.   Yes.

5    Q.   Can you describe the first such extension?

6    A.   On the 18th, Chris Holt and I engaged in a dialogue with

7    Mr. Newkirk, and we asked him to get Bradley Reifler on the

8    line.  And we then went into a side conference room, the three

9    of us, and Reifler was on the phone.  He indicated to us that

10   he had known Calvin Darden, Sr. for a long time and that

11   closing was assured.  The only things we were waiting for

12   were -- that he was waiting for, I should say, was --

13              MR. HARRIS:  Objection to "he."

14              THE COURT:  Overruled.

15   A.   -- was completion of a fee agreement in terms of what

16   Darden Media or he would owe to Forefront Capital.

17              MR. HARRIS:  Objection, your Honor, as to who was the

18   speaker.

19              THE COURT:  Pardon?

20              MR. HARRIS:  Objection as to who the speaker is, your

21   Honor.

22              THE COURT:  I'm really having trouble hearing you.

23              MR. HARRIS:  I'm sorry, your Honor.  I don't know who

24   the speaker is.

25              THE COURT:  All right, whose the speaker?

FBNKNEW4                    Deitch - direct

 1          THE WITNESS:  Bradley Reifler.

 2          THE COURT:  Okay.

 3          THE WITNESS:  And then he also said --

 4          THE COURT:  Wait a minute, hold on.  Are you okay?

 5          JUROR:  Yeah, I don't know what happened.  I just

 6  leaned forward and the next thing, it just dropped.  Sorry.

 7          THE COURT:  It's a trap.

 8          JUROR:  Sorry.

 9          THE COURT:  Go ahead, Counsel.

10  BY MR. ADAMS:

11  Q.  Mr. Deitch, at the conclusion of this call with

12  Mr. Reifler, was a new extension fee proposed?

13  A.  Mr. Reifler suggested that we be given a nonrefundable

14  deposit of 10 percent of the purchase price, or $3.1 million.

15  He asserted that --

16          MR. HARRIS:  Objection; hearsay from Mr. Reifler.

17          MR. ADAMS:  I'll withdraw this question, your Honor,

18  and move along.

19          THE COURT:  Okay.

20  BY MR. ADAMS:

21  Q.  Did there come a time that you received $3.1 million as an

22  extension fee?

23  A.  Yes.

24  Q.  Was that the last time that an extension fee was promised

25  to Alpha Media?

1   A.  No.

2   Q.  What was the next extension fee, as you recall?

3   A.  5 million, nonrefundable, dollars.

4   Q.  Can you please turn to what's been marked as Government

5   Exhibit 197 for identification.

6   A.  Yes.  Yes.

7   Q.  Do you recognize that document?

8   A.  Yes.

9   Q.  What is it?

10  A.  It is an email -- well, there are two emails on here, one

11  from Harvey Newkirk to me, and then one from me to Mr. Newkirk.

12  Mr. Newkirk's email gave me the fed reference number.  I

13  responded by saying, we have the money but why did you send

14  4.9 million?

15          MR. ADAMS:  Your Honor, the government offers

16  Government Exhibit 197.

17          MR. HARRIS:  No objection, your Honor.

18          THE COURT:  Received.

19          (Government's Exhibit 197 received in evidence)

20  Q.  So, Mr. Deitch, what money were you expecting as of

21  November 12, 2013?

22          MR. HARRIS:  Objection to "you."

23          MR. ADAMS:  Withdrawn, your Honor.

24  Q.  What money was Alpha Media entitled to as of November 12,

25  2013?

1    A.  $5 million.

2    Q.  Did you have of an expectation, you personally have an

3    expectation, that such money was going to be provided on that

4    day?

5    A.  I had been told it was, yes.

6    Q.  By whom?

7    A.  Mr. Newkirk.

8    Q.  And did you in fact receive some funds on November 12,

9    2013?

10             MR. HARRIS:  Objection to "you."

11             THE COURT:  Overruled.  I think it's obvious who's

12   being referred to.

13   A.  $4.9 million was wired to the client trust account of our

14   firm.

