FBOKNEW1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

       v.                                14 CR 534(JSR)

HARVEY NEWKIRK,

       Defendant.

------------------------------x

                            New York, N.Y.
                            November 24, 2015
                            9:30 a.m.

Before:

                  HON. JED S. RAKOFF,

                            District Judge

                    APPEARANCES

PREET BHARARA
    United States Attorney for the
    Southern District of New York
ANDREW C. ADAMS
SARAH E. PAUL
    Assistant United States Attorneys

HARRIS, O'BRIEN, ST. LAURENT & CHAUDHRY, LLP
    Attorneys for Defendant Newkirk
JONATHAN A. HARRIS
PRIYA CHAUDHRY
JARED FOLEY

Also present:  Stephan Francois, paralegal
                 Chloe Marmet, paralegal
                 Paul Deal, Secret Service
                 James Hilliard, FBI

FBOKNEW1                          C. R. Darden – direct

1            (In open court; jury present)

2            THE COURT:  Good morning, ladies and gentlemen, and my

3    apologies for the delay and thank you for your promptness.  The

4    delay was totally my fault.  I have been thinking whether I

5    should hold myself in contempt of court but I made a really

6    impassioned mercy pitch to myself and convinced myself to

7    forgive myself this one time only.  But we are ready to call

8    our next witness.

9            MR. ADAMS:  Thank you.  Your Honor, the government

10   calls Calvin Ramarro Darden.

11    CALVIN RAMARRO DARDEN,

12        called as a witness by the Government,

13        having been duly sworn, testified as follows:

14           THE DEPUTY CLERK:  Please be seated.  State your name

15   and spell it slowly for the record.

16           THE WITNESS:  It's Calvin Ramarro Darden, C-a-l-v-i-n

17   Ramarro, R-a-m-a-r-r-o, Darden, D-a-r-d-e-n.

18           MR. ADAMS:  Your Honor, may I?

19           THE COURT:  Counsel.

20   DIRECT EXAMINATION

21   BY MR. ADAMS:

22   Q.  Good morning, Mr. Darden.

23   A.  Good morning.

24   Q.  How old are you?

25   A.  41.

1    Q.  Can you briefly describe your educational background?

2    A.  Sure.  Went to high school, a few different high schools,

3    moved around a lot.  I went to Morehouse College in Atlanta and

4    I left in '97.

5             THE COURT:  Mr. Darden, you need to get closer to the

6    microphone.

7             THE WITNESS:  Sorry.

8             I went to Morehouse College in '92.  I did not -- I

9    left in '97, I did not graduate.  That's the extent.

10   Q.  Where did you work after you left college?

11   A.  Salomon Brothers, and then from Salomon it was Merrill

12   Lynch, and then Smith Barney, then Wachovia, then AIC.

13   Q.  In applying for those jobs, did you represent that you had

14   in fact graduated from college?

15   A.  I did.

16   Q.  Have you ever served time in prison?

17   A.  I have.

18   Q.  Can you briefly describe the crime that resulted in that

19   prison sentence?

20   A.  Sure.  So, I basically lied to my employers and

21   misrepresented the amount of -- the amount of money I had made

22   the previous year, in order to induce them -- in order to gain

23   I guess a higher signing bonus or forgivable loan at my next

24   employer.

25   Q.  What was the sentence that you received in connection with

FBOKNEW1                         C. R. Darden – direct

1    that crime?

2    A.  It was four to twelve.

3    Q.  Did you serve that sentence?

4    A.  I did.

5    Q.  Approximately when were you released from prison?

6    A.  I believe it was September 2008.

7    Q.  Have you been arrested for any crimes since that time?

8    A.  I have.

9    Q.  Have you since pled guilty to crimes?

10   A.  I have.

11   Q.  We'll come back to that in a minute.

12          What is your father's name?

13   A.  Calvin Darden.

14   Q.  Does you yo your father have a middle name?

15   A.  No, he does not.

16   Q.  Do you know an individual named Harvey Newkirk?

17   A.  I do.

18   Q.  Do you see him in the courtroom today?

19   A.  I do.

20          MS. CHAUDHRY:  We stipulate.

21          THE COURT:  Okay.

22          MR. ADAMS:  Thank you.

23   Q.  Who first introduced you to Mr. Newkirk?

24   A.  A gentleman by the name of Brent Watson.

25   Q.  And who is Brent Watson?

1    A.  Brent was a colleague of mine at Merrill Lynch.

2    Q.  When were you first introduced to Mr. Newkirk,

3    approximately?

4    A.  At the end of 2008, the beginning of 2009.

5    Q.  And at the time that you were first introduced to

6    Mr. Newkirk, what, if anything, did you explain to him

7    regarding your recent prison status?

8    A.  I told him, you know, why I was arrested, you know, when I

9    had gotten back.  You know, that's about it.

10   Q.  In general, what was the purpose of your introduction to

11   Mr. Newkirk?

12           MS. CHAUDHRY:  Objection.

13           THE COURT:  Overruled.

14           You may answer.

15           THE WITNESS:  Oh.  We were talking about a potential

16   boxing match between Floyd Mayweather and Manny Pacquiao.

17   Q.  What was the name of the business under which you were

18   operating at that time?

19   A.  The Reign Entertainment Group LLC.

20   Q.  Who controls Reign Entertainment Group?

21   A.  I did, I did.

22   Q.  I'll just refer to it as Reign going forward.

23           Has your father ever held any formal position at

24   Reign?

25   A.  No, he hasn't.

1    Q.  Has your father ever discussed with you the possibility of

2    holding an informal position at Reign?

3    A.  Yes, he has.

4    Q.  Can you describe what that position was?

5    A.  So, in the event that one of the deals closed, you know,

6    that I was going after I had spoken to him about, then he would

7    consider coming on as chairman or in some sort of advisory

8    capacity.

9    Q.  What financing, if any, has your father ever provided for

10   Reign's different business ventures?

11   A.  None.

12   Q.  And what kind of nonfinancial assistance has your father

13   provided to Reign?

14   A.  I would say a lot, you know, so any -- he would provide me

15   with advice or manage -- anything kind of in his warehouse.  He

16   was a manager for a lot of years, so managerial advice, things

17   like that.

18   Q.  Has your father participated in meetings involving Reign's

19   business?

20   A.  He has.

21   Q.  Has he participated on telephone calls involving Reign's

22   business?

23   A.  He has.

24   Q.  For what purpose would your father join in those telephone

25   calls or meetings?

FBOKNEW1                    C. R. Darden – direct

1   A.  Really to provide credibility to whatever it is that we

2   were talking about at the time.

3   Q.  Have you ever used your father's name on contracts

4   associated with Reign's business?

5   A.  I have.

6   Q.  Was that with or without his authorization?

7   A.  That was without.

8   Q.  Was that with or without his knowledge?

9   A.  Without.

10  Q.  At any point did Mr. Newkirk pursue any business

11  opportunities with you in your capacity as the controller of

12  Reign?

13  A.  Yes.

14          MS. CHAUDHRY:  Objection.  May we approach?

15          THE COURT:  Yes, definitely.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

1              (At the sidebar)

2              THE COURT:  I don't see how the government could have

3     put that question without coming to the sidebar.  I had ruled

4     out the boxing stuff with respect to the defendant unless the

5     door was opened and several times, while defense counsel has

6     skirted, she has not opened the door.  I allowed the questions

7     to be put initially to this witness about Reign because it was

8     bringing out past misconduct by him but I don't see how you can

9     possibly inquire in that connection about misconduct or

10    questionable conduct by Mr. Newkirk.

11             MR. ADAMS:  Your Honor, it's not my intention to start

12    asking him about anything having to do with fraud on the boxing

13    right now.

14             THE COURT:  Well, what are you asking?

15             MR. ADAMS:  My understanding from our discussion on

16    the end of the first day of trial, about the 403 ruling, was

17    that it would be permissible to demonstrate that Mr. Newkirk

18    had some connection with Reign, that he had done business with

19    Reign, that he was aware that Junior was a controller of Reign,

20    but I will not be asking anything further about the

21    circumstances of the boxing deal or whether Mr. Darden, Sr.

22    made any sort of personal guarantees.

23             MS. CHAUDHRY:  Your Honor, may I respond?

24             THE COURT:  Yes.

25             MS. CHAUDHRY:  The flow of the questions has been

FBOKNEW1                          C. R. Darden - direct

1   whether Reign was an entity through which he is committing

2   fraud by telling people and signing for people as his dad, and

3   now the next question is, is Mr. Newkirk involved with deals

4   with Reign.  I think that this is in violation of the 404(b).

5   I don't think the jury can unhear that now without me having to

6   explain --

7           THE COURT:  What?  From the question that's just a

8   question that wasn't even answered?

9           MS. CHAUDHRY:  He did answer it.

10          THE COURT:  Pardon?

11          MS. CHAUDHRY:  He did answer it.

12          THE COURT:  Excuse me, the question just put right

13  now?  No.  You objected and I called a sidebar.

14          MS. CHAUDHRY:  I think he answered a previous

15  question:  Through Reign, did you do any business with

16  Mr. Newkirk?  And he said yes.  Then the next question is when

17  I objected because then he asked about boxing.

18          THE COURT:  I'm sorry, I totally disagree with you, I

19  couldn't disagree with you more.  If anything, the Court has

20  leaned over backwards, it seems to me, because I actually think

21  you have in effect come close to opening the door several

22  times, and the notion that the questions put so far, up to the

23  one just put, in any way, shape or form impugn Mr. Newkirk is

24  not one that the Court thinks is a reasonable position.

25          So, to cut through this all, because this is getting

FBOKNEW1                         C. R. Darden – direct

1    silly, the objection to the question is sustained.  I

2    understand the government thinks there's a small window there

3    and the Court did leave open some small window but I think it's

4    not possible to go down this road without raising problems.

5    Sustained.

6              MR. ADAMS:  Your Honor, may I just pose one question

7    that I was going to ask, that I think is slightly different?

8              THE COURT:  Yes.  What's the question?

9              MR. ADAMS:  At any point did Mr. Newkirk have any

10   financial interest in --

11             THE COURT:  Yes, that's precisely the question I

12   allowed you to put, in my rulings in motions in limine.

13             MR. ADAMS:  Thank you, your Honor.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

FBOKNEW1                    C. R. Darden - direct

1              (In open court)

2    BY MR. ADAMS:

3    Q.  Mr. Darden, at any point did Mr. Newkirk have an interest,

4    a financial interest, in the business conducted by Reign

5    Entertainment Group?

6    A.  Yes.

7    Q.  And did Mr. Newkirk operate through any business of his

8    own?

9    A.  He did.

10   Q.  What was that business called?

11   A.  I believe one was Invictus Ventures.  I'm not sure of the

12   other.

13   Q.  In 2011, did Reign have an Internet domain name?

14   A.  It did.

15   Q.  What was it?

16   A.  @TheReignInc.com.

17   Q.  And did you have an email address at that domain name?

18   A.  Yes, I did.

19   Q.  What was it?

20   A.  It was CDarden@TheReignInc.com.

21   Q.  What email address, if any, did your father have at

22   TheReignInc.com?

23   A.  He did not.

24   Q.  Did you also have a Gmail account?

25   A.  I'm sorry, did I?

FBOKNEW1                    C. R. Darden - direct

1    Q.  Yes, sir.

2    A.  Yes, I did.

3    Q.  What was that account?

4    A.  CalvinRDarden@gmail.com.

5    Q.  Has your father ever had access to either your Reign email

6    account or your Gmail account?

7    A.  No, sir.

8    Q.  Are you familiar with a business called Darden Development?

9    A.  I am.

10   Q.  Have you ever had an email address associated with that

11   business?

12   A.  I have.

13   Q.  What was it?

14   A.  CRDarden@DardenDevelopment.com.

15   Q.  At any point have you ever told Mr. Newkirk that your

16   father had access to any of your email accounts?

17   A.  No, I have not.

18   Q.  When writing to -- have you written to Mr. Newkirk from the

19   Reign, Inc. account?

20   A.  Yes, I have.

21   Q.  When doing that, prior to July of 2013, did you write it as

22   yourself or as someone else?

23   A.  As myself.

24   Q.  To your knowledge, did Mr. Newkirk also have his own Gmail

25   account?

1    A.  He did.

2    Q.  Did you occasionally receive emails from that account as

3    well?

4    A.  Yes, I did.

5    Q.  When you received emails from Mr. Newkirk's Gmail account,

6    were they addressed to you as yourself or to your father?

7    A.  To me.

8            MR. ADAMS:  Can we please see Government Exhibit 704

9    in evidence.

10   Q.  Mr. Darden, you have a copy of the exhibits sitting in

11   front of you.  If you could just turn to the ones that we're

12   specifically talking about.  We're at 704 right now.

13   A.  Okay.

14   Q.  Do you recognize this document?

15   A.  I do.

16   Q.  What's the date on this email?

17   A.  July 23rd, 2013.

18   Q.  And who's it from?

19   A.  It's from Harvey -- HNewkirk06@gmail.com.

20           MS. CHAUDHRY:  Excuse me.  That's not what's on the

21   screen.

22   A.  I'm sorry, I'm at 706.  Excuse me.

23   Q.  704, sir.

24   A.  704, I'm sorry.

25   Q.  Thank you.

1              Do you recognize that document?

2    A.  I do.

3    Q.  What is it?

4    A.  It's an email from HNewkirk06@Gmail to me,

5    CDarden@TheReignInc, and Kevin Valentine.

6    Q.  What's the date on this email?

7    A.  It is March 24th, 2013.

8    Q.  And what is it that Mr. Newkirk is writing to you about?

9    A.  It is about in reference to a property that he was

10   interested or negotiating for.

11   Q.  And was he writing to you in your capacity as the

12   controller of Reign?

13   A.  Yes.

14           MS. CHAUDHRY:  Your Honor, I object.  May we approach?

15           THE COURT:  Yes.

16           (Continued on next page)

17

18

19

20

21

22

23

24

25

FBOKNEW1                         C. R. Darden − direct

1              (At the sidebar)

2              MS. CHAUDHRY:  Your Honor, I think the Court's ruling

3    is that they could elicit that there was business with Invictus

4    on the boxing deal.  This is an email about other deals, and I

5    think this is outside the scope of the ruling.  And, also, they

6    say this conspiracy began in August; this is an email from

7    March.  I don't know why it's relevant and I don't know why it

8    comes in.

9              THE COURT:  Well, I think it's relevant background but

10   I also think that we should just move on.  I think we're

11   wasting time.  I don't think the jury can follow any of this at

12   this point in any event, but I don't think it's inconsistent

13   with my ruling.  But let's move on, let's get to the facts of

14   the immediate case.

15             MR. ADAMS:  I will also just say that this exhibit is

16   in evidence through stipulation already.

17             THE COURT:  Yes.

18             MR. HARRIS:  I think that was before the ruling, your

19   Honor.

20             THE COURT:  I'm sorry?

21             MR. HARRIS:  I think that was before your ruling.

22             MS. CHAUDHRY:  It was before the Court's ruling.

23             THE COURT:  What was before my ruling?

24             MR. HARRIS:  In other words, there were some

25   stipulations about −−

849
FBOKNEW1                              C. R. Darden – direct

1              THE COURT:  A stipulation is a stipulation; a

2      stipulation is not dependent on rulings.  If you stipulated it,

3      you stipulated it.  Come on.

4              (Continued on next page)

FBOKNEW1                    C. R. Darden – direct

1          (In open court)

2    BY MR. ADAMS:

3    Q.  Mr. Darden, in 2011, what was your primary telephone

4    number?

5    A.  (347)850-5686.

6    Q.  Was that still your primary phone number in February of

7    2014?

8    A.  Yes, sir.

9          MR. ADAMS:  Can we please publish Government Exhibit

10   902 in evidence, page 2.

11   Q.  Mr. Darden, do you recognize the number (404)227-4067?

12   A.  I do.

13   Q.  What is?

14   A.  That is another telephone number that I had.

15   Q.  And did you also use that number in 2013 and 2014?

16   A.  I did.

17          MR. ADAMS:  Can we, please, go to page 1 of the same

18   exhibit.

19   Q.  The address listed here, Mr. Darden, the Father Capodanno

20   Boulevard, whose address was that?

21   A.  That was my address at the time.

22   Q.  Have you ever impersonated your father using the 4067

23   number?

24   A.  I have.

25   Q.  Have you ever impersonated your father with the intent of

FBOKNEW1                          C. R. Darden - direct

1   fooling Mr. Newkirk?

2   A.  I have not.

3   Q.  Have you ever impersonated your father on telephone calls

4   that Mr. Newkirk participated on?

5   A.  I have.

6   Q.  And when you did that, would you alter your voice in any

7   way?

8   A.  No.

9           MS. CHAUDHRY:  Objection; leading.

10          MR. ADAMS:  Withdrawn.

11  Q.  Mr. Darden, when you did that, how, if at all, would you

12  alter your voice?

13  A.  I did not.

14  Q.  Have you ever placed three-way telephone calls to this 4067

15  number while Mr. Newkirk was on the phone?

16  A.  I believe so.

17  Q.  And for what purpose would you do that?

18  A.  I believe there was -- at the time, there was another

19  individual that I was looking to maybe come into whatever deal

20  it was and they had asked to speak to my father.  So I would

21  call that number, that 404 number, and leave a message, knowing

22  that my father wasn't going to pick that telephone up because

23  it was my phone, so I was the only one that had access to it,

24  and then leave a message like, you know, hey, Dad, call me back

25  or something, something like that.

1    Q.  Did there come a time that you began to pursue an

2    opportunity to purchase Maxim Magazine?

3    A.  Yes, I did.

4    Q.  And at the time that you began that, did Mr. Newkirk still

5    have some financial interest in Reign Entertainment Group?

6    A.  Yes.

7    Q.  Let me ask you to look at Exhibit 601 in evidence.  Let's

8    turn to page 3.

9           Mr. Darden, do you recognize the attachment to 601?

10   A.  Yes, I do.

11   Q.  What is it?

12   A.  This is a -- this is our bid letter, my bid letter, to the

13   investment banker that was heading up the Maxim deal at the

14   time.

15          MR. ADAMS:  Can we please highlight or blow up the

16   first paragraph.

17   Q.  Mr. Darden, which entity was bidding on Maxim?

18   A.  The Reign.

19   Q.  And ultimately, was The Reign or some other entity going to

20   be the acquiring entity of Maxim Magazine?

21   A.  I'm sorry, can you repeat that question, please?

22   Q.  Was Reign going to be purchasing Maxim itself or through

23   some other entity?

24   A.  It was going to be through a newly formed entity.

25          MR. ADAMS:  Can we please turn to Government Exhibit

1    603, please, also in evidence, and look at page 2.

2    Q.  Do you recognize this document?

3    A.  Yes, I do.

4    Q.  What is it?

5    A.  It's an engagement letter between Bryan Cave and Calvin

6    Darden at The Reign Entertainment Group.

7                    (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Fbo6new2                          C.R. Darden – direct

1   BY MR. ADAMS:

2   Q.  Would you turn, please, to page 4.  Whose signatures appear

3   on that page?

4   A.  Harvey Newkirk and my signature.

5   Q.  When you say your signature, over whose name does that

6   signature appear?

7   A.  Over my father's name.

8   Q.  Did you or your father sign that document?

9   A.  I signed it.

10  Q.  Did your father know that you were signing that document?

11  A.  No, sir.

12  Q.  Did you ever tell him that you would be signing any

13  engagement letter with Bryan Cave?

14  A.  No, sir.

15  Q.  During the course of the Maxim deal, when if ever, did you

16  discuss with Mr. Newkirk the use of that initial R in the name

17  Calvin R. Darden Senior?

18  A.  There was a point in the middle -- not sure of the date --

19  where we talked about my father does not have a middle initial,

20  only I have a middle initial, and it would create ambiguity or

21  possibly provide a cover for my father in the event that, you

22  know, something happened.

