Fc16new1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                           14 CR 534(JSR)

 5   HARVEY NEWKIRK,

 6                  Defendant.

 7   ------------------------------x

 8                                       New York, N.Y.
                                         December 1, 2015
 9                                       9:50 a.m.

10
     Before:
11
                         HON. JED S. RAKOFF,
12
                                         District Judge
13

14                          APPEARANCES
     PREET BHARARA
15        United States Attorney for the
          Southern District of New York
16   ANDREW C. ADAMS
     SARAH E. PAUL
17        Assistant United States Attorneys

18   HARRIS, O'BRIEN, ST. LAURENT & CHAUDHRY, LLP
          Attorneys for Defendant Newkirk
19   JONATHAN A. HARRIS
     PRIYA CHAUDHRY
20   JARED FOLEY

21   Also present:  Stephan Francois, paralegal
                    Chloe Marmet, paralegal
22                  Paul Deal, Secret Service
                    James Hilliard, FBI
23

24

25
```

 1          (In open court; jury not present)

 2          THE COURT:  Bring in the jury, please.

 3          Defendants Exhibits 573, 391 and 240 are excluded both

 4   on the grounds that they open the door to the 404(b) and also

 5   on relevance grounds; but if defense counsel wants to make a

 6   record, you can do so at the next break.

 7          MS. CHAUDHRY:  Okay.

 8          (In open court; jury present)

 9          THE COURT:  Please be seated.

10          So, ladies and gentlemen, welcome back.  Thank you for

11   your promptness, which is utterly disgusting and it puts me to

12   shame.  In all seriously, I had another matter I had to deal

13   with this morning.  I really appreciate your promptness.  It is

14   very helpful to the Court.

15          As you know we are now going to sit full days except

16   on Friday.  I am hopeful we'll complete the case this week, but

17   we'll talk about that.

18          Counsel.

19          MS. CHAUDHRY:  Thank you.

20   CROSS-EXAMINATION

21   BY MS. CHAUDHRY:

22   Q.  Good morning.

23          Mr. Darden, you've entered into a cooperation

24   agreement with the government; correct?

25   A.  Yes, ma'am.

1   Q.  And even though you admit to lying repeatedly in the past,

2   you told the jury that you're telling the truth now; right?

3   A.  That's correct.

4   Q.  And last week you sat in that chair and you lied about the

5   crime that you served three and a half years for; isn't that

6   true?

7   A.  I don't believe so.

8   Q.  You don't believe so.

9           Were you asked this question and did you give this

10  answer:

11  "Q.  Can you briefly describe the crime that resulted in the

12  prison sentence?

13  "A.  Sure.  So basically I lied to my employers and

14  misrepresented the amount of -- the amount of money I had made

15  the previous year in order to induce them in order to gain, I

16  guess, a higher signing bonus or forgivable loan at my next

17  employer."

18          Were you asked those questions and you give those

19  answers?

20  A.  I did.

21  Q.  Is that still your testimony?

22  A.  It is.

23  Q.  In fact, that is only three counts of the five counts you

24  pled guilty to in 2005; isn't that true?

25  A.  I wasn't aware there were five counts.  I thought there

Fc16new1                          C.R. Darden - cross

1  were three counts.  But what I said was not a lie so...

2  Q.  It was not a lie?

3  A.  It was not a lie.

4  Q.  What you described was lying to your employers; correct?

5  A.  That's correct.  That's not a lie.

6  Q.  Your prior guilty plea, that was in court; correct?

7  A.  Yes.

8  Q.  It was under oath; correct?

9  A.  Yes, it was.

10  Q.  And you actually pled guilty to following counts:

11       Count One:  Grand larceny the first degree in the

12  county of New York during the perioded July 7th, 2003 through

13  October 20th, 2003, you stole exactly $3,185,520 from your

14  former employer AIC.

15       Did you plead guilty to that?

16  A.  I did.

17  Q.  Count Two:  Larceny in the second degree, during the period

18  February 4th 2003 and April 29th, 2003, you stole from your

19  former employer Wachovia Securities $632,480.

20       You pled guilty to that; correct?

21  A.  Yes.

22  Q.  Count Three:  Grand larceny in the second degree during the

23  period April 1st, 2001 through July 27, 2001, you stole

24  property from your former employer Smith Barney Citigroup

25  $344,208.

1            That's correct; right?

2    A.   That's correct.

3    Q.   And you also pled guilty to Count Four:  Grand larceny in

4    the second degree, which is during the period June 1st, 2003

5    through and including September 19th, 2003, you stole money

6    from a former client Catherine Aldridge in the amount of

7    $570,000.

8            You plead guilty to that also; right?

9    A.   Right.

10   Q.   You also pled guilty to Count Five, which is a scheme to

11   defraud.  April 1st, 2001 through April 1st, 2004, you engaged

12   in a scheme constituting a systematic ongoing course of conduct

13   with the intent to defraud more than one person and to obtain

14   property from more than one person by false and fraudulent

15   pretenses.

16           You pled guilty to that; correct?

17   A.   I did.

18   Q.   As part of your guilty plea to the scheme to defraud, under

19   the scheme you admitted that you stole the money from your

20   employers and that you did this by fraudulently inducing each

21   of them to hire you, give you substantial loans and by

22   increasingly misrepresenting and exaggerating your production

23   and book of business as well as your list of clients from your

24   previous jobs.

25           That was your guilty plea; correct?

1   A.   That's correct.

2   Q.   And you also admitted during your plea allocution that you

3   supported those false claims by your past performance as a

4   broker by submitting to each new employer financial documents

5   and business records of the previous employer that you altered

6   and you fabricated.

7         You pled guilty to that; correct?

8   A.   That is also correct.

9   Q.   And you admitted during your guilty plea that part of your

10  fraud against AIC was promising AIC that you would take that

11  three million dollars and that you would pay back Wachovia but

12  instead you kept the money; correct?

13  A.   That's correct.

14  Q.   And you used that money entirely for personal consumption;

15  correct?

16  A.   That's correct.

17  Q.   And you also pled to stealing from at least eight investors

18  between 2001 and 2004; correct?

19  A.   That's correct.

20  Q.   And these investors were your clients; correct?

21  A.   That's correct.

22  Q.   You were a broker; correct?

23  A.   Yes, ma'am.

24  Q.   And those eight investors were first Catherine Aldridge;

25  correct?

Fc16new1                    C.R. Darden - cross

1    A.  When you say first, was she one --

2    Q.  Number one is Catherine Aldridge, right, the 87-year-old

3    woman?

4    A.  I don't know -- I don't know her age.  I am sorry.

5    Q.  You don't know her age?

6    A.  I never met her.

7    Q.  You never met her?

8    A.  I never met her.

9    Q.  Her age was discussed at your plea allocution, wasn't it?

10   A.  I don't remember my plea allocution, ma'am.

11   Q.  We'll get that for you.

12            Another of your victims was the rapper Nelly that you

13   stole $950,000 from; correct?

14   A.  Correct.

15   Q.  Another victim you stole 480,000 from; correct?

16   A.  Correct.

17   Q.  Another victim you stole $200,000 from; correct?

18   A.  Correct.

19   Q.  If you would like to refresh your recollection your

20   transcript is in front of you in the notebook at Defense

21   Exhibit 602.

22   A.  I didn't say I didn't say it or it didn't happen.  I jut

23   said I don't recall it.  I don't need to look at it.  I will

24   take your word for it.

25            THE COURT:  No.  No.  Counsel can't testify, but I

Fc16new1                         C.R. Darden - cross

1   don't think it is material.

2          Move on.

3   Q.  From Latrell Sprewell $300,000; correct?

4   A.  Correct.

5   Q.  From another victim you stole $390,000; correct?

6          MR. ADAMS:  Objection.  403, cumulative.

7          THE COURT:  No.  Overruled.

8   Q.  Is that correct?

9   A.  Correct.

10  Q.  And from another victim you stole $50,000; correct?

11  A.  I believe so.

12  Q.  From the eighth victim you stole $100,000; is that correct?

13  A.  I believe so.

14  Q.  And during your plea you admitted that you did that by

15  telling them that their money was going to be invested in

16  various investments for their benefit when in fact you

17  personally -- you used personally most of their money to

18  purchase luxury items for your own benefit and to pay back your

19  own debts.  You admitted that; correct?

20  A.  If I admitted that, then that is correct.

21  Q.  Did you admit that, sir?

22  A.  I don't remember.  But if I did, then that is --

23  Q.  Sir, I ask you to look at Defense Exhibit 602, page 8,

24  lines 10 through 16.

25  A.  Okay.  That happened.  I just don't recall every single

Fc16new1                          C.R. Darden - cross

1    minute of my allocution at this point, but that is fine.  Yes.

2    Q.  You served three and a half years in prison for this;

3    correct?

4    A.  I did.

5    Q.  Your testimony is you don't recall what you did that made

6    you go to prison?

7            THE COURT:  Sustained.

8            MR. ADAMS:  Objection.

9    Q.  At your allocution you admitted that the total theft from

10   all of your victims was $7,211,600; correct?

11   A.  Sounds correct.

12   Q.  When you interviewed with these firms that you got jobs

13   with and then stole money from, these were in-person

14   interviews; correct?

15   A.  They were.

16   Q.  And you met with various people, let's say, at Merrill

17   Lynch; correct?

18   A.  I did.

19   Q.  You sat in front of them and spoke to them face-to-face;

20   correct?

21   A.  Yes.  It was in-person.

22   Q.  You lied to them about your education; correct?

23   A.  I did.

24   Q.  And you told them that you had certain clients that you did

25   not have; correct?

Fc16new1                              C.R. Darden – cross

1   A.   That's correct.

2   Q.   To their faces; correct?

3   A.   Yes.  It was in-person.

4   Q.   You said you had at least 21 UPS executives who were your

5   clients; correct?

6   A.   I don't remember the amount, but that sounds correct.

7                (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FC1VNEW2                          C. R. Darden – cross

1    Q.  You told them that your clients were Shaquille O'Neal;

2    correct?

3    A.  Yes, ma'am.

4    Q.  That was a lie?

5    A.  It was.

6    Q.  Angela Bassett; correct?

7    A.  Yes.

8    Q.  That was a lie?

9    A.  It was not.

10   Q.  Angela Bassett was your client?

11   A.  Yes, she was.

12   Q.  Samuel L. Jackson?

13   A.  No.

14   Q.  No what?

15   A.  He was not my client.

16   Q.  But you told them he was, right?

17   A.  I don't recall, but okay.  If I did, that certainly was not

18   the case.  That was not true that he was my client; he was not

19   my client.

20   Q.  You told them that Star Jones was your client; correct?

21   A.  Yes, I did.

22   Q.  Star Jones is someone whose wedding you attended; correct?

23   A.  I did.

24   Q.  But she was not your client?

25   A.  Not -- well, I had done things for Star Jones, but she was

FC1VNEW2                        C. R. Darden - cross

1   not my client while I was at -- that was a little bit

2   ambiguous, but no.

3   Q.  And you told them that Snoop Dogg's production team was

4   your client; correct?

5   A.  I don't believe so.  I don't know anything about Snoop

6   Dogg's production team.

7   Q.  You don't believe so.

8          When you left Merrill Lynch for Smith Barney, again,

9   you interviewed with Smith Barney in person; correct?

10  A.  I did.

11  Q.  You sat down across from them and met with them, right?

12  A.  I did.  It was in person.

13  Q.  And you had dinners with them?

14  A.  I don't recall dinners, but okay.

15  Q.  Again, you sat there face-to-face and lied to them about

16  your clients, right?

17  A.  I did.

18  Q.  You handed them documents that were completely fabricated

19  by you; correct?

20  A.  It was.

21  Q.  You just handed them to them and said, These are true.

22         Correct?

23  A.  I don't know that I handed them to them and said, These are

24  true; but I guess that was the premise, so I would agree with

25  that.

FC1VNEW2                              C. R. Darden - cross

1    Q.  You did discuss your production numbers; correct?

2    A.  I'm sure.

3    Q.  And they were completely made up by you, right?

4    A.  They were.

5    Q.  You sat there face-to-face and told them, These are true.

6    A.  That's true.

7    Q.  Based on that, Smith Barney gave you a $344,000 loan,

8    right?

9    A.  Yes, ma'am.

10   Q.  And then when you went to Wachovia, again, you met with

11   them in person, right?

12   A.  I did.

13   Q.  You interviewed with various people at Wachovia, right?

14   A.  Yes, ma'am.

15   Q.  You told them about your book of business, right?

16   A.  Yes.

17   Q.  Which was lies; correct?

18   A.  Yes.

19   Q.  You described your clients; correct?

20   A.  I'm sure.

21   Q.  That was lies?

22   A.  It was.

23   Q.  You gave them false documents that you completely

24   fabricated; correct?

25   A.  That's correct.

1004

FC1VNEW2                          C. R. Darden - cross

1   Q.  You sat there face-to-face and told them that these are all

2   true, right?

3   A.  Sounds about right.

4   Q.  You told them that your commission was a million dollars,

5   right?

6   A.  I don't remember the exact number, but that sounds correct.

7   Q.  But it was actually only $78,000, right?

8   A.  That sounds about right too.

9   Q.  You sat there face-to-face with them and said, Yes, I got a

10  million dollars of commission last year, right?

11  A.  Sounds about correct.

12  Q.  And they, after meeting with you, hired you and gave you

13  $632,000, right?

14  A.  Yes, ma'am.

15  Q.  Six months later you joined AIC, a hedge fund in Canada,

16  right?

17  A.  Not a hedge fund, but, yes, I did join AIC.

18  Q.  That is owned by a billionaire named Michael Chin Lee;

19  correct?

20  A.  At the time.

21  Q.  And to get that job, you met with Mr. Chin Lee; correct?

22  A.  I did.

23  Q.  You met with him in person?

24  A.  I did.

25  Q.  And you told him face-to-face about your production;

FC1VNEW2                          C. R. Darden - cross

1   correct?

2   A.  I did.

3   Q.  And that was all lies?

4   A.  It was.

5   Q.  You told them in person-to-person about your book of

6   business; correct?

7   A.  Yes.

8   Q.  And that was all lies?

9   A.  Yes, it was.

10   Q.  You promised to deliver him Shaquille O'Neal, right?

11   A.  I don't remember exactly who I said, but it was -- I'm sure

12   it was the same list that you just previously mentioned.  I

13   don't remember exactly what I said.

14   Q.  And that list was all a lie, wasn't it?

15   A.  It wasn't all a lie.  Like you just said, Angela Bassett

16   was a lie, but that wasn't a lie.  So it was not all a lie, but

17   it was greatly exaggerated.

18   Q.  Nelly the rapper was a lie, right?

19   A.  It was not.

20   Q.  Nelly the rapper was your client?

21   A.  Yes, he was.

22   Q.  And you stole money from him?

23   A.  I did.

24   Q.  You showed him a Smith Barney printout of your production

25   numbers that you completely created, right?

FC1VNEW2                        C. R. Darden - cross

1   A.  And Michael Lee-Chin and Nelly.

2   Q.  Michael Lee-Chin.

3   A.  I did.

4   Q.  And you pretended at that time that you had $732 million in

5   assets under management, right?

6   A.  I don't remember that, but it sounds correct.

7   Q.  You discussed these fake assets with him; correct?

8   A.  I did.

9   Q.  None of your celebrity clients came with you to AIC, did

10  they?

11  A.  I don't believe so.

12  Q.  The only person from UPS who came with you to AIC was your

13  father, right?

14  A.  I don't know that to be true.  I'm not sure.

15  Q.  Based on all this, Mr. Chin Lee did hire you, right?

16  A.  He did.

17  Q.  After believing your lies?

18  A.  He did.

19  Q.  And he gave you $3 million?

20  A.  He did.

21  Q.  At some point he asked for his money back, right?

22  A.  Yes.

23  Q.  Instead of giving it back, you went on a trip to Vegas,

24  right?

25  A.  I don't remember going on a trip to Vegas after he asked

FC1VNEW2                           C. R. Darden – cross

1    for the money back.  But I've been to Vegas several times so I

2    can't say when exactly I went.

3    Q.  You went on a trip to LA, right?

4    A.  I went on several trips to LA so I'm not sure exactly what

5    you're referring to.

6    Q.  And Fort Lauderdale?

7    A.  Okay.

8    Q.  And you put a down payment on a $200,000 shark aquarium for

9    your mansion?

10   A.  I did.

11   Q.  All during this time that you were defrauding your

12   employers and stealing from your clients, you spoke to your

13   parents twice a day on the phone, didn't you?

14   A.  I don't know about that.

15   Q.  Did you speak to them regularly?

16   A.  Regularly.

17   Q.  This 87-year-old woman, you told her that you are going to

18   invest her money in real estate, right?

19   A.  I did not.  I never spoke to her.  Never met her.

20   Q.  You took her money and you put it --

21   A.  Are you referring to Catherine Aldridge?

22   Q.  Yes.

23   A.  I never met her.

24   Q.  You put her money as a down payment for the mansion you

25   made yourself in Long Island, right?

FC1VNEW2                          C. R. Darden - cross

1   A.  I don't -- I'm not quite sure, but okay.

2   Q.  Where did you get the money for the down payment for your

3   mansion?

4   A.  I don't remember.

5   Q.  All of this money that you stole, the seven million that we

6   discussed, that went to yourself; correct?

7   A.  The seven million?  Okay.

8   Q.  And with it you bought a mansion in Long Island?

9   A.  I did.

10  Q.  And you had a Lamborghini?

11  A.  I did.

12  Q.  And a Mercedes?

13  A.  I did.

14  Q.  And a Porsche Turbo?

15  A.  Okay.

16  Q.  You don't remember?

17  A.  I don't.

18  Q.  You don't remember if you had a Porsche in your garage?

19  A.  I've had a couple, so I don't know at what point, when I

20  had the Porsche, but okay.

21  Q.  You had a $200,000 grand piano?

22  A.  I don't think I had a $200,000 grand piano, no, I don't

23  believe so.

24  Q.  Did you have a grand piano?

25  A.  I did.

FC1VNEW2                          C. R. Darden - cross

1   Q.  And you had mink rugs in the house that you built?

2   A.  I'm not -- I don't know.  I'm not sure.  May -- very well

3   possible.

4   Q.  $200,000 worth of art in the house that you built?

5   A.  Probably.

6   Q.  And you had this $200,000 aquarium filled with sharks in

7   the house that you built, right?

8   A.  I did.

9   Q.  You were sentenced -- aside from Catherine Aldridge, who

10  you say you've never met, all these other people who we

11  discussed you met in person, right?

12  A.  I did.

13  Q.  And you sat there face-to-face talking to them about your

14  lies, right?

15  A.  Yes, ma'am.

16  Q.  Just like you're sitting here face-to-face with me right

17  now.

18          THE COURT:  Sustained.

19  Q.  When you were sentenced, you said, You guys can expect

20  great things from me.  You know, I made a vow to God to be a

21  better person and I'll be a better person.  And nothing like

22  this will ever happen again.  And I make the same vow to the

23  Court today.

24          You said that; correct?

25  A.  Unfortunately, I did.

FC1VNEW2                                C. R. Darden – cross

1   Q.  What we just discussed of making these lies and stealing

2   the money and using it for yourself, that's the truth of what

3   happened, right?

4   A.  Yes, ma'am.

5   Q.  You were given a sentence of four to 12 years, right?

6   A.  I was.

7   Q.  Which means that you were up for parole in three and-a-half

8   years, right?

9   A.  Yes, ma'am.

10  Q.  And you did not want to be in jail, right?

11  A.  Nobody wants to be in jail.

12  Q.  You did not want to be in jail, did you?

13  A.  Absolutely not.

14  Q.  So you lied to the parole board during your hearing to get

15  out of jail, didn't you?

16  A.  I don't believe so.

17  Q.  You don't believe so.

18          On August 8, 2008, you had a hearing in front of the

19  parole board; correct?

20  A.  I did.

21  Q.  You told the parole board that the reason you stole all

22  this money is because you were being blackmailed by a dangerous

23  drug dealer; isn't that correct?

24  A.  Probably so.

25  Q.  And that the reason you stole this money is because you

FC1VNEW2                          C. R. Darden – cross

1    were trying to pay this drug dealer back; correct?

2    A.  That's correct.

3    Q.  But in truth, you stole all this money and squandered it on

4    yourself?

5    A.  Partly in truth.

6    Q.  You lied to the parole board to get out of jail, right?

7    A.  I did not lie.

8    Q.  You're saying it's the truth that you were being

9    blackmailed by a drug dealer and that's why you did all of

10   this?

11   A.  I'm saying that that was not a lie; so what I said was the

12   truth, yes, ma'am.

13   Q.  Even though you pled guilty to all of these things we

14   discussed and squandering the money on yourself?

15   A.  Yes, ma'am.

16        THE COURT:  Sustained.

17   Q.  Your entire hope of cooperating here -- sorry.

18        After your parole hearing, you were released on

19   parole, right?

20   A.  I was.

21   Q.  What day was that?

22   A.  I'm not sure of the exact date.

23   Q.  Was it September of 2008?

24   A.  That sounds correct.

25   Q.  Have you been back to jail since then?

FC1VNEW2                          C. R. Darden - cross

1    A.  I have.

2    Q.  What was that for?

3    A.  For this, for the maximum parole.

4    Q.  Once you got out of jail, you were on parole, right?

5    A.  Yes.

6    Q.  How long were you on parole?

7    A.  Couple of years.

8    Q.  You don't remember?

9    A.  I don't remember the exact length, no.

10   Q.  Your entire hope of cooperating here and testifying is so

11   that you don't have to go back to jail, right?

12   A.  I do not want to go back to jail, no.

13   Q.  In fact, according to you, you wouldn't go back to jail for

14   any amount of money; correct?

15   A.  According to -- I'm sorry, I don't know that I understand

16   the question.  Can you repeat it please.

17   Q.  You told your father that you would not go back to jail for

18   any amount of money; isn't that correct?

19   A.  I don't remember telling him that.  That sounds correct

20   though.

21   Q.  Mr. Darden, I'd like to show you -- and just you -- what's

22   been marked for identification as DX 241.

23            Do you see it in front of you?

24   A.  I do.

25   Q.  What is DX 241?

FC1VNEW2                          C. R. Darden – cross

1   A.  It's an email that I sent to my father.

2   Q.  From your real email address?

3   A.  Yes, I sent it.

4   Q.  To his real email address?

5   A.  Yes.

6   Q.  What is the date of that email?

7   A.  November 29th, 2012.

8           MS. CHAUDHRY:  Your Honor, at this time I offer DX 241

9   into evidence.

10          MR. ADAMS:  Objection.  Hearsay.

11          THE COURT:  I think it comes in for impeachment

12  purposes.

13          Overruled.

14          (Defendant's Exhibit 241 received in evidence)

15          MS. CHAUDHRY:  Would you please publish DX 241 for the

16  jury please.

17  Q.  Mr. Darden, this is an email from you to your father,

18  November 29, 2012; correct?

19  A.  Correct.

20          MS. CHAUDHRY:  Can we blow up the top paragraph

21  please.

22          All right.  I will read from it.

23  Q.  Mr. Darden, the first paragraph says:  Dad, I saw your text

24  message.  I'm not really sure where to start, but I guess I'll

25  start with the situation with Bobby.  No, that money has not

FC1VNEW2                       C. R. Darden – cross

1    come in.  This is not the first time you've accused me or

2    insinuated that this money has already come in and I'm

3    withholding it and being deceitful.  But given some of the

4    things I've done in the past, I can understand that.

5              The bottom line is that Bobby and the other guys that

6    he's put me in contact with are all drug dealers.  He used/uses

7    his store in the Diamond District as a front.  I didn't know

8    this when I first started dealing with him, but that's

9    certainly the reality.

10             That being said, I don't even like being remotely

11   involved in the situation nor do I like being around any of the

12   people he associates with.  I don't even like being around

13   Rich, because he's a drug dealer too.  Not only is there money

14   in the garage, but there are drugs too.  That's the problem.  I

15   don't even go into the garage because I don't like jail and

16   won't go back for any amount of money.  That's why Rich is

17   doing everything.

18             That is your statement; correct?

19   A.  It is.

20   Q.  And you go on to say that you don't tell your father the

21   whole story because you don't want him involved and you don't

22   want him to have knowledge of anything; is that correct?

23   A.  That's correct.

24   Q.  Mr. Darden, it's a fact that all the lies you told for your

25   prior conviction were for money; correct?

1    A.  That's correct.

2    Q.  All the lies that you told since you got out of jail for

3    the frauds you've been committing have also been for money,

4    right?

5    A.  That's correct.

6    Q.  According to you, according to the email I just read, not

7    going to jail is more important than money, right?

8    A.  Not going to jail is more important than money, okay.

9    Q.  Is that true?

10   A.  Is it true that I said -- that's correct.

11   Q.  Is that true that that's how you feel?

12   A.  That not going to jail is -- that's correct.  That sounds

13   about right.

14   Q.  Your sole purpose of testifying here is that you're hoping

15   not to go back to jail, right?

16   A.  The sole purpose.  Well, I don't know about the sole

17   purpose, "sole" meaning only, but that is certainly a big

18   reason.

19   Q.  Mr. Darden, last week you sat in that chair and you told

20   this jury that it was Harvey Newkirk's idea to use the name

21   Calvin R. Darden Senior; correct?

22               MR. ADAMS:  Objection.

23               Mischaracterizes.

24               I can address it further at sidebar if need be.

25               THE COURT:  What page and line?

FC1VNEW2                          C. R. Darden – cross

1            MS. CHAUDHRY:   Transcript 854, starting line 15 going

2       to the bottom of the page, continuing on 855, line 1 to 9.

3            THE COURT:   All right.   Just one moment.

4            MS. CHAUDHRY:   And I was just about to read it.

5            THE COURT:   I'm sorry, 664?

6            MS. CHAUDHRY:   Sorry.   854, eight-five-four, starting

7       at line 15.

8            (Pause)

9            THE COURT:   No, I think it's ambiguous.

10           Sustained.

11      BY MS. CHAUDHRY:

12      Q.   Last week you testified as follows:

13      "Q.   During the course of the Maxim deal, when, if ever, did

14      you discuss with Mr. Newkirk the use of that initial R in the

15      name Calvin R. Darden Senior?

16      "A.   There was a point in the middle, not sure of the date,

17      where we talked about my father does not have a middle initial,

18      only I have a middle initial.   So it would create ambiguity or

19      possibly provide a cover for my father in the event that, you

20      know, something happened.

21      "Q.   Was it your preference to use Calvin R. Darden Senior or

22      some other name when signing documents?

23      "A.   That was my preference.

24      "Q.   And during the Maxim deal, who raised the issue of using

25      this ambiguous name?

FC1VNEW2                              C. R. Darden - cross

1    "A.  Harvey raised it.

2    "Q.  In what circumstance did you want to use that false name?

3    "A.  Again, to create ambiguity in the event that something

4    happened.  It would basically provide my father cover as he

5    doesn't have a middle initial, so Calvin R. Darden Senior

6    really doesn't exist."

7          Were you asked those questions, did you give those

8    answers?

9    A.  Yes.

10   Q.  When you said "middle of the deal," when was that?

11   A.  I don't know the exact point.

12   Q.  When would you say the deal began?

13   A.  In July of '13.

14   Q.  Would you agree that it was after July of '13?

15   A.  I would.

16   Q.  I'd like to show you -- and just you -- DX 507 for

17   identification.

18          Do you recognize this?

19   A.  I do.

20   Q.  What is it?

21   A.  It's a document to the gentleman in Taipei, Taiwan.

22   Q.  And is it from you?

23   A.  It is.

24          MS. CHAUDHRY:  Your Honor, I offer DX 507 into

25   evidence.

1            MR. ADAMS:  Objection, your Honor.

2            I'd request a quick sidebar at this point.

3            THE COURT:  Okay.  Come to sidebar.

4            (At the side bar)

5            THE COURT:  Just so I'm clear, is it the defense

6   contention that this is a document actually signed by the

7   witness?

8            MS. CHAUDHRY:  Yes.

9            THE COURT:  Let me hear from the government.

10            MR. ADAMS:  Thank you, your Honor.

11            So I expect that the next couple of questions will be

12   about the Calvin R. Darden signature on a pre-Maxim document.

13            The full story behind the discussions between

14   Mr. Darden Junior and Mr. Newkirk regarding the use of this

15   document actually extends back into the boxing deal, that's the

16   origin of the decision to use this, which is why I phrased my

17   question that Ms. Chaudhry just read as, "During the course of

18   the Maxim deal, did you discuss the use of this name."

19            But that would be our position that if we're going to

20   get into things that do not have to do with the Maxim deal and

21   conspiring to use the same ambiguous name that would, at the

22   very least, open the door to asking questions about the origin

23   circumstances --

24            THE COURT:  All right.

25            So I think what you're saying is it opens the door.

FC1VNEW2                         C. R. Darden - cross

1                MR. ADAMS:  Yes, sir.

2                MS. CHAUDHRY:  Your Honor, this is the NBA fraud that

3    he pled guilty to that has nothing to do with Mr. Newkirk.

4    This is a document he sent on his own.  Mr. Newkirk is not

5    anywhere on this.

6                THE COURT:  What they are saying is that if your

7    contention is that he lied in the testimony you just read

8    because he suggested -- although, as I indicated, I thought it

9    was ambiguous.  But if it's your suggestion that he came up

10   with this name prior to the Maxim deal and therefore it was his

11   idea, not Mr. Newkirk's idea, or Mr. Newkirk had no knowledge

12   of it prior to that or no involvement or whatever you want to

13   argue from that, then the government says that opens the door

14   to their showing that, in fact, according to them, Mr. Newkirk

15   and Mr. Darden Junior hatched the use of that name in

16   connection with the boxing fraud.  So that's why they are

17   saying it opens the door.

18               So I think that at least -- I don't know if it opens

19   the door to everything about the boxing deal, but it certainly

20   opens the door to one of the main reasons I kept it out, which

21   was that I thought there was too much potential for prejudice

22   and confusion in getting into the details of that entire deal.

23   But here you leave them with no choice because they have to

24   rebut the implications that you're arguing from 507.  So it's

25   really your choice.

FC1VNEW2                         C. R. Darden - cross

1          MS. CHAUDHRY:  My question would be when the

2    government -- thank you, your Honor -- says that Mr. Newkirk's

3    involvement with this began -- because I have other documents

4    with this and I can probably predate it.

5          MR. ADAMS:  I'm not sure what you mean by "this."

6          THE COURT:  When do you say he started using -- the

7    witness started using the name Calvin R. Darden Senior?

8          MR. ADAMS:  I believe as early as the boxing deal

9    through the NBA fraud and through this fraud.

10         MS. CHAUDHRY:  Can you give me a date of when you

11   think that Mr. Newkirk was involved in --

12         THE COURT:  I'll tell you what.

13         MS. CHAUDHRY:  Move on?

14         THE COURT:  You can come back to this after you've

15   seen their date, if you want to revisit it.  For now I'm going

16   to sustain the objection, unless you want to open the door.

17         MS. CHAUDHRY:  Never.

18         THE COURT:  But assuming you don't want to open the

19   door, right, I'll sustain the objection, but subject to being

20   revisited after you get the dates from them at the next date.

21         MS. CHAUDHRY:  Thank you.

22         THE COURT:  Okay.

23         (Continued on next page)

24

25

FC1VNEW2                          C. R. Darden – cross

1           (In open court)

2    BY MS. CHAUDHRY:

3    Q.  Mr. Darden, last week you testified about Merrill Lynch

4    proof of funds letters.  Do you remember that?

5    A.  I do.

6    Q.  You testified that these letters are signed by Roderick A.

7    Jones.

8    A.  Yes.

9    Q.  But that's actually your signature?

10   A.  It is.

11   Q.  That you were forging his name on all these documents?

12   A.  Yes, ma'am.

13   Q.  And that none of them are real?

14   A.  Not one.

15   Q.  In fact, when the government executed a search warrant in

16   your house after the arrest, they found reams of Merrill Lynch

17   letterhead in your house; correct?

18   A.  I don't know.  I wasn't there.

19   Q.  Did you have reams of Merrill Lynch letterhead in your

20   house?

21   A.  No idea.

22   Q.  You have no idea.

23           Is it possible?

24   A.  Certainly possible.

25   Q.  You had the originals of all these fake Merrill Lynch

FC1VNEW2                          C. R. Darden - cross

 1   letters in your house; is that correct?

 2   A.  Original.  I mean, no, I don't know that I had an original

 3   at my house; it's something that I just kind of pull it

 4   offline.  So I had an original in my house, I wouldn't

 5   necessarily agree with that, but --

 6   Q.  You signed these documents yourself, right?

 7   A.  I did.

 8   Q.  With a pen?

 9   A.  I'm sure.

10   Q.  And then you scanned them in?

11   A.  That sounds -- we scan them in.

12   Q.  You scan them into your computer to email them out, right?

13   A.  Yes.

14   Q.  And so the version that you created in your house that you

15   signed with a pen was in your house, right?

16   A.  I don't know that.  I'm not sure.  Like I said, I wasn't

17   there.  I'm not sure what they got from my house, but that

18   sounds fully possible.

19   Q.  You testified about a letter last week that was addressed

20   to Harvey Newkirk, right?

21   A.  Okay.  I don't know -- did I address a letter -- okay.

22   Which letter?

23   Q.  The question was:  "This letter is addressed at the top to

24   Harvey K. Newkirk.  Whose idea was it to address the document

25   to Mr. Newkirk?

FC1VNEW2                        C. R. Darden – cross

1    "A.  Harvey."

2              Were you asked that question, did you give this

3    answer?

4    A.  I did, yes.

5    Q.  Is that still your statement?

6    A.  Absolutely.

7    Q.  I'd like to show you -- and only you -- what's been marked

8    as Defense Exhibit 468.

9              Have you reviewed it?

10   A.  I have.

11   Q.  What is it?

12   A.  It's a same Merrill Lynch letter addressed to Barbara,

13   Barbara Laurence.

14   Q.  And the first page of that?  Is that an email from you?

15   A.  It is.

16             MS. CHAUDHRY:  Your Honor, I offer Defense 468 into

17   evidence.

18             MR. ADAMS:  Objection.  608(b).

19             THE COURT:  I'm sorry?  Objection?

20             MR. ADAMS:  Under 608 as extrinsic evidence;

21   impeachment.

22             THE COURT:  Overruled.

23             Received.

24             (Defendant's Exhibit 468 received in evidence)

25             MS. CHAUDHRY:  Can you please put up Defense 468 for

FC1VNEW2                          C. R. Darden - cross

1   the jury.

2   Q.  This first page is an email from yourself to yourself on

3   Friday, May 31st, 2013; correct?

4   A.  Correct.

5   Q.  The subject is Merrill Lynch letter; correct?

6   A.  That's correct.

7   Q.  This is one of the letters that you wrote that you signed;

8   correct?

9   A.  It is.

10  Q.  The attachment just says "scan," right?

11  A.  Yes, ma'am.

12  Q.  Now, we're looking at the attachment.

13          This is a letter that you wrote on Merrill Lynch

14  letterhead; correct?

15  A.  I did.

16  Q.  On May 31st, 2013?

17  A.  I did.

18  Q.  It is addressed to Ms. Barbara Laurence and Mr. Seth

19  Kenigis.  Am I pronouncing that right?

20  A.  Sounds about right.

21  Q.  That's Starbright Media at 11111 Biscayne Boulevard;

22  correct?

23  A.  Correct.

24  Q.  And the salutation begins Ms. Laurence and Mr. Kenigis;

25  correct?

FC1VNEW2                         C. R. Darden - cross

1   A.  Correct.

2   Q.  And this is a proof of funds letter, fraudulently written

3   by you, but going to be from Roderick A. Jones; correct?

4   A.  That's correct.

5   Q.  Who is Barbara Laurence?

6   A.  Somebody that was helping me with the deal.

7   Q.  Barbara Laurence is actually somebody that you hired to

8   help you with the Maxim deal, right?

9   A.  She wasn't paid.

10  Q.  You did have a contract with her; correct?

11  A.  She wasn't paid.

12  Q.  Did you have a contract with her?

13  A.  Very well possible.  I'm not sure.

14  Q.  And she was somebody working with you on the Maxim deal?

15  A.  She was.

16  Q.  She was also helping you look for other possible media

17  deals at the same time, right?

18  A.  She was.

19  Q.  Including a deal with *Fuse*?

20  A.  That's correct.

21  Q.  This letter that you wrote says that:  Regarding the

22  potential acquisition of a cable television network by

23  Mr. Darden's company, Reign Entertainment, Mr. Darden and Reign

24  Entertainment have sufficient business and -- thank you --

25  personal assets as well as committed funds to execute a

FC1VNEW2                         C. R. Darden – cross

1   transaction in excess of $200 million.

2         Correct?

3   A.  Correct.

4   Q.  You were the one who addressed this letter to Ms. Laurence

5   and Mr. Kenigis; correct?

6   A.  I did.

7         MS. CHAUDHRY:  You can take that down.

8   Q.  Last week you testified about the personal financial

9   statement that you completed; correct?

10  A.  I did.

11  Q.  This is a personal financial statement that you completed

12  on behalf of your father, right?

13  A.  I did.

14  Q.  You completely made up all the numbers in there, right?

15  A.  Yes, I did.

16  Q.  You did that so that this personal financial statement

17  could be sent to potential investors so that you could buy

18  *Maxim Magazine*, right?

19  A.  That's correct.

20  Q.  You testified that Mr. Newkirk sent you that form, right?

21  A.  Yes.

22  Q.  I'd like to show you what's been marked as Defense Exhibit

23  566.

24  A.  I'm sorry, which number?

25  Q.  566.

FC1VNEW2                          C. R. Darden – cross

1          Do you recognize it?

2    A.  I mean I don't -- I recognize it as I see exactly what it

3    is.

4    Q.  What is it?

5    A.  It's a working group list.

6    Q.  For?  For the Maxim transaction?

7    A.  It is.

8          MS. CHAUDHRY:  Your Honor, I offer 566 into evidence.

9          MR. ADAMS:  No objection.

10          THE COURT:  Received.

11          (Defendant's Exhibit 566 received in evidence)

12   Q.  Mr. Darden, this is a --

13          MS. CHAUDHRY:  Go to the second page please.  I'm

14   sorry, back to the first page.

15   Q.  This is an email from Ryan Brown at Houlihan Lokey sent

16   October 8th, 2013; correct?

17   A.  Correct.

18   Q.  It's sent to a number of people, including

19   cdarden@thereigninc; correct?

20   A.  Correct.

21   Q.  And that would be you?

22   A.  It is.

23   Q.  Also on this list is Mr. Newkirk; correct?

24   A.  Correct.

25   Q.  And also on this list are the lawyers from Bodman; correct?

FC1VNEW2                          C. R. Darden – cross

1    A.   That's correct.

2    Q.   That's who was representing the Maxim group?

3    A.   Yes.

4    Q.   Correct?

5            MS. CHAUDHRY:  If we can turn to the next page please.

6    Q.   It's entitled Project Beta Closing and Transaction Working

7    Group List, October 8th, 2013.

8            Correct?

9    A.   Correct.

10           MS. CHAUDHRY:  If we could please --

11           MR. ADAMS:  I'm sorry.  Objection.

12           Mischaracterizes, misreads the title of the document.

13           MS. CHAUDHRY:  What did I say?  I'm sorry, you're

14   right.  It says "Closing and Transition."  My apologies.

15           Could we please see the next page.

16   Q.   This lists all the people who are going to be part of the

17   teams; correct?

18   A.   Yes.

19           MS. CHAUDHRY:  If we can go to the next page.

20           These are people from Alpha Media Group.

21           The next page please.

22           This is the contact information for the Cerberus

23   people.

24           The next page please.

25   Q.   This is the page for the Darden Media contact people;

FC1VNEW2                          C. R. Darden - cross

1     correct?

2     A.   Some, yes.

3     Q.   Yes.

4             Barbara Laurence is number two on this; correct?

5     A.   That's correct.

6     Q.   Under it is listed her company, Starbright Media; correct?

7     A.   It is.

8     Q.   She was one of your advisers on the Maxim transaction, was

9     she not?

10    A.   She was.

11    Q.   I'd like to show you 560 and 561 please.  That's

12    five-six-zero.

13            Do you recognize these?

14    A.   I do.

15    Q.   What are they?

16    A.   Emails from Barbara to Harvey attaching a personal

17    financial statement.

18    Q.   And these emails were later forwarded to you; correct?

19    A.   They were.

20    Q.   I'd like to show you 559 and 563.  I'm sorry, we'll just

21    look at 563.

22            Do you recognize 563?

23    A.   I do.

24    Q.   What is 563?

25    A.   It is an email from Harvey to me attaching a personal

FC1VNEW2                          C. R. Darden - cross

1    financial statement.

2              MS. CHAUDHRY:  I offer 563 into evidence.

3              MR. ADAMS:  No objection.

4              THE COURT:  Received.

5              (Defendant's Exhibit 563 received in evidence)

6    Q.  At the bottom of this email is the email from Barbara

7    Laurence to Mr. Newkirk dated September 27th; correct?

8    A.  That's correct.

9    Q.  2013?

10   A.  Yes.

11   Q.  That's correct?

12             And the top of it is Mr. Newkirk forwarding you

13   exactly her email; correct?

14   A.  Yes.

15   Q.  There's an attachment, the personal financial statement

16   form, valleybank.xls; correct?

17   A.  That's correct.

18             MS. CHAUDHRY:  Can we see the attachment please.

19   Q.  This is the personal financial statement that you ended up

20   completing, right?

21   A.  Correct.

22   Q.  So it actually went from Barbara Laurence to Harvey Newkirk

23   to you; correct?

24   A.  Correct.

25   Q.  I'd like to show you 562.

FC1VNEW2                          C. R. Darden – cross

1              Do you recognize 562?

2    A.  I do.

3    Q.  What is 562?

4    A.  An email from me -- I'm sorry, from Harvey to me attaching

5    a filled-in personal financial statement from Barbara.

6              MS. CHAUDHRY:  I offer 562.