15   Q.  And where is your firm based?

16   A.  Detroit, Michigan.

17   Q.  Did you receive the full amount that was expected?

18   A.  No.

19   Q.  How much did you receive?

20   A.  4.9 million.

21   Q.  Did you ask Mr. Newkirk why $100,000 had not been provided?

22   A.  Yes.

23   Q.  And what response did you get?

24   A.  I didn't get one.

25             MR. ADAMS:  Nothing further, your Honor.

1           THE COURT:  Cross-examination?

2           MR. HARRIS:  Thank you, your Honor.

3    CROSS-EXAMINATION

4    BY MR. HARRIS:

5    Q.  Mr. Deitch --

6           MS. CHAUDHRY:  Your Honor, there's a problem --

7           JUROR:  It's all good.

8           THE COURT:  Okay, are we all set?  Very good.

9    BY MR. HARRIS:

10   Q.  Mr. Deitch?

11   A.  It is Deitch.

12   Q.  Sorry.  Mr. Deitch, my name is Jonathan Harris.  And we

13   have never met before, correct?

14   A.  That is correct.

15   Q.  We've never spoken before, correct?

16   A.  Correct.

17   Q.  You met and spoke with the government before coming here

18   today?

19   A.  I did.

20   Q.  I apologize for getting your name wrong.

21   A.  No problem.

22   Q.  Mr. Deitch, the government asked you some questions, do you

23   recall, about a control agreement at Merrill Lynch?

24   A.  Yes.

25   Q.  And the government showed you what's been marked as

1   Government Exhibit 192.

2           MR. HARRIS:  Can you put that up, please.

3   Q.  192 is in the context of you were sending a draft

4   securities control agreement to Mr. Newkirk, correct?

5   A.  Correct.

6   Q.  And I am going to talk about the control agreement in a

7   second.  I firstly want to turn your attention to paragraph 5

8   of this document.

9   A.  Of which, the --

10  Q.  192, the first page.

11  A.  Of the email?

12  Q.  Of the email.

13  A.  Yes, sir.

14  Q.  It says, "As I mentioned on our call, the board is deeply

15  disappointed that Mr. Darden hasn't delivered the 1.5 million

16  in cash, as required."

17          You wrote that, right?

18  A.  I did.

19  Q.  Who was the board there?

20  A.  The board of Alpha Media.

21          MR. HARRIS:  We can take this down and we'll come back

22  to it.

23  Q.  But, Mr. Deitch, you work at the Bodman firm, correct?

24  A.  I do.

25  Q.  And you are a partner there?

FBNKNEW4                          Deitch - cross

1   A.  I am.

2   Q.  It has about 150 or so attorneys?

3   A.  It does.

4   Q.  And it's prominent firm in Detroit?

5   A.  It is.

6   Q.  And who was the Bodman firm counsel for in this

7   transaction?

8   A.  Alpha Media.

9   Q.  Alpha Media is the owner of Maxim?

10  A.  It was at that time, yes.

11  Q.  It was at that time.

12      And Alpha Media itself was controlled by an investment

13  firm named Cerberus, correct?

14  A.  There were several shareholders.  Cerberus had the largest

15  stake, yes.

16  Q.  So Alpha Media -- so when you say you need approval from

17  the board, you're talking about Alpha Media, not Cerberus?

18  A.  Correct.

19  Q.  Cerberus has a representative on the board of Alpha Media?

20  A.  It did.

21  Q.  It did?

22      And some other investors representatives had

23  representatives on the board?

24  A.  Yes.  And there were some independent directors, as I

25  recall.

1   Q.  Forrest Dillon, he's another -- you mentioned his name --

2   he's another partner at Bodman who worked on the deal; is that

3   correct?

4   A.  Yes.

5   Q.  And did some other folks at Bodman work on the deal?

6   A.  I'm sure there were others, yes.

7   Q.  And Bodman is simply acting as counsel, correct?

8   A.  I'm sorry?

9   Q.  Bodman is simply acting as counsel, correct?

10  A.  That is correct.

11  Q.  Bodman does not own Maxim Magazine, correct?

12  A.  It did not.

13  Q.  So when you were looking for direction as to what to do in

14  this deal, who did you ask?  Who did you take direction from?