23  Q.  Was it your preference to use Calvin R. Darden Senior or

24  some other name when signing documents?

25  A.  That was my preference.

Fbo6new2                               C.R. Darden – direct

1    Q.  And during the Maxim deal who raised the issue of using

2    this ambiguous name?

3    A.  Harvey raised it at the time.

4    Q.  And in what circumstances did you want to use that false

5    name?

6    A.  Again, it was to create ambiguity in the event that

7    something happened.  It would basically provide my father with

8    cover as he doesn't have a middle initial.  So Calvin R. Darden

9    Senior really doesn't exist.

10   Q.  Did your father authorize you to sign any documents in

11   connection with the Maxim deal?

12   A.  Not one.

13   Q.  Did you ever tell Mr. Newkirk that you had your father's

14   authorization to sign his name?

15   A.  No, I did not.

16   Q.  Did Mr. Newkirk ever ask you whether you had such

17   authorization?

18   A.  No sir.

19   Q.  Did you provide your father with copies of any of the

20   documents you signed over his name?

21   A.  No, I did not.

22   Q.  Did you win the bid to purchase Maxim?

23   A.  Yes.

24   Q.  Ultimately what was your bid?

25   A.  $31 million.

Fbo6new2                              C.R. Darden - direct

1   Q.  I ask you to turn to Government Exhibit 630, which is in

2   evidence.  Please turn to page 100 of that document.

3           Do you recognize that document?

4   A.  I do.

5   Q.  What is it?

6   A.  This is the asset purchase agreement if I am not mistaken.

7   Q.  What is the heading on this document?

8   A.  "Limited Guaranty".

9   Q.  Who was supposed to be guaranteeing what through this

10  document?

11  A.  My father was supposedly -- sorry, guarantying the purchase

12  price effectively.

13  Q.  Did your father sign this document?

14  A.  No, sir.

15  Q.  Did you ever share the existence of this document with your

16  father?

17  A.  I did not.

18  Q.  Would you please turn to page 107 of the same document.

19          Do you recognize that document?

20  A.  I do.

21  Q.  What is it?

22  A.  In is effectively a proof of funds letter, if you will,

23  from Merrill Lynch.

24  Q.  Who drafted this letter?

25  A.  I did.

Fbo6new2                          C.R. Darden - direct

1    Q.   And who is Broderick A. Jones?

2    A.   He is an advisor at Merrill Lynch.

3    Q.   At the time that this document was created, did you discuss

     it with Mr. Jones?

5    A.   No.

6    Q.   Did you have Mr. Jones' permission to sign this document?

7    A.   I did not.

8    Q.   The letter is addressed at the top to Harvey K. Newkirk.

9    Whose idea was to address the document to Mr. Newkirk?

10   A.   Harvey.

11   Q.   For what purpose was this being addressed to Mr. Newkirk?

12   A.   Basically that there would be less liability.  I guess in

13   the event that -- maybe at the time it was the investment

14   banker, Lee Ann Gliha, if we were to address it to her, she

15   could --

16           MS. CHAUDHRY:  Objection, narrative.

17           THE COURT:  Sustained.

18           MR. ADAMS:  Your Honor, may I have a side bar for the

19   next question?

20           THE COURT:  Excuse me?

21           MR. ADAMS:  May I have a quick side bar for the next

22   question, please?

23           THE COURT:  All right.

24           (Continued on next page)

25

```
 1                (At the side bar)
 2                THE COURT:  Gosh, I am getting so much exercise.
 3                MS. CHAUDHRY:  To keep us warm.
 4                THE COURT:  By the way, I note for the record that
 5      thanks to defense counsel's good suggestion, the courtroom
 6      today is at 72 degrees.
 7                MS. CHAUDHRY:  Thank you.
 8                MR. ADAMS:  Noticeably so.
 9                THE COURT:  Go ahead.
10                MR. ADAMS:  So my next question regarding this Merrill
11      Lynch letter is:  Did you have any help drafting it?  And I
12      expect that he will say Harvey did.
13                THE COURT:  Did you have?
14                MR. ADAMS:  Did you have any help drafting this
15      letter, and I will expect Mr. Darden will say, Yes, Mr. Newkirk
16      helped me draft the letter.
17                The next exhibit, which is stipulated in is draft
18      language that is being exchanged by Mr. Darden Junior and
19      Mr. Newkirk at the Invictus address.  It basically tracks the
20      language of the Merrill Lynch language.  It does mention the
21      promotion for Floyd Mayweather, Jr, but it is not my intention
22      again to ask anything about trying to do anything in particular
23      with this document.  We think it goes to Mr. Newkirk's
24      knowledge of that Merrill Lynch letter, which Mr. Harris opened
25      on, was a fraud.  It also reflected here --
```

Fbo6new2                          C.R. Darden – direct

1          THE COURT:  It is really just three words.

2          MR. ADAMS:  Yes.

3          THE COURT:  Why don't you redact those three words?

4          MR. ADAMS:  Sure.  Thank you.

5          (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Fbo6new2                          C.R. Darden - direct

1            (In open court; jury present)

2    BY MR. ADAMS:

3    Q.  Mr. Darden, did you have any assistance in drafting that

4    Merrill Lynch letter?

5    A.  I did.

6    Q.  Who helped you draft it?

7    A.  Harvey.

8            MR. ADAMS:  Your Honor, may I approach?

9            THE COURT:  Yes.

10   Q.  Mr. Darden, I am showing you what is in evidence as

11   Government Exhibit 703.

12           Do you recognize that document?

13   A.  I do.

14   Q.  What is it?

15   A.  It's an e-mail from me at CDardenTheReignInk.com to

16   HarveyHNewkirk@Invictus.com.

17   Q.  What is the date?

18   A.  January 11th, 2012.

19   Q.  Generally how does the language of that letter compare to

20   the language of the Merrill Lynch letter that we just

21   described?

22   A.  It is generally the same.

23   Q.  And how much in available assets does that letter reflect

24   that your father had at Merrill Lynch?

25   A.  100 million in committed funds.

Fbo6new2                              C.R. Darden - direct

1   Q.  Did you and Mr. Newkirk ever discuss that $100 million

2   number?

3   A.  We did.

4   Q.  Can you describe that conversation?

5   A.  It was -- what we were in -- discuss what we were talking

6   about at the time, the venture?

7   Q.  No, sir.

8        Did Mr. Newkirk and you ever have a discussion about

9   your father actually having a hundred million dollars?

10  A.  Yes.

11  Q.  Can you describe that conversation?

12  A.  I said I wish he had a hundred million dollars and we

13  laughed about it.

14  Q.  The Merrill Lynch letter, what amount of money did that

15  reflect your father having?

16  A.  31 million.

17  Q.  Did you have any discussion about that amount of money with

18  Mr. Newkirk?

19  A.  Yes.  It was essentially the same.

20  Q.  Let me ask you to turn to Government Exhibit 174.

21        Do you recognize that document?

22  A.  I do.

23  Q.  What is it?

24  A.  This is an e-mail from Harvey.Newkirk@KLGates to me at

25  CDardenTheReignInk.com.

1          MR. ADAMS:  Your Honor, the government offers Exhibit

2    174.

3          MS. CHAUDHRY:  We object.

4          THE COURT:  Ground?

5          MS. CHAUDHRY:  Relevance.

6          THE COURT:  Overruled.  Received.

7          (Government's Exhibit 174 received in evidence)

8    BY MR. ADAMS:

9    Q.  Mr. Darden, what was Mr. Newkirk forwarding to you in this

10   e-mail?

11   A.  An example letter of proof of funds.

12   Q.  Let me ask you to turn to Government Exhibit 175.

13        Do you recognize that document?

14   A.  I do.

15   Q.  What is it?

16   A.  It is an e-mail from Harvey.Newkirk@KLGates to me at

17   CDarden@TheReignInc.Com.

18        MR. ADAMS:  Your Honor, the government offers Exhibit

19   175.

20        MS. CHAUDHRY:  Same objection.

21        THE COURT:  Very same objection?

22        MS. CHAUDHRY:  Same objection.

23        THE COURT:  Same ruling.

24        Received.

25        (Government's Exhibit 175 received in evidence)

1              MR. ADAMS:  Can we please publish that.  Thank you.

2    BY MR. ADAMS:

3    Q.  Mr. Darden, what was Mr. Newkirk writing to you about in

4    this e-mail?

5    A.  About the language.  We had had a conversation over the

6    phone.  I asked him if he could give me the language that he

7    just said over the phone and his e-mail said it was the

8    language from the last paragraph of the letter that was

9    previously sent.

10   Q.  And the letter that was previously sent in Government

11   Exhibit 174, how does that compare generally to the language in

12   the Merrill Lynch letter that you described earlier?

13   A.  It is generally the same.  It was --

14             MS. CHAUDHRY:  Objection.  The documents speak for

15   themselves.

16             THE COURT:  No.  This is permissible.  Overruled.

17   Q.  Continue.

18   A.  They generally are the same.  It gives the background of

19   the firm.  The Merrill Lynch letter is obviously from Merrill

20   Lynch.  This one is from Morgan Stanley and is kind of changing

21   the background info but still providing the same client info if

22   you will.

23   Q.  In 2012 did your father actually have a hundred million

24   dollars?

25   A.  My father has never had a hundred million dollars.

Fbo6new2                              C.R. Darden - direct

1    Q.  Did you tell your father that you had won the right to bid

2    on Maxim?

3    A.  I did.

4    Q.  Did you provide him with copies of any of the asset

5    purchase agreements?

6    A.  No, I did not.

7    Q.  Did you tell your father about the testimony obligations

8    set forth in that limited guaranty?

9    A.  No.

10   Q.  Why not?

11   A.  Because he wouldn't have agreed with a personal guaranty.

12   Q.  Did your farther participate in any in way in discussions

13   or meetings regarding Maxim Magazine?

14   A.  He did.

15   Q.  What were the purpose of those discussions in meetings?

16   A.  Again, initially was to gain credibility.  We also had, you

17   know, meetings with the people -- the managers of Maxim.  So we

18   had a meeting that was --

19          MS. CHAUDHRY:  Objection, narrative.

20          THE COURT:  Sustained.

21   Q.  Mr. Darden, did you father also participate in the

22   telephone calls regarding Maxim Magazine?

23   A.  Yes, he did.

24   Q.  With whom did he participate on the phone calls?

25          MS. CHAUDHRY:  Objection.

1              THE COURT:  Ground?

2              MS. CHAUDHRY:  Speculation.  He is asking him what

3    phone calls his far participated in.

4              THE COURT:  Overruled.

5    A.  We had phone calls with the team that I had assembled once

6    the acquisition went through and I had calls with potential

7    investors at the time -- the investment banker at the time.

8    Q.  And during any of those telephone calls or discussions were

9    you concerned at all that the topic of your father's guarantee

10   might come up?

11   A.  No, I was not.

12   Q.  Why not?

13   A.  Because those conversations were conversations that would

14   be had with the investment bankers or the owners of Maxim.  We

15   never had any meetings with the owners of Maxim or with the

16   investment bankers.  So it just -- there wouldn't be any reason

17   why those conversations would come up with people that we were

18   speaking with.

19   Q.  When you say "owners of Maxim," who are you referring to?

20   A.  Alpha Media Group.

21   Q.  Did you ever have any meetings with your father and the

22   management at Maxim?

23   A.  We did.

24   Q.  What was the purposes of those meetings?

25   A.  You know, I like to say they were kind of interviewing to

1  kind of keep their jobs if you will.  We really talked about

2  how the magazine was being run, what we would do differently,

3  listening to what they were saying they would do differently.

4  Q.  At any of these meetings with the management of Maxim, did

5  your father's personal guarantee come up as a topic?

6  A.  Never.

7  Q.  What role, if any, had you asked your father to play at

8  Maxim in the event that your purchase was successful?

9  A.  I asked him to be the chairman.

10  Q.  Prior to the purchase of Maxim, what role, if any, did your

11  father have with respect to the attempted purchase?

12  A.  He didn't.

13        Well, he had an advisory capacity.

14  Q.  What role were you going to be playing at Maxim if you were

15  able to purchase it?

16  A.  I would have been head of the holding company.  Not the

17  magazine itself but the holding company.

18  Q.  When, if ever, did you have conversations with Mr. Newkirk

19  regarding any role that he might have at Maxim if you were able

20  to purchase it?

21  A.  When you say "when," I don't remember the -- we've had

22  conversations.  I cannot tell you the date in which those

23  conversations have taken place if that is what you are asking.

24  Q.  Can you describe the content of the conversations?

25  A.  So at the time I felt that he knew more about the asset

1    than virtually anyone.  He had done a lot of work with it.  We

2    talked about him being the president or chief operating officer

3    for the magazine itself.

4    Q.  Let me ask you to turn to the very last document in your

5    binder.  It is actually Defense Exhibit 331.

6              Do you recognize that document?

7    A.  I do.

8    Q.  What is it?

9    A.  It's an e-mail from me at CalvinRDarden@Gmail to my father

10   and a gentleman named Wally Buran.

11   Q.  Can you please turn to the attachment and directing you to

12   the first line referring to "a complete pledge of 1.5 million

13   in shares for extension."

14   A.  Yes.

15   Q.  What was that in reference to?

16   A.  That was in reference to an extension.  There was a point

17   when I was speaking with the investment banker and I needed an

18   extension because obviously I didn't have the money to close.

19   So we agreed on a million-and-a-half-dollar extension that they

20   would push to the end.

21   Q.  Did you discuss how you planned to pay for that extension

22   with your father?

23   A.  My father, no.

24   Q.  Why were you comfortable sending this document to your

25   father?

Fbo6new2                          C.R. Darden - direct

1   A.  Because it was a checklist.  I was kind of showing him

2   where I was in the process.  So that was essentially it.  And

3   kind of showing him that I was going to get this closed.

4   Q.  In your experience in dealing with your father, how often

5   was he actually reading e-mails that you were sending?

6           MS. CHAUDHRY:  Objection.

7           THE COURT:  Sustained as to form.

8   Q.  Mr. Darden, how frequently would you discuss e-mails that

9   you sent to your father with your father?

10  A.  He -- we discussed -- he said it better catch his attention

11  in the first line or two because he doesn't read --

12          MS. CHAUDHRY:  Objection, nonresponsive.

13          THE COURT:  Sustained.

14  Q.  Mr. Darden, did your winning bid get any press at the time?

15  A.  It did.

16  Q.  Did you or someone else speak to the press on behalf of

17  Reign Entertainment?

18  A.  Yea.  We had a PR person.

19  Q.  When, to your knowledge, did your father speak to the

20  press?

21  A.  He didn't.

22  Q.  Was your father nevertheless quoted in articles in the

23  press?

24  A.  Yes.

25  Q.  How did the authors come to get quotes from your father?

1    A.  They would send a list of their questions and I would

2    answer the questions back through the PR person.

3    Q.  Let me ask you to turn to what is in evidence as Government

4    Exhibit 710.

5              Do you recognize that document?

6    A.  I do.

7    Q.  What is it?

8    A.  This is an e-mail from Harvey.Newkirk@BryanCave to me.

9    Q.  Sorry, 710.  Sorry.  Do you have it in front of you?

10   A.  I do.

11   Q.  You can look on your screen as well.

12   A.  Yes.

13   Q.  Do you recognize that document?

14   A.  I do.

15   Q.  What is it?

16   A.  Sorry.  I misspoke it was actually from me at

17   CDarden@TheReignInc.Com to Harvey.Newkirk@BryanCave.

18   Q.  What were you sending to Mr. Newkirk?

19   A.  A list of -- a list of the questions that the PR company

20   had -- PR firm had sent over.

21   Q.  Had you drafted the sample questions?

22   A.  The PR firm.

23   Q.  Did you share these with your father?

24   A.  I did not.

25   Q.  Among those questions do you see anything referring to your

Fbo6new2                              C.R. Darden - direct

1   father's purported personal guarantee?

2   A.  No.

3   Q.  Did you provide any quotes to the press related to your

4   father's personal guarantee?

5   A.  No.

6   Q.  Why not?

7   A.  It was just -- I never seen a press report talk about

8   personal guarantees.  It is not commonplace or practice.  It is

9   not something they asked or anything that I would certainly

10  volunteer.

11  Q.  Did there come a time that you created a personal financial

12  statement for your father?

13  A.  Yes.

14  Q.  Did you have any assistance in creating that document?

15  A.  I did.

16  Q.  Who helped you?

17  A.  Harvey.

18  Q.  Will you please turn to what has been marked for

19  identification as Government Exhibit 168.

20          Do you recognize that document?

21  A.  I do.

22  Q.  What is it?

23  A.  It's an e-mail from Harvey.Newkirk@BryanCave to me at

24  CalvinRDarden@Gmail.

25          MR. ADAMS:  Your Honor, the government offers Exhibit

1  168.

2            MS. CHAUDHRY:  Your Honor, we would not object if the

3  government clarifies what the attachment actually is to this

4  exhibit.

5            THE COURT:  Okay.  So the exhibit will be received,

6  but you can ask him about what the attachment is.

7            (Government's Exhibit 168 received in evidence)

8  BY MR. ADAMS:

9  Q.  Mr. Darden, what is attached to this e-mail?

10  A.  A personal financial statement.

11  Q.  Why was it being provided by Mr. Newkirk to you?

12            MS. CHAUDHRY:  Objection, speculation.

13            THE COURT:  Sustained as to form.

14  Q.  Had you requested such a document from Mr. Newkirk?

15  A.  I had.

16  Q.  Why?

17  A.  Because I hadn't seen one.  I just didn't know what form

18  the personal financial statement -- what it needed to look

19  like, what it looked like.

20  Q.  What did you plan on doing with a personal financial

21  statement?

22  A.  There were several potential lenders that had asked for it.

23  Q.  Let me ask you to turn to what has been marked for

24  identification as Exhibit 169.

25            Do you recognize that document?

872

1    A.  I do.

2    Q.  What is it?

3    A.  It's an e-mail from Harvey.Newkirk@BryanCave to me at

4    CalvinRDarden@Gmail.

5    Q.  Is anything attached to it?

6    A.  It is.  It's a blank personal financial statement.

7         MR. ADAMS:  Your Honor, the government offers Exhibit

8    169.

9         MS. CHAUDHRY:  No objection.

10        THE COURT:  Received.

11        (Government's Exhibit 169 received in evidence)

12   BY MR. ADAMS:

13   Q.  Mr. Darden, was this being provided to you for the same or

14   for a different purpose?

15   A.  For the same.

16   Q.  And did there come a time that you made use of this second

17   example of a personal financial statement?

18   A.  Yes.

19   Q.  Did you discuss the content of your father's personal

20   financial statement with Mr. Newkirk?

21   A.  I did.

22   Q.  What did you discuss?

23   A.  I discussed the numbers, discussed what needs to go where,

24   the amount that it needed to show in order to kind of satisfy

25   the -- the potential lenders or the sellers.

Fbo6new2                              C.R. Darden - direct

1    Q.  Let me ask you to turn to Exhibit 171.

2            Do you recognize that document?

3    A.  I do.

4    Q.  What is it?

5    A.  Again, it is an e-mail from Harvey to me at -- excuse me.

6    Actually I am CC'd on it as well.  But it is a -- it's a copy

7    of the personal financial statement filled out.

8            MR. ADAMS:  Your Honor, the government offers

9    Government Exhibit 171.

10           MS. CHAUDHRY:  No objection.

11           THE COURT:  Received.

12           (Government's Exhibit 171 received in evidence)

13           MR. ADAMS:  Can we please publish that.  Thank you.

14   BY MR. ADAMS:

15   Q.  Mr. Darden, to whom is Mr. Newkirk sending this personal

16   financial statement?