7              MR. ADAMS:  No objection.

8              THE COURT:  Received.

9              (Defendant's Exhibit 562 received in evidence)

10             MS. CHAUDHRY:  Can you please publish 562.  Thank you.

11             Please don't blow it up.

12   Q.  At the bottom this is an email from Barbara Laurence to

13   Harvey Newkirk, same day, September 27th, 2013; correct?

14   A.  Correct.

15   Q.  Subject:  To see if this works.  Correct?

16   A.  Correct.

17   Q.  And that email is forwarded by Mr. Newkirk to you the same

18   day; correct?

19   A.  Yes.

20   Q.  There's nothing written on top, is there?

21   A.  There is not.

22   Q.  He just forwards the same attachment, which is Barbara

23   Laurence personal financial statement revised and then a bunch

24   of numbers; correct?

25   A.  That's correct.

FC1VNEW2                          C. R. Darden - cross

1    Q.   The subject is Personal Financial Statement Example One.

2              Right?

3    A.   Yes.

4              MS. CHAUDHRY:  If we could please see the attachment.

5    Q.   This is a completed amended personal financial statement of

6    Barbara Laurence and Lynn Welshman; correct?

7    A.   It is.

8    Q.   And this is what Mr. Newkirk sent you; correct?

9    A.   That's correct.

10   Q.   He sent it to you as it was forwarded to him by your

11   adviser Barbara Laurence, right?

12   A.   That's correct.

13             MS. CHAUDHRY:  We can take it down please.

14   Q.   Mr. Darden, last week you testified that Mr. Newkirk was

15   promised the position of chief -- COO of Maxim; correct?

16   A.   I believe I said president or COO.

17   Q.   What is the COO?

18   A.   Chief operating officer.

19   Q.   So you recall testifying saying:  We talked about him being

20   the president or chief operating officer for the magazine.

21             Correct?

22   A.   Right.

23   Q.   That is still your testimony?

24   A.   It is.

25   Q.   There were a lot of employment letters drafted by Bryan

FC1VNEW2                         C. R. Darden – cross

1    Cave for Maxim, right?

2    A.   There were.

3    Q.   And you testified that you were the one who signed them

     all; correct?

5    A.   I did.

6    Q.   I'd like to show you Defense Exhibit 519.

7              Do you recognize it?

8    A.   I do.

9    Q.   What is it?

10   A.   It's an email from -- I'm not sure who it's from, but to

11   Harvey's assistant that attaches the employment packets.

12             MS. CHAUDHRY:  At this time I offer Defense Exhibit

13   519 into evidence.

14             MR. ADAMS:  Objection.

15             401.  This witness isn't on this email.

16             MS. CHAUDHRY:  Your Honor, he did sign the attachment

17   on the first page.

18             THE COURT:  I don't understand the relevance, but if

19   you want to make a proffer at sidebar, I'll hear you.

20             (Continued on next page)

21

22

23

24

25

1          (At the side bar)

2          THE COURT:  So what's the relevance?

3          MS. CHAUDHRY:  This is the actual employment letter to

4     the COO that was already the general counsel and COO of Maxim

5     that he signed.  This is the offer letter made.  He's saying

6     that Mr. Newkirk was --

7          THE COURT:  He's saying what?

8          MS. CHAUDHRY:  That Mr. Newkirk was going to be the

9     COO.  And this is like a 15, 20-page employment letter that he

10    signed making that offer to somebody else.

11         THE COURT:  I see.

12         MS. CHAUDHRY:  And there is no employment letters or

13    offers of any written to Mr. Newkirk.

14         THE COURT:  Okay.  Maybe I misunderstood.

15         Now that I hear the proffer, what's your objection?

16         MR. ADAMS:  Just to the email, your Honor.  He

17    recognizes the underlying documents, that's fine.  But he's not

18    on this email; he can't recognize this email.

19         THE COURT:  Oh, well --

20         MS. CHAUDHRY:  I'm happy to redact.

21         THE COURT:  Just redact that.

22         MS. CHAUDHRY:  Yes.

23         THE COURT:  Okay.  Good.

24         Received.

25         MS. CHAUDHRY:  It's going to be the same employment

FC1VNEW2                        C. R. Darden – cross

 1   agreement for Ben Madden.

 2             MR. ADAMS:  Same issue.

 3             THE COURT:  Yes, yes.  So you'll make the appropriate

 4   redactions.  With that understanding, they will be received.

 5             MS. CHAUDHRY:  Thank you.

 6             THE COURT:  Now, roughly how much longer do you have?

 7             MS. CHAUDHRY:  I will go into the beginning of the

 8   afternoon session.

 9             THE COURT:  Okay.  So around 11:15 we'll give the jury

10   a break then.

11             MR. HARRIS:  May I just have this document?

12             THE COURT:  Excuse me?

13             MR. HARRIS:  Just on this document --

14             THE COURT:  Oh, it's yours.

15             MR. HARRIS:  No, it's my understanding that Ms. Tornay

16   is going to be testifying this afternoon, so I think the

17   document can come in anyway.

18             MS. CHAUDHRY:  He said it does.

19             MR. HARRIS:  Okay.  Fine.

20             MS. CHAUDHRY:  It's just the email.

21             THE COURT:  Yes.

22             MR. HARRIS:  Thank you.

23             (Continued on next page)

24

25

1           (In open court)

2           THE COURT:  With the redactions indicated at the

3    sidebar, 519 is received.

4           (Defendant's Exhibit 519 received in evidence)

5           THE COURT:  I should explain, ladies and gentlemen,

6    when you get the exhibits, all of which will be sent to you

7    during your deliberation, some of them will have things blacked

8    out.  That's usually because either it's personal information

9    or people that have nothing to do with this case or something

10   else that's totally irrelevant to your consideration.  So don't

11   worry about that if you see blackouts in various documents.

12          Go ahead, counsel.

13          MS. CHAUDHRY:  Thank you.

14          If you could publish this starting at page 2, not page

15   1.  Thank you.

16   BY MS. CHAUDHRY:

17   Q.  Mr. Darden, this is the employment letter that you signed;

18   correct?

19   A.  It is.

20   Q.  That is your signature at the bottom?

21   A.  That's correct.

22   Q.  You signed it as yourself; correct?

23   A.  I did.

24   Q.  And as an authorized representative?

25   A.  Yes.

FC1VNEW2                          C. R. Darden - cross

1  Q.  Dated October 15th, 2013?

2  A.  Correct.

3  Q.  It's addressed to Mr. David Simcox; correct?

4  A.  It is.

5  Q.  In the first paragraph you are offering him employment with

6  the Darden Media Group; correct?

7  A.  Yes.

8  Q.  This is a letter for him to have a job with Maxim after you

9  acquire Maxim; correct?

10  A.  Not long after.

11  Q.  When you acquire Maxim, this is the employment letter for

12  that; correct?

13  A.  That's correct.

14  Q.  The third paragraph says:  Your initial position will be as

15  chief operating officer/general counsel to perform duties as

16  assigned by the company.  You will initially be paid a salary

17  at the rate of $250,000 per year, and it goes on.

18          Correct?

19  A.  That's correct.

20  Q.  Mr. Simcox was already the general counsel of Maxim;

21  correct?

22  A.  He was already, yes.  He was not going to be going forward,

23  but he was at that point in time.

24  Q.  You signed this engagement letter; correct?

25  A.  I did.

FC1VNEW2                          C. R. Darden – cross

1    Q.   And sent it to him; correct?

2    A.   I did.

3    Q.   He signed it, right?

4    A.   That's correct.

5    Q.   That's right.

6              MS. CHAUDHRY:  If we could please see GX 144, which I

7    believe is in evidence, page 6.  If we could please flip

8    through some of these pages.

9    Q.   These are all employment letters that you signed on behalf

10   of Maxim, right?

11   A.   I did sign them, yes.

12   Q.   Thank you.

13             There is no employment letter for Mr. Newkirk, is

14   there?

15   A.   No, there is not, no.

16   Q.   His name -- and he never signed an employment agreement

17   with Maxim, did he?

18   A.   No, he didn't, because we hadn't acquired it yet, right.

19   But so that was something that was going to come after the

20   acquisition was complete.

21             But all of these people that I signed these letters

22   for, they were all getting fired, with the exception of like

23   one or two, because their severance packages were too large for

24   us to assume.  So we're signing them.  I don't remember the

25   legal reasons behind it, but they weren't going to stay, so we

FC1VNEW2                              C. R. Darden - cross

1   were replacing everybody.

2   Q.  So your testimony is that you signed all of these

3   employment letters which are offer letters, right?

4   A.  That's correct.

5   Q.  And you sent them to these people; correct?

6   A.  That's correct.

7   Q.  You did this before closing, right?

8   A.  That's correct.

9   Q.  You did that with the intent of firing all of these people?

10  A.  Absolutely.

11          No, not all of them.  With the exception of a couple.

12  I don't remember exactly, but there were a couple that if they

13  didn't get brought over in acquisition, you were going to have

14  to pay them an outrageous sum of money.  With the exception of

15  those, like, one or two people, everybody else was --

16  Q.  Who were those one or two people?

17  A.  I don't remember exactly who they were.

18  Q.  You don't remember --

19  A.  I know like Ben Madden was one of them.

20  Q.  Ben Madden was one of them.  Great.

21          I'd like to show you DX 520.

22          Do you recognize this?

23  A.  I do.

24  Q.  What is it?

25  A.  An offer letter to Ben Madden.

FC1VNEW2                           C. R. Darden - cross

1            MS. CHAUDHRY:  I offer DX 520 into evidence.

2            MR. ADAMS:  Objection.

3            Relevance.

4            THE COURT:  It's not totally irrelevant.  But under

5     the circumstances, its marginal relevance, if any, would be

6     outweighed by the fact that it's cumulative.

7            Sustained.

8     Q.  Mr. Madden was offered the job of president; correct?

9     A.  He was.

10    Q.  And he was already the president, right?

11    A.  He -- well, yes, he was.

12    Q.  And you just testified that he's one of the people that was

13    not going to be fired, right?

14    A.  But if I'm not mistaken, his position couldn't be -- like

15    we had had this discussion.  His position couldn't be below

16    something, I don't remember exactly what it was, right.  So we

17    were going to -- so the way that we had it structured, so, one,

18    there was a holding company where we were going to have

19    officers at this holding company.  Then the Maxim level was

20    here.  So if we couldn't -- again, I don't remember exactly

21    what his employment contract or -- you know, what it said for

22    him coming over in an acquisition, but it's not necessarily

23    true that he would have maintained or stayed on as president.

24           But we also talked about --

25           MS. CHAUDHRY:  Objection.

FC1VNEW2                          C. R. Darden - cross

1              Nonresponsive.  Move to strike.  And hearsay.

2              THE COURT:  No, no, no.  I think it was fairly

3    responsive, but I think it's gone far enough.

4              Put another question.

5    Q.  You said you don't recall exactly the offer that was made

6    to him?

7    A.  No.  When I said -- well, one, I don't recall the offer

8    that was made to him.  But I was referring to whatever the

9    terms of his contract for if and when Maxim got bought out,

10   what he was going to be entitled to.  I don't remember the

11   terms, the exact terms of that.

12             MS. CHAUDHRY:  Your Honor, at this time I offer

13   Defense Exhibit 520.

14             THE COURT:  Under these circumstances, I will receive

15   it.

16             (Defendant's Exhibit 520 received in evidence)

17             MS. CHAUDHRY:  Please publish 520.  Thank you.

18   Q.  This is a draft letter dated October 10th, 2013; correct?

19   A.  Correct.

20   Q.  It is addressed to Mr. Ben Madden; correct?

21   A.  It is.

22   Q.  Starts "Dear Ben," right?

23   A.  Yes.

24   Q.  Says:  It is our pleasure to offer you employment with the

25   Darden Media Group.

1       And then it goes on to say:  The company agrees to

2   employ you and you agree to be employed by the company as

3   president, which employment will only become effective upon the

4   closing of the sale transaction.

5       Is that correct?

6   A.  That's correct.

7   Q.  The second paragraph says:  You will initially be paid a

8   salary at a rate of $425,000 per year.

9       Correct?

10  A.  Correct.

11  Q.  That is the offer that was made to Mr. Madden; correct?

12  A.  It is.

13  Q.  That was the term of his employment; correct?

14  A.  Yes.

15  Q.  I'd like to show you page 3 of Government Exhibit 144.

16      That is your signature on the employment agreement

17  with Mr. Madden; correct?

18  A.  Yes, ma'am.

19  Q.  It was consistent with the letter we just read; correct?

20  A.  Yes.

21  Q.  Mr. Newkirk is not named in this letter as a president of

22  Maxim, is he?

23  A.  No.

24  Q.  Mr. Darden, last week you were shown Government Exhibit 637

25  and 638.  637 was a signature you did for the Comvest letter of

FC1VNEW2                          C. R. Darden - cross

1    intent.  Do you remember that?

2    A.  I do.

3    Q.  638 was also a signature you did for the letter of intent;

4    correct?

5    A.  Okay.

6    Q.  You testified that the reason that you signed it twice is

7    because the Comvest people insisted it be signed by your

8    father; correct?

9    A.  That's correct.

10   Q.  And you were asked how long -- you were asked this question

11   and you gave this answer:  "From the time that you sent

12   Mr. Newkirk the first version of this document to the time that

13   you sent him this version, approximately how much time had

14   past?

15   "A.  It wasn't a lot.  It was probably minutes."

16           Right?

17   A.  Yes.

18   Q.  That was your testimony?

19   A.  It was.

20   Q.  Is that still your testimony?

21   A.  It is.

22   Q.  I'd like to show you GX 637 please.

23           The middle of this page is the email that you sent him

24   with the first signature; correct?

25   A.  I'm sorry.  Am I looking at one here or am I turning here?

FC1VNEW2                           C. R. Darden - cross

1    I see the emails that begin forward message and the time.

2    Q.  They are the same.  What's on the screen and your book are

3    the same.

4    A.  What's your question?  I'm sorry.

5    Q.  The time that you signed the first one, it says November

6    8th, 2013, 5:33 a.m.; correct?

7    A.  Yes.

8          MS. CHAUDHRY:  Can we show 638 please.

9    Q.  This time in the middle is your signature; correct?

10   A.  Yes.

11   Q.  The time that you sent the second signature is November 8,

12   2013 at 6:26 a.m.; correct?

13   A.  Correct.

14   Q.  That is seven minutes shy of an hour, right?

15   A.  It is.

16          But, I'm sorry, your question -- you're asking me is

17   is that when I sent it to -- so the testimony I gave last week

18   and -- I'm a little bit confused.

19          You're asking when I sent -- these are when I scanned

20   it to myself.  I scanned one, sent it to myself at five

21   whatever a.m.  The next one I scanned at 6:26, scanned it to

22   myself at 6:26.  So I'm not sure if that's exactly referring to

23   what I testified to last week.  I'm not really sure because I

24   think it's kind of two different things.

25   Q.  How much time past between your two signatures?

FC1VNEW2                          C. R. Darden – cross

1    A.  Oh, so, like you said, it was about an hour between the two

2    signatures.

3    Q.  Mr. Darden, I want to talk --

4              MS. CHAUDHRY:  Can you please take that down.

5              Thank you.

6    Q.  I want to talk to you about the basketball fraud that you

7    pled guilty to in connection with your testimony today.

8    A.  Okay.

9    Q.  Isn't it a fact that at the same time that you were running

10   this Maxim fraud you were also running your basketball fraud?

11   A.  I believe the basketball thing was before, but it could

12   very well be at the same time.  It sounds about right.

13   Q.  And in the NBA fraud -- is it okay if I call it "the NBA

14   fraud"?

15   A.  Of course.

16   Q.  You were impersonating your father, right?

17   A.  I was.

18   Q.  You were emailing people as your father?

19   A.  I was.

20   Q.  You were calling people and pretending to be your father?

21   A.  The NBA fraud.  At times probably.

22   Q.  That's the guy in Taiwan, Melvin; correct?

23   A.  Yes, ma'am.

24   Q.  You called and spoke to Melvin and pretended to be your

25   father?

FC1VNEW2                            C. R. Darden - cross

1    A.  No, when I spoke to Melvin, I was myself.

2    Q.  You did sign documents on behalf of your father in that;

3    correct?

4    A.  I'm sure.

5    Q.  You testified that this was all done without the knowledge

6    of your father, right?

7    A.  That -- I testified that what exactly was done without the

8    knowledge of my father?

9    Q.  Impersonating him.

10   A.  Yes, that was done without his knowledge.

11   Q.  Emailing as him.

12   A.  Yes, that's correct.

13   Q.  Signing as him.

14   A.  Of course.

15   Q.  Mr. Darden, as part of your cooperation, you've met with

16   the government over 15 times; correct?

17   A.  I'm not sure of the amount, but that -- I wouldn't be

18   surprised.

19   Q.  One of those meetings was on May 21st, 2014; correct?

20   A.  Okay.

21   Q.  Is that correct?

22   A.  I'm not sure of the exact date, but I'll take your word for

23   it.

24   Q.  On that date you told the government that in the beginning

25   of your NBA fraud, your father knew and approved of you

FC1VNEW2                         C. R. Darden - cross

1    impersonating him; correct?

2    A.   I don't recall that.

3    Q.   You don't recall that.

4            I'll get that for you in a second.

5    A.   Okay.

6    Q.   As part of your fraud on Melvin from Taiwan, you told him

7    that you met with Jim Dolan of the Knicks, right?

8    A.   Probably.

9    Q.   And you pretended that Jim Dolan was involved in the NBA

10   deal, right?

11   A.   I'm sure.

12   Q.   You never met Jim Dolan, right?

13   A.   Never.

14   Q.   He was never involved?

15   A.   Never spoke to him, never met him, nothing ever.

16   Q.   And you took $500,000 from Melvin; correct?

17   A.   Yes, ma'am.

18   Q.   You said that it would be refunded if the deal fell

19   through?

20   A.   I did.

21   Q.   You told him that you'd met with Isiah Thomas; correct?

22   A.   I did.

23   Q.   Did you meet with him?

24   A.   I did not.  I did speak to him; I didn't meet him.

25   Q.   That money that Melvin gave you, the $500,000, you spent

FC1VNEW2                          C. R. Darden – cross

 1  all of it on personal items; correct?

 2  A.  Probably, yes.

 3  Q.  Many of them are luxury items?

 4  A.  Probably.

 5  Q.  You had a bank account with Merrill Lynch for Reign;

 6  correct?

 7  A.  Yes.

 8  Q.  That is where the money went from Melvin?

 9  A.  I don't -- I don't remember.

10         Well, initially --

11         MS. CHAUDHRY:  Objection.

12         And I withdraw.  I'll ask another question.

13         THE COURT:  All right.  Put another question.

14  Q.  Did the money from Melvin ultimately end up in an account

15  controlled by you?

16  A.  Yes.

17  Q.  Was that an account that was at Merrill Lynch?

18  A.  Yes, I believe so.

19  Q.  Did anyone else use that account?

20  A.  No.

21  Q.  Mr. Darden, with the money that was in the Reign Merrill

22  Lynch account, you spent $20,000 towards the purchase of a new

23  Porsche; correct?

24  A.  Probably.

25  Q.  You spent a couple thousand dollars at a place called

FC1VNEW2                         C. R. Darden - cross

1   Westchester Puppies; correct?

2   A.  Okay.

3   Q.  Is that true?

4   A.  I don't -- yes, I'm -- sure.

5   Q.  If you'd like, it's in evidence, 297, in front of you.  I

6   can tell you the line I'm reading from.

7           You also spent several thousand dollars at Christian

8   Louboutin, the women's shoe store; correct?

9   A.  Okay.

10  Q.  You also went on vacation to Puerto Rico; correct?

11  A.  Okay.

12  Q.  And there you did a kayaking adventure; correct?

13  A.  Sure.

14  Q.  And you were on a golf trip, right?

15  A.  I don't golf, so probably not.

16  Q.  Did you stay at a golf resort?

17  A.  I don't remember.  Been to Puerto Rico 20 times.

18  Q.  You also sent a bunch of money to the Mercedes dealership;

19  correct?

20  A.  Okay.

21  Q.  Because after you got out of jail, you had a Mercedes,

22  right?

23  A.  Immediately after?  No.

24  Q.  At some point.

25  A.  At some point, yes.

FC1VNEW2                      C. R. Darden - cross

1   Q.  How many Mercedeses did you have?

2   A.  I don't know; two, three.

3   Q.  Can you tell us what they were?

4          MR. ADAMS:  Objection.

5          403.

6          THE COURT:  Sustained.

7   Q.  Were all of those cars bought with money you'd stolen?

8   A.  No.

9   Q.  Where did you get the money to buy these cars?

10  A.  First got out of jail I got a couple $100,000 from my

11  father; I had a couple $100,000 in the bank; I sold some

12  watches; I sold some art.  So I had some money.  So all the

13  money that I bought a car was not from stolen money.

14  Q.  Those were watches and art that you had bought from your

15  previous fraud; is that right?

16  A.  Not necessarily, no.

17  Q.  Mr. Darden, when you were convicted the first time, you

18  were also ordered to pay restitution, right?

19  A.  I was.

20  Q.  And you were ordered to pay all of those people every dime

21  that you took from them back, right?

22  A.  I was.

23          (Continued on next page)

24

25

Fc16new3                          C.R. Darden  - cross

1   BY MS. CHAUDHRY:

2   Q.  And you just said you sold some art and watches to buy

3   yourself a car; is that right?

4   A.  Yes, I did.

5   Q.  With the money that was in the Merrill Lynch Reign account

6   you also wrote several checks to your wife Suhine Pedrosa?

7   A.  Okay.

8   Q.  For over $15,000?

9   A.  Sounds about right.

10  Q.  Now, Mr. Darden, I want to go back to where you said you

11  don't recall if you told the government that on May 21st, 2014

12  that in the beginning of the MBA fraud that your father knew

13  and approved of your impersonating him.

14          MS. CHAUDHRY:  I would like to approach, your Honor.

15          THE COURT:  Okay.

16          THE WITNESS:  Thanks.

17  Q.  Mr. Darden, I draw your attention to the second red flag

18  towards the bottom of the page.  When you met with the

19  government was somebody taking notes?

20  A.  Yes.

21  Q.  Have you read the part that is marked with the second red

22  flag?

23  A.  Just now, yes.

24  Q.  Does that refresh your recollection that on May 21st, 2014

25  when you met with the government, you told them that in the

Fc16new3                    C.R. Darden  – cross

1   beginning of the MBA fraud your father knew and approved of you

2   impersonating him?

3   A.  Does it refresh my recollection?  No, it does not.

4   Q.  Did you in fact tell them that?

5   A.  I don't believe so.

6   Q.  Thank you.

7   A.  You're welcome.

8   Q.  Mr. Darden, one of the lies you've told as part of your

9   many frauds is that your father has cancer; is that correct?

10  A.  Is that one?  That is not a lie, no.

11  Q.  Your father does have cancer?

12  A.  He does.

13  Q.  But you have told lies about other parts of his health;

14  right?

15  A.  I am sure, yes.

16  Q.  Do you love your father?

17  A.  I do.

18  Q.  Have you seen your father recently?

19  A.  I have.

20  Q.  When is the last time you saw him?

21  A.  In Atlanta when I went down for a friend's funeral.

22  Q.  You have not seen him since then?

23  A.  I don't believe so.

24  Q.  Have you spoken to him since you went down to Atlanta?

25  A.  I have.

Fc16new3                         C.R. Darden  - cross

1   Q.  How often do you speak to him?

2   A.  I mean, I call him probably every day.  I don't speak every

3   day, but I try to call him every day.

4   Q.  He is not in the hospital for cancer treatment right now,

5   is he?

6   A.  No, he is not.

7   Q.  Nor has he had a stroke?

8   A.  No, he has not.

9   Q.  I would like to show you Defense Exhibit 503, and just you.

10          Do you recognize 503?

11  A.  I do.

12  Q.  What is it?

13  A.  It's an e-mail from me to a gentleman named Rich Lauck of

14  Performance Media.

15          MS. CHAUDHRY:  I offer 503 into evidence.

16          MR. ADAMS:  Objection.  403 and it's extrinsic

17  evidence.

18          THE COURT:  Well, I am going to receive it, but I

19  think we're beginning to verge on two problems.  One is

20  cumulativeness and the other is the 608 issue.

21          So keep that in mind, counsel.

22          MS. CHAUDHRY:  Sure.

23          If we can publish.

24  BY MS. CHAUDHRY:

25  Q.  This is an e-mail to you from Rich Lauck.

Fc16new3                          C.R. Darden  – cross

1          Who is Rich Lauck?

2    A.  He is the father of another gentleman that was a

3    father-in-law of another gentleman that was involved in the

4    Maxim deal.

5    Q.  This e-mail pertains to the Maxim deal, doesn't it?

6    A.  It does.

7    Q.  It is dated January 6, 2014?

8    A.  It is.

9    Q.  In the top you are writing to Mr. Lauck; correct?

10   A.  I am.

11   Q.  And you are writing as yourself?

12   A.  Yes, ma'am.

13   Q.  You are not pretending to be your father there?

14   A.  No, ma'am.

15   Q.  You say, "Good morning, Rich.  I am sorry for the delay in

16   getting back to you.  The only hold up is that I actually need

17   my father's involvement.  My father had knee replacement

18   surgery over a month ago.  Then as a result of that surgery, he

19   had a blood clot that caused a stroke.  He has been improving

20   but has spent a lot of time in the hospital."

21          Your father did not have a stroke; correct?

22   A.  He did not have a stroke.  No, he did not.

23   Q.  At the time that this was sent, January 6, 2014, your

24   father was not even speaking to you; right?

25   A.  No, he was not.

Fc16new3                        C.R. Darden  - cross

1    Q.  And this is a lie that you were telling Rich Lauck to delay

2    paying him back; correct?

3    A.  That's correct.

4    Q.  And Rich Lauck is someone that you stole $175,000 from as

5    part of the Maxim deal; correct?

6    A.  Yes, that's correct.

7    Q.  He sent the money directly to you at your Merrill Lynch

8    Reign account; correct?

9    A.  He did.

10   Q.  And you spent that money on yourself; correct?

11   A.  Okay.  I don't -- I don't -- I really don't recall.

12   Q.  You never returned his money, did you?

13   A.  No, I did not.

14   Q.  You made several lies to Mr. Lauck about this case; right?

15   A.  I am sure.

16   Q.  Did you do that on the phone also?

17   A.  I did.

18   Q.  And Mr. Newkirk is not copied on this e-mail, is he?

19   A.  On this e-mail, no.

20   Q.  And last week you didn't tell the jury about stealing the

21   $175,000 from Mr. Lauck, did you?

22   A.  No.

23          THE COURT:  Ladies and gentlemen, we'll take our

24   midmorning break at this time, a 15-minute break, and we'll see

25   you in 15 minutes.

Fc16new3                          C.R. Darden  – cross

1            (Jury excused)

2            (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Fc16new3                          C.R. Darden  – cross

1              (In open court; jury not present)

2              THE COURT:  You may step down.  We'll see you in 15

3    minutes.

4              (Witness excused)

5              THE COURT:  Please be seated.

6         So I have accorded the defense at great liberty in

7    going into sort of peripheral impeachment matters because this

8    is obviously a very important witness; but given the witness's

9    admissions as to the various kinds of lies he has told

10   repeatedly over a period of time, I think further specific

11   examples would be cumulative unless they directly relate to the

12   Maxim deal.

13             MS. CHAUDHRY:  Without introducing the document, may I

14   request -- there are a variety of lies and they get more and

15   more brave.  May I ask --

16             THE COURT:  Within limits, yes, but you won't spend

17   more than 15 minutes on that.

18             MS. CHAUDHRY:  I only have two more pages on that.

19             THE COURT:  In that case 10 minutes.

20             MS. CHAUDHRY:  I shouldn't have said that.

21             THE COURT:  15 minutes is fine.  We'll see you in 15

22   minutes.

23             THE DEPUTY CLERK:  All rise.

24             (Recess)

25             THE COURT:  Let's get the witness back on the stand.

1          (In open court; jury present)

2          THE COURT:  Please be seated.

3          Counsel.

4    BY MS. CHAUDHRY:

5    Q.  Mr. Darden, please look at Defense Exhibit 491.

6          Do you recognize it?

7    A.  I do.

8    Q.  What is it?

9    A.  It's an e-mail from me to Melvin Yin, a gentleman in

10   Taiwan.

11         MS. CHAUDHRY:  I offer 491.

12         MR. ADAMS:  Objection.  404, 403, 608(b).

13         THE COURT:  Sustained.

14   Q.  As part of your MBA fraud, you tell Melvin in Taiwan that

15   your father was diagnosed with bone marrow cancer, didn't you?

16   A.  Yes, I did.

17   Q.  You said he was going to have surgery; correct?

18   A.  Yes.

19   Q.  None of those things are true?

20   A.  Both of those are true.

21   Q.  That he has bone marrow cancer and he had surgery?

22   A.  Multiple myeloma.  He had to have surgery to –– something

23   to do with the cells, like a cell transplant.  Something like

24   that.

25   Q.  And that was October of 2012?

Fc16new3                         C.R. Darden  – cross

1   A.  I don't know exactly when it was.

2   Q.  You were telling the truth to Melvin there?

3   A.  I told you the truth just now.  I don't remember exactly

4   what was happening at that point in time.  My father does have

5   multiple myeloma and he did have surgery for it.

6   Q.  He had surgery how many times?

7   A.  I believe it was once.

8   Q.  The next year, October of 2013, you told Melvin that your

9   father was having surgery again, didn't you?

10  A.  Probably.

11  Q.  And that was a lie?

12  A.  I don't know what I told him he was having surgery for.  So

13  if you can show me something.  I am not sure.  My father had

14  two knee replacement transplants.  One of them could have been

15  talking about that.  If I said he was having surgery related to

16  cancer, then that would be a lie.

17  Q.  Would you like to look at DX 492?

18  A.  Not especially.  Would you like me to?

19  Q.  I would like you to.

20  A.  Okay.

21          Okay.

22  Q.  You told Melvin in October of 2013 that your father had to

23  have surgery for cancer again; correct?

24  A.  I am sorry.  Where is that?  I just don't see that.  That's

25  all.

1060

Fc16new3                          C.R. Darden  - cross

Q.  That's okay.  We can move on.  Now I want to talk to you

about --

            THE COURT:  Let me see the exhibit, please.

            Come to side bar.

            (At the side bar)

            (Continued on next page)

Fc16new3                          C.R. Darden  – cross

1          THE COURT:  So after our discussion the very first

2     thing you did was to offer an exhibit, which I sustained their

3     objection to even though we had just discussed that we were

4     going to put a stop to it and you were just going to ask him

5     about his various lies.  I don't understand why you did that.

6          Then you go on and in your next colloquy with him you

7     ask him whether he told a lie about his father having surgery.

8     Something that you've already previously established in any

9     event through numerous prior questions and exhibits.  And when

10    he says, Well, if I told a lie about my father having surgery

11    then that would be a lie.  Then of course he invited you to put

12    something in front of him, but what you put in front of him,

13    which I don't think you should have done in any event given my

14    ruling, doesn't say something about whether it is surgery or

15    not.

16          So what was your basis for that last question?

17          MS. CHAUDHRY:  Actually the top of it says, My father

18    had to have surgery again.

19          THE COURT:  Yes.

20          MS. CHAUDHRY:  But then the chain is talking --

21          THE COURT:  Your question to him is did you tell him

22    having looked at this exhibit that your father had to have

23    surgery for cancer.  It doesn't say that.

24          MS. CHAUDHRY:  That doesn't say it, but the chain does

25    say it.  He keeps telling him my father has cancer.  That is

Fc16new3                              C.R. Darden  – cross

 1   why I let it go to answer your first question.

 2              THE COURT:  Let me just make clear.

 3              MS. CHAUDHRY:  I am moving on.

 4              THE COURT:  I gave you 15 minutes, which will be

 5   strictly enforced to ask questions.  These are all repetitive

 6   and they are all cumulative but because of your desire to go

 7   through that two pages of additional lies, that is fine, but

 8   not with exhibits.  Just put the questions.

 9              MS. CHAUDHRY:  That's fine.  I am sorry.  I actually

10   misunderstood it is only two pages I will let you.  I thought

11   you said I could show the two documents.  My bad.  I thought

12   that is what you had said.

13              THE COURT:  No problem.

14              (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

Fc16new3                          C.R. Darden  – cross

1            (In open court; jury present)

2    BY MS. CHAUDHRY:

3    Q.  Mr. Darden, I want to ask you about the fake physician's

4    affidavit you created in this case.

5            Do you remember testifying it about that last week?

6    A.  Yes.

7    Q.  This is an affidavit that you created to be from your

8    father's actual doctor; right?

9    A.  I did create the affidavit, no.  But, yes, it was supposed

10   to be from my father's physician, yes.

11   Q.  Were you asked this question and did you give this answer:

12   "Q.  When you prepared the final version of it, where were you?

13   "A.  I was in Atlanta at Kinkos."

14   A.  I did.

15   Q.  Is that your answer?

16   A.  Yes.

17   Q.  That is where you were?

18   A.  I was.

19   Q.  I want to show you Government 178.

20           MS. CHAUDHRY:  If it is easier, you can put up defense

21   493.  It is the same one.  And the second page, please.

22           We'll ask the government to put up 178.

23   Q.  This is the document that you said that you had faxed from

24   Kinkos in Atlanta; right?

25   A.  I would need to see the next page.

Fc16new3                              C.R. Darden  - cross

1           MS. CHAUDHRY:  Next page, please.

2   Q.  This is?

3   A.  That's a blank copy, yes.

4           MS. CHAUDHRY:  If you go to the first page.

5   Q.  You did this in January of 2014; right?

6   A.  Yes.

7           MS. CHAUDHRY:  Can we please see Defense 493.

8   Q.  Do you recognize Defense 493?

9   A.  I do.

10          MS. CHAUDHRY:  Show him the second page.

11  Q.  Do you recognize it?

12  A.  I do.

13  Q.  What is it?

14  A.  The filled out physician's affidavit.

15  Q.  The first page of that, is that an e-mail to you from

16  Mr. Newkirk attaching this?

17  A.  It is.

18          MS. CHAUDHRY:  I offer Defense 493.

19          MR. ADAMS:  No objection.

20          THE COURT:  Received.

21          (Defendant's Exhibit 493 received in evidence)

22          MS. CHAUDHRY:  May I publish it to the jury?

23          THE COURT:  Yes.

24  BY MS. CHAUDHRY:

25  Q.  This is the e-mail that you sent the completed affidavit to

1     Mr. Newkirk with; right?

2     A.  That's correct.

3     Q.  It is dated January 27th, 2014 at 10:56 in the morning?

4     A.  Yes.

5     Q.  The subject is signature pages, slash, affidavit, slash,

6     notarized pages; correct?

7     A.  Yes.

8     Q.  It says, Harvey, please see the attachment.  Thanks,

9     Calvin.

10            Correct?

11    A.  Yes.

12            MS. CHAUDHRY:  The second page if we can see.

13    Q.  This is the actual affidavit; correct?

14    A.  Yes.

15    Q.  And this is what you sent to him on January 27th; right?

16    This is what is attached to that e-mail?

17    A.  Yes.

18    Q.  Mr. Darden, you got in a fight with your father on November

19    19th, 2013?

20    A.  I did.

21    Q.  And then you did not speak to your family for two months;

22    correct?

23    A.  Correct.

24    Q.  And --

25    A.  I didn't speak to my father.  My family, not my father.

Fc16new3                          C.R. Darden  - cross

1  Q.  Who did you speak to?

2  A.  The other members of my family.

3  Q.  Did you speak to your mother?

4  A.  I did.

5  Q.  On her cell phone or house phone?

6  A.  I don't recall.

7  Q.  Did you call the house?

8  A.  Don't recall.  Probably.  I really don't know.  I spoke to

9  my mother, though.  Either on the house phone or cell phone.  I

10 don't remember which.

11 Q.  The whole time that you were not --

12 A.  The whole time -- I don't know what you mean by the "whole

13 time."  I spoke to her while I was fighting with my father.  I

14 don't know if I spoke to her the whole time.  I don't know how

15 to answer that question.

16 Q.  Was there a time that you were not speaking to your mother

17 after the fight with your father?

18 A.  Yes.

19 Q.  How long was that?

20 A.  A week.

21 Q.  So at this point you had not spoken to your father for two

22 months, right, when you sent this?

23 A.  No.  At this point I was speaking to my father.

24 Q.  Were you actually in Atlanta when you sent this?

25 A.  I was.

Fc16new3                         C.R. Darden  – cross

1    Q.  Were you staying with your parents?

2    A.  No, I was not.

3    Q.  Where were you staying?

4    A.  I was staying in a hotel.  My parents were not in Atlanta

5    when I was there.

6    Q.  Your parents were not in Atlanta?

7    A.  They got there the day I left as a matter of fact.

8    Q.  Did you see them at all?

9    A.  I did not.

10   Q.  Did they know you were there?

11   A.  They did.

12            Actually, I stayed with my sister.

13   Q.  You stayed with your sister?

14   A.  I did.

15   Q.  You testified that you went and got a notarization in

16   Atlanta because it had to be in Atlanta; right?

17   A.  That's correct.

18   Q.  Sorry?

19   A.  That's correct.

20   Q.  And this physician's affidavit basically says your father

21   is -- sorry.  The purpose of this physician's affidavit was to

22   explain to Shane McMahon why your father could not come to New

23   York to meet him; right?

24   A.  That's correct.

25   Q.  And your father was not in the hospital at the time; right?

Fc16new3                    C.R. Darden  - cross

1   A.  No, he was not.

2   Q.  Nor was he dying of cancer?

3   A.  No.

4   Q.  And after you faxed this affidavit, did you go back to your

5   sister's house?

6   A.  I am not sure.  I don't remember if I -- if I went back to

7   her house or not.  I really don't remember.

8   Q.  Did you speak to her again?

9   A.  I am sure.

10  Q.  Did you speak to your parents again?

11  A.  I spoke to them -- I know I spoke to them the day I was

12  leaving because that was the day they were getting back.

13  Q.  Do you remember where they were coming back from?

14  A.  I don't.

15  Q.  Did you see your grandmother?

16  A.  I did not.

17  Q.  Had she gone with them?

18          MR. ADAMS:  Objection.

19  A.  I don't know.

20          MR. ADAMS:  Objection, relevance.

21          THE COURT:  Sustained.

22          MS. CHAUDHRY:  You can take that down, please.  Thank

23  you.

24  Q.  Last week you testified about your father's role in The

25  Reign Entertainment Group.  Do you remember that?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Fc16new3                          C.R. Darden   - cross

1   A.  I do.

2   Q.  And you were asked this question and you gave this answer:

3   "Q.  Has your father ever discussed with you the possibility of

4   holding an informal position at Reign?

5   "A.  Yes, he has.

6   "Q.  Can you describe what that position was?

7   "A.  So in the event that one the deals closed, you know, that

8   I was going after -- I had spoken to him about -- then he would

9   consider coming on as chairman or some sort of advisory

10  capacity."

11            Did you give those answers?

12  A.  I did.

13  Q.  That is still your testimony?

14  A.  It is.

15  Q.  No deal with Reign ever closed, did it?

16  A.  It did not.

17  Q.  But you were holding your father out as the founder and

18  chairman of the Reign Entertainment Group, were you not?

19  A.  I was.

20  Q.  You told your father that you were holding him out as the

21  founder and chairman of the Reign Entertainment Group; is that

22  correct?

23  A.  No, I did not.  I did not explicitly tell him I was holding

24  him out as the chairman and founder of The Reign Entertainment

25  Group.  So that is not.

Fc16new3                        C.R. Darden  - cross

1   Q.  Did you ever send him e-mails that showed information about

2   The Reign Entertainment Group, in which your father was listed

3   as chairman and founder of The Reign Entertainment Group?

4   A.  Probably.

5   Q.  I want to talk to you about the contracts of Reign.  Last

6   week you testified:

7   "Q.  Have you ever used your father's name on contracts

8   associated with Reign's business?

9   "A.  I have.

10  "Q.  Was that with or without his authorization?

11  "A.  That was without.

12  "Q.  Was that with or without his knowledge?

13  "A.  Without."

14          Were you asked those questions and did you give those

15  answers.

16  A.  I did -- I did and I was.

17  Q.  Is that still your testimony?

18  A.  It is.

19  Q.  Now, you told your father about the deals that you were

20  trying to do through Reign; correct?

21  A.  I did.

22  Q.  You said that you did that because you value your father's

23  opinion; correct?

24  A.  It's true.

25  Q.  And I would like to show you DX 239.

Fc16new3                              C.R. Darden   – cross

1    A.  I have it.

2    Q.  Do you recognize it?

3    A.  I do.

4    Q.  What is it?

5    A.  E-mail sent to my father.

6    Q.  When?

7    A.  Friday, April 27th, 2012.

8    Q.  From your real e-mail address to his real e-mail address?

9    A.  That's correct.

10             MS. CHAUDHRY:  I offer Exhibit 239.

11             MR. ADAMS:  Objection, 401, 403, 608(b).

12             THE COURT:  Sustained.

13             MS. CHAUDHRY:  Your Honor, may I approach?

14             THE COURT:  Yes.

15             MS. CHAUDHRY:  I am sorry.  At side bar?

16             THE COURT:  Yes.

17             (Continued on next page)

18

19

20

21

22

23

24

25

Fc16new3                           C.R. Darden  – cross

1              (At the side bar)

2              MS. CHAUDHRY:  Thank you.

3              Your Honor, in this e-mail there are several

4    references to not just what Reign is doing but he refers to

5    "our" lawyer, referring to his dad and The Reign lawyer.  He

6    refers to our equity contributions and he refers to various

7    fees that they are going to get and he says, Regarding Kobe

8    Bryant we have already been paid a million dollars.  Our

9    attorney will have the contract ready by Monday.

10             THE COURT:  Who do you think "our" is a reference to?

11             MS. CHAUDHRY:  Him and his father.

12             THE COURT:  No.  I don't think that is a fair reading

13   of this.

14             MS. CHAUDHRY:  Okay.

15             THE COURT:  Sustained.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

Fc16new3                        C.R. Darden  - cross