15  A.  The board of Alpha Media.

16  Q.  That's more than one person?

17  A.  That is correct.

18  Q.  Houlihan Lokey, they were another advisor for Alpha Media

19  on this deal; is that right?

20  A.  That is correct.

21  Q.  And Houlihan Lokey is a financial advisory firm; is that

22  right?

23  A.  Yes.

24  Q.  And Houlihan Lokey, they ran the auction for Maxim,

25  correct?

1   A.  Yes.

2   Q.  And there came a time which you described when Darden Media

3   made a bid for Maxim, correct?

4   A.  Yes.

5   Q.  And, ultimately, who had decision-making authority over

6   whether to accept that bid?

7   A.  The board of Alpha Media.

8   Q.  Then you also talked on direct about various extensions.

9   Do you recall that testimony?

10  A.  Yes.

11  Q.  And who had authority to determine whether or not to grant

12  Darden Media an extension?

13  A.  They had been negotiating the contract.

14  Q.  Was it ultimately your decision or the board's decision

15  whether to give an extension to Darden Media?

16  A.  Well, after we finished negotiating the agreement, it was

17  approved by the board.

18  Q.  By the board?

19  A.  Yes, sir.

20  Q.  Now, the board could have said no, correct?

21  A.  Correct.

22  Q.  And Darden Media had its own advisors, correct?

23  A.  Yes.

24  Q.  And Forefront was a banker for Darden Media; is that right?

25  A.  As far as I know.

1   Q.  And you testified about some conversations with

2   Mr. Reifler?

3   A.  I did.

4   Q.  And Bryan Cave was counsel for Darden Media, correct?

5   A.  Correct.

6   Q.  And Harvey Newkirk was one of the attorneys at Bryan Cave

7   who worked on this, right?

8   A.  Yes.

9   Q.  And you testified about an associate named Chaeri Tornay,

10  correct?

11  A.  Correct.

12  Q.  Do you also recall working with a senior partner from Bryan

13  Cave named Jay Dorman?

14  A.  Yes, but that came in November, yes.

15  Q.  Later on?

16  A.  Later on, uh-huh.

17  Q.  I'd like to go back to GX 192, please.

18  A.  Yes, sir.

19  Q.  Now, you sent the control agreement to Mr. Newkirk,

20  correct?

21  A.  Yes.

22  Q.  And you testified that Mr. Newkirk said Merrill Lynch

23  wouldn't sign it, correct?

24  A.  Yes.

25  Q.  Did you ever speak to anyone at Merrill Lynch about that?

FBNKNEW4                          Deitch - cross

1   A.  Not that I recall.

2   Q.  Do you recall being given contact information for Mr. Brent

3   Watson at Merrill Lynch?

4   A.  I don't recall.

5           MR. HARRIS:  Your Honor, may I approach, please?

6           THE COURT:  Yes.

7   Q.  Mr. Deitch, I'm showing you what's been marked as Defense

8   Exhibit 456 for identification.  I ask you to take a look at it

9   and recall whether you were told that the contact at Merrill

10  Lynch will be Brent Watson.

11  A.  What the email says is, I believe --

12          MR. ADAMS:  Objection, objection; not in evidence.

13          THE COURT:  Yes, the email is not in evidence, so just

14  if you have an independent recollection that this document

15  helps to trigger, that's fine.  Otherwise --

16          THE WITNESS:  I do not have that recollection.

17          THE COURT:  All right, that's the answer.

18  BY MR. HARRIS:

19  Q.  Mr. Deitch, there was nothing stopping you from calling

20  Merrill Lynch, was there?

21  A.  No.

22  Q.  Now, Mr. Deitch, you were shown Government Exhibit 195.

23          MR. HARRIS:  Could we please put that up on the

24  screen.

25  Q.  You testified that the stock was no good to Alpha Media's

FBNKNEW4                     Deitch - cross

1     collateral, correct?