17   A.  To the gentlemen at Forefront Capital.  I was CC'd as well.

18   Q.  You were CC'd at which address?

19   A.  My G-Mail.

20   Q.  What is Forefront Capital?

21   A.  They were an investment banking firm, merchant banking.

22   Q.  What was their role in the Maxim deal?

23   A.  Initially they were advisors.  They were going to raise

24   money for us.

25   Q.  Did there come a time that Forefront executed a commitment

Fbo6new2                          C.R. Darden - direct

1   letter in connection with the Maxim deal?

2   A.  Yes, they did.

3   Q.  What was the purpose of the Forefront commitment letter?

4   A.  I guess at the time Alpha wasn't comfortable with one

5   individual being --

6              MS. CHAUDHRY:  Objection.

7              THE COURT:  Ground?

8              MS. CHAUDHRY:  Speculation, foundation.  He is

9   testifying about what another party was feeling.

10             THE COURT:  Sustained.

11  Q.  Mr. Darden, did you request a commitment letter from

12  Forefront?

13  A.  I requested a commitment letter from Forefront when it was

14  requested by the investment bankers that they provide one.

15  Q.  Who participated in negotiating such a commitment letter

16  for you?

17  A.  Harvey.

18  Q.  Can you please turn to what is in evidence as Government

19  Exhibit 707.

20             Turning to the attachment, do you recognize this

21  document?

22  A.  I do.

23  Q.  What is it?

24  A.  This is from me at CDarden@TheReign to Harvey that attaches

25  the commitment letter from Forefront.

Fbo6new2                          C.R. Darden - direct

1    Q.  Did you ever share the existence of the commitment letter

2    with Alpha Media?

3    A.  Yes.

4    Q.  Did you also participate in drafting a release from the

5    same agreement?

6    A.  Yes.

7    Q.  Can you please turn to Exhibit 709 in evidence.

8            Do you recognize this document?

9    A.  I do.

10   Q.  What is Mr. Newkirk sending to Mr. Reifler?

11   A.  This is the general release and indemnification agreement.

12   Q.  Who participated in the general release on your behalf?

13   A.  That will be Harvey.

14   Q.  Did your father sign either the commitment letter or the

15   general release?

16   A.  No, he didn't.

17   Q.  Did you tell him about either?

18   A.  No.

19   Q.  To your knowledge did Mr. Newkirk tell him about either?

20   A.  Not to my knowledge.

21   Q.  To your knowledge did either you or Mr. Newkirk inform

22   Alpha Media of the existence of the general release?

23   A.  Definitely not.

24   Q.  Let me ask you to turn to Exhibit 144 marked for

25   identification.

Fbo6new2                              C.R. Darden - direct

1              Mr. Darden, in addition to signing documents over

2     Calvin R. Darden Senior, were there also times that you signed

3     documents of your own name?

4     A.  I did.

5     Q.  Looking at Exhibit 144, do you recognize this set of

6     documents?

7     A.  I do.

8     Q.  What are they?

9     A.  They were letters -- I guess employment letters to the

10    employees -- then employees of Maxim.

11             MR. ADAMS:  Your Honor, the government offers Exhibit

12    144.

13             MS. CHAUDHRY:  No objection.

14             THE COURT:  Received.

15             (Government's Exhibit 144 received in evidence)

16    BY MR. ADAMS:

17    Q.  Mr. Darden, why were you signing these over the name Calvin

18    Darden Junior?

19    A.  Because I was signing them in the -- I had to sign them in

20    the office or in the conference room at Harvey's firm.  There

21    was -- I am sorry, I forget her name, but the assistance there

22    at the time, so I couldn't signed it Calvin Darden Senior

23    because obviously I wasn't Calvin Darden Senior.  So those

24    documents I had to sign Calvin Darden Junior.

25             MR. ADAMS:  Ms. Marmet, can we display the signature

1    page on 184 and page 8 of Government Exhibit 516 in evidence.

2    Can we blow up the signatures on both.

3    Q.  Mr. Darden, did you alter your signature in any way when

4    signing over your own name?

5    A.  I did.

6    Q.  Can you describe what you did to alter your signature?

7    A.  I just kind of left the L out of it.  There were a lot of

8    documents that I still had to sign quickly.  So I had to be

9    able to sign it quickly and be comfortable doing it; but it had

10   to be different from how I normally sign my name if you will.

11   Q.  Did you have any discussion with Mr. Newkirk regarding that

12   alteration before you signed the documents in Exhibit 144?

13   A.  I did.

14   Q.  Can you describe that discussion, please?

15   A.  Because all the other -- all the other documents had been

16   signed as my father because I wasn't signing as my father.  At

17   that particular time that signature would have to be different.

18   It couldn't be the same if I am signing as myself at that

19   particular time.

20   Q.  Did there come a time that you obtained a loan from a

21   company called Open Gate Capital?

22   A.  There did.  There was.

23   Q.  Why did you need the loan from Open Gate?

24   A.  For an extension.

25   Q.  An extension for what?

Fbo6new2                              C.R. Darden - direct

1    A.  To close.

2    Q.  I will ask you to turn to Exhibit 118, which is in

3    evidence.

4            Do you recognize this pledge and security agreement?

5    A.  I do.

6    Q.  Turn please to page 23 of that exhibit.  What appears on

7    this Schedule 4(C) here?

8    A.  It is a list of stocks from Coca-Cola, Target and Cardinal

9    Health.

10   Q.  What is it that you were doing with these stocks?

11   A.  Pledging the stocks.

12   Q.  Whose stocks were these purported to be?

13   A.  My father's.

14   Q.  Did your father in fact have stock in these three

15   companies?

16   A.  He did.

17   Q.  Do you see the reference here to an account ending in 1905

18   in which the shares are held?

19   A.  Yes.

20   Q.  Were these stock shares actually held in such an account?

21   A.  No, they weren't.

22   Q.  Was your father's stock actually available to be pledged as

23   collateral for a loan?

24   A.  No it was not.

25   Q.  Why not?

879

1   A.  Because it was -- all the shares were restricted because of

2   his -- he was an insider or is an insider at those companies.

3   So they are not freely tradeable shares.  He is not allowed to

4   do that as an insider.

5   Q.  Did you ever tell Mr. Newkirk that this stock was available

6   to pledge as collateral?

7   A.  I did not.

8   Q.  Did you ever tell Mr. Newkirk that your father was willing

9   to pledge any stock as collateral?

10  A.  Definitely not.

11          MR. ADAMS:  Your Honor, may I approach?

12          THE COURT:  Yes.

13  Q.  Handing you what is in evidence as Government Exhibit 117,

14  Mr. Darden.  Do you recognize this document?

15  A.  I do.

16  Q.  What is it?

17  A.  This is a promissory note between Calvin R. Darden Senior

18  and Open Gate Capital.

19  Q.  Will you turn, please, to the last page, 5 of 5.

20          Was this actually notarized?

21  A.  Yes.

22  Q.  Did your father actually sign this document?

23  A.  No, he did not.

24  Q.  How did you go about signing an actually notarization of

25  this document?

Fbo6new2                         C.R. Darden - direct

1   A.  Because my name is Calvin Darden.  So unless you know my

2   father, you wouldn't know whether I am signing as Junior or

3   Senior.  So I can get a document notarized as Calvin Darden.

4   Q.  Who negotiated these agreements with Open Gate on your

5   behalf?

6   A.  Harvey.

7   Q.  Did there come a time that Open Gate asked for a copy of

8   the prior Forefront commitment letter to Alpha Media Group?

9   A.  Yes.

10  Q.  Can you please turn to what is in evidence as Government

11  Exhibit 606.

12          Do you recognize this document?

13  A.  I do.

14  Q.  What is it?

15  A.  This is an e-mail from me to the CEO of Open Gate attaching

16  the commitment letter from Forefront.

17  Q.  Was that the commitment letter to Alpha Media Group or to

18  someone else?

19  A.  To Alpha Media.

20  Q.  By this time had you already executed the general release

21  and indemnification of that same commitment letter?

22  A.  Yes.

23  Q.  Did you inform Open Gate of the existence of that general

24  release?

25  A.  No.

Fbo6new2                              C.R. Darden - direct

1   Q.  To your knowledge did Mr. Newkirk ever inform Open Gate of

2   the existence of that general release?

3           MS. CHAUDHRY:  Objection.

4           THE COURT:  Ground?

5           MS. CHAUDHRY:  Speculation.

6           THE COURT:  Well, he is asking to the witness's

7   knowledge.  I will allow it.  Overruled.

8   A.  No.

9   Q.  Did there come a time that Open Gate asked for its own

10  commitment letter?

11  A.  Yes.

12  Q.  Did you provide it?

13  A.  Yes.

14  Q.  Did you also release Forefront from the Open Gate

15  commitment letter?

16  A.  Yeah.  That was the only way they would provide it.

17  Q.  Did you discuss that commitment for Open Gate and the

18  release with Mr. Newkirk?

19  A.  Yes.

20  Q.  Can you describe that conversation?

21  A.  It was actually a conversation that Harvey and I had with

22  the CEO of Forefront.  So once we told him that we needed a

23  commitment letter, he said the only way he would provide one is

24  if we provided him with an indemnification against it.

25  Q.  Please turn in your binder to what has been marked for

Fbo6new2                              C.R. Darden - direct

1    identification as Government Exhibit 177.

2              Do you recognize that document?

3    A.  I do.

4    Q.  What is it?

5    A.  It's an e-mail from Harvey to me saying to sign and send to

6    Brad.  It attaches the indemnification agreement.

7              MR. ADAMS:  Your Honor, the government offers Exhibit

8    177.

9              MS. CHAUDHRY:  No objection.

10             THE COURT:  Received.

11             (Government's Exhibit 177 received in evidence)

12   BY MR. ADAMS:

13   Q.  Mr. Darden, to which of your e-mail accounts was this being

14   sent?

15   A.  To CalvinRDarden@Gmail.

16   Q.  Who drafted the release or who negotiated the release on

17   your behalf?

18   A.  Harvey.

19   Q.  In this e-mail who does Mr. Newkirk instruct to sign the

20   agreement?

21   A.  Me.

22   Q.  To your knowledge did Mr. Newkirk ever ask your father to

23   sign any document in connection with the Maxim deal?

24   A.  Not to my knowledge, no.

25   Q.  Did you tell Open Gate about this release agreement from

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Fbo6new2                          C.R. Darden - direct

1    Forefront?

2    A.  I did not.

3    Q.  Did Open Gate in fact provide some funding for the Maxim

4    deal?

5    A.  They did.

6    Q.  What was it?

7    A.  3.1 million.

8    Q.  Where was that sent?

9    A.  Directly to the Alpha or owners or the lawyers, but it went

10   directly to them.

11   Q.  Did there come a time that you defaulted on the Open Gate

12   loan?

13   A.  It did.

14   Q.  Approximately how long after getting the money?

15   A.  I don't remember exactly.  I mean, the term of the loan

16   was -- I don't even know if it was a week.  So it was

17   immediately after.  So a matter of days.

18   Q.  Let me ask you to turn to what is in evidence as Government

19   Exhibit 608.

20          Mr. Darden, do you see the reference by Mr. Ellis to

21   his attempts to contact Mr. Newkirk?

22   A.  I do.

23   Q.  Did you have any discussions with Mr. Newkirk regarding

24   Ellis's attempts to reach out to him?

25   A.  I did.

Fbo6new2                          C.R. Darden - direct

1   Q.  Can you describe those conversations?

2   A.  We were trying to buy time and as Harvey said he would try

3   to avoid his phone calls or responding to e-mail for as long as

4   possible in order to buy some time to close.

5   Q.  Did you tell your father about the nonpayment of the Open

6   Gate loan?

7   A.  Definitely not.

8   Q.  To your knowledge did Mr. Newkirk inform your father of the

9   nonpayment on that loan?

10  A.  No, he did not to my knowledge.

11  Q.  Despite defaulting on the Open Gate loan, did you continue

12  pursuing financing after this Open Gate demand for repayment?

13  A.  Yes.

14  Q.  Let me ask you to turn to what has been marked for

15  identification as Government Exhibit 119.

16          Do you recognize this document?

17  A.  I do.

18  Q.  What is it?

19  A.  This is the agreement for a third extension.

20          MR. ADAMS:  Your Honor, the government offers 119.

21          MS. CHAUDHRY:  No objection.

22          THE COURT:  Received.

23          (Government's Exhibit 119 received in evidence)

24  BY MR. ADAMS:

25  Q.  Mr. Darden, if you turn, please, to the second page looking

Fbo6new2                          C.R. Darden - direct

1  at the paragraph -- the numbered paragraph one, how much did

2  you promise to pay for this new extension?

3  A.  Five million.

4  Q.  Looking at paragraph two, what was the new purchase

5  deadline?

6  A.  November 12th, 2013.

7  Q.  Let me ask you to turn to what is already in evidence as

8  Government Exhibit 609.  Turning to page 3, what is the

9  attachment on this document?

10  A.  This was the terms of the promissory note.

11  Q.  Promissory note between?

12  A.  Between Darden Media Group and MDW Funding.

13  Q.  Who is the controller at MDW funding?

14  A.  Mark Weinberg.

15  Q.  Looking at the portion that we discussed financing amount,

16  how much were you to be everything is?

17  A.  5,500,000.

18  Q.  If you turn, please, to page 4, the section headed

19  "guarantee," what was being offered to Mr. Weinberg in exchange

20  for that 5.5 million?

21  A.  Stock held purportedly held at Bank of America, Merrill

22  Lynch.

23  Q.  If you turn back to page 1 of the exhibit, the e-mail

24  itself, what is Mr. Newkirk telling you?

25  A.  That it is good to execute.

Fbo6new2                          C.R. Darden - direct

1   Q.  To which e-mail address is Mr. Newkirk sending this?

2   A.  My G-Mail.

3   Q.  Let me ask you to turn, please, to 307 in evidence.  If you

4   turn, please, to the attachment beginning on page 3, do you

5   recognize this document?

6   A.  I do.

7   Q.  What is it?

8   A.  A statement from Bank of America.

9   Q.  If you turn also to page 7 of the same exhibit, what is

10  that document?

11  A.  Another statement from Bank of America.

12  Q.  What do these bank statements purport to be?

13  A.  Holdings of stock from Coca-Cola, Target, Cardinal Health.

14  Q.  And who created these documents?

15  A.  A gentleman named Eric Flewellyn.

16  Q.  At whose direction were these documents created?

17  A.  Mine.

18  Q.  What instructions did you give to Mr. Flewellyn?

19  A.  Just the amount that it needs to show.

20  Q.  Apart from the dates on these documents, how does the

21  content differ at all?

22  A.  It doesn't.

23  Q.  Was that purposeful or an oversight?

24  A.  No.  It was an oversight certainly.

25  Q.  Turning to the first page here --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Fbo6new2                    C.R. Darden - direct

1    A.  Excuse me, first page, page number 1?

2    Q.  Yes, sir, of the e-mail.  Do you see where Mark Weinberg

3    has sent this to Greg Watson and to The Reign Inc. account?

4    A.  Yes.

5    Q.  Did you discuss Mr. Weinberg's discovery regarding these

6    two statements with Mr. Newkirk?

7    A.  I did.

8    Q.  Did you discuss that initially over the phone or in person?

9    A.  That was over the phone.

10   Q.  Who called whom upon Mr. Weinberg's discovery?

11   A.  He called me about it.

12   Q.  What did he tell you?

13   A.  That Mark Weinberg had noticed that the dates were the

14   same -- sorry.  The dates were different but all of the

15   information in the statements were identical.

16   Q.  Before that conversation with Mr. Newkirk had you realized

17   that the statements were essentially identical but for the

18   dates?

19   A.  No, I hadn't.

20   Q.  Did you discuss that oversight with Mr. Newkirk?

21   A.  I did.

22   Q.  What was his reaction to the oversight?

23   A.  Well, I told him that -- I hadn't realized it when -- when

24   Eric had sent them over and that we would just tell, you know,

25   Mark Weinberg that it was obviously some sort of mistake on

Fbo6new2                          C.R. Darden - direct

 1    Merrill Lynch Bank of America's part, that we would get to the

 2    bottom of it.

 3    Q.  Did you ever tell Mr. Newkirk that you actually thought

 4    that the statements were a mistake on the bank's part?

 5    A.  No.

 6    Q.  Did there come a time that Mr. Weinberg sent a money to the

 7    Bryan Cave escrow account?

 8    A.  Yes.

 9    Q.  Did Mr. Weinberg ever authorize you to send that money to

10    Alpha Media?

11    A.  No.

12    Q.  Let me ask you to turn to Exhibit 716 in evidence.

13            Mr. Darden, do you recognize this document?

14    A.  I do.

15    Q.  What is it?

16    A.  This is an e-mail from me at CDarden@TheReignInc.com to

17    Harvey.Newkirk@BryanCave.com.

18    Q.  And what were you writing to Mr. Newkirk in this e-mail?

19    A.  Authorizing the release of five million to Bodman, PLC,

20    which was Alpha Media's lawyer.

21    Q.  What is the date on this e-mail?

22    A.  November 8th, 2013.

23    Q.  As of November 8th, 2013, did you have any agreement with

24    Mr. Weinberg to forward his money?

25    A.  No, sir.

Fbo6new2                          C.R. Darden - direct

1    Q.  So why did you send this e-mail?

2    A.  Harvey asked.  He said that I had to send him an e-mail

3    authorizing the release.

4    Q.  And how did you sign off on the e-mail?

5    A.  Calvin Darden Senior.

6    Q.  Did you discuss how this document needed to be signed with

7    Mr. Newkirk?

8    A.  Yes.

9    Q.  Can you describe that conversation?

10   A.  He told me that it needed to be signed as my father.

11   Q.  Can you please turn to Government Exhibit 314.

12           Do you recognize that document?

13   A.  I do.

14   Q.  What is it?

15   A.  It's a release of funds.  It's a release of funds to Harvey

16   purportedly from Mark Weinberg.

17   Q.  When you say "purportedly from Mark Weinberg," who is this

18   actually from?

19   A.  From me.

20   Q.  How did you go about creating this document?

21   A.  It was a spoof e-mail app I guess.

22   Q.  Let me ask you to turn to 612 in evidence.

23           Do you have that document, sir?

24   A.  Yes, I do.

25   Q.  Do you recognize it?

Fbo6new2                         C.R. Darden - direct

1    A.   I do.

2    Q.   What is it?

3    A.   It's an e-mail from my wife's account to my account.

4    Q.   The reference to Anonymailer log-in details, what does that

5    refer to?

6    A.   That was the app I just referenced.

7    Q.   What is it exactly that Anonymailer does?

8    A.   You can send an e-mail and make it look like it is from

9    whomever you want it to be from.

10   Q.   And in the "from" line where it says to Suhal7, who is that

11   supposed to be?

12   A.   That is my wife's e-mail account.

13   Q.   Did your wife actually send this e-mail?

14   A.   She did not.

15   Q.   Why were you using your wife's account?

16   A.   Because you had to use PayPal for it and she had PayPal for

17   her account so I used it.

18   Q.   Let me ask you to turn to 614 also in evidence.

19        Do you recognize this document?

20   A.   I do.

21   Q.   What is it?

22   A.   It was a test e-mail that I used from the Anonymailer app

23   that I sent to myself.

24   Q.   Why were you sending this spoofed e-mail to Mr. Newkirk?

25   A.   To get the funds that were being held in escrow there moved

Fbo6new2                          C.R. Darden - direct

1    to the seller's escrow in order to buy time.

2    Q.  Before you sent this spoofed e-mail to Mr. Newkirk, did you

3    call Mr. Newkirk?

4    A.  I did.

5    Q.  Can you describe that conversation?

6    A.  I just told him that he was going to be receiving an e-mail

7    releasing the funds and asking him not to respond to the e-mail

8    for as long as possible.

9    Q.  Did you specifically tell Mr. Newkirk that you were about

10   to send a spoofed e-mail?

11   A.  No, I did not.

12   Q.  What other instructions did you give Mr. Newkirk on that

13   call?