```
 1                    (In open court; jury present)

 2    BY MS. CHAUDHRY:

 3    Q.  We talked about your father's role in the Maxim deal.  Your

 4    father agreed to help you with the Maxim deal; right?

 5    A.  To an extent, yes.

 6    Q.  That was in July of 2013?

 7    A.  That sounds correct.

 8    Q.  That was after you had sent him Defense Exhibit 241, which

 9    was the e-mail from November 2012; right?

10    A.  I don't -- I am sorry.  I don't know what e-mail that is.

11    Q.  It is in your book, 241.

12    A.  If the date is after, then July is after the date that the

13    e-mail was sent.  Then, yes.  So, yes, after November.

14    Q.  That is the e-mail where in the first paragraph you say

15    that you don't always -- I don't ever tell you the -- sorry.

16              MS. CHAUDHRY:  It is in evidence.

17    Q.  In the first paragraph you say, I don't ever tell you the

18    whole story because I don't want you to -- I don't want you

19    involved on any level nor do I want you to have any knowledge

20    of anything.

21              MS. CHAUDHRY:  If we can go to the second page.

22    Q.  On the second page of this in the second to last paragraph

23    you say, Dad, I am not trying to take advantage of you and I am

24    not lying to you.  I just don't choose to tell you everything.

25              Is that correct?
```

Fc16new3                          C.R. Darden  – cross

1  A.  Is that correct that is what it says?

2  Q.  Yes.  That is what it says?

3  A.  That is what it says.

4  Q.  That was sent in November.  To your father in November of

5  2012?

6  A.  Sounds correct.

7  Q.  In July of 2013 he agreed to help you with the Maxim deal;

8  is that right?

9  A.  Yes.

10  Q.  This is the same e-mail where you told him that there were

11  drug dealers in your life; right?

12  A.  Yes, I believe so.

13  Q.  And that --

14  A.  I don't know about in my life.  I don't know what you mean

15  by that.  You said there are drug dealers in my life.  I do

16  know drug dealers, yes.

17  Q.  I am asking you about this exact e-mail, the first

18  paragraph.

19  A.  Yes.

20  Q.  It is in front of you.

21  A.  Yeah.  No, it is not.  Go ahead.

22  Q.  The book is in front of you.

23  A.  No.

24  Q.  The first paragraph?

25  A.  I see it.

Fc16new3                              C.R. Darden  - cross

1   Q.  You refer to drug dealers?

2   A.  I just had a problem with the way you posed the question.

3   That was my point.  I didn't say -- I didn't see the e-mail.  I

4   have a problem with the way you phrased it.  That's all.

5   Q.  Is it a fact that in this e-mail you tell your father about

6   drugs and drug dealers?

7   A.  I did, yes.

8   Q.  And you are free to look at that e-mail if you would like

9   to.  You are also telling him that you are struggling with

10  money; is that correct?

11  A.  Yes.

12  Q.  And that you needed someone to cosign a loan for you

13  because you don't have credit; right?

14          MR. ADAMS:  Objection.  The document speaks for itself

15  and it is cumulative at this point.

16          THE COURT:  Sustained.

17  Q.  You testified that he agreed to help you with the Maxim

18  deal to lend credibility; right?

19  A.  I did.

20  Q.  Last week you told this jury that your father was supposed

21  to be just an advisor on the Maxim deal; is that correct?

22  A.  I don't know if I -- just an advisor?  I mean if the deal

23  would have got gotten closed -- my father had probably come on

24  as chairman had the deal got enclosed.

25  Q.  What does it mean to be chairman?

Fc16new3                          C.R. Darden  - cross

1    A.  Well, it is different.  So he wasn't going to be doing

2    anything day-to-day.  See, my father was a figurehead.  So that

3    is what I meant.  He was not going to have CEO or day-to-day.

4    This would be in an advisory capacity and that was the role he

5    would play as chairman.

6    Q.  He was going to be chairman and just an advisor; is that

7    what you are saying?

8    A.  Yes.  That's what I am saying.

9    Q.  You met with the government on October 24th, 2014; right?

10   A.  Okay.

11   Q.  And that day you told the government that your father is

12   behind this deal; right?

13   A.  Not sure.  That he was behind it at what point?  So, again,

14   my father was behind it to a certain extent up to a certain

15   point when he was no longer involved at all.  So, yes, he was

16   involved up until a point and then there was a certain point

17   where he was not involved at all in any capacity in any way,

18   shape or form.

19   Q.  You told the government that the Maxim deal was announced

20   at your father's church; correct?

21   A.  I don't -- so I heard.  I wasn't there.

22   Q.  That was what you told the government; right?

23   A.  I don't remember everything that I told the government, but

24   that may be correct.

25              (Continued on next page)

FC1VNEW4                         C. R. Darden – cross

1                MS. CHAUDHRY:  May I approach, your Honor?

2                THE COURT:  Yes.

3    Q.  Mr. Darden, when you met with the government, there was

4    someone taking notes; correct?

5    A.  There was.

6    Q.  Have you reviewed what I've handed you?

7    A.  I have.

8    Q.  Does reviewing that refresh your recollection of whether

9    you told the government that your father is behind this deal;

10   that it was announced at his church, which is The Greater

11   Community Church of Christ, where your father is the deacon;

12   and it was announced that your father is buying Maxim?

13   A.  It does to an extent.  So like I said, right, so it says

14   Darden Senior is behind this, right.  So there was a point in

15   time where he was, there was a point in time in which he

16   wasn't, right.  So because it says "Darden Senior is behind

17   this" doesn't mean that it was absolute from beginning to end,

18   right.  So I don't know.

19                So this -- I can't -- I'm not going to get all that

20   from just three lines on here.  And I'm not even quite sure how

21   accurate the notes are.  They are notes, right?  So I can't

22   really -- I can't really say.

23   Q.  I'll take those from you.

24                But the second part, that it was announced in his

25   church where he's a deacon that he is purchasing *Maxim*

FC1VNEW4                          C. R. Darden - cross

1   *Magazine*, you recall saying that, don't you?

2               MR. ADAMS:  Objection.

3               Calls for hearsay.

4               THE COURT:  Sustained.

5   Q.  And even though he was only going to be an adviser, you

6   told *The Wall Street Journal* that he's buying Maxim; correct?

7   A.  I believe the PR person told -- yes.  So -- yes, yes.

8   Q.  I'd like to show you Defense Exhibit 238.

9               Do you recognize this?

10  A.  I do.

11  Q.  What is it?

12  A.  It's an email from me to my father; from my real email

13  address to his real email address.

14  Q.  What is the date?

15  A.  The date is September 22nd, 2013.

16  Q.  Does it attach anything?

17  A.  It does.  It attaches an article from *The New York Times*.

18              MS. CHAUDHRY:  Your Honor, I offer Defense 238.

19              MR. ADAMS:  Objection.

20              608(b).  403.

21              THE COURT:  Sustained.

22  Q.  Did you share with him any articles that talked about his

23  purchase of *Maxim Magazine*?

24  A.  I did.

25  Q.  After that, you met -- you had your meetings in New York;

FC1VNEW4                           C. R. Darden - cross

1   correct?

2   A.  Yes, it was after that, I believe.

3   Q.  You used him to gain credibility at those meetings?

4   A.  I did.

5   Q.  Your statements to the press that your father had bought

6   *Maxim Magazine* are a lie?

7   A.  I don't know that I made a statement to the press saying

8   that my father bought *Maxim Magazine*, so -- because he as an

9   individual wasn't buying it; it was the company Darden Media

10  Group, so Darden Media Group or Darden Media Holdings.  That's

11  separate from Cal Darden Senior, an individual.

12  Q.  Did you see *The Wall Street Journal* article in this case?

13  A.  I'm not sure.  Probably so.  I don't recall it.

14  Q.  I'll ask you about that in a second.

15  A.  Okay.

16  Q.  So after the press says that Darden Media Group, headed by

17  your father, has bought Maxim, your father agreed to come to

18  New York, right?

19  A.  He did.

20  Q.  He agreed to be on phone calls with you; is that correct?

21  A.  He did.  Yes, ma'am.

22  Q.  That's after you had forwarded him articles saying that he

23  bought Maxim?

24  A.  I'm sure.

25  Q.  And he got on a call with Andy Nikou for you; correct?

FC1VNEW4                    C. R. Darden - cross

1   A.  Yes.

2   Q.  That's the guy from Open Gate --

3   A.  It is.

4   Q.  -- that you needed a loan from?

5   A.  That's correct.

6   Q.  And he, in fact, got on two calls with him for you, right?

7   A.  Probably so.

8   Q.  You say that you're the one who signed all these

9   guarantees, right?

10  A.  I did.

11  Q.  You forged his name?

12  A.  I did.

13  Q.  And you made him liable for over $31 million?

14  A.  I did.

15  Q.  You testified that you did not believe your father had $31

16  million; correct?

17  A.  That's correct.

18  Q.  So these guarantees, if collected on, would bankrupt him;

19  correct?

20  A.  That's correct.

21  Q.  And you lied to him about all of that, right?

22  A.  I did.

23  Q.  Even when you were meeting with him in person; correct?

24  A.  I did.

25  Q.  Every phone call you had with him?

FC1VNEW4                         C. R. Darden - cross

1  A.  I don't know about every phone call, but I lied to my

2  father, yes.

3  Q.  You did this just so you could have *Maxim Magazine*, right?

4  A.  I do it just so I could -- yes.

5  Q.  You didn't end up owning *Maxim Magazine*, did you?

6  A.  No.

7  Q.  Your father has been sued for all of this, right?

8  A.  He has.

9  Q.  You testified last week that your father did not know about

10 the financing in this case; correct?

11 A.  That he did not know about the financing, is that your

12 question?

13 Q.  Yes.

14 A.  Well, there was no financing, so I don't know how to answer

15 your question.  You said he did not know about the financing.

16 Q.  Did your father know --

17 A.  The lack of financing?

18 Q.  Sorry?

19 A.  The lack of financing?

20 Q.  Did your father know how the Maxim purchase was going to be

21 financed?

22 A.  Well, not -- in the beginning -- so it changed, right.  So

23 in the beginning I had people lined up that were going to put

24 up money.  He was aware.  He met with some of them.

25          That didn't happen, right.  And then it changed.  And

1  then there were things that he certainly didn't know about.

2          So in the beginning there were certain aspects that he

3  was aware of and that morphed.  And then towards the end he

4  didn't know anything about it, right.

5          So it's not a yes-or-no answer.  In the beginning,

6  yes; in the end, no.  At some point in the middle it changed.

7  Q.  What did he know in the beginning?

8  A.  So he knew what I told him in that there were certain

9  investors lined up.  He had met with a couple of investors that

10  they were talking about putting in equity; it would have been

11  equity deals.  In fact, there were two or three that he met

12  with initially.  Those did not close for one reason or another.

13          Then when I could no longer get equity for the deal,

14  everybody wanted some sort of collateralized debt.  With that

15  collateralized debt, they all wanted some sort of debt that was

16  backed by my father's assets.  At that point he didn't know

17  anything about it because he was not willing to do that.  So

18  not only was he not willing to do it, he didn't have the

19  capacity to do it.  So he didn't know about that.

20  Q.  Did you discuss with your father the fact that Darden Media

21  Group was going to secure $14 million in equity for this deal?

22  A.  Yes, I did.

23  Q.  And you did that on a conversation that was a phone call

24  with yourself, Brad Reifler of Forefront, your father, and

25  Harvey Newkirk; correct?

1    A.  Repeat that -- what's the first part?  Did I do what

2    exactly on a phone call with those individuals?

3    Q.  Did you have a phone call that included Harvey Newkirk,

4    Brad Reifler of Forefront, yourself, and your father in which

5    you discuss the fact that Darden Media Group is going to secure

6    $14 million in equity?

7    A.  Yes, I did.

8    Q.  I want to ask you about Wally Buran.

9    A.  Okay.

10   Q.  He's your father's friend, right?

11   A.  He is.

12   Q.  An adviser?

13   A.  Mm-hmm.  Yes, ma'am.

14   Q.  Sorry?

15   A.  Yes, ma'am.

16   Q.  He's a personal friend of your father's?

17   A.  He is.

18   Q.  Do you know where he works?

19   A.  He has his own firm now.  He worked at KPMG for a lot of

20   years.

21   Q.  This is someone with whom you spoke about Maxim?

22   A.  I did.

23   Q.  How long have you known him?

24   A.  Years.  Long time.

25   Q.  He was an adviser to your father in this deal also, wasn't

1    he?

2    A.  No, I'm not going to say he was an adviser to my father.

3    He was an adviser to me on this deal, not my father.

4    Q.  Did you send him any of the deal documents?

5    A.  I did.

6    Q.  What did you send him?

7    A.  I know that I sent him the closing docs.  But there is a

8    checklist, a closing checklist.  I know I sent him that.  I'm

9    sure that wasn't the only document though.

10   Q.  What else did you send him?

11   A.  I don't recall.

12          MR. ADAMS:  Objection.

13          Relevance.

14          THE COURT:  Sustained.

15   Q.  Isn't it a fact that Mr. Buran was eventually added to the

16   list of Darden advisers by Houlihan Lokey?

17          MR. ADAMS:  Objection.

18          Relevance.

19          THE COURT:  It also sounds like it's hearsay.

20          Sustained.

21   Q.  I'd like to show you what's been marked as Defense 568.

22          Do you recognize it?

23   A.  I do.

24   Q.  What is it?

25   A.  It's the closing and transition working group list that you

FC1VNEW4                          C. R. Darden - cross

1    spoke of not too long ago.

2    Q.  Is it emails to you?

3    A.  I'm cc'd on it, yes.

4              MS. CHAUDHRY:  Your Honor, I offer this exhibit into

5    evidence.

6              MR. ADAMS:  Objection.

7              Relevance.

8              MS. CHAUDHRY:  Your Honor, as for relevance, I direct

9    you to page 3 of the attachment.

10             THE COURT:  So if you're offering that for its truth,

11   then it's still the hearsay problem.

12             MS. CHAUDHRY:  Your Honor, what I'm offering it for is

13   that every person that got that email was able to -- was put on

14   notice that this is somebody who's a Darden adviser and has

15   contact information for that person.

16             THE COURT:  What's the relevance of that?

17             MS. CHAUDHRY:  Your Honor, the relevance is that this

18   is Mr. Darden Senior's close friend and personal adviser; and

19   all the people on that email chain are Houlihan Lokey:  The

20   buyers, the buyers' lawyers, the sellers, the sellers' lawyers,

21   and everybody involved in the deal.

22             THE COURT:  I'm still not understanding the relevance.

23             However, I think the objection was waived by the

24   previous nonobjection to a similar document that was received

25   in evidence, so I will receive it.

FC1VNEW4                          C. R. Darden – cross

1          (Defendant's Exhibit 568 received in evidence)

2          MS. CHAUDHRY:  Can we please show 568 to the jury.

3  Q.  The first page is an email from Ryan Brown of Houlihan

4  Lokey; correct?

5  A.  Yes, ma'am.

6  Q.  Dated October 9th, 2013, correct?

7  A.  It is.

8  Q.  And it is written to Ben Madden.  That was the president of

9  Maxim, right?

10  A.  Correct.

11  Q.  Dave Simcox, that was the general counsel we talked about?

12  A.  Yes, ma'am.

13  Q.  Right.  There are several other people, including yourself,

14  with your fake father's address, right?

15  A.  That was not -- with my fake -- that was my email address,

16  so yes.

17  Q.  That you used to pretend to be your father.

18  A.  To some, yes.

19  Q.  Wally Buran is one of the people on this email list, right?

20  A.  He is.

21  Q.  As are Mr. Newkirk and Chaeri Tornay.  And they are both

22  from Bryan Cave?

23  A.  That's correct.

24  Q.  And Larry Dietch is the next one at Bodman.  He's the

25  lawyer for Maxim, right?

FC1VNEW4                         C. R. Darden - cross

1    A.  Yes.

2    Q.  And Forrest F. Dillon, he's also the lawyer for Maxim,

3    right?

4    A.  Okay.

5            MS. CHAUDHRY:  If we could please flip through the

6    pages.  Sorry, can we go back to the page before.

7    Q.  This is Project Beta Closing and Transition Working Group

8    List, October 9th, 2013.  Correct?

9    A.  Correct.

10           MS. CHAUDHRY:  And if we could please flip to page 3.

11   Q.  Under Darden Media, the people listed, No. 3 is Wally

12   Buran; correct?

13   A.  Yes, ma'am.

14   Q.  That telephone number and email are information that you

15   provided Houlihan Lokey to add to this list; correct?

16   A.  I believe so.

17   Q.  And you did forward your father and Mr. Buran the closing

18   task checklist; correct?

19   A.  I did.

20           MS. CHAUDHRY:  Can we please see Defense 331 that is

21   in evidence.

22   Q.  This is the email from you to your father, Wally Buran,

23   October 9, 2013; correct?

24   A.  It is.

25   Q.  Subject is checklist for closing; correct?

FC1VNEW4                          C. R. Darden - cross

1    A.  It does.

2    Q.  And you're attaching this project beta closing timeline; is

3    that correct?

4    A.  Correct.

5            MS. CHAUDHRY:  If we could please turn to the

6    attachment.

7    Q.  The very first section, No. 1, extension payment, it says:

8    Complete pledge of 1.5 MM in shares for extension; correct?

9    A.  It does.

10   Q.  The priority is high; correct?

11   A.  It is.

12   Q.  The target date is the same date of this email, the 9th of

13   October?

14   A.  Yes.

15   Q.  The last column is in red, which is critical issue

16   identified; correct?

17   A.  Correct.

18   Q.  Mr. Darden, can you please look at Defense Exhibit 216.

19   A.  Okay.

20   Q.  Do you recognize this?

21   A.  I do.

22   Q.  What is it?

23   A.  *The Wall Street Journal* article about the Maxim purchase.

24           MS. CHAUDHRY:  I'd offer Defense 216 into evidence

25   please.

1          MR. ADAMS:  Objection.

2          Hearsay, relevance, and cumulative.

3          THE COURT:  Sustained.

4    Q.  Did you see *The Wall Street Journal* article that came out?

5    A.  I did.

6    Q.  You saw it at the time?

7    A.  Yes, I saw it at the time.

8    Q.  Did you also see an article in Bloomberg about the sale of

9    Maxim to Darden Media Group?

10   A.  Probably.  I'm not sure.

11   Q.  You testified that you were asked these questions, you gave

12   these answers:  "Was your father nevertheless quoted in

13   articles in the press?

14   "A.  Yes.

15   "Q.  How did the authors come to get quotes from your father?

16   "A.  They would send the list of their questions and I would

17   answer the questions back through the PR person."

18          Is that correct?

19   A.  That's correct.

20   Q.  But, in fact, you did the interview -- some of the

21   interviews yourself, didn't you?

22   A.  Maybe -- I don't remember -- probably -- I don't -- I can't

23   say no.  I don't remember.  But --

24   Q.  *The Wall Street Journal* article you did; correct?

25   A.  I don't remember if I did it.  I believe the PR person did

1    it, but I could be wrong.  I'm not 100 percent sure.

2    Q.  *The Wall Street Journal* article refers to an interview with

3    Calvin Darden Senior, doesn't it?

4              MR. ADAMS:  Objection.

5              Hearsay.

6              THE COURT:  Sustained.

7              It's not in evidence.

8    Q.  I'd like to show you Government Exhibit 710.  It's not in

9    your book.  It's going to hopefully appear on the screen.

10             This was shown to you last week; correct?

11   A.  It was.

12   Q.  You were asked some questions about this, were you not?

13   A.  That's true.

14   Q.  This is the exhibit that you said they would ask their

15   questions and I would respond to; correct?

16   A.  Yes.

17   Q.  The email at the bottom from Lee Ann Ramirez at Goodman

18   Media dated September 12th, 2013, it says prep questions,

19   that's the subject, right?

20   A.  It is.

21   Q.  And it says:  Good afternoon, Cal.

22             Correct?

23   A.  Yes.

24   Q.  And she has written this to cdarden@thereigninc; correct?

25   A.  Correct.

FC1VNEW4                          C. R. Darden – cross

1    Q.  She says:  Attached please find a draft of potential

2    questions Bill at *Wall Street Journal* may ask you in bank;

3    correct?

4    A.  Okay.  Yes.

5    Q.  And then she says:  We will review them during our prep

6    call.

7         Correct?

8    A.  Correct.

9    Q.  This is referring to Bill, who wrote *The Wall Street*

10   *Journal* article, right?

11   A.  Seemingly so.

12   Q.  These are questions that she sent you that are going to be

13   asked by Bill; correct?

14   A.  That's correct.

15   Q.  There is no email exchange between you and *The Wall Street*

16   *Journal* providing answers to these questions, is there?

17   A.  I don't know.  I have no idea.

18   Q.  You have no idea.

19   A.  There could be.  There might not be.  I have no idea.

20   Q.  On September 4th, when you met with the government, you

21   told them -- when you were asked about the interviews with the

22   press*, The Wall Street Journal*, etc., you said that you were

23   the one who did those interviews, didn't you?

24   A.  That very well may be possible.

25   Q.  I'm going to ask you about George Wight.

1   A.  Okay.

2   Q.  He is someone who was initially going to provide financing

3   for this deal, right?

4   A.  He was initially supposed to provide all the financing for

5   the deal.

6   Q.  And he went to your parents' house with you to Atlanta to

7   discuss the deal, right?

8   A.  He did.

9   Q.  This was two months before the deal was announced, right?

10  A.  That's correct.

11  Q.  You were present during those conversations with Mr. Wight

12  and your father; correct?

13  A.  I was.

14  Q.  And Mr. Wight wanted to get a deal with Target for a DVD

15  distribution in exchange for financing; correct?

16          MR. ADAMS:  Objection.

17          Calls for hearsay.

18          THE COURT:  Well, on the present state of the record,

19  sustained.

20  Q.  This was said in front of the father, right, these

21  conversations with Mr. Wight?

22  A.  Was what said in front of him, so we're clear?

23  Q.  Did you have a conversation -- sorry.  Did you, in your

24  father's presence, hear George Wight say that he wanted to get

25  a deal with Target for DVD distribution in exchange for

FC1VNEW4                         C. R. Darden - cross

1    financing the Maxim deal?

2    A.  That's incorrect.

3    Q.  What do you recall him saying in the presence of your

4    father?

5              MR. ADAMS:  Objection.

6              608(b), 403, cumulative, irrelevant.

7              MS. CHAUDHRY:  It goes to the effect on the listener.

8              THE COURT:  I will allow it, but I continue to be

9    concerned of peripheral matters, but I will allow it.

10   A.  So we spoke about the Target deal and we spoke about the

11   Maxim deal.  At no point did he say that he was going to

12   provide the financing for Maxim in exchange for the Target

13   deal.  That was never said.  My father wouldn't allow that

14   anyway.  So that's incorrect.

15   Q.  And again, this meeting at your parents' house was two

16   months before the deal was announced, right?

17   A.  It was.

18   Q.  Then after the deal was announced, you and your father met

19   with George Wight again in New York City; correct?

20   A.  We did.

21   Q.  I want to talk to you about The Reign Merrill Lynch

22   accounts.

23            You testified that your father had no role in Reign,

24   but you opened the Merrill Lynch bank accounts in his name

25   anyway, right?

FC1VNEW4                    C. R. Darden - cross

1    A.  Okay.  Sure.  Yes.

2    Q.  You used his date of birth?

3    A.  Probably so.

4    Q.  And his Social Security number?

5    A.  Probably so.

6    Q.  You were the only one who used that account?

7    A.  That's correct.

8    Q.  You testified that there were no successful deals for

9    Reign, right?

10   A.  That's correct.

11   Q.  So all the money that was in that account was obtained by

12   fraud, right?

13             MR. ADAMS:  Objection.

14             Asked and answered.  403.

15             THE COURT:  Sustained.

16   Q.  You were going to open the Maxim bank account in your

17   father's name also, weren't you?

18   A.  No, I can't say that I was.  I'm not sure, if I'm not

19   mistaken, the account for the Maxim, it was a corporate

20   account, it wasn't an individual account.  But if it required

21   individual information, then I would have given my father's

22   information.  I just can't say that I did, so I'm not sure.

23   Q.  Did you have your father's driver's license?

24   A.  I did.

25   Q.  How did you get that?

FC1VNEW4                         C. R. Darden - cross

1   A.  I asked him to send it to me.

2   Q.  Why did you tell him you needed it?

3   A.  It was for a deal prior to the Maxim deal.  I don't

4   remember exactly what it was for, but it was prior to Maxim.

5   Q.  It was prior to Maxim.

6   A.  It was.

7   Q.  Can you estimate when you asked your father for his

8   driver's license?

9   A.  Maybe a year before, it could have been two years before.

10  I'm not sure.

11  Q.  Did you tell your father that you needed his driver's

12  license to open the Maxim bank accounts in his name?

13  A.  I'm not sure.  I could have.  I really -- I don't recall.

14         I know when I initially asked him for his license, it

15  was a year or two before the Maxim deal.  So as far as the bank

16  accounts are concerned, I very well could have asked him or

17  told him that I need it for -- I could have, I just -- I don't

18  recall.

19  Q.  You sent copies of his driver's license to various people

20  involved in the Maxim deal, right?

21  A.  I did.

22  Q.  And you testified that you also used his driver's license

23  to get a document notarized for him because you're the same

24  name; correct?

25  A.  Repeat the question.  I'm sorry.

FC1VNEW4                          C. R. Darden – cross

1    Q.  That you used his driver's license to get someone to

2    notarize a document that was supposed to be signed by him

3    because you are both named Calvin Darden?

4    A.  That's incorrect.

5    Q.  You did not use his driver's license to get any documents

6    notarized?

7    A.  I don't need his driver's license to get a document

8    notarized because if I'm getting it notarized, it's getting

9    notarized as Calvin Darden, which is my name, so that's what my

10   ID says.  So I use my own ID; I didn't have to use his.  I did

11   not use his for that.

12   Q.  What did you use his driver's license for?

13   A.  It could have very well been for to open the bank account

14   that you just mentioned.  I really don't remember.

15   Q.  Is there anything else you used it for?

16   A.  Not that I recall at the moment.

17           MS. CHAUDHRY:  Your Honor, may we approach?

18           THE COURT:  All right.

19           (Continued on next page)

20

21

22

23

24

25

FC1VNEW4                          C. R. Darden - cross

1            (At the side bar)

2            MS. CHAUDHRY:  The next question I'm going to ask him

3    is he testified that Mr. Newkirk knew that his father was not

4    signing for Reign and that he was the one who was signing for

5    Reign.  And the next document I would like to show him is this

6    one, 506, which, I'm sorry, I should have brought you a copy

7    too.  And the purpose of it is the email.  It says:  Have you

8    take a look before my dad executes it.

9            THE COURT:  Any objection?

10           MR. ADAMS:  Yes.

11           Well, I think it opens the door.  If the suggestion is

12   that Mr. Newkirk received this email with the belief Calvin

13   Darden Senior was actually going to be signing this thing, this

14   goes back to the original agreement in the context of the

15   boxing deal that he was not going to be doing this.

16           THE COURT:  I don't think it opens the door.

17           You may.

18           MS. CHAUDHRY:  Thank you.

19           (Continued on next page)

20

21

22

23

24

25

1          (In open court)

2    BY MS. CHAUDHRY:

3    Q.  Mr. Darden, you testified that Mr. Newkirk knew that the

4    signatures on The Reign documents were yours; correct?

5    A.  Which Reign documents are you referring to, all Reign

6    documents?

7    Q.  Yes.

8    A.  I believe so.

9    Q.  I'd like to show you Defense 506 please.

10   A.  Yes, ma'am.

11   Q.  What is it?

12   A.  This is an email from me to Harvey.  It attaches the

13   Starbright Media contract with Barbara Laurence.

14          MS. CHAUDHRY:  I offer 506 in evidence.

15          MR. ADAMS:  Objection previously raised.

16          THE COURT:  Yes.  That objection is preserved, but

17   overruled.

18          The document is received.

19          (Defendant's Exhibit 506 received in evidence)

20          MS. CHAUDHRY:  Thank you.

21          Would you please publish it for the jury.  Thank you.

22   Q.  This is an email from you from your gmail address to

23   Mr. Newkirk's gmail address on June 4th, 2013; correct?

24   A.  That's correct.

25   Q.  And at the top is -- let's start at the bottom, is another

1    email from Barbara Laurence who we discussed was one of your

2    advisers; correct?

3    A.  That's correct.

4    Q.  And she's forwarding a document; correct?

5    A.  That's correct.

6    Q.  Your email to Harvey Newkirk at the top, it reads:  Harvey,

7    take a look and let me know your thoughts before my dad

8    executes.

9            Is that correct?

10   A.  It is.

11           MS. CHAUDHRY:  If we can please turn to the actual

12   document, second page.

13   Q.  The signature page is for Mr. Calvin Darden Senior;

14   correct?

15   A.  Yes.

16   Q.  I want to talk to you about the fight you had with your

17   father on November 19th, 2013.

18           You previously testified as follows:  "Directing you

19   to the following day, did you have a conversation with

20   Mr. Newkirk about the same falling out?

21   "A.  I did.

22   "Q.  And according to Mr. Newkirk, what conversations, if any,

23   had he had with your father?

24   "A.  He told me that my father called him and told him that he

25   wasn't going to be a part of the Maxim deal anymore, to make

FC1VNEW4                          C. R. Darden – cross

1    sure that his name wasn't on any documents, and that people

2    didn't think that he was involved, and to send back -- I don't

3    remember if he told Harvey to send back the statements or if he

4    told Harvey to tell me to send back the statements, but we

5    talked about that, the stock statements that he previously

6    sent."

7              Were you asked those questions, did you give those

8    answers.

9    A.  I was and I did.

10   Q.  Is that still your testimony?

11   A.  It is.

12   Q.  Now, you testified last week that even though your father

13   was just an adviser, he called Harvey to say, Make sure my name

14   is not on any documents.

15             Right?

16   A.  That's correct.

17   Q.  And there was no -- from your testimony last week, there's

18   no mention of the call from Andy Nikou to your father, was

19   there?

20             MR. ADAMS:  Objection.

21             THE COURT:  Sustained.

22   Q.  Last week when you testified about your conversation with

23   Mr. Newkirk, following your fight with your father, you did not

24   say that Mr. Newkirk told you that your father had gotten a

25   call from Andy Nikou, did you?

1   A.  Did I say that in my testimony?  No, I did not.

2   Q.  You testified as follows:

3   "Q.  What did you ask, if anything, about the request from your

4   father about sending the stock statements back?

5   "A.  I was like -- I didn't know what does he mean, you know,

6   send the statements back because he emailed the statements.  So

7   Harvey said to print them out and he would send them back --

8   send them back to him."

9          Were you asked those questions, did you give those

10  answers.

11  A.  I was and I did.

12  Q.  Did you tell your father that Mr. Newkirk had your stock

13  statements?

14  A.  Did I tell my father that -- I'm not sure -- that he had --

15  I can't see why I would have -- I don't know because my father

16  emailed the statements to me.  So did I tell my father that

17  Harvey had the statements?  I don't -- it doesn't really make

18  sense to me, so probably -- I don't know how to answer that.

19         THE COURT:  Mr. Darden, there are three possibilities:

20  One is you did, you didn't, or you don't recall one way or the

21  other.

22  A.  Can you ask me the question again please?

23  Q.  Sure.

24         Did you tell your father that Harvey Newkirk had your

25  stock statements?  Sorry, his stock statements.

FC1VNEW4                         C. R. Darden - cross

1   A.  I don't recall.

2   Q.  But you did testify that your father wanted Mr. Newkirk to

3   send the stock statements back.

4               MR. ADAMS:  Objection.

5               Mischaracterizes.

6               THE COURT:  Sustained.

7   Q.  Why didn't you print out the stock statements and mail them

8   back to your father if he wanted them back?

9   A.  Because he didn't tell me he wanted -- he didn't tell me he

10  wanted them back.  My father and I weren't speaking.  This is

11  information I got from Harvey.  So I was -- I was doing what

12  Harvey had asked me to do.  My father didn't ask me to send

13  them back.

14  Q.  You testified --

15  A.  Print them out.

16  Q.  "So Harvey said to print them out and he would send them

17  back -- send them back to him."

18               Correct?

19  A.  Yes.

20  Q.  So Harvey told you to print them out and then Harvey would

21  mail them back.

22  A.  Did Harvey tell me that?  Yes, Harvey told me that.

23  Q.  Told you to print them out from your computer.

24  A.  I don't -- Harvey was telling me what my father told him.

25  Harvey is relaying to me what my father told him.  So I don't

FC1VNEW4                          C. R. Darden – cross

1    remember exactly what Harvey told me to do.  Print them out and

2    then send them to me, that wouldn't have made sense.  So I