2     A.   That is what I said, yes.

3     Q.   But even though the stock was no good -- and this was in

4     the context of your looking at the stock as a potential payment

5     for an extension fee, correct?

6     A.   It was a substitution for the cash collateral, the cash

7     extension fee.

8     Q.   And this is in October, this is October 11, 2013, this

9     email, right?

10    A.   Yes.

11    Q.   And so, after October 11, 2013, even though Alpha Media

12    could not get satisfied with the stock as collateral, Alpha

13    Media continued to press ahead with the deal with Darden Media,

14    correct?

15    A.   Correct.

16    Q.   Mr. Deitch, you testified it was important to Alpha Media

17    that the deal was being done with Calvin Darden, Sr. correct?

18    A.   Correct.

19    Q.   And Alpha Media could have insisted on a meeting with

20    Calvin Darden, Sr. before entering into the asset purchase

21    agreement on September 9th, correct?

22    A.   Correct.

23    Q.   And, in fact, you are aware that Calvin Darden, Sr. had a

24    meeting with senior executives from Maxim --

25             MR. ADAMS:   Objection.

1   Q.  -- including Ben Madden --

2           MR. ADAMS:  Objection.

3           THE COURT:  Sustained.

4   Q.  Now, Mr. Deitch, you testified that about Calvin

5   Darden, Jr.'s involvement in the deal, correct?

6   A.  I don't recall that.

7   Q.  You knew that Calvin Darden, Jr. was involved in the deal,

8   correct?

9   A.  Not until after the contract was signed on September 9th.

10  Q.  Okay.  But you learned after that and you had exchanged

11  some emails with Mr. Darden, Jr.?

12  A.  Mr. Darden, Jr. reached out to me with a phone call at one

13  point, yes.

14  Q.  After you learned that Mr. Darden, Jr. was involved in the

15  deal, Alpha Media continued going on with the deal, correct?

16  A.  Correct.

17  Q.  Am I correct that originally Darden Media had a period of

18  exclusivity to purchase Maxim Magazine?

19  A.  Yes.

20  Q.  And then there were some extensions entered into and

21  eventually the period of exclusivity expired; is that right?

22  A.  I sent a notice to Darden Media terminating exclusivity

23  based upon nonperformance.

24  Q.  And then Alpha Media entered into a new period of

25  exclusivity with an outfit called Infinity; is that right?

FBNKNEW4                    Deitch - cross

1   A.  Yes.

2   Q.  And then Infinity was unable to conclude a deal during its

3   period of exclusivity; is that right?

4   A.  Yes.

5   Q.  And after Infinity was unable to conclude its deal, Alpha

6   Media reopened negotiations with the Darden Group; is that

7   correct?

8   A.  Yes.

9   Q.  And that was not your decision to reopen negotiations, that

10  was the decision made by the board of Alpha Media; is that

11  right?

12  A.  Yes.

13  Q.  Mr. Deitch, am I correct that after the $4.9 million was

14  wired to the Bodman firm, that there was an issue over the

15  return of those funds; is that correct?

16  A.  That is correct.

17  Q.  Am I also correct that on the same day that the money was

18  wired to the Bodman firm, that Mr. Newkirk reached out to you

19  and asked you, please hold onto to that money, an issue has

20  arisen?

21  A.  That is correct.

22  Q.  Mr. Deitch, Alpha Media has sued Calvin Darden, Sr.?

23  A.  Yes.

24  Q.  That suit is to recover on the guarantee paid to Alpha

25  Media, correct?

FBNKNEW4                    Deitch - cross

1    A.  Yes.

2            MR. HARRIS:  May I have -- I'm sorry, I don't have a

3    paper copy of this but could you get up DX 457 for

4    identification only, so only to the Court and the witness and

5    the government.

6    Q.  Mr. Deitch, am I correct that at the time you were

7    negotiating the asset purchase agreement with Mr. Newkirk, you

8    believed him to have been both persistent and a gentleman?