14   A.  Just that.  He was going to receive an e-mail releasing the

15   funds and the instruction I gave after that for him not to

16   respond to it for as long as possible.

17   Q.  Did Mr. Newkirk ask you any questions about that

18   instruction?

19   A.  Not one.

20   Q.  Did he agree to follow it?

21   A.  Yes.

22   Q.  Why were you asking --

23   A.  Well,he just said okay.  That is it.

24   Q.  Why were you asking Mr. Newkirk to wait as long as possible

25   before replying to the spoofed e-mail?

Fbo6new2                         C.R. Darden - direct

1   A.  Because Mark Weinberg would get the reply.

2   Q.  Did you know that at the time that you were preparing to

3   send the spoofed e-mail?

4   A.  I did.

5   Q.  What did you hope to gain by having Mr. Newkirk delay his

6   response as long as possible?

7   A.  Just time.  You know, I was just trying to buy time with

8   the seller.  Actually, the attorney for the sellers at that

9   point in time.  That was the sole goal.

10  Q.  Since you knew or expected that Mr. Weinberg would receive

11  the reply, how did you expect to get away with this?

12  A.  I didn't.  It wasn't about getting away with it.  It was

13  simply getting the extension or buying time so...

14  Q.  Did you ever tell Mr. Newkirk that Mark Weinberg had in

15  fact authorized the release of his money?

16  A.  I did not.

17  Q.  At any point did you tell Mr. Newkirk that Mr. Weinberg had

18  become comfortable with the collateral that you had offered for

19  his loan?

20  A.  Definitely did not.

21  Q.  At any point did you tell Mr. Newkirk that your father's

22  stock shares had been moved into a control account?

23  A.  I did not.

24  Q.  At any point during your call before the spoofed e-mail

25  with Mr. Newkirk, did he ask you whether Mark Weinberg had

Fbo6new2                          C.R. Darden - direct

1   become comfortable with the loan?

2   A.  No, sir.

3   Q.  After sending the spoofed e-mail to Mr. Newkirk, did there

4   come a time that you learned that a reply had in fact been sent

5   to Mr. Weinberg?

6   A.  Yes.

7   Q.  So after sending the spoofed e-mail but before learning

8   that Mr. Weinberg received a reply, did you speak to

9   Mr. Newkirk on the phone?

10  A.  I did.

11  Q.  What did you talk about?

12  A.  We talked about how much money was going to go -- that we

13  couldn't send $5 million to Alpha Media because we didn't have

14  enough because we had to pay Comvest.  So we were going to send

15  Alpha Media 4.9 million instead of five million and that was

16  essentially the brunt of the conversation.  At the end he told

17  me he was going to reply, but it was really about not sending

18  that entire amount, the entire five million amount to Open

19  Gate -- sorry, not to Open Gate, to Alpha Media.

20  Q.  And did there come a time that you in fact learned that

21  Mark Weinberg had discovered his money had been sent out?

22  A.  I did.

23  Q.  How did Mark Weinberg learn about this fraudulent lier

24  account?

25  A.  From the e-mail reply.

Fbo6new2                          C.R. Darden - direct

1    Q.  Let me ask you to turn to 613, which is in evidence.

2           Do you recognize this document?

3    A.  I do.

4    Q.  What is it?

5    A.  It is an e-mail from me to Harvey in the

6    CalvinRDarden@Gmail to the HNewkirk06@Gmail.

7    Q.  What is it you were asking about?

8    A.  If everything is okay.  "Is everything okay."

9    Q.  What you were you referring to?

10   A.  Just, I hadn't heard back from him.  So I called several

11   times and just wanted to know what was going on.  I knew a

12   reply had been sent, but I hadn't heard from him.

13   Q.  Were you sending this to Mr. Newkirk's work account or his

14   personal account?

15   A.  To his personal account.

16   Q.  What had, if anything, did Mr. Newkirk told you about

17   other's access to his work account?

18   A.  That, you know, other people at his job had access to his

19   work e-mail.  So if it was something I didn't want someone to

20   see to send it to his personal e-mail.

21   Q.  Did you speak with Mr. Newkirk again on the evening of the

22   day of this spoofed e-mail?

23   A.  I did.

24   Q.  What plans, if any, did you make at that point?

25   A.  To meet the next morning.

Fbo6new2                              C.R. Darden - direct

1   Q.  Did you in fact meet the next morning?

2   A.  We did.

3   Q.  Where was that?

4   A.  Outside his office in my car.

5   Q.  Sorry?

6   A.  Outside his office in my car.  Actually, my truck.

7   Q.  What did you discuss in that in-person meeting in the

8   truck?

9   A.  Just, your know, what had happened.  We talked about what

10  people at his firm were saying.  I had asked about, What now,

11  basically.  That sort of thing.  What Mark Weinberg was saying,

12  what resource if anything, had he contacted the authorities,

13  you know.  Pretty much everything regarding, you know, that

14  type of thing.

15  Q.  Did you discuss the possibility of prosecution at that

16  point?

17  A.  Well, I had asked about if he had contacted the

18  authorities.  That is kind of one in the same to me.

19  Q.  What did Mr. Newkirk tell you?

20  A.  He didn't believe so.  He wasn't sure about that.  You

21  know, we had to just get the deal closed.  That was the best

22  way to get -- to get around it.

23          MR. ADAMS:  Your Honor, I am going to move on to a

24  different topic at this point if now is an appropriate time for

25  a break.

Fbo6new2                              C.R. Darden - direct

 1              THE COURT:  We're just getting rolling.  Let's move

 2      on.

 3              We'll give you a break in 15 minutes, but why give the

 4      jury any break.

 5              MR. ADAMS:  Can we please publish 637 in evidence.

 6      Q.  Do you recognize this document, Mr. Darden?

 7              MS. CHAUDHRY:  Sorry.  I don't have that document.

 8      A.  I don't have the document.  I see it on the screen if you

 9      want me to use that.

10      Q.  Mr. Darden, looking at the first page of the attachment, do

11      you recognize that document?

12      A.  I do.

13      Q.  What is it?

14      A.  This is a letter of interest from Comvest to Darden Media

15      Group.

16      Q.  If we can flip to the very last page of this exhibit,

17      please, how is this document signed?

18      A.  Calvin Darden.

19      Q.  Was this signed purporting to be you or your father?

20      A.  My father.

21      Q.  Did your father in fact sign that document?

22      A.  He did not.

23      Q.  And if we could, please, just turn back to the very first

24      page of the e-mail itself.

25              Can you tell us what time this e-mail was sent?

Fbo6new2                          C.R. Darden - direct

1   A.  10:10 a.m. on November 11th.  Sorry.  Yes, November 8th.  I

2   am sorry.

3   Q.  Did there come a time that you learned that there was a

4   problem with the way in which you had signed this document?

5   A.  Yes.

6   Q.  What did you learn?

7   A.  That I signed -- I didn't sign the document Calvin Darden

8   Senior.  I signed it as myself, just Calvin Darden.  They had a

9   problem with that and wouldn't accept the document that way and

10  wanted something that clearly stipulated Senior.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FBOKNEW3                      C.R. Darden - direct

 1  BY MR. ADAMS:

 2  Q.  And who told you about that problem?

 3  A.  Harvey.

 4  Q.  Will you please turn to 638, in evidence.

 5  A.  I'm sorry, you said 630?

 6  Q.  638.  It will appear on your screen.

 7        Do you recognize the document on your screen?

 8  A.  I do.

 9  Q.  What is it?

10  A.  It is an email from me to Harvey Newkirk.

11  Q.  Can we flip to the second page of the exhibit, please.

12        Is this, in substance, the same letter of intent that

13  you just described?

14  A.  It is.

15  Q.  Can you turn, please, to the very last page of this

16  exhibit.

17        How does the name appear now?

18  A.  Calvin R. Darden, Sr.

19  Q.  Did you discuss this change of name with Mr. Newkirk?

20  A.  Yes.

21  Q.  Can you describe that conversation?

22  A.  That before we had sent the first one that said they said

23  they may have a problem with it, so -- and as soon as they did,

24  I told him that if in fact they did have a problem with it, I

25  would send another one.

FBOKNEW3                          C.R. Darden - direct

1   Q.  From the time that you had sent Mr. Newkirk the first

2   version of this document to the time that you sent him this

3   version, approximately how much time had passed?

4   A.  It was -- it wasn't a lot; it was probably minutes.

5   Q.  What collateral was being promised to Comvest in connection

6   with their potential loan?

7   A.  Essentially the same collateral from Mark Weinberg and Open

8   Gate Capital.

9   Q.  Who negotiated the Comvest letter of intent on your behalf?

10  A.  Harvey.

11  Q.  Did there come a time that you spoke by telephone with

12  representatives of Comvest Capital?

13  A.  I did.

14  Q.  Approximately how many times were you on the phone with

15  Comvest?

16  A.  I believe it was three, maybe four.

17  Q.  So, with respect to the first time that you ever spoke on

18  the phone with Comvest, did you do that as yourself or

19  impersonating your father?

20  A.  As myself.

21  Q.  Did you have any discussions with Mr. Newkirk regarding the

22  conversation you had with Comvest as yourself?

23  A.  I did.

24  Q.  Can you describe that conversation?

25  A.  Yes, he told me that they weren't comfortable with me in

1   the deal and that it had to be -- in order for them to move

2   forward, it had to be my father.

3   Q.  Following the signing of the letter of intent, did you have

4   another conversation over the phone with Comvest

5   representatives?

6   A.  I did.

7   Q.  And at that time, did you speak as yourself or as your

8   father?

9   A.  As my father.

10  Q.  And why did you do that?

11  A.  Because they had just said that they didn't want me

12  involved in the deal and that they wanted my father to speak or

13  they wanted, you know, my father on the phone.

14  Q.  Who else was on the call that you were talking to?

15  A.  The Comvest individuals, the broker that brought us to

16  Comvest, Harvey.  There were several people on that call.

17  Q.  And during that telephone call, did you alter your voice in

18  any way?

19  A.  I didn't.

20  Q.  Was that the only time during the Maxim deal that you

21  impersonated your father on the phone?

22  A.  It was not.

23  Q.  To whom else did you impersonate your father over the

24  phone?

25  A.  A gentleman named Shaul Greenwald, or Shaul; I'm not sure

1   how to pronounce it.

2   Q.  Is Mr. Greenwald the only other person you did that to?

3   A.  No.  He's the one that comes to mind right now, though.

4   Q.  Prior to --

5   A.  Wait, I'm sorry.  No, as far as -- I mean I spoke to the

6   investment banker as my father, the lawyer; so, no, it wasn't

7   just Shaul Greenwald.

8   Q.  When you say the lawyer, who are you referring to?

9   A.  I spoke to a lawyer at Bryan Cave, I spoke to a lawyer for

10  Bodman, I forget his name as well, which is Alpha Media's

11  lawyer but there were several people.

12  Q.  Prior to the call that you described with the Comvest

13  representative and Mr. Newkirk, had Mr. Newkirk heard your

14  father's actual voice?

15  A.  He had.

16  Q.  Let me ask you to turn to 611, in evidence.

17          Mr. Darden, why were you writing this email?

18  A.  Because I had spoken to -- hold on, let me just read it.

19          So, this was to the gentleman, the representative, at

20  Comvest, and I thanked him for the call and told him that I was

21  going to be sending funds, you know, to get -- to have them get

22  to work, basically.

23  Q.  And was this before or after the call that you impersonated

24  your father on?

25  A.  After.

FBOKNEW3                          C.R. Darden - direct

1   Q.  And from which email account were you writing?

2   A.  From my Gmail.

3   Q.  And in whose voice were you writing?

4   A.  As my father.

5   Q.  Was that intentional or a mistake?

6   A.  That was by mistake.

7   Q.  When, during the course of the Maxim deal, did you use the

8   Gmail account to intentionally impersonate your father?

9   A.  I did -- I believe this was the only time.

10  Q.  After you made this mistake, did you have any conversations

11  with Mr. Newkirk about it?

12  A.  I did.

13  Q.  Can you describe those conversations?

14  A.  I told him that it was a mistake and that I would just have

15  to be -- anytime I contacted Mark, I would have to be

16  consistent and use that email, so I would have to make a note

17  of that.

18  Q.  Let me ask you to turn to 720, please.

19          Mr. Darden, what is this document?

20  A.  This is an email from Harvey to me at The Reign, Inc.,

21  to -- and it's, Larry is the lawyer for Bodman for Alpha Media.

22  Q.  Why was Mr. Newkirk sending you this draft email?

23  A.  It was a draft that I was going to basically forward to

24  Larry.

25  Q.  Do you see in the third line the reference to Darden Media

1   Group having reached an agreement with an investor?

2   A.  Yes.

3   Q.  Had Darden Media Group, in fact, reached an agreement with

4   an investor to provide funds sufficient to close the deal?

5   A.  We had not.

6   Q.  Why did Mr. Newkirk write that?

7   A.  Again, to buy time and to, you know -- basically, just to

8   buy time and placate the lawyer to kind of satisfy him and kind

9   of keep him, you know, at bay for as long as possible.

10  Q.  Mr. Darden, what is Melody Partners?

11  A.  Melody Partners is another group, former UBS bank guys,

12  that -- I don't know if they manage their own money or if they

13  manage money for others, so I don't know if they're an

14  investment bank or broker but they have the ability to raise

15  funds, although I'm not quite sure exactly what they are.

16  Q.  And were they involved in the Maxim deal at some point?

17  A.  They were.

18  Q.  In what capacity?

19  A.  They were trying to find financing at a certain point.

20  Q.  Let me ask you to turn to 620 in your binder, in evidence.

21       What was Mr. Newkirk emailing about in this document?

22  A.  It was -- that's the address to my parents' home.

23  Q.  And for what purpose was he providing that address?

24  A.  They had asked for all stockholdings, strictly

25  stockholdings, property.

1   Q.   Turning to page 2, do you see the reference towards the top

2   to 81,420 shares of Coca-Cola?

3   A.   Yes.

4   Q.   Are those shares the same or different than those that had

5   been pledged previously to Open Gate?

6   A.   Same.

7   Q.   Were those shares still subject to any claim by Open Gate

8   at that time?

9   A.   They were.

10  Q.   And were those the same shares that had been promised to

11  Mark Weinberg before the fraudulent wire of his money?

12  A.   Yes.

13  Q.   And, again, did your father ever authorize you to pledge

14  these shares to anyone?

15  A.   He did not.

16  Q.   Did you ever tell Mr. Newkirk at this time that your father

17  had authorized pledging the shares?

18  A.   No, sir.

19  Q.   When you were dealing with Melody Partners, did you still

20  want to be negotiating over the pledge of your father's shares?

21  A.   No, I did not.

22  Q.   Why not?

23  A.   Because I didn't want to do a debt deal because all the

24  debt deals required some form of collateral from my father,

25  which he wasn't going to give.  It was virtually impossible to

1    get a debt deal done, so I just wanted to get -- we wanted to

2    do an equity deal.

3    Q.  When you say virtually impossible, what difficulties had

4    you already encountered in trying to set up a debt deal?

5    A.  Every one, you know, from Open Gate to Mark Weinberg, even

6    just in the beginning with Alpha Media wanting collateral,

7    everybody that we had discussed a debt deal with wanted one

8    form of collateral or another from my father.

9    Q.  Let me ask you to look at Exhibit 617, in evidence.  I'll

10   go through these quickly.  If you would please look at 617, 618

11   and 619.

12   A.  Okay.

13   Q.  Who are these emails from?

14   A.  My father.

15   Q.  Is that your father's actual email address?

16   A.  It's his actual email address.

17   Q.  What was it that he was sending to you in these documents?

18   A.  Stock statements.

19   Q.  Are those actually stock statements of your father's

20   holdings?

21   A.  They are.

22   Q.  Why were you asking your father for these stock statements?

23   A.  Because I told him that there was a potential investor,

24   Melody Partners, that I explained that his shares were

25   restricted and they wanted to see or verify the restrictive

1     nature of the stock, and if they were able to do so -- they

2     don't specialize in equity deals, they specialize in debt, but

3     if they're able to kind of verify that all the stock was

4     restricted and that there wasn't enough collateral to do the

5     type of deal that they had spoken about, then they would try --

6     they would use their best efforts to find an equity partner for

7     us.

8     Q.   Do these stock statements hide the fact of the restrictions

9     on the shares in any way?

10    A.   They do not.

11    Q.   Had you previously provided these kind of documents to Open

12    Gate?

13    A.   No.

14    Q.   Had you provided any document that demonstrated

15    restrictions on the shares to Mr. Weinberg?

16    A.   No.

17    Q.   And so why were you showing them to Melody Partners?

18    A.   Because, again, they said that if they could, you know,

19    verify that there weren't enough assets and the stocks were

20    truly restricted, they would kind of go outside their

21    wheelhouse and file an equity partners for us.

22    Q.   If we could look quickly at the attachment to 618, please.

23           With respect to the Coca-Cola Enterprises stock

24    statement, was this a legitimate or a fake stock statement?

25    A.   The one in my father's statement was legitimate, so this

FBOKNEW3                          C.R. Darden - direct

1    one, this one is legitimate.

2    Q.  Did you use it?

3    A.  No, I didn't.

4    Q.  Why not?

5    A.  Because I had already represented that he had a lot more

6    Coca-Cola shares than he actually had, so I had to, you know,

7    basically, I made another stock statement that still showed the

8    restrictive nature but just more because the investment

9    bankers, the guys over at Forefront and Robert Wolf -- they

10   were involved and they saw those initial statements -- this

11   came from those guys, so I had to be consistent and show, you

12   know, the same thing.

13           MR. ADAMS:  Your Honor, I'm going to move on to one

14   other thing but I'll check with you first.

15           THE COURT:  Okay, you got me, what can I say?

16           All right, ladies and gentlemen, we'll take a

17   15-minute break at this time.

18           (Continued on next page)

19

20

21

22

23

24

25

1              (Jury not present)

2              THE COURT:  Mr. Darden, you can step down.  We'll see

3    you in 15 minutes.

4              (Witness temporarily excused)

5              THE COURT:  A couple of housekeeping things:

6              First, my law clerk provided both sides earlier today

7    a first draft of my proposed instructions.  If anyone has any

8    objections, additions, suggestions, edits, whatever, you should

9    provide them to me in writing by no later than close of

10   business a week from today, Tuesday of next week.  So that will

11   give you a full week.  I prefer to have it in writing rather

12   than orally at the charging conference, although we will have a

13   charging conference, but what I really want is, if you disagree

14   with a particular charge, I want your proposed alternative

15   language, not just an objection.

16             Secondly -- I'm sorry, Ms. Chaudhry, you had

17   something?

18             MS. CHAUDHRY:  It's just difficult for me to sit; I'll

19   wait until you're finished at this point.

20             THE COURT:  I'm sorry, was there something you wanted

21   to raise?

22             MS. CHAUDHRY:  No, I am just waiting for -- I really

23   have to use the bathroom.

24             THE COURT:  I see, all right.  Why don't we take a

25   ten-minute break for us and then come back because I do have

1    some things we do need to discuss.

2              MS. CHAUDHRY:   Thank you.

3              (Recess)

4              THE COURT:   A couple of other things:

5              By the way, a number of the lawyers in this case are

6    very delightfully soft-spoken, thus presenting a challenge to

7    our court reporters, but I'm suffering, as you may hear, from a

8    bad cold and it has also clogged up my ears, so I need you to

9    ask you to speak up.

10             We received two notes from the jury this morning.  One

11   was from Juror No. 8:  "Your Honor, can you please review the

12   schedule over the next two weeks, as best you know it, as of

13   today?"

14             And the other was just signed "From The Jury:"

15   "Honorable Judge, is it possible for us to know how many more

16   witnesses there are for the government and the defense?"

17             So, these seem to me to be both reflecting concern,

18   legitimate concern, of the jury as to how long this case is

19   going to take.