3    would have maybe emailed Harvey and maybe he printed them out

4    and sent them.  I did not print out the statements and mailed

5    them to Harvey so he could mail them back to my father, if I

6    understand your question correctly.

7    Q.  I refer you back to your testimony last week.  And I am at

8    922, starting at 17.

9         Your answer -- so question, What did you ask -- my

10   apologies.  Backing up to 15.

11        "What did you ask, if anything, about the request from

12   your father regarding -- about sending the stock statements

13   back?

14   "A.  I was like I don't -- I didn't know, what does he mean,

15   you know, send the stock statements back because he emailed me

16   the statements.  So Harvey said to print them out and he would

17   send them back, send them back to him."

18        Were you asked those questions, did you give those

19   answers?

20   A.  I was.  I did.

21   Q.  And the second part, when you said, Harvey said to print

22   them out and he would send them back, you're referring to the

23   conversation you had with Mr. Newkirk; correct?

24   A.  I believe so.

25   Q.  You're saying there that Mr. Newkirk told you to print out

FC1VNEW4                        C. R. Darden - cross

1   the stock statements and then Mr. Newkirk would mail them back

2   to your father; correct?

3   A.  I believe so.

4   Q.  Then you just testified a few minutes ago that you didn't

5   print them out, right?

6   A.  No, I did not.

7   Q.  Even though you had said that Mr. Newkirk told you to print

8   them out, you didn't do that.

9            THE COURT:  Sustained.

10  Q.  Did you delete them?

11  A.  Did I delete the emails?

12  Q.  Yup.

13  A.  I don't remember deleting the emails.

14  Q.  You testified that the next time you spoke to your father

15  was January 22nd; correct?

16  A.  I did.

17  Q.  Have you spoken to your father about your testimony today?

18  A.  I have not.

19  Q.  I'd like to show you what's in evidence as Government's

20  Exhibit 901, pages -- what I'm showing you from that exhibit is

21  pages 1168 through 1170, 1173 through 1174, 1177.  These are up

22  for the jury.

23            These are the phone records for you, right?  These are

24  your cell phone?

25  A.  It is.

FC1VNEW4                          C. R. Darden - cross

1              MS. CHAUDHRY:  If we could please blow it up so it's a

2    little easier to see.

3    Q.  This first highlighted in yellow, that is a call placed to

4    your father's cell phone; correct?

5    A.  Yes.

6    Q.  That's on January 12th, 2014; is that correct?

7    A.  It is.

8    Q.  That's a 16-minute phone call; correct?

9    A.  Yes, it is.

10   Q.  The highlighted in blue, same day, that's a call to your

11   family's house; correct?

12   A.  It is.

13   Q.  That's for two minutes?

14   A.  It is.

15             MS. CHAUDHRY:  If we could please see the next page.

16             If we could blow it up.  Thank you.

17   Q.  This is page 169 of this exhibit.

18             On the 13th there is a 24-minute call between you and

19   your family's phone; correct?

20   A.  Okay.

21   Q.  And there are several other calls listed between you and

22   your father's phone that are a minute; is that correct?

23   A.  Okay.

24             MS. CHAUDHRY:  The next page please.

25             Can you make that bigger.

FC1VNEW4                          C. R. Darden - cross

1   Q.  These are the calls from January 13th.  The yellow is a

2   phone call between you and your father's cell phone for three

3   minutes; and the blue is calls between you and your parents'

4   house phone, one for nine minutes, the other for two minutes.

5           Is that correct?

6   A.  That's correct.

7           MS. CHAUDHRY:  If we could look at 1173, please.

8           Can you blow that up.

9   Q.  These are calls from the 15th.  And again, the blue are all

10  between you and your parents' house phone for one minute, three

11  minutes, three minutes, and two minutes.  And then the yellow

12  is a cell phone call between you and your father that was eight

13  minutes; is that correct?

14  A.  That's correct.

15          MS. CHAUDHRY:  If we could look at the next one

16  please.  I think it's 1174.

17  Q.  There's a two-minute call between you and your parents'

18  house phone on the 16th; is that correct?

19  A.  It is.

20          MS. CHAUDHRY:  And 1177 please.

21  Q.  It's a three-minute call between you and your parents'

22  house phone on the 18th?

23  A.  Yes.

24          MS. CHAUDHRY:  1180 please.

25  Q.  These show several calls between you and your parents'

FC1VNEW4                         C. R. Darden – cross

1   house phone on the 20th; correct?

2   A.  Yes.

3   Q.  Including one for 17 minutes?

4   A.  That's correct.

5            MS. CHAUDHRY:  Can we see 1181.

6   Q.  The yellow is a phone call on January 21st between you and

7   your father's cell phone for five minutes, and then a call the

8   same day between you and your father's house phone for two

9   minutes, right?

10  A.  That's correct.

11  Q.  And 1182 is the last one we're going to show you.

12           This is another call between you and your father's

13  cell phone on the 21st, and this is for three minutes; is that

14  correct?

15  A.  That's correct.

16  Q.  So from the phone records I just showed you, you and your

17  father had started speaking again by January 12th; correct?

18  A.  I thought it was later, but okay.

19  Q.  These phone records do show phone calls between you and

20  your father; correct?

21           MR. ADAMS:  Objection.  Objection.

22           Speaks for itself.

23           THE COURT:  Sustained.

24  Q.  It's a fact that you did start speaking to him on January

25  12th, right?

FC1VNEW4                            C. R. Darden - cross

1    A.  That's not correct.

2              MR. ADAMS:  Objection.

3              The records speak for themselves.

4              THE COURT:  Well, if he has an independent

5    recollection, he can testify; but I think he's already

6    indicated his recollection.

7              Sustained.

8    Q.  Mr. Darden, when you signed the personal guarantee in this,

9    forging your father's signature, you were in the Bahamas,

10   right?

11   A.  For one of them, yes.

12   Q.  That was on a family vacation; is that correct?

13   A.  It was.

14   Q.  Your father was there with you?

15   A.  He was.  He was there with me in the Bahamas; he was not

16   there with me when I signed it.

17   Q.  He was with you in the Bahamas, right --

18   A.  He was.

19   Q.  -- when you signed it?

20              And you signed that guarantee knowing that your father

21   would be liable for $31 million?

22   A.  I did.

23   Q.  You spent that vacation with him?

24   A.  Yes.

25   Q.  Did you tell him that you had done that?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

FC1VNEW4                        C. R. Darden - cross

1    A.  No.

2    Q.  How many days was that vacation?

3    A.  I don't know, maybe a week, five days, six.

4    Q.  I want to ask you about the stock statements that your

5    father sent you.

6    A.  Okay.

7    Q.  Last week you were asked the following question and you

8    gave the following answer at 905, 22:

9    "Q.  Why were you asking your father for these stock

10   statements?

11   "A.  Because I told him that there was a potential investor,

12   Melody Partners; that I explained that his shares were

13   restricted and they wanted to see or verify that they were

14   restricted."

15           Is that correct?

16   A.  That's correct.

17   Q.  Was that the first time your father sent your stock

18   statements -- his stock statements to you?

19   A.  It was not.

20   Q.  When did he previously send them?

21   A.  Maybe a year or two prior.  It wasn't all of them.  I don't

22   recall him sending me the Coca-Cola statement before, but it

23   wasn't all the statements.

24   Q.  And in what context did your father send you those

25   Coca-Cola statements?

1   A.   It was in regards to the NBA deal that I was working on.

2   Q.   The one you pled guilty to defrauding?

3   A.   Yes.

4   Q.   Why did you ask your father -- sorry.

5        What was the context in the NBA deal in which he sent

6   you the stock statements?

7   A.   Actually, it wasn't the one that I pled guilty for.  The

8   one I pled guilty for is the one in Taiwan.  This was the

9   basketball deal before that when I was looking to like arrange

10  this tour, this overseas tour for the players.

11       There was a prospective investor that was looking to

12  come in, because we had to pay the players up front.  I told my

13  father about it; I asked him to send me the stock statement; he

14  said that he couldn't pledge anything.  The prospective

15  investor wanted to see it; I asked my father to send it to me;

16  he sent it; I showed it to him.  That was the extent.

17  Q.   For what purpose did you show that investor your father's

18  stock statements?

19  A.   You mean the answer that I just --

20  Q.   Mm-hmm.

21  A.   So there was a prospective investor that wanted to see my

22  father's statement.  I guess he was contemplating putting in

23  money.  I asked my father for his statement; he sent the

24  statement.  That was the context.

25  Q.   When your father sent you the statement on November 19th,

FC1VNEW4                         C. R. Darden - cross

1  the Coca-Cola statement --

2  A.  November 19 -- that's the one -- okay.  Go ahead.  I'm

3  sorry.

4  Q.  The Maxim deal.

5  A.  Yes, ma'am.

6  Q.  You then had it altered; correct?

7  A.  No, I had already -- it was altered before that.

8  Q.  It was altered on October 2nd, 2013; correct?

9  A.  I don't remember the date, but it was before the date he

10  sent it to me, yes.

11  Q.  I show you Defense Exhibit 380 to refresh your recollection

12  in the book in front of you.

13  A.  Oh, sorry.

14  Q.  Do you recognize Defense 380?

15  A.  I do.

16  Q.  What is it?

17  A.  This is the stock statement that we were just talking

18  about, the fake Coca-Cola stock statement.

19          MS. CHAUDHRY:  I offer 380 into evidence.

20          MR. ADAMS:  No objection.

21          THE COURT:  Received.

22          (Defendant's Exhibit 380 received in evidence)

23          MS. CHAUDHRY:  Please publish 380.

24  Q.  The first page of 380 is an email from Eric Flewellyn --

25  sorry, eflewellen40@aol.com to you on October 2nd, 2013;

FC1VNEW4                        C. R. Darden – cross

1  correct?

2  A.  It is.

3  Q.  Who is eflewellen40?

4  A.  The gentleman that had made the statements for me.

5  Q.  He's the one who actually made the statements for you?

6  A.  I don't know if he made it.  I believe that somebody that

7  works for him made it.

8  Q.  And how do you know Eric Flewellyn?

9  A.  Eric was a car salesman I bought one of my cars from.

10  Q.  How long have you known Mr. Flewellyn?

11  A.  Maybe 2009, 2000 -- I don't know, something like that.

12       MS. CHAUDHRY:  Can we see the attachment to this

13  please.

14  Q.  This is the sample statement he sent you; correct?

15  A.  It is.

16  Q.  And this is a fake Coca-Cola statement?

17  A.  It is.

18  Q.  And this statement has listed in it in the middle 81,420

19  shares of Coca-Cola, right?

20  A.  It does.

21  Q.  And that's a number that you had made up?

22  A.  All of it is made up.

23  Q.  All of it's made up.

24  A.  Yes.

25  Q.  Did you use the prior Coke statement your father had sent

FC1VNEW4                          C. R. Darden - cross

1    you as a template to make this one?

2    A.  Yes, I did.

3    Q.  I'd like to show you 381.

4            THE COURT:  Counsel, bear in mind that in a couple of

5    minutes we're going to break for lunch.

6            MS. CHAUDHRY:  Great.  I'll just finish this part.

7            Thank you.

8    Q.  Please look at 381.

9    A.  Okay.

10   Q.  What is it?

11   A.  Same Coca-Cola statement email from me to Eric Flewellyn.

12           MS. CHAUDHRY:  I'd like to offer 381 into evidence.

13           MR. ADAMS:  No objection.

14           THE COURT:  Received.

15           (Defendant's Exhibit 381 received in evidence)

16           MS. CHAUDHRY:  Please publish it.

17   Q.  The top is an email from you to -- you're responding to

18   Mr. Flewellyn on the same day; correct?

19   A.  That's correct.

20   Q.  October 2nd, 2013?

21           And you write to him:  It looks great.  All I need is

22   a line that goes under, quote, stock account dash dash number

23   of stock units, unquote.  Can you have him do it first thing in

24   the morning.  I need it ASAP, my man.  Thanks.

25           Is that correct?

FC1VNEW4                                    C. R. Darden - cross

1    A.  That's correct.

2            MS. CHAUDHRY:  Can we see the second page.

3    Q.  The middle of it, where it says stock account dash number

4    of stock units, you wanted a line literally drawn in underneath

5    that; correct?

6    A.  Yes.

7    Q.  So that it would look more authentic?

8    A.  That's correct.

9    Q.  And once that line was -- he did eventually draw that line

10   in for you, right?

11   A.  I'm sure he did.

12   Q.  And then that is -- this is the focus Coke statement that

13   you then sent to everybody in this deal, right?

14   A.  Probably so.

15   Q.  If you go back to the first page, you said you needed it

16   first thing in the morning.  That would be October 3rd, right?

17   A.  I believe so.

18   Q.  That was the day the first extension fee was due in the

19   Maxim deal, right?

20   A.  I believe so.

21   Q.  And on neither of these emails is Harvey Newkirk copied, is

22   he?

23   A.  No.

24   Q.  You didn't forward any of these emails to Harvey Newkirk,

25   did you?

FC1VNEW4                          C. R. Darden – cross

1    A.  I don't know if I forwarded it to him or not.  I know he's

2    not cc'd or copied on here.  I can't say that I didn't forward

3    it to him.  I'm sorry.  I don't know.

4               MS. CHAUDHRY:  We can break.

5               THE COURT:  All right.

6               So ladies and gentlemen, we'll break for lunch and

7    we'll resume at 2 o'clock.

8               (Jury excused)

9               THE COURT:  Anything counsel needs to raise with the

10   Court?

11              MR. ADAMS:  Nothing from the government.

12              MS. CHAUDHRY:  Nothing for defense.

13              THE COURT:  How much longer do you have?

14              MS. CHAUDHRY:  I probably have about two and-a-half

15   hours.

16              THE COURT:  No.  No way.

17              MS. CHAUDHRY:  Your Honor, this is the main witness.

18              THE COURT:  Yes, it's the main witness.  But having

19   represented to the Court both in your estimates last week and

20   then again this morning that you would be concluding by early

21   this afternoon, you proceeded to spend several hours on what

22   was a vastly repetitive questioning about his multiple past

23   lies and that was your choice.  And I, within broad limits,

24   allowed it, even though it was more or less endless questions

25   on the very same theme.

FC1VNEW4                          C. R. Darden – cross

1          And so I'm not going to allow you now to change your

2     estimates, because having gotten the benefit of that

3     cumulative, repetitive questioning, you now want to spend some

4     more time on other matters.

5          I will give you till 3:30, an hour and-a-half.  No

6     more.

7              (Luncheon recess)

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            A F T E R N O O N   S E S S I O N

2                           2:10 p.m.

3         (In open court; jury not present)

4         THE COURT:  Please be seated.  We're waiting on one

5    juror.

6         MS. CHAUDHRY:  Your Honor, may we approach while we're

7    waiting?

8         THE COURT:  Yes.

9         (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FC1VNEW4                              C. R. Darden - cross

1                (At the side bar)

2                MS. CHAUDHRY:  Your Honor, I wanted to bring up three

3       things.  One is when I gave the Court my time estimate, it did

4       not account for a 10:00 start and in the time I had asked for

5       the extra time would have been used this morning.

6                Two, I am going to ask about a couple of documents

7       that are not related to the Maxim fraud, but were done at the

8       time and I asked the government to stipulate to their

9       admissibility and the government has not agreed.  I will offer

10      them quickly.  I don't need to show them.  The relevance of

11      those is that they are separate frauds he was doing at the same

12      time on, for example, the BMW Financial Services to get his

13      Porsche and the Mercedes, part of the benefits of his plea deal

14      is that these are crimes that he knows about that he did not

15      have to plead guilty to in addition.

16               Do you want me to keep going?

17               THE COURT:  Pardon me?

18               MS. CHAUDHRY:  I have a third thing.  Do you you want

19      me to stop so you can respond?

20               THE COURT:  On the first thing, my recollection is

21      that your original estimate was not based on a late start, but

22      you gave the second estimate to the same degree after we

23      started.  Nevertheless, we started 45 minutes late, which was

24      totally my fault, or actually it was the fault of New York

25      traffic so I blame it entirely on the Mayor.

FC1VNEW4                         C. R. Darden - cross

1              MS. CHAUDHRY:  We would stipulate to that.

2              THE COURT:  I will give you two hours and 15 minutes.

3              MS. CHAUDHRY:  Thank you.  When I finish early, I

4    expect a smile from the Court.

5              THE COURT:  That goes without saying.

6              Now, your second point was?

7              MS. CHAUDHRY:  I know the Court is concerned that I am

8    introducing documents that are irrelevant and so that is why I

9    wanted to introduce those documents, not necessarily to show

10   them but to have them in the record.  So that the relevance is

11   when I go to the part of the benefits of your plea deal, which

12   is very exciting, I will be listing all the times that he did

13   not have to plead guilty to and these are separate frauds that

14   I was doing at the same time.

15             THE COURT:  Well, I will take them up as they are

16   offered.  I don't think I can make a ruling in advance.

17             You had a third point?

18             MS. CHAUDHRY:  Yes.  My third point was there was a

19   collection of when the government executed their search warrant

20   in this case, they recovered a number of documents from his

21   house, which I briefly talked about.  And according to the

22   government, they have the originals.  What I have been given

23   are scanned copies.  The government has agreed to stipulate

24   that those were in fact found in his house but not to the

25   admissibility.  So there is going be a section when I come to

1    later that I would like to introduce some of them.   In

2    particular, the one I want to introduce is the government's

3    exhibit --

4                THE COURT:  I don't think I can receive them unless

5    they qualify as "reams."

6                MS. CHAUDHRY:  That is why that binder is so big.

7                In particular I would like to introduce are he signed

8    the letter of intent with Harvey Newkirk and Invictus, which

9    the government has entered into evidence as Government Exhibit

10   701.  In his house he had, I believe, the originals of

11   different signature pages where he has one on one of them

12   forged Mr. Newkirk's signature and on the other one he has I

13   think like with scissor cut and glued it onto a different

14   document and I would like to introduce those.

15               THE COURT:  What is the objection?

16               MR. ADAMS:  She is inquiring into it under 608, but it

17   it is extrinsic evidence for impeachment.

18               THE COURT:  I know.  There is no question this is the

19   most important witness in the case from the standpoint of the

20   defense.  That is a discretionary call and I allowed that.

21   These are things that have already been in effect referred to.

22   I think I will allow those two in.

23               MR. ADAMS:  Your Honor, if I could raise one more

24   issue on that?

25               THE COURT:  Yes.

FC1VNEW4                              C. R. Darden – cross

1                MR. ADAMS:  The document she is referring to goes

2      directly to the boxing deal.  It is a letter of intent.

3                MS. CHAUDHRY:  They already entered it into evidence.

4                MR. ADAMS:  It was admitted for a particular reason.

5                THE COURT:  But why would that open the door?

6                MR. ADAMS:  That depends on what the line of cross is.

7                THE COURT:  I agree with that.

8                MR. ADAMS:  It is in evidence, though.

9                THE COURT:  It might open the door to his house, but I

10     am not sure it opens the door to the 404(b).

11               MR. ADAMS:  I just raise it.

12               THE COURT:  You're forwarned about your questioning in

13     that regard.

14               MS. CHAUDHRY:  My questioning is just about the

15     signature page.

16               MR. HARRIS:  If we're still waiting, I would raise

17     something.

18               THE COURT:  They are all here.

19               (Continued on next page)

20

21

22

23

24

25

FC1VNEW4                          C. R. Darden – cross

1                   (In open court; jury present)

2                   THE DEPUTY CLERK:  May I bring in the jury?

3                   THE COURT:  Yes.

4                   Let's get the witness on the stand.

5                   Please be seated.

6                   Counsel, go ahead.

7     BY MS. CHAUDHRY:

8     Q.  Mr. Darden, last week you testified about the fake Bank of

9     America statements.  Do you remember that?

10    A.  Yes, ma'am.

11    Q.  These are statements that you commissioned from Eric

12    Flewellyn?

13    A.  Yes, ma'am.

14    Q.  They were completely bogus?

15    A.  They were.

16    Q.  You knew that at the time you commissioned them from Eric

17    Flewellyn?

18    A.  I did.

19    Q.  You did not tell the jury last week that Harvey Newkirk did

20    not know that they were fake statements, did you?

21    A.  I did not tell them that, no.

22    Q.  And when you met with the government on April 4th, 2014,

23    you told them that Mr. Newkirk believed that they were real

24    bank statements; right?

25    A.  I believe so.

FC1VNEW4                          C. R. Darden - cross

1   Q.  And at that meeting you also told them that you had no idea

2   that they were fake; right?

3   A.  That's correct.

4   Q.  You lied to them and you said that you thought that they

5   were real bank statements; right?

6   A.  I did.

7   Q.  That you were paying Eric Flewellyn to get access to your

8   dad's real account; right?

9   A.  No.  I -- I disagree with the second part.  Did I say that

10  to the government, the first part, yes.  I would say no to the

11  second part.

12  Q.  You told the government that what you thought you were

13  paying for was unauthorized access to your father's real

14  account; right?

15  A.  I -- I don't remember exactly what I told the government.

16  I know I wasn't truthful at that -- at that first session.

17  Q.  And you got several fake Bank of America account statements

18  from Eric Flewellyn?

19  A.  I did I am sure.

20  Q.  Several of them you edited by hand and sent him back?

21  A.  I am sure I probably edited all of them.

22  Q.  And these are all done between e-mail between you and Eric

23  Flewellyn; is that correct?

24  A.  I am sure.

25  Q.  On none of those e-mails is Harvey Newkirk copied, is he?

1    A.  No, he is not.

2    Q.  I would like to show you defense 575.

3         Do you see it?

4    A.  I do.

5    Q.  What is it?

6    A.  It's an e-mail from me to Kevin Valentine with the Bank of

7    America statement -- with the fake Bank of America statement

8    that you just referenced.

9         MS. CHAUDHRY:  I offer 575 into evidence.

10        MR. ADAMS:  One moment, your Honor.

11        No objection.

12        THE COURT:  Received.

13        (Defendant's Exhibit 575 received in evidence)

14        MS. CHAUDHRY:  Please publish 575 to the jury.

15   BY MS. CHAUDHRY:

16   Q.  This is the cover page to the e-mail from you to Kevin

17   Valentine on October 9th, 2013; correct?

18   A.  It is.

19   Q.  The attachment is DardenBofA.PDF?

20   A.  Yes, ma'am.

21        MS. CHAUDHRY:  Can we please see the attachment?

22   Q.  This is the Bank of America statement with the word

23   "Sample" across it; right?

24   A.  It is.

25        MS. CHAUDHRY:  Can we see the rest of the pages.

1   Q.  This is the actual fake statement; correct?

2   A.  Yes.

3   Q.  And if we go back to the first page, Mr. Newkirk is not

4   copied on this, is he?

5   A.  No, ma'am.

6   Q.  Previously you testified that you may have forwarded things

7   to Mr. Newkirk but you can't remember; right?

8   A.  That's what I said.

9   Q.  As part of your cooperation in this case, you met with the

10  government more than 15 times, would you agree?

11  A.  I don't know how many times.  It was significant.

12  Q.  You looked at a lot documents with them?

13  A.  I have.

14  Q.  As part of your cooperation, you agreed to waive your

15  privacy interest in your e-mail accounts; correct?

16  A.  I did.

17  Q.  You have gone through your own e-mails with the government,

18  haven't you?

19  A.  Some.

20  Q.  You authorized the government to go through all of your

21  e-mail accounts; is that correct?

22  A.  I did.

23  Q.  When you say you don't remember, have you ever seen any of

24  the fake documents that Eric Flewellyn sent you forwarded to

25  Harvey Newkirk?

FC1VNEW4                          C. R. Darden – cross

1    A.  Yes.

2    Q.  Which ones?

3    A.  So whatever the finished version of this, Harvey seen it

4    because Harvey sent it out.  So that would have been me

5    forwarding it to Harvey.

6    Q.  He got the finished version; right?

7    A.  You mean did he see a draft?

8    Q.  Right.

9    A.  I don't believe so.

10           MS. CHAUDHRY:  We can take that down.

11   Q.  I am going to ask you about the Open Gate loan.  You

12   testified that your father did not know about the Open Gate

13   loan; is that correct?

14   A.  No, I did not testify saying that he didn't know about the

15   Open Gate loan.  He did know about the Open Gate loan.  He just

16   didn't sign the Open Gate loan.

17   Q.  What did he know about the Open Gate loan?

18   A.  He knew they were providing a loan.

19   Q.  When did he know that?

20   A.  When they were contemplating providing the loan.

21   Q.  When was that?

22   A.  I don't know the exact date.  I am sure it is somewhere in

23   the paperwork.  I cannot tell you what the exact date was.

24   Q.  Would you agree it was before they made the loan?

25   A.  Yes.

FC1VNEW4                          C. R. Darden – cross

1    Q.  On April 14th, 2014 when you met with the government, you

2    told them that your father thought that the Open Gate interest

3    rate was very high; correct?

4    A.  That's correct.

5    Q.  When you testified about the Open Gate loan, you were shown

6    GX 178; right?

7              MS. CHAUDHRY:  Can we put that up, please, Ms. Marmet.

8    Q.  This is the notice of the Open Gate lawsuit sent from

9    Harvey Newkirk's work account; correct?

10   A.  Yes, ma'am.

11   Q.  And it is sent to both your G-Mail account and The Reign

12   account; is that correct?

13   A.  It is.

14   Q.  And you testified last week that you did seek out a

15   litigator to handle this lawsuit; correct?

16   A.  Yes, ma'am.

17   Q.  You testified that Mr. Newkirk sent you this e-mail

18   "because he told me that I needed to get another lawyer for

19   it"; correct?

20   A.  That's correct.

21   Q.  And you did reach out to another litigator, didn't you?

22   A.  A couple.

23             MS. CHAUDHRY:  You can take that down.

24   Q.  You testified last week about some of the forms that

25   Mr. Newkirk sent you?

FC1VNEW4                          C. R. Darden - cross

1    A.  Some of the what, ma'am?

2    Q.  Forms?

3    A.  Yes.

4    Q.  And in the Maxim transaction there were a lot of lawyers,

5    weren't there?

6    A.  There were.

7    Q.  Maxim had the lawyers; correct?

8    A.  Absolutely.

9    Q.  The lenders had lawyers?

10   A.  Yes.

11   Q.  Darden Media Group had Bryan Cave; correct?

12   A.  That's correct.

13   Q.  And isn't it a fact that Bodman who is the lawyer for the

14   Maxim also sent forms around?

15   A.  Yes.

16   Q.  And that the Open Gate lawyers also sent forms of pledge

17   agreements?

18   A.  They did.

19   Q.  And that Mark Weinberg one of the investors -- sorry --

20   lenders also sent forms?

21   A.  Yes.

22   Q.  And the form that Mr. Newkirk sent you were sent from his

23   work account?

24   A.  I can't say what account they were sent from, but probably

25   so.  There were a lot of forms.  I don't know if all of them

1    went from Bryan Cave, but it would seem likely.

2    Q.  I would like to show you what has been marked as Defense

3    543 and 544.  If you could please look at those.

4            Do you recognize these?

5    A.  I do.

6    Q.  What are they?

7    A.  This is -- the top is an e-mail that I sent to Kevin

8    Valentine.  It attaches a letter with The Reign letterhead.

9    Q.  Is that 543 you are talking about?

10   A.  It is.

11   Q.  Do you also recognize 544?

12   A.  I do.  Again, it is an e-mail that I sent from me to Kevin

13   Valentine as a scanned attachment on the Reign letterhead to

14   Lee Ann Gliha.

15           MS. CHAUDHRY:  I offer 543 and 544 into evidence.

16           MR. ADAMS:  Objection.  Hearsay, offered for the

17   truth, 608 as well.

18           THE COURT:  Sustained.

19           MS. CHAUDHRY:  Your Honor, may I approach?

20           THE COURT:  No.  But if you want to tell me there is a

21   non hearsay purpose you are offering it for, I will consider

22   it.

23           MS. CHAUDHRY:  Yes, your Honor.  On 543 the e-mail

24   that is the second one from Mr. Darden to Kevin.

25           THE COURT:  Let me just look at that.

FC1VNEW4                              C. R. Darden - cross

1              I am sorry.  Give me the first words.

2              MS. CHAUDHRY:  Kevin, comma, can you please.

3              THE COURT:  I see it.

4              MS. CHAUDHRY:  Two inches down.

5              THE COURT:  Yes, I see it.

6              (Pause)

7              THE COURT:  Is that all you are offering from this?

8              MS. CHAUDHRY:  And the attachment.

9              THE COURT:  And the attachment.

10             MS. CHAUDHRY:  That shows who is supposed to sign it?

11             THE COURT:  Received.

12             (Defendant's Exhibit 543 received in evidence)

13             THE COURT:  Now let me look at the other one, 544.

14             Yes, that's received as well.

15             (Defendant's Exhibit 544  received in evidence)

16             MS. CHAUDHRY:  Can we publish 543, please.

17      BY MS. CHAUDHRY:

18      Q.  Mr. Darden, this is -- I am starting in the middle about

19      two inches down -- actually, excuse me.

20             Starting from the bottom, forwarded messages,

21      originally an e-mail from Harvey Newkirk at Bryan Cave on

22      July 15th, 2013; correct?

23      A.  Yes.

24      Q.  Is this an e-mail he sends to you at your G-Mail, to

25      Laurence Media, to Special K investors; correct?

1    A.  Yes, that's correct.

2    Q.  Kevin Valentine is not on this original e-mail, is he?

3    A.  No, he is not.

4    Q.  That e-mail above it from July 15th at 12:44, you forward

5    that to Kevin Valentine?

6    A.  Correct.

7    Q.  You said to Kevin Valentine:

8              "Can you please attach Reign letterhead to the

9    attached offer letter from Maxim Magazine.

10             "Additionally, can you please add the Merrill letter

11   attached to the bid letter so there is only one download.

12   Lastly as this is a digital file, I need my signature digitally

13   added to the signature line.

14             "This can serve as my written could be set to do that.

15   Thank you."

16             That is what it says?

17   A.  Yes, ma'am.

18   Q.  That is sent to Mr. Valentine's G-Mail address?

19   A.  It is.

20             MS. CHAUDHRY:  If we can please go to the signature

21   page or can we flip to the signature page so the jury can see

22   it.  Can you go to the signature line.  Thank you.

23   Q.  The signature line is for Calvin R. Darden Senior?

24   A.  Yes.

25   Q.  This is what you were asking Kevin Valentine to attach the

FC1VNEW4                           C. R. Darden - cross

1   digital signature to?

2   A.  Believe so, yes.

3        MS. CHAUDHRY:  If we can go to the first page again.

4   I am sorry, the e-mail.

5   Q.  Mr. Newkirk is not copied on this e-mail from you to Kevin

6   Valentine asking him to attach a digital signature for you, is

7   he?

8   A.  No, he is not.

9        MS. CHAUDHRY:  And if we can please show 544.

10  Q.  This is an e-mail from you to Kevin Valentine again on the

11  same day at 2:19?

12  A.  That's correct.

13  Q.  July 15th, 2015?

14  A.  Yes.

15  Q.  Mr. Newkirk is not copied on this either, is he?

16  A.  No, he is not.

17       MS. CHAUDHRY:  If we can please flip to the

18  attachment.

19  Q.  This is the same letter we just saw; right?

20  A.  I believe so, yes.

21       MS. CHAUDHRY:  Please keep going.

22  Q.  Whose signature is that?

23  A.  Mine.

24  Q.  Is that a digital signature or did you sign it yourself?

25  A.  I think I signed it myself.  I am not certain.  It's my

FC1VNEW4                            C. R. Darden – cross

1    signature, though.

2    Q.  This is not something that you copied Mr. Newkirk on?

3    A.  I don't believe so.

4    Q.  You have known Kevin Valentine for a long time?

5    A.  I have.

6    Q.  It is someone who went to Morehouse College?

7    A.  Yes.

8    Q.  He has been involved in several deals with you, hasn't he?

9    A.  He has.

10   Q.  He has been in your dad's company Darden Development?

11   A.  To an extent.

12   Q.  You had him put your father's digital signature on

13   documents since at least 2010; correct?

14   A.  He did.

15   Q.  I would like to show you Defense 577.

16           Do you recognize it?

17   A.  I do.

18   Q.  What is it?

19   A.  An e-mail from me to Kevin.

20           MS. CHAUDHRY:  I offer 577.

21           MR. ADAMS:  Objection, 608(b).

22           THE COURT:  What is the objection again?

23           MR. ADAMS:  608(b) and it is also cumulative under