9    A.  Yes, and I wrote that to him.

10           MR. HARRIS:  May I have one moment, please, your

11   Honor?

12           THE COURT:  Yes.

13           (Pause)

14           MR. HARRIS:  Your Honor, I have very little left.  I

15   believe I'll be able to finish in the five minutes without a

16   problem.

17           THE COURT:  All right.  If it's really five minutes,

18   we'll keep the jury until two after.

19           MR. HARRIS:  Thank you, your Honor.

20   BY MR. HARRIS:

21   Q.  Mr. Deitch, am I correct -- who is Ben Madden?

22   A.  Ben Madden was, in 2013, the president or CEO of Alpha

23   Media.

24   Q.  Am I correct that Ben Madden signed the deal documents on

25   behalf of Alpha Media?

FBNKNEW4                          Deitch - cross

1   A.   Yes.

2   Q.   I'd like to -- Mr. Deitch, Ben Madden, the individual, is

3   not your client, correct, Alpha Media is your client; is that

4   right?

5   A.   Yes.

6   Q.   I'd like to show you what's been marked as Defendant's

7   Exhibit 439 for identification.

8            Mr. Deitch, in a deal like the Alpha Media sale, would

9   it be ordinary for there to be some checklist of things that

10  need to be done for closing?

11  A.   Yes, transactions of this type are what I would call

12  paper-intensive.

13  Q.   Exhibit 439, Defendant's Exhibit 439 for identification,

14  that's an email from an -- and, I'm sorry, I am not going to

15  try --

16  A.   I can't pronounce her name either, so...

17  Q.   All right.

18            And you're copied on that?

19  A.   I am.

20  Q.   And it's a closing checklist of this deal?

21  A.   Yes.

22            MR. HARRIS:  Your Honor, I offer Defense Exhibit 439.

23            MR. ADAMS:  Objection; hearsay.

24            THE COURT:  Sustained.

25  Q.   Are these prepared in the regular course of doing a deal

1    like this?

2    A.  Yes.

3    Q.  Is it important to the deal, in the ordinary course, that

4    these be prepared?

5    A.  Yes.

6              MR. HARRIS:  Your Honor, I offer it again.

7              MR. ADAMS:  Same objection.

8              THE COURT:  Do I understand that this is not a

9    statement of what occurred but actually just a statement of

10   what is proposed to occur?  I'm asking the witness.

11             THE WITNESS:  Yes.  We had --

12             THE COURT:  No, no, just answer -- so the answer is

13   yes.

14             THE WITNESS:  I'm sorry.

15             THE COURT:  So I'll reverse my original objection;

16   it's not hearsay at all.  Received.

17             MR. HARRIS:  Thank you, your Honor.

18             (Defendant's Exhibit 439 received in evidence)

19   BY MR. HARRIS:

20   Q.  I have just three --

21             THE COURT:  You've got two minutes.

22             MR. HARRIS:  That's all I need.

23             THE COURT:  That's good.  That's all you've got.

24             MR. HARRIS:  That's all I need.

25   Q.  Mr. Deitch, this is a list of various things that need to

1    be done in order to close the deal and who's going to do them?

2    A.  This list actually was administrative tasks that needed to

3    be done in order to have a functioning company when the deal

4    closed on October 18th.

5    Q.  That is fine.

6            If you just look at page 1 of the checklist, which is

7    now up on the screen, although if it could be flipped, it would

8    be helpful --

9    A.  Yep.

10   Q.  -- and you go down to item 3 under "Treasury," do you see

11   that?

12   A.  Yes.

13   Q.  And (a) is termed "bank account operating structure,"

14   right?

15   A.  Yes.

16   Q.  And there's an owner of the project; that's the person

17   who's supposed to do it?

18   A.  Yes.

19   Q.  And there is a Buren listed.  Do you see that?

20   A.  Yes.

21   Q.  Do you know who Buren is?

22   A.  I don't recall.  I know the name Newkirk and I know the

23   name Heinz, but I don't remember Buren.