20             So, let's start with the government.  How much longer

21   is Mr. Darden on direct?

22             MR. ADAMS:   An hour and a half maybe.

23             THE COURT:   Okay.  So we probably won't get to his

24   cross or maybe just start his cross today.

25             How long -- and I'm just asking for a ballpark, it's

1    not binding -- how long do you think you'll be on cross?

2            MS. CHAUDHRY:  Your Honor, it will be at least all of

3    the first day I start, I think, Tuesday and into Wednesday.

4            THE COURT:  Okay.

5            MS. CHAUDHRY:  And if the government would just

6    stipulate to the admission of certain documents, it will be go

7    faster.

8            THE COURT:  Well, that's between you and them.

9            So, then after that, who else does the government

10   have?

11           MR. ADAMS:  Your Honor, I think we'll call five, not

12   the full slate that we had left but we'll probably be calling

13   five other witnesses.

14           THE COURT:  Five other witnesses?

15           MR. ADAMS:  Yes, sir.  And I have strong views that

16   they are not cumulative.  I'm happy to walk through it but it

17   will be Mr. Alfieri and Ms. Tornay from Bryan Cave that testify

18   about different aspects of their interactions with Mr. Newkirk.

19   Neither of them are particularly lengthy witnesses; we're

20   talking more on the line of Larry Deitch from yesterday.

21           THE COURT:  Well --

22           MR. ADAMS:  Shaul Greenwald --

23           THE COURT:  I may start imposing time limits if it

24   doesn't seem to me to be moving.

25           That would presumably take us through the end of the

1    week if you really have five.  It will take the rest of

2    Wednesday, all of Thursday, and if we sit at all on Friday,

3    it's probably going to be quite short because of Juror No. 4.

4              Now let's turn to the defense.  Other than the

5    defendant, who are you planning to call?

6              MS. CHAUDHRY:  Your Honor, at this point we have

7    potentially four extremely short witnesses.  I'm assuming the

8    government is going to stipulate to the 3500s and, if so, we

9    don't need to call an agent.

10             Our witnesses would be Mike Brown, the attorney from

11   Alston & Bird who made the statements on Mr. Darden, Sr.'s

12   behalf.

13             THE COURT:  You don't have to tell me now who they

14   are; just when you say short, are you talking like --

15             MS. CHAUDHRY:  I'm talking 15 questions.

16             THE COURT:  Okay.

17             So, that cumulatively would not take even a day?

18             MS. CHAUDHRY:  No, not even the morning.

19             THE COURT:  So, really the whole issue will be one

20   you're not required to make until the government rests, but

21   assuming, as you told me yesterday, at least you're leaning

22   towards calling Mr. Newkirk, that would presumably add two days

23   to the schedule, your direct, their cross.  It could be less

24   than that, but that would be a possibility.

25             So, I haven't looked at my calendar other than I know

1    there are some problems on that week, in terms of scheduling,

2    but I think what we have to tell the jury, based on what you

3    just said, is that while we were hopeful at one point that the

4    case would end this coming week, it now looks like it will be

5    somewhat into the following week but we don't know yet how long

6    into the following week.  I think we can't tell them it will

7    conclude in the following week under any scenario you've just

8    told me.

9              And let me just forecast for you that, depending how

10   late in that week we are, I may do something that I've never

11   done but Milton Pollack, from whom I learned so much, did in

12   every single case, and that was have summations begin 15

13   minutes after the close of evidence.  So, start writing your

14   summations now.

15             Anything else we need to take up?

16             MS. CHAUDHRY:  Your Honor, with that hint, will the

17   Court have time limits on summations?

18             THE COURT:  Time limits on?

19             MS. CHAUDHRY:  I'm sorry, on summations.

20             THE COURT:  Yes.  We don't have to discuss that now,

21   but there will be time limits on summations, yes, definitely.

22             MS. CHAUDHRY:  Okay.

23             THE COURT:  Okay.

24             I'll give the two jury notes to my courtroom deputy to

25   number.

FBOKNEW3                              C.R. Darden - direct

1           Anything else?

2           MS. CHAUDHRY:  One thing, if I can just discuss with

3    the government and maybe bring it up or I can just raise it to

4    the Court at sidebar, we discussed the stipulation on the

5    admissibility of these documents.  Your Honor, the government

6    and I had several conversations about those stipulations and

7    what I told them explicitly is I'm not requiring them to call a

8    foundational witnessing from Google or Bryan Cave to say that

9    these are authentic, that I am stipulating to authenticity but

10   as for admissibility, it was still the case that if they're not

11   relevant or anything else --

12           THE COURT:  Okay.

13           MS. CHAUDHRY:  -- and I put that in an email to them,

14   and they said the way they drafted the stipulation says, it may

15   be received, not they will be, and that I still had those

16   objections.

17           THE COURT:  Okay.  Well, then I misunderstood because

18   I thought the government was telling me that the admissibility

19   had been stipulated to or for particular documents we discussed

20   at the sidebar.

21           MR. ADAMS:  Your Honor, we drafted this for both

22   authenticity and admissibility.  We moved to admit everything,

23   they were all received.  It was not our intention to simply

24   stipulate --

25           THE COURT:  Let me just say, they were received.

1          MR. ADAMS:  Yes.

2          THE COURT:  Are these among the ones that were

3     received earlier in the trial, when you read those boring

4     stipulations?

5          MR. ADAMS:  They were not that boring but, yes, at the

6     time we read the stipulations.

7          THE COURT:  Well, we can have a disagreement on that,

8     but they were received.  At the point they were received, you

9     didn't inform the Court that you objected on any ground?

10         MS. CHAUDHRY:  You are correct, because I think I was

11    lulled into not listening to that part but we had had that

12    conversation, so it is my mistake and I understand that now,

13    that I should be more careful with the government.

14         THE COURT:  One other thing, Ms. Chaudhry, and I don't

15    want you to not have this on the record:  I understand you told

16    my law clerk this morning that you had something you wanted to

17    raise about an article in the press.

18         MS. CHAUDHRY:  Yes, your Honor.  The press is here

19    every day, and Law360 reported this morning that Mr. Newkirk

20    will be testifying in this case, which is not exactly what I

21    had said.  And I know that the jury is instructed not to look

22    at the news or talk about the case but I just wanted to make

23    sure they didn't hear that from someone somewhere, that I

24    had --

25         THE COURT:  Well, Law360 is a really terrific

1    publication but it is one largely limited to lawyers.  We have

2    no lawyers on this jury, so it seems, even if they had violated

3    my rule, which I think is very unlikely, they wouldn't have

4    seen this.

5         MS. CHAUDHRY:  I'm not saying they would or they

6    wouldn't.  People --

7         THE COURT:  And if they did -- well, all right.

8    Assuming, for the sake of argument, that they saw or heard

9    something about that, which I think is extremely unlikely, but

10   assuming that, what would I ask them?  "Did you hear that

11   Mr. Newkirk may be taking the stand?  And disregard that.  He

12   hasn't decided yet."

13        MS. CHAUDHRY:  Actually, the question I suggested your

14   Honor ask is just, "Has anyone heard anything, either directly

15   or indirectly, about this case?"  And that's it.

16        THE COURT:  No, I won't do that, but I'll tell you

17   what I will do:  I will find an occasion at the end of the

18   day -- and remind me if I forget -- to remind the jury that

19   they should not do anything in terms of outside inquiries, if

20   they hear, see anything, they should turn away from it,

21   et cetera, okay?

22        MS. CHAUDHRY:  Thank you.

23        THE COURT:  All right, very good.

24        Let's bring in the jury and the witness.

25        THE DEPUTY CLERK:  Marshal, would you please bring in

1    the jury.

2           Can you bring the jury in now?

3           THE COURT:  I want the jury brought in, please.

4           MARSHAL:  Oh, I'm sorry, your Honor.

5           THE DEPUTY CLERK:  Marshal, could you please bring in

6    the jury right now.

7           THE COURT:  Excuse me.  Come to the sidebar.

8           (Page 917 SEALED by order of the Court)

1           (In open court)

2           THE COURT:  Please bring in the witness.

3           MR. ADAMS:  Your Honor, may I just request some

4    assistance from your deputy, please?

5           (Pause)

6           THE COURT:  Please continue.

7           MR. ADAMS:  Thank you, Judge.

8    BY MR. ADAMS:

9    Q.  Mr. Darden, before we resume, let me just take a step back.

10          Did you commit fraud in connection with the Maxim

11   deal?

12   A.  I did.

13   Q.  And did you commit that fraud with anyone else?

14   A.  I'm sorry, repeat that.

15   Q.  Did you commit that fraud with anyone else?

16   A.  I did.

17   Q.  Who was that?

18   A.  Harvey.

19   Q.  What was Mr. Newkirk's role in the Maxim fraud?

20   A.  He was the attorney.

21   Q.  When you say he was the attorney, what sort of fraudulent

22   acts would Mr. Newkirk do for you?

23   A.  So he drafted all the agreements -- so I got his, you know,

24   counsel on a lot of the numbers that had to go into the

25   commitment letter, in the proof of funds letter, things like

1   that so...

2   Q.  Let me ask you to turn back to Exhibit 620, please, in your

3   binder.

4           Sir, do you see the reference at the top to some real

5   estate in Roswell, Georgia?

6   A.  I do.

7   Q.  What real estate is being referenced in that email?

8   A.  My parents' home.

9   Q.  And what did you expect to do with that property, if

10  anything?

11  A.  Show it to Melody Partners.

12  Q.  And was that property subject to restrictions of the kind

13  that your father's stock was subject to?

14  A.  It was not.

15  Q.  Did your father ever authorize you to put up his property

16  as collateral for any loan?

17  A.  Certainly not.

18  Q.  Did you ever tell Mr. Newkirk that your father had offered

19  to put up his real estate as collateral for a loan?

20  A.  No, I did not.

21  Q.  Did there come a time, after your father had sent you the

22  stock statements that we just reviewed in 617, 18 and 19, that

23  you and your father had a falling-out?

24  A.  Yes.

25  Q.  What happened, as far as you understand it, to cause that

1   falling-out?

2   A.   So I'd asked for the stock statements, I told him why, and

3   he was fine with that, for the most part.  But then they had

4   also asked for the property, and I couldn't ask my father for

5   that because that wouldn't -- it wouldn't make sense they want

6   to see that the stock is restricted but there's no restrictions

7   on the house or any property that he owns.  So there was a

8   property in particular that I didn't know the address to and I

9   didn't ask him, I actually asked my sister, and shortly after,

10  my father was on the phone with my sister and I think she

11  mentioned it and --

12              MS. CHAUDHRY:  Objection.

13              THE COURT:  Yes, we'll leave it where it is.  Put

14  another question.

15              MR. ADAMS:  Thank you.

16  BY MR. ADAMS:

17  Q.   Mr. Darden, why were you comfortable asking for the stock

18  statements but not going to your father directly with respect

19  to the real estate?

20  A.   Because Melody Partners, they wanted to see that the stock

21  was restricted, so that was fine, they couldn't use it.  The

22  property is different, so they could use the property, although

23  it wasn't enough, you could use the property as collateral for

24  a loan.  I couldn't ask my father for that, he wouldn't agree

25  to that.  So -- does that answer the question?

FBOKNEW3                          C.R. Darden - direct

1   Q.  So can you describe any conversations you had with your

2   father with respect to that real estate?

3   A.  Sure.  So, he called me, he asked me if I was alone.  And I

4   said, sure.  And he said, because I want to have a tough

5   conversation with you.  So I said, sure.  And he said, why did

6   you call your sister, asking about, you know, this property.

7        I don't even remember the lie I told, to be completely

8   honest with you.  I said something and it didn't make sense to

9   him, and he said like, that makes no sense.  And he asked me if

10  I was, you know -- what I was up to, something like that, he

11  asked me what I was up to.  And --

12       MS. CHAUDHRY:  Objection; hearsay.

13       THE COURT:  Well, the statement "what are you up to"

14  is not hearsay because it's not a statement of a fact; it's

15  just an inquiry.  A question cannot be hearsay.  Overruled.

16  BY MR. ADAMS:

17  Q.  What was your response to your father?

18  A.  I don't even remember.  Whatever it was, it wasn't the

19  truth.  I made up some story that I thought made sense at the

20  time but it didn't.

21  Q.  And at that point, what, if anything, did he tell you

22  regarding his continued participation in the Maxim deal?

23  A.  He said I wasn't being honest with him, he didn't feel as

24  though I was being honest with him, my story made no sense, and

25  he didn't want to be a part of it anymore, he was not going to

1    be a part of it anymore.

2    Q.  Directing you to the following day, did you have a

3    conversation with Mr. Newkirk about the same falling-out?

4    A.  I did.

5    Q.  And according to Mr. Newkirk, what conversations, if any,

6    had he had with your father?

7    A.  He told me that my father called him and told him that he

8    wasn't going to be a part of the Maxim deal anymore, to make

9    sure that his name wasn't on any documents, and that people

10   didn't think that he was involved, and to send back -- I don't

11   remember if he told Harvey to send back the statements or if he

12   told Harvey to tell me to send back the statements, but we

13   talked about that, the stock statements that he had previously

14   sent.

15   Q.  What did you ask, if anything, about that request from your

16   father about sending the stock statements back?

17   A.  I was like I didn't know -- what does he mean, you know,

18   send the statements back because he emailed me the statements.

19   So, Harvey said to print them out and he would send them back,

20   send them back to him.

21   Q.  During that call, did you discuss your father's decision to

22   withdraw from the Maxim deal in any capacity?

23   A.  We did.

24   Q.  Did Mr. Newkirk ask you anything during that call?

25   A.  He did.

1    Q.  What was that?

2    A.  He asked me if I knew if my father had told anybody else

3    that he wasn't involved.  And I said, I didn't know he told

4    you.  So -- I didn't think so but I didn't have a way to know.

5    Q.  After that conversation with Mr. Newkirk, did the two of

6    you nevertheless continue pursuing the Maxim deal?

7    A.  We did.

8    Q.  Did you nevertheless continue promising your father's

9    assets as collateral for loans?

10   A.  Yes.

11   Q.  At any point did you tell Mr. Newkirk that your father was

12   willing to reenter the Maxim deal?

13   A.  Definitely not.

14   Q.  At any point did your father tell you that he was willing

15   to reenter the Maxim deal?

16   A.  Absolutely not.

17   Q.  Are you familiar with a person named Shaul Greenwald?

18   A.  I am.

19   Q.  Who is he?

20   A.  That's the potential investor based in Brooklyn.

21   Q.  When did you first meet him in person?

22   A.  It was -- I can't even tell you the date, to be honest with

23   you.  I'm sorry.

24   Q.  Was it before or after the Mark Weinberg spoofed wire?

25   A.  It was after.

1   Q.  And who was with you during that in-person meeting with

2   Mr. Greenwald?

3   A.  Harvey.

4   Q.  What was the purpose of the meeting?

5   A.  To -- so, Shaul was interested in getting involved in the

6   Maxim deal, he wanted to hear about it, right, hear about our

7   vision for it, what were we going to do different that the

8   previous owners couldn't do different.  So, we had a meeting to

9   essentially, you know, lay that out.

10  Q.  And what, if anything, did Mr. Newkirk tell Mr. Greenwald

11  about the financing of the deal at that meeting?

12  A.  That we had had, you know, financing where my father was

13  putting up a certain amount of money.

14  Q.  Did there come a time that Mr. Greenwald asked to speak

15  with your father?

16  A.  He did.

17  Q.  And, to your knowledge, has your father ever actually

18  spoken with Mr. Greenwald?

19  A.  He has not.

20  Q.  Did there come a time that you impersonated your father on

21  a call with Mr. Greenwald?

22  A.  I did.

23  Q.  Why did you do that?

24  A.  Because Shaul wanted to speak to him and we had already

25  said in a meeting that my father was putting up, you know,

1   certain assets or was going to back the deal.  So had it not

2   been for that, I would have actually put my father on the phone

3   with him but because of that, I couldn't because he was

4   obviously going to want to talk about that.  So I did it

5   myself.

6   Q.  And prior to making the call to Mr. Greenwald,

7   impersonating your father, did you discuss that impersonation

8   with Mr. Newkirk?

9   A.  I did.

10  Q.  Can you describe what Mr. Newkirk said to you in that

11  conversation?

12  A.  He just asked, considering we had just had a meeting with

13  Shaul, if I was going to change my voice at all.  And I said,

14  no.  We kind of laughed about it, and that was it.  Excuse me.

15  Q.  What did you understand Mr. Newkirk's concern to be with

16  your changing or not changing your voice?

17  A.  If Shaul was going to --

18            MS. CHAUDHRY:  Objection.

19            THE COURT:  Sustained.

20  Q.  Mr. Darden, did you have any concern with not changing your

21  voice on a call to Shaul Greenwald?

22  A.  I did not.

23  Q.  Why not?

24  A.  Because, you know, he had only sat in front of me for --

25  you know, it wasn't that long and I just, I wasn't real

1   concerned with it, I just did it with -- I did it on the phone

2   with the Comvest guys, there was no -- they didn't say anything

3   about it, so I really wasn't concerned.

4   Q.  What was Mr. Newkirk's reaction to that conversation?

5   A.  We laughed about it.

6   Q.  Let me ask you to turn to 631, in evidence.

7        Do you recognize this document?

8   A.  I do.

9   Q.  What is it?

10  A.  It's an email from Harvey.Newkirk@BryanCave to me, and it

11  was going over the draft of the language.  Shaul had asked some

12  specific questions, and I had asked Harvey how to answer them,

13  and so he sent me this draft to send to Shaul.

14  Q.  And directing you towards the middle, where it says

15  "Holdings paid 3.1 million," do you see that?

16  A.  I do.

17  Q.  What is the 3.1 million in reference to?

18  A.  The loan from Open Gate.

19  Q.  And had Holdings actually paid that money?

20  A.  No.

21  Q.  Was that money sill subject to Open Gate's claims at that

22  point?

23  A.  It was.

24  Q.  Did you mention Open Gate's claims to Mr. Greenwald?

25  A.  No.

1    Q.  To your knowledge, did Mr. Newkirk ever mention Open Gate's

2    claims to Mr. Greenwald?

3    A.  Not to my knowledge.

4    Q.  And did Mr. Greenwald ever release any funds to you for the

5    purpose of the Maxim deal?

6    A.  He did not.

7    Q.  Do you know an individual named David Leveall?

8    A.  I do.

9    Q.  And what role, if any, did Mr. Leveall play in the Maxim

10   deal?

11   A.  I think he was a broker, a broker for a group in Detroit or

12   Houston or something like that.

13   Q.  And what documents, if any, did you provide to Mr. Leveall

14   in connection with the Maxim deal?

15   A.  Those same statements, Bank of America statements from --

16   that the others had seen.

17   Q.  And what concerns, if any, did Mr. Leveall have with

18   respect to the stock statements?

19           MS. CHAUDHRY:  Objection.

20           THE COURT:  Sustained.

21   Q.  Mr. Darden, did you discuss Mr. Leveall's review of those

22   documents with Mr. Newkirk at any time?

23   A.  I did.

24   Q.  What did Mr. Newkirk tell you regarding Mr. Leveall's

25   review of those documents?

1    A.  He told me that he had -- that one way or another, he was

2    able to kind of do some diligence on the documents and was able

3    to find out that that account number belonged to some old

4    defunct company and that it was not in fact an account number

5    for my father.

6    Q.  When you say he had performed that kind of investigation,

7    are you referring to Mr. Newkirk or Mr. Leveall?

8    A.  I'm sorry, Mr. Leveall.

9    Q.  And what was your response to learning that information?

10          MS. CHAUDHRY:  Objection.  Sorry, your Honor, the

11   prior answer was, the question was about what Mr. Newkirk said

12   and then the answer he just gave is hearsay about what

13   Mr. Leveall said.

14          THE COURT:  Since I don't have it on my screen, let me

15   hear the last question and answer, please.