24   403.

25           THE COURT:  Overruled.  Received.

FC1VNEW4                          C. R. Darden – cross

1              (Defendant's Exhibit 577 received in evidence)

2              MS. CHAUDHRY:  Please publish 577 for the jury.

3    BY MS. CHAUDHRY:

4    Q.  Mr. Darden, this is an e-mail to you from Kevin Valentine

5    on July 22nd, 2010; is that correct?

6    A.  It is.

7    Q.  At the bottom is an e-mail you were applying to from Kevin

8    Valentine to you first?

9    A.  Yes.

10   Q.  He says, "Please make sure your father's informed of the

11   contracts execution before you send to Jay to cover my ass.  I

12   appreciate it."

13             And you respond at the top, "He thought it was done a

14   week ago.  In any event, your ass is always covered because you

15   didn't have anything to do with anything.  I am the one who

16   does the signatures."

17             Correct?

18   A.  That's correct.

19             MR. ADAMS:  Your Honor, can we have a very brief side

20   bar on the last exhibit.

21             THE COURT:  All right.

22             (Continued on next page)

23

24

25

1           (At the side bar)

2           MS. CHAUDHRY:  I don't know exactly which agreement

3    was attached to this.  I would have to go back and look given

4    the date that it is 2010.  I am positive it is the boxing deal

5    and this is going to the point that Mr. Darden Junior was

6    obscuring or covering up the fact of his father's involvement

7    or not.

8           THE COURT:  The door has long since been opened to you

9    rebutting their claims of when Mr. Newkirk knew about X, Y or Z

10   in terms of false signatures or things like that.  What the

11   door has not been opened onto is getting into the fraudulent

12   nature of the details of the previous boxing fraud.  So this is

13   a good example.  The attachment is not there.  It is being

14   offered with respect to concealment arguably from Newkirk from

15   things that are going on and you can bring that out that

16   Newkirk knew what was going on.  That hasn't opened the door

17   yet to the fraudulent scheme as opposed to just rebutting these

18   particular suggestions or inferences.

19          MR. ADAMS:  So that I don't keep asking for side bars

20   on this --

21          THE COURT:  That is generally the line I am drawing.

22          MR. ADAMS:  Let me ask this:  My proposed line of

23   redirect on this issue --

24          THE COURT:  We're not going to get to that in this

25   century.

FC1VNEW4                          C. R. Darden – cross

1          MS. CHAUDHRY:  I am moving.  I am moving.

2          MR. ADAMS:  Just so I stop popping up and bothering

3    you with these:  Mr. Darden, did you have a conversation in the

4    course of the boxing deal with Mr. Newkirk about actively

5    hiding the fact of personal guarantees from your father?

6          THE COURT:  Or you can say prior to the Maxim deal and

7    when was that.  I think you can start off by saying prior to

8    the maximum deal.  Did you have such a conversation and when

9    was that.  That for sure I will allow.

10          MS. CHAUDHRY:  Your Honor, if that is going to be

11    allowed on recross and I show that letter that I showed you

12    that he sends pertaining --

13          THE COURT:  We'll worry about recross when we get to

14    it.  Let's finish cross.

15               (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1        (In open court; jury present)

2    BY MS. CHAUDHRY:

3    Q.  Mr. Darden, you testified last week that you spoofed Mr.

4    Weinberg by using a spoof e-mail app?

5    A.  Yes.

6    Q.  That you bought?

7    A.  Yes.

8    Q.  That this was an app that you let you pretend that you were

9    e-mailing from someone else's account; correct?

10   A.  That's correct.

11   Q.  You also bought a spoof app for telephones; correct?

12   A.  I did.

13   Q.  I would like to show you what is in evidence as DX 303,

14   page three.

15   A.  I am sorry.  Which number, please?

16   Q.  301.  I may have misspoken.  Page 3 on October 10th --

17   sorry, October 4th, you purchased a spoof card app for your

18   phone for $9; right?

19   A.  Yes.  This is the same one on the screen; right?

20   Q.  Yes.  The same one on the screen.

21        Everything on the screen is the same as your book.

22   Whatever is more convenient for you.

23        If I can show you 303 at page 3 also.  In December of

24   2012 you buy that app again, right, for $9.95?

25   A.  Yes.

FC1VNEW4                        C. R. Darden – cross

1   Q.  And this is an app that let's the people making phone calls

2   pretend that is coming from a different phone number?

3   A.  That's correct.

4   Q.  It also let's the person using that app disguise their

5   voice when they are making phone calls?

6   A.  I don't know about voice -- I don't know that you can

7   disguise your voice.  You can certainly make it like you are

8   calling from any number that you like.  I am not 100 percent

9   whether you can disguise your voice or not.  I am not certain.

10          MS. CHAUDHRY:  Thank you.  You can take that down.

11  Q.  Now, you testified that last week when I asked you about

12  the bogus e-mail chains, do you remember that?

13  A.  I do.

14  Q.  And how you made that big chain between your mom and some

15  guy from Target?

16  A.  Yes.

17  Q.  And your mom and guy from Target and from Cardinal Health?

18  A.  Yes.

19  Q.  That you would create these bogus chains to fool the

20  ultimate recipient of the e-mail; correct?

21  A.  Correct.

22  Q.  I would like to show you DX 398.

23  A.  Okay.  I have it.

24  Q.  Do you recognize it?

25  A.  I do.

1    Q.   What is it?

2    A.   It's an e-mail from me The Reign Inc. to my G-Mail and also

3    CC's Alan Feldman and another gentleman Daniel Kasten.  I am

4    not sure who it is.

5              MS. CHAUDHRY:  I offer 398 into evidence.

6              MR. ADAMS:  Objection.  608(b) and cumulative.

7              MS. CHAUDHRY:  Your Honor, it will be relevant with

8    the next exhibit.

9              THE COURT:  On that representation I will allow it,

10   but we'll strike it if it turns out the other exhibit doesn't

11   close the loop so to speak.  398 is contingently received.

12             (Defendant's Exhibit 398 received in evidence)

13   BY MS. CHAUDHRY:

14   Q.   This is an e-mail at the top from you from your Reign

15   account; correct?

16   A.   That's correct.

17   Q.   To yourself at your G-Mail account?

18   A.   That's correct.

19   Q.   October 9, 2013?

20   A.   Yes.

21   Q.   As you said it copies Alan Feldman and someone Daniel

22   Kasten@Yahoo?

23   A.   Correct.

24   Q.   And it attaches BofA483031571905; correct?

25   A.   Correct.

FC1VNEW4                          C. R. Darden - cross

1    Q.  Below it is forwarding an e-mail from Brent Watson;

2    correct?

3    A.  That's correct.

4    Q.  That e-mail is not actually from Brent Watson; right?

5    A.  I am sure it wasn't.

6    Q.  You made that?

7    A.  Probably.

8    Q.  That e-mail that is forwarded from you pretending to be --

9    A.  Not probably.  I did.  It is not probably.  I did.

10   Q.  You went through and when you forwarded it, you changed the

11   words to Brent Watson?

12   A.  I did.

13   Q.  That is sent October 9, 2013 3:49 p.m.?

14   A.  Yes.

15   Q.  The subject is B of A statement?

16   A.  Correct.

17   Q.  It says, Cal, as per your request, please see attached

18   statement ending in account ... 1095.  Please let me know if

19   there is anything else you need.

20            Right?

21   A.  Yes, ma'am.

22   Q.  I would like to show 401.

23            Do you see it?

24   A.  Yes, I do.

25   Q.  What is it?

1    A.  It's an e-mail from me to Harvey that attaches the bank

2    statement -- actually, it doesn't show an attachment.

3    Q.  It does not show an attachment, but it does forward an

4    attachment?

5    A.  I am sure it does, absolutely.

6            MS. CHAUDHRY:  I would like to offer 401 into

7    evidence.

8            MR. ADAMS:  Objection, hearsay.

9            MS. CHAUDHRY:  If your Honor would look at the middle

10   of that, that is the relevance.

11           THE COURT:  Overruled.  Received.

12           (Defendant's Exhibit 401 received in evidence)

13           MS. CHAUDHRY:  Please publish 401.

14   BY MS. CHAUDHRY:

15   Q.  Now, the e-mail we saw before you were pretending came from

16   Brent Watson?

17   A.  I did.

18   Q.  This is an e-mail that you sent to Harvey Newkirk and that

19   he replies to you?

20   A.  Correct.

21   Q.  And the e-mail in the middle that is slowly getting blown

22   up, starting in the middle you say Calvin Darden to Harvey

23   Wednesday, October 9th.  Harvey, FYI attached is my father's

24   bank statement from B of A.  Thanks, Cal.

25           Is that correct?

FC1VNEW4                         C. R. Darden – cross

1    A.  Correct.

2    Q.  What you were forwarding him appears to be an e-mail from

3    your father's account The Reign account to yourself; correct?

4    A.  The Reign account is not my father's account, but that is

5    correct.

6    Q.  That's correct.

7           Below that what you have included is that same bogus

8    e-mail chain, correct?

9    A.  I believe so, yes.

10   Q.  And this time you make it from Roderick Jones?

11   A.  Correct.

12   Q.  You also type in his e-mail address to be

13   Roderick_Jones@MerrillLynch.com?

14   A.  That's correct.

15   Q.  That is the same e-mail sent at 3:49 that you previously

16   sent to Alan Feldman pretending that it came from Brent Watson;

17   correct?

18   A.  Yes.

19   Q.  This is how you sent the fake Bank of America statement to

20   Harvey Newkirk; right?

21   A.  Yes.

22   Q.  I would like to show you Defense Exhibit 473.

23          Do you see it?

24   A.  Oh, yes.

25   Q.  Do you recognize it?

1   A.  I do.

2   Q.  What is it?

3   A.  An E-mail from me to Harvey that attaches a Merrill Lynch

4   letter.

5           MS. CHAUDHRY:  I offer 473 into evidence.

6           MR. ADAMS:  No objection.

7           THE COURT:  Received.

8           (Defendant's Exhibit 473 received in evidence)

9   BY MS. CHAUDHRY:

10  Q.  This is an e-mail from you to Harvey Newkirk on

11  December 17, 2013?

12  A.  That's correct.

13  Q.  And you write to him, "Harvey, please confirm receipt";

14  correct?

15  A.  I did.

16  Q.  And to that what you are forwarding is another e-mail from

17  Rod Jones?

18  A.  Correct.

19  Q.  That is not actually from Rod Jones?

20  A.  No.

21  Q.  You made this fake bogus chain?

22  A.  Yes, ma'am.

23  Q.  You made it to say Rod Jones and you wrote his e-mail

24  HotRodJones72; is that correct?

25  A.  That is correct.

FC1VNEW4                          C. R. Darden - cross

1    Q.  You have that going from HotRodJones to yourself?

2    A.  Yes.

3    Q.  And you have pretended that HotRodJones is writing to you

4    and saying, "Here you go"?

5    A.  Yes, ma'am.

6         MS. CHAUDHRY:  Can we see the attachment.

7    Q.  This is a letter that you wrote pretending to be Roderick

8    Jones?

9    A.  Yes.

10   Q.  And that you addressed to Mr. Newkirk?

11   A.  Yes.

12   Q.  And you signed?

13   A.  I did.

14   Q.  And this is on some of the letterhead you had in your

15   house; correct?

16   A.  Yes.

17   Q.  And the way you sent this to Mr. Newkirk was the e-mail we

18   just saw; right?

19   A.  Yeah -- yes.

20   Q.  I would also like to show you 579.

21        Do you recognize it?

22   A.  I do.

23   Q.  What is it?

24   A.  Another e-mail that I sent from Harvey that attaches a

25   Merrill Lynch letter purportedly from Roderick Jones, but it

FC1VNEW4                         C. R. Darden – cross

1   wasn't.  It was many from me.

2            MS. CHAUDHRY:  I offer 579 into evidence.

3            MR. ADAMS:  No objection.

4            THE COURT:  Received.

5            (Defendant's Exhibits 579 received in evidence)

6   BY MS. CHAUDHRY:

7   Q.  This is an e-mail from you to Mr. Newkirk on December 19th,

8   2013; correct?

9   A.  Yes, it is.

10  Q.  And you write to him, Harvey, please see attachment below.

11           Thanks, Calvin.

12           Right?

13  A.  Yes.

14  Q.  What you are forwarding him as you just said is another

15  totally bogus e-mail you made up?

16  A.  Yes.

17  Q.  You once again wrote in Rod Jones; correct?

18  A.  Yes.

19  Q.  You wrote that in the HotRodJones72 e-mail?

20  A.  I did.

21  Q.  You pretended that HotRodJones is e-mailing you; right?

22  A.  I did.

23  Q.  What you wrote pretending to be HotRodJones, This is the

24  best –- in all caps –- that I could get got... good luck in

25  closing your deal, exclamation point; right?

FC1VNEW4                         C. R. Darden – cross

1    A.  I did.

2            MS. CHAUDHRY:  Can we see the attachment.

3    Q.  This is another letter that you wrote on Merrill Lynch

4    letterhead; correct?

5    A.  Yes.

6    Q.  And that you signed; correct?

7    A.  Oh, yes.  I am sorry.

8    Q.  You are pretending to be Jonathan Quinn this time?

9    A.  Yes.

10   Q.  A branch manager?

11   A.  Yes.

12   Q.  And you address this letter to Mr. Newkirk?

13   A.  I did.

14   Q.  This e-mail is the way you gave Mr. Newkirk this letter;

15   right?

16   A.  Yes.

17   Q.  I would like to show you defense 422.

18   A.  I have it.

19   Q.  Do you recognize it?

20   A.  I do.

21   Q.  What is it?

22   A.  An e-mail from me to Harvey confirming -- basically

23   confirming the receipt of the e-mail that he had just sent to

24   me.

25           MS. CHAUDHRY:  I offer 422 into evidence.

FC1VNEW4                          C. R. Darden - cross

1          MR. ADAMS:  No objection.

2          THE COURT:  Received.

3          (Defendant's Exhibit 442 received in evidence)

4          MS. CHAUDHRY:  Please publish 422.

5   BY MS. CHAUDHRY:

6   Q.  This is an e-mail at the bottom from Harvey Newkirk on

7   January 17, 2014; correct?

8   A.  That's correct.

9   Q.  He writes, I am writing in reference to the action filed by

10  Open Gate against the various Darden parties.  Please confirm

11  by reply e-mail that although we accepted service on your

12  behalf, you advised us that you were going to seek alternate

13  litigation counsel and did find counsel which you wished to

14  engage.

15          That is what he writes; correct?

16  A.  Correct.

17  Q.  And you respond that same day, January 17th, 2014 at

18  1:29 p.m.; correct?

19  A.  Yes.

20  Q.  And you respond from your G-Mail address?

21  A.  I did.

22  Q.  You also copy CDardenTheReignInk; correct?

23  A.  I did.

24  Q.  You write, Confirmed.  Thank you.

25          Correct?

1    A.  I did.

2    Q.  Mr. Darden, last week you testified about a 404 phone

3    number that you had so you could pretend to be your father;

4    correct?

5    A.  Yes.

6    Q.  404 is the area code for Atlanta?

7    A.  It is.

8    Q.  You were not living in Atlanta?

9    A.  I was not.

10   Q.  You opened this phone number and this account in May of

11   2013; correct?

12   A.  I did.

13   Q.  And you did it so that you could call people and pretend to

14   be your father; correct?

15   A.  Correct.

16   Q.  You did in fact use that phone number and pretend to be

17   your father; correct?

18   A.  Yes, ma'am.

19   Q.  And you were asked last week regarding this phone number at

20   the bottom of 850, line 25:

21   "Q.  Have you ever impersonated your father with the intent of

22   fooling Mr. Newkirk?

23   "A.  I have not.

24   "Q.  Have you ever placed a three-way telephone call to this

25   4067 number while Mr. Newkirk was on the phone?

FC1VNEW4                          C. R. Darden – cross

1    "A.  I believe so."

2              Was that your testimony?

3    A.  It was.

4    Q.  Is that still your testimony?

5    A.  It is.

6    Q.  I would like to show you 505.

7    A.  I have it.

8    Q.  Do you recognize it?

9    A.  I do.

10   Q.  What is it?

11   A.  It's an e-mail that I sent to Harvey and Barbara.

12   Q.  Is it about this phone number?

13   A.  It is.

14           MS. CHAUDHRY:  I offer 505 into evidence.

15           MR. ADAMS:  No objection.

16           THE COURT:  Received.

17           (Defendant's Exhibit 505 received in evidence)

18           MS. CHAUDHRY:  Please publish 505.

19   BY MS. CHAUDHRY:

20   Q.  At the top of this e-mail it is from you to Harvey Newkirk

21   and LaurenceMedia@AOL; correct?

22   A.  Correct.

23   Q.  Is that Barbara Laurence?

24   A.  It is.

25   Q.  It is dated September 2nd, 2013?

FC1VNEW4                        C. R. Darden – cross

1   A.  Correct.

2   Q.  And the subject is regarding forward Project Beta; correct?

3   A.  Yes.

4   Q.  You write, Good morning, Harvey and Barbara.  For whatever

5   reason neither of my cell phones are working here, but I

6   highjacked my father's cell while we're here for the week.

7   Please call me any time at 404-227-4067.  I am also available

8   through e-mail.

9           That is what you said?

10  A.  Yes, ma'am.

11  Q.  This is while you were in the Bahamas with your father?

12  A.  Yes.

13  Q.  When you signed the personal guarantee?

14  A.  Yes.

15  Q.  This is an e-mail of you telling Barbara and Harvey that

16  that is your father's cell phone?

17  A.  Yes.

18  Q.  I want to turn your attention to November 12th, which is

19  the date that you spoke to Mark Weinberg.  I would like to show

20  you DX 479, which the government might tell me is already in

21  evidence.

22  A.  I have it.

23          THE COURT:  Are you offering it?

24          MS. CHAUDHRY:  Yes.

25          THE COURT:  They are not objecting so it is received.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          (Defendant's Exhibit 479 received in evidence)

2    BY MS. CHAUDHRY:

3    Q.  I would like to show the DX 479, please.

4          This is the receipt for your purchase of the spoof

5    app; right?

6    A.  Yes, ma'am.

7    Q.  And you said that you made this from your wife's PayPal

8    account?

9    A.  Yes.

10   Q.  And your wife didn't make this purchase; right?

11   A.  No.

12   Q.  And the receipt is sent from Suhai7@AOL.com.  Is that your

13   wife?

14   A.  Yes.

15   Q.  So she forwarded you the receipt?

16   A.  I don't remember if she forwarded it to me, but I have

17   access to her account.  I could have done it myself, but she

18   very well may have.  I am not sure.

19   Q.  Harvey Newkirk is not copied on this receipt, is he?

20   A.  No, ma'am.

21   Q.  You also received an e-mail about the log-in information

22   for this account?

23   A.  That's correct.

24   Q.  That also went to your wife's e-mail address?

25   A.  It did.

FC1VNEW4                         C. R. Darden - cross

 1   Q.  It got forwarded to you?

 2   A.  Okay.

 3   Q.  And Mr. Newkirk was not copied on that e-mail?

 4   A.  No, he wasn't.

 5           MS. CHAUDHRY:  Can we see 480, please?

 6   Q.  Can you please look at 480.

 7   A.  I have it.

 8   Q.  Is that the e-mail with the log-in information?

 9   A.  It is.

10           MS. CHAUDHRY:  I offer 480.

11           MR. ADAMS:  No objection.

12           THE COURT:  Received.

13           (Defendant's Exhibit 480 received in evidence)

14   BY MS. CHAUDHRY:

15   Q.  It is from Suhai7 to Honeybunny.  Is that you?

16   A.  It is.

17   Q.  And again this is your log-in information to the spoof

18   account?

19   A.  Yes, ma'am.

20   Q.  You testified that you sent the test e-mail to make sure

21   this works to yourself; correct?

22   A.  I did.

23   Q.  You did not send the test e-mail to Harvey Newkirk?

24   A.  Not at all.

25   Q.  Nor did you forward the successful test to him, did you?

FC1VNEW4                          C. R. Darden - cross

1    A.  I did not.

2    Q.  The only e-mail he got was the actual spoof; right?

3    A.  Yes, ma'am.

4    Q.  And you agree that you did not tell Mr. Newkirk that you

5    were going to send him a spoof e-mail; right?

6    A.  I agree.

7    Q.  I would like to show you 481, which might be in evidence as

8    a government exhibit.

9         MS. CHAUDHRY:  It apparently is an exhibit so if the

10   government can publish it.

11        MR. ADAMS:  There is no objection.

12        THE COURT:  Received.

13        (Defendant's Exhibit 481 received in evidence)

14   BY MS. CHAUDHRY:

15   Q.  This is the e-mail that you sent asking if everything is

16   okay?

17   A.  Yes.

18   Q.  He did not reply to this e-mail, did he?

19   A.  No.  Um, no.  He called me later in the day.  He did not

20   reply by e-mail to this e-mail if that is what you mean.

21   Q.  He did not reply by e-mail to this e-mail?

22   A.  That's correct.

23   Q.  Mr. Darden, in addition to the lies we've already talked

24   about that you were telling people for this deal, you also lied

25   to someone named Joel who wanted to buy the Coca-Cola building;

FC1VNEW4                          C. R. Darden – cross

1    correct?

2    A.  I did.

3    Q.  You were pretending to be your father and try to connect

4    him with the Coca-Cola people?

5    A.  With Joel I am not sure if he spoke –– when I spoke to Joel

6    I believe I spoke to Joel as myself.  E-mails might be

7    different, but I believe I spoke to Joel as myself.

8    Q.  You e-mailed with Joel pretending to be your father?

9    A.  I believe that to be true.

10   Q.  There are a series of e-mails where you send him fake

11   e-mails about the coke building?

12   A.  I did.

13   Q.  You forward these to Brad Reifler?

14   A.  I did.

15   Q.  And Mr. Newkirk is not on any of those e-mails; right?

16   A.  I don't believe he is.

17   Q.  Nor did you forward any of those to Mr. Newkirk?

18   A.  I don't think so.

19                (Continued on next page)

20

21

22

23

24

25

FC1VNEW6                         C. R. Darden – cross

1    Q.  I want to talk to you about Shaul Greenwald.

2              Last week you testified that he's somebody you met

3    with as a potential investor; correct?

4    A.  Yes, ma'am.

5    Q.  You testified that he was deciding whether to be a debt or

6    equity investor; correct?

7    A.  Yeah, he was -- he was -- well, it was -- it was going to

8    work out where he was going to be a little of both.  He was

9    going to have an equity stake, but the money that he was

10   putting up was going to have to be returned.  So it was kind of

11   a hybrid.

12   Q.  Last week you testified at 924, line 4:

13   "Q.  What was the purpose of that meeting?

14   "A.  To -- so Shaul was interested in getting involved in the

15   Maxim deal.  He wanted to hear about it, right, hear about a

16   vision for it, what we were going to be doing different than

17   the previous owners didn't do different.  So we had a meeting

18   to essentially, you know, lay that out."

19             Was that your testimony?

20   A.  Yes, ma'am.

21   Q.  Is that what the meeting was about?

22   A.  Yes.

23   Q.  The vision for Maxim?

24   A.  It was.

25   Q.  And you met with him in person; correct?

FC1VNEW6                          C. R. Darden - cross

1   A.  Yes.

2   Q.  And you sat in the same room with him?

3   A.  I did.

4   Q.  What you told him was lies, right?

5   A.  I don't -- well -- not necessarily.  So that when we talked

6   about the vision, my vision for it wasn't a lie, that was what

7   I wanted to do with it.  So I have to say no.

8   Q.  Okay.  Did you also tell him that your father was putting

9   up collateral for the deal?

10  A.  I don't remember if we spoke about collateral at that

11  meeting.  I'm not entirely sure.  We very well could have.  I'm

12  not -- I don't remember.

13  Q.  After that meeting, you called Mr. Greenwald pretending to

14  be your father, right?

15  A.  I did.

16  Q.  And you lied to him on that deal because you were

17  pretending to be your father, right?

18  A.  I did.

19  Q.  You testified that you used your real voice, right?

20  A.  I did.

21  Q.  That you didn't bother changing it?

22  A.  I did not.

23  Q.  That's the same voice you are using right now?

24  A.  That's correct.

25  Q.  The same intonation you are using right now?

FC1VNEW6                              C. R. Darden - cross

1   A.  Same intonation.  I probably spoke slower, right, and made

2   maybe a point not to use any slang or young slang.  Intonation.

3   I mean I'm not certain.

4   Q.  You didn't deepen your voice, did you?

5   A.  Deepen my voice, no.

6   Q.  Did you use the same voice tone that you're using with the

7   jury right now?

8   A.  I would say for the most part.

9   Q.  And you agree that you were lying to Shaul Greenwald on the

10  phone?

11  A.  I was.

12  Q.  And then you testified that you laughed about that?

13  A.  No, I didn't laugh about lying to him.  Harvey and I had a

14  conversation about whether or not I was going to change my

15  voice.  It was a joke made up.  We laughed about, you know,

16  just kind of about the situation about, No, I'm not going to

17  change my voice, ha ha.  Like that.  I didn't laugh about lying

18  to him.

19  Q.  So you were laughing about talking to Shaul Greenwald on

20  the phone right after you met him and not even bothering

21  changing your voice?

22  A.  That's correct.

23  Q.  From the NBA deal, which was a fraud, you took $500,000

24  from this person Melvin, right?

25  A.  Yes.

1   Q.  And you also took $175,000 from Richard Lauck, right?

2   A.  Yes.

3   Q.  That money ended up in the Merrill Lynch Reign account,

4   didn't it?

5   A.  Which one are you referring -- so -- I had a couple of

6   accounts.  I'm not entirely sure, but it very well could have.

7   Q.  You then proceeded to purchase a Porsche from the BMW

8   dealership; correct?

9   A.  I don't know if it was during that time, but I did purchase

10  a Porsche.

11  Q.  In 2012 you purchased a Porsche; correct?

12  A.  So what you -- you just mentioned Rich Lauck, who I met in,

13  I don't know, 2013.  Then you say, And then you went on to

14  purchase a Porsche.  But the Porsche was purchased in 2012

15  so --

16  Q.  When did you take the money from Melvin?

17              MR. ADAMS:  Objection.

18              Asked and answered and cumulative.

19              THE COURT:  And what?

20              MR. ADAMS:  Cumulative.  More generally of this

21  particular line I think has already been covered.

22              THE COURT:  Sustained.

23              MS. CHAUDHRY:  Your Honor, may we approach?

24              THE COURT:  No.

25  Q.  You created a series of false documents with Eric Flewellyn

FC1VNEW6                          C. R. Darden - cross

1   in order to purchase that Porsche, right?

2   A.  I don't know if it was for that Porsche, I'm not -- I'm not

3   certain.

4   Q.  I'd like to show you Defense Exhibit 367 please.  I'm

5   sorry, that's the wrong exhibit.

6           Eric Flewellyn created for you a series of fake Chase

7   bank statements; correct?

8   A.  He did.

9   Q.  That were showing three months of Chase bank activity;

10  correct?

11  A.  I believe so, yes.

12  Q.  And that was completely bogus, right?

13  A.  Yeah, everything with Eric was completely bogus.

14  Q.  He also created a W-2 for Reign; correct?

15  A.  He did.

16  Q.  And that you submitted to Porsche to get the loan to buy

17  that car, right?

18  A.  I don't know -- I don't know if he submitted it or not, I'm

19  not sure.  I don't know if I -- I don't even know if I got that

20  car.  I'm not certain, but he did -- that document was -- was

21  made.

22  Q.  And he also made a fake ADP statement for you; correct?

23  A.  That's correct.

24  Q.  That was showing earnings of yours through Reign; correct?

25  A.  I'm sure, yes.

FC1VNEW6                          C. R. Darden – cross

1   Q.  That was totally fake, right?

2   A.  Everything from Eric was totally fake.

3   Q.  And that was submitted to BMW Financial Services in an

4   effort to get a loan for the Porsche; correct?

5   A.  I'm not sure if we submitted it to him.  I'm not sure.

6   Q.  In 2013, you purchased a Mercedes SLS AMG; correct?

7   A.  I did.

8   Q.  That's the one where the doors open on the side like the

9   *Back to the Future* car, right?

10  A.  They do.

11  Q.  And that car is $220,000?

12  A.  Probably, yes.

13  Q.  Payments for that car were made out of the Reign Merrill

14  Lynch account; correct?

15  A.  Or it could have been.  I had another account, so I'm

16  not -- I'm not certain.  But very well -- that's very possible.

17  I'm not certain.

18  Q.  And you submitted some fake documents to get that car,

19  right?

20  A.  Again, I'm not -- I'm not certain.

21  Q.  Did you send more -- did you send bank statements for it?

22  A.  I don't remember.  I know I had to -- like with that car I

23  had to trade in the car that I had previously and I paid a lot

24  in cash.  I don't remember what was submitted.  I really -- I

25  really am not sure.

FC1VNEW6                          C. R. Darden – cross

1    Q.  And the car previously is you mean the Porsche, right?

2    A.  It actually was the Porsche, but it wasn't -- so it was a

3    Porsche.  I did not get that Porsche from Eric.  So it wasn't

4    the same one that you just referenced.  But it was a Porsche,

5    that's correct.

6    Q.  You got that Porsche from a BMW dealership, right?

7    A.  No, I believe I got that Porsche from a Porsche dealership.

8    Q.  Okay.  And that was a financed deal, right?  That's the one

9    you were looking for a cosigner for?

10             MR. ADAMS:  Objection.

11             Relevance.  403.

12             THE COURT:  Sustained.

13   Q.  I want to talk to you about the people you impersonated as

14   part of this deal.

15             You agree Roderick Jones is one of them; correct?

16   A.  Yes.

17   Q.  And Greg Watson is one of them?

18   A.  Yes.

19   Q.  Your father is one?

20   A.  Yes.

21   Q.  Your mother is one?

22   A.  Yes.

23   Q.  Your wife?

24   A.  I'm not certain, but --

25   Q.  When you went on using her PayPal account and bought

1   something, was that with her authorization?

2   A.  That's not pretending to be her.  I had access to the

3   account.  I told her I need to use the PayPal account.  So I

4   don't -- so I would say no, that's not pretending to be my

5   wife.

6   Q.  She gave you permission to use her account to buy this

7   spoof app?

8   A.  I would tell her, Hey, this is what I'm doing if you see

9   it, okay.  So yeah.

10  Q.  You also impersonated Shirley Franklin, the ex-mayor of

11  Atlanta?

12  A.  Did I impersonate her?  I don't remember impersonating

13  Shirley Franklin.

14  Q.  I'd like to show you what's been marked as Defense Exhibit

15  483 and 484.

16          Have you looked at both of those?

17  A.  I have.

18  Q.  What are they?

19  A.  Emails with me pretending to be Shirley sent to her.

20          MS. CHAUDHRY:  I offer 483 and 484 into evidence.

21          MR. ADAMS:  Objection.

22          Cumulative.

23          THE COURT:  Overruled.

24          Received.

25          (Defendant's Exhibits 484, 484 received in evidence)

FC1VNEW6                          C. R. Darden – cross

1      MS. CHAUDHRY:  If we can go to the second page.

2    Q.  The second page is an entire bogus exchange between Steve

3    White, the president of Comcast Cable, right?

4    A.  That's correct.

5    Q.  You made this up?

6    A.  I made up the exchange, not the information.  So the

7    information I took off of Comcast website; so that was true

8    information.  But I made up the chain.

9    Q.  Right.

10      And the bottom, you are pretending to be Steve White?

11   A.  Yes.  Absolutely.

12   Q.  Right.

13      MS. CHAUDHRY:  If we could go back to the first page.

14   Q.  And then you pretend at the bottom that it's Steve White

15   actually writing to Shirley; correct?

16   A.  Yes, that's correct.

17   Q.  Shirley Franklin.

18      And then the next email is you pretending to be your

19   mom, pretending to write to your dad -- sorry.  The next email

20   is you pretending to be Shirley Franklin pretending to write to

21   your dad, right?

22   A.  Yes.

23   Q.  And then above that you pretend to be your father writing

24   to yourself?

25   A.  Yes.

FC1VNEW6                         C. R. Darden - cross

1   Q.   And then you forward that whole thing to Shane McMahon;

2   correct?

3   A.   Yes.

4   Q.   He's one of the victims here?

5   A.   He is.

6   Q.   Mr. Newkirk is not on any of these emails, is he?

7   A.   No.

8           MS. CHAUDHRY:   484 please.

9   Q.   This is just another email from you to Shane referring to

10  this email chain below, right?

11  A.   That's correct.

12  Q.   You are telling him about these other people that are also

13  involved, Allen Danenbaum, senior vice president of

14  programming; correct?

15  A.   Yes.

16  Q.   He was not involved in your conversations, was he?

17  A.   Not at all.

18  Q.   Mr. Newkirk is not on that email, is he?

19  A.   No, ma'am.

20  Q.   So you also impersonated Steve White, the president of

21  Comcast Cable?

22  A.   Yes.

23  Q.   You impersonated your father's oncologist, Dr. Ruddy?

24  A.   Can you repeat that?

25  Q.   You impersonated your father's oncologist --

FC1VNEW6                          C. R. Darden – cross

1   A.  I did.

2   Q.  -- Dr. Ruddy?

3   A.  I did.

4   Q.  You impersonated Jeff Henderson, the CFO of Cardinal

5   Health?

6   A.  Yes.

7   Q.  And you had actually prepared a long email chain pretending

8   to be Jeff Henderson so that your father can do a hardship

9   withdrawal of his stock, right?

10  A.  Yes, ma'am.

11  Q.  You impersonated John Mulligan of Target?

12  A.  I did.

13  Q.  You impersonated someone named Alma from Bank of America?

14  A.  I did.

15  Q.  And Alma is actually someone who just works at your

16  dentist's office, right?

17  A.  I have no idea.

18  Q.  Where did you get the name?

19  A.  I think Alma is actually the person that works at Merrill

20  Lynch.

21  Q.  You impersonated Mark Weinberg?

22  A.  I did.

23  Q.  You impersonated Lynn O'Brien from Coca-Cola in your emails

24  with Joel about selling the Coke building, right?

25  A.  That's correct.

FC1VNEW6                          C. R. Darden – cross

1    Q.  Now, we just saw the emails about you impersonating Shirley

2    Franklin.  She's a family friend of yours; correct?

3    A.  She is.

4    Q.  She's a close friend of your mother's?

5    A.  No.  My father more so.

6    Q.  You recently saw her, didn't you?  You saw her at her son's

7    funeral in Atlanta; correct?

8    A.  I did.

9    Q.  And at that funeral, you told people that you were not

10   worried about this case and you're not going to jail, didn't

11   you?

12   A.  I don't recall that at all.

13   Q.  You saw many of your classmates from Morehouse at that

14   funeral, didn't you?

15   A.  I did.

16   Q.  And when you attended that funeral, you stayed at your

17   parents' house; correct?

18   A.  I did.

19   Q.  With friends of yours?

20   A.  Yes.

21   Q.  Kevin Valentine?