24   Q.  Okay.

25           MR. HARRIS:  Your Honor, I have no further questions.

1              THE COURT:  All right.  We have one minute left, if
2    there's any redirect.
3              MR. ADAMS:  I've got one minute of redirect, your
4    Honor.
5    REDIRECT EXAMINATION
6    BY MR. ADAMS:
7    Q.  Mr. Deitch, could we please pull up attachment to
8    Exhibit 189.  Mr. Deitch, who's the Merrill Lynch letter
9    addressed to?
10   A.  Harvey Newkirk.
11   Q.  Who did you rely on for information regarding Calvin
12   Darden, Sr.'s at Merrill Lynch?
13   A.  Harvey Newkirk.
14   Q.  You reported to the Alpha Media board with respect to
15   progress on the Maxim sale, correct?
16   A.  Yes.  We had meetings once or twice a week by conference
17   call.
18   Q.  Was it important to you to provide accurate information to
19   the board when you reported to them?
20   A.  Yes.
21   Q.  Was it important that you provide complete information to
22   the board when you reported to them?
23   A.  Yes.
24   Q.  And you had --
25              MR. HARRIS:  Objection; leading.

1          THE COURT:  Overruled.

2     Q.  Were those dues that you had to your client?

3     A.  Yes.

4     Q.  You said you learned that Calvin Darden, Jr. was involved

5     with Darden Media Group at some point after September 9th?

6     A.  Yes.

7     Q.  What role did you understand Mr. Calvin Darden, Jr. to have

8     with respect to Darden Media Group?

9     A.  I actually didn't know.

10    Q.  Who is Dan Broadley, if you know?

11    A.  Dan Broadley works for a firm called Versant Funding, owned

12    by a man named Mark Weinberg.

13    Q.  On November 12, 2013, did you speak with Mr. Broadley?

14          MR. HARRIS:  Objection; hearsay.

15          THE COURT:  Well, the question calls for a yes-or-no

16    answer.

17          THE WITNESS:  I don't recall.  I do recall he called

18    our office.

19    Q.  I'm sorry, sir?

20    A.  He may have spoken to Mr. Dillon in my office.

21    Q.  Do you recall -- do you know, one way or the other, whether

22    that contact from Mr. Broadley was before or after Mr. Newkirk

23    reached out to you on the 12th?

24          MR. HARRIS:  Objection.

25          THE COURT:  Sustained.

FBNKNEW4                         Deitch - redirect

1           MR. ADAMS:  No further questions, your Honor.

2           THE COURT:  All right.

3           So, ladies and gentlemen, thank you very much.  And we

4    will see you tomorrow at 9:00 a.m.

5           (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FBNKNEW4

```
 1                (Jury not present)

 2                THE COURT:  You can step down.

 3                THE WITNESS:  Thank you, your Honor.

 4                (Witness excused)

 5                THE COURT:  So who is your first witness tomorrow?

 6                MR. ADAMS:  Your Honor, we intend to call Shaul

 7     Greenwald first tomorrow.  My understanding, as of today, was

 8     that he could not come today, as we had expected, because of a

 9     family funeral but I understand he will be available tomorrow.

10                And if I can just address very quickly what we

11     expect --

12                THE COURT:  Who else are you calling tomorrow?

13                MR. ADAMS:  Junior, Calvin Darden, Jr.?

14                THE COURT:  How long is this other guy going to be?

15                MS. PAUL:  30 minutes, your Honor.

16                THE COURT:  What's he going to say?

17                MR. ADAMS:  Mr. Greenwald is one of the victims.  He

18     postdates the November 12th and November 19th fiasco and

19     communications from Calvin Darden, Sr. to Mr. Newkirk that we

20     heard about previously.  So we think this is not cumulative, it

21     is someone who is experiencing representations from Mr. Newkirk

22     even after Calvin Darden, Sr. has very explicitly withdrawn

23     from any participation in the deal, and his testimony will be

24     brief.

25                THE COURT:  Do you have any witnesses after
```

FBNKNEW4

1   Calvin, Jr.?

2           MR. ADAMS:  Yes, your Honor.  We will be calling

3   Chaeri Tornay, I think, immediately after Calvin Darden, Jr.

4   and Vincent Alfieri, who's on both our --

5           THE COURT:  So why can't you call this guy after

6   Calvin Darden, Jr.?

7           MR. ADAMS:  I think we can, your Honor.

8           THE COURT:  Good.  So we'll start with Calvin

9   Darden, Jr. tomorrow and the other fellow will come next week.

10          MR. ADAMS:  Thank you, your Honor.

11          THE COURT:  Now, defense counsel is going to give me

12  her best estimate as to whether the defendant was going to take

13  the stand.