16          (Record read)

17          MS. CHAUDHRY:  It's actually three questions before.

18   It would be the question that he gave that answer to.

19          THE COURT:  Okay, you want to go to that.

20          MS. CHAUDHRY:  Sorry.

21          (Record read)

22          THE COURT:  So, if it were offered for its truth, as a

23   statement of Mr. Darden, his out-of-court statement would be

24   hearsay, but if it's offered for what was told to Mr. Newkirk,

25   so that it relates to Mr. Newkirk's state of mind, then it

FBOKNEW3                        C.R. Darden – direct

1    would it would be receivable for that limited purpose.  I don't

2    know the answer to that because I don't know what he's going to

3    say, but why don't we hear the answer and I will strike it if

4    it turns out to be hearsay.

5              So, you may answer the question.

6              THE WITNESS:  My response was, we talked about saying

7    the exact same thing that we had told to Mark Weinberg, that it

8    was obviously some mistake on Bank of America/Merrill Lynch's

9    part, we would get to the bottom of it and get back to them.

10             THE COURT:  So, that's not hearsay.  So, the objection

11   is overruled.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MR. ADAMS:

2   Q.  Mr. Darden, did you and Mr. Newkirk also discuss the

3   specific bank account number during that conversation?

4   A.  Yes.

5   Q.  Can you describe what Mr. Newkirk said to you about the

6   bank account number?

7   A.  Yeah.  Again, he said that Mr. Leveall had found out that

8   that bank account number did not belong to my father but goes

9   to a now defunct company.

10  Q.  Approximately when within the course of the Maxim deal had

11  you and Mr. Newkirk had this discussion?

12  A.  Probably the middle.

13  Q.  Before or after the Mark Weinberg spoofed e-mail?

14  A.  This was after.

15  Q.  And did Mr. Leveall ultimately provide you with any

16  funding?

17  A.  No, he did not.

18  Q.  Are you familiar with a person named Shame McMahon?

19  A.  I am.

20  Q.  Who is he?

21  A.  Another potential investor.

22  Q.  What role in the Maxim transaction did Mr. McMahon play?

23  A.  He contemplated putting up or providing aid for -- I am

24  sorry, a convertible loan for I believe half.

25  Q.  What did you offer to Mr. McMahon, if anything, as

Fbo6new4                              C.R. Darden - direct

1    collateral for that loan?

2    A.   Same collateral.

3    Q.   Who negotiated on your behalf with Shane McMahon?

4    A.   Harvey.

5    Q.   I ask you to turn to 628 in evidence.

6             Do you recognize this document?

7    A.   I do.

8    Q.   What is the date on this e-mail?

9    A.   December 9, 2013.

10   Q.   Was this before or after the conversation with Mr. Newkirk

11   regarding Mr. Leveall's concerns?

12   A.   After.

13   Q.   And what is Mr. Newkirk sending in this e-mail?

14   A.   There were a couple of issues that -- that Shane's lawyer

15   had brought up.  So this was really the response to those

16   issues.

17   Q.   What is attached to this e-mail?  Look at page 4.

18   A.   The same Bank of America statement as previously -- as we

19   talked about previously.

20   Q.   What was the purpose of continuing to circulate this same

21   bank statement?

22   A.   It is the only statement we had.  I had.

23   Q.   Let me ask you to turn to 635 in evidence, please.

24             Do you recognize that document?

25   A.   I do.

Fbo6new4                         C.R. Darden - direct

1   Q.  What is it?

2   A.  This is an e-mail from -- from me to Harvey that attaches a

3   physician's affidavit.

4   Q.  Why were you attaching a physician's affidavit in the

5   e-mail to Mr. Newkirk?

6   A.  Because Shane's lawyers had requested it because we had

7   said several times.  So remember my father and I were not

8   speaking at that point in time.  The McMahons were requesting

9   meetings and calls and things like that.  So I told them that

10  my father wasn't able to do that so they asked for a

11  physician's affidavit to be able to, I guess, attest to his

12  mental capacity, or what have you, to still be the chairman of

13  the organization.

14  Q.  Had your father's health been used by you previously in the

15  Maxim deal?

16  A.  Yes.  That was -- yes.

17  Q.  In what way?

18  A.  Well, that was the reason.  So, again, my father and I were

19  not speaking so having him come up to a meeting was just

20  impossible given the fact that we weren't speaking.  He was no

21  longer involved.  So we told him that my father was not well

22  and able to meet with them --

23          MS. CHAUDHRY:  Objection.

24          THE COURT:  Sustained.

25  Q.  Mr. Darden, if you could confine your answer to what --

1    A.   Sorry.

2    Q.   -- what you represented.

3    A.   So I told him that my father was not well or able to meet

4    or to speak to them all the things that they were requesting.

5    Q.   Was your father in fact ill at this time?

6    A.   Was he ill?  My father was diagnosed with something, but he

7    was fine for the most part.  He certainly was able to meet with

8    them if necessary.

9    Q.   Did you discuss the McMahons' request for a physician's

10   affidavit with Mr. Newkirk?

11   A.   I did.

12   Q.   At the time that the McMahons requested this affidavit from

13   you what, if anything, did you ask Mr. Newkirk at that point?

14   A.   So his lawyers had requested -- they made a bunch of

15   requests.  I thought they were ridiculous.  We got off the

16   phone immediately.  Either I called Harvey or Harvey called me

17   and I just kind of laughed and said, How the fuck am I supposed

18   to do that, and we both just laughed.

19   Q.   What was difficult to obtain about this document?

20   A.   Like, how am I supposed to get a physician's -- all of it

21   was difficult, right.  So, yeah, the whole thing was just

22   seemingly next to impossible.

23   Q.   Turning to the affidavit itself, who is Dr. Ray?

24   A.   That is my father's doctor.

25   Q.   Is that a real person?

1    A.  Wait.  I am sorry.  Where am I turning to?

2    Q.  We're still in the same exhibit.  Page 2.

3    A.  Okay.

4    Q.  Is Dr. Ray a real person?

5    A.  Yes.

6    Q.  An actual physician?

7    A.  He is.  My father's real physician.

8    Q.  Did he actually sign this document?

9    A.  No, he did not.

10   Q.  Why couldn't you just go get the real Dr. Ray to sign an

11   affidavit like this?

12   A.  Because I am assuming he would have to get my father's

13   permission to provide that information.  Even if he didn't need

14   his permission, he would certainly tell him.

15   Q.  How was this made?

16   A.  Harvey sent me the affidavit, the blank affidavit.  I

17   filled it out and cut and paste a notary seal at the bottom, a

18   notary stamp.

19   Q.  Let's take a look at Exhibit 178 marked for identification.

20   A.  Which number?

21   Q.  178, please.

22            Do you recognize that document?

23   A.  Yes.

24   Q.  What is it?

25   A.  This is an e-mail from Harvey to me saying as requested

1    attached is the blank physician's affidavit.

2              MR. ADAMS:  Your Honor, the government offers 178.

3              MS. CHAUDHRY:  No objection.

4              THE COURT:  Received.

5              (Government's Exhibit 178 received in evidence)

6    BY MR. ADAMS:

7    Q.  Mr. Darden, who had requested that Mr. Newkirk send this

8    document?

9    A.  Shane's attorney.

10   Q.  When you prepared the final version of it, where were you?

11   A.  I was in Atlanta in Kinkos in Atlanta.

12   Q.  Why were you in Atlanta at that time?

13   A.  Because there were -- you know, in addition to the

14   physician's affidavit there were several documents that they

15   wanted signed and notarized, right.  So I had already told them

16   that my father wasn't well.  He wasn't well enough to speak

17   with them or meet with them.  He is in Atlanta.  So I couldn't

18   have -- I couldn't have it notarized in New York.  That would

19   mean that he came to New York to do that.  So I had to fly to

20   Atlanta and get a notary.

21   Q.  If your father had actually been in New York, why would

22   that pose a problem?

23   A.  Because if he is fine enough to be in New York, then he is

24   fine enough to meet with us, at least get on a call with us.

25   That is what I am sure the McMahon lawyer would say.

1           MS. CHAUDHRY:  Objection.

2           THE COURT:  So the last clause will be stricken but

3    the rest will stay.

4           MS. CHAUDHRY:  Thank you.

5    Q.  Did you inform Mr. Newkirk at any point that you were in

6    Georgia?

7    A.  I did.

8    Q.  How did you inform him?

9    A.  I actually called him when I was at Kinkos to ask him a

10   couple questions about the document.

11   Q.  What sort of questions were you asking Mr. Newkirk?

12   A.  With a couple documents I wasn't sure, you know, what name

13   needed to go where.  It wasn't with this document specifically,

14   but with a couple of the documents.

15   Q.  What information, if any, was Mr. Newkirk providing to you?

16   A.  He just would answer my question.  He would tell me what

17   was supposed to go where.

18   Q.  Let me ask you to turn to Government Exhibit 633 in

19   evidence.

20           Do you recognize this document?

21   A.  I do.

22   Q.  What is it?

23   A.  It's an e-mail from Harvey.Newkirk@BryanCave to me at

24   CalvinRDarden@Gmail and The Reign account.  It is a notice of

25   service of process regarding the Open Gate loan.

1    Q.  What demands, if any, were Open Gate making at this point?

2    A.  They wanted their money.

3    Q.  What is the date on this e-mail?

4    A.  That is January 2nd, 2014.

5    Q.  What conversations, if any, did you have with Mr. Newkirk

6    regarding this Open Gate litigation document?

7    A.  You know, what could be done about it; you know, if I

8    had -- if there were any recourse; how much time did I have

9    before they would do something and something had to be done; if

10   we could -- if I could -- no, if we could speak to or if he

11   could speak to the lawyers to kind of buy more time; or, you

12   know, what kind of deal we could work out with them to kind of

13   pull back from the lawsuit and accept maybe more equity or

14   different terms of the loan to get them to not go through with

15   the lawsuit.

16   Q.  Why were you hoping that Open Gate wouldn't continue with

17   the lawsuit?

18   A.  Well, mainly because they are not suing me, they are suing

19   my father.  So, I mean, that was the main concern.  And then it

20   could potentially derail closing.  So those were the two big

21   terms.  Even if we had the ability to close the deal or I had

22   the ability to close the deal, it could derail it.

23   Q.  Did you tell your father about the existence of this

24   lawsuit?

25   A.  Definitely not.

1    Q.  To your knowledge did Mr. Newkirk ever inform your father

2    about the existence of this lawsuit?

3    A.  Not to my mother.

4    Q.  At some point did you seek out a litigator to handle this

5    lawsuit for you?

6    A.  I did.

7    Q.  Did Mr. Newkirk nevertheless continue to represent you in

8    connection with this lawsuit also?

9    A.  He did.

10   Q.  In what ways?

11   A.  So really in speaking -- still in speaking with the

12   attorneys and the principals of Open Gate and trying to, you

13   know, do what I just said before, trying to offer them more

14   equity, you know, a high management fee, different things like

15   that.

16   Q.  Let me ask you turn to Exhibit 634 in evidence.

17           Do you recognize that document?

18   A.  I do.

19   Q.  What is it?

20   A.  It's an e-mail from Harvey.Newkirk to me at my G-mail and

21   The Reign referencing the action filed by Open Gate.

22   Q.  Why was Mr. Newkirk sending this e-mail to you?

23   A.  Because he had told me that I needed to get another lawyer

24   for it.

25   Q.  How did you plan to deal with the Open Gate lawsuit?

1    A.  Really to close and then pay them from the proceeds at

2    closing.

3    Q.  What is the date on this document?

4    A.  January 17th, 2014.

5    Q.  Even after January 17th, did Mr. Newkirk continue to

6    represent you in connection with the litigation?

7    A.  I believe so.

8    Q.  Did you reach out to other litigators?

9    A.  I did.

10   Q.  Did those litigators ever make an appearance in the Open

11   Gate case if you know?

12   A.  They did not.

13   Q.  Did you and Mr. Newkirk pursue other lenders while you were

14   pursuing the McMahons?

15   A.  He did.

16   Q.  What collateral were you promising to them?

17   A.  Same as all the others.

18   Q.  Was this before or after January 1st of 2014?

19   A.  It was after.

20   Q.  Did the McMahons ever provide any funds?

21   A.  They did not.

22   Q.  Mr. Darden, you talked earlier about your falling out with

23   your father.

24   A.  Uh-huh.

25   Q.  After that falling out were you speaking with your father?

Fbo6new4                          C.R. Darden - direct

1    A.  The next time we spoke was, I believe, January the 22nd.

2    That is the next time we spoke.

3    Q.  How did you go about reconnecting?

4    A.  Long story.  I was -- my mother called me.  It was a

5    Sunday.  She told me -- she was crying.  She said that she just

6    had enough and she wanted me to call my father.  She said she

7    wanted me to call my father and, you know, I said I didn't

8    think that was a good idea.

9              MS. CHAUDHRY:  Objection.

10             THE COURT:  Why wasn't that waived?  He was asked what

11   led to his reconnecting with his father and no objection was

12   made.  Now he is answering that portion of that question.

13             Overruled.

14   Q.  Mr. Darden, let me ask during the period of time after that

15   conversation with your mother, did you in fact reconnect with

16   your father?

17   A.  I did.

18   Q.  During the period of time when you were not speaking to

19   your father, did Mr. Newkirk ever tell you that he was speaking

20   with your father?

21   A.  He did.

22   Q.  During that period when you and your father were not

23   speaking, were you and Mr. Newkirk continuing to work on the

24   Maxim deal?

25   A.  Yes.

Fbo6new4                          C.R. Darden - direct

1   Q.  Would you please take a look at Exhibit 150 in your binder.

2   This is just marked for identification.

3           Do you recognize that document?

4   A.  I do.

5   Q.  What is it?

6   A.  It's a cooperation agreement to my lawyer.

7   Q.  Cooperation agreement that is between you and who?

8   A.  Between me and United States with the U.S. Attorney's

9   Office.

10          MR. ADAMS:  Your Honor, the government offers Exhibit

11  150.

12          MS. CHAUDHRY:  No objection.

13          THE COURT:  Received.

14          (Government's Exhibit 150 received in evidence)

15  BY MR. ADAMS:

16  Q.  Mr. Darden, approximately when did you plead guilty in

17  connection with the Maxim fraud?

18  A.  I believe it was February 13th, 2014.

19  Q.  I direct you to the first paragraph of this document where

20  it refers to a professional basketball exhibition game in

21  Taiwan.

22  A.  Yes.

23  Q.  Can you briefly describe the crime that you pled to in that

24  count?

25  A.  Sure.  I was negotiating with a gentleman in Taiwan about

1    bringing a basketball game or having a professional basketball

2    game in Taiwan and I got him to basically send the money up

3    front before the game had occurred, if that is sufficient.

4    Q.  Did you impersonate your father in connection with that?

5    A.  I did.

6    Q.  And in addition to that exhibition of the basketball game,

7    did you also take part in an attempt to organize a business

8    venture relating to the National Basketball Association?

9    A.  Yes, I did.

10   Q.  Did you impersonate your father in connection with that

11   venture?

12   A.  I did.

13   Q.  Did you successful close any deal in connection with that

14   venture?

15   A.  I did not.

16   Q.  Are those the only lies that you admitted to in your

17   conversations with the government?

18   A.  They are not.

19   Q.  Was the MBA fraud that you just described something that

20   you were charged with at the time that you talked about it with

21   the government?

22   A.  It was not.

23   Q.  What are you required to do under terms of this agreement?

24   A.  Tell the truth.

25   Q.  If you tell the truth, what do you expect the government

Fbo6new4                        C.R. Darden - direct

1    will do for you?

2    A.   Submit a 5K motion.

3    Q.   What do you understand that motion to provide?

4    A.   It provides information both good and bad about my past as

5    well as my cooperation.

6    Q.   In the government's motion, do you understand that it talks

7    about all of your prior bad acts or only some of them?

8    A.   All.

9    Q.   Who ultimately gets to determine your sentence in

10   connection with your guilty plea?

11   A.   The judge.

12   Q.   What promises have been made to you by the government with

13   respect to what sentence you will receive?

14   A.   None.

15   Q.   And what happens to your cooperation agreement if you lie

16   on the stand today?

17   A.   Effectively it gets ripped up.

18   Q.   In the event the agreement gets ripped up, do you get to

19   take back your guilty plea or are you stuck with it?

20   A.   I am stuck.

21           MR. ADAMS:  One moment, your Honor.

22           (Pause)

23           MR. ADAMS:  Nothing further, sir.

24           THE COURT:  Cross-examination.

25   CROSS-EXAMINATION

```
 1    BY MS. CHAUDHRY:
 2    Q.  Mr. Darden, my name is Priya Chaudhry.  I represent Harvey
 3    Newkirk.
 4    A.  Good afternoon.
 5    Q.  We have never spoken before, have we?
 6    A.  We have not.
 7    Q.  You just told the jury that in addition to the lies you
 8    talked about right now, there were other lies that you told the
 9    government about?
10    A.  Yes, ma'am.
11    Q.  In fact, there were lots of other lies you told as part of
12    this fraud; correct?
13    A.  I don't know about lots, but I told them, yes.
14    Q.  Well, one of those lies is that you told people that you're
15    grandmother had died; right?
16    A.  I don't recall that.  You asked me if one of the lies I
17    told the government in regard to this case is if my grandmother
18    had passed.  I don't know that I understand the question.
19            Is that the question?
20    Q.  No.  My question is did you tell anybody that your
21    grandmother died as part of this fraud?
22    A.  I don't remember.  Maybe.  I am not sure.
23    Q.  Okay.
24            MS. CHAUDHRY:  May I approach?
25            THE COURT:  Yes.
```

1    Q.  Mr. Darden, I have handed you what is marked for

2    identification as Defense Exhibit 499, 497, 496.

3    A.  Yes, ma'am.

4    Q.  Have you reviewed them?

5    A.  I see -- yes.

6    Q.  Mr. Darden, you said that both The Reign the Calvin Darden

7    at G-Mail are your accounts; correct?

8    A.  Yes, ma'am.

9    Q.  You're the only person who controlled them?

10   A.  Yes.

11   Q.  All the e-mails coming from those account are from you?

12   A.  That's correct.

13   Q.  None of them are from anyone else; is that correct?

14   A.  That's correct.

15           MS. CHAUDHRY:  Your Honor, at this time I offer these

16   into evidence.

17           MR. ADAMS:  Your Honor, if I could have a minute to

18   review these?

19           THE COURT:  Excuse me?

20           MR. ADAMS:  If I can have one minute to review.

21           THE COURT:  Go ahead.

22           (Pause)

23           MR. ADAMS:  No objection, your Honor.

24           THE COURT:  These are received.

25           (Government's Exhibits 499, 497, 496 received in

1   evidence)

2           MS. CHAUDHRY:  Your Honor, before we start looking at

3   them, I have a few more questions.

4   BY MS. CHAUDHRY:

5   Q.  Mr. Darden, your grandmother is alive; correct?

6   A.  My grandmother, yes, she is.

7   Q.  She lives with your parents?

8           THE COURT:  Forgive me but most people have more than

9   one grandmother.

10  Q.  This is your mother's mother?

11  A.  My mother's mother is alive.  My father's is not.

12  Q.  She lives with your parents?

13  A.  Yes, she does.

14  Q.  How old is she?

15  A.  91, 92.

16  Q.  Do you love her?

17  A.  I do.

18  Q.  You saw her in September when you were home in Atlanta;

19  correct?

20  A.  I did.

21  Q.  You stayed in the same house she lives in?

22  A.  I did.

23          MS. CHAUDHRY:  I would like to show the jury Defense

24  499 please.

25  Q.  Mr. Darden, I draw your attention at the top of this e-mail

1    that is from Calvin Darden at The Reign.  That is you; correct?

2    A.  It is.

3    Q.  And this e-mail is dated October 15th, 2015; is that

4    correct?