22   A.  Yes.

23   Q.  Who else?

24   A.  Trevor Baldwin.

25   Q.  And how many days did you stay with your parents?

FC1VNEW6                          C. R. Darden - cross

1   A.  Three, four, two.  I'm not sure.

2   Q.  Mr. Darden, isn't it a fact that you also created a fake

3   email address for Harvey Newkirk?

4   A.  It is.

5   Q.  In fact, on September 9th of 2011, you created the email

6   address hnewkirk1@gmail?

7   A.  I did.

8   Q.  And you registered the name belonging to that as Harvey

9   Newkirk?

10  A.  Whatever it -- I don't remember what the name was, but yes.

11  Q.  Mr. Darden, you are married; correct?

12  A.  I am.

13  Q.  When did you get married?

14  A.  2007.

15  Q.  Do you have any children with your wife?

16  A.  I do.

17  Q.  How many?

18  A.  One.

19  Q.  You have a daughter?

20  A.  I do.

21  Q.  She lives with you?

22  A.  Yes.

23  Q.  Do you also have a son with your wife?

24  A.  No, I have a stepson with my wife.

25  Q.  As far as you know, does your family know that you're

1    married?

2    A.  Yes.

3                MR. ADAMS:  Objection.

4                Speculation.  Relevance.

5                THE COURT:  Sustained.

6    Q.  Has your wife gone on any family vacations with you?

7    A.  Yes.

8                MR. ADAMS:  Objection.

9                Relevance.

10               THE COURT:  Sustained.

11   Q.  Has your wife met your mother?

12               MR. ADAMS:  Objection.

13               Relevance.

14               MS. CHAUDHRY:  The next question will be relevant.

15               THE COURT:  Well, I'll allow that question

16   contingently.  So we'll see what the next question is.

17               But the question pending is to your knowledge, has

18   your wife met your mother?

19   A.  She has.

20   Q.  Your wife impersonated your mother on the phone to Shane

21   McMahon, one of the victims in the Maxim deal, didn't she?

22   A.  Maybe.  I'm not sure.

23   Q.  You told the government?

24   A.  Maybe so.

25   Q.  You told the government on April 14th, 2014 that your wife

1    called Shane McMahon and pretended to be your mother, didn't

2    you?

3    A.  I believe so.

4         MS. CHAUDHRY:  Your Honor, I don't know what time the

5    Court likes to take its afternoon break, so I'm just asking.

6         THE COURT:  Another ten minutes.

7    Q.  Mr. Darden, the government executed a search warrant in

8    your home, didn't they, after you were arrested?

9    A.  It was before I was actually arrested, yes, they did.

10   Q.  That's the home you live in with your wife; correct?

11   A.  We don't live there anymore, but --

12   Q.  That was where you were living with your wife?

13   A.  That's correct.

14   Q.  And your daughter?

15   A.  Yes.

16   Q.  How old is she?

17        MR. ADAMS:  Objection.

18        Relevance.

19        THE COURT:  Sustained.

20   Q.  That is the home in which there were reams of Merrill Lynch

21   letterhead; correct?

22   A.  I think I answered that.  I'm not sure about reams.  I

23   don't recall that.

24   Q.  How many pages would you estimate were in your apartment of

25   Merrill Lynch letterhead?

FC1VNEW6                          C. R. Darden – cross

1   A.  I thought it was all on the computer, so I would say none.

2   But again, I wasn't there.  I'm really not sure.  There could

3   have been a lot, there could have been none.  So something I

4   did on my computer.

5   Q.  There were hard copies found in your apartment; correct?

6   A.  I'm not sure.  I don't know what they took from there, so I

7   guess you would have to ask the government.

8          MS. CHAUDHRY:  The government stipulates that there

9   were hard copies found.

10  A.  Okay.

11  Q.  There were 19 different pages of pre-notarized paper;

12  correct?

13  A.  I can't say correct.  I don't know what was taken.

14         THE COURT:  If the government wants to stipulate to

15  something at this point, that's fine.  They don't have to; no

16  party is required to stipulate.  He's already indicated he has

17  no particular memory of this.  So either arrive at a

18  stipulation or move on.

19         Do you want to confer with the government for a

20  minute?

21         MR. ADAMS:  Your Honor, we're willing to stipulate

22  that particular documents were found in Mr. Darden's house.

23         THE COURT:  Okay.  All right.  So let's do that.

24         Go ahead.  Which documents do you want to introduce?

25         MS. CHAUDHRY:  DX 709 and 710.

1           THE COURT:  Okay.  Any objection?

2           MR. ADAMS:  Not to authenticity, but to on grounds of

3   cumulativeness --

4           THE COURT:  On grounds of?

5           MR. ADAMS:  Both it is cumulative under 403; and to

6   the extent it is going to impeachment, it's extrinsic under

7   608(b).

8           THE COURT:  It's not going to impeachment, I don't

9   think, but it is relevant.  And the 403 objection is overruled.

10          So 709 and 710 are received.

11          (Defendant's Exhibits 709, 710 received in evidence)

12          MS. CHAUDHRY:  We can show these to the jury.

13          709, because these are photocopies -- they are

14  actually ten pages; we'd like to look at every single one

15  please.

16  Q.  These were found in your house.

17          This is a certificate of conformity notarized by

18  Cinque Axam in Georgia; correct?

19  A.  Yes.

20          MS. CHAUDHRY:  The next page please.

21  Q.  This is another page notarized by Cinque Axam in Georgia;

22  correct?

23  A.  Yes.

24          MS. CHAUDHRY:  The next page please.

25  Q.  This is another page notarized by the same person?

FC1VNEW6                          C. R. Darden - cross

1   A.   Yes.

2        MS. CHAUDHRY:   Next page please.

3   Q.   This is a different page notarized by the same person?

4   A.   Yes.

5        MS. CHAUDHRY:   Next page.

6   Q.   This is a different page notarized by Cinque Axam; correct?

7   A.   Yes.

8        MS. CHAUDHRY:   Next page.

9   Q.   Mr. Darden, I should have pointed out that in all of these

10  pages, you have signed -- that's your signature; correct?

11  A.   It is.

12  Q.   You're signing as Calvin R. Darden Senior; correct?

13  A.   It says -- yes, that's correct.

14       MS. CHAUDHRY:   Next page.

15  Q.   Again, you're signing as Calvin R. Darden Senior notarized

16  by Cinque Axam?

17  A.   That's correct.

18       MS. CHAUDHRY:   Next page.

19  Q.   This is another of your signatures notarized by Cinque

20  Axam?

21  A.   Correct.

22       MS. CHAUDHRY:   Next page.

23  Q.   Again, you sign Calvin Darden Senior and it is -- and

24  there's actually a blank for you to sign that's Calvin Darden

25  Junior that is not signed, right, on this one?

1    A.  Is there a blank for --

2    Q.  At the top, does it say Calvin Darden Junior and have a

3    signature line?

4    A.  It does.

5    Q.  And that is not signed, right?

6    A.  It is not.

7    Q.  It's only signed for Calvin Darden Senior, and that's your

8    signature, right?

9    A.  That's correct.

10   Q.  It's also notarized by Cinque Adams?

11   A.  Yes.

12   Q.  And I'd like to show you defense 710.

13           These are notarized pages also from Georgia from a

14   different notary named Gregory Peace; correct?

15   A.  Yes.

16   Q.  This again is signed by you pretending to be Calvin R.

17   Darden Senior; correct?

18   A.  That's correct.

19           MS. CHAUDHRY:  Next page.

20   Q.  Same.  Signed by you pretending to be Calvin R. Darden

21   Senior?

22   A.  Correct.

23   Q.  Notarized by Gregory Peace.

24   A.  Correct.

25           MS. CHAUDHRY:  Next page.

FC1VNEW6                        C. R. Darden - cross

1   Q.  This is another example you signing on behalf of Calvin R.

2   Darden Senior notarized by Gregory Peace?

3   A.  It is.

4           MS. CHAUDHRY:  The next page.

5   Q.  Same thing, you signing?

6   A.  Same thing.

7   Q.  Notarized by --

8   A.  Yes, ma'am.

9   Q.  -- Gregory Peace.

10          MS. CHAUDHRY:  Next page.

11  Q.  You signed, notarized by Gregory Peace?

12  A.  Yes, ma'am.

13          MS. CHAUDHRY:  Next page.

14  Q.  You forged your dad's signature, notarized by Gregory

15  Peace?

16  A.  Correct.

17          MS. CHAUDHRY:  Next page.

18  Q.  You forged your dad's signature, notarized by Gregory

19  Peace?

20  A.  Yes, ma'am.

21          MS. CHAUDHRY:  The next page.

22  Q.  You're signing your dad's signature, notarized by Gregory

23  Peace; is that correct?

24  A.  Correct.

25          THE COURT:  All right.

1          If you want to take a break now, this will probably be

2     a good time.  So we'll take a 15-minute break at this time.

3          (Jury excused)

4          THE COURT:  You can step down.  We'll see you in 15

5     minutes.

6          (Witness excused)

7          THE COURT:  Ms. Chaudhry, you have, just so you know,

8     one hour and six months left on the greatly expanded time limit

9     that I gave.

10         Also I received the government's comments on the

11    proposed charge.  Now, you have till 5 o'clock, but I assume

12    that the defense is going to be submitting something.

13         MS. CHAUDHRY:  Yeah, that's part of -- our office is

14    emailing Mr. Infallible soon or --

15         THE COURT:  All right.

16         I'll need that at 5 because I have to go teach at

17    Columbia and I want to look at them tonight so we can have the

18    charging conference some time tomorrow.

19         MS. CHAUDHRY:  I thought our charging conference was

20    today at 5.

21         THE COURT:  Well, it's not going to be possible

22    because of other commitments.

23         MS. CHAUDHRY:  I'm sorry.  You have to be there at 5?

24         THE COURT:  Excuse me?

25         MS. CHAUDHRY:  You have to be there at 5?

FC1VNEW6                              C. R. Darden – cross

1          THE COURT:  I need your comments, as I indicated a

2    week ago --

3          MS. CHAUDHRY:  You will have them.

4          THE COURT:  -- by 5 p.m.

5          MS. CHAUDHRY:  Yes.

6          THE COURT:  But we will not have the charging

7    conference till tomorrow.  But I need to look at them.  If you

8    prefer that I don't look at them, that's fine.  But if you want

9    me to look at it, since I have to leave to teach at Columbia at

10   5:30, and it turns out I have another matter from 5 to 5:30.

11         All right.  Very good.  We'll see you in 15 minutes.

12         (Recess)

13         THE COURT:  Okay.  Let's get the witness on the stand;

14   let's bring in the jury.

15         (Jury present)

16         THE COURT:  All right, counsel.

17   BY MS. CHAUDHRY:

18   Q.  Mr. Darden, the government has stipulated that Defense

19   Exhibits 704, 705, 706, 707, 711, 712, and 714 were all found

20   in your home upon execution of a search warrant.

21         Would you please look at 704.

22   A.  I see it.

23   Q.  What is it?

24   A.  A guaranteed contract.

25   Q.  Is it signed by you?

FC1VNEW6                         C. R. Darden – cross

1   A.  Not on the second page or third page.

2   Q.  Keep going.

3   A.  Which page --

4   Q.  Do you see your signature anywhere?

5   A.  So yes, on the last page, last two.

6   Q.  Is it signed by you pretending to be your father?

7   A.  It is.

8           MS. CHAUDHRY:  I offer 704.

9           MR. ADAMS:  Same objections as previously for the

10  record, but understood that it is overruled.

11          THE COURT:  All right.  Received.

12          (Defendant's Exhibit 704 received in evidence)

13          MS. CHAUDHRY:  Please publish 704.

14  Q.  Mr. Darden, this is a guarantee for Calvin Darden Senior in

15  the top quadrant there, it says that; correct?

16  A.  Yes.

17  Q.  That's your father?

18  A.  It is.

19          MS. CHAUDHRY:  And if we can blow up the bottom third.

20  Q.  It is a guarantee for $1.6 million; correct?

21  A.  It is.

22          MS. CHAUDHRY:  If we could please flip through the

23  pages.

24  Q.  This page crosses out the state where it's created and says

25  New York and County of Richmond; correct?

FC1VNEW6                         C. R. Darden - cross

1    A.  Correct.

2    Q.  But it's the same document, right, otherwise?

3    A.  It is.

4          MS. CHAUDHRY:  Next page.

5    Q.  This is signed by you pretending to be your father;

6    correct?

7    A.  It is.

8          MS. CHAUDHRY:  Next page.

9    Q.  And it's notarized; correct?

10   A.  Yes, ma'am.

11   Q.  And it's notarized in New York; correct?

12   A.  It is.

13   Q.  This is a guarantee for $1.6 million that is not related to

14   this case, is it?

15   A.  No.

16   Q.  This is dated October 24th, 2011, right?

17   A.  That's correct.

18   Q.  Your father did not authorize you to guarantee $1.6 million

19   at that time, did he?

20   A.  He did not.  No, ma'am.

21   Q.  I'd like to show you -- I'd like you to look at 705.

22   A.  I have it.

23   Q.  What is it?

24   A.  Direction to pay loan.

25   Q.  From whom and to whom?

FC1VNEW6                          C. R. Darden - cross

1  A.  John Mulligan.  The undersigned is confirmed by John

2  Mulligan in email dated, very truly yours, Calvin Darden.

3        So from John Mulligan to me purporting to be my

4  father.

5        MS. CHAUDHRY:  I offer Defense 705.

6        MR. ADAMS:  Same objections, but same understanding.

7        THE COURT:  Received.

8        (Defendant's Exhibit 705 received in evidence)

9        MS. CHAUDHRY:  Please publish 705.

10 Q.  Mr. Darden, this is -- actually at the bottom it says:

11 Very truly yours, Calvin Darden, Calvin R. Darden Senior;

12 correct?

13 A.  Yes.

14 Q.  So this is from Calvin R. Darden Senior to Target Corp.,

15 that's who the "you" is on the top?  Right?  It says Target

16 Corp. you?

17 A.  Yes.

18 Q.  And it's a reference to -- and it's not executed, it is

19 dated in January of 2014; correct?

20 A.  That's correct.

21 Q.  It says:  Reference is made to the loan to be advanced by

22 you -- and above it it says you as Target Corp. -- to the

23 undersigned Darden as confirmed by John Mulligan, chief

24 financial officer.  That is somebody you impersonated in this

25 case, right?

FC1VNEW6                          C. R. Darden - cross

1    A.  Correct.

2    Q.  And it refers to an email dated January 21st, 2014, right?

3    A.  It does.

4    Q.  That is an email that you created; correct?

5    A.  Correct.

6    Q.  And this is authorizing -- this draft would authorize

7    Target to pay proceeds of a loan by wire transfer; correct?

8    A.  That's correct.

9              MS. CHAUDHRY:  Can we see the next page please.

10   Q.  This is also a direction from your father this time to

11   Cardinal Health; correct?

12   A.  It is.

13   Q.  And this is you drafting a document directing Cardinal

14   Health to pay $3.2 million towards a loan for your father;

15   correct?

16   A.  No, I didn't draft -- you said this is me drafting.  I

17   didn't draft this.

18   Q.  This document says that Cardinal Health is authorized --

19   A.  Yes.

20   Q.  -- to send $3.2 million, right?  And it's Calvin R. Darden

21   Senior, right?

22   A.  Correct.

23   Q.  And as the government stipulated, this is found in your --

24   I'd like you to look at 706, please.

25   A.  I have it.

FC1VNEW6                              C. R. Darden – cross

1   Q.  What are they?

2   A.  Limited liability interest power.

3   Q.  And limited liability in what company?

4   A.  Darden Media Holdings.  It also says Darden Media Group.

5   So one or the other or both.

6            MS. CHAUDHRY:  I offer 706.

7            MR. ADAMS:  Same objection and understanding.

8            THE COURT:  Received.

9            (Defendant's Exhibit 706 received in evidence)

10  Q.  These are executed by you; correct?

11  A.  They are.

12  Q.  Pertaining to your father?

13  A.  Yes, ma'am.

14  Q.  And these are limited liability company interest powers;

15  correct?

16  A.  They are.

17           MS. CHAUDHRY:  See the next page please.

18  Q.  That's also you signing pertaining to your dad?

19  A.  Correct.

20           MS. CHAUDHRY:  Next page.

21  Q.  That's another signature of yours pertaining to your dad?

22  A.  It is.

23           MS. CHAUDHRY:  Next page.

24  Q.  Same thing.  You signing pertaining to your father?

25  A.  Same thing.

1      MS. CHAUDHRY:  Next page.

2           Next page.

3           Next page.

4           Next page.

5           That's it.

6  Q.  If you could please look at 707.

7           What are these?

8  A.  It says certificate for Darden Media Group.

9  Q.  Have you signed these pertaining to your father?

10 A.  Yes.

11      MS. CHAUDHRY:  I offer 707.

12      MR. ADAMS:  The government has the same position, your

13 Honor.

14      THE COURT:  Received.

15      (Defendant's Exhibit 707 received in evidence)

16      MS. CHAUDHRY:  If we can just show the pages with the

17 signatures please.

18 Q.  That's your signature pretending to be your father?

19 A.  It is.

20 Q.  And the other one?  That's also your signature pretending

21 to be your father?

22 A.  It is.

23 Q.  I'd like to show you -- I'd like you to look at 711 please.

24 A.  I see it.

25 Q.  What is it?

1183

1   A.  Signature page.

2   Q.  Of you forging your father's signature?

3   A.  Yes, ma'am.

4           MS. CHAUDHRY:  I offer 711 please.

5           MR. ADAMS:  Same position.

6           THE COURT:  Same ruling.  Received.

7           (Defendant's Exhibit 711 received in evidence)

8   Q.  Mr. Darden, this is 39 pages.  We're going to show the jury

9   every single one.

10          This is you signing as your father on page 1?

11  A.  They are.

12  Q.  And page 2?

13  A.  Same.

14  Q.  Page 3?

15  A.  Same.

16  Q.  Page 4?

17  A.  Same.

18  Q.  Page 5?

19  A.  Same.

20          MS. CHAUDHRY:  Sorry, page 5, can we go back to page

21  5.

22  Q.  Page 5 is just a signature with a block and there's no

23  document attached, right?  It's just a signature page?

24  A.  Yes.

25  Q.  Right.

FC1VNEW6                              C. R. Darden – cross

1              MS. CHAUDHRY:  Next page.

2   Q.  That's your signature pretending to be your father?

3   A.  Yes.

4   Q.  On this one also there is no document reference, it's just

5   a signature page ready to go?

6   A.  That's correct.

7              MS. CHAUDHRY:  Next page.

8   Q.  That's your signature at the bottom?

9   A.  It is.

10  Q.  Pretending to be your father?

11  A.  Yes.

12             MS. CHAUDHRY:  Next page.

13  Q.  That's your signature?

14  A.  It is.

15  Q.  Pretending to be your father?

16  A.  It is.

17             MS. CHAUDHRY:  Next page.

18  Q.  This is another page of no document attached, just a

19  signature page; correct?

20  A.  That's correct.

21             (Continued on next page)

22

23

24

25

1    BY MS. CHAUDHRY:

2    Q.  And it is you pretending to your father?

3    A.  It is.

4    Q.  Next page.  On this page you have signed three times

5    pretending to your father; correct?

6    A.  That's correct.

7    Q.  On this one there is no -- also it is just a signature page

8    and no other --

9    A.  That is because I wasn't just sent the whole document.  I

10   was sent the signature page and asked to send the signature

11   page.  So, yes.

12   Q.  Next page.  This is the same page and you are signing three

13   different ways?

14   A.  Yes, three different ways.  I am signing it the same, but

15   it is three signature lines.  That is correct.

16   Q.  Can we go to the one before that.  Sorry.  The one before.

17          This page and the next page are the same, but you're

18   signatures are different; right?

19   A.  Are the signatures -- I was signing the documents very

20   quickly.  They are not meant to be different.  I am -- each

21   signature is purported to be Calvin R. Darden Senior and I am

22   signing the document.  So there is no -- I wasn't trying to

23   make, you know, any differentiation between one signature and

24   the other.

25   Q.  We'll flip through the rest.  Please keep going.  Is that

Fc16new7                          C.R. Darden - cross

1    your signature?

2    A.  Yes, it is.

3    Q.  Next page.  Is that your signature?

4    A.  It is.

5    Q.  Next page.  That is your signature?

6    A.  It is.

7    Q.  Next page.  That is your signature?

8    A.  It is.

9    Q.  Next page.  That's your signature?

10   A.  Same, yes.

11   Q.  Next page.  That is your signature?

12   A.  Yes.

13   Q.  Next page.  That's your signature?

14   A.  It is.

15   Q.  Next page.  That's your signature?

16   A.  It is.

17   Q.  Next page.  That's you?

18   A.  Same.

19   Q.  Next page.  Well, now, these are different.

20            MR. ADAMS:  Objection.  Sorry.  This is vague I think

21   or mischaracterizing.

22   Q.  The past three pages we have seen are Calvin R. Darden

23   Junior?

24   A.  Yes, I believe so.

25   Q.  That is you?

Fc16new7                          C.R. Darden - cross

1    A.  Yes.

2    Q.  That is you signing as yourself?

3    A.  That is me signing as myself.  That is why the signature is

4    different from the ones before.

5    Q.  Next page.  That is you signing as your father?

6    A.  That one is hard to say but probably.

7    Q.  Next page.  That is you signing as your father?

8    A.  Believe so.

9    Q.  Next page.  That is you signing as your father?

10   A.  Same.

11   Q.  Next page.  Is that you signing as your father?

12   A.  Yes.

13   Q.  Next page.  That you is signing as your father?

14   A.  It is.

15   Q.  Next page.  That is you signing as your father?

16   A.  It is.

17   Q.  Next page.  That is you signing as your father and

18   yourself?

19   A.  That's correct.

20   Q.  Next page.  That is you signing as your father and

21   yourself?

22   A.  Yes.

23   Q.  Next page.  That is you signing as your father and

24   yourself?

25   A.  Yes.

Fc16new7                                C.R. Darden - cross

1  Q.  Next page.  That is you signing as your father?

2  A.  That is weird but probably so.

3  Q.  Next page.  Next page.  Next page.  Next page.  That's it.

4          That you signing as your father?

5  A.  Yes.

6  Q.  Next page.  That is you signing as your father?

7  A.  Correct.

8  Q.  That is you signing as your father?

9  A.  That one looks more like me signing as me.  Again, it is

10  hard to say.

11  Q.  Next page.  Is that you signing as your father?

12  A.  It is.

13  Q.  Next page.  That is you signing as your father?

14  A.  Yes.

15  Q.  If we go back to the page before it, the next page, we just

16  saw the two same pages with two different signatures; right?

17  A.  I think those are the same.  The one before that, I think

18  that one is different.

19  Q.  Next page.  That's it.

20          I would like you to look at 712, please.

21  A.  Okay.

22  Q.  What is that?

23  A.  It's on Reign letterhead a letter to -- purportedly to a

24  guy at Live Nation but it is not.

25  Q.  Who is it signed by?

Fc16new7                          C.R. Darden – cross

1    A.  That is signed by me.

2    Q.  As?

3    A.  My father.

4              MS. CHAUDHRY:  I offer 712.

5              MR. ADAMS:  Your Honor, given the content and date on

6    this, we have a relevance objection that I think is different

7    than the prior objection.

8              THE COURT:  Let me take a look.

9              Come to the side bar.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (At the side bar)

2              THE COURT:  So what are you offering this for?

3              MS. CHAUDHRY:  This is a separate fraud he is running

4      at the same time with the dates are going to be in April of

5      2013 and there is nothing else that he didn't get charged with

6      even though the government found this and this is clearly him

7      pretending to be his dad writing to this poor guy at Live

8      Nation Comedy about Dave Chappelle and Chris Rock, a show I

9      would have liked to see.

10             MR. ADAMS:  At this and point I think it is

11     cumulative.  If it is being offered, it is again extrinsic

12     evidence offered for impeachment.

13             THE COURT:  If I understand the offer, it is not as

14     impeachment.  Well, it is impeachment of a different kind.  It

15     is impeachment through prior fraudulent acts as opposed to

16     impeachment to a particular statement that he has made here in

17     court.

18             Now, I am going to allow it, but I must say I am

19     surprised that counsel has convinced me to give her an extended

20     cross-examination, which will end in four minutes to 5:00.  It

21     will not go three minutes to 5:00.  It not go over until

22     tomorrow.  If it is in the middle of a question, it will be

23     ended right there.  Despite all that, you've spent a good 15 or

24     20 minutes between before the break and after the break in

25     going through page after page where it could have easily just

Fc16new7                          C.R. Darden – cross

1   been said, Are all the signatures fraudulent signatures you

2   signed?  You chose to do it your way.  That's fine.  Believe me

3   the time limit is going to be very strictly enforced.

4               MS. CHAUDHRY:  Thank you.

5               (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Fc16new7                        C.R. Darden - cross

1            (In open court; jury present)

2            MS. CHAUDHRY:  Your Honor, I offer 712.

3            THE COURT:  Yes.  The objection is noted, but is

4    overruled.  712 is received.

5            (Defendant's Exhibit 712 received in evidence)

6            MS. CHAUDHRY:  Can I please publish it to the jury?

7            THE COURT:  Yes.

8    BY MS. CHAUDHRY:

9    Q.  Mr. Darden, this is a letter on Reign letterhead to Live

10   Nation Comedy; correct?

11   A.  It is.

12   Q.  To someone named Jeff?

13   A.  Yes.

14   Q.  It is a letter of intent that is about a proposed comedy

15   tour featuring Chris Rock and Dave Chappelle?

16   A.  Correct.

17   Q.  And Live Nation?

18   A.  Correct.

19   Q.  Go to the second page.  That is signed by you pretending to

20   be your father?

21   A.  Both.  I signed both is what I meant.  I am sorry.

22   Q.  I don't know what you are saying.

23   A.  Both signatures there, I signed both signatures.

24   Q.  So this --

25   A.  As my father and as Jeff.

Fc16new7                        C.R. Darden - cross

1    Q.  You also signed as Jeff?

2    A.  I did.

3    Q.  Go to the last page.  This is a tour that is supposed to be

4    April of 2013; is that correct?

5    A.  It is correct that is what it says.  There wasn't a tour.

6    Q.  Finally I show you 714.  What are these?

7    A.  Signatures.

8    Q.  Of?

9    A.  714?

10   Q.  Yes.

11   A.  One is Harvey's signature.  The other is my signature.

12   Q.  Are there two pages?

13   A.  There are.  The same as the second.

14            MS. CHAUDHRY:  I offer 714.

15            MR. ADAMS:  Same objection.

16            THE COURT:  Same ruling.  Received.

17            (Defendant's Exhibit 714 received in evidence)

18   BY MS. CHAUDHRY:

19   Q.  Government Exhibit 701, which is in evidence, can we please

20   see page 4 of it.

21            This is a signature page of the agreement between

22   Invictus and Reign Entertainment Group; correct.

23   A.  It is.  I believe so.

24   Q.  If you flip back to the front of that exhibit in your

25   binder, you'll see that this is the document that Mr. Newkirk

Fc16new7                          C.R. Darden - cross

1    sent you; correct?

2    A.   That's correct.

3    Q.   And you'll notice on this that for Reign it is signed as

4    Calvin Darden CEO; correct?

5    A.   It is.

6    Q.   And that is a digital signature of your father's?

7    A.   It is.

8    Q.   For Invictus it is signed by Harvey Newkirk; correct?

9    A.   Correct.

10   Q.   Underneath it is written in by hand Harvey K. Newkirk,

11   Managing Member; is that correct?

12   A.   Correct.

13   Q.   Those are the same signature pages in your house; right?

14   A.   Are they the same signature pages as what?

15   Q.   714 that you just looked at, those are signature pages

16   between Invictus and Reign Entertainment Group?

17   A.   They are.

18              MS. CHAUDHRY:  I offer 714.

19              MR. ADAMS:  Same objection.

20              THE COURT:  Same ruling.  Received.

21              (Defendant's Exhibit 714 received in evidence)

22              MS. CHAUDHRY:  Can we please show 714.

23   BY MS. CHAUDHRY:

24   Q.   So this page that was in your house under Reign

25   Entertainment, it now says it is signed by Calvin Darden,

1   Junior; correct?

2   A.   It does.

3   Q.   It says president; right?

4   A.   Yes.

5   Q.   That is your signature?

6   A.   It is.

7   Q.   But the signature of Harvey Newkirk's is taken from that

8   other document, isn't it?

9   A.   Is the signature taken -- I don't know what you mean.

10   Q.   Mr. Newkirk did not sign this document that you signed, did

11   he?

12   A.   I believe he did.

13   Q.   You believe he did?

14   A.   I believe he did.  I have no reason to believe that he

15   didn't.

16   Q.   701 was the actual letter of intent between Reign and

17   Invictus; correct?

18   A.   Okay.

19   Q.   We just looked at?

20   A.   Okay.

21   Q.   Is that the one he sent you?

22   A.   I don't know if he sent -- yes.  I am not sure.

23   Q.   You can look at 701.

24   A.   If it attaches an e-mail, looking at this one page, I don't

25   know if he sent it to me or not.  I think he sent me all the

Fc16new7                          C.R. Darden - cross

 1  documents.  So I didn't draft any of them myself, right.  So I

 2  can give you a yes for that.

 3  Q.  This page as the government stipulated was found in your

 4  house?

 5  A.  I don't know.  Again, you would have to ask the government.

 6  I don't know what was found in my house.

 7          MS. CHAUDHRY:  Can we get a side-by-side comparison of

 8  the signature page from 701 and this one, please.

 9  Q.  The one on the right is the one that is in evidence that

10  Mr. Newkirk sent you; correct?

11  A.  Okay.

12  Q.  The one on the left is as the government stipulated one

13  that was in your house?

14  A.  Meaning he did not send it to me.

15          MR. ADAMS:  Objection, speculation.

16          THE COURT:  Sustained.

17          MS. CHAUDHRY:  Can we see the second signature page in

18  714.

19  Q.  The second page is 714.  This one again instead of being

20  signed by Calvin Darden CEO is signed by Calvin Darden Senior,

21  President; correct?

22  A.  Okay.

23  Q.  Is that your signature?

24  A.  It is.

25  Q.  Where it says Harvey Newkirk, this time the name is typed;

Fc16new7                    C.R. Darden - cross

1   correct?

2   A.  It is.

3   Q.  And it says chief executive officer; correct?

4   A.  Yes.

5   Q.  And that is your signature as Harvey Newkirk, isn't it?

6   A.  I don't believe so.

7   Q.  You don't believe so?

8   A.  No, I don't.

9        MS. CHAUDHRY:  You can take this down.

10  Q.  Mr. Darden, before you got arrested in this case, the

11  agents came by your house and spoke to your wife; correct?

12  A.  They did.

13  Q.  And they came back the next morning at 6:15 to arrest you;

14  right?

15  A.  They did.

16  Q.  And you made arrangements not to be there?

17  A.  Did I make arrangements not to be there?

18  Q.  Yes.

19  A.  That is probably correct.

20  Q.  And they called you on your phone and you said that you

21  were in Long Island?

22  A.  That's correct.

23  Q.  But that was a lie, you were actually in New Jersey?

24  A.  No.  I was actually in Long Island.  I went to New Jersey.

25  I went from Long Island to New Jersey.

Fc16new7                         C.R. Darden - cross

1   Q.  You went to a hotel in New Jersey?

2   A.  That is where I parked my car.  I went to a friend's house

3   in New Jersey.

4   Q.  You parked your car and you left it there and you came back

5   to New York City; right?

6   A.  I parked.  My friend whose house I was at, he called the

7   lawyer friend of his.  Him and I went to that lawyer together.

8   He drove.  And that lawyer was in the city, yes.

9   Q.  When you finally were arrested, you met with Pretrial

10  Services; correct?

11  A.  I believe so.

12  Q.  And you lied to Pretrial Services and said you had no

13  criminal history; isn't that correct?

14  A.  That is not correct.

15  Q.  That is not correct?

16  A.  That is not correct.

17  Q.  You pretended that you couldn't remember your own address

18  when asked by Pretrial Services; correct?

19  A.  I would say that is incorrect.  I could not remember my

20  address?

21  Q.  Yes.

22  A.  I would say that is incorrect as well.

23  Q.  You lied about your trip to the Bahamas to Pretrial

24  Services; isn't that correct?

25  A.  I don't remember discussing the trip to the Bahamas with

Fc16new7                        C.R. Darden - cross

Pretrial Services.  You would have to give me a little bit

more.

Q.  At the time the government asked that you be detained and

that five financially responsible people have to sign for you;

correct?

        MR. ADAMS:  Objection, relevance.

        THE COURT:  Sustained.

Q.  You were first on home confinement when you were released

after your arrest?

A.  I was.

Q.  You were told that you could have no computer access; is

that correct?

A.  Yes.

Q.  And you started meeting with the government in April of

2014; correct?

A.  I am not sure of the date.

Q.  Was it about a month after you were released?

A.  Probably.

Q.  You met with them, would you agree, over 15 times?

        MR. ADAMS:  Objection.  Asked and answered twice.

        THE COURT:  Sustained.

Q.  In some of those meetings you lied to the government,

haven't you?

        MR. ADAMS:  Objection.  Asked and answered.

        THE COURT:  Sustained.

Fc16new7                              C.R. Darden - cross

1   Q.  You were told in those meetings it is a crime to lie to a

2   federal agent, weren't you?

3   A.  I did.  I was.

4   Q.  And you testified that you were the only officer of Reign;

5   correct?

6   A.  That's correct.

7   Q.  And on April 14th you told the government that you and your

8   father were officers of Reign; is that true?

9   A.  I don't know that I said my father was an officer of Reign.

10  So I cannot say that that is true.

11  Q.  You testified in this trial that the $100 million proof of

12  funds letter is something you created; correct?

13          MR. ADAMS:  Objection.  That mischaracterizes the

14  testimony.

15          THE COURT:  Sustained.

16  Q.  Did you create the $100 million proof of funds letter for

17  Merrill Lynch?

18  A.  Did I create it?  I took it from a template that was given

19  to me.  So if you are asking if I created it, I took it from

20  that template and typed it, you know, here on the computer.  So

21  in that sense, yes.  But I took it from a template that we

22  discussed last week that was given to me by Harvey.

23  Q.  And you told the government also that you literally could