14          MS. CHAUDHRY:  With the agreement that it's not

15  binding, we believe he will.

16          THE COURT:  He will?

17          MS. CHAUDHRY:  Yes, sir.

18          THE COURT:  All right.  Very good.  We'll see you

19  tomorrow.

20          MS. CHAUDHRY:  Your Honor, sorry, one small thing --

21  it doesn't actually have to be on the record -- we are down to

22  one alternate and Juror No. 6 is sniffling, three of them were

23  wearing their coats.  If we could just make it a little warmer

24  so we don't lose another alternate?

25          THE COURT:  Well, you are assuming a power that is not

```
 1    given to federal judges.  However, I agree with you that the
 2    exact temperature right now is 70 and it was 69 when we first
 3    got together this morning, whereas it should be 72.  So I will,
 4    with a great deal of bowing and scraping, bring that to the
 5    attention of the powers that be and beg them to get it up to 72
 6    by tomorrow morning.
 7                 MS. CHAUDHRY:  And, your Honor, there is one issue
 8    that the government and I are going to try to resolve.  If we
 9    can't, I am happy to be here ten minutes before 9:00 to bring
10    it up to the Court so the jury does not wait, and with your
11    permission we would just let Mr. Infallible know if we need to
12    be here a little bit early.
13                 THE COURT:  When are you going to know?
14                 MS. CHAUDHRY:  After we talk.
15                 THE COURT:  When are you going to talk?
16                 MS. CHAUDHRY:  Right now.
17                 THE COURT:  Okay.  So let me know by 2:00 o'clock.
18                 MR. ADAMS:  And, your Honor, I'm sorry, last thing:
19    In advance of Calvin Darden, Jr. coming on, it's our intention
20    to provide a redacted version of his cooperation agreement that
21    will address the 403 ruling with respect to the boxing venture.
22                 THE COURT:  Okay.
23                 MR. ADAMS:  Thank you.
24                 (Adjourned to November 24, 2015 at 9:00 a.m.)
25                                    * * *
```

832

```
 1                      INDEX OF EXAMINATION
 2   Examination of:                              Page
 3   ROBERT WOLF
 4   Direct By Ms. Paul . . . . . . . . . . . . 715
 5   Cross By Mr. Harris  . . . . . . . . . . . 756
 6   Redirect By Ms. Paul . . . . . . . . . . .780.
 7   LAURENCE DEITCH
 8   Direct By Mr. Adams  . . . . . . . . . . . 781
 9   Cross By Mr. Harris  . . . . . . . . . . . 812
10   Redirect By Mr. Adams  . . . . . . . . . . 826
11                      GOVERNMENT EXHIBITS
12   Exhibit No.                              Received
13    187   . . . . . . . . . . . . . . . . . . 784
14    188   . . . . . . . . . . . . . . . . . . 786
15    190   . . . . . . . . . . . . . . . . . . 794
16    191   . . . . . . . . . . . . . . . . . . 796
17    192   . . . . . . . . . . . . . . . . . . 797
18    193   . . . . . . . . . . . . . . . . . . 799
19    194   . . . . . . . . . . . . . . . . . . 801
20    195   . . . . . . . . . . . . . . . . . . 803
21    197   . . . . . . . . . . . . . . . . . . 810
22                      DEFENDANT EXHIBITS
23   Exhibit No.                              Received
24    342   . . . . . . . . . . . . . . . . . . 778
25    189   . . . . . . . . . . . . . . . . . . 791
```

833

439     . . . . . . . . . . . . . . . . . 824