5    A.  That's correct.

6    Q.  It is to Lee Ann Gliha.  She is the banker at Houlihan

7    Lokey?

8    A.  That is correct.

9    Q.  And Houlihan Lokey is the banker on the Maxim deal?

10   A.  That's correct.

11   Q.  At the top of the e-mail you write, It has been a rough 36

12   hours as my wife's mother passed away a few hours ago.  She

13   broke her knee on Sunday and passed away from a blood clot

14   resulting from the break.

15         That is your statement to many Ms. Gliha; correct?

16   A.  Yes.  But I was actually -- I wasn't referring to my

17   grandmother.  It was in my wife's family.  It wasn't my wife's

18   mother, but somebody in her family passed away.

19   Q.  You signed this Cal; correct?

20   A.  Yes, I did.

21   Q.  And this is from The Reign account; correct?

22   A.  It is.

23   Q.  You testified that The Reign account is one you created to

24   impersonate your father; correct?

25   A.  No, I did not.

Fbo6new4                              C.R. Darden - cross

1   Q.  You did not?

2   A.  I did not say that.  I did not give testimony saying that I

3   created The Reign account to impersonate my father.

4   Q.  So your testimony is --

5            THE DEFENDANT:  Excuse me.  Just so I am clear.

6   Forgive me.  So 499 is not a reference to your grandmother but

7   to your wife's mother, yes?

8            THE WITNESS:  Yes.  But it is incorrect still.

9            THE COURT:  Was this true or false that she passed

10  away a few hours ago.

11           THE WITNESS:  That statement is false.

12           THE COURT:  Go ahead.

13  BY MS. CHAUDHRY:

14  Q.  So let me just be clear on something.  The e-mail below

15  that you are responding to from Lee Ann Gliha calling you Cal;

16  correct?

17  A.  Yes.

18  Q.  And she is asking you about a wire that is supposed to be

19  sent the next day; correct?

20  A.  Yes.

21  Q.  And you're father goes by Cal; correct?

22  A.  He does.

23  Q.  Right.  In this e-mail she is writing to The Reign e-mail

24  address?

25  A.  That's correct.

Fbo6new4                          C.R. Darden - cross

1   Q.  So is it your testimony that she is writing to The Reign

2   e-mail address to write to you?

3           MR. ADAMS:  Objection, speculation.

4           THE COURT:  Sustained.

5   Q.  You received this e-mail at the bottom from Lee Ann Gliha;

6   correct?

7   A.  I did.

8   Q.  And is it your understanding that she was writing to you or

9   your father?

10  A.  To --

11          MR. ADAMS:  Objection, speculation.

12          THE COURT:  No.  I will allow it.

13  A.  My father.

14  Q.  So you're responding as your father talking about your

15  wife's mother passing away; is that correct?

16  A.  Yes, ma'am.

17  Q.  That would be your grandmother?

18  A.  So if I was my father, my wife's mother is not my mother

19  nor is it my grandmother.  So no.

20  Q.  If you're your father's --

21  A.  My father's -- let's say I am my father.  Let's say my

22  wife's mother.  That would be my wife's mother.  She is not my

23  mother nor is she my grandmother.  We are not related.  My

24  wife -- I am not saying my mother.  I am saying I am speaking

25  as my father.

Fbo6new4                              C.R. Darden - cross

```
 1            THE COURT:  Wait.  I think there may be some
 2    confusion.  They may not both still be alive, but you have two
 3    grandmothers; correct?
 4            THE WITNESS:  I do.
 5            THE COURT:  Give me their first names.
 6            THE WITNESS:  Elouise and Jesse.
 7            THE COURT:  Who is Elouise the mother of?
 8            THE WITNESS:  That is -- Elouise is my mother's
 9    mother.
10            THE COURT:  So if your father was referring to his
11    wife's mother, would he not be referring to Elouise?
12            THE WITNESS:  Yes, he would be.
13            THE COURT:  So if you're posing as your father and
14    refer to your wife's mother passing away, what you are
15    referring to is the person who is your grandmother?
16            THE WITNESS:  My grandmother.  That is correct.
17            THE COURT:  Very good.
18            MS. CHAUDHRY:  Thank you, your Honor.
19    BY MS. CHAUDHRY:
20    Q.  And so that is not true, right, your grandmother didn't
21    die?
22    A.  No, that is not true.
23    Q.  And this was a lie told in relation to someone asking about
24    a wire for Maxim?
25    A.  Yes, ma'am.
```

Fbo6new4                    C.R. Darden - cross

1           MS. CHAUDHRY:  Your Honor, I handed the Court, the

2    witness and the government Defense 502, but I didn't refer to

3    it earlier.  I offer 502 also.

4           MR. ADAMS:  Just one moment, your Honor.

5           (Pause)

6           MR. ADAMS:  Assuming this is not being offered for its

7    truth, no objection.

8           THE COURT:  I assume none of these are being offered

9    for the truth.

10          MS. CHAUDHRY:  That is how I started this, yes.  Thank

11   you.

12          THE COURT:  Received.

13          (Defendant's Exhibit 502 received in evidence)

14          MS. CHAUDHRY:  I would like to show 502 to the jury,

15   please.

16   BY MS. CHAUDHRY:

17   Q.  Mr. Darden, you have a G-Mail account; correct?

18   A.  Correct.

19   Q.  And this is an e-mail from your G-Mail account on Thursday,

20   October 31st to Larry Deitch?

21   A.  Yes, ma'am.

22   Q.  You testified that he is the lawyer for the Alpha Media

23   Group?

24   A.  Yes.

25   Q.  And this is an e-mail you pretending to be -- well you

1   actually are writing it yourself; correct?

2   A.  Yes.

3   Q.  So I draw your attention to the first paragraph about six

4   lines, five lines down.  You say, Aside from the

5   misunderstanding about my father's shares being moved to

6   Forefront's broker dealer instead of Merchant Bank, the passing

7   of my grandmother (who lived with my parents) and the

8   hospitalization of my father occurred within the same week,

9   these two events were nearly catastrophic for my family and it

10  took a great deal of time to be sure my family was actually

11  going to make it home from the hospital.

12          This is your statement; correct?

13  A.  Yes, ma'am.

14  Q.  And again you're grandmother did not die around

15  October 31st of 2013, did she?

16  A.  My grandmother is still alive, yes.

17  Q.  Your father was not hospitalized at that time, was he?

18  A.  No, ma'am.

19  Q.  And these were lies told to try to get Larry Dietch to give

20  you more time for the Maxim deal; right?

21  A.  That's correct.

22          MS. CHAUDHRY:  I would like to show the jury Defense

23  497.

24  Q.  Mr. Darden, this is an e-mail at the top --

25          MS. CHAUDHRY:  So we'll start at the one with the

Fbo6new4                        C.R. Darden - cross

1    bottom and halfway through starting August 22nd at 8:18 if you

2    can blow that up.  Can we blow it up a little less so the jury

3    can see the left.

4    Q.  I will read it.  This e-mail is -- in the beginning of the

5    e-mail from you writing from The Reign account signing as Cal.

6    That means that if you writing to somebody pretending to be

7    your father; correct?

8    A.  The Cal is not what makes it so.  I believe because I said

9    my mother-in-law but not because I said Cal.

10   Q.  Right.  This is August 22nd, 2011; correct?

11   A.  That's correct.

12   Q.  So three -- two years before you were telling Larry Deitch

13   and Lee Ann Gliha this is an e-mail from you to someone named

14   Patty; correct?

15   A.  Yes, it is.

16   Q.  And you say my mother-in-law passed away last -- late

17   Friday night.  So needless to say it was a very long and trying

18   weekend for the family but everyone is holding out fairly well.

19           That is your statement; correct?

20   A.  Yes, ma'am.

21   Q.  And in response to it, if we can go up, Patty says that she

22   would like to send your wife a card; correct?

23   A.  Correct.

24   Q.  She asked for your wife's name and address so she could

25   send her a card?

Fbo6new4                          C.R. Darden - cross

1   A.  Yes -- yes.

2   Q.  Your response at the top of the e-mail is, Thanks, Patty.

3   My wife's name is Patricia Gail but everyone calls her --

4   everyone calls her Gail.  In lieu of cards or flowers, we're

5   asking that donations be sent to our church's foundation.  I

6   will forward the information to you once I receive it.

7        That is your statement?

8   A.  That's my statement.

9   Q.  And again none of those things are true; correct?

10  A.  No, ma'am.

11  Q.  And this was another fraud you were doing to try to get

12  money; correct?

13  A.  I don't remember what it was for but probably.  I am not

14  quite sure.

15  Q.  You don't remember why you were telling this lie about your

16  grandmother dying?

17  A.  No, I don't even -- I don't remember who that is to, but it

18  probably was so -- but I am not sure who that was to.

19  Q.  These three e-mails that I have -- I have shown you,

20  Mr. Newkirk is not copied on any of those e-mails?

21  A.  I don't believe so.

22  Q.  That is three lies you have told about your grandmother's

23  dying just to get money; is that correct?

24  A.  It is.

25        MS. CHAUDHRY:  May I approach?

1              THE COURT:  Yes.

2   Q.  Mr. Darden, you testified about impersonating your father;

3   correct?

4   A.  I did.

5   Q.  You have also impersonated your own mother?

6   A.  Yes.

7   Q.  Your mother is Patricia Gail Darden?

8   A.  Yes.

9   Q.  Do you love her?

10  A.  Very much.

11  Q.  Her e-mail address is G1950@Yahoo.com; correct?

12  A.  That is -- I believe that is her correct e-mail address,

13  yes.

14  Q.  But you made up an e-mail address for her; correct?

15  A.  I did.

16  Q.  You made up an address that is Gail_Darden3@yahoo.com?

17  A.  Yes.

18  Q.  And you registered that e-mail address, didn't you?

19  A.  I did.

20  Q.  You used the name Gail Darden?

21  A.  Yes, ma'am.

22  Q.  And you were the one who uses that account?

23  A.  Yes, ma'am.

24  Q.  She has never used that account has she?

25  A.  Not once.

1  Q.  Every e-mail that comes to that account comes to you; is

2  that correct?

3  A.  Yes, ma'am.

4  Q.  And every reply that goes from that account goes from you?

5  A.  Certainly.

6  Q.  Every time you reply from that account, you are pretending

7  to be your mother; is that correct?

8  A.  Yes, ma'am.

9  Q.  I have handed you what has been marked for identification

10  as 410, 486, 411, 412, 414, 490, 418, 419, 421, and 494.

11          Mr. Darden, do you recognize these documents?

12  A.  I do.

13  Q.  And these e-mails from the Gail_Darden3@Yahoo address;

14  correct?

15  A.  Yes, ma'am.

16  Q.  That is the address that you control?

17  A.  Yes, ma'am.

18  Q.  So all of these e-mails from this are from you; correct?

19  A.  That's correct.

20          MS. CHAUDHRY:  At this time I offer these.

21          MR. ADAMS:  No objection.

22          THE COURT:  Received.

23          (Government's Exhibits 410, 486, 411, 412, 414, 490,

24  418, 419 received in evidence)

25          (Government's Exhibits 421 and 494 received in

 1    evidence)

 2              MS. CHAUDHRY:  I would like to show the jury 410,

 3    please.

 4    BY MS. CHAUDHRY:

 5    Q.  Now, Mr. Darden, this is an e-mail from December 23rd, 2013

 6    at 11:22 from your fake mom account to yourself; correct?

 7    A.  Yes, ma'am.

 8    Q.  And the text of that e-mail is -- you write, Hi, Gail, it

 9    was great speaking with you earlier and please give Cal my

10    best.

11              That Cal would be your father?

12    A.  Yes, ma'am.

13    Q.  As per our conversation, I can confirm that Cal has an

14    excess of 95,000 Cardinal units with varying degrees of

15    restrictions and deferments plus stock options.  I hope this

16    helps.  Happy holidays to you and the family, exclamation

17    point.  Sincerely, Jeff Henderson, Chief Financial Officer,

18    Cardinal Health, Inc., and then is lists two phone numbers and

19    the website for Cardinal; is that correct?

20    A.  That's correct.

21    Q.  And the e-mail itself, the text of it is supposed to be

22    from Jeff Henderson to your mother; correct?

23    A.  That's correct.

24    Q.  Jeff Henderson according to this e-mail is the CFO of

25    Cardinal Health?

Fbo6new4                        C.R. Darden - cross

1   A.  Yes, ma'am.

2   Q.  Is that one of the companies on which your father is a

3   director?

4   A.  Yes, ma'am.

5   Q.  I would like to show -- sorry.

6           You wrote this as a draft to begin forwarding

7   messages; correct?

8   A.  Yes, ma'am.

9   Q.  So that you could create a long forwarded chain that looks

10  like a conversation between your mom and Jeff Henderson;

11  correct?

12  A.  That's correct.

13          MS. CHAUDHRY:  I would like to show the jury 486,

14  please.

15  Q.  Now, this is also from -- this is an e-mail from you from

16  your CalvinDarden@Gmail replying to your fake mom e-mail

17  account, right, to the Gail_Darden@Yahoo.

18  A.  Yes, ma'am.

19  Q.  This is the same day, December 23rd, 2013 at 11:26 in the

20  morning?

21  A.  That's correct.

22  Q.  You are still pretending to be Jeff Henderson in the text?

23  A.  Yes.

24  Q.  This one says, Hi, Gail.  It was great speaking with you

25  earlier.  Please give Cal my best.  As per conversation I can

Fbo6new4                          C.R. Darden - cross

1    confirm that Cal has in excess 95,000 Cardinal units with

2    varying degrees of restrictions and deferments plus an excess

3    of 15,000 stock options.

4              MR. ADAMS:  Objection, your Honor, these documents

5    speak for themselves.

6              THE COURT:  Sustained.

7    Q.  What you added on this one is the 15,000 stock options;

8    correct?

9    A.  Yes.

10   Q.  That is the way it differs from the first one?

11   A.  I believe so.

12             MS. CHAUDHRY:  Then I would like to show the jury 411,

13   please.  Defense Exhibit 411.

14   Q.  This is from the Gail Darden account that you created;

15   right?

16   A.  Yes.

17   Q.  The subject is Cardinal shares; correct?

18   A.  Yes.

19   Q.  And it was sent December 23rd, 2013 at 11:31 a.m.?

20   A.  Yes, ma'am.

21   Q.  And it is actually sent to you; correct?

22   A.  Yes, ma'am.

23   Q.  To your G-Mail address?

24   A.  Yes.

25   Q.  And the text of it says Hi, Jeff.  Thank you so much for

1   returning my call earlier.

2            MR. ADAMS:  Objection.  It speaks for itself.

3            MS. CHAUDHRY:  I would like to ask questions about the

4   text, your Honor.

5            THE COURT:  Well, I will allow that within limits.

6   Let see how it goes.

7   Q.  It begins by referring to a call earlier.  Your mother

8   never had a call with Jeff Henderson earlier on December 23rd;

9   correct?

10  A.  No, ma'am.

11  Q.  That is a total lie; correct?

12  A.  My mother was not aware of any facet of that.  This is a

13  total lie.  That's correct.

14  Q.  And it goes on to as pretending to be your mom.  You are

15  asking at the bottom, Any information you can provide would be

16  appreciated; correct?

17  A.  That's correct.

18            MS. CHAUDHRY:  And I would like to show the jury 412,

19  please.

20  Q.  Now, this is the whole chain that you forwarded to

21  yourself; correct?

22  A.  Looks to be.

23  Q.  And at the top you, even though it is from your G-Mail

24  address to your G-Mail address, you write, Ramarro, below is

25  the e-mail from Cardinal CFO; correct?

1   A.  Yes, ma'am.

2   Q.  Ramarro is what your mom calls you; correct?

3   A.  Correct.

4   Q.  This is pretending to be your mom writing to you; correct?

5   A.  Correct.

6   Q.  And if we go down to the last e-mail on this, you've

7   actually changed the time.  When you created this forward

8   chain, you went back and changed the time that this was sent to

9   9:27, didn't you?

10  A.  I don't recall, but everything about it is fake.  So

11  probably.  I am not arguing whether I did or not.  Everything

12  about it is fake.  There is not one real thing on here.

13  Probably so.  I just don't recall.

14  Q.  In addition to it being fake and creating a fake chain, you

15  also went and edited the fake chain to change the time;

16  correct?

17  A.  Sure.

18          MS. CHAUDHRY:  I would like to show the jury 414,

19  please.

20  Q.  At 11:57 you send from your mom's fake account the whole

21  chain to yourself and Harvey Newkirk; correct?

22  A.  Okay.  Yes.

23          MS. CHAUDHRY:  Can we blow up the top, please.

24  Q.  And at the top you write, Ramarro and Harvey, this is the

25  e-mail from the CFO of Cardinal Health; correct?

1    A.  Yes.

2    Q.  And that is you pretending to be your mother writing to

3    yourself and Harvey Newkirk?

4    A.  Yes, ma'am.

5    Q.  In all the e-mails that I have showed you before where

6    you're drafting the e-mails to create the fake chain and all of

7    those are fake, Mr. Newkirk is not on a single one of those, is

8    he?

9    A.  No, ma'am.

10   Q.  And as you testified previously, you knew he had a personal

11   e-mail and a business e-mail; right?

12   A.  I did.

13   Q.  Neither his personal nor his business e-mail is copied on

14   these, are they?

15   A.  That's correct.

16   Q.  That's correct.

17            MS. CHAUDHRY:  I would like to show the jury 490,

18   please.  Defense Exhibit 490.

19   Q.  Mr. Darden, this e-mail was sent December 24th, 2014,

20   Christmas Eve; correct?

21   A.  Yes, ma'am.

22   Q.  It says 11:12 in the morning?

23   A.  It is.

24   Q.  It is from the fake account you created for your mother?

25   A.  It is.

Fbo6new4                              C.R. Darden - cross

1   Q.  And it is to yourself; correct?

2   A.  It is.

3   Q.  And the subject is Target shares; correct?

4   A.  Yes.

5   Q.  And this is an e-mail in which you are pretending to be

6   your mother writing to John?

7   A.  Yes.

8   Q.  And who is John supposed be in this?

9   A.  I am not sure.  John -- maybe it was the CFO of Target.  I

10  am not sure exactly.  It doesn't say.

11  Q.  In this e-mail you say, Cal and I are requesting

12  confirmation on the number of shares that we have.  I have

13  statements from Bank of America as well as Fidelity and I am

14  not sure if they were showing duplicate shares.  Bank of

15  America is showing a little 64,000 shares and Fidelity is

16  showing over 13,000 with approximately 59,000 options.  Can you

17  please confirm?  And then it is signed Happy Holidays.  Best

18  regards.

19          Is that correct?

20  A.  Yes, ma'am.

21  Q.  Your mother never asked anyone at Target for confirmation

22  of these shares, did she?

23  A.  Not at all.

24  Q.  At the top it says, I just spoke with your assistant and

25  she ask that I e-mail you.

1              Your mother never spoke to John's assistant on

2      Christmas Eve 2013, did she?

3      A.   My mother has never spoke to anybody in regard to this,

4      ever.

5      Q.   Your mother has never spoken to anybody in regard to this

6      ever; is that correct?  I couldn't hear you.

7      A.   Ever.  That's correct.

8      Q.   Mr. Darden, can you move the microphone closer to yourself?

9      A.   Oh, I am sorry.

10     Q.   Thank you.

11             MS. CHAUDHRY:  I would like to show the jury 418,

12     please.  Before you blow it up, please.

13     Q.   This is an e-mail responding to the one you just sent from

14     your mom's fake account?

15     A.   Yes, ma'am.

16     Q.   It is actually sent from your personal G-Mail account?

17     A.   Yes, it is.

18     Q.   And again it is December 23rd, Christmas Eve at 8:25 a.m.?

19     A.   That's correct.

20     Q.   And now the subject is regarding Target shares; correct?

21     A.   Yes, ma'am.

22     Q.   And you write --

23             MS. CHAUDHRY:  Now we can blow up the top, please.

24     Q.   Hi, Gail.  I am so sorry for the delay in getting back to

25     you.  No one named John from Target ever got back your mother;

1    correct?