24  not remember who did this letter on April 14th; right?

25  A.  I don't recall that either.  That I literally could not

Fc16new7                        C.R. Darden - cross

1   remember what exactly.

2   Q.  After you met with the government in 2014 they consented to

3   you being released from home confinement?

4   A.  After I met with them?

5   Q.  After you began meeting with the government?

6   A.  No.  I wouldn't -- did they consent?  I asked my lawyer if

7   she could -- if we can get off home confinement.  She said that

8   she would put in a motion.  She did that.  What the government

9   did after, I am not sure.  I don't know if they consented and

10  the judge said it is okay, or they didn't consent and the judge

11  said it's okay.  I don't know that.

12          MS. CHAUDHRY:  Your Honor, if you could look at

13  Defense 606 that I talked about.

14          THE COURT:  So what is it that you want in that

15  regard?  If you want me to tell the jury that on August 29th,

16  2014, upon the application of Mr. Darden's counsel but with the

17  consent of the government Mr. Darden's bail conditions were

18  modified so that his term of home confinement was removed, I

19  will so instruct the jury.

20          MS. CHAUDHRY:  Thank you.

21          THE COURT:  So instructed.

22  BY MS. CHAUDHRY:

23  Q.  Since that condition of home confinement was removed,

24  you've been free to go wherever you want in this district;

25  isn't that correct?

Fc16new7                      C.R. Darden - cross

1   A.  That's correct.

2   Q.  In fact, you've asked for permission and gotten to travel

3   to Atlanta twice also; right?

4   A.  Yes.

5   Q.  Including 4th of July for a family visit?

6   A.  Yes.

7   Q.  And a September event.

8         And you pled guilty twice in this case, didn't you?

9   A.  I believe so.

10  Q.  The first time was in November of 2014.  That is before you

11  signed your cooperation agreement?

12  A.  Correct.

13  Q.  And at that time you were pleading to two federal frauds,

14  right, the Maxim fraud and the MBA fraud?

15  A.  Yes, ma'am.

16  Q.  At that with the government you did not have a cooperation

17  agreement with them; is that correct?

18  A.  That's correct.

19  Q.  The government did give you a letter that informed you that

20  their calculation of your guidelines range is 97 to 120 months?

21         MR. ADAMS:  Objection, relevance.

22         THE COURT:  Overruled.

23  Q.  Is that correct?

24  A.  I am sorry.  Can you repeat the question?

25  Q.  Yes.

Fc16new7                         C.R. Darden - cross

1   A.  They gave me what?

2   Q.  If you could look at Defense 601.

3   A.  You can just repeat the question if you don't mind.

4   Q.  The government told you at that time in a letter that your

5   guideline range according to them is 97 to 121 months?

6   A.  That sounds correct.

7   Q.  And in January of 2015 you entered into a cooperation

8   agreement with the government; right?

9   A.  Correct.

10  Q.  Is that something that the government showed you when you

11  were here last week?

12  A.  Yes.

13  Q.  My colleague just reminded me 97 to 121 months, that is a

14  guideline range for how much prison you should get for this

15  crime; correct?

16  A.  It is a prison guideline.  That's correct.

17  Q.  So in January 2015 when you entered the cooperation

18  agreement, at that time you pled guilty again?

19  A.  Correct.

20  Q.  And at that time you pled guilty to three federal crimes?

21  A.  Yes.

22  Q.  This time the maximum sentence is 60 years?

23  A.  I believe so.

24  Q.  20 years each?

25  A.  Okay.

Fc16new7                          C.R. Darden - cross

1   Q.  And in that letter, in the cooperation letter in evidence

2   in evidence, the government does not state any guidelines

3   range, does it?

4   A.  I can't -- I don't know whether it states the guideline

5   range.  I don't know it by heart.  If you say it doesn't, I

6   believe you.  I have no idea.

7   Q.  Would you like to review it?

8   A.  No.  That is what I am saying.  If you say that it doesn't

9   have one in there, then it doesn't have one in.  I just cannot

10  say right now.

11              MR. ADAMS:  Your Honor, we can stipulate there is no

12  guidelines agreement set forth in the cooperation agreement.

13              THE COURT:  All right.

14  Q.  The government in your cooperation agreement has agreed to

15  write a letter to Judge Rakoff on your behalf when you are

16  sentenced?

17              THE COURT:  Counsel, come to the side bar.

18              (Continued on next page)

19

20

21

22

23

24

25

Fc16new7                          C.R. Darden – cross

 1                (At the side bar)

 2                THE COURT:  I thought as an experienced counsel,

 3     defense counsel knew that you should never refer to which judge

 4     is going to be the sentencing judge.

 5                MS. CHAUDHRY:  Oh, my God.  I am really sorry.

 6                THE COURT:  That is something that is forbidden.

 7                MS. CHAUDHRY:  I am sorry.

 8                THE COURT:  What is done is done.  Why don't you

 9     rephrase the question.

10                MS. CHAUDHRY:  I am sorry.

11                (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (In open court; jury present)

2            MS. CHAUDHRY:  Withdraw the question.

3   BY MS. CHAUDHRY:

4   Q.  In your cooperation agreement, the government has agreed to

5   write a letter to the sentencing judge on your behalf if you

6   provide substantial assistance; correct?

7   A.  Well, they would do that if I told the truth.  So I

8   don't -- I don't know that about substantial assistance.

9            MS. CHAUDHRY:  The government stipulates that your

10  cooperation agreement states that the letter would be written

11  by them in exchange for substantial assistance?

12           THE COURT:  Are you planning to offer it?

13           MS. CHAUDHRY:  It is in.

14           THE COURT:  It is already in evidence?

15           MS. CHAUDHRY:  Yes.

16           THE COURT:  So it speaks for itself in this regard.

17           MR. ADAMS:  Thank you.

18  BY MS. CHAUDHRY:

19  Q.  Your cooperation deal, it has a maximum sentence of 60

20  years, but there is no mandatory minimum sentence, is there?

21  A.  I am not -- I am not sure.

22           MS. CHAUDHRY:  Can we please put up the cooperation

23  agreement.

24  A.  Again, if you say that it doesn't, I mean --

25           MR. ADAMS:  There is no question pending.  Objection

Fc16new7                          C.R. Darden - cross

1    to the last statement and move to strike.

2              THE COURT:  Granted.

3              So do you want to put up the cooperation agreement?

4              MS. CHAUDHRY:  Yes.  I need the government to do it

5    for me.

6    Q.  I draw your attention to the second paragraph where the

7    last sentence says, The total maximum sentence of incarceration

8    on all counts is 60 years' imprisonment; correct?

9    A.  Correct.

10   Q.  There is no mandatory minimum sentence listed here?

11   A.  Not listed, no.

12   Q.  Is it your understanding there is a mandatory minimum

13   sentence that you are looking at?

14   A.  I don't know if there is a mandatory minimum sentence or

15   not.  You asked if it is listed.  I said it is not listed so --

16   Q.  When you pled guilty pursuant to this cooperation

17   agreement --

18             THE COURT:  Just so we don't spend too much time on

19   this and so the jury understands, first of all, there is no

20   mandatory minimums that apply in a fraud case including this

21   one.  Secondly, every federal criminal statute has a maximum

22   and a judge can sentence anyone anywhere up to the maximum.

23   But judges are given guidelines, which they don't have to

24   follow, but they are guidelines, not mandatory requirements.

25   So when you heard a reference in his first letter to -- I

Fc16new7                        C.R. Darden - cross

1   should say in the government's letter at his first plea to a

2   guideline range, that is something that a sentencing court may

3   consider but it is not bound by.  If the government in

4   connection with a cooperation agreement sends a letter to the

5   judge asking for credit for the cooperation, that takes you

6   outside the guidelines but the judge can then give whatever

7   sentence he or she wants.  It is up to the judge.

8            So let's move forward.

9   BY MS. CHAUDHRY:

10  Q.  This cooperation agreement contains the only three crimes

11  you pled guilty to in connection with this; correct?

12  A.  Yes, ma'am.

13  Q.  You agree that in committing these crimes that you were

14  impersonating your father; right?

15  A.  I do.

16  Q.  And that you pretended to be him?

17  A.  Yes.

18  Q.  You did not have to plead guilty to aggravated identity

19  theft as part of this deal, did you?

20  A.  That wasn't one of my charges, no.

21  Q.  You did not have to plead guilty to aggravated identity

22  theft of your mother, did you?

23  A.  I did not.

24  Q.  Even though you impersonated her?

25  A.  I didn't.

Fc16new7                          C.R. Darden - cross

1   Q.  You did not have to plead guilty to aggravated identity

2   theft of Shirley Franklin, did you?

3   A.  Did not.

4   Q.  You did not have to plead guilty to aggravated identity

5   theft of Mark Weinberg whom you spoofed, did you?

6   A.  Correct.

7   Q.  You did not have to plead guilty to aggravated identity

8   theft of Brent Watson on whose behalf you sent a bunch of

9   e-mails; correct?

10  A.  Correct.

11  Q.  Nor for Roderick Jones?

12  A.  Correct.

13  Q.  You didn't have to plead to aggravated identity theft for

14  John Milligan, the president of Target?

15  A.  No.

16  Q.  Or to the president of Comcast Cable?

17  A.  Correct.

18          MR. ADAMS:  Objection.  401, 403.  It is stipulated he

19  did not have to plead guilty to identity theft in this

20  document.

21          THE COURT:  I think the jury has picked up on the

22  point.

23  Q.  You admitted that you had made false statements to the

24  government while you were meeting with them but you didn't

25  plead guilty to making -- you didn't plead guilty to making

1   false statements to the government, did you?

2   A.  I did not.

3   Q.  The MBA fraud was committed while you were on parole;

4   right?

5   A.  I believe so.

6   Q.  And you did not have to plead guilty to a parole violation,

7   did you?

8   A.  No, I didn't.

9   Q.  You paid someone named Kevin Leon to make fake insurance

10  documents, didn't you?

11  A.  That was through Eric Flewellyn.

12  Q.  You didn't plead guilty to insurance fraud, did you?

13  A.  I didn't.

14  Q.  And your wife who impersonated your mother, she didn't have

15  to plead guilty to anything, did she?

16  A.  No.

17  Q.  And you did not have to plead guilty to obstruction of

18  justice for any of the lies you told the government, did you?

19  A.  I did not.

20  Q.  You did not have to plead guilty to create a tax return for

21  Reign, did you?

22  A.  No, ma'am.

23  Q.  As part of your cooperation agreement, you got a pass on

24  all this other behavior; right?

25  A.  I believe --

Fc16new7                        C.R. Darden - cross

1                MR. ADAMS:  Objection.

2                THE COURT:  As phrased sustained.

3   Q.  Isn't it the case that you have not had to plead guilty for

4   any of the other crimes you told the government you committed?

5   A.  Correct.

6   Q.  Now, Mr. Darden, you testified earlier that you consulted

7   your father on business deals because you valued his expertise;

8   correct?

9   A.  Correct.

10  Q.  Did you consult him before you entered this cooperation

11  deal with the government?

12  A.  I did not.

13  Q.  Have you seen him since your arrest?

14  A.  Yes.

15  Q.  You have been to his house at least twice?

16  A.  Yes.

17  Q.  And stayed with him?

18  A.  Yes.

19  Q.  As far as he know, does he know that you plead guilty?

20  A.  You know, my father and I never spoke about it.  My mother

21  knows.  I am sure she told my father.  My mother and I have

22  never spoken about it.

23  Q.  You discussed these pending lawsuits with him against him?

24  A.  Some.

25  Q.  Mr. Darden, the three and a half years that you spent in

Fc16new7                          C.R. Darden - cross

1   jail, you said you didn't like that; right?

2   A.  That's correct.

3   Q.  Did you spend some of that time in solitary confinement

4   also?

5   A.  I did.

6   Q.  That means you were locked up 23 hours a day?

7   A.  I was locked up what?

8   Q.  Alone 23 hours a day?

9   A.  One time I was alone.  The other times, no.

10  Q.  And right now as this plea agreement states for the three

11  frauds that you have pled guilty to, you are looking up to 60

12  years; correct?

13  A.  Yes, ma'am.

14  Q.  As you sit here right now, you are not in jail, are you?

15  A.  No.  I am not in jail right now.

16  Q.  You've been out of custody since March of 2014?

17  A.  That's correct.

18  Q.  Even though you pled guilty twice on November 2014 and

19  January 2015; right?

20  A.  Yes.  I am out on bail.

21  Q.  Right now you are free to go wherever you want within this

22  district; right?

23          MR. ADAMS:  Objection.  Asked and answered.

24          THE COURT:  Sustained.

25  Q.  You can see whomever you want right now; correct?

1   A.  Yes.  I would say yes.

2   Q.  You can sleep in your own bed; right?

3   A.  I can.

4   Q.  With the government's agreement you can go to Atlanta;

5   right?

6   A.  Yes.

7   Q.  And you don't want to go back to jail, do you?

8   A.  Do not.

9   Q.  You're hoping that at the time you are sentenced that you

10  do not get jail time; right?

11  A.  Of course.

12  Q.  And it is the government who is going to write that letter

13  at the time of your sentencing, isn't it?

14  A.  With conditions.  So maybe, maybe not.  That is for them to

15  decide.

16  Q.  One of the things the government has asked you to do is

17  testify in this case against Mr. Newkirk?

18  A.  Correct.

19          THE COURT:  Very good.

20          Redirect.

21          MR. ADAMS:  Your Honor, may I approach?

22          THE COURT:  Yes.

23  REDIRECT EXAMINATION

24  BY MS. CHAUDHRY:

25  Q.  Mr. Darden, do you recall on cross-examination earlier

1    today you were asked some questions about a letter that was

2    drafted to an entity called Starbright Media?

3    A.  Yes.

4    Q.  I have handed you what I marked as Government Exhibit 2004.

5         Do you recognize that document?

6    A.  I do.

7    Q.  What is it?

8    A.  It's an e-mail from Harvey to me.

9    Q.  What is the date?

10   A.  June 15th, 2013.

11   Q.  And do you recognize 2005?

12   A.  I am sorry.  Do I recognize what?

13   Q.  Government Exhibit 2005 also in your hand?

14   A.  Yes.

15   Q.  What is that?

16   A.  Again, an e-mail from Harvey Newkirk to me.

17   Q.  What, if anything, appeared to be attached to 2005?

18   A.  The Starbright Media agreement -- marked up agreement.

19         MR. ADAMS:  Your Honor, the government offers Exhibit

20   2004 and 2005.

21         MS. CHAUDHRY:  No objection.

22         THE COURT:  Received.

23         (Government's Exhibits 2004 and 2005 received in

24   evidence)

25   BY MR. ADAMS:

1    Q.  Mr. Darden, I apologize but I don't have this prepared to

2    put up on the screen.  But if you wouldn't mind -- well, we do

3    have it.

4           Would you please read the top e-mail here from

5    Mr. Newkirk to you?

6    A.  It says, Needs to be revised why Starbright named as

7    possible acquirer.  In the prior document did we use Reign or

8    Darden Media Group?  I can't remember.  Harvey K. Newkirk.

9    Q.  Did there come a type that the Starbright Media letter was

10   revised by Mr. Newkirk?

11   A.  That's correct.

12   Q.  Is that what is attached to Exhibit 2005?

13   A.  Yes.

14   Q.  Were you shown that on cross-examination?

15   A.  I was not.

16   Q.  Will you please turn to the exhibit or the attachment to

17   2005.  Can we please turn to the signature block.  Can you

18   please describe how, if at all, these signature blocks for your

19   father's signature has been altered by Mr. Newkirk?

20   A.  It was taken out, crossed out and replaced with The Reign

21   Entertainment Group, LLC.

22   Q.  What is the name that appears there as the new managing

23   member for Reign, LLC?

24   A.  Calvin R. Darden Senior.

25   Q.  Is there such a person as Calvin R. Darden Senior?

Fc16new7                        C.R. Darden - redirect

1   A.  There is not.

2   Q.  In the course of the Maxim deal, did you ever discuss the

3   use of the name Calvin R. Darden Senior with Mr. Newkirk?

4   A.  I did.

5   Q.  Can you describe that conversation for us?

6   A.  Again, it was discussed because that person doesn't exist

7   it would potentially provide cover to my father and just make

8   it ambiguous.

9   Q.  When you say provide cover for your father, in what event

10  were you anticipating that your father would need covered?

11  A.  So in the event that somebody said, Hey -- in an event like

12  this really where somebody just would be able to say -- I would

13  be able to say, Listen, I signed that or that was me.  So that

14  is how I provided the cover.

15          MR. ADAMS:  Your Honor, may I approach?

16  Q.  Mr. Darden, I've handed you what has been marked for

17  identification as Government Exhibit 2007.

18          Do you recognize that document?

19  A.  I do.

20  Q.  What is it?

21  A.  It's an e-mail from Harvey to me.

22  Q.  What is the date?

23  A.  October 10th, 2013.

24          MR. ADAMS:  Your Honor, the government offers

25  Government Exhibit 2007.

Fc16new7                    C.R. Darden - redirect

1              MS. CHAUDHRY:  No objection.

2              THE COURT:  Received.

3              (Government's Exhibit 2007 received in evidence)

4    BY MR. ADAMS:

5    Q.  Mr. Darden, do you recall earlier on cross-examination you

6    were asked some questions by Ms. Chaudhry regarding the

7    Roderick Jones e-mails that appear at the bottom of this

8    exhibit that you then forwarded on to Mr. Newkirk?

9    A.  I did.  I do.

10   Q.  Were you shown this exhibit on cross-examination?

11   A.  I was not.

12   Q.  The reference that Mr. Newkirk makes to having a

13   discussion, what was it that he was looking forward to

14   discussing with you?

15             MS. CHAUDHRY:  Objection, speculation.

16             THE COURT:  Sustained.

17   Q.  Mr. Darden, the reference below to "my father's bank

18   statement from B of A," is that the same Bank of America

19   statement that we've been discussing throughout this trial?

20   A.  It is.

21             MR. ADAMS:  Your Honor, may I approach?

22             THE COURT:  Yes.

23             What you just gave me was the same exhibit.

24             MR. ADAMS:  I apologize.  2006.

25             THE COURT:  Go ahead.

1    Q.  Mr. Darden, do you recall being asked some questions on

2    cross-examination regarding the fake personal financial

3    statement?

4    A.  Yes.

5    Q.  That you used in the course of the Maxim deal?

6    A.  Yes.

7    Q.  Do you recall being asked some questions about who actually

8    put in information into the personal financial statement?

9    A.  Yes.

10   Q.  Do you recognize what has been marked as Government

11   Exhibit 2006?

12   A.  I do.

13   Q.  What is it?

14   A.  It's an e-mail from -- at the top it is an e-mail from

15   Harvey to me and a couple more people CC'd on it.

16          MR. ADAMS:  Your Honor, the government offers Exhibit

17   2006.

18          MS. CHAUDHRY:  No objection.

19          THE COURT:  Received.

20          (Government's Exhibit 2006 received in evidence)

21   BY MR. ADAMS:

22   Q.  Mr. Darden, the reference in the third e-mail from the top,

23   the e-mail from Mr. Newkirk to your G-Mail account and some

24   other people reads, Does the PFS from the fourth service

25   request full PFS.

Fc16new7                          C.R. Darden - redirect

1          Does the reference PFS from before a reference to a

2    personal financial statement of your father?

3    A.  It is.

4    Q.  What is it in the top e-mail that Mr. Newkirk is asking of

5    you?

6          MS. CHAUDHRY:  Objection.  Speculation, the document

7    speaks for itself.

8          THE COURT:  Which line are you talking about now?

9          MR. ADAMS:  I am asking if he had an understanding of

10   what was being required or requested on the question from

11   Mr. Newkirk.

12         THE COURT:  I understand that is your question, but

13   which line are you referring to specifically?

14         MR. ADAMS:  Sorry.  Other than the brokerage report is

15   how is starts.

16         THE COURT:  Do you have a sense of which areas he

17   needs more detail on.

18         Sustained.

19   Q.  Mr. Darden, were you shown this exhibit on

20   cross-examination?

21   A.  I was not.

22   Q.  Mr. Darden, you were asked a number of questions about

23   prior crimes, prior frauds that you committed.  With respect to

24   the MBA fraud, for example, did you discuss that with the

25   government?

Fc16new7                          C.R. Darden - redirect

1   A.  I have.

2   Q.  Have you previously told the government about various fake

3   documents that Ms. Chaudhry asked you about on

4   cross-examination?

5   A.  I have.

6   Q.  Have you talked with the government about the Live Nation

7   Comedy tour that we heard about on cross?

8   A.  I have.

9   Q.  Did you close the Live Nation Comedy tour deal?

10  A.  I did not.

11  Q.  Did you close any of the MBA deals?

12  A.  No.

13  Q.  Did you tell the government about those frauds before or

14  after your cooperation agreement?

15  A.  Before.

16  Q.  Since entering into a cooperation agreement with the

17  government, have you lied to the government?

18  A.  I have not.

19  Q.  You talked about lying to the government in the first

20  meeting that you had back in 2014.

21  A.  Correct.

22  Q.  Why did you lie in that first meeting?

23  A.  You know, honesty, man, I think -- I think I was

24  delusional.  Got caught up in my own lies.  Really just kind of

25  minimizing.  It is hard to say.  That's basically it

Fc16new7                          C.R. Darden - redirect

1   unfortunately.

2   Q.  Did you correct the lies in subsequent meetings?

3   A.  I did.

4   Q.  Did you after that meeting meet with the government on

5   multiple occasions?

6   A.  I did.

7   Q.  Did you meet with the government on multiple occasions

8   before ever getting a cooperation agreement?

9   A.  I did.

10  Q.  In speaking of your cooperation, what are you required to

11  do under that agreement?

12  A.  Tell the truth.

13  Q.  And it is your hope to receive what is called a 5K1 letter;

14  right?

15  A.  That's correct.

16  Q.  And what is your understanding about the information that

17  the government provides to the sentencing judge in connection

18  with that 5K1 letter?

19  A.  My understanding is that it provides, you know, good

20  information as well as the bad.  So I guess my extended

21  cooperation as well as past misdeeds.

22  Q.  When you say "past misdeeds," is it your expectation that

23  the government will leave out information about fake documents

24  that you were cross-examined on?

25  A.  No.

Fc16new7                          C.R. Darden - redirect

1   Q.  Is it your expectation that the government is going to

2   leave out the MBA --

3            MS. CHAUDHRY:  Objection, leading.

4            THE COURT:  Well, I think it has to be in this form

5   because these are questions designed to obtain a negative.  So

6   overruled.

7   A.  I am sorry.  Can you repeat the question?

8   Q.  Is it your expectation that the government will leave out

9   information about the MBA?

10  A.  Not my expect.

11  Q.  Is it your expectation that the government will leave out

12  information about the Live Nation Comedy?

13  A.  No, sir.

14  Q.  Is it your expectation that the government will leave out

15  information about any of the fraudulent documents that you've

16  reviewed with Ms. Chaudhry today?

17  A.  No, sir.

18  Q.  Are there any promises in your cooperation agreement

19  whatsoever regarding your wife?

20  A.  There are not.

21  Q.  Are there any promises in your cooperation agreement

22  regarding the government's treatment of any one else?

23  A.  No, sir.

24  Q.  What happens to your cooperation agreement if you lie on

25  the stand today?

Fc16new7                               C.R. Darden - redirect

1   A.  It gets ripped up.

2   Q.  What effect, if any, does Harvey Newkirk's conviction or

3   acquittal have on your cooperation agreement?

4              MS. CHAUDHRY:  Objection.

5   A.  None.

6              THE COURT:  Ground?

7              MS. CHAUDHRY:  The document speaks for itself.  He is

8   referring to the cooperation agreement.

9              THE COURT:  No.  I think he is asking for his

10  understanding, and with that the objection is overruled.

11  A.  No.

12  Q.  Do you get any added benefit if Harvey Newkirk is

13  convicted?

14             MS. CHAUDHRY:  Objection.

15             THE COURT:  What is your understanding in that regard?

16             THE WITNESS:  Are you asking me?

17             THE COURT:  Yes.  I could ask the man on the moon, but

18  I thought I would ask you.

19             THE WITNESS:  Whether he is convicted or not has no

20  affect on my agreement or sentencing for that matter.

21  Q.  Who ultimately gets to determine your sentence, the

22  government or a sentencing judge?

23  A.  The sentencing judge.

24  Q.  Mr. Darden, when did you first meet Mr. Newkirk?

25  A.  Probably end of 2008, beginning of 2009.

1  Q.  Was that shortly after you were released from prison?

2  A.  It was.

3  Q.  At the time that you met Mr. Newkirk, did you discuss your

4  recent prison stint?

5  A.  I did.

6          MS. CHAUDHRY:  Objection.  Outside the scope.

7          THE COURT:  Overruled.

8  Q.  What did you tell Mr. Newkirk at the time about your prior

9  conviction?

10          MS. CHAUDHRY:  Objection.  Asked and answered in his

11  first direct.

12          THE COURT:  Overruled.

13  A.  I told him, you know, what I went to jail for, how long I

14  did, that I just came home basically.

15  Q.  What, if anything, did you describe about the circumstances

16  of the investment fraud conviction Ms. Chaudhry asked you

17  about?

18  A.  Repeat that question.

19  Q.  What, if anything, did you describe to Mr. Newkirk at the

20  time that you were first meeting him about the circumstances of

21  your investment fraud conviction?

22  A.  The circumstances of the investment fraud conviction.  I am

23  not real -- I am not really sure.  I am not sure.  What the

24  circumstances -- I don't know that I really understand the

25  question.

1    Q.   Sure.

2    A.   The circumstances under which I was locked up?

3    Q.   Did you tell him the crimes you had been convicted for?

4    A.   I did.

5    Q.   Now, Ms. Chaudhry showed you a number of e-mails in which

6    you impersonated your mother.

7         Do you recall those e-mails?

8    A.   I do.

9         MR. ADAMS:   Please pull up Defense Exhibit 421,

10   please.

11   Q.   Do you have that in front of you, sir?

12   A.   I do.

13   Q.   You sent this e-mail to Harvey Newkirk; correct?

14   A.   I did.

15   Q.   And you sent it from an e-mail account that impersonated

16   your mother?

17   A.   Correct.

18   Q.   Was it your intention to fool Mr. Newkirk with this e-mail?

19   A.   It wasn't.

20   Q.   What did you intend Mr. Newkirk to do with this e-mail?

21   A.   That was going to be sent to the McMahons.  So this came

22   from a request that the McMahon lawyers had made through Harvey

23   to Harvey and then Harvey related to me.  So it was going to --

24   this was going to them through Harvey.

25        MR. ADAMS:   And if you zoom in on the bottom of the

Fc16new7                          C.R. Darden - redirect

1    e-mail here, John, good afternoon.

2    Q.  This is an e-mail you wrote?

3    A.  It is.

4    Q.  Do you see the reference in the third line where you say, I

5    have statements from Bank of America?

6    A.  That's correct.

7    Q.  And as well as Fidelity; is that right?

8    A.  Yes.

9    Q.  What Bank of America statement is this a reference to?

10   A.  The same --

11          MS. CHAUDHRY:  Objection.  He just testified this is a

12   fake e-mail.  It's a lie.

13          THE COURT:  Overruled.

14   A.  The same Bank of America statements that we talked about.

15   Q.  What is the date on that e-mail?

16   A.  December 20th, 2013.

17   Q.  Is that before or after Mark Weinberg had alerted

18   Mr. Newkirk to these fake statements?

19   A.  After.

20          MS. CHAUDHRY:  Objection.

21          THE COURT:  Ground.

22          MS. CHAUDHRY:  Calls for speculation of when Mr.

23   Weinberg and Mr. --

24          THE COURT:  Sustained.

25   Q.  Mr. Darden, did you and Mr. Newkirk previously before this

1   e-mail discuss whether or not Mr. Weinberg had noticed that the

2   Bank of America statements were fake?

3   A.  We did.

4   Q.  Approximately when was that?

5   A.  Maybe a couple months before this.

6   Q.  And was this e-mail that you sent to Mr. Newkirk

7   referencing the Bank of America statement, was that before or

8   after you and Mr. Newkirk had discussed what David Leveall whom

9   we discussed on direct had learned about the fakeness of these

10  Bank of America statements?

11  A.  After.

12  Q.  At the time that you sent this e-mail, had you already had

13  conversations with Mr. Newkirk regarding the account number for

14  the Bank of America statements?

15  A.  We had.

16  Q.  Had you already had conversations with Mr. Newkirk

17  regarding the almost entire overlap between the October and

18  September bank statements?

19  A.  Yes.

20          THE COURT:  I am sorry, counsel.  Come to the side

21  bar, please.

22          (Continued on next page)

23

24

25

Fc16new7                          C.R. Darden - redirect

1              (At the side bar)

2              THE COURT:  I want to let the jury go for the day.

3     Just so I can give them a heads up as to our schedule, roughly

4     how much more redirect do you have?

5              MR. ADAMS:  Half an hour.

6              THE COURT:  Let's figure there may be some recross and

7     redirect.  I don't expect that to be more than an hour and a

8     half.  Sorry, a half hour.  So an hour and a half altogether

9     for the redirect and recross.

10             Then you have some other witnesses?

11             MR. ADAMS:  We do.

12             THE COURT:  Roughly how long do you think that will

13    take?

14             MR. ADAMS:  So we'll have everyone available tomorrow.

15    We're hopeful that we can finish tomorrow.

16             THE COURT:  I think we're going to finish tomorrow.  I

17    wanted to know whether we'll get beyond that or not.  Do you

18    think that will take both the rest of the morning assuming

19    contrary to practice that we start at 9:00 and the whole

20    afternoon, too?

21             MR. ADAMS:  Potentially the whole afternoon.

22             MS. PAUL:  Because we do have five additional

23    witnesses.  None of them are more than an hour on direct.

24             THE COURT:  What I think I will tell the jury is the

25    government's case will conclude tomorrow.

Fc16new7                              C.R. Darden - redirect

1          MS. CHAUDHRY:  Sorry.  We have out-of-town witnesses

2     that we were hoping to call out of order because they are

3     planning to fly in for tomorrow afternoon.

4          THE COURT:  I cannot do that.  I cannot do that.  We

5     need to finish the government's case.  We need to have any

6     motions you want to make.  We need to have the charging

7     conference.

8          MR. HARRIS:  Okay.

9          THE COURT:  We'll take them on Thursday.  We'll need

10    to know from you by close of business tomorrow whether the

11    defendant is taking the stand.  This will not be a binding

12    commitment.  The government's case will be over and it is not

13    fair for the government for them not to know the night before

14    that he takes the stand.  Consider that overnight.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

Fc16new7                        C.R. Darden - redirect

1          (In open court; jury present)

2          THE COURT:  Ladies and gentlemen, here is the

3    schedule:  We expect the government's case will end tomorrow.

4    After it ends, I have to take up all sorts of boring legal

5    stuff with the lawyers, which you are fortunately spared.  That

6    will probably take whatever time is left tomorrow.  On Thursday

7    the defendant is never required to call any witnesses, but they

8    may call witnesses.  They will decide.  If there are defense

9    witnesses, we'll start them on Thursday.  If there are not

10   defense witnesses or if they don't take the whole day, then

11   we'll start closing arguments on Thursday.  So I think the

12   likelihood is we'll sit a half day on Friday just from 9:00 to

13   12:00 and it will be that is the close of all the evidence.  I

14   cannot guarantee that.  You know the schedule for the next few

15   days.  If we do go over to next week, and I am still modestly

16   hopeful that will not happen, it may happen, it will be because

17   I am -- and your deliberations will take whatever time you want

18   them to take, but we'll not sit on Monday.  The schedule will

19   be in your hands not mine starting Tuesday.

20          So very good.  So we'll see you tomorrow.  I know it

21   is unfair for me to ask you to be here once again at 9:00.  I

22   have no standing to make that request, but I am going to make

23   is anyway because you have a record that you have to fulfill.

24   See you tomorrow at 9:00.

25          (Jury excused)

Fc16new7                           C.R. Darden - redirect

1              (In open court; jury not present)

2              THE COURT:  Mr. Darden, you may step down and we'll

3    see you at 9:00 tomorrow.

4              THE WITNESS:  Thank you.

5              (Witness excused)

6              THE COURT:  Please be seated.

7              I will mention one quick thing given the side bar.  If

8    the government's case finishes before the afternoon is over

9    tomorrow and the defense wants to put on its out-of-town

10   witnesses rather than have them go over to Thursday and we

11   still have time before 5:00, I am perfectly happy to take up

12   the motion practice later so to speak rather than do it as we

13   normally do it right at the close of the government's case.  I

14   would offer that as a little bit of an option to the defense.

15   I don't know where we'll be.

16             Very good.  We'll see you tomorrow.

17             (Adjourned to December 2, 2015 at 9:00 a.m.)

18

19

20

21

22

23

24

25