2    A.  My mother has never spoke to anybody regarding this e-mail

3    or any other as far as this deal is concerned.  She never

4    returned any phone call or returned any e-mail.  Never.  Not

5    once.

6    Q.  And you go on to say that he is on vacation and I will be

7    off to January 6th.

8              You totally made that up; right?

9    A.  Yes, ma'am.

10   Q.  And this conversation with Michelle, I thought Michelle was

11   about to help you with your request.

12             You made that up; correct?

13   A.  I made that up.

14   Q.  This confirmation that Cal -- that is your father?

15   A.  Yes, ma'am.

16   Q.  Has over 77,000 restricted units or over 59,000 options,

17   that is totally made up; right?

18   A.  I made up everything.

19   Q.  And then you talk about, I heard about Cal's knee surgery.

20   Your mom never discussed with anybody at Target your father's

21   knee surgery; correct?

22             MR. ADAMS:  Objection.

23             THE COURT:  Excuse me?

24             MR. ADAMS:  Objection, speculation.

25             THE COURT:  Well, as phrased sustained.

Fbo6new4                          C.R. Darden - cross

1    Q.  As far as you are aware has your mom ever discussed with

2    anybody at Target your father's knee surgery?

3    A.  As far as I am aware, no.

4    Q.  And, Mr. Darden, I just want to confirm the prior chain you

5    saw from December 23rd and this one on December 24th, at this

6    time your family was not speaking to you, were they?

7    A.  No, they were not.

8              MS. CHAUDHRY:  I would like to show the jury 419,

9    please.

10   Q.  This is the forwarded chain of the past two we saw;

11   correct?

12   A.  Yes, ma'am.

13   Q.  At the top of it you are using your mom's bank account?

14   A.  Yes, ma'am.

15   Q.  You are pretending to be her; right?

16   A.  Yes.

17   Q.  And this is sent again on Christmas Eve at 8:30 in the

18   morning?

19   A.  Yes, ma'am.

20   Q.  It is actually sent to your personal G-Mail address?

21   A.  Yes, ma'am.

22   Q.  And you respond, Thank you.  Same to you and yours.

23        Correct?

24   A.  Yes.

25             MS. CHAUDHRY:  I would like to show jury Defense 421,

Fbo6new4                          C.R. Darden – cross

1    please.

2    Q.  Now, you've forwarded this entire totally made up chain to

3    yourself and Harvey Newkirk; correct?

4    A.  Yes, ma'am.

5    Q.  And this is pretending to be from your mother to Harvey

6    Newkirk?

7    A.  That's correct.

8    Q.  As far as you know has your mother ever e-mailed Harvey

9    Newkirk?

10   A.  She never has.

11   Q.  This e-mail says, Ramarro and Harvey, please see the e-mail

12   below from the CFO of Target, John Mulligan.

13           Is that correct?

14   A.  That's correct.

15           MS. CHAUDHRY:  Can you please blow up the middle part.

16   Yes from there to John.  Thank you.

17   Q.  But now when you forwarded it, you changed the "to" line to

18   John Mulligan; correct?

19   A.  Yes, ma'am.

20   Q.  So you edited the forward?

21   A.  I did.

22   Q.  And then you edited the e-mail address that it was

23   forwarded to -- from?

24   A.  Yes.

25   Q.  It now says John.Mulligan@Target.com?

1   A.  Yes, ma'am.

2   Q.  And then under, Thank you, same to you and yours, you added

3   this line that says, on Monday December 23rd, 2013, 5:25 p.m.,

4   John Mulligan, bracket, John.Mulligan@Target.com, closed

5   bracket, wrote, colon, you added that; correct?

6   A.  I did.

7   Q.  You add that?

8   A.  I did.

9   Q.  You did that so this whole chain would appear authentic;

10  correct?

11  A.  Yes, ma'am.

12  Q.  This whole chain with your edits is what was sent to Harvey

13  Newkirk; correct?

14  A.  It is.

15  Q.  None of the e-mails that you created building this bogus

16  chain were ever sent to Harvey Newkirk, were they?

17  A.  No, ma'am.

18          MS. CHAUDHRY:  I would like to show the jury Defense

19  Exhibit 494.

20  Q.  Mr. Darden, you sent that by January 22nd of 2014.  You

21  were speaking to your parents then; correct?

22  A.  Yes, ma'am.

23  Q.  This is an e-mail from January 29, 2015; correct?

24  A.  Yes.

25  Q.  You were already speaking to your parents again at this

Fbo6new4                           C.R. Darden - cross

1   point?

2   A.   Yes.

3   Q.   And this is an e-mail chain that starts from your mom's

4   bank account?

5   A.   Yes, ma'am.

6   Q.   And every e-mail in this that is purportedly from your mom

7   is not from your mom; correct?

8   A.   If you see any e-mail from Gail_Darden3@Yahoo.com, that is

9   not from my mother.  That is from me.  Any e-mail.

10        MS. CHAUDHRY:  So I want to take the bottom e-mail.

11   No, the very bottom one.  The one that starts, On Wednesday.

12   Q.   The very bottom e-mail of this chain that you created is

13   allegedly from your mom's fake account?

14   A.   Correct.

15   Q.   It is supposed to be to you; correct?

16   A.   Yes, ma'am.

17   Q.   And you say writing as her, Ramarro, referring to yourself;

18   correct?

19   A.   Yes.

20   Q.   She just spoke to the bank; correct?

21   A.   Yes.

22   Q.   Did your mom actually speak to any bank that morning?

23   A.   No.  My mom has not spoken to anybody regarding this deal

24   or financing for it.

25   Q.   It further says that vacancy that they can see 5,124,870 is

Fbo6new4                          C.R. Darden - cross

1    coming in but the funds have not actually hit the account yet.

2              was that statement true?

3    A.  None of it is true, ma'am.

4    Q.  And at the bottom she writes, lastly -- you write

5    pretending to be your mom, Lastly, am I sending the funds

6    directly to you or to a third-party for the Maxim stuff?

7    Please send me all the info I need.  Thanks.  Love you, mom.

8              That is you writing?

9    A.  Everything is me writing.  That's correct.

10   Q.  And now if we can go up the chain.  This e-mail at the

11   bottom you forwarded to Brad Reifler; correct?

12   A.  Yes, ma'am.

13             MS. CHAUDHRY:  So if we can go from the middle where

14   it says, From Calvin Darden.  Thank you.

15   Q.  So you take this e-mail that you sent from your fake mom's

16   account to yourself and then you forward that to Brad Reifler;

17   right?

18   A.  That's right.

19   Q.  Brad Reifler is from Forefront?

20   A.  Yes.

21   Q.  He is actually waiting for money?

22   A.  Yes.

23   Q.  You sent that to him so that -- you pretend to be your mom

24   so you can convince him that money is really coming?

25   A.  I did.

Fbo6new4                              C.R. Darden - cross

1    Q.  In this e-mail you're writing back to your mom; correct?

2    A.  Yes.

3    Q.  And just copy Mr. Reifler?

4    A.  Yes.

5    Q.  And you start by saying, Thanks, Mom; correct?

6    A.  Yes.

7    Q.  But that e-mail is not really going to your mom?

8    A.  No.  None of the e-mails are going to my mother or coming

9    from my mother.

10   Q.  Right.  And then at the bottom you write to Mr. Reifler and

11   you say, Brad, if you don't mind, can you please forward the

12   wire instructions to my mom as I can't seem to find it in my in

13   box?

14   A.  That's correct.

15   Q.  As far as you know did your mom ever receive wiring

16   instructions on this?

17   A.  No, she did not.

18            MS. CHAUDHRY:  Can we go up one e-mail.

19   Q.  So Brad Reifler is responding to this e-mail; correct?

20   A.  Yes, ma'am.

21   Q.  And he says, That is great.  The wire should hit within 30

22   minutes to an hour.  We do these all the time.  And he attaches

23   wire instructions.

24            Correct?

25   A.  Yes, ma'am.

Fbo6new4                    C.R. Darden - cross

1  Q.  But anything he attaches and sends to Gail_Darden@Yahoo --

2  sorry, Gail_Darden3@Yahoo actually goes to you; correct?

3  A.  Correct.

4  Q.  Mr. Darden is this an e-mail address that you had on your

5  phone so that you can get the e-mail while you were walking

6  around?

7  A.  Probably.

8  Q.  Probably.

9       What other e-mail address did you have on your phone

10  that weren't yours?

11  A.  I don't recall.

12  Q.  You don't recall?

13  A.  I don't.

14  Q.  Can you estimate for us how many there were?

15  A.  I can't.

16       MS. CHAUDHRY:  Can we go up on this e-mail, please.

17  Q.  You reply to Brad Reifler's e-mail on January 29th at

18  2:02 p.m and you say, Mom, I am trying to reach you.  Did you

19  forward the wiring instructions to the banker at Merrill?

20       You weren't actually trying to reach your mom, were

21  you?

22  A.  No, ma'am.

23  Q.  You were just writing this so Brad Reifler would think you

24  were?

25  A.  Yes.

1   Q.  So he would think that your mom is involved in this deal?

2   A.  Yes.

3   Q.  And you then refer to her being in the hospital and she

4   can't call.  She wasn't in the hospital at that time was she?

5   A.  I am sure she wasn't.

6   Q.  You had no reason to believe that she couldn't call you,

7   could she?

8   A.  No, ma'am.

9   Q.  Did you ask her to reply all?

10  A.  Yes.

11  Q.  So that Brad Reifler would get the e-mail that you're about

12  to send pretending to be your mother?

13  A.  That's correct.

14  Q.  You sign this, Thanks, love you?

15  A.  Correct.

16  Q.  Pretending to say that to your mom?

17  A.  Yes, ma'am.

18  Q.  But it is not going to anyone but yourself and Brad

19  Reifler?

20  A.  That's correct.

21          MS. CHAUDHRY:  Let's see the top e-mail, please.

22  Q.  This top e-mail is you replying from your fake mom account?

23  A.  Yes.

24  Q.  Which may have been from on your phone -- an e-mail address

25  you kept on your phone?

Fbo6new4                          C.R. Darden - cross

1   A.   Maybe.

2   Q.   It is at 2:56; right?  Is this reply 2:56 p.m.?

3   A.   Okay.

4   Q.   Right?

5   A.   Yes.

6   Q.   You say, We were in with the doctor, pretending to be your

7   mom; right?

8   A.   Yes, ma'am.

9   Q.   Your mom was not in with the doctor?

10  A.   No.

11  Q.   Nor was your dad?

12  A.   No.

13  Q.   And you say in this, I am forwarding to Broderick at

14  Merrill Lynch right now.  Your mom never forwarded anything to

15  Merrill Lynch; correct?

16  A.   No, ma'am.

17  Q.   But you mention Broderick at Merrill Lynch?

18  A.   I did.

19  Q.   Who are referring to Broderick?

20  A.   The gentleman -- the financial advisor at Merrill Lynch

21  that was referenced in the other documents.

22  Q.   So now you are adding Broderick's name to this so that Brad

23  Reifler believes that something really is going to happen?

24  A.   Yes, ma'am.

25  Q.   You refer to Merrill Lynch; right?

Fbo6new4                      C.R. Darden - cross

1  A.  Yes.

2  Q.  No wire was coming from Merrill Lynch, was it?

3  A.  No, ma'am.

4  Q.  As you said earlier everything in this is a lie; is that

5  correct?

6  A.  That's correct.

7  Q.  And this is an e-mail chain that Harvey Newkirk is not on;

8  is that correct?

9  A.  That's absolutely correct.

10 Q.  All the e-mails that you had to send yourself to build this

11 chain, you never copied Mr. Newkirk on those e-mails, did you?

12 A.  Not at all.

13          THE COURT:  Counsel, we're almost at 1:00.  This is

14 probably a good place to stop.

15          MS. CHAUDHRY:  Can I ask one more question?

16          THE COURT:  Sure.

17 Q.  I handed you what is marked for identification as

18 Defendant's 501.

19          MS. CHAUDHRY:  I offer it at this time.

20          MR. ADAMS:  Objection, 608.

21          THE COURT:  We're going to have to take this up out of

22 the presence of the jury.

23          Ladies and gentlemen, I want to respond to a couple of

24 notes that you sent earlier.  A couple of you wanted letters to

25 your employers.  I just signed them and you should just wait in

Fbo6new4                          C.R. Darden - cross

1    the jury room and we'll have those letters for you before you

2    leave today.  If anyone else needs a letter to an employer

3    saying you are on jury service and it is vital that you be

4    here, obviously I am happy to provide a letter.

5           In terms of schedule, counsel and I have been working

6    to try to streamline the remainder of the case as best we can.

7    It is a shame I had hoped that the other trial I had, which had

8    to be done simultaneously with this trial because it involved

9    people coming from various parts of the country and even abroad

10   and that is what led to the double trial.  I was hopeful that

11   would be over and we could sit full days.  That is not going to

12   happen at least this coming week, but I still remain modestly

13   hopeful that we can finish this case by the end of the coming

14   week.  Obviously we're not going to sit again until next,

15   Tuesday as you know, because of the Thanksgiving holiday and a

16   different obligation I have on Monday.

17           (Continued on next page)

18

19

20

21

22

23

24

25

FBOKNEW5

1          THE COURT:  (Continuing)  But we will sit our 9:00 to

2     1:00 time on Tuesday, Wednesday, Thursday.

3          I want to take up with Juror No. 4 whether we can sit

4     at least a short period on Friday but we'll work that out with

5     him.  If we don't finish the case by then, then we will finish

6     it the follow week -- that much I will guarantee, absolutely

7     guarantee you, I'll do every necessary to make sure that

8     happens -- but I can't guarantee you we'll finish this week;

9     we'll do our best.

10          So, it's not a question of number of witnesses or

11     anything like that; it's really a question of what counsel

12     believes they can eliminate fairly and not compromise their

13     cases and we're working on that.

14          Let's see if there's anything else we need to take up.

15          Oh, yes.  Since we'll be on a break now for about a

16     week, you should please remember, don't talk about the case,

17     don't discuss it with your friends or relatives when you're

18     eating that turkey.  Talk, as you should, about football or

19     something like that.  We never know whether any given case in

20     this court is going to be covered by the media or not, but if

21     the unlikely event that you see something in the media about

22     the case, turn away immediately, don't look at it.  And all of

23     this is very important because we want you to judge this case

24     on the testimony and the evidence that you hear right in court.

25          Have a terrific Thanksgiving, and we will see you at

FBOKNEW5

1    9:00 o'clock next Tuesday.

2                   (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FBOKNEW5

```
 1                    (Jury not present)
 2               THE COURT:  Mr. Darden, you can step down.  We'll see
 3    you next Tuesday at 9:00 o'clock.
 4               THE WITNESS:  Thank you.
 5                    (Witness temporarily excused)
 6               THE COURT:  First, the way that the testimony went
 7    since the last break, a short, direct and to-the-point
 8    examination by the government, a rapid-fire, in the best sense,
 9    cross-examination by defense counsel, that's the way it should
10    go.  I don't know why we didn't have that earlier in this
11    trial, but I mention it now both to compliment both sides but
12    also because if the rest of the trial were to proceed like
13    that, we would finish next week, without doubt.  So, I just
14    encourage both sides to keep up the good work.
15               Now, I do want to take up one matter at the sidebar.
16               MS. CHAUDHRY:  Is it about what I handed you?  Should
17    I bring it up?
18               THE COURT:  No, it's not about that.  If you want to
19    bring up something else, sure.
20                    (Pages 980-984 SEALED by order of the Court)
21
22
23
24
25
```

FBOKNEW5

1          (In open court)

2          THE COURT:  Now, we have Exhibit -- what was the

3     number?

4          MS. CHAUDHRY:  501, sir.

5          THE COURT:  501?  Okay, let me take a look at that.

6          (Pause)

7          THE COURT:  So, what's the objection?

8          MR. ADAMS:  608(b), it's extrinsic evidence, proof of

9     untruthfulness.

10         THE COURT:  Yes, I agree.  And I can think of two or

11    three other objections, but on the other hand, since he has

12    already more or less testified to this, what do you care?

13         MR. ADAMS:  Just to the admission of the document

14    itself.  I have no problem with the inquiry into this new email

15    address -- I think that's fair game -- but the document itself

16    is my objection.

17         THE COURT:  Well, what I'm getting at is this -- and

18    this is really for both sides -- if we're going to continue to

19    streamline this, then I hope that both sides will, number one,

20    confine their objections to things they really care about.  I

21    don't mean to say that you don't have a valid objection here --

22    I think you do -- but I am not quite sure what the prejudice

23    is, but this goes both ways because the defense -- Mr. Darden

24    has already admitted, for example, he repeatedly admitted that

25    he lied about everything concerning his mother and his

FBOKNEW5

1     grandmother.  And defense counsel has been given a certain

2     leeway to show how extensive it was, but there is a point where

3     it just becomes endless, a waste of time.

4          MS. CHAUDHRY:  Yet, your Honor, I actually did that

5     one up front, and I am not going to do any more chains.  I'm

6     just going to show fake documents and say, you did it the same

7     way.  It was just the one laborious trudge through.

8          THE COURT:  All right.  Well, since the government

9     objected and the objection is technically correct, the 501 is

10    excluded, but let's see if we can move things along.  I think

11    we have a terrific jury -- this is as good a jury as I've seen

12    and they're all attentive, they're all really on top of

13    everything -- and we owe it to them not to waste their time and

14    to bring this case to a conclusion.

15          Now, everyone here has a right to be critical of the

16    Court -- I was 45 minutes late today, that's as inexcusable as

17    can be -- so I include myself in the group that has to do

18    better, but I think we owe it to this jury to move things

19    along.

20          Okay, anything else we need to take up?

21          MR. ADAMS:  Your Honor, could I just make one quick

22    request at sidebar?

23          THE COURT:  Yes.

24          MS. CHAUDHRY:  Before we go to sidebar:  I can ask the

25    question, I can't show the document?

FBOKNEW5

1                THE COURT:  Yes.

2                (Page 988 SEALED by order of the Court)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FBOKNEW5

```
1                (In open court)

2                MR. HARRIS:  Have a good Thanksgiving, your Honor.

3                THE COURT:  Okay.  I will see you next week.  Have a

4    good Thanksgiving.

5                (Adjourned to December 1, 2015 at 9:00 a.m.)

6                              * * *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      INDEX OF EXAMINATION

 2   Examination of:                           Page

 3   CALVIN RAMARRO DARDEN

 4   Direct By Mr. Adams  . . . . . . . . . . . 835

 5   Cross By Ms. Chaudhry  . . . . . . . . . . 944

 6                      GOVERNMENT EXHIBITS

 7   Exhibit No.                            Received

 8    174  . . . . . . . . . . . . . . . . . . 862

 9    175  . . . . . . . . . . . . . . . . . . 862

10    168  . . . . . . . . . . . . . . . . . . 871

11    169  . . . . . . . . . . . . . . . . . . 872

12    171  . . . . . . . . . . . . . . . . . . 873

13    144  . . . . . . . . . . . . . . . . . . 876

14    177  . . . . . . . . . . . . . . . . . . 882

15    119  . . . . . . . . . . . . . . . . . . 884

16    178  . . . . . . . . . . . . . . . . . . 935

17    150  . . . . . . . . . . . . . . . . . . 941

18    499, 497, 496  . . . . . . . . . . . . . 945

19    410, 486, 411, 412, 414, 490, 418, 419 . . . 956

20    421 and 494  . . . . . . . . . . . . . . 956

21                      DEFENDANT EXHIBITS

22   Exhibit No.                            Received

23    502  . . . . . . . . . . . . . . . . . . 951

24

25
```