```
 1                      INDEX OF EXAMINATION
 2   Examination of:                        Page
 3   CALVIN R. DARDIN
 4   Cross By Ms. Chaudhry . . . . . . . . . . . 992
 5   Redirect By Ms. Chaudhry . . . . . . . . . .1213
 6                    GOVERNMENT EXHIBITS
 7   Exhibit No.                        Received
 8    2004 and 2005  . . . . . . . . . . . . . .1214
 9    2007    . . . . . . . . . . . . . . . . . .1217
10    2006    . . . . . . . . . . . . . . . . . .1218
11                    DEFENDANT EXHIBITS
12   Exhibit No.                        Received
13    241   . . . . . . . . . . . . . . . . . . .1013
14    468   . . . . . . . . . . . . . . . . . . .1023
15    566   . . . . . . . . . . . . . . . . . . .1027
16    563   . . . . . . . . . . . . . . . . . . .1030
17    562   . . . . . . . . . . . . . . . . . . .1031
18    519   . . . . . . . . . . . . . . . . . . .1036
19    520   . . . . . . . . . . . . . . . . . . .1041
20    493   . . . . . . . . . . . . . . . . . . .1064
21    568   . . . . . . . . . . . . . . . . . . .1086
22    506   . . . . . . . . . . . . . . . . . . .1098
23    380   . . . . . . . . . . . . . . . . . . .1111
24    381   . . . . . . . . . . . . . . . . . . .1113
25    575   . . . . . . . . . . . . . . . . . . .1124
```

 1   543          . . . . . . . . . . . . . . . . . .1130

 2   544          . . . . . . . . . . . . . . . . .1130

 3   577          . . . . . . . . . . . . . . . . .1134

 4   398          . . . . . . . . . . . . . . . . .1139

 5   401          . . . . . . . . . . . . . . . . .1141

 6   473          . . . . . . . . . . . . . . . . .1143

 7   579          . . . . . . . . . . . . . . . . .1145

 8   442          . . . . . . . . . . . . . . . . .1147

 9   505          . . . . . . . . . . . . . . . . .1149

10   479          . . . . . . . . . . . . . . . . .1151

11   480          . . . . . . . . . . . . . . . . .1152

12   481          . . . . . . . . . . . . . . . . .1153

13   484, 484     . . . . . . . . . . . . . . . . .1162

14   709, 710     . . . . . . . . . . . . . . . . .1171

15   704          . . . . . . . . . . . . . . . . .1177

16   705          . . . . . . . . . . . . . . . . .1179

17   706          . . . . . . . . . . . . . . . . .1181

18   707          . . . . . . . . . . . . . . . . .1182

19   711          . . . . . . . . . . . . . . . . .1183

20   712          . . . . . . . . . . . . . . . . .1192

21   714          . . . . . . . . . . . . . . . . .1193

22   714          . . . . . . . . . . . . . . . . .1194

23

24

25