FC2VNEW1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                         14 CR 534(JSR)

HARVEY NEWKIRK,

            Defendant.         JURY TRIAL

------------------------------x

                                   New York, N.Y.
                                   December 2, 2015
                                   9:25 a.m.

Before:

                   HON. JED S. RAKOFF,

                                   District Judge


                        APPEARANCES
PREET BHARARA
     United States Attorney for the
     Southern District of New York
ANDREW C. ADAMS
SARAH E. PAUL
     Assistant United States Attorneys

HARRIS, O'BRIEN, ST. LAURENT & CHAUDHRY, LLP
     Attorneys for Defendant Newkirk
JONATHAN A. HARRIS
PRIYA CHAUDHRY
JARED FOLEY

Also present:  Stephan Francois, paralegal
                  Chloe Marmet, paralegal
                  Paul Deal, Secret Service
                  James Hilliard, FBI

FC2VNEW1                                C. R. Darden - cross

 1                    (Trial resumed)

 2                    (Jury not present)

 3                    THE COURT:  Good morning.

 4                    Let's bring in the jury.

 5                    (Jury present)

 6                    THE COURT:  Good morning, ladies and gentlemen.

 7               You are really good about being prompt.  Even I did a

 8     little bit better today.

 9                    So we are ready to continue.

10                    MR. ADAMS:  Thank you, your Honor.

11      CALVIN R. DARDEN JR.,

12          called as a witness by the Government,

13          having been previously duly sworn, testified as follows:

14     REDIRECT EXAMINATION

15     BY MR. ADAMS:

16     Q.  Good morning, Mr. Darden.

17     A.  Good morning.

18     Q.  Do you recall yesterday Ms. Chaudhry asked you about your

19     impersonation of your father in various situations?

20     A.  Yes.

21     Q.  Did you impersonate your father on telephone calls to Mark

22     Weinberg?

23     A.  I did.

24     Q.  You were asked a number of questions regarding the spoofed

25     email that was purportedly for Mr. Weinberg.

1         Do you recall those questions?

2   A.  I do.

3   Q.  At the time that you sent the spoofed Weinberg email, did

4   you have Mr. Weinberg's approval to rescind his funds?

5   A.  Certainly not.

6   Q.  Had you told Mr. Newkirk that you had any such approval?

7   A.  I did not.

8         MR. ADAMS:  Your Honor, may I approach?

9         THE COURT:  Yes.

10  Q.  I'm handing you what's been marked for identification as

11  Government Exhibit 162.

12        Do you recognize that document?

13  A.  I do.

14  Q.  What is it?

15  A.  It's an email from Harvey Newkirk to Larry Dietch and I'm

16  cc'd on it.

17        MR. ADAMS:  Your Honor, the government offers 162.

18        MS. CHAUDHRY:  Sorry.  Just pulling it up.

19        No objection.

20        THE COURT:  Received.

21        (Government's Exhibit 162 received in evidence)

22  Q.  Mr. Darden, what's the date on that email?

23  A.  It is November 11, 2013.

24  Q.  Approximately how long before the spoofed email that you

25  created was this email sent?

FC2VNEW1                        C. R. Darden - cross

1   A.  I'm not sure.  I'm not sure.  I'm sorry.

2   Q.  As of November 11th, 2013, how well were your negotiations

3   with Comvest actually progressing?

4   A.  They weren't.

5   Q.  What did you tell Mr. Newkirk before sending him the

6   spoofed email?

7           MS. CHAUDHRY:  Objection.

8           Asked and answered in direct.

9           THE COURT:  No, I'll allow it.  Overruled.

10  A.  Repeat the question please.

11  Q.  What did you tell Mr. Newkirk before you sent him the

12  spoofed email?

13  A.  I just told him that he was going to receive an email and

14  not to reply to it for as long as possible.

15  Q.  And why did you want him not to reply to it for as long as

16  possible?

17  A.  Because Mark Weinberg was going to see the email and would

18  reply to it.  So I just, you know, needed time for it to get to

19  the other escrow account to buy time with the sellers.

20  Q.  Did you speak with Mr. Newkirk again after you had sent him

21  the spoofed Weinberg email?

22  A.  I did.

23  Q.  Had he, in fact, delayed his reply?

24  A.  He had.

25  Q.  And I believe you testified earlier about the meeting with

FC2VNEW1                          C. R. Darden - cross

1  Mr. Newkirk in your truck the day after the spoofed email?

2  A.   That's correct.

3           MS. CHAUDHRY:  Objection.

4           Outside the scope.

5           THE COURT:  Overruled.

6  Q.   What did you and Mr. Newkirk discuss in your truck the day

7  after --

8           MS. CHAUDHRY:  Objection.

9           Asked and answered in direct.

10          THE COURT:  Overruled.

11  Q.   What did you and Mr. Newkirk discuss in your truck the day

12  after the Mark Weinberg spoofed email?

13  A.   What the people at his firm were saying about the

14  situation, what type of -- if the authorities had been -- if

15  Mr. Weinberg had alerted the authorities.  We talked about, I

16  believe, the escrow -- the Bodman escrow was in Michigan.  And

17  we talked about the funds being in that escrow account; if

18  there's a dispute, it would have to stay in that -- stay in

19  that account.

20          That was -- you know, that was generally -- generally

21  it.

22  Q.   What, if anything, did Mr. Newkirk tell you about

23  continuing to try to close the deal at that point?

24  A.   That that would be the only way to kind of solve the

25  problem is that we would have to get it closed.

FC2VNEW1                        C. R. Darden – cross

1   Q.  And what, if anything, did Mr. Newkirk tell you about how

2   closing the deal would solve your problem?

3   A.   In that, you know, he gets his money back; no harm, no foul

4   essentially.

5   Q.  You testified yesterday about a number of documents and

6   incidents where you used the fake initial "R" for your father's

7   name, Calvin R. Darden Senior.

8   A.   Yes.

9   Q.  You had testified about using that to create some sense of

10  ambiguity.

11  A.   That's correct.

12  Q.  Did you and Mr. Newkirk discuss the use of that false

13  initial "R" even prior to the Maxim deal?

14  A.   We had.

15  Q.  Can you describe your discussions regarding that use of the

16  false initial even before the Maxim deal.

17  A.   So the first discussion -- that was actually something that

18  I brought up.  And I just told him that my father did not have

19  a middle initial, so a Calvin R. Darden Senior didn't exist.

20  Q.  You said you brought it up prior to the Maxim deal.  Who

21  raised the issue of using that false initial in the course of

22  the Maxim deal?

23  A.   Harvey.

24  Q.  Can you describe the circumstances under which he raised

25  the issue of using that fake name prior in the Maxim deal.

FC2VNEW1                        C. R. Darden - cross

1   A.  Sure.

2            So it was, you know, in regards to putting along the

3   document, he just reminded me of the conversation that we had

4   previously had and said that it would -- it would cause

5   ambiguity and provide a cover.

6   Q.  Ms. Chaudhry asked you yesterday a number of questions

7   about the various versions of that Merrill Lynch proof of funds

8   letter.

9            Do you recall those?

10  A.  I do.

11           MR. ADAMS:  Could we please publish what's already in

12  evidence as Government Exhibit 630 and just go to the very last

13  page please.

14  Q.  Mr. Darden, is this one of those fake Merrill Lynch

15  letters?

16  A.  It is.

17  Q.  Did Roderick Jones ever know about your use of this letter?

18  A.  Certainly not.

19  Q.  Who actually signed the name "Roderick A. Jones"?

20  A.  I did.

21  Q.  What, if anything, did Mr. Newkirk tell you about why the

22  letter needed to be addressed to him as opposed to anyone else?

23           MS. CHAUDHRY:  Objection.

24           Asked and answered in direct; not covered in cross.

25           THE COURT:  No, I think this is broadly within the

FC2VNEW1                           C. R. Darden – cross

1   scope.

2          I define scope, just for guidance of counsel, quite

3   broadly.  And, of course, you will have full opportunity on

4   recross if you want to get into an area that you think wasn't

5   adequately covered on cross.

6          MS. CHAUDHRY:  Thank you.

7   A.  That there would be less liability; that if we had made it

8   to whomever it was intended for, they could -- in the event

9   that the deal didn't get closed, they could turn around and sue

10  based on that letter.  But it would be less liability because

11  it was made out to him and he wasn't going to turn around and

12  sue us.  So it was less liability.

13  Q.  Do you recall Ms. Chaudhry asking you some questions about

14  an Atlanta area area code phone number that you used to

15  impersonate your father?

16  A.  I do.

17         MR. ADAMS:  Can we please publish what's in evidence

18  as Defense Exhibit 566 and go to page 3.  I'm sorry, it's going

19  to be a few more pages in.  Page 3 of the actual attachment.

20  One more.  There we go.

21  Q.  Mr. Darden, do you recall discussing this working group

22  list yesterday?

23  A.  I do.

24  Q.  On the contact name for Calvin Darden Senior, is that your

25  father's address?

FC2VNEW1                    C. R. Darden - cross

1    A.  It is not.

2    Q.  What is that address?

3    A.  That is -- the 375 Park Avenue?

4    Q.  Yes, sir.

5    A.  That was a virtual office here in Manhattan that I set up.

6    Q.  The mobile telephone number ending 5686, whose telephone

7    number is that?

8    A.  Mine.

9    Q.  How long have you been using that phone number at the time

10   that this working group list came out?

11   A.  Since 2008.

12   Q.  Have you spoken with Mr. Newkirk using that telephone

13   number over the course of your relationship?

14   A.  I have.

15   Q.  For how long approximately had you used that phone number

16   to speak to Mr. Newkirk?

17   A.  Since we met.

18   Q.  Would you impersonate your father on that phone number when

19   you'd speak to Mr. Newkirk?

20   A.  I would not.

21   Q.  The email address here, cdarden@thereigninc.com, how long

22   have you been using that to communicate with Mr. Newkirk?

23   A.  Since 2008.

24        MR. ADAMS:  Can we please publish what's in evidence

25   by stipulation as Government Exhibit 110.

FC2VNEW1                          C. R. Darden - cross

1            Can we please blow up the information.

2    Q.  Mr. Darden, do you have that on your screen there?

3    A.  I do.

4    Q.  Can you please read what is provided in the line that

5    begins "F in" in the middle.

6    A.  It says Cal Darden Junior.

7    Q.  What is the email address directly below that?

8    A.  Cdarden@thereigninc.com.

9            MR. ADAMS:  Your Honor, may I approach?

10           THE COURT:  Yes.

11   Q.  I'm handing you what is already in evidence as Government

12   Exhibit 702.

13           Mr. Darden, what's the date on that email?

14   A.  October 3rd -- October 3rd, 2011.

15   Q.  And what is this email?

16   A.  This is -- this was another deal that Harvey and I were

17   looking at.  And it's in -- you know, it's an email from me to

18   the gentlemen in the group giving -- providing everyone's

19   contact.

20   Q.  And what is the contact info that you provide for yourself?

21   A.  347-850-5685.

22   Q.  Is that phone number right?

23   A.  No, that was a typo.  My number is actually 5686.

24           MR. ADAMS:  Can we please publish what's in evidence

25   as Defense Exhibit 505.

FC2VNEW1                        C. R. Darden - cross

1  Q.  Mr. Darden, do you recall discussing this with Ms. Chaudhry

2  yesterday?

3  A.  I do.

4  Q.  When you provided the phone number, this Atlanta area code

5  ending in 4067, were you intending to fool Harvey Newkirk with

6  this email?

7  A.  I was not.

8  Q.  Who were you intending to fool?

9  A.  Barbara Laurence.

10 Q.  Did you ever speak with Mr. Newkirk on the 4067 number with

11 the intent of duping him into believing it was your father's

12 phone.

13 A.  I have not.

14        MR. ADAMS:  Can we please publish what's in evidence

15 as Defense Exhibit 562 and 563.

16        We can put those side-by-side please.

17 Q.  Mr. Darden, do you recall reviewing those documents

18 yesterday?

19 A.  I do.

20        MR. ADAMS:  Can we please now publish what's in

21 evidence as Government Exhibit 168 and 169.

22 Q.  Are those emails the same as the defense exhibits that

23 Ms. Chaudhry walked you through?

24 A.  I believe so.

25 Q.  Have you already been shown those documents on direct

FC2VNEW1                          C. R. Darden - cross

1    examination the week before?

2    A.  I have.  I was.

3              MR. ADAMS:  Can we please go to what's in evidence as

4    Defense Exhibit 519, page 2.

5    Q.  Do you recall discussing these employment letters yesterday

6    on cross?

7    A.  I do.

8    Q.  Who was going to be the Maxim management team in the

9    transition between Alpha Media and Darden Media if Darden Media

10   had actually purchased Maxim?

11   A.  The current -- the then-current team at that point.

12   Q.  What was the purpose of entering into new employment

13   agreements with the then-current team?

14   A.  Because we didn't really -- we didn't know anything about

15   running the assets.  We were going to have to keep them on for

16   a very limited time until we could replace them with -- with,

17   you know, new people.

18   Q.  And in the course of your discussions about new management,

19   was it any secret that you were looking at other people to come

20   in and manage *Maxim Magazine*?

21   A.  No, not at all.

22   Q.  You were asked at length on cross about who some of your

23   clients were or who you had represented your clients to be at

24   Merrill Lynch and AIC.  Do you remember that?

25   A.  I do.

FC2VNEW1                          C. R. Darden – cross

1   Q.  To your knowledge, was your father ever a client of Harvey

2   Newkirk's?

3   A.  He was not.

4           MR. ADAMS:  Your Honor, could I ask for just a brief

5   sidebar before I show the next exhibit?

6           THE COURT:  All right.

7           (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FC2VNEW1                         C. R. Darden – cross

1            (At the side bar)

2            MR. ADAMS:  Thank you.

3            The next exhibit I want to show is 701.  It's in

4    evidence through stipulation.  Ms. Chaudhry talked about it

5    yesterday.

6            Ms. Chaudhry did not publish the first page of it

7    yesterday and I intend to do that today.  At this point I don't

8    think there is any need to redact any of this.  It does

9    reference the boxing deal, but I'm not about to ask anything

10   about the fraud on the boxing deal.  I'm going to be focusing

11   entirely on the line that says Invictus will be investing into

12   Reign.  Before I did that, I wanted to make sure I wasn't going

13   to draw an objection.

14           THE COURT:  Well, I think it would be –– I'm going to

15   leave it to defense counsel.  If you want portions of this

16   exhibit redacted, I am inclined to grant that.

17           MS. CHAUDHRY:  I would agree.

18           THE COURT:  I am going to allow the inquiry on the

19   part that the government has indicated.

20           MS. CHAUDHRY:  I can't see it.

21           THE COURT:  This is called heightism.  The prosecutor

22   is clearly guilty of it.

23           MR. ADAMS:  Sorry.

24           MS. CHAUDHRY:  Can we come back to this so I could

25   have a chance to look at ––

FC2VNEW1                          C. R. Darden – cross

1        THE COURT:  You can just put up the portion on the

2  screen without showing the rest and then later on you can work

3  out any redactions.

4        MS. CHAUDHRY:  Yeah.

5        THE COURT:  Okay.

6        (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FC2VNEW1                         C. R. Darden - cross

1              (In open court)

2    BY MR. ADAMS:

3    Q.  In the government's binder in front of you there's a tab

4    for government exhibits -- it's the smaller of the two.

5    There's a tab marked Government Exhibit 701.  And this is in

6    evidence.

7              MR. ADAMS:  Ms. Marmet, can we publish just the

8    portion that we've discussed.

9    Q.  Mr. Darden, once you've found that document, let me know if

10   you recognize it.

11   A.  I do.

12   Q.  You testified on cross-examination about money that you had

13   made from prior frauds, right?

14   A.  Yes.

15   Q.  Did Mr. Newkirk stand to profit from the Maxim deal if it

16   closed?

17   A.  He did.

18   Q.  Did Mr. Newkirk have a financial interest in Reign

19   Entertainment Group?

20   A.  He did.

21   Q.  Could you please read for us just the paragraph that's

22   displayed on the screen in front of you.

23   A.  Dear Mr. Darden, in order to enable Invictus Ventures LLC,

24   Invictus, and Reign Entertainment Group LLC, Reign, to enter

25   into mutually-agreeable agreements concerning the investments

FC2VNEW1                              C. R. Darden – cross

1   by Invictus through Invictus-FMMPI, LLC a to-be-formed Delaware

2   limited liability company into Reign, Invictus and Reign, each

3   a party and collectively the parties, hereby confirm their

4   mutual intentions.

5   Q.  So did you enter into this agreement with Mr. Newkirk?

6   A.  I did.

7   Q.  What's the date of that agreement?

8   A.  May 4th, 2010.

9   Q.  Through this agreement, which entity is investing into

10  which entity?

11  A.  Invictus --

12          MS. CHAUDHRY:  Objection.

13          Speaks for itself.

14          THE COURT:  No.  Overruled.

15  A.  Invictus Ventures is investing into Reign.

16  Q.  What was your understanding of who controlled Invictus

17  Ventures?

18  A.  Harvey Newkirk.

19  Q.  To your knowledge, did Mr. Newkirk ever tell any of your

20  potential lenders about his interest in Reign Entertainment?

21  A.  Not to my knowledge.

22          MR. ADAMS:  Can we please publish what's in evidence

23  as Defense Exhibit 241 please.

24  Q.  Mr. Darden, do you recall testifying yesterday about this

25  long email?

FC2VNEW1                          C. R. Darden - cross

1    A.  I do.

2    Q.  Do you recall testifying about the reference to the car

3    loan --

4    A.  I do.

5    Q.  -- in this email?

6    A.  Sorry.  I do.

7    Q.  Was your father willing to cosign a car loan for you?

8    A.  He was not.

9    Q.  How, if at all, was his attitude any different with respect

10   to signing a $31 million personal guarantee for the Maxim deal?

11   A.  It wasn't any different.  But I didn't ask him to sign a

12   personal -- you know, a $31 million guarantee because I knew

13   what his answer would be.

14   Q.  You were asked yesterday about creating a gmail account

15   under Mr. Newkirk's name.  Do you recall that?

16   A.  I do.

17   Q.  Do you remember the circumstances under which you created

18   that account?

19   A.  I don't.

20   Q.  Did you ever use that account?

21   A.  I haven't.

22   Q.  When was the last time you accessed that account?

23   A.  Within your office, a conference room.

24   Q.  And before that when was the last time you had accessed it?

25   A.  I couldn't even tell you.

FC2VNEW1                          C. R. Darden - cross

1    Q.  When you last accessed that account, who was present in the

2    room with you?

3    A.  You were present, I believe co-counsel, I believe it was

4    the agent, Mr. Hilliard.

5    Q.  And what did you see, if anything, in the sent email folder

6    in that account?

7    A.  There were no sent emails.

8    Q.  What did you see in the received email folder in that

9    account?

10   A.  There were none.

11   Q.  Let me ask you to turn or to look at Defense Exhibit 543 in

12   evidence.

13          Do you remember being asked some questions about this

14   document?

15   A.  I do.

16   Q.  Do you recall what the attachment for Project Beta Darden

17   Media Indication of Interest Letter was?

18   A.  I believe it was our indication of interest that would be

19   going to the investment bankers indicating our interest in

20   Maxim.

21   Q.  Do you recall being asked whether or not Mr. Newkirk

22   appears on that document?

23   A.  I do.

24   Q.  Is Mr. Newkirk included among the people in the top email,

25   the one that -- not the forwarded email?

FC2VNEW1                          C. R. Darden – cross

1    A.  He is not.

2              MR. ADAMS:  Your Honor, may I approach?

3              THE COURT:  Yes.

4    Q.  Mr. Darden, I've handed you what is marked for

5    identification as Government Exhibit 2008.

6              Do you recognize that document?

7    A.  I do.

8    Q.  What is it?

9    A.  It's an email from me to Harvey.

10   Q.  What's the date?

11   A.  It is July 15th, 2013.

12             MR. ADAMS:  The government offers Exhibit 2008.

13             MS. CHAUDHRY:  No objection.

14             THE COURT:  Received.

15             (Government's Exhibit 2008 received in evidence)

16   Q.  Mr. Darden, when you write to Mr. Newkirk at the top, "Do

17   we need to attach a draft of a Merrill letter," what is the

18   document to which you were asking whether the Merrill letter

19   needed to be attached?

20   A.  The interest letter.

21   Q.  The same one that you just looked at in Defense Exhibit

22   543?

23   A.  Correct.

24   Q.  Is that a draft of the false Merrill Lynch letter?

25   A.  That's correct.

FC2VNEW1                       C. R. Darden - cross

1   Q.  Were you shown this document on cross-examination?

2   A.  I was not.

3   Q.  What were you asking Mr. Newkirk in this?

4           MS. CHAUDHRY:  Objection.

5           Document speaks for itself.

6           MR. ADAMS:  Withdrawn, your Honor.

7   Q.  Mr. Darden, why were you asking Mr. Newkirk whether you

8   needed to attach a draft of the Merrill letter?

9   A.  Because he was the one negotiating with the investment

10  bankers and anything, you know, that -- I wanted to know his

11  opinion if it had to be attached or not, if it will be

12  satisfactory.

13  Q.  You were also shown another example of a Merrill Lynch

14  letter from December of 2013.  Do you recall looking at that

15  document?

16          MR. ADAMS:  Can we call up Defense Exhibit 473 please.

17  Q.  Do you remember discussing this December 16th letter?

18  A.  I do.

19  Q.  Who had provided you the language to use in all of your

20  Merrill Lynch letters?

21  A.  Harvey.

22          MR. ADAMS:  Your Honor, may I approach?

23          THE COURT:  Yes.

24  Q.  Mr. Darden, I'm showing you what's been marked for

25  identification as Government Exhibit 176.

FC2VNEW1                         C. R. Darden – cross

1              Do you recognize that document?

2   A.  I do.

3   Q.  What is it?

4   A.  It's an email from Harvey to Cal Darden Junior.

5   Q.  What's the date?

6   A.  July 24, 2013.

7   Q.  When you say to Cal Darden Junior, to which email account

8   was this being sent?

9   A.  Cdarden@thereigninc.com.

10             MR. ADAMS:  Your Honor, the government offers

11  Government Exhibit 176.

12             MS. CHAUDHRY:  No objection.

13             THE COURT:  Received.

14             (Government's Exhibit 176 received in evidence)

15  Q.  Mr. Darden, was the Merrill Lynch letter the only

16  fraudulent letter that Mr. Newkirk helped you draft?

17  A.  It was not.

18  Q.  What are you discussing with Mr. Newkirk in this pair of

19  emails?

20  A.  It was a loan for 250,000.

21  Q.  For what purpose?

22  A.  This may have been -- I'm not 100 percent sure, but it

23  looks like it was the Live Nation --

24             MS. CHAUDHRY:  Objection.

25             Sidebar.

FC2VNEW1                          C. R. Darden – cross

1            THE COURT:  No, I sustain the objection, so there's no

2       need for sidebar.

3            Well, let's see what the next question is and we'll

4       see if we need a sidebar.

5       Q.  Mr. Darden, had your father agreed to provide a personal

6       guarantee in connection with any of your business for Reign

7       Entertainment Group?

8       A.  No.

9       Q.  You were asked --

10           MS. CHAUDHRY:  Your Honor, may we approach?

11           THE COURT:  All right.

12           (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

FC2VNEW1                           C. R. Darden – cross

1          (At the side bar)

2          MS. CHAUDHRY:  Your Honor, before we began this trial,

3   I asked the government for notice of all other bad acts they

4   intended to introduce.  The only thing they brought up was the

5   mailman thing which was the boxing venture which we've already

6   litigated.

7          This is now a separate venture that they just brought

8   up.  There's nothing on the face of that email that indicated

9   it had anything to do with anything other than the Maxim

10  transaction.  The government never indicated to me that they

11  were going to be introducing evidence of other bad acts of

12  Mr. Newkirk's.  This is a 404(b) offer of evidence by the

13  government that was never given the defense notice.  It's

14  inappropriate.  It's incredibly prejudicial.

15         THE COURT:  So why did you not object to the exhibit?

16         MS. CHAUDHRY:  The exhibit has nothing on it that says

17  Live Nation and the dates of which are in the Maxim fraud.  It

18  never would have occurred to me that they are offering other

19  evidence of another bad act.

20         THE COURT:  What is this?

21         MR. ADAMS:  Your Honor, frankly, I had understood that

22  this was a portion of the Maxim deal.

23         I'll withdraw it.

24         THE COURT:  Oh, okay.

25         MS. CHAUDHRY:  The jury already heard it.

FC2VNEW1                          C. R. Darden - cross

 1                 I just want to make my record that --

 2                 THE COURT:  Wait, wait, wait.

 3                 What did the jury hear?  They heard a question to

 4       which I sustained an objection, so they know to disregard any

 5       answer that was given and they know to disregard the question.

 6       And they heard you say no objection to the admission of an

 7       exhibit.

 8                 So what is it that you say that they've heard?

 9                 MS. CHAUDHRY:  I don't have the transcript.

10                 I believe they heard him say, Who gave you that

11       language and what was it part of?

12                 He said, It was part of a Live Nation deal that I was

13       also something.

14                 THE COURT:  All I know is I sustained the very first

15       objection you raised and the exhibit, which was introduced

16       without objection.

17                 Now, if you want me to strike the exhibit, I will do

18       that, but I don't see what else -- and I think the whole thing

19       is making a mountain out of a molehill.

20                 MR. ADAMS:  Your Honor, also the Live Nation was

21       something that Mr. Darden was crossed on yesterday.

22                 THE COURT:  Oh, is that right?

23                 THE DEFENDANT:  Your Honor --

24                 THE COURT:  No, no, no, no.  I cannot hear from

25       noncounsel.

```
 1              MS. CHAUDHRY:  Your Honor, he was crossed on it.  The
 2   government has never until this moment in this question
 3   indicated, even when I asked them for other bad acts, that
 4   Mr. Newkirk had any involvement in this.
 5              THE COURT:  Look, he's withdrawing any further
 6   questions on that.  So your point has been accepted by the
 7   government.
 8              Now, what is it you want me to do at this point other
 9   than what has now been done on consent?
10              MS. CHAUDHRY:  Your Honor, I would just ask the
11   government if they met with their witness last night to prepare
12   him for today and if there's any other testimony that is going
13   to come out about other frauds, I would like to know now.
14              MR. ADAMS:  We did not meet with our witness last
15   night.  And if there is anything that strikes me even coming
16   close to it, I'll ask for a sidebar.
17              THE COURT:  Okay.
18              MR. HARRIS:  Your Honor, may I?
19              THE COURT:  How many voices are going to be heard?
20              MR. HARRIS:  I'm trying to be responsive to my client,
21   your Honor.
22              THE COURT:  All right.  Go ahead.
23              MR. HARRIS:  Mr. Newkirk believes that the government
24   used the word "fraud" in their question.
25              THE COURT:  So what?
```

FC2VNEW1                          C. R. Darden - cross

1           You know, have the lawyers, the very fine, experienced

2    lawyers in this case have no respect for the jury?  The jury

3    knows that when I sustain an objection they are to disregard

4    it.  My instructions, of course, will repeat that to it, I

5    think it's about the third paragraph of my instructions if you

6    looked at them.  So I don't know what you're talking about

7    here.

8           The objection was made.  The objection was sustained.

9           (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FC2VNEW1                          C. R. Darden - cross

1          (In open court)

2    BY MR. ADAMS:

3    Q.  Mr. Darden, you were asked yesterday about a Reign

4    Entertainment bank account that you maintained at Merrill

5    Lynch.  Do you recall those questions?

6    A.  I do.

7    Q.  Did your father have any control over that account?

8    A.  Did not.

9    Q.  Father have any participation in setting up that account?

10   A.  He didn't.

11   Q.  You were also asked some questions about what was referred

12   to as the NBA fraud yesterday.

13   A.  That's correct.

14   Q.  Did your father know that you were pursuing opportunities

15   relating to the National Basketball Association?

16   A.  He did.

17   Q.  Did he approve of you going after those opportunities?

18   A.  He did.

19   Q.  Did he know that you were impersonating him with respect to

20   the NBA fraud?

21   A.  He did not.

22   Q.  Did he approve of you impersonating him in the NBA fraud?

23   A.  Of course not.

24   Q.  Was that any different than his position with respect to

25   the Maxim deal?

1    A.  No.

2    Q.  Mr. Darden, did you ever try to deceive Mr. Newkirk

3    regarding your father's health status?

4    A.  I did not.

5    Q.  Now, you were asked some questions about lies that were

6    told about your father's health yesterday.  Do you recall that?

7    A.  I do.

8    Q.  At any point did you ever receive an email from Mr. Newkirk

9    asking you if your father was feeling better?

10   A.  No.

11   Q.  Did you ever receive any phone calls from Mr. Newkirk

12   asking you how your father was feeling?

13   A.  No.

14   Q.  Did you ever receive any condolences for your grandmother

15   who you had lied about having died?

16   A.  I didn't.  Did not.  Sorry.

17   Q.  You testified that there was a period of time that you and

18   your father weren't speaking, right?

19   A.  That's correct.

20           MR. ADAMS:  Your Honor, may I approach?

21           THE COURT:  Yes.

22   Q.  I've handed you two documents marked for identification.

23           First, if you'd look at what's marked as Government

24   Exhibit 2009.  Do you recognize that document?

25   A.  I do.

FC2VNEW1                          C. R. Darden - cross

1    Q.  What is it?

2    A.  It's an email from the lawyer at K&L Gates to me, Harvey,

3    Shane McMahon, a bunch of people from Forefront.

4              MR. ADAMS:  Your Honor, the government offers 2009.

5              MS. CHAUDHRY:  Objection.

6              Relevance.

7              THE COURT:  Pardon?

8              MS. CHAUDHRY:  Relevance.

9              THE COURT:  Can't tell yet.

10             So as we did during your cross, we'll receive it for

11   now subject to being stricken and omitted if it turns out to be

12   irrelevant.

13             So put your next question.

14             MR. ADAMS:  Thank you, your Honor.

15             I'll come back to this in just a moment to loop it in.

16             THE COURT:  Well --

17             MR. ADAMS:  But in a very short moment.

18             THE COURT:  All right.

19             MR. ADAMS:  Thank you.

20   BY MR. ADAMS:

21   Q.  Mr. Darden, you were asked some questions about when you

22   started speaking with your father again; correct?

23   A.  I did.

24   Q.  You were shown about your telephone records that showed you

25   started speaking with your father on January 12th as opposed to

FC2VNEW1                          C. R. Darden – cross

1    the 22nd?

2    A.  Yes.  I actually meant the 12th; it was a Sunday.

3    Q.  Why do you have a recollection it was a Sunday in

4    particular?

5    A.  Because my mother called me.  I was in church.  My mother

6    called me.  Actually, I had to step out because she wanted

7    me -- she said that she had enough and wanted me to call my

8    father.

9                MS. CHAUDHRY:  Objection.

10               Hearsay.  Move to strike.

11               THE COURT:  No, I don't think it's being offered for

12   the truth; it's being offered for why he had a recollection of

13   that particular Sunday.

14               Overruled.

15               MR. ADAMS:  Your Honor, with respect to relevance in

16   2009, I just direct you to the date and day.

17               THE COURT:  Okay.  I see it now.

18               So 2009 will remain.  Received.

19               (Government's Exhibit 2009 received in evidence)

20               MR. ADAMS:  Can we please publish 2009.

21   Q.  Mr. Darden, can you tell us what day of the week January

22   12th was?

23   A.  Sunday.

24               (Continued on next page)

25

Fc26new2

1    BY MR. ADAMS:

2    Q.   Despite having reconnected with your father on January 12th

3    was your father willing to resume his advisory role with

4    respect to the Maxim deal?

5    A.   He was not.

6    Q.   Did you tell him at that time that he was being sued by

7    Open Gate Capital?

8    A.   I did not.

9    Q.   To your knowledge did Mr. Newkirk inform him that he was

10   being sued by Open Gate?

11   A.   Not to my knowledge.

12             MR. ADAMS:   Can we please look at what is in evidence

13   as Defense Exhibit 422.

14   Q.   Mr. Darden, do you recall testifying about this yesterday?

15   A.   Yes.

16   Q.   When Mr. Newkirk wrote to you, I am writing in reference to

17   the action filed at Open Gate against the various Darden

18   parties," why was Mr. Newkirk writing to you on this day?

19   A.   Because we had spoken about me getting another lawyer.  He

20   said his firm couldn't do it and he had to send an e-mail

21   basically saying such.

22   Q.   So what did Mr. Newkirk tell you the purpose of this e-mail

23   was?

24   A.   I am sorry.  I don't recall what the purpose of the e-mail

25   was.

Fc26new2

1    Q.  According to Mr. Newkirk who had originally requested that

2    such an e-mail be sent?

3    A.  His higher-ups at his firm.

4    Q.  To whom was it supposed to be sent?

5    A.  To my father.

6    Q.  What had Mr. Newkirk told you at that point about the

7    access of others at Bryan Cave to his Bryan Cave e-mail

8    account?

9    A.  Any e-mail coming in and going out was subject to being

10   seen by other people at his firm.

11   Q.  You were asked yesterday about a long series of documents

12   that were found in your home.

13           Do you recall that?

14   A.  I do.

15   Q.  Who would send you signature pages for your signature and

16   execution?

17   A.  Harvey.

18   Q.  Did those include signature pages that included a fake name

19   Calvin R. Darden Senior?

20   A.  They did.

21           MR. ADAMS:  Can we please publish what is in evidence

22   as Defense Exhibit 705.

23   Q.  Do you recall looking at that document yesterday?

24   A.  I do.

25   Q.  Do you recall testifying that you did not draft that

Fc26new2

1  document?

2  A.  That's correct.

3  Q.  Who did draft that document if you recall?

4  A.  If I recall it was Harvey that drafted the document.

5  Q.  Let me ask you to turn to what has been marked for

6  identification as Government Exhibit 2010 in front of you.  I

7  handed that up a moment ago.  Take a moment to look through

8  that and tell me if you recognize that document.

9  A.  I have 2009.  I don't believe I have '10.

10  Q.  One moment.

11  A.  Thanks.

12  Q.  Do you recognize that document?

13  A.  I do.

14  Q.  What is it?

15  A.  This is a loan agreement from the lawyers of one of the

16  perspective investors.

17  Q.  Can you describe the various attachments generally?

18  A.  The first attachment is a loan agreement.  The second

19  attachment is the direction to pay loan, which I believe we

20  just looked at.

21  Q.  Is that an e-mail and who is it from?

22  A.  It is.  It's -- it's an e-mail from the prospective

23  investors' lawyer to Harvey.

24  Q.  What is the date on the top e-mail?

25  A.  Sorry.  January 29th, 2014.

Fc26new2

1  Q.  Are you included among the recipients at the top of e-mail?

2  A.  I am.

3         MR. ADAMS:  Your Honor, the government offers Exhibit

4  2010.

5  A.  Wait.  I am sorry.  At the very top it says from Calvin

6  Darden to Harvey Newkirk.  Below that it is from the lawyer to

7  Harvey Newkirk and I am CC'd.  But the very top it is from

8  Calvin Darden to Harvey Newkirk.

9         MR. ADAMS:  Your Honor, the government offers Exhibit

10  2010.

11         MS. CHAUDHRY:  Your Honor, brief voir dire?

12         THE COURT:  Okay.

13  VOIR DIRE

14  BY MS. CHAUDHRY:

15  Q.  Mr. Darden, did you just testify that Kyle Miller at Pryor

16  Cashman was Shaul Greenwald's lawyer?

17  A.  I don't know whose lawyer.  Kyle Miller is at Pryor

18  Cashman.  Pryor Cashman is a law firm so I am not sure whose

19  lawyer he is.

20  Q.  I believe you just testified that he was the lawyer for the

21  lender?

22  A.  I said the prospective lender, I believe.

23  Q.  That would be Shaul Greenwald's lawyer?

24  A.  I don't know -- there were a bunch of prospective lenders

25  so it doesn't say here.

Fc26new2

1   Q.  Mr. Darden, wasn't Kyle Miller of Pryor Cashman your

2   attorney at some point in this deal?

3   A.  Not that I re-- my attorney?

4          MR. ADAMS:  Objection.  I don't know what this has to

5   do with the admissibility of the document.

6          THE COURT:  Well, this is voir so it is limited, but I

7   think that conceivably does bear on the admissibility.  So I

8   will allow that question.

9   A.  I am really -- I don't know who Pryor Cashman -- I cannot

10  even tell you my lawyer for what -- I am not allowed to ask

11  questions, right?  So I have no idea.

12         THE COURT:  So that's the answer.

13         Anything else?

14         MS. CHAUDHRY:  Proof of foundation problem with this

15  document.

16         THE COURT:  So do I understand --

17         THE WITNESS:  Wait.  I know the answer.

18         MS. CHAUDHRY:  Objection.

19         THE COURT:  You don't have a pending question.

20         THE WITNESS:  Oh, sorry.

21         THE COURT:  Is this entire document something you sent

22  to Mr. Newkirk?

23         THE WITNESS:  Yes.

24         THE COURT:  Received.

25         (Government's Exhibit 2010 received in evidence)

Fc26new2                          C.R. Darden - Cross

1    BY MR. ADAMS:

2    Q.  Can I ask you to please turn to Tab 2 of this document.

3           Does that appear to be the same document that Ms.

4    Chaudhry showed you yesterday marked as 705?

5    A.  It is.

6    Q.  Why did you send it to Mr. Newkirk?

7    A.  I sent -- I guess for his review.  I sent all the documents

8    to Mr. Newkirk regarding the deal or any prospective lenders.

9    Q.  Were you shown this document on cross-examination

10   yesterday?

11   A.  This document, yes.

12   Q.  Were you shown Government Exhibit 2010 yesterday?

13   A.  I was not.

14          MR. ADAMS:  No further questions.

15          THE COURT:  Recross.

16   RECROSS-EXAMINATION

17   BY MS. CHAUDHRY:

18   Q.  Mr. Darden, you were just shown Government Exhibit 2009

19   which refers to a conference call.

20   A.  Yes.

21   Q.  Was there a conference call?

22   A.  I believe so, yes.

23   Q.  Did you participate in it?

24   A.  Maybe, maybe not.  I am not certain.

25   Q.  Is this something you would have participated in pretending

Fc26new2                              C.R. Darden - Cross

1   to be your father?

2   A.  No.

3   Q.  So all of these people listed on this conference call group

4   knew that you were involved and --

5           MR. ADAMS:  Objection, speculation.

6           THE COURT:  Sustained.

7   Q.  Did you participate in this conference call openly as

8   yourself?

9   A.  I don't know that I participated on this conference call.

10  There were several conference calls with all these people that

11  I did not participate on, but I have spoken to every

12  individual.  I have been on calls with every individual on this

13  list on a conference call as myself, not as my father.

14  Q.  And any of these people that are also people you have been

15  calls with where you pretended to be your father?

16  A.  Only Harvey.

17  Q.  Mr. Darden, do you know an individual named Jim McMillan?

18  A.  Jim McMillan?

19  Q.  James McMillan?

20  A.  I do.

21  Q.  Is he a lawyer?

22  A.  He is.

23  Q.  Is he someone who you spent a lot of time in his office at

24  one point?

25  A.  At one point, yes.

Fc26new2                              C.R. Darden - Cross

1   Q.  And while you were there, isn't it a fact that you had some

2   of your friends make phone calls pertaining to your father?

3           MR. ADAMS:  Objection, scope.

4           THE COURT:  Overruled.

5   A.  I don't recall -- I don't necessarily recall that.

6   Q.  Is it possible?

7   A.  Is it possible that I had --

8           MR. ADAMS:  Objection, speculation.

9           THE COURT:  Sustained.

10  Q.  Did you ever have friends of yours make phone calls

11  pretending to be your father?

12          MR. ADAMS:  Objection, asked and answered.

13          THE COURT:  I think it has been, but I will allow it

14  one more time.

15  A.  Not that I recall.

16  Q.  Did you ever tell Mr. McMillan that that is something you

17  did?

18  A.  At one point James was -- I was going to hire James to be

19  my lawyer for the Maxim case so I am sure.

20  Q.  Mr. Darden, you were just shown Government Exhibit 2010.

21          Do you have that in front of you?

22  A.  I do.

23  Q.  And this is an e-mail that you forwarded to Mr. Newkirk;

24  correct?

25  A.  It is.

Fc26new2                          C.R. Darden - Cross

1    Q.  And if you read down e-mail in the middle it says, Harvey

2    attached are the final documents.  Kyle.

3            There are several attachments in there.  I pulled them

4    up so the jury can see how voluminous this is.  These are all

5    documents drafted by Pryor Cashman; correct?

6    A.  I don't know if all the documents were drafted by Pryor

7    Cashman.  I have no idea.

8    Q.  The document that the government just showed you that was

9    in your house --

10           MS. CHAUDHRY:  What number was that?

11           MR. ADAMS:  Defense 705.

12   Q.  -- Defense 705.  That is actually Attachment 3 that came

13   from Pryor Cashman; correct?

14   A.  I believe so.

15   Q.  You testified that Mr. Newkirk drafted that?

16   A.  To my knowledge.  If this whole thing came from Pryor

17   Cashman, it could be that Pryor Cashman drafted it.  Most of

18   the documents Harvey drafted them for me.  It is hard for me to

19   say.  I cannot say exactly who drafted what.

20   Q.  Mr. Darden, you said that when you first started meeting

21   with the government, the reason that you were lying to them is

22   that you were delusional and caught up in your own lies?

23   A.  Probably.

24   Q.  What do you mean by that?

25   A.  I don't know.  I think I just told so many lies that I kind

Fc26new2                          C.R. Darden – Cross

 1   of got swept up in my own lies.

 2   Q.  What did you mean by the word "delusional"?

 3   A.  I think t\at if you tell so many lies, you get swept up in

 4   your lies.  You get to the point where you start believing your

 5   own lies.  That to me is delusional.

 6   Q.  Are you at that point now?

 7   A.  I am not.

 8   Q.  But you were then?

 9   A.  I believe so.

10   Q.  You were asked on redirect about the Merrill Lynch letter

11   that you submitted with Mr. Newkirk's name on it.

12   A.  I was.

13   Q.  And you said that there would be less liability if it was

14   in Mr. Newkirk's name; right?

15   A.  So I was told.

16   Q.  That letter was submitted along with an offer letter signed

17   by you pretending to be your father; right?

18   A.  That's correct.

19   Q.  That whole packet was submitted to the Bodman Law Firm and

20   Houlihan Lokey; correct?

21   A.  That's correct.

22   Q.  Houlihan Lokey is one of the investment banks for Maxim;

23   correct?

24   A.  They were.

25   Q.  Wasn't it your understanding that it was Houlihan Lokey's

Fc26new2                          C.R. Darden - Cross

1    job to confirm the finances for this deal?

2              MR. ADAMS:  Objection, relevance.

3              THE COURT:  Overruled.

4    A.  Was it my understanding that they were to confirm the

5    finances?  Probably so.

6    Q.  So they would be the ones who call the phone number for

7    Roderick Jones that you had to put in?

8    A.  I don't know their diligence process.

9              MS. CHAUDHRY:  Can we please show Mr. Darden GX 110.

10             Thank you, Ms. Marmet.

11   Q.  Mr. Adams asked you to read the line that said FN.  Could

12   you please read the line above it that says N, colon?

13   A.  It says, Darden Cal.

14   Q.  Your father goes by Cal?

15   A.  We both go by Cal.

16   Q.  You both go by Cal.

17             Mr. Darden, before you went to prison, didn't you go

18   by Ramarro?

19   A.  That is my middle name.  So I go by Calvin.  I go by Cal.

20   Some people call my Ramarro.  My family calls me Marro.

21   Q.  Before you went to prison, didn't you widely introduce

22   yourself as Ramarro?

23   A.  I think just -- before I sent to prison just as many people

24   knew me as Calvin or Cal knew me as Ramarro.

25   Q.  In this deal all the documents we have seen, you don't

Fc26new2                         C.R. Darden - Cross

```
 1    refer to yourself ever as Ramarro?

 2    A.  I don't.

 3              MR. ADAMS:  Objection, mischaracterizes.

 4              THE COURT:  Sustained.

 5              MS. CHAUDHRY:  We can take that down.  Thank you.

 6    Q.  You were asked on redirect about the employment letters

 7    that Bryan Cave drafted?

 8    A.  Correct.

 9    Q.  Bryan Cave is a law firm; correct?

10    A.  They are.

11    Q.  They bill for their time; correct?

12    A.  Believe so.

13    Q.  And the law firm's bill was ultimately going be paid by the

14    Darden Media Group; correct?

15    A.  I am sure.

16    Q.  And isn't it your testimony that you were going to pay the

17    law firm to draft all of these employment letters only to fire

18    all of those people as soon as the deal went through?

19    A.  It wasn't going to be as soon as the deal went through, but

20    it was going to be relatively soon after.  So like I previously

21    explained, so there was going be transition period up.  Once we

22    got through that transition period, we were going to fire most

23    of the highly paid ones and replace them.  So that is correct.

24    Q.  You testified on redirect about Mr. Newkirk's interest in

25    Reign; correct?
```

Fc26new2                              C.R. Darden - Cross

1   A.  That's correct.

2   Q.  Reign did not acquire Maxim, did it?

3   A.  It did not.

4   Q.  In fact, all the documents on the Maxim sale after the

5   offer letter are done in the name of Darden Media Group; isn't

6   that correct?

7              MR. ADAMS:  Objection, mischaracterizes.

8              THE COURT:  Sustained as to form.

9   Q.  You were signing the documents pretending to be your father

10  for Darden Media Group; correct?

11  A.  I was.

12  Q.  Those were the documents that were actually for the

13  purchase of the Maxim Magazine; correct?

14  A.  Yes.

15  Q.  And the personal guarantee was done under Darden Media

16  Group, Calvin Darden Senior?

17  A.  Yes.

18  Q.  The loan with Mr. Weinberg was done under Darden Media

19  Group and Calvin Darden Senior?

20  A.  I believe so.

21  Q.  The loan with Open Gate, same thing, Darden Media Group and

22  Calvin Darden Senior?

23  A.  Yes.

24  Q.  All these potential lenders and investors, all of those

25  documents were done Calvin Darden Senior, Darden Media Group?

Fc26new2                          C.R. Darden - Cross

1    A.  That's correct.

2    Q.  And there is no document that you signed that said that

3    Reign owns Darden Media Group, is there?

4    A.  I am not -- I don't -- I am not sure.  I don't know if

5    there -- I didn't even create Darden Media Group so I

6    couldn't -- I can't tell you.  I really have no idea.  As a

7    matter of fact, I believe in the offer letter it says Reign

8    or -- it mentions a subsidiary and says Darden Media Group or

9    Darden Media Holdings if my memory serves me correctly.

10   Q.  The asset purchase agreement that you signed is for Darden

11   Media Group; correct?

12   A.  Yes.

13   Q.  And Reign is not on there anywhere?

14   A.  I don't believe so.

15   Q.  You testified about the HNewKirk1 G-Mail account that you

16   created for Mr. Newkirk; correct?

17   A.  Correct.

18   Q.  And you started meeting with the government in April of

19   2014; right?

20   A.  That sounds correct.

21   Q.  That is about a month after you were released?

22   A.  Sounds correct.

23   Q.  And we talked on cross about how by August the government

24   had agreed to release you from home confinement also; right?

25   A.  Again, I don't know if the government had agreed to it or

Fc26new2                         C.R. Darden - Cross

1   not.  The judge agreed to it.  So I am not sure whether -- I

2   have no idea.

3   Q.  You were off home confinement by August of 2014?

4   A.  I was.

5   Q.  And you met with the government throughout 2014; is that

6   correct?

7   A.  Probably.

8   Q.  And through -- we're almost at the end of 2015, but

9   throughout 2015 also?

10  A.  I would not say I met with them throughout two years.  No,

11  I would not say that throughout.

12  Q.  Have you met with them this year?

13  A.  I have.

14  Q.  How many times?

15  A.  Several.  I couldn't tell you how many.

16  Q.  Isn't it a fact that the first time you told the government

17  about this e-mail account that you created for Mr. Newkirk was

18  September of this year?

19  A.  Actually, they made me aware of it.  So I wasn't even -- I

20  wasn't even aware of it.

21  Q.  You never told them about it?

22  A.  I didn't.

23  Q.  And that is the meeting that you were discussing with Mr.

24  Adams and you went into that account?

25  A.  That's correct.

Fc26new2                          C.R. Darden - Redirect

1   Q.  And you remembered the password for that account?

2   A.  No.  We actually had -- I had to reset the password because

3   I couldn't remember it.  I reset it and it sends you a link to

4   put in a new password.  We put in a new password so we could go

5   in there and see what was there and what wasn't there.

6   Q.  Mr. Darden, you said there was nothing in the "sent"?

7   A.  That's correct.

8   Q.  Nothing in the "received"; is that correct?

9   A.  That's correct.

10  Q.  Mr. Darden, you do know how to delete e-mails, don't you?

11  A.  There was nothing in the "trash" either.

12  Q.  Do you know how to delete e-mails?

13  A.  I do.

14  Q.  Do you know how to empty the trash?

15  A.  I do.  But if I was going to delete it, I would have

16  deleted the e-mail that actually showed that an e-mail was set

17  up so...

18          MS. CHAUDHRY:  Nothing further.

19          THE COURT:  Anything else?

20          MR. ADAMS:  Two questions, your Honor.

21  REDIRECT EXAMINATION

22  BY MR. ADAMS:

23  Q.  Mr. Darden, you were discussing the conference call and the

24  e-mail that sets up the conference call on January 2014.

25          Do you recall that?

Fc26new2                      C.R. Darden – Redirect

1   A.  I do.

2   Q.  You testified a moment ago that the only person who had

3   been on the phone call with you amongst those people at the

4   conference call who had experienced you impersonate your father

5   was Harvey Newkirk?

6   A.  That's correct.

7   Q.  In the instances when you had impersonated your father

8   while Mr. Newkirk was on the line, was it with the intent of

9   fooling Mr. Newkirk?

10  A.  It was not.

11  Q.  What was the intent?

12  A.  To fool whomever else was on the line.

13  Q.  Was the call to --

14          MS. CHAUDHRY:  Objection, outside the scope.

15          THE COURT:  I can't tell until I hear the answer.

16          MR. ADAMS:  For the reporter the question was:  Was

17  the call to Mark Hughes at Comvest one such example of such a

18  call?

19          THE COURT:  I am sorry.  I didn't see the full

20  question on the screen.

21          Overruled.

22  A.  It was.

23          MR. ADAMS:  Can we please publish Government

24  Exhibit 601.  Can we go to the second page, please.

25          Third page.  Zoom in on the bottom half of that first

Fc26new2                          C.R. Darden - recross

1    full paragraph.

2    Q.  Mr. Darden, was Darden Media Group affiliated with The

3    Reign Entertainment Group?

4    A.  It was.

5    Q.  Was The Reign Entertainment Group going to be acquiring

6    Maxim?

7    A.  It was.

8    Q.  Or some other entity?

9    A.  It was going to be a subsidiary -- well, according to this

10   document, The Reign Entertainment Group and its affiliates

11   Darden Media through a subsidiary of Darden Media Group to

12   acquire all of the businesses.

13   Q.  Who had responsibility for setting up the subsidiary at

14   Reign Entertainment Group?

15   A.  Harvey.

16        MR. ADAMS:  No further questions.

17   RECROSS-EXAMINATION

18   BY MS. CHAUDHRY:

19   Q.  Mr. Darden, two questions.  You were just shown a brief

20   snippet by the government.

21        You are not a lawyer; correct?

22   A.  I am not.

23   Q.  You are not a transactional lawyer then?

24   A.  Certainly not.

25   Q.  You don't know the legal definition of "affiliate," do you?

Fc26new2                          C. R. Darden - recross

1   A.  I don't.

2           THE COURT:  Anything else?

3   REDIRECT EXAMINATION

4   BY MR. ADAMS:

5   Q.  Could you have pulled off this fraud without a lawyer?

6   A.  Absolutely not.

7   RECROSS-EXAMINATION

8   BY MS. CHAUDHRY:

9   Q.  Mr. Darden, how many frauds have you pulled off without a

10  lawyer?

11          MR. ADAMS:  Objection, scope.

12          THE COURT:  I will allow that, but that opens certain

13  doors.

14          MS. CHAUDHRY:  Can I rephrase the question?

15          THE COURT:  Yes.

16  Q.  Did you use a lawyer in your MBA fraud that you plead

17  guilty to?

18  A.  I did.

19  Q.  Was your lawyer part of that fraud?

20  A.  Was the lawyer part -- well, maybe.  Yeah.  Yes.

21  Q.  Who is that lawyer?

22          MR. ADAMS:  Objection, relevance.

23          THE COURT:  I am going to sustain but not on relevance

24  grounds but on 403 grounds.

25  Q.  Your prior frauds that you went to prison for in all the

Fc26new2                         C. R. Darden – recross

1  fraud you pulled on your three employers, was a lawyer involved

2  in any of those?

3  A.  No.  Those didn't require a lawyer.

4  Q.  The frauds that you pulled on your clients and stole their

5  money, was a lawyer involved in those?

6  A.  Same case, no.

7          MS. CHAUDHRY:  Nothing further.

8          THE COURT:  Anything else?

9          MR. ADAMS:  No.

10          THE COURT:  Thank you very much.  You may step down.

11          (Witness excused)

12          THE COURT:  Please call your next witness.

13          MS. PAUL:  The government calls Shaul Greenwald.

14          MS. CHAUDHRY:  Your Honor, do I need to take the

15  binder back?

16          THE DEPUTY CLERK:  Do you prefer to swear or affirm?

17          THE WITNESS:  Affirm.

18   SHAUL GREENWALD,

19      called as a witness by the Government,

20      having affirmed, testified as follows:

21          THE DEPUTY CLERK:  State your name and spell it slowly

22  for the record.

23          THE WITNESS:  Shaul, S-h-a-u-l, Greenwald,

24  G-r-e-e-n-w-a-l-d.

25          THE COURT:  Counsel.

Fc26new2                         Greenwald - direct

 1              MS. PAUL:  Thank you, your Honor.

 2     DIRECT EXAMINATION

 3     BY MS. PAUL:

 4     Q.  Good morning, Mr. Greenwald.

 5     A.  Good morning.

 6     Q.  Where are you employed?

 7     A.  Riverside Abstract.

 8     Q.  What type of business is that?

 9     A.  It's a title insurance agency.

10     Q.  What is your position at Riverside Abstract?

11     A.  I am a CEO.

12     Q.  Let me direct your attention now to December of 2013.  Did

13     there come a time in December of 2013 when you were approached

14     about making a loan in connection with the purchase of Maxim

15     Magazine?

16     A.  Yes.

17     Q.  Briefly can you describe how you were first approached by

18     making that loan?

19     A.  A client of mine called me.  A client of mine called me and

20     mentioned that he wanted to to introduce me to someone through

21     a relationship that he had and asked me if I would meet with

22     the people.  I said, Sure.  We had a meeting in my office.  I

23     believe it was the day after.  We had some e-mail

24     correspondents prior to that.  I believe we met in my office.

25     Q.  Who did you meet with in your office?

1    A.  At the time I had met with Calvin Darden Junior and the

2    defendant.

3    Q.  And at that meeting did the defendant and Calvin Darden

4    Junior explain the deal to you?

5    A.  Yes.

6    Q.  What did they explain about it?

7    A.  They explained that they were purchasing Maxim magazine and

8    some other assets that were along with the magazine and they

9    needed a short -- a short-term loan associated with that

10   purchase.

11            MR. HARRIS:  Your Honor, objection to "they."

12            THE COURT:  Sustained.

13   Q.  How much money were you contemplating lending,

14   Mr. Greenwald?

15   A.  If I recall about $5 million was the request.

16   Q.  At this meeting did Mr. Newkirk tell you anything about the

17   role of someone named Calvin Darden Senior in the deal?

18   A.  At the meeting we discussed Calvin Darden Senior, yes.

19   Q.  What, if anything, did Mr. Newkirk tell you about

20   Mr. Darden Senior and his role in the deal?

21   A.  We were talking about Calvin Darden Junior and Calvin

22   Darden Senior going into a deal together and they were -- that

23   was the basic information about the deal and they wanted me to

24   be part of the deal and be involved in the deal.

25   Q.  Did Mr. Newkirk describe Mr. Darden Senior's background to

1   you?

2   A.  Yes.

3   Q.  And what did he say about it?

4   A.  He said that he was a -- he lived out if I remember

5   correctly in Atlanta, Georgia and he had a lot -- he was on

6   board of a bunch of different companies, a few companies that

7   he mentioned at the time.  He was a -- if I remember correctly

8   he was on the board of directors of Coca-Cola International,

9   Target -- Target Corporation and a health care company.  I

10  believe it was Cardinal Health.

11  Q.  At this meeting was there any discussion about how your

12  loan for the deal would be secured?

13  A.  We spoke about a number of things, but the company -- the

14  company itself, Maxim itself would be some sort of collateral

15  and we also spoke about somehow collateralizing the shares that

16  Mr. Calvin Darden Senior had at his disposal and some sort of a

17  collateral against those shares.

18  Q.  Did Mr. Newkirk tell you that Mr. Darden Senior was willing

19  to put up his stocks as collateral?

20  A.  Yes.

21  Q.  Was it important to you to have your loan secured by that

22  collateral?

23  A.  Yes.

24  Q.  Why was that important?

25  A.  I didn't know much about the magazine and, you know, the

1    environment of the Internet.  I didn't feel that was

2    necessarily the collateral I was interested in; but in the

3    interest of doing the deal and making a return -- a pretty

4    quick return was promised to me -- on our investment, the

5    collateral I was most interested in was stock of a -- of those

6    companies, which were pretty strong.

7    Q.  Had you learned that Mr. Darden Senior was not involved in

8    the deal, would you have continued to consider making a loan?

9    A.  I don't believe so.

10   Q.  Why not?

11   A.  Well, really the only collateral that we had was the -- was

12   the stock and the -- the stocks and the -- of those few

13   companies.  So we weren't really looking at the deal as far as

14   the actual magazine or any of the assets that were coming along

15   with that.  Although that was potentially part of the

16   collateral, that was not our main address.

17              MS. PAUL:  May I approach, your Honor?

18              THE COURT:  Yes.

19   Q.  Mr. Greenwald, I am handing you a binder of documents.

20   They are government exhibits that are in evidence.  I will be

21   asking you to turn to particular ones.  Okay?

22   A.  Sure.

23   Q.  Please take a look at Government Exhibit 802.

24   A.  Yes.

25   Q.  Do you recognize that document?

Fc26new2                         Greenwald - direct

1  A.  Give me one moment.

2         Yes.

3  Q.  What is it?

4  A.  There are various e-mails between myself, Harvey Newkirk

5  and Calvin Darden regarding the -- regarding this potential

6  loan.

7  Q.  When you say Calvin Darden, which Calvin Darden are you

8  referring to?

9  A.  If I am correct about it, I believe it was Calvin Darden

10  Junior.

11  Q.  What is the date of this e-mail exchange?

12  A.  The date starts Thursday, December 12th of 2013 and it

13  continues throughout Thursday, December 12th.

14  Q.  If we can turn to the last page of the document, please.

15  A.  Sure.

16  Q.  If we can take a look at the last e-mail there from Mr.

17  Newkirk -- actually on the second to last page.

18  A.  Uh-huh.

19  Q.  That is where it begins.

20  A.  Sure.

21  Q.  Do you see that e-mail from Mr. Newkirk?

22  A.  Yes.

23  Q.  To you?

24  A.  Yes, I do.

25  Q.  If we can go back to the last page, please.

Fc26new2                          Greenwald – direct

1    A.   Yes.

2    Q.   This is a reference to an e-mail made by Mr. Newkirk to

3    Calvin Darden Senior being responsible for the balance of 13.9

4    million plus transaction expenses at the closing.

5              Do you see that?

6              It is also up on your screen if that is more

7    convenient for you.

8    A.   Yes.  Yes, I do.

9    Q.   Did Mr. Newkirk ever tell you where that $13.9 million was

10   going to come from?

11   A.   I don't recall.

12   Q.   And in this e-mail, if we can go back to the page before,

13   Mr. Newkirk also makes a reference to -- he states in this

14   e-mail, Holdings paid $3.1 million deposit previously paid.

15             Do you see that?

16   A.   Yes, I do.

17   Q.   Did you have any understanding as to where the 3.1 million

18   deposit had come from?

19   A.   No.

20   Q.   Did Mr. Newkirk ever tell you that there was existing

21   litigation with respect to the $3.1 million?

22   A.   No.

23   Q.   Did Mr. Newkirk ever tell you about another lender to the

24   deal by the name of Open Gate Capital?

25   A.   No.

1    Q.  Turning to the first page of the document, please, and

2    focusing on that top e-mail from Mr. Newkirk, let me know when

3    you got that.

4    A.  Yes.

5    Q.  Did Mr. Newkirk tell you that Mr. Darden Senior was willing

6    to resign from the boards of the companies on which he held

7    stock if necessary?

8    A.  That was our understanding, yes.

9    Q.  Please take a look at Government Exhibit 803 in evidence.

10   A.  Sure.

11   Q.  Focusing on the top e-mail from you dated December 12th,

12   2013, to Mr. Newkirk, do you see that?

13   A.  Yes, I do.

14   Q.  Who did you copy on this e-mail?

15   A.  I retained at that point attorneys who I worked with in the

16   past at a firm named Morris & Cohen, specifically it was a

17   Eitan Tabak.

18   Q.  And there is an e-mail address that you copied to

19   CRDarden@DardenDevelopment.com.  Do you see that?

20   A.  Yes, I do.

21   Q.  Whose e-mail address did you believe that to be?

22   A.  Mr. Darden Senior.

23   Q.  Why did you copy that e-mail address on your e-mail there?

24   A.  One of the point of the mechanism as far a security would

25   be his shares and his potential guarantees and I wanted to make

1    sure he was involved in the conversation.

2    Q.  Now, you list a number of things in your e-mail that you

3    want a securities for your loan -- securities within the buying

4    entity, personal guarantee, stock interest, a mechanism force

5    of sale, as well as a deed to Mr. Darden's home or second

6    mortgage.

7              Do you see that?

8    A.  Yes.

9    Q.  Why did want those things as a security for your loan?

10   A.  As a lender we're trying to secure ourself to the best of

11   our ability to make sure we don't have -- that we have as low

12   risk as possible.  So as much as we were told what we could

13   get, we would try to get as much interest as possible.

14   Q.  Did Mr. Newkirk tell you that these were things that

15   Mr. Darden Senior was willing to put up as collateral?

16   A.  Yes.

17   Q.  Please take a look at Government Exhibit 804.

18              When is the date e-mail to Mr. Newkirk?

19   A.  It is the next day, December 13th, 2013.

20   Q.  And what is attached to the e-mail?

21   A.  This was a term sheet that pretty much gave the terms of

22   potential financing for this transaction.

23   Q.  If we can turn to the second page of the attachment and

24   focus on where it says "guarantor collateral."

25              Do you see that, Mr. Greenwald?

Fc26new2                         Greenwald - direct

1    A.  Yes, I do.

2    Q.  What is listed here?

3    A.  Guarantor collateral.  Parent pledges equity in borrower,

4    Calvin Darden Senior pledges primary residence in Georgia and

5    proceeds of equity grants (including options) in Coca-Cola,

6    Cardinal Health and Target.

7    Q.  What does "equity in the borrower" mean?

8    A.  Equity in borrower to my recollection -- the borrower in

9    this scenario is Darden Media Group, LLC, and that would be the

10   purchaser I believe or in some aspect it would be the purchase

11   of the actual magazine.  So we were looking for the cause of

12   pledge of equity in the actual asset.

13   Q.  Would you have been willing to rely on equity in the

14   borrower as the sole collateral for this loan?

15   A.  No.

16   Q.  Why not?

17   A.  We didn't really think there was value to it.

18   Q.  And focusing on the section of this term sheet that says

19   "intercreditor arrangements," do you see that?

20   A.  Yes.

21   Q.  It says here that lender will be senior to all other

22   indebtedness of the borrower and parent and any junior lenders

23   will enter into subordination agreement with lender.

24        What did that mean, Mr. Greenwald?

25   A.  When making a loan, you want to make sure that even if

Fc26new2                        Greenwald - direct

1    there are borrowing other funds potentially that you just want

2    to make sure you're as secure as possible, that any other

3    indemnities or any other loans or anything they owed to anyone

4    else you would be senior to them and you would be in first

5    position in order to receive any of those collateral pledges.

6    Q.   If the collateral had been promised to another lender,

7    would you have wanted to know that?

8    A.   Yes.

9    Q.   Why?

10   A.   Again, you're -- our understanding is that we're lending

11   money and we would have the ability to collect and be in first

12   position under those loans.  You don't want there to be too

13   much -- too much money outstanding when someone is going into a

14   deal and you want to make sure that you're money is as secure

15   as possible.

16   Q.   Mr. Greenwald, do you need water?

17   A.   I should be fine.

18   Q.   Did there come a time when you asked to speak to Mr. Darden

19   Senior?

20   A.   I don't recall if I asked to speak to him, but I definitely

21   spoke to him at some point.

22   Q.   Did you speak to that person on the phone?

23   A.   I spoke to someone who purported to be Calvin Darden

24   Senior.

25   Q.   Just to be clear was that over the phone?

1   A.  I am sorry.

2   Q.  Just to be clear that was over the phone?

3   A.  Yes.  We never met in person.

4   Q.  Can you describe that conversation or conversations?

5   A.  I don't recall.  I definitely recall having a least one

6   conversation and I don't know if there were more or others were

7   potential texts.  I believe a few conversations.  We spoke

8   about the deal itself, about how we would be getting more

9   information if we would like to feel more comfortable with the

10  deal and whatever I would need to get this done.  Especially we

11  spoke about Coca-Cola and Target and at one point I recall he

12  told me he was coming to New York and maybe we would get to

13  together and meet, which didn't pan out.  But we definitely

14  spoke about many different aspects of the deal, family, other

15  aspects of just general conversation as well.  But mostly about

16  the deal and just trying to get me comfortable to get into this

17  deal and make it happen.  It is very important to him to make

18  this deal happen.

19  Q.  Sitting here today do you know whether the person you spoke

20  to over the phone was actually Calvin Darden Senior?

21  A.  I don't know.

22  Q.  What phone numbers were you using at that time?

23  A.  Likely either my office phone or my cell phone.

24  Q.  What is your office number?

25  A.  718-252-4200.

Fc26new2                        Greenwald – direct

1   Q.  What are the last four digits of your cell phone number?

2   A.  2729.

3   Q.  Did there come a time in mid to late December when the deal

4   fell apart?

5   A.  Yes.

6   Q.  What do you recall about that?

7   A.  I recall that it didn't happen.  I recall there were some

8   news report of it not happening as well.  I believe I read an

9   article about it at that time and basically that was pretty

10  much the end of the deal.

11  Q.  Directing your attention now to late January of 2014, do

12  you recall the conversation about you making a loan restarting

13  around that time?

14  A.  Yes, I do.

15  Q.  What, if anything, do you recall about how that

16  conversation restarted?

17  A.  I don't recall exactly.  I just remember there was a --

18  either e-mail or phone call that the deal is back on.  For

19  whatever reason the deal fell apart.  Could have been that they

20  had a contract and missed the deadlines.  And they would like

21  to restart the conversation to see if they can get this loan

22  back on the table.

23  Q.  Please take a look at Government Exhibit 812.

24  A.  Sure.

25  Q.  What is the date of this e-mail exchange, Mr. Greenwald?

1   A.  It seems all February 6th, 2014.

2   Q.  Do you recall sending money to an escrow account around

3   this time in connection with the Maxim deal?

4   A.  Yes, we does.

5   Q.  Approximately how much money did you send to the escrow

6   account?

7   A.  If I recall $3 million or is it 4 million.

8   Q.  Where was the escrow account being held?

9   A.  It was held at a law firm.

10  Q.  Do you remember which one?

11  A.  If I remember, I believe Pryor Cashman.

12  Q.  Why did you send the money to an escrow account at Pryor

13  Cashman?

14  A.  Sometimes when you are involved in deals, the borrower

15  wanted to feel secure that they are not going to go down the

16  road and being left without having funds available to them when

17  they need it.  So we felt we had a prior relationship with

18  Pryor Cashman with a couple people there and we felt pretty

19  secure that the money would be held in escrow and we had escrow

20  agreements to that extent.  In order to make them comfortable,

21  we gave them a time period to get certain parts of our deal

22  that we needed to get comfortable went.  We think we gave them

23  a 24-hour period or maybe some form of that to get us

24  comfortable and that is how -- that is -- we sent -- we sent

25  funds at that point.

Fc26new2                           Greenwald – direct

1    Q.  When you say "to get us comfortable," when sort of comfort
2    were you seeking?
3    A.  I think we were very uncomfortable with the deal itself as
4    far as exactly if the deal was actually still up and running,
5    if there was actually going be a closing, if we actually were
6    able to get securities as far as what we were required --
7    basically at that point mostly the shares that we were talking
8    about originally.
9    Q.  The shares of Mr. Darden Senior?
10   A.  Yes.
11   Q.  And you mentioned that the escrow account that you sent the
12   money to was at Pryor Cashman.  Did the location of the escrow
13   account make a difference to you?
14   A.  Sure.
15   Q.  Why?
16   A.  Well, we generally won't send any funds to someone we don't
17   have a relationship with or a law firm that is not a well
18   known, prestigious law firm.  In this case we happened to have
19   both.  Pryor Cashman is a very prestigious law firm.  In
20   addition, I had a relationship with the person that was being
21   involved in escrow there.
22   Q.  Did Mr. Newkirk make you aware of any past issue or
23   problems in the Maxim deal involving money that had been sent
24   to an escrow account at a law firm?
25           MR. HARRIS:  Objection, your Honor, relevance.

1              THE COURT:  Overruled.

2              You may answer.

3    A.  Can you repeat the question.

4    Q.  Yes.

5              Did Mr. Newkirk make you aware of any past issues or

6    problems in the Maxim deal involving money being sent to an

7    escrow account at the law firm?

8    A.  No.

9    Q.  Did he ever tell you about a lender by the name of Mark

10   Weinberg?

11   A.  I don't recall.

12   Q.  Please take a look at Government Exhibit 814.  I would like

13   to direct your attention to the e-mail from you, which is the

14   second one from the top.  If we can focus in on that, please.

15             Do you see that e-mail?

16   A.  Which one am I focusing on?

17   Q.  The second one from the top on first page, an e-mail from

18   you dated February 7th.

19   A.  Yes, I do.

20   Q.  Now, you say in this e-mail that you feel you're not

21   getting the full picture of what is happening.

22             What did you mean by that?

23   A.  Like I mentioned I feel that we got this deal back on, part

24   of our requirements and our, I guess, notices of actually

25   funding this deal was we really -- we really didn't feel there

Fc26new2                          Greenwald - direct

1    was a deal potentially that was actually happening.  We weren't

2    sure whether that was happening.  We were being told it was

3    happening, but we weren't getting a lot of information.  The

4    deal seemed to have canceled at one point or at least was

5    definitely teetering on cancellation and it was being

6    reinstated.  We wanted to know the deal was reinstated and the

7    deal was actually happening.

8    Q.  What ultimately happened with the money that you sent to

9    the escrow account at Pryor Cashman?

10   A.  We requested for the money to come back for us.

11   Q.  Why did you ask for the money back?

12   A.  We didn't feel comfortable that the deal was happening.  We

13   told them that, I recall, if the deal ever comes back and if we

14   can get comfortable, we may entertain the deal again, but right

15   now we're just not comfortable.

16   Q.  Did you ever authorize the release of your moneys to the

17   seller of Maxim?

18   A.  No.

19   Q.  After you received your money back from the Pryor Cashman

20   escrow ask was that the end of your involvement in the Maxim

21   deal?

22   A.  I believe so.

23            MS. CHAUDHRY:  One moment.

24            MS. PAUL:  No further questions.

25            THE COURT:  Counsel, let me ask so I know whether to

Fc26new2                          Greenwald – direct

1    give the jury their break now or later.  About roughly how long

2    do you expect to be?

3             MR. HARRIS:  20, 25 minutes.

4             THE COURT:  Ladies and gentlemen, we'll give you your

5    midmorning break now.  We'll resume in 15 minutes.

6             (Jury excused)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (In open court; jury not present)

2    THE COURT:  Please be seated.  You may recall that

3    Juror No. 1 comes from quite some distance had previously sent

4    us a note in which he was concerned both about expenses he was

5    incurring and also about care for his children because in order

6    to be here on time he had to stay over in Manhattan and you

7    will recall that I indicated to him that I would talk to his

8    employer.  I did.  I had two very excellent conversations with

9    his employer and the financial concerns were obviated.

10    But this morning we received another note from him

11    that says as follows:  Starting next week I will have no one to

12    watch my children in the morning.  I checked train schedules

13    and I think I can get here by 10:20-10:30.

14    So I don't know what we're going to do about that, if

15    anything.  We'll see how we're proceeding in terms of the time

16    it takes to finish the case.  I wanted to flag that note for

17    you so you can start thinking about that.  We do still have one

18    alternate.  On the other hand Juror No. 1 has, as the note

19    indicates, indicated his desire to try to work things out so

20    that he can continue to serve.  So I just raise it for your

21    consideration.  We'll take that up later depending how things

22    go whether there is a need to do anything.

23    Yes, ma'am.

24    MR. HARRIS:  Your Honor, I just wanted to flag for you

25    one issue to discuss with you today.

Fc26new2                          Greenwald - direct

1              THE COURT:  I am sorry?

2              MR. HARRIS:  I just wanted to flag for you that we

3    have one issue to discuss with you today.  It does not involve

4    Mr. Greenwald.  It does not need to be done now.  I just wanted

5    to make sure --

6              THE COURT:  What is the issue?

7              MR. HARRIS:  May I do it at side bar, your Honor.

8              THE COURT:  Yes.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       (At the side bar)

2           MR. HARRIS:  Your Honor, in anticipation of

3   Mr. Newkirk's testimony, I had discussed with the government

4   questions that I might have and getting their opinion whether

5   they thought it would open the door, and they thought that

6   Mr. Newkirk testifying opened the door.  I said I didn't

7   understand that to be --

8           THE COURT:  I haven't ruled on that one way or the

9   other.  So I agree we need to discuss that.  I am not prepared

10  to discuss it until you tell me that it makes a difference.

11  Otherwise, it is just an advisory opinion.

12          MR. HARRIS:  I understand.

13          THE COURT:  So if you decide by the end of today that

14  he will definitely take the stand unless it opens the door -- I

15  assume we're talking about the boxing deal?

16          MR. HARRIS:  That's correct, your Honor.

17          THE COURT:  -- or you conclude that he will definitely

18  take the stand regardless or whatever, then I will take it up.

19  I am not going to waste my time until I know whether it is

20  material in effect.

21          MR. HARRIS:  Just wanted to flag it.

22          THE COURT:  Very good.  Thanks a lot.

23          (In open court)

24          THE COURT:  We'll see you all in a few minutes.

25          (Recess)

FC2VNEW3                          Greenwald - cross

1              (Jury present)

2              THE COURT:  Counsel.

3              MR. HARRIS:  Thank you, your Honor.

4    CROSS-EXAMINATION

5    BY MR. HARRIS:

6    Q.  Good morning, Mr. Greenwald.  By name is Jon Harris.  I

7    represent Harvey Newkirk.  We spoke about a week or so ago.

8    A.  Correct.  Good morning.

9    Q.  Mr. Greenwald, you testified you're an attorney.  What kind

10   of attorney are you?

11   A.  I testified that I'm CEO of a company and I am attorney.

12   Q.  Sorry.

13   A.  I actually practice -- don't practice law per se, but I'm

14   involved with a company that deals with some sort of practical

15   law, real estate law.

16   Q.  You testified that you were introduced to this transaction

17   by someone you knew in December 2013.

18   A.  Yes.

19   Q.  Do you recall who that person was?

20   A.  I got through them through a fellow named Joel Schreiber

21   who introduced me to a company called Forefront Capital, I

22   believe.

23   Q.  Had you ever done any business with Forefront before?

24   A.  Not that I recall.

25   Q.  Am I correct that your interest was in making a short-term

1    secured loan?

2    A.  Yes.

3    Q.  Am I also correct that you had no interest in Maxim as a

     business?

5    A.  No, it was no interest.

6    Q.  And the government showed you a term sheet which is

7    Government Exhibit 804.

8            Do you have the exhibits in front of you?

9    A.  Yes.  Yes, I do.

10           MR. HARRIS:  Can you put Government Exhibit 804 up.

11   If we could look at the first page of the email.

12   Q.  That is from Eitan Tabak; is that correct?

13   A.  Yes, it is.

14   Q.  Mr. Tabak was your attorney on this deal; is that right?

15   A.  Yes.

16   Q.  This is a term sheet for the -- can I call it the first

17   iteration?  There was a deal on the table maybe in December, it

18   went away, and then it came back in January?

19   A.  Correct.

20   Q.  All right.  So this is a term sheet for the first iteration

21   of the deal, right?

22   A.  Yes.

23           MR. HARRIS:  If we can go now to the term sheet,

24   please, first page of the term sheet.

25   A.  Yes.

FC2VNEW3                          Greenwald - cross

1   Q.   Thank you.

2            There was going to be a loan of $5 million; is that

3   right?

4   A.   Yes.

5   Q.   And fair to call that -- if we just go down, that was going

6   to be due -- the idea was that it would be repaid within 14

7   days of closing; is that right?

8   A.   Correct.

9   Q.   That's a short-term loan?

10  A.   Very short-term.

11  Q.   And your concern is that your loan gets paid back with

12  interest.

13  A.   Correct.

14  Q.   Could you just explain to the jury what the difference

15  is --

16            MR. HARRIS:  You can take down 804 please.

17  Q.   Can you explain for the jury what's the difference between

18  a secured loan and an unsecured loan.

19  A.   Unsecured loan may be something which you may lend to

20  anyone, but particularly a friend or someone you may trust.

21  And you may lend them a small amount of money or a large amount

22  of money; but it's not secured by anything specific, it's just

23  basically based on the person's word and their goodwill and

24  maybe have documents between each other, but nothing specific

25  that you're attaching your interest to.

FC2VNEW3                      Greenwald - cross

1    Q.  And a secured loan?

2    A.  Secured loan would be -- a standard secured loan may be

3    where there's a business that you collateralize or real estate

4    that you may collateralize with mortgage on a property, other

5    assets.  Someone may have stocks, bonds, collateral that may be

6    available.

7    Q.  So that if the loan is not repaid back, you get to try to

8    collect against the collateral.

9    A.  Correct.

10   Q.  Kind of like a loan on a house would be a secured loan.

11   A.  Correct.

12   Q.  You testified that you met with Calvin Darden Junior; is

13   that right?

14   A.  Yes.

15   Q.  And you also spoke with him?

16   A.  Yes.

17   Q.  I'm going to hand you two exhibits.

18          MR. HARRIS:  Your Honor, may I approach?

19          THE COURT:  Yes.

20          MR. HARRIS:  I'm going to hand the exhibit -- what's

21   been marked for identification as Defense Exhibit 426 and 427.

22   Q.  If you could please look at 426 and 427.

23          Those are both, am I correct, emails from Calvin

24   Darden to yourself on December 12th, 2013?

25   A.  Yes.

1                MR. HARRIS:  Your Honor, I offer 426 and 427.

2                MS. PAUL:  No objection.

3                THE COURT:  Received.

4                (Defendant's Exhibits 426, 427 received in evidence)

5                MR. HARRIS:  Can we please put up Exhibit 426.

6                I need Defendant's Exhibit 426.  I'm sorry, that was

7       my fault.

8       Q.  I'll go ahead and ask you about it.

9                Do you need a moment to look through it,

10      Mr. Greenwald?

11      A.  Yes, please.

12      Q.  Sure.  Take your time.

13      A.  Okay.

14      Q.  You've had an opportunity to look through it?

15      A.  Yes, I did.

16      Q.  Am I correct that Defense Exhibit 426 is a collateral

17      worksheet that was sent to you by Calvin Darden?

18      A.  It seems so, yes.

19      Q.  Did you understand that to be Darden Senior or Junior?

20      A.  I don't recall from the email.  I don't recall from the

21      context.

22      Q.  The attachment is a worksheet of collateral; is that right?

23      A.  Yes.

24      Q.  If you just go back to page 1 of the email.  That worksheet

25      is being forwarded to you.  It's something that Forefront had

FC2VNEW3                          Greenwald – cross

1   sent and that is being forwarded on to you; is that right?

2   A.  Yes.

3   Q.  And on the email forwarding it to you, Mr. Newkirk is not

4   on that email, right?

5   A.  The email forwarded to me, he's not on it; correct.

6               MR. HARRIS:  Can we look at Defendant's Exhibit 427 in

7   evidence.

8   A.  Yes.

9   Q.  And that's an email from Mr. Darden to yourself?

10  A.  Yes, it is.

11  Q.  Do you recall which Mr. Darden?

12  A.  I would assume it would be Calvin Darden Senior.

13  Q.  And that attaches -- in any event, Mr. Newkirk is not on

14  it, whether it's from Junior or Senior, right?

15  A.  Correct.

16  Q.  And that attaches a Bank of America statement and then it

17  attaches a statement of shares in Coca-Cola Enterprises and

18  Cardinal Health; is that right?

19  A.  Yes, it is.

20  Q.  Now, we talked about the term sheet before and I showed it

21  to you, right?

22  A.  Correct.

23  Q.  That's a term sheet and that's not binding, right?

24  A.  Correct.

25  Q.  So if you don't get comfortable, you don't do the deal,

1    right?

2    A.  Right.

3    Q.  And if the other party doesn't like your terms or they

4    don't get comfortable, they don't do the deal?

5    A.  That's correct.

6    Q.  That's what you're asking for.

7    A.  We're just trying to get the information down on paper.

8         MR. HARRIS:  May I approach, your Honor?

9         THE COURT:  Yes.

10        MR. HARRIS:  I've handed the witness what's been

11   marked as Defendant's Exhibit 430 for identification.

12   Q.  Am I correct that's an email from Harvey Newkirk dated

13   Saturday, December 14th, 2013, to Eitan Tabak and that you're

14   copied on it?

15   A.  Yes, that's correct.

16        MR. HARRIS:  Your Honor, I offer Defense Exhibit 430.

17        MS. PAUL:  No objection.

18        THE COURT:  Received.

19        (Defendant's Exhibit 430 received in evidence)

20        MR. HARRIS:  Thank you, your Honor.

21        Could you please publish 430.

22   Q.  This isn't the first iteration of the deal when you're

23   trying to get comfortable with the collateral, right?

24   A.  Correct.

25   Q.  And the main thing you wanted to get comfortable with was

1  the stock, you testified; is that right?

2  A.  Well, it was amongst the few things in collateral, of

3  course.

4  Q.  There's also real estate?

5  A.  Well, there was real estate and there was the company

6  itself.

7  Q.  So Mr. Newkirk sends your lawyer an email with yourself

8  copied saying:  Because of the nature of the particular

9  securities, one cannot perfect a security interest in them

10 through the use of a control agreement.  As a result, my best

11 idea is accompanied by the client to resign or seek permission

12 for a sales plan.  And then he goes on.  Is that right?

13 A.  Yes.  Correct.

14 Q.  You were aware that there were restrictions on the shares;

15 correct?

16 A.  I don't recall at this time.  It seems that there was some

17 sort of restrictions, that's correct.

18 Q.  And Mr. Newkirk is sending you an email about how to deal

19 with that?

20 A.  Yes.

21 Q.  And then the deal went away and it comes back in January;

22 is that right?

23 A.  Sometime in late January, it seems, or February, yes.

24 Q.  May I ask you please to turn to Government Exhibit 808.

25 A.  Eight zero?

FC2VNEW3                          Greenwald – cross

1   Q.  Eight-zero-eight.

2   A.  I don't have it.

3   Q.  You don't have it?

4   A.  I don't believe so.

5   Q.  It's in evidence so it's on your screen.  And if you can't

6   read it, I can give you my copy.

7   A.  It's very hard to.

8   Q.  I'll give you my copy.

9           MR. HARRIS:  Your Honor, I have one thing highlighted

10  on my copy, but I don't care about the highlighting, if that's

11  okay with you.

12          THE COURT:  That's fine.

13  Q.  You testified before that you put the escrow at Pryor

14  Cashman; is that right?

15  A.  Yes, I did.

16  Q.  And that you had also had prior dealings with Pryor

17  Cashman?

18  A.  Yes, specifically with Dennis Sughrue.

19  Q.  Am I correct that the lawyer at Pryor Cashman on this deal

20  was a man named Dennis Sughrue.  Do I have his name right?

21  A.  I believe that's how you pronounce it, or Sughrue.

22  Q.  If you go to the --

23          MR. HARRIS:  If we can blow up the bottom email here.

24  It's a little hard.

25  Q.  January 25th, 2014.  And it's from Mr. Sughrue.  And he

1   writes:  Shaul -- that's your first name, right?

2   A.  Correct.

3   Q.  Eitan, please see attached a draft loan agreement, a note

4   for the Darden loan.  The black line show changes from the

5   document that was prepared and previously contemplated a $5

6   million loan.  Please be in touch with any questions or

7   comments, Dennis.

8           Right?

9   A.  Correct.

10          MR. HARRIS:  And then can we see the email above that.

11  Q.  And you write back:  Dennis, always good to see you in a

12  transaction.

13          Is that right?

14  A.  Correct.

15  Q.  Who did you understand Mr. Sughrue to be representing in

16  this transaction?

17  A.  I believed him to be representing the Dardens.

18  Q.  He was not your lawyer, right?

19  A.  Definitely not my lawyer.

20  Q.  Do you know if Mr. Sughrue had an associate named Mr. Kyle

21  Miller who worked on the deal?

22  A.  I don't recall.

23          MR. HARRIS:  Can we just go up a couple in the email

24  chain.

25  Q.  Just take a look at this.

1    MR. HARRIS:  Can we go to the top please and the first

2    kind of half.

3    Q.  If you look at the second email -- the first email says:

4    Attached is a guarantee.  That's from Dennis Sughrue.  And then

5    there's an email from Calvin Darden at the Reign and it's to

6    Dennis Sughrue at Pryor Cashman and then also to K. Miller at

7    Pryor Cashman.

8    Do you see that?

9    A.  Yes, I see it.

10   Q.  Mr. Miller worked with Mr. Sughrue?

11   A.  I don't know.

12   Q.  It appears that way?

13   A.  Appears.

14   MS. PAUL:  Objection.

15   THE COURT:  Sustained.

16   MR. HARRIS:  Can we please put up Government Exhibit

17   2010.

18   I'm sorry, I do not have a copy for you, but maybe the

19   government does.

20   May I approach, your Honor?

21   THE COURT:  Yes.

22   Q.  This document is in evidence, Mr. Greenwald.

23   Can you go please to the second page of the document.

24   A.  Yes.

25   Q.  The email at the bottom is from kylemiller@pryorcashman.com

1    to Mr. Tabak and to yourself, with a cc to Calvin Darden.

2              Do you see that?

3    A.  Yes, I do.

4    Q.  It says:  Attached is a revised draft of the loan

5    agreement, a draft of the Darden Media Holdings pledge

6    agreement, etc.

7    A.  Correct.

8    Q.  If you go to the top email in that second page, it actually

9    starts on the bottom of page 1, if we could have the first

10   page.

11   A.  Yes.

12             MR. HARRIS:  I was just asking called up on the

13   screen, if we could have the first page called up on the

14   screen.

15             Thank you.  I'm sorry.

16   Q.  The one at the bottom is -- there's an email from Eitan

17   Tabak, and that's to yourself and Kyle Miller and Mr. Sughrue.

18   And it says:  Kyle, can you please send me the revised

19   documents showing the cleanup changes we agreed on.

20   A.  Yes, I see it.

21   Q.  This is the second go-round; this is the loan documents

22   that are being worked on?

23   A.  Seems so, yes.

24   Q.  And in the course of working on that second loan, at some

25   point you sent $3 million, is that right, to Pryor Cashman's

1    escrow?

2    A.   Yes.

3    Q.   And the second loan was a smaller amount.   The first loan

4    contemplated had been five million, the second loan

5    contemplated for three million?

6    A.   I believe so.

7    Q.   And the deal never went through and you got your money

8    back; is that correct?

9    A.   That's correct.

10   Q.   Even after the deal never went through and you got your

11   money back, you still would have been willing to revisit doing

12   the deal had it come back to life; is that right?

13   A.   Potentially we would have been, continued our discussions,

14   yes.

15              MR. HARRIS:   One second please.

16              (Pause)

17   BY MR. HARRIS:

18   Q.   Mr. Greenwald, do you recall how many calls you had with

19   the person you believed to be Calvin Darden Senior?

20   A.   I don't recall, but a few, I believe.

21   Q.   Did they sound like -- and you met with Calvin Darden

22   Junior, right?

23   A.   Yes, I did.

24   Q.   Did the person on the phone sound like the same person who

25   you met with?

FC2VNEW3                    Greenwald – redirect

1   A.  No.

2          MR. HARRIS:  I have no further questions.

3          THE COURT:  All right.

4          Redirect.

5          MS. PAUL:  Yes.

6          Could we bring up Defense Exhibit 426 please.

7   REDIRECT EXAMINATION

8   BY MS. PAUL:

9   Q.  Do you have Defense Exhibit 426, Mr. Greenwald?

10  A.  Yes, I do.

11  Q.  Can you take a look at the bottom email on the first page

12  please.

13  A.  Yes.

14  Q.  Is Mr. Newkirk copied on that email?

15  A.  Yes, he is.

16  Q.  This is the email that forwards around the collateral

17  worksheet; is that right?

18  A.  Correct.

19  Q.  So that's attached to this email that Mr. Newkirk is copied

20  on?

21  A.  Yes, it is.

22  Q.  If we can just look at the email just above that, please.

23  A.  Okay.

24          MS. PAUL:  Can you focus in on that.  Thank you.

25  Q.  Is Mr. Newkirk copied on this email as well?

1   A.  Yes.

2          MS. PAUL:  Can we please bring up Government Exhibit

3   804 please.

4   Q.  Mr. Greenwald, you were asked some questions on

5   cross-examination about this term sheet.

6          Do you recall those questions?

7   A.  Yes.

8   Q.  I think you testified that the term sheet reflected what

9   you were asking for at the start of the deal; is that right?

10  A.  Correct.

11  Q.  Now, if we could go to page 3 of this document.

12  A.  Okay.

13  Q.  Where it says guarantor collateral.

14  A.  Yes.

15  Q.  This is the collateral listed here in the term sheet; is

16  that right?

17  A.  Yes, it is.

18  Q.  Did Mr. Newkirk tell you that the collateral listed here in

19  the term sheet was, in fact, available to be pledged?

20  A.  I don't recall.

21  Q.  Did Mr. Newkirk tell you that Calvin Darden Senior's stocks

22  were available to be pledged as collateral for your loan?

23  A.  We spoke about the stocks, that they were available for a

24  pledge in some sort of action, yes.

25          MS. PAUL:  If we could bring up Government Exhibit

1        2010 please.

2    Q.  Do you have that, Mr. Greenwald?

3    A.  I don't have that.  I have it on the screen.

4    Q.  If you could take a look on your screen.

5    A.  Okay.

6    Q.  The email at the bottom there.

7    A.  Okay.  I see it.

8    Q.  We could focus in on that.

9            Do you see this email from Calvin Darden dated January

10   29, 2014?

11   A.  Yes.

12   Q.  In this email, Mr. Darden directs Kyle to get in touch with

13   Harvey for the information that Eitan just requested.

14           Do you see that?

15   A.  Yes, I do.

16   Q.  He also says that he wants to make sure Harvey is aware of

17   everything that we've granted to them.  Do you see that?

18   A.  Yes.

19           MS. PAUL:  One moment please.

20           Nothing further.

21           THE COURT:  Anything else?

22           MR. HARRIS:  I'm sorry.  One moment, your Honor, if I

23   may.

24           (Pause)

25           MR. HARRIS:  Nothing further, your Honor.

1           THE COURT:  Thank you very much.  You may step down.

2           (Witness excused)

3           THE COURT:  Please call your next witness.

4           MS. PAUL:  The government calls Chaeri Tornay.

5    CHAERI TORNAY,

6         called as a witness by the Government,

7         having been duly sworn, testified as follows:

8           MS. PAUL:  May I inquire?

9           THE COURT:  Yes.

10          MS. PAUL:  Thank you, your Honor.

11   DIRECT EXAMINATION

12   BY MS. PAUL:

13   Q.  Good morning, Ms. Tornay.

14   A.  Good morning.

15   Q.  Where are you employed?

16   A.  I'm currently employed at PriceWaterhouseCoopers.

17   Q.  What is your position there?

18   A.  It is director within the office of the general counsel.

19   Q.  Before working at PriceWaterhouseCoopers, where were you

20   employed?

21   A.  I was at Bryan Cave.

22   Q.  For approximately how long?

23   A.  For approximately eight years as a full-time associate, and

24   then as a summer intern for two summers.

25   Q.  And is an associate an attorney position?

FC2VNEW3                         Tornay – direct

1   A.   That's correct.

2   Q.   What were your duties and responsibilities as an associate

3   at Bryan Cave?

4   A.   I worked in the general corporate group; so I worked on

5   corporate transactions and securities matters.

6   Q.   While you were working at Bryan Cave, did you know an

7   attorney named Harvey Newkirk?

8   A.   Yes.

9   Q.   What was Mr. Newkirk's position at Bryan Cave?

10  A.   His title was counsel.

11  Q.   Is that a more senior or less senior position than an

12  associate position?

13  A.   It is more senior.

14  Q.   Approximately when did you first meet Mr. Newkirk?

15  A.   It was approximately July, summer of 2013.

16  Q.   After meeting Mr. Newkirk, did you work with him on any

17  transactions?

18  A.   Yes, I did.

19  Q.   What transaction did you work with him on?

20  A.   It was the Maxim transaction.

21  Q.   Do you see Mr. Newkirk in the courtroom today?

22  A.   I do.

23  Q.   Where do you see him?

24          MR. HARRIS:  We stipulate, your Honor.

25          THE COURT:  All right.

FC2VNEW3                         Tornay – direct

1   Q.  How did you first come to be involved with the Maxim

2   transaction?

3   A.  I was asked by Jay Dorman, who was at the time the head

4   partner of the corporate group, to assist Mr. Newkirk in the

5   transaction.

6   Q.  Approximately when did you start working on it?

7   A.  It was approximately some time in, I think, the end of July

8   2013.

9   Q.  At that time did Mr. Newkirk describe the deal to you?

10  A.  Yes.

11  Q.  What did he tell you about it?

12  A.  At the time we had introductory meetings.  And he had

13  described that the client was Mr. Darden Senior; and that the

14  company that was the over -- sort of the parent company was

15  Reign Entertainment; and there would be two entities formed

16  below it that would be involved in the acquisition.

17  Q.  Did he describe those two entities as subsidiaries of

18  Reign?

19  A.  Yes.  They were to be formed by Bryan Cave with

20  Mr. Newkirk.

21  Q.  Do you remember what the subsidiaries were called?

22  A.  One was Darden Media Holdings and then the lower

23  subsidiary, which was supposed to be the entity, legal entity

24  acquiring Alpha Media Group, was, I believe, DMG Beta

25  Acquisition.

1    Q.  Who was the seller of Maxim?

2    A.  It was Alpha -- it was a company called Alpha Media Group.

3    Q.  Now, at the time you first became involved in the deal,

4    what was the deal status?

5    A.  Mr. Newkirk and Mr. Dorman had explained that it was moving

6    along at a quick pace.  And at the time that I had started

7    working with Mr. Newkirk, it was probably, I would say, about

8    two-thirds along in terms of the transaction documents that had

9    been worked on and negotiated.

10   Q.  What was your initial role in the deal?

11   A.  Mr. Newkirk was primarily working on negotiating the main

12   agreement, which was the purchase agreement.  I was assisting

13   with whatever other ancillary documents he needed assistance

14   on.

15   Q.  Who did you report to in connection with your work on the

16   deal?

17   A.  Mr. Newkirk.

18   Q.  Who was the most senior attorney on the deal at the

19   beginning?

20   A.  Mr. Newkirk.

21   Q.  Initially, were you on any calls regarding the deal?

22   A.  The first call that I can recall being a part of was a

23   group call that Mr. Newkirk was on as well as Calvin Darden

24   Junior and Barbara Laurence and another gentleman named Brad

25   Reifler.

FC2VNEW3                        Tornay - direct

1   Q.  And in general, what was that call about?

2   A.  That call was sort of a planning call in terms of what the

3   group was looking to do after the transaction closed and how

4   they could revamp the reputation of Maxim and future plans for

5   how they could bring it back to what it once was.

6   Q.  Why were you participating in that call?

7   A.  I had asked Mr. Newkirk if I should be on the call.  And he

8   had mentioned if I had time, that I should join.  So I was only

9   in listening mode during the call.

10  Q.  Now, as a lawyer working on a deal, had you ever

11  participated in a planning call like that before?

12  A.  Not to my recollection.  I thought it was a little bit

13  early in the deal to be discussing that kind of future plan.

14  Q.  Now, you mentioned that Calvin Darden Junior was on the

15  call.  Did Mr. Newkirk ever tell you what role, if any, Calvin

16  Darden Junior was going to play in the Maxim deal?

17  A.  No.

18  Q.  Did Mr. Newkirk ever ask you to participate in calls with

19  Calvin Darden Senior?

20  A.  No.

21  Q.  When Mr. Newkirk received calls about the deal, did he

22  typically ask you to participate or not?

23          MR. HARRIS:  Objection.  Leading.

24          THE COURT:  No, I think it's okay in its foundational

25  situation, but do be careful about the leading.

1       Overruled for now.

2       MS. PAUL:  Thank you, your Honor.

3   A.  Can you please repeat the question.

4   Q.  Yes.

5       When Mr. Newkirk received calls about the deal, did he

6   typically ask you to participate or not?

7   A.  No, he did not.

8   Q.  Did Mr. Newkirk ever ask you to email the client?

9   A.  Yes.

10  Q.  What email address did he tell you to use?

11  A.  He gave me one email address.  It was the

12  calvinrdarden@gmail.com address.

13  Q.  And who, if anyone, did he say had access to that email

14  address?

15  A.  He told me that both Mr. Darden Senior and Mr. Darden

16  Junior had access to that email address.

17  Q.  Did you send materials to that email address?

18  A.  Yes.

19  Q.  Just in general, what types of materials did you send?

20  A.  At Mr. Newkirk's instruction, I had sent over documents

21  that had to be signed by Mr. Darden Senior in connection with

22  the transaction.

23      MS. PAUL:  May I approach, your Honor?

24      THE COURT:  Yes.

25  Q.  Ms. Tornay, I've handed you a binder of exhibits that are

1   in evidence and I'll be asking you about that.

2           Please take a look first at Government Exhibit 636.

3           Do you recognize that document?

4   A.  Yes.

5   Q.  What is it?

6   A.  It is an email that I sent to the calvinrdarden@gmail.com

7   address on October 14th, 2013.

8   Q.  And why did you send this email?

9   A.  It is an email attaching for Mr. Darden Senior's signature

10  the employee offer letters and the executive employment

11  agreements that had to be signed in connection with the

12  closing.  These were the employees who are -- currently at the

13  time were at Alpha Media Group and would be transitioning into

14  the company after closing.

15  Q.  You addressed this email to Mr. Darden.  Which Mr. Darden

16  were you referring to?

17  A.  I was referring to Mr. Darden Senior.

18          MS. PAUL:  If we could just bring up the attachment,

19  first page of the attachment.

20  Q.  Who ended up signing the documents that are -- the

21  employment letters that are attached to this email?

22  A.  Mr. Darden Junior ended up signing them in the end.

23  Q.  And approximately when did Mr. Darden Junior sign these

24  documents.

25  A.  So these letters are dated October 15th.  And it was just

1  right around that time that Mr. Darden Junior came in in person

2  to Bryan Cave to sign the documents.

3  Q.  And did he sign them in your presence?

4  A.  Yes.

5  Q.  Had you ever met Mr. Darden Junior before?

6  A.  I had not.

7  Q.  What, if anything, did Mr. Newkirk tell you about why

8  Mr. Darden Junior rather than Mr. Darden Senior was signing the

9  documents?

10 A.  Mr. Newkirk had told me that Mr. Darden Senior was not able

11 to come to New York from Atlanta because his mother-in-law had

12 passed away and that they were staying back -- he was staying

13 back for funeral services.

14 Q.  Do you know whether Mr. Darden Senior's mother-in-law had,

15 in fact, passed away?

16 A.  No, I don't know.

17 Q.  Can you describe what happened when Mr. Darden Junior came

18 to Bryan Cave to sign these documents.

19 A.  We had arranged -- the associate that I was working with,

20 Haley Cohen, and I had arranged a conference room so that he

21 could come and sign the documents.  And so we did that on our

22 conference room floor.  He came in person to sign the

23 documents.

24 Q.  Was Mr. Newkirk there when that happened?

25 A.  I believe that Haley and I -- Ms. Cohen and I -- we arrived

FC2VNEW3                              Tornay - direct

1    at a conference room and Mr. Darden Junior was there --

2              MR. HARRIS:  Objection, your Honor.  Not responsive.

3              THE COURT:  I'll allow it.  But I caution the witness

4    just to respond to the question put.  But I'll leave what the

5    answer is said at the moment.

6              Put another question.

7              MS. PAUL:  Yes.

8    Q.  Was Mr. Newkirk in the conference room that day?

9    A.  He entered after Mr. Darden Junior arrived.

10   Q.  When he entered, did he and Mr. Darden Junior greet each

11   other?

12   A.  Yes, they did.

13   Q.  Can you describe that greeting.

14   A.  It was a very friendly greeting.  They hugged, they called

15   each other bro, and it seemed like they were friends.

16   Q.  Please take a look at Government Exhibit 144.

17             Do you recognize that document?

18   A.  Yes.

19   Q.  What is it?

20   A.  These are signature pages that were signed at that meeting

21   by Mr. Darden Junior.  They were signature pages for the

22   employment agreements.

23   Q.  Are these some of the document -- are these signature pages

24   for some of the documents that Mr. Darden Junior signed in your

25   presence?

1    A.   Yes.

2    Q.   After Mr. Darden Junior signed these documents, what

3    happened?

4    A.   After the documents were signed, Mr. Newkirk had told me

5    that he and Mr. Darden Junior were going to take the original

6    signed agreements straight to Alpha Media Group's offices for

7    an in-person meeting.

8    Q.   I'd like to direct your attention now to October 18th of

9    2013.

10          Do you recall the Maxim deal being scheduled to close

11   around that time?

12   A.   Yes.

13   Q.   For the Maxim deal, what were you doing in the days leading

14   up to that October closing date?

15   A.   In the days leading up to it I was working with Mr. Newkirk

16   and with Alpha Media Group's counsel, Bodman, to prepare and

17   finalize the closing documents.  And I also participated on

18   check-in calls that happened frequently up until the closing.

19   Q.   What were the check-in calls about just in general?

20   A.   They were group calls where Alpha Media Group's counsel,

21   their lawyers, were on.  I would join and there were various

22   other parties trying to line administrative items such as bank

23   accounts and payroll up towards to have it in line and ready

24   for closing.

25   Q.   Was Mr. Newkirk on those check-in calls?

1   A.  He was not.

2   Q.  What, if anything, did he tell you about why he was not

3   participating?

4   A.  Prior to the calls, I would often check in with him and ask

5   if he would be joining and ask for an update.  And he would

6   tell me he would not be joining due to a conflict of some

7   nature.  And then I would join and provide whatever updates I

8   had.

9   Q.  Did the deal close on October 18th?

10  A.  It did not.

11  Q.  Can you walk us through what happened that day.

12  A.  So that morning, Mr. Newkirk came in and I met him on the

13  office floor where we were, both of our offices were.  And

14  seller's counsel, Bodman, they were the attorneys, were sitting

15  on a separate floor from the conference room.

16        Mr. Newkirk told me that Mr. Darden Senior had been

17  hospitalized overnight and that he was not going to be able to

18  press go on the funding.

19  Q.  So after Mr. Newkirk said that to you, what happened?

20  A.  We both went to -- walked to the conference room floor

21  together and we entered the conference room.  And Mr. Newkirk

22  shared the news with the lawyers from Bodman.

23  Q.  Were you present when he did that?

24  A.  Yes.

25  Q.  Prior to that day, had you ever been involved in a

1    transaction that had failed to close?

2              MR. HARRIS:  Objection.

3              Irrelevant, your Honor.

4              THE COURT:  Sustained.

5    Q.  Do you know if, in fact, Calvin Darden Senior had been

6    hospitalized at that time?

7    A.  No, I do not.

8    Q.  After Mr. Newkirk communicated this to the sellers, what

9    happened?

10   A.  So the lawyers from Bodman, Forrest Dillon and Larry

11   Dietch, were surprised and had asked what had happened and had

12   asked for more information.

13   Q.  What was Mr. Newkirk's response to their request for more

14   information?

15   A.  Mr. Newkirk had said at the time he didn't have -- he had

16   limited information about when Mr. Darden Senior was going to

17   be released from the hospital, when he could release the

18   funding.

19   Q.  After October 18th, what was your role in the Maxim deal?

20   A.  I had limited -- a limited role, excuse me, going forward.

21   Mr. Newkirk had asked me to help on a couple of items beyond

22   that point.

23             At some point I think in November I assisted and also

24   then in January in connection with the loan from the McMahons.

25   Q.  During your time working on the Maxim deal, did Mr. Newkirk

1    tell you about a lender called Open Gate Capital?

2    A.  So Open Gate Capital, the name was familiar to me because

3    in connection with --

4              MR. HARRIS:  Objection.  Nonresponsive.

5              THE COURT:  The question was did he say anything to

6    you about Open Gate Capital.

7              THE WITNESS:  He did not provide an explanation for

8    Open Gate Capital other than in connection with adding the name

9    of Open Gate Capital to certain disclosure schedules for the

10   loan agreement.

11   Q.  And what loan agreement are you referring to?

12   A.  This is the loan agreement for the -- with the McMahons.

13   Q.  And approximately when was it that you were discussing a

14   potential loan for the McMahons?

15   A.  Oh, timing-wise that was probably the end of December/early

16   January.

17   Q.  Was that the first time you became aware of Open Gate?

18   A.  Yes.

19   Q.  Did Mr. Newkirk ever inform you that Open Gate had filed or

20   threatened to file a lawsuit to recover money that it was owed?

21   A.  No.

22   Q.  Do you recall a potential lender to the Maxim deal named

23   Mark Weinberg?

24   A.  I recall that name, yes.

25   Q.  Please take a look at Government Exhibit 201.

1          Do you recognize that document?

2     A.  Yes.

3     Q.  What is it?

4     A.  It is an email chain between me and Mr. Newkirk on November

5     7th.

6     Q.  Of 2013?

7     A.  Yes.

8     Q.  If you could turn to the second page of the document

9     please, the email from Mr. Newkirk there.

10         Do you see that?

11    A.  Yes.

12    Q.  Do you recall money from Mr. Weinberg having been in an

13    escrow account at Bryan Cave?

14    A.  Yes.

15    Q.  Had you ever seen Bryan Cave act as an escrow agent in this

16    matter?

17    A.  It was in my personal experience --

18         MR. HARRIS:  Objection.

19         THE COURT:  Sustained.

20    Q.  Mr. Newkirk makes reference in this email to the Bodman

21    trust account.  Do you see that?

22    A.  Yes.

23    Q.  What did you understand that to be?

24    A.  I understood that to be the account for the sellers, Alpha

25    Media Group.  It was their attorneys.

1   Q.  Please take a look at Government Exhibit 202.

2           Do you recognize that document?

3   A.  Yes.

4   Q.  What is it?

5   A.  It is an email from me to Mr. Newkirk also dated on

6   November 7, 2013.  And it's 2:55 in the afternoon.

7   Q.  In your email to Mr. Newkirk, you make reference to an

8   internal approval from St. Louis.  Do you see that?

9   A.  Yes.

10  Q.  What was that?

11  A.  It was an approval that was required internally within

12  Bryan Cave in order to release the funds ultimately upon

13  receiving these instructions.

14  Q.  Release which funds?

15  A.  I'm sorry, the funds that were sitting in the escrow

16  account.

17  Q.  Just to be clear, Mr. Weinberg's funds?

18  A.  Yes.

19  Q.  So did you get the internal approval that you needed in

20  order for the funds to be released?

21  A.  Yes.

22  Q.  So as of November 7th, had everything been set up

23  mechanically for the money to be released?

24  A.  Yes.

25  Q.  So what were you waiting on at this point before releasing

1    Mr. Weinberg's money?

2    A.  Mr. Newkirk had indicated in that last email that we were

3    waiting for two written confirmations, one from Mr. Darden

4    Senior and the other one from Mr. Weinberg.

5    Q.  Now, you also state in your email to Mr. Newkirk that his

6    voicemail box is full and it's not accepting any further

7    messages.  Do you see that?

8    A.  Yes.

9    Q.  How often was that an issue with respect to Mr. Newkirk in

10   your experience?

11              MR. HARRIS:  Objection.  Relevance.

12              THE COURT:  Sustained.

13   Q.  In your experience, was Mr. Newkirk difficult to reach?

14              MR. HARRIS:  Objection.

15              THE COURT:  Sustained.

16              MS. PAUL:  May I approach, your Honor?

17              THE COURT:  Sure.

18   Q.  Ms. Tornay, I've handed you a document that's been marked

19   for identification as Government Exhibit 151.  Please take a

20   look at that document and tell me if you recognize it.

21   A.  Yes, I do.

22   Q.  What is it?

23   A.  It is a check request that has my name as the requester

24   name.  And I signed the request.  And it's to be sent

25   internally to the accounting -- to the accounting department at

1   Bryan Cave.  And the payee here is Bodman for an amount of $4.9

2   million.

3   Q.  What's the date on this document?

4   A.  It is November 8th, 2013.

5         MS. PAUL:  The government offers Government Exhibit

6   151 into evidence.

7         MR. HARRIS:  No objection, your Honor.

8         THE COURT:  Received.

9         (Government's Exhibit 151 received in evidence)

10  Q.  Ms. Tornay, what was the purpose of this document?

11  A.  This was to -- this was to admit to our internal accounting

12  department to -- which was -- this was required to release the

13  funds.

14  Q.  And again, whose funds are you referring to?

15  A.  Mr. Weinberg's funds.

16        MS. PAUL:  May I approach, your Honor?

17        THE COURT:  Yes.

18  Q.  Ms. Tornay, I'm handing you two documents which have been

19  marked for identification as Government Exhibits 170 and 170A.

20        Starting with Government Exhibit 170, can you take a

21  look at that document and tell me if you recognize it.

22  A.  Yes, I do.

23  Q.  What is it?

24  A.  It is an email exchange between me and Mr. Newkirk dated

25  August 26, 2013.

1           MS. PAUL:  The government offers Government Exhibit

2      170 into evidence.

3           MR. HARRIS:  I have no objection, your Honor.

4           THE COURT:  Received.

5           (Government's Exhibit 170 received in evidence)

6      Q.  Ms. Tornay, what was Mr. Newkirk asking you for in this

7      email exchange?

8      A.  He was asking me for information, language for a general

9      release and waiver that would be provided to Forefront.

10     Q.  For what purpose?

11          MR. HARRIS:  Objection, your Honor.

12          The document speaks for itself.

13          THE COURT:  No, I'll allow it.

14          MR. HARRIS:  Thank you.

15     Q.  For what purpose?

16     A.  He was asking for information for the general release which

17     was supposed to be provided to Forefront, which was Darden

18     Media releasing Forefront from obligations in the commitment

19     letter.

20     Q.  Taking a look at the bottom email from you on the first

21     page there, what were you asking Mr. Newkirk for here about the

22     general release and waiver?

23     A.  I was just trying to understand a little bit more of the

24     context so that I could provide appropriate sample language

25     since general releases and waivers can vary.

FC2VNEW3                          Tornay - direct

```
 1   Q.  And what was Mr. Newkirk's response?

 2            Take a look at the email from him at the top of the

 3   page.

 4            MR. HARRIS:  Asked and answered.

 5            THE COURT:  I'll allow it.

 6   A.  He was asking for the information -- it was supposed to be

 7   Darden Media releasing Forefront from its obligations under the

 8   commitment letter.  And it's something that Alpha Media Group

 9   had requested.

10   Q.  All right.  Please take a look at what's been marked for

11   identification as Government Exhibit 170A.

12            Do you recognize that document?

13   A.  Yes.

14   Q.  What is it?

15   A.  It is an email chain between me and Mr. Newkirk dated

16   August 26th, 2013.  It's a little bit later in the day than the

17   previous.

18            MS. PAUL:  The government offers Government Exhibit

19   170A into evidence.

20            MR. HARRIS:  Your Honor, may I have one moment to look

21   at it?

22            THE COURT:  Yes.

23            (Pause)

24            MR. HARRIS:  No objections.

25            THE COURT:  Received.
```

FC2VNEW3                          Tornay - direct

1          (Government's Exhibit 170A received in evidence)

2   Q.  Ms. Tornay, I'd like to focus on the bottom email from

3   Mr. Newkirk on the second page of the document.

4          Do you see that email?

5   A.  Yes.

6   Q.  This is from Mr. Newkirk to you on August 26th?

7   A.  Yes.

8   Q.  So what was Mr. Newkirk sending to you in that email?

9   A.  He was sending me the release language that he had wanted

10  me to use to put together in the agreement.

11  Q.  To be clear, which agreement?

12  A.  Sorry, the general release and waiver that he had requested

13  that I provide sample language for.

14  Q.  And this was in connection with the Forefront release?

15  A.  Yes.

16  Q.  Ms. Tornay, did you make a record of the hours that you

17  spent working on the Maxim transaction?

18  A.  Yes.

19  Q.  Please take a look at Government Exhibit 507.  It should be

20  in your binder.  I'd like to direct your attention specifically

21  to page 16 of this document, which we'll bring up on the screen

22  as well.

23          Is this a bill?

24  A.  Yes.

25          (Continued on next page)

Fc26new4                          Tornay - direct

1  BY MS. PAUL:

2  Q.   There is a reference on this bill -- actually withdrawn.

3        Where it says C. Tornay on the bill, is that a record

4  of particular hours that you worked?

5  A.   Yes.

6  Q.   There is a reference here on the bill -- the next page.  I

7  apologize.  Page 17.  I believe it is on your screen.

8        There is a reference here in the bill to a conference

9  that you had with Mr. Newkirk regarding a nondisclosure

10  agreement with Stealth SME.

11        Do you see that on the bill?

12        MR. HARRIS:  Objection, your Honor, relevance.

13        THE COURT:  Overruled.

14  Q.   Do you see that?

15  A.   Yes.

16  Q.   Do you recall billing work for Stealth SME?

17  A.   Mr. Newkirk asked me to prepare a nondisclosure for the

18  entity and I had asked him to which client matter number I

19  should bill the work and he indicated that I should bill it to

20  here.

21  Q.   When you say "here," what do you mean?

22  A.   Sorry.  To the matter number related to Mr. Darden Senior

23  and the Maxim transaction.

24  Q.   Ms. Tornay, are you registered as a notary public?

25  A.   Yes.

Fc26new4                          Tornay - direct

1    Q.   What is that?

2    A.   A notary public is someone who verifies the identity of the

3    person signing a document and also confirms witnesses' oaths.

4    Q.   Did there come a time when Mr. Newkirk asked you to

5    notarize a document for him?

6    A.   Yes.  I recall there was one time.

7              MS. PAUL:  May I approach, your Honor?

8              THE COURT:  Yes.

9    Q.   I am handing you a document that has been marked for

10   identification as Government Exhibit 143.

11             Is this a document that you notarized?

12   A.   Yes.

13   Q.   Is that your notary stamp on the second page?

14   A.   Yes, it is.

15   Q.   Whose signature appears above yours?

16   A.   Mr. Newkirk.

17             MS. PAUL:  The government offers Government

18   Exhibit 143 into evidence.

19             MR. HARRIS:  Your Honor, I object, and request a side

20   bar.

21             THE COURT:  Come to side bar.

22             (Continued on next page)

23

24

25

Fc26new4                          Tornay - direct

1          (At the side bar)

2          MR. HARRIS:  Your Honor, I think this violates the

3     ruling on Mr. Mailman and I don't believe we opened the door to

4     and I don't believe it should come in.

5          MS. PAUL:  Your Honor, there is no reference to the

6     boxing deal in this document whatsoever.  In fact, this

7     document is to Mr. Newkirk from Reign.

8          THE COURT:  I don't see any reference other than the

9     term pugilist in the beginning sentence, which could easily be

10    redacted.  Other than that, there is no indication that this

11    relates to the boxing deal.  So the objection is overruled.

12    But if the defense wants that word redacted on the assumption

13    that the jury will be pugilistically challenged, that would be

14    okay.  I see counsel doesn't feel that is necessary.

15          How much longer do you have.

16          MS. PAUL:  I am almost done.

17          THE COURT:  Very good.

18          (Continued on next page)

19

20

21

22

23

24

25

1           (In open court; jury present)

2           MS. PAUL:  The government offers Government

3    Exhibit 143 into evidence.

4           THE COURT:  Received.

5           (Government's Exhibit 143 received in evidence)

6    BY MS. PAUL:

7    Q.  Ms. Tornay, is this the document that Mr. Newkirk asked you

8    to notarize for him?

9    A.  Yes.

10   Q.  And what, if anything, did he tell you about it?

11   A.  He did not tell me anything about it.

12          MS. PAUL:  One moment.

13   Q.  Directing your attention to the first paragraph of the

14   document on page 1, what does the first paragraph indicate?

15          MR. HARRIS:  Objection.  The document speaks for

16   itself.

17          THE COURT:  I think that could call for a little

18   explaining.

19          Overruled.

20   A.  It indicates that he is the managing member of this entity

21   called Invictus Pugilist Ventures, LLC, which is a limited

22   liability company formed in Delaware.

23   Q.  Specifically paragraph one there, what does that paragraph

24   indicate?

25          MR. HARRIS:  Your Honor, I repeat my objection.  She

Fc26new4                          Tornay - cross

1    has no knowledge.

2              THE COURT:  Overruled.

3              MR. HARRIS:  Thank you.

4    A.  It describes that on February 3rd, 2011 there was an

5    assignment agreement where Mr. Newkirk assigned his right to

6    Josh Mailman to certain revenue entitlements of The Reign

7    Entertainment Group and that was in consideration of cancelling

8    Mr. Mailman's interest and the right to receive a profit amount

9    equal to 20 percent.

10             MS. PAUL:  One moment.

11             No further questions.

12             THE COURT:  Cross-examination.

13   CROSS-EXAMINATION

14   BY MR. HARRIS:

15   Q.  Good afternoon, Ms. Tornay.  My name is John Harris.  I

16   represent Harvey Newkirk.

17             We have never met, have you?

18   A.  No.

19   Q.  We have never spoken; right?

20   A.  That's correct.

21   Q.  Ms. Tornay, just on this GX 143, which is the last document

22   the government showed you, that refers in paragraph one to

23   February 2011; correct?

24   A.  Yes.

25   Q.  When did you first meet Mr. Newkirk?

1   A.  I met him in approximately July 2013.

2   Q.  When were you working on the Maxim deal with Mr. Newkirk?

3   A.  It was the, you know, summer into the fall of 2013 and it

4   spilled over 2014.

5   Q.  The government asked you some questions about an escrow

6   account.

7          Do you recall that?

8   A.  Yes.

9   Q.  There are a bunch of procedures.  You are require approval

10  from St. Louis?

11  A.  Yes.

12  Q.  Why approval from St. Louis?

13  A.  The -- as I learned in the process, the CFO or partner at

14  Clokland in the St. Louis office had to confirm that the funds

15  were in the escrow account to be wired.

16  Q.  Is St. Louis the home base, for lack of a better word, for

17  Bryan Cave?

18  A.  So for Bryan Cave it is the founding office, the

19  originating office.  That's correct.

20  Q.  So A lawyer in New York had no ability to send a $5 million

21  wire without the approval from St. Louis; right?

22  A.  I learned that that was one of the procedures that was

23  required, yes.

24  Q.  And then the government showed you some -- I apologize, I

25  just don't remember the exhibit number, but they showed you an

1  exhibit that showed, I guess, a form you filled out about the

2  wire.

3  A.  Yes.  The check request.

4  Q.  Do you know what exhibit number that is?

5  A.  151.

6  Q.  151.  Thank you.

7        You have to provide in this form the amount, and the

8  date, where it is going, who it is going to, all that type of

9  information?

10  A.  Yes.  That is correct.

11  Q.  Without this form no wire gets sent; right?

12  A.  Yes.  It is a requirement.

13  Q.  You understand that Bryan Cave would keep a record of all

14  these forms; right?

15  A.  Yes.

16  Q.  So you can always go back and check and see who sent a wire

17  to whom and who authorized it?

18  A.  Yes.  That is my understanding.

19  Q.  That is all open; right?

20        MS. PAUL:  Objection, vague.

21  Q.  That is all kept in the ordinary records of Bryan Cave;

22  correct?

23  A.  My understanding is that the accounting department keeps

24  records of this nature.  That's correct.

25  Q.  There was a question about your e-mail at Bryan Cave.  Was

1    your understanding that your e-mail at Bryan Cave was private?

2    A.  Can you please explain what you mean by "private"?

3    Q.  Did you understand that folks at the firm could look at

4    your e-mail?

5            MS. PAUL:  Objection, relevance.

6            THE COURT:  I will allow it.

7    A.  As I understood with our policy at the firm with respect to

8    e-mails was that the firm could monitor or review e-mails that

9    were either being received or sent out from my personal e-mail

10   address or any of the other attorneys or staff members.

11   Q.  That also applied to your Bryan Cave e-mail; correct?

12   A.  Yes.  That's correct.

13   Q.  How long, Ms. Tornay, were you at Bryan Cave?

14   A.  I was there starting in September 2007 as a full-time

15   attorney.

16   Q.  You were an associate?

17   A.  Yes.

18   Q.  And as an associate did you have your own clients?

19   A.  I did not.

20   Q.  You primarily worked on clients that were brought in by

21   somebody else at the firm?

22   A.  Yes.

23   Q.  And am I correct that Bryan Cave has approximately a

24   thousand lawyers worldwide?

25   A.  I believe that was pretty accurate at the time.  I don't

1    know the current number, but that is approximately.  Somewhere

2    between 1000 and 1,500 attorneys.

3    Q.  Bryan Cave is a prestigious law firm?

4    A.  Yes.

5    Q.  Am I correct that Bryan Cave had offices around the world?

6    A.  Yes, it does.

7    Q.  Offices in London, Paris and New York?

8            MS. PAUL:  Objection, relevance.

9            THE COURT:  Sustained.

10   Q.  You were in the New York office; correct?

11   A.  I was, yes.

12   Q.  How many lawyers in the New York office?

13   A.  It is approximately somewhere in the range of 120 to 140

14   attorneys at any given time.

15   Q.  Are the lawyers in the New York office divided into

16   practice groups?

17   A.  Yes, they are.

18           MS. PAUL:  Objection, relevance.

19           THE COURT:  I cannot tell yet so I will allow the next

20   few questions.

21           MR. HARRIS:  Thank you.

22           THE COURT:  So the answer was?

23   A.  Yes, we are divided.  No, I am sorry.  The attorneys are

24   all divided into practice groups.

25   Q.  What practice group were you in?

Fc26new4                          Tornay - cross

1   A.  I was in the general corporate practice group.

2   Q.  Was there a head of the corporate practice group?

3   A.  In the New York office the head was this gentleman Jay

4   Dorman.

5   Q.  You mentioned Mr. Dorman on your direct exam; correct?

6   A.  I did, yes.

7   Q.  Did there come a time that Mr. Dorman had a role in the

8   Maxim deal?

9   A.  I had learned that --

10           MS. PAUL:  Objection.  Calls for hearsay.

11           THE COURT:  Sustained.

12  Q.  Did you work with Mr. Dorman on the Maxim deal?

13  A.  I did not work with Mr. Dorman.

14           MR. HARRIS:  May I approach, your Honor?

15           THE COURT:  Yes.

16           MR. HARRIS:  I am handing to Ms. Tornay what is marked

17  as Defense 761, which is an e-mail from herself to Jay Dorman

18  dated November 14th, 2013.  The subject is Maxim in connection

19  with the closing date.  I would offer that exhibit.

20           MS. PAUL:  Objection, hearsay.

21           THE COURT:  Sustained.

22           MR. HARRIS:  Not offered for truth, your Honor.

23           THE COURT:  Let me see it.

24           Well, I don't see what relevance it would have if not

25  offered for its truth; but if you want to come to side bar, I

Fc26new4                          Tornay - cross

1    will hear you.

2              MR. HARRIS:  Thank you, your Honor.

3              (Continued on next page)

```
 1              (At the side bar)
 2              MR. HARRIS:  Your Honor, it is offered to show that
 3     she in fact worked with Mr. Dorman on this transaction and she
 4     had a role in the transaction.
 5              THE COURT:  You wouldn't know that unless it is taken
 6     for its truth.
 7              MR. HARRIS:  That is a fair point, your Honor.
 8              THE COURT:  Pardon?
 9              MR. HARRIS:  That's a fair point, your Honor.
10              THE COURT:  Sustained.
11              MR. HARRIS:  May I offer it for the truth?
12              THE COURT:  It's hearsay.
13              MR. HARRIS:  It is a business record and it is a
14     document that attaches--
15              THE COURT:  Well, if you want to establish that it is
16     a business record, you haven't done that yet.  Let me ask you
17     this:  What is the relevance of the fact that she worked on it?
18              MR. HARRIS:  I believe Ms. Tornay somewhat diminished
19     her involvement.
20              THE COURT:  She?
21              MR. HARRIS:  Diminished her involvement in the matter.
22     She basically said she didn't do anything.  She didn't know
23     this.  She didn't know that.  In fact, she spoke with
24     Mr. Dorman.  She dealt with the people at K&L Gates.  She knew
25     about the McMahon deal.  I think it is relevant to establish
```

1    that.

2              THE COURT:  Wait.  First of all, I am sorry, you want

3    to establish that Ms. Tornay did all those things?

4              MR. HARRIS:  I do.

5              THE COURT:  What is the relevance of that?

6              MR. HARRIS:  The relevance is she tried to put

7    Mr. Newkirk out on an island and I believe --

8              THE COURT:  I am sorry?

9              MR. HARRIS:  She tried to put Mr. Newkirk out on an

10   island in terms of her involvement with the deal.  The

11   government thought it was relevant.  They elicited that

12   testimony and I don't believe that testimony is correct.

13             THE COURT:  How is this witness who --

14             MR. HARRIS:  She is Ms. Tornay.  I have a series of

15   documents.

16             THE COURT:  Let's go back a step.  I am not sure it is

17   relevant; but assuming it is relevant, you can get that from

18   Ms. Tornay.  I thought we were talking about the relevance of

19   this document assuming you can make it -- can show it is a

20   business record, which you haven't done that, assuming you can

21   do that and you overcome the hearsay problem, all this shows is

22   that she is attaching some documents.  So what is the relevance

23   of that?

24             MR. HARRIS:  She is sending it to Mr. Dorman who is

25   the head of the corporate department.

1           THE COURT:  Right.

2           MR. HARRIS:  Who took over responsibility for this

3   deal starting in the middle of November.

4           THE COURT:  Okay.

5           MR. HARRIS:  I would like to establish that.

6           THE COURT:  I am still missing your point.  You are

7   trying to show that Mr. Newkirk is no longer involved?

8           MR. HARRIS:  No.  He remains involved, your Honor.

9           THE COURT:  So what is the relevance of all this?

10          MR. HARRIS:  Mr. Newkirk is being supervised.  The

11  head of the corporate department is involved.  The head of the

12  corporate department is actively negotiating with the McMahons

13  and the other parties.  So it is Bryan Cave that is engaged,

14  not Mr. Newkirk.

15          THE COURT:  Well, that's true.  The question is:

16  These are allegations that Mr. Newkirk knew X and Y and Z that

17  made this a fraudulent deal.  Do you have any evidence that

18  Mr. Dorman knew any of those things?

19          MR. HARRIS:  I have evidence that Mr. Dorman spoke

20  with Calvin Darden Junior, that he spoke with Mr. Deitch, that

21  he was aware of the spoof e-mail problems, that he continued to

22  work on the deal, that he did not tell Mr. Newkirk to stop

23  working on the deal.

24          THE COURT:  Assuming that you are going to establish

25  that, I think we have to take it one step at a time.  I think

1    the argument seems to be that because other people were

2    involved in this deal who are not accused of having fraudulent

3    knowledge that the jury can infer from that that Mr. Newkirk

4    did not have fraudulent knowledge.  I think that is a very weak

5    argument and normally it would be inadmissible except for the

6    government has asked for, and I've in my draft tentatively

7    given all those and objected to that we'll be discussed at the

8    conference, a conscious avoidance instruction.  If relevant at

9    all, and I still have doubts about it, but if relevant at all

10   it would only be relevant on the conscious avoidance issue,

11   because as the defense points out in their objection to the

12   conscious avoidance issue, the government's primary position is

13   that Mr. Newkirk had actual knowledge and there is no

14   suggestion and defense has offered none that Mr. Dorman had

15   actual knowledge.

16            MR. HARRIS:  That's correct.

17            THE COURT:  So the only conceivable relevance would

18   be, well, Mr. Newkirk, we can tell Mr. Newkirk to not have --

19   the government has not shown that Mr. Newkirk has actual

20   knowledge and, ladies and gentlemen, don't think he had

21   conscious avoidance knowledge because other people who were

22   involved in the case didn't have conscious avoidance knowledge

23   where the government is not taking such.  I take it that is the

24   best gloss I can put on your argument.

25            MR. HARRIS:  Yes, your Honor.

Fc26new4                          Tornay - cross

 1            THE COURT:  Does the government want to be heard on

 2   any of that?

 3            MS. PAUL:  Just briefly, your Honor.  Our position is

 4   what Jay Dorman knew or what he didn't know or whether he had

 5   knowledge or not is completely irrelevant whether Mr. Newkirk

 6   had knowledge.

 7            THE COURT:  You are not calling Mr. Dorman, are you?

 8            MR. HARRIS:  We're not, your Honor.

 9            THE COURT:  So if this comes in at all, it is going to

10   come in very indirectly through someone who has no personal

11   knowledge of what Mr. Dorman was.  But to the extent that

12   Mr. Dorman's involvement from the side from peripheral e-mails

13   or things like that, if you can establish the business record

14   aspect of this, I will allow in this exhibit and we'll take it

15   one step at a time.

16            MS. CHAUDHRY:   thank you, your Honor.

17            (Continued on next page)

18

19

20

21

22

23

24

25

Fc26new4                          Tornay – cross

1           (In open court; jury present)

2   BY MR. HARRIS:

3   Q.  Ms. Tornay, did Bryan Cave have a document management

4   system?

5   A.  Can you -- yes.  They had a document management system.

6   Q.  And agreements in a deal were routinely stored in that

7   system?

8   A.  Yes.  That is correct.

9   Q.  Was that an important part of Bryan Cave's business,

10  keeping accurate files on deals?

11  A.  Yes.

12  Q.  Sometimes a superior at Bryan Cave asked you to send them

13  an agreement?

14  A.  Yes.

15          THE COURT:  If I may, I will take the liberty of

16  interrupting.

17          Ms. Tornay, looking at Exhibit 761, was this an e-mail

18  and the attachments thereto prepared as part of your ordinary

19  course of your legal work at Bryan Cave?

20          THE WITNESS:  Yes.

21          THE COURT:  Was it prepared at or about the time of

22  the e-mail reflected at the top of the Exhibit 761?

23          THE WITNESS:  Yes.

24          THE COURT:  Were these materials kept and retained as

25  part of the ordinary business of Bryan Cave?

Fc26new4                          Tornay - cross

1                    THE WITNESS:  Yes.

2                    THE COURT:  Are you offering 761.

3                    MR. HARRIS:  I am, your Honor.

4                    THE COURT:  Received.

5                    (Defendant's Exhibit 761 received in evidence)

6                    MR. HARRIS:  Can we publish 761 to the jury.

7    BY MR. HARRIS:

8    Q.  I will be brief with this document, Ms. Tornay.

9                    Do you see that you are sending a document entitled

10   Maxim third extension agreement or extension for third

11   agreement to Mr. Dorman?

12   A.  The subject heading is "Maxim extensions of the closing

13   date," yes.

14   Q.  Do you recall why you were sending this to Mr. Dorman?

15   A.  Mr. Dorman had asked me to send him the extension

16   agreement.

17   Q.  Did you have an understanding why Mr. Dorman asked you to

18   do that?

19   A.  I had learned right around that time.

20                   MS. PAUL:  Objection, calls for hearsay.

21                   THE COURT:  Sustained.

22   Q.  Ms. Tornay, I would like to show you Government Exhibit 507

23   which is in evidence.

24   A.  Yes.

25   Q.  Can you please turn to page 23 of 34.

Fc26new4                          Tornay - cross

1    A.  Did you say 23?

2    Q.  Yes.

3    A.  Okay.

4    Q.  Did you see that on page 23 -- this is the time records for

5    the case; right?

6    A.  Yes.  These are the time records we keep for the bills,

7    yes.

8    Q.  This is not just your time records; right?  This is all the

9    time records for all the lawyers who work on this matter;

10   right?

11   A.  Yes.

12   Q.  So if you look just page 23, you see Mr. Newkirk has billed

13   time into the matter at the top?

14   A.  Yes.

15   Q.  H.F. Berger, who is that?

16   A.  Ms. Berger is a paralegal at Bryan Cave.

17   Q.  You have time entries; correct?

18   A.  Yes.

19   Q.  Then on 11-14-13 Mr. Dorman has time entries; correct?

20   A.  Yes.

21   Q.  If you flip the page to the next page, do you see that

22   Mr. Dorman has additional time entries?

23   A.  Yes.

24   Q.  Do you see that continues throughout this document if you

25   flip it through?

Fc26new4                         Tornay - cross

1   A.  Yes.

2   Q.  Do you also see that a Mr. Weissman has time entries?

3   A.  Yes.

4   Q.  Who do you understand Mr. Weissman to be?

5   A.  Mr. Weissman is a partner in the litigation group at Bryan

6   Cave.

7   Q.  Then if we flip through this, we see that as this deal goes

8   out into -- if you go to page 30, this ends, this particular

9   bill ends on 12-31-2013; correct?

10  A.  Yes.

11  Q.  Do you see that you continue to have time entries right up

12  until the end?

13  A.  Yes.

14  Q.  Do you also see that Mr. Dorman continued with the time

15  entries right up until the end?

16  A.  Yes.

17  Q.  As to the Maxim deal; correct?

18  A.  Yes.

19  Q.  There are some entries there on that page 30 for J.S.

20  Chavkin.  Who is J.S. Chavkin?

21  A.  Jeff Chavkin is a partner in the banking/lending group at

22  Bryan Cave.

23  Q.  Am I correct that you worked with Mr. Chavkin in

24  conjunction with the proposed investment by the McMahons?

25  A.  Mr. Newkirk asked me to assist Mr. Chavkin.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  Q.  Do you recall what you worked on with Mr. Chavkin?

2  A.  Yes.

3  Q.  What was that?

4  A.  Mr. Newkirk had asked me to help provide Mr. Chavkin with

5  any background information to the original transaction.  He

6  also asked me to assist in preparing schedules to the loan

7  agreement, disclosure schedules.

8  Q.  What is a disclosure schedule?

9  A.  A disclosure schedule is usually an annex, an attachment to

10  the main agreement and each schedule coordinates back to

11  certain provisions within the agreement and sets forth certain

12  information that is required in the agreement.

13  Q.  So, for example, a party to a deal might say you have to

14  list all outstanding lawsuits?

15  A.  Yes.  That could be.

16  Q.  It might say you have to list all outstanding loans?

17  A.  Yes.

18  Q.  The McMahons were asking for both those things; correct?

19  A.  I don't recall whether both were included.

20  Q.  Do you recall if Open Gate -- the Open Gate loan was listed

21  on those schedules?

22  A.  I believe I was instructed by Mr. Newkirk to include Open

23  Gate Capital in the schedules, but I cannot recall exactly

24  those schedules.

25  Q.  Am I correct that the McMahons were represented by K&L

Fc26new4                          Tornay - cross

1    Gates in that transaction?

2    A.   Yes.   I recall that they were, yes.

3    Q.   And that you had communications with K&L Gates?

4    A.   I -- my recollection is that I communicated as

5    Mr. Newkirk's instruction with an associate, an attorney there.

6    I believe her name was Calvina Bostick.

7    Q.   You also testified on direct that you were I believe a

8    phone call with Barbara Laurence?

9    A.   Yes.

10   Q.   Who did you understand Ms. Laurence to be?

11   A.   I had understood Ms. Laurence to be in more of a consulting

12   advisory role to the transaction.

13   Q.   You also testified directly that you communicated with Brad

14   Reifler?

15   A.   He was on that one group call that I mentioned, yes.

16   Q.   You also were on calls with Mr. Deitch of the Bodman Firm?

17   A.   Yes.   He is one of the attorneys for Alpha Media Group.

18   Q.   You spoke with John Moskowitz from Odeon Partners?

19   A.   Yes, I did, on one occasion.

20   Q.   You spoke with a gentleman named Hines who was a consultant

21   to the Dardens?

22   A.   Yes.

23   Q.   You spoke with a gentleman named Valentine who is a

24   consultant for the Dardens?

25   A.   Yes.

Fc26new4                          Tornay - cross

 1   Q.  You testified on direct that you actually met Calvin Darden

 2   Junior; correct?

 3   A.  I met him on that one occasion, yes.

 4   Q.  He came to the office to sign this documents; is that

 5   right?

 6   A.  Yes.

 7   Q.  Did Barbara Laurence come on that day with him?

 8   A.  She did not.

 9   Q.  Do you recall when Mr. Darden came to sign the documents?

10   A.  Mr. Darden Junior came in -- it was one or two days prior

11   to the October 18th date.  So sometime that week.

12   Q.  The October 18th date, that was the date you originally

13   scheduled for closing; correct?

14   A.  Just to clarify it was not the original date for the

15   closing.  This was a previous date I believe in September that

16   had been extended out to October 18th.

17   Q.  That was the date of the extended closing?

18   A.  Yes.  That's correct.

19   Q.  You testified that Mr. Newkirk wasn't there at first;

20   correct?

21           MS. PAUL:  Objection.

22   A.  Can you please clarify?  Wasn't where?

23   Q.  Physically present.

24           MS. PAUL:  Objection, vague.

25   Q.  Were you aware that Mr. Newkirk had had a prematurely born

Fc26new4                              Tornay – cross

1    baby that week?

2              MR. HARRIS:  Objection.

3              THE COURT:  Totally inappropriate, counsel, given the

4    previous objection and putting your credibility into play and--

5              MR. HARRIS:  I did --

6              THE COURT:  Excuse me.

7              Ladies and gentlemen, I think we're going to take a

8    lunch break now.  We'll see you at 2:00.

9              (Jury excused)

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       (In open court; jury not present)

2              THE COURT:  Please be seated.

3              MR. HARRIS:  I did not mean to ask that improper

4       question, your Honor.

5              THE COURT:  Well, I will let it go at that because of

6       my respect for counsel; but there has been a tendency at

7       various points in this case for counsel to put in effect their

8       credibility in issue by stating as facts something not in

9       evidence.  If it were to happen again, I would have to take

10      more drastic measure.

11             MR. HARRIS:  Your Honor, I apologize.  I did not mean

12      to do that.

13             THE COURT:  Very good.

14             How much longer do you have?

15             MR. HARRIS:  15 minutes, 20 minutes.

16             THE COURT:  Who else do we have in terms of government

17      witnesses.

18             MR. ADAMS:  The government will call Vincent Alfieri,

19      followed by Elizabeth Garvey, Paul Deal and then we'll be done.

20      I think we'll be finished today if we keep at this pace.

21             THE COURT:  As I informed you yesterday, the answer is

22      not a hypothetical.

23             MR. ADAMS:  Your Honor, if we could just raise one

24      issue before we resume Ms. Tornay.

25             THE COURT:  Yes.

Fc26new4                          Tornay - cross

1          MR. ADAMS:  We were going to raise this at the end of

2     the day in anticipation of potential defense witnesses.  We

3     believe that the reference to Mr. Newkirk's children's health

4     and the premature birth of a child is completely irrelevant and

5     extremely prejudicial and should be precluded regardless of

6     which witnesses testify about it under 401 and 403.

7          THE COURT:  I am not going to make an advisory ruling

8     on that.  You may recall that on the direct of this witness,

9     your colleague asked questions of the sort was Mr. Newkirk hard

10    to get ahold of or hard to reach and I sustained the objection

11    so that is not part of the evidence.  Had I not sustained those

12    objections, then the defense could fairly have raised, Isn't it

13    a fact that Mr. Newkirk was not present.  They couldn't raise

14    it in the form that objected, but I am talking about evidence

15    later in the case.  They can present evidence that the reason

16    that Mr. Newkirk was not present at a given meeting or given

17    occasion was because of health issues or family issues or

18    whatever.  So I cannot make an across-the-board ruling on this

19    until I hear the specific context.  I do agree it should be the

20    subject of a side bar not a subject of question stated in open

21    court.

22         MR. ADAMS:  Thank you, your Honor.  Fair enough with

23    respect to the question that was put earlier.  The reason that

24    we want to raise it now, and I think it is no longer simply

25    advisory, is given what Mr. Harris was just about to ask Ms.

Fc26new4                          Tornay – cross

1    Tornay.  It seems like this is the next question that is

2    coming.

3              THE COURT:  So we'll just leave it at that.  We'll see

4    you all at 2:00.

5              MR. ADAMS:  Thank you, your Honor.

6              (Luncheon recess)

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                  A F T E R N O O N   S E S S I O N

2                           2:06 P.M.

3           MR. HARRIS:  Your Honor, may I have a brief sidebar?

4           THE COURT:  Okay.

5           (At the side bar)

6           MR. HARRIS:  I don't want to ask an improper question.

7      I didn't think it was improper because she knew he was

8      in the hospital.  I have that.  I expected her to say, Yes, I

9      was aware.

10          THE COURT:  I'm glad you had a good-faith basis, but

11     it's still not the proper form; although this diminishes the

12     degree of impropriety.

13          It still is a separate objection to refer to something

14     that's not in evidence as a fact.  So you would still have

15     to -- you could put it in the form of did you have an -- was

16     so-and-so present or not.  Did you have any understanding as to

17     why he was not present.  Now that, of course, also might be

18     objectionable as hearsay, but -- and I'm not quite sure how you

19     would overcome that.

20          So I think you have more technical difficulties, but

21     I'm glad to know at least that you had a good-faith basis for

22     assuming that she knew it.  That makes it a much less egregious

23     violation.  But I'm not sure you can ask the question for the

24     reasons just mentioned.  I think it's hearsay.

25          MR. HARRIS:  Can I ask her if she knew why he was late

FC2VNEW5                          Tornay - cross

1    for the meeting?

2              THE COURT:  How would she know that other than by

3    hearsay?

4              MR. HARRIS:  He told me he was at the hospital.

5              THE COURT:  Pardon?

6              MR. HARRIS:  Yeah, I understand it's for the truth.

7              THE COURT:  Yes.

8              MR. HARRIS:  All right.

9              THE COURT:  But good try.

10             MR. HARRIS:  Okay.

11             THE COURT:  Your colleague is -- I can see the wheels

12   turning and she may have a suggestion for you.

13             But anyway, why don't we continue.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1         (In open court)

2         THE COURT:  All right.  Let's bring in the jury.

3         (Jury present)

4         THE COURT:  All right.

5         Counsel.

6    CHAERI TORNAY, resumed.

7    BY MR. HARRIS:

8    Q.  Good afternoon, Ms. Tornay.

9    A.  Hi.  Good afternoon.

10   Q.  Ms. Tornay, do you recall if Mr. Newkirk ever asked you to

11   work an a promissory note for the Maxim deal?

12   A.  I do recall that he asked me to work on it.

13   Q.  Do you recall if that was for a $3.5 million promissory

14   note?

15   A.  I do not recall that, no.

16   Q.  Do you recall if that was on October 23rd, 2013?

17   A.  I'm sorry, I don't recall the date.

18   Q.  I'm just going to show you a document.

19         MR. HARRIS:  Your Honor, may I approach?

20         THE COURT:  Yes.

21   Q.  Ms. Tornay, I'm showing you Defendant's Exhibit 758 for

22   identification only.  Do you have that document?

23   A.  Yes.

24   Q.  Do you see that's an email from Harvey Newkirk to yourself

25   on 10/23/2013?

FC2VNEW5                          Tornay - cross

1   A.  Yes.

2   Q.  Does that refresh your recollection as to the date you were

3   asked to work on the promissory note?

4   A.  Yes.

5   Q.  What date was that?

6   A.  It was October 23rd, 2013.

7   Q.  Does that also refresh your recollection that the amount

8   was $3.5 million?

9   A.  Yes, the email states that it's 3.5 million.

10  Q.  Please don't read from the email; try and get your

11  recollection.

12          Am I correct that the borrower, the grantor, was going

13  to be Mr. Darden?

14  A.  Yes.

15  Q.  Ms. Tornay, you testified that Mr. Darden was, I believe,

16  late to the closing meeting.

17  A.  When you are referring to "the closing meeting," can you

18  please clarify.

19  Q.  Sure.

20          There's going to be a closing on October 18th.

21  A.  Yes, the morning of October 18th.

22  Q.  You testified that Mr. Dietch came in.

23  A.  Yes, Mr. Dietch and Mr. Forrest Dillon were also in the

24  conference room.

25  Q.  Do you recall testifying that Mr. Newkirk had told you

1   about Calvin Darden's mother-in-law?

2   A.   Yes.

3   Q.   Did you hear that from someone else as well?

4   A.   I believe I also had learned that from --

5            MS. PAUL:  Objection.  Calls for hearsay.

6            THE COURT:  Sustained.

7   Q.   Do you believe that you learned that first from

8   Mr. Newkirk?

9   A.   I do not recall.

10  Q.   May I show you a document.

11           I show you what's been marked Defendant's Exhibit 551

12  for identification only.

13  A.   Yes.

14  Q.   Does that refresh your recollection as to who you first

15  learned about the mother-in-law from?

16  A.   Yes, Forrest Dillon and --

17           MS. PAUL:  Objection.  Calls for hearsay.

18           THE COURT:  Sustained.

19           MR. HARRIS:  Not for the truth, your Honor.

20           THE COURT:  I'm sorry?

21           MR. HARRIS:  It's not for the truth.

22           THE COURT:  First of all, I'm not sure the witness

23  fully understands when you ask whether a document refreshes

24  your recollection.  What that means is not what it says on the

25  document, it means that having looked at the document, do you

FC2VNEW5                        Tornay - cross

 1     now have an independent recollection in your mind as to fact X

 2     or fact Y or fact Z.

 3              But the previous question was does that refresh your

 4     recollection as to who first learned -- as to whom, it should

 5     have been "whom," you said "who," but I will forgive you -- as

 6     to whom you first learned about the mother-in-law from.  And

 7     the answer was yes, and then she began saying something else.

 8     There was an objection, calls for hearsay.  I sustained the

 9     objection, however, because she was answering beyond the scope

10     of the question put.  The answer to your question was yes.

11              Now, would you like to put another question?

12              MR. HARRIS:  I would, your Honor.

13     BY MR. HARRIS:

14     Q.  Do you recall from whom you first learned it?

15     A.  Based on this refreshment of my recollection, yes.

16     Q.  And from whom?

17     A.  From Larry Dietch and Forrest Dillon of Bodman.

18     Q.  Thank you.

19              You testified earlier that Mr. Newkirk was late to --

20     I'm going to call it that October closing meeting.

21     A.  Yes, he had arrived a little bit late that morning.

22     Q.  Do you know why?

23              MS. PAUL:  Objection.

24              THE COURT:  Sustained.

25              MR. HARRIS:  Your Honor, may I have one moment?

1    THE COURT:  Yes.

2    (Pause)

3    Q.  Ms. Tornay, do you have a recollection of the period of

4    time when Mr.  -- I believe you testified there was a period of

5    time when Mr. Newkirk was out of the office a lot.

6    MS. PAUL:  Objection.

7    THE COURT:  You can answer that question yes or no.

8    A.  I -- no, I don't recall a specific period of time during

9    which he was --

10   Q.  Do you remember him being out of the office a lot during

11   the Maxim transaction?

12   MS. PAUL:  Objection.

13   THE COURT:  Well, I will allow that.  I think, just so

14   you're aware, it opens the door to the question I sustained

15   your objection on.  You know the one I'm referring to.

16   MR. HARRIS:  I understand that, your Honor.

17   THE COURT:  Okay.  But you want to go forward?

18   MR. HARRIS:  I do.

19   THE COURT:  Okay.

20   MR. HARRIS:  Thank you.

21   THE COURT:  So the question is do you remember him

22   being out of the office a lot during the Maxim transaction?  If

23   you understand the question, I'll let you answer it; if you

24   want some more -- it's a little bit vague.  If you want more

25   specificity, I'll ask counsel to rephrase it.

1   THE WITNESS:  Yes, I would prefer more specificity.

2   Thank you.

3   BY MR. HARRIS:

4   Q.  Do you remember Mr. Newkirk being out of the office --

5   THE COURT:  Let me put some questions.

6   During the period that you were working on the Maxim

7   transaction, were you familiar with Mr. Newkirk's presence or

8   absence from the office during that period?

9   THE WITNESS:  Yes, I was familiar.

10   THE COURT:  Okay.

11   From when to when are we talking about in terms of

12   your involvement?

13   THE WITNESS:  I was involved from approximately the

14   end of July/early August until this October 18th closing.  That

15   was the majority of the time I spent working on the

16   transaction.

17   THE COURT:  During that period, were you, yourself in

18   the office most days?

19   THE WITNESS:  Yes.

20   THE COURT:  Was Mr. Newkirk in the office most days,

21   to your observation?

22   THE WITNESS:  To my observation, he was out of the

23   office frequently.

24   THE COURT:  Okay.

25   THE WITNESS:  During that period.

1          THE COURT:  All right.

2          Anything else?

3          MR. HARRIS:  I think that's it, your Honor.

4          THE COURT:  All right.

5          MR. HARRIS:  Oh, no, I'm sorry.  I just meant on that

6   line.

7          THE COURT:  I knew that.  Hope springs eternal, but I

8   knew I shouldn't rely on that.

9          MR. HARRIS:  All right.

10  BY MR. HARRIS:

11  Q.  Am I correct that one of the things that a lawyer working

12  on a deal like this does is work on various documents?

13  A.  Yes.

14  Q.  One of the sets of documents you worked on on this

15  transaction were employment agreements?

16  A.  I had worked on them in conjunction with Jay Warren.

17  Q.  And who was Jay Warren?

18  A.  Jay Warren is a partner at Bryan Cave who specializes in

19  employment law.

20  Q.  Did there come a time when you asked Mr. Warren to send you

21  a form for employment agreements?

22  A.  Yes, I believe there was.

23  Q.  Is that something corporate lawyers do standardly, ask

24  other lawyers for a form?

25  A.  Yes, it's common practice.

1    Q.  Why do you do that?

2              MS. PAUL:  Objection.  Relevance.

3              THE COURT:  I'll allow it.

4    Q.  And why do you do that?

5              THE COURT:  I know that there's an argument some

6    counsel have made in some circumstances that this would require

7    an expert, but I don't think that's true and therefore will

8    allow the question.

9              MR. HARRIS:  Thank you, your Honor.

10   Q.  And why would you do that?

11   A.  To look for or establish a foundation for an agreement

12   where you would look for a similar agreement that might fit

13   your use for the current transaction or matter.

14   Q.  Is there anything improper about that?

15   A.  No.

16   Q.  By the way, did you ever see any employment agreement for

17   Harvey Newkirk with Maxim?

18   A.  No, I did not.

19   Q.  We spoke about Mr. Dietch before.

20   A.  Yes.

21   Q.  Mr. Dietch was an attorney for Alpha Media?

22   A.  He was an attorney at Bodman which was Alpha Media's

23   counsel.

24   Q.  And then the government asked you a series of questions on

25   direct about the transfer funds out of escrow to the Bodman

1   firm.  Do you recall that?

2   A.  Yes.

3   Q.  And I asked you some questions as well before lunch.

4   A.  Yes.

5   Q.  I'd like to hand you two emails which I marked as Defendant

6   Exhibit 759 and Defendant's Exhibit 760.

7           MR. HARRIS:  Your Honor, may I approach?

8           THE COURT:  Yes.

9   Q.  If we could look at 759 first.  That's an email from Calvin

10  Darden to yourself.

11  A.  Yes.  Dated November 7th, 2013 at 12:43 p.m.

12  Q.  That's the day you were working on the escrow stuff?

13  A.  Yes.

14          MR. HARRIS:  Your Honor, I offer Defendant's Exhibit

15  759.

16          MS. PAUL:  No objection.

17          THE COURT:  Received.

18          (Defendant's Exhibit 759 received in evidence)

19  Q.  May I show you 760 first, which is not evidence.  That's an

20  email from yourself to Calvin Darden, Harvey Newkirk,

21  11/7/2013?

22  A.  Yes, that is correct.

23          MR. HARRIS:  Your Honor, I offer Defense Exhibit 760.

24          MS. PAUL:  No objection.

25          THE COURT:  Received.

FC2VNEW5                          Tornay - cross

1                    (Defendant's Exhibit 760 received in evidence)

2    Q.  If we could look first at Defendant's Exhibit 759.

3                    Mr. Darden in the top email is forwarding to you an

4    email from Laurence Dietch; correct?

5    A.  Yes, that is correct.

6    Q.  And in the email that's being forwarded, Laurence Dietch is

7    saying:  Calvin -- the subject is email what I would like to

8    receive, right?

9    A.  Yes.

10   Q.  And then it starts with:  Calvin.  And then it has text.

11   I'm writing to confirm that Harvey Newkirk left me with

12   instructions.  Correct?

13   A.  Yes.

14   Q.  And then it's Chaeri.  Is that how you spell your name?

15   A.  It is not the way I spell my name.

16   Q.  Okay.  And then it says:  Cal, my preference is that your

17   father send the email before one.  Right?

18   A.  Yes.

19   Q.  And what did you understand was being asked of you here?

20   A.  I had understood that this request was to send this text to

21   Mr. Darden Senior at the calvinrdarden@gmail.com email address.

22   Q.  And then if you could go to the next exhibit, Defendant's

23   Exhibit 760.

24   A.  Yes.

25   Q.  You, in fact, picked up the text that Mr. Dietch sent you

FC2VNEW5                              Tornay - cross

```
1   and copied it into an email and sent it; correct?

2   A.  That is correct, yes.

3   Q.  Is that something lawyers commonly do, propose language?

4            MS. PAUL:  Objection.

5            THE COURT:  Sustained.

6   Q.  Is that something that, in your experience as a lawyer, you

7   did, either send or received proposed language?

8            MS. PAUL:  Objection.

9            THE COURT:  Sustained.

10  Q.  Did you believe there was anything wrong or improper in

11  taking Mr. Dietch's proposed language and using it?

12           MS. PAUL:  Objection.

13           THE COURT:  No, I'll allow it.

14  A.  No, I did not think there was anything wrong with that.

15           MR. HARRIS:  May I have one moment, your Honor?

16           THE COURT:  Yes.

17           (Pause)

18  Q.  Ms. Tornay, you met and spoke and emailed on multiple

19  occasions with Harvey Newkirk; is that right?

20  A.  Yes.

21  Q.  In that time did Harvey Newkirk ever ask you to do anything

22  that you thought was wrong?

23           MS. PAUL:  Objection.

24           THE COURT:  Sustained.

25  Q.  Did you ever see Harvey Newkirk do anything you believed
```

FC2VNEW5                          Tornay – cross

1    was wrong?

2              MS. PAUL:  Objection.

3              THE COURT:  Sustained.

4              MR. HARRIS:  Your Honor, may I have a brief sidebar?

5              THE COURT:  You can.  Your chances of succeeding on

6    this one approach zero, but you can.

7              MR. HARRIS:  This is the end of my exam, your Honor.

8              THE COURT:  Well, then I don't want to deprive you of

9    that opportunity.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               (At the side bar)

2               THE COURT:  So let's start with basics.

3          She's being asked for an opinion.  Only experts can

4     give opinions.  She's a fact witness.  This question doesn't

5     call for any fact; it calls for an opinion.  That's No. 1.

6          No. 2, assuming she had been qualified as an expert in

7     right and wrong in this context, you would have had to call her

8     affirmatively as an expert, we would have had a *Daubert*

9     hearing, which I doubt she would have survived, etc., etc.  I

10    can go on and on, but her opinion is neither here nor there.

11              MR. HARRIS:  I understand your point.

12          I think I was asking her a personal opinion.

13              THE COURT:  Her personal opinion is irrelevant.

14              MR. HARRIS:  I understand.

15              THE COURT:  Her personal opinion is irrelevant.  Her

16    expert opinion, assuming she was qualified as an expert -- and

17    she seems like a lovely person, I'm sure we could perhaps

18    inquire into her expertise, but it would have to be the subject

19    of an expert report and all like that.

20          I did allow you, over objection, to bring out where

21    there was a custom and practice that could be said to be proper

22    or improper and that you have already brought out, but that's

23    as far as it goes.  Okay?

24              MR. HARRIS:  Okay.  Thank you, your Honor.

25              MS. CHAUDHRY:  Will we be able to ask that everything

FC2VNEW5                          Tornay - cross

1   Mr. Newkirk instructed her to do was part of custom and

2   practice --

3               THE COURT:  Pardon?

4               MS. CHAUDHRY:  Would we be allowed to ask if

5   everything Mr. Newkirk instructed her to do was part of custom

6   and practice?

7               THE COURT:  I think that's too broad and too vague.

8   To me it has its own problems.  But you've already honed in on

9   the specifics that I think were of concern because you made it

10  part of your cross-examination.

11              MS. CHAUDHRY:  Okay.

12              THE COURT:  So I think we should let it go at that.

13              MS. CHAUDHRY:  Okay.

14              MR. HARRIS:  Okay.  Thank you, your Honor.

15              (Continued on next page)

16

17

18

19

20

21

22

23

24

25

FC2VNEW5                         Tornay - redirect

1              (In open court)

2              MR. HARRIS:  Your Honor, I believe I have no further

3    questions.

4              THE COURT:  All right.  Well, you're a man of your

5    word.

6              Redirect please.

7              MS. PAUL:  Thank you, your Honor.

8    REDIRECT EXAMINATION

9    BY MS. PAUL:

10   Q.  Ms. Tornay, you were asked some questions on

11   cross-examination about people who you spoke with in connection

12   with the Maxim deal.  Do you recall those questions?

13   A.  Yes.

14   Q.  Did you ever speak to Calvin Darden Senior about this deal?

15   A.  No.

16   Q.  Did you ever receive Bank of America statements that

17   purported to show the stock --

18             MR. HARRIS:  Objection.  Objection.

19             Outside the scope.

20             THE COURT:  Overruled.

21   Q.  Did you ever receive Bank of America statements that

22   purported to show the stockholdings of Calvin Darden Senior?

23   A.  I do not recall receiving those.

24   Q.  Did you ever learn about a lawsuit filed by Open Gate

25   Capital in connection with a defaulted loan?

1  A.  No.

2          MS. PAUL:  Can we bring up Defense Exhibit 761 please.

3  Q.  It's also up on your screen.

4  A.  Yes.

5  Q.  Do you recall being asked questions about this document on

6  cross-examination?

7  A.  Yes.

8  Q.  Do you recall sending this email to Mr. Dorman?

9  A.  Yes.

10  Q.  Do you recall working with Mr. Dorman on the Maxim deal?

11  A.  I did not work directly with Mr. Dorman.  He had requested

12  certain documents of me and this was one of those occasions.

13  Q.  In this email you are responding to his request for

14  documents?

15  A.  Yes, that's correct.

16  Q.  You say in your email that Harvey will likely have the

17  fully-executed copies of these.  What are you referring to?

18  A.  I'm referring to the attachments to this email, which are

19  the extensions of the outside closing date, the date for the

20  transaction.

21          MS. PAUL:  Can we bring up Government Exhibit 143

22  please.

23  Q.  Do you recall being asked some questions about this

24  document on cross-examination, Ms. Tornay?

25  A.  Yes.

1   Q.  In particular, do you recall being asked about the date of

2   February 3rd, 2011?

3   A.  Yes.

4          MS. PAUL:  Could we go to the second page of the

5   document.

6   Q.  On what date did you notarize this document for

7   Mr. Newkirk?

8   A.  On December 16, 2013.

9          MS. PAUL:  One moment.

10          No further questions.

11          THE COURT:  All right.  Anything else?

12          MR. HARRIS:  Very brief, your Honor.

13          THE COURT:  Go ahead.

14   RECROSS EXAMINATION

15   BY MR. HARRIS:

16   Q.  Ms. Tornay, you were just shown Defendant's Exhibit 761.

17          MR. HARRIS:  Can we please put that up.

18   Q.  You were asked some questions about whether you worked with

19   Mr. Dorman on the Maxim deal.

20   A.  Yes.

21   Q.  Am I correct that Mr. Dorman continued to work on the deal

22   until the end?

23   A.  I learned that --

24          MS. PAUL:  Objection.  Calls for hearsay.

25          THE COURT:  No.

1          Did you personally observe him working on it?

2          THE WITNESS:  His office was down the hall, so I did

3    not personally observe him working on it, no.

4          THE COURT:  Sustained.

5    Q.  Were you informed of the team -- Ms. Tornay, when you're an

6    associate on a case, when you're an associate on a case and

7    you're working with other people at Bryan Cave or a law firm,

8    is it important to know who the other members of the team are?

9          MS. PAUL:  Objection.

10          THE COURT:  Well, there are some objections to form,

11    but I will allow it to be answered yes or no.

12    A.  Yes, it is important to know the team members on a matter

13    or transaction.

14    Q.  Is that important to doing your job as a lawyer

15    representing your client?

16    A.  It is.

17    Q.  Did you have an understanding of Mr. Dorman's role on the

18    Maxim matter?

19          MS. PAUL:  Objection.  Calls for hearsay.

20          THE COURT:  No, I think this is different.

21          I'll allow that.

22          Congratulations.

23          MR. HARRIS:  Thank you, your Honor.

24    A.  This was an atypical progression and it was not a team

25    environment.  Mr. Dorman came into the transaction after I had

1    spent the majority of time working on it.  I spent most of my

2    time up until that October 18th date working directly with

3    Mr. Newkirk and I had learned that Mr. Dorman stepped in later.

4            So if you see this email, it's November 14th.  I had

5    learned that he had stepped in later and I was playing less of

6    a role in that at that time.

7    Q.  You understood Mr. Dorman to be playing a role?

8    A.  I was not aware of what his specific role in the

9    transaction was at the time.

10   Q.  Do you know from personal observation, do you know if

11   Mr. Dorman was involved with the McMahon part of the

12   transaction?

13   A.  At that time, during the McMahon part of the transaction, I

14   worked directly with Mr. Chavkin and I had understood that

15   Mr. Dorman was involved at that time.

16   Q.  Thank you.

17           MR. HARRIS:  No further questions.

18           THE COURT:  All right.

19           Recross -- or I'm sorry, re-redirect.

20           MS. PAUL:  No, your Honor.

21           THE COURT:  Nothing further.

22           Thank you so much.  You may step down.

23           (Witness excused)

24           THE COURT:  Please call your next witness.

25           MS. PAUL:  Yes.  The government calls Vincent Alfieri.

1    VINCENT ALFIERI,

2         called as a witness by the Government,

3         having been duly sworn, testified as follows:

4              THE COURT:  Counsel.

5              MS. PAUL:  Thank you, your Honor.

6    DIRECT EXAMINATION

7    BY MS. PAUL:

8    Q.  Good afternoon.

9    A.  Good afternoon.

10   Q.  Where are you employed?

11   A.  I'm a partner at Bryan Cave.

12   Q.  For how long have you been a partner at Bryan Cave?

13   A.  Since officially 2002.

14   Q.  What are your duties and responsibilities?

15   A.  I'm a lawyer.  I practice litigation, commercial

16   litigation, and some employment law.  And so I represent

17   clients in those areas.

18   Q.  Do you have any other duties and responsibilities currently

19   at the firm?

20   A.  Currently I handle lateral partner recruitment for the

21   firm.

22   Q.  For how long have you held that position?

23   A.  Since June of this year.

24   Q.  In 2013 and 2014, did you have any additional duties and

25   responsibilities at Bryan Cave?

1   A.  Yes, I was the managing partner of the New York office.

2   Q.  And what did that entail?

3   A.  The managing partner is the leader of the office.  There

4   are other staff people who help operate the office, but the

5   managing partner is overall responsible for the running and

6   operation of the office.

7   Q.  As the managing partner, did you assist with interviewing

8   and hiring other lawyers to work at the New York office?

9   A.  I did.

10  Q.  What was your role in that process?

11  A.  For lateral partners, partner candidates, and for other

12  senior lawyers, I was directly involved with other partners in

13  the office and at the firm.

14  Q.  What is a lateral candidate?

15  A.  It's a lawyer who is already practicing probably at another

16  law firm, sometimes for a company as an in-house lawyer.

17  Q.  Are you still the managing partner at Bryan Cave?

18  A.  I am not.

19  Q.  Why not?

20  A.  Just the normal changeover.  I had been the managing

21  partner for something like eight years, so we've just done a

22  changeover and there's another person in that role now.

23  Q.  In 2013, did there come a time when you interviewed a

24  lawyer timed Harvey Newkirk to work at Bryan Cave?

25  A.  Yes.

FC2VNEW5                    Alfieri - direct

1   Q.  Was Mr. Newkirk ultimately hired?

2   A.  He was.

3   Q.  Do you recall approximately when he was hired?

4   A.  I think it was June of 2013.

5   Q.  What position was he given?

6   A.  Counsel.

7   Q.  Where does that position fit in among the hierarchy of

8   legal positions at Bryan Cave?

9   A.  It's in between partners and associates.

10  Q.  Do you see Mr. Newkirk in the courtroom today?

11  A.  I do.

12  Q.  Where do you see him?

13          MR. HARRIS:  We stipulate.

14          THE COURT:  So stipulated.

15  Q.  At what point during the interview process did you

16  interview Mr. Newkirk?

17  A.  Multiple times throughout the process.  I was probably one

18  of the first people to interview him when he was first brought

19  to our attention by a legal recruiter.

20  Q.  During the interview process, what did you and Mr. Newkirk

21  discuss?

22  A.  We discussed his background, his current position at

23  another law firm, his then-current position at another law

24  firm, the types of matters that he had worked on throughout his

25  career, and his client base.

1   Q.  When you say "client base," what do you mean?

2   A.  I mean the people and/or companies that he represented,

3   that he said that he represented as clients.

4   Q.  Was that something that was important to you to know during

5   the hiring process?

6   A.  Yes.  We didn't actually have a need to hire a lawyer -- a

7   corporate lawyer who did the sorts of things that Mr. Newkirk

8   did unless that person also had what we would call a practice,

9   meaning that he had a client following that would be coming

10  along with him.

11  Q.  And who, if anyone, did Mr. Newkirk tell you that he had

12  represented previously?

13  A.  I can't remember all of them.  There were numerous persons

14  and entities that he mentioned and that were also in writing in

15  various documents that he provided to us.

16          MS. PAUL:  May I approach, your Honor?

17          THE COURT:  Yes.

18  Q.  Mr. Alfieri, I'm handing you a binder of documents which

19  contains exhibits that are in evidence in this case.

20  A.  Okay.

21  Q.  And I'll be asking you about them.

22          Please take a look at Government Exhibit 513 in your

23  binder.

24  A.  Okay.

25  Q.  Do you recognize that document?

FC2VNEW5                          Alfieri - direct

1   A.  Yeah.  Yes, I do.  It's a copy of an email from Beth

2   Johnson who was employed at Bryan Cave at that time as a staff

3   person working on lateral partner recruitment.

4   Q.  Are you copied on this email?

5   A.  I am.

6   Q.  What's the date of the email?

7   A.  April 25, 2013.

8   Q.  What's attached to this email?

9   A.  Mr. Newkirk's CV, his resume, and a business plan and a

10  list of representative transactions that Mr. Newkirk had worked

11  on.

12  Q.  Turning to the business plan, what is that?

13  A.  It's not uncommon for lateral candidates to provide the

14  firm with a written document that outlines both the clients

15  that that person thinks he has at the time and other possible

16  prospects, client prospects, that the person will probably

17  pursue if he were to join the firm.  So that's what this is.

18  That's Mr. Newkirk's version of that.  He's describing his

19  experience, existing business opportunities, and probably some

20  prospective opportunities as well.

21  Q.  If you could turn to page 7 of the document, which I think

22  is the -- I believe it's the third page of the business plan.

23  Directing your attention to the bottom of the page, client No.

24  7.

25  A.  Yes.

1   Q.   Who is that?

2   A.   That's Calvin Darden Senior.

3   Q.   What, if anything, do you recall Mr. Newkirk telling you

4   about having represented Calvin Darden Senior?

5   A.   That Mr. Darden Senior was a current client; that he had a

6   long-standing relationship with Mr. Darden Senior, the client,

7   as well as Calvin Darden Junior, Darden Senior's son.

8   Q.   And turning to the next page of the document, does

9   Mr. Newkirk's description of his representation of Mr. Darden

10  Senior continue here at the top?

11  A.   Yes.  Yeah, he describes Mr. Darden Senior as a former

12  Senior vice president at UPS and a member of the board of

13  directors of other prominent organizations.  And he was the CEO

14  of Darden Development Corporation -- Darden Development Group,

15  excuse me.

16  Q.   Directing your attention to where it says "relationship."

17  A.   Mm-hmm.  He describes Mr. Darden Senior as a current

18  client.

19  Q.   Do you recall him telling you that he had worked with the

20  Dardens on two transactions over the past three years?

21  A.   I do.

22  Q.   Did you rely on the information in this business plan in

23  deciding whether to hire Mr. Newkirk to the firm?

24  A.   Yes.

25  Q.   Following the interview process, did you recommend that

1    Mr. Newkirk be hired?

2    A.  I did.

3    Q.  Why?

4    A.  After reviewing this, reviewing -- there are other

5    documents that Mr. Newkirk, at our request, provided, talking

6    about, again, his experience, his background, the clients that

7    he had, the clients that he hoped to bring and the practice

8    that he would hope to build at our firm.  And after a number of

9    interviews by other partners of our firm, we all concluded --

10   and I certainly concluded -- that Mr. Newkirk would be a good

11   addition to the firm.  And we offered him a position as

12   counsel.

13   Q.  Please take a look at Government Exhibit 501.

14          Do you recognize that document?

15   A.  Yes, I do.

16   Q.  What is it?

17   A.  It's another email from Beth Johnson.  This is May 6, 2013.

18   And it's to me and another partner at Bryan Cave.  And she's

19   including the lateral hire questionnaire.  That's another

20   document that we typically get from every lateral candidate

21   either at the counsel level or at the partner level.

22   Q.  Whose lateral hire questionnaire is attached to this email?

23   A.  Mr. Newkirk.

24   Q.  Was this a document that you relied on in determining

25   whether to hire Mr. Newkirk?

FC2VNEW5                    Alfieri - direct

1   A.  Yes.

2   Q.  What's the purpose of having a candidate fill out a lateral

3   hire questionnaire?

4   A.  It's the core document where all the relevant information

5   is brought together about the person's background, educational

6   background, other firms or companies that the person has worked

7   at, as well as a series of questions about whether the person

8   has had an ethical violation or whether is involved in any

9   lawsuits.

10          And then it also brings together all of the economic

11  information about existing clients, perhaps prospective

12  clients, as well as the person's compensation history and all

13  of that.  And it is signed by the candidate.  This one was

14  signed by Mr. Newkirk.

15          And then among the other documents and the other

16  interviews that we conduct, that becomes part of the basis of

17  our decision-making and it also is the document that we use to

18  take the next steps of conducting a full background check and

19  that sort of thing.

20  Q.  If you could take a look at page 6 of Mr. Newkirk's lateral

21  hire questionnaire.  And it's specifically part E, for-profit

22  enterprises.  Do you see that?

23  A.  Yes.

24  Q.  What's the purpose of this section of the lateral hire

25  questionnaire?

FC2VNEW5                         Alfieri - direct

A.   We want to know if any partner or senior lawyer, like a

counsel, is involved in some other for-profit venture.

          Our intention is that partners and counsel will really

be full-time, devote their full time and energy to their

position at the firm and the interests of the clients that they

will serve well at the firm.

Q.   In this section, did Mr. Newkirk disclose having any

ownership interest in any companies?

A.   Yeah.  It says that -- I'm quoting:  I have an ownership

interest in Invictus Ventures LLC.  I am a multi-generational

family investment vehicle.  And he goes on to say:  I have not

represented the company in the past and at this time do not

plan to represent the company in the future.

Q.   Why would it matter whether or not he had represented the

company in the past or didn't plan to represent the company in

the future?

          MR. HARRIS:  Objection.

          Assumes facts not in evidence.

          THE COURT:  Overruled.

A.   It matters to us to know if a senior lawyer that's going to

be coming into our firm has an interest in a company that might

become a client of ours.  We actually do not want our lawyers,

our partners, and senior lawyers -- any lawyer really -- to

have an ownership interest in a company that we are going to

represent as a client because we believe that will create the

1    possibility of divided loyalty.

2    Q.  What do you mean by "divided loyalty"?

3    A.  The lawyer's first duty and first interest is supposed to

4    be on behalf of the clients that we represent and that's all.

5    And if the lawyer has a profit interest in the client, it

6    creates the possibility or at least the possibility of the

7    appearance that the lawyer could be more worried about his or

8    her own profit rather than the interests of the client.

9    Q.  Do you know what Invictus Ventures LLC is?

10   A.  I actually don't.

11   Q.  And on this lateral hire questionnaire, did Mr. Newkirk

12   disclose having any ownership interest in any other companies?

13   A.  Not that I recall; not in this section.

14   Q.  In any other section?

15   A.  I don't believe so.

16   Q.  Do you know what Reign Entertainment Group is?

17   A.  I believe it's an entity that's in some way associated with

18   Calvin Darden Senior.

19   Q.  Do you recall Mr. Newkirk ever telling you that he had an

20   ownership interest in the Reign Entertainment Group?

21   A.  I have no such recollection.

22   Q.  After the completion of the interview process, did Bryan

23   Cave send a formal offer letter to Mr. Newkirk?

24   A.  We did.

25   Q.  Please take a look at Government Exhibit 514.

1    A.  Okay.

2    Q.  What is Government Exhibit 514?

3    A.  That is the offer letter dated May 23, 2013 that we

4    prepared and sent to Mr. Newkirk.  Shows his signature and our

5    signature.

6    Q.  What position was being offered to Mr. Newkirk in this

7    letter?

8    A.  As a counsel with Bryan Cave.

9    Q.  What was his start date according to the letter?

10   A.  June 10, 2013.

11   Q.  What rate of compensation does the letter indicate that

12   Mr. Newkirk would receive?

13              MR. HARRIS:  Excuse me one second.  I think there's

14   some extraneous information at the top.  Can we just redact

15   that?

16              One second, your Honor.  Sorry.

17   Q.  So Mr. Alfieri, what rate of compensation does the letter

18   indicate that Mr. Newkirk would receive?

19   A.  An annual rate of $300,000.

20   Q.  Directing your attention to paragraph 4, what type of bonus

21   was Mr. Newkirk eligible for according to the letter?

22   A.  Well, he was entitled to participate in any of the bonus

23   programs that we had available for counsel.  Some of those at

24   that time had to do with whether or not the person was busy

25   enough, had enough work to show that he would be in that kind

1   of a bonus program.  And another type of bonus program related

2   to the fees that that person might generate from clients that

3   that person brought to the firm.

4           In this case, both of those are discretionary bonuses.

5           In this case we had, based on a discussion with

6   Mr. Newkirk beforehand, set $500,000 as the threshold of fees

7   to be received by clients brought to the firm by Mr. Newkirk as

8   the floor for fees that would trigger him being eligible for a

9   bonus based on fees.

10  Q.  So what did Mr. Newkirk have to do to be eligible for a

11  consideration for that bonus?

12  A.  There would have had to have been fee collections from

13  clients related to his activities that he brought to the firm,

14  it would have to be at least $500,000.

15  Q.  And directing your attention now to paragraph 6 of the

16  offer letter.

17  A.  Yes.

18  Q.  What is indicated about Mr. Newkirk's eligibility for

19  partnership consideration?

20  A.  Right.  He joined us as counsel.  And in the letter we

21  indicated that he would first be eligible for partnership

22  consideration -- meaning we would assess it -- in the year

23  2014, with the earliest possible effective date of January 1,

24  2015.

25  Q.  As managing partner of the firm at that time, were you

FC2VNEW5                          Alfieri – direct

1    involved in the decision-making process regarding whether or

2    not to offer a lawyer a partnership at the firm?

3    A.   Yes.

4    Q.   With respect to Mr. Newkirk, what were you looking for

5    during the partner evaluation period?

6              MR. HARRIS:  Objection.  Relevance.

7              THE COURT:  Sustained.

8              MS. PAUL:  Your Honor, may we have a brief sidebar?

9              THE COURT:  Yes.

10             (Continued on next page)

1        (At the side bar)

2            MS. PAUL:  Your Honor, I believe this goes directly to

3    his motivation.  One of the things --

4            THE COURT:  There's no showing on the question put

5    that Mr. Newkirk was aware of these considerations, that's why

6    I sustained the objection.  If something was said to

7    Mr. Newkirk, that's a different story.  But that wasn't the

8    question put.  You asked for his internal decision-making

9    process and that could not affect Mr. Newkirk's motivation

10   unless he was told it.

11           MS. PAUL:  Understood.  Thank you, your Honor.

12           THE COURT:  Okay.

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2    Q.  Mr. Alfieri, after Mr. Newkirk was hired, did he work on a

3    deal involving the potential acquisition of *Maxim Magazine*?

4    A.  Yes.

5    Q.  Did Mr. Newkirk tell you who his client was in connection

6    with the Maxim deal?

7    A.  Calvin Darden Senior.

8    Q.  And what, if anything, did Mr. Newkirk tell you about

9    Calvin Darden Junior's involvement in the Maxim deal?

10   A.  I had already known from the other documents we just

11   discussed that Mr. Newkirk identified Calvin Darden Junior as a

12   friend.  And I think that's all I knew.  That is largely what I

13   knew from Mr. Newkirk.  Although at some point Mr. Newkirk

14   advised that Mr. Darden, Calvin Darden Junior, was working on

15   the deal, he was involved in the deal, but the client remained

16   Calvin Darden Senior.

17              (Continued on next page)

18

19

20

21

22

23

24

25

FC26NEW6                          Alfieri - direct

1    BY MS. PAUL:

2    Q.  Directing your attention now to October of 2013, did there

3    come a time in October of 2013 when you asked Mr. Newkirk to

4    report about the Maxim deal during a partners meeting?

5    A.  I did.  We have regular monthly partners meetings.  For

6    some of those meeting the counsel are invited.  One of those

7    was coming up.  I had heard that there had been -- the Maxim

8    deal had gotten to a point that I think had been reported in

9    the papers so I came to Mr. Newkirk.

10             MR. HARRIS:  Objection.

11             There is no objection.

12   Q.  Please continue.

13   A.  With that background I came to Mr. Newkirk and asked him if

14   he would like to report on what sounded like a newsworthy

15   transaction.

16   Q.  And in the weeks following that partners meeting, did

17   Mr. Newkirk bring to your attention any issues or problems with

18   the deal?

19   A.  There -- we had at least one conversation, possibly more,

20   and I don't remember if I initiated or he initiated it; but I

21   learned from Mr. Newkirk that there were some problems going

22   forward on the deal and it sounded to me like there might be

23   some commercial litigation that might occur so we had a

24   conversation in which I advised him if he thought that was a

25   possibility that he should speak with one of our litigation

1   partners to be prepared on behalf of the client.

2   Q.   What was his response to that?

3   A.   That he would do so if that were needed.

4   Q.   Did he indicate that it was needed?

5   A.   In that first conversation -- I think we had more than one

6   conversation.  I think the first time we discussed it he

7   indicated that he would and he would look at it again if it

8   were needed and I believe we had a second conversation in which

9   he told me things were under control and he didn't need to

10  consult with one of our litigation partners.

11  Q.   I would like to direct your attention now to November 12th

12  of 2013.  Do you recall an issue arising that day with respect

13  to money released from a Bryan Cave escrow account in

14  connection with the Maxim deal?

15  A.   Yes.

16  Q.   What do you recall happening that day?

17  A.   I don't really recall if I was advised on the 12th or on

18  the following day; but in essence what I was advised and what I

19  learned was that $4.9 million I believe of moneys that were

20  being held in escrow by Bryan Cave had been released to one of

21  the parties or the attorneys for one of the parties in the

22  Maxim transaction and that was not with the permission of the

23  party that had deposited that money with us.

24  Q.   Did you speak with Mr. Newkirk about the release of the

25  money?

FC26NEW6                     Alfieri - direct

1   A.  After I learned that there was this problem, yes, I went to

2   him directly.

3   Q.  Did he bring the matter to your attention or did you go to

4   him with it?

5   A.  I went to him with it.

6   Q.  Did Bryan Cave conduct an investigation to determine

7   whether or not the e-mail authorizing the release of the money

8   was actually a fake e-mail?

9   A.  Once we --

10          MR. HARRIS:  Calls for a yes or no, your Honor.

11  A.  Yes.

12  Q.  What did the firm conclude as a result of that

13  investigation?

14          MR. HARRIS:  Objection, your Honor.

15          THE COURT:  Sustained.

16  Q.  Mr. Alfieri, did you share with Mr. Newkirk the results of

17  Bryan Cave's investigation into that e-mail?

18  A.  I did.

19          MR. HARRIS:  Objection, same.

20          THE COURT:  No.  That question will be permitted as a

21  yes or no answer.  The answer is yes.  Put another question.

22  Q.  What did you share with Mr. Newkirk?

23          MR. HARRIS:  Objection, same.

24          THE COURT:  I can't really tell, but I think we do

25  need a side bar.

FC26NEW6                         Alfieri - direct

1              (Continued on next page)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

FC26NEW6                        Alfieri – direct

1                (At the side bar)

2                THE COURT:  So I assume this is foundational to

3       something that Mr. Newkirk said or did.  So what is it?  Tell

4       me what the testimony is going to be.

5                MS. PAUL:  It is not offered for its truth.  The

6       results of the investigation it offered for conversation.

7                THE COURT:  What?

8                MS. PAUL:  He shared with Mr. Newkirk that there had

9       been a spoofed e-mail and Mr. Newkirk had no reaction.

10               THE COURT:  Sustained on a 403 basis.  I think the

11      inference is too problematic and it is not irrelevant but it is

12      somewhat speculative and the prejudice would be considerable.

13      Sustained.

14               MR. HARRIS:  Thank you.

15               (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1          (In open court; jury present)

2    BY MS. PAUL:

3    Q.  Mr. Alfieri, can you please take a look at Government

4    Exhibit 340.

5          Do you recognize that document?

6    A.  Yes.

7    Q.  What is it?

8    A.  It's an e-mail from Mr. Newkirk to me and to another

9    partner at Bryan Cave dated November 19, 2013, and it forwards

10   an attachment.

11   Q.  Do you see the e-mail at the bottom half of the page?

12   A.  I do.

13   Q.  What is that e-mail?

14   A.  That is what Mr. Newkirk is forwarding along with the

15   attachment.  It's an e-mail dated November 11, 2013 from Mark

16   Weinberg to Mr. Newkirk.

17   Q.  What is attached to the e-mail?

18   A.  Certain Bank of America account statements.

19   Q.  Was Mr. Newkirk the person to bring these bank statements

20   to your attention initially?

21   A.  No.

22   Q.  Prior to the issue with the release of the money on

23   November 12th, had you learned about the existence of these

24   bank statements?

25   A.  No.

1   Q.  In the course of your discussions with Mr. Newkirk

2   regarding that released wire, did Mr. Newkirk bring up the

3   existence of these bank statements?

4   A.  No.

5   Q.  Now, following the issue with the release of the money, did

6   Mr. Newkirk bring to your attention any other issues or

7   problems with respect to the Maxim deal?

8   A.  No.

9   Q.  Who is Jay Dorman?

10  A.  He was a Senior corporate partner at Bryan Cave.  At that

11  time he was a corporate partner.

12  Q.  Did there come a time when he became involved in the Maxim

13  deal?

14  A.  Yes.

15  Q.  Why?

16  A.  Almost immediately after I learned about the unauthorized

17  transfer of the escrow funds, I made the decision that I wanted

18  the most senior corporate experienced partner I could that I

19  had available to me to now work on this deal.

20  Q.  Are you familiar with an entity called Open Gate Capital?

21  A.  I am now.

22  Q.  Did there come a time when you learned about a lawsuit

23  filed by Open Gate in connection with the default of the loan?

24  A.  Yes.

25  Q.  Please take a look at Government Exhibit 506.

1           Do you recognize that document?

2    A.  Yes.  It begins as an e-mail from another one of my

3    partners dated January 16, 2013, and it is to me and

4    Mr. Dorman.

5    Q.  What is attached to the e-mail?

6    A.  This is another e-mail.  These are some internal e-mails

7    but there is another e-mail from a James Ellis to Mr. Newkirk

8    dated November 22, 2013, and then there is a copy of the docket

9    sheet for a lawsuit involving Open Gate Capital and Calvin

10   Darden Senior.

11   Q.  Prior to receiving this e-mail in January of 2014, do you

12   recall having heard about the Open Gate lawsuit?

13   A.  I had not heard about it.

14   Q.  Did Mr. Newkirk ever mention Open Gate Capital to you at

15   all?

16   A.  No.

17   Q.  And did Mr. Newkirk ever mention any lenders filing

18   lawsuits in connection with the Maxim deal?

19   A.  Not to me.

20   Q.  Did Mr. Newkirk ever inform you that if he accepted process

21   of lawsuit on behalf of Calvin Darden Senior not --

22           MR. HARRIS:  Objection.  Leading, assuming facts not

23   in evidence.

24           THE COURT:  Overruled.

25   A.  Not to me.

1    Q.  Following the issue with the released money on

2    November 12th, were there continued efforts to close the Maxim

3    deal?

4    A.  Yes.

5    Q.  Why?

6    A.  We believed that we represented Calvin Darden Senior.  We

7    believe we had a client with interest at stake in that

8    transaction and we believed we had a duty to try to resolve the

9    issues, resolve the questions and bring that matter to

10   conclusion on his behalf.

11   Q.  Did Mr. Newkirk tell you that Calvin Darden Senior was

12   still involved in the deal?

13   A.  Yes.

14   Q.  Did Mr. Newkirk tell you that he was in contact with

15   Mr. Darden Senior in connection with the deal?

16           MR. HARRIS:  Objection, leading.

17           THE COURT:  Overruled.

18   A.  Yes.

19   Q.  Had you believed that Mr. Calvin Darden Senior was no

20   longer involved in the deal, what would you have done?

21           MR. HARRIS:  Objection.

22           THE COURT:  Sustained.

23   Q.  Please take a look at Government Exhibit 507.

24   A.  Yes.

25   Q.  What is the date e-mail?

1    A.  It is an e-mail from Mr. Newkirk dated January 31, 2014.

2    Q.  What is attached to the e-mail?

3    A.  It is a bill.  It is a Bryan Cave bill for service rendered

4    in connection with the Maxim deal.

5    Q.  Were you aware at that time that Mr. Newkirk had sent out a

6    bill in connection with the Maxim deal?

7            MR. HARRIS:  Objection.

8            Sorry, withdrawn.

9    A.  I don't think so.

10           THE COURT:  No.  I am sorry.

11           You withdrew the objection?

12           MR. HARRIS:  One second, your Honor.

13           I am going to object again.

14           THE COURT:  Pardon?

15           MR. HARRIS:  I am going to object again.

16           THE COURT:  Waived.

17           You may answer.

18   A.  I actually don't recall.  I don't think I knew at that

19   time.

20   Q.  If we can take a look at page 1 of the bill.

21   A.  Of the bill?

22   Q.  Yes.

23   A.  Yes.

24   Q.  Who is this bill addressed to?

25   A.  Calvin Darden Senior care of The Reign Entertainment Group,

FC26NEW6                          Alfieri – direct

1   LLC.

2   Q.  At what address?

3   A.  375 Park Avenue, New York, New York.

4   Q.  What is the total bill for?

5   A.  The total amount of the bill?

6   Q.  Yes.  Directing your attention to where it says "statement

7   total,' what is the total?

8   A.  $498,059.94.

9   Q.  Based on the amount of this bill, was Mr. Newkirk eligible

10  for consideration for a discretionary bonus at the firm?

11  A.  Only if it was collected.

12  Q.  I would like to direct your attention now to February of

13  2014.

14  A.  Sorry.  What date?

15  Q.  February 14.  Did there come a time February 2014 when

16  Calvin Darden Junior was arrested in connection with the Maxim

17  deal?

18  A.  So I understand, yes.

19        MS. PAUL:  May I approach, your Honor?

20        THE COURT:  Yes.

21  Q.  I have handed you a document that has been marked for

22  identification as Government Exhibit 181, Mr. Alfieri.  Please

23  take a look at that document and let me know if you recognize

24  it.

25  A.  Yes.  It's a printout of a series of e-mails amongst a

1   number of us at Bryan Cave including Mr. Newkirk.

2   Q.  What is the date on this e-mail chain?

3   A.  It starts at February 14, 2014.

4   Q.  Did you participate in this e-mail exchange with

5   Mr. Newkirk?

6   A.  I did.

7          MS. PAUL:  The government offers Government

8   Exhibit 181 into evidence.

9          MR. HARRIS:  May I have one moment, your Honor?

10          THE COURT:  Yes.

11          (Pause)

12          MR. HARRIS:  No objection, your Honor.

13          THE COURT:  Received.

14          (Government's Exhibit 181 received in evidence)

15   BY MR. HARRIS:

16   Q.  Mr. Alfieri, directing your attention to the bottom e-mail

17   on page 1, which is an e-mail from you on February 14th of

18   2014.

19          Do you see that?

20   A.  I do.

21   Q.  This is an e-mail to you to Mr. Newkirk?

22   A.  Correct.

23   Q.  What did you ask Mr. Newkirk for in this e-mail?

24   A.  I asked him to confirm all the e-mail addresses that he

25   knows of for Calvin Darden Senior and Calvin Darden Junior and

FC26NEW6                          Alfieri - direct

1    to provide whatever telephone numbers he has for Calvin Darden

2    Junior.

3    Q.  And taking a look at the response for Mr. Newkirk, which is

4    the e-mail just above --

5    A.  Yes.

6    Q.  -- how did Mr. Newkirk respond?

7    A.  He replied to me with a copy to one of my other partners

8    and he said -- he indicated two e-mail addresses for Senior and

9    one e-mail address for Junior with a telephone number for

10   Junior.

11   Q.  And did Mr. Newkirk indicate that any of these e-mail

12   addresses were shared between Mr. Newkirk Junior and Mr. Darden

13   Senior?

14           MR. HARRIS:  Objection.  The document speaks for

15   itself.

16           THE COURT:  Sustained.

17   Q.  Did had Newkirk ever tell you that any of these e-mail

18   addresses were shared between Calvin Darden Senior and Calvin

19   Darden Junior?

20           MR. HARRIS:  Objection.

21           THE COURT:  Overruled.

22   A.  Not that I recall.

23           MS. PAUL:  One moment.

24           No further questions.

25           THE COURT:  Cross-examination.

1    MR. HARRIS:  Your Honor, I think I will go more than

2    15 minutes.  Would you prefer me to start?

3    THE COURT:  Why don't we get started.

4    MR. HARRIS:  Happy to.

5    CROSS-EXAMINATION

6    BY MR. HARRIS:

7    Q.  Mr. Alfieri, you were excited about having Harvey Newkirk

8    join Bryan Cave?

9    A.  We were pleased to have him join us.

10   Q.  He was at a good law firm, K&L Gates?

11   A.  Correct.

12   Q.  Prior to that he had been to another law firm Thelen Reid?

13   A.  Yes.

14   Q.  He had gone to Columbia Law School?

15   A.  Yes, he had.

16   Q.  He was a graduate from Cornell?

17   A.  Yes.

18   Q.  One second, please.

19       Mr. Alfieri, am I correct that you were aware of the

20   representation for the purchase of Maxim?

21   A.  That I was aware of the --

22   Q.  That Bryan Cave was going to represent the Dardens in

23   connection with the purchase of Maxim?

24   A.  Yes, I was aware of it.

25   Q.  Does Bryan Cave require this there be an engagement letter

FC26NEW6                      Alfieri – cross

1   for all clients?

2   A.  Yes.

3              MR. HARRIS:  Your Honor, may I approach?

4              THE COURT:  Yes.

5   Q.  Mr. Alfieri, I am showing you what has been marked

6   Defendant's Exhibit 290.  It's an engagement letter on Bryan

7   Cave letterhead with The Reign Entertainment Group.

8              Do you see that?

9   A.  Yes.

10             MR. HARRIS:  Your Honor, I offer Defendant

11  Exhibit 290.

12             MS. PAUL:  No objection.

13             THE COURT:  Received.

14             (Defendant's Exhibit 290 received in evidence)

15  BY MR. HARRIS:

16  Q.  Mr. Alfieri, am I correct that the engagement is not

17  between Harvey Newkirk and the client, but between Bryan Cave

18  and the client?

19  A.  That's correct.

20  Q.  That is true for all of Bryan Cave's engagement letters?

21  A.  Absolutely.

22  Q.  If a payment is made by the client, that payment goes to

23  Bryan Cave; correct?

24  A.  Of course.

25  Q.  And Bryan Cave is responsible for the provision of legal

FC26NEW6                        Alfieri - cross

1  services under the agreement; correct?

2  A.  Through our lawyers, yes.

3  Q.  And the government asked you some questions about

4  Mr. Newkirk's offer letter.

5          Do you recall that?

6  A.  I do.

7  Q.  Under his offer letter, Mr. Newkirk --

8          MR. HARRIS:  Can we put that up.  It is 514.  Can we

9  not put the very top up.  Thank you.

10  Q.  Paragraph one says that Mr. Newkirk will be a lawyer,

11  employee of the firm; correct?

12  A.  That is correct.

13  Q.  And he is counsel?

14  A.  Yes.

15  Q.  And am I right that Mr. Newkirk had been an associate at

16  Bryan Cave -- sorry, at K&L Gates?

17  A.  That is what we were advised, yes.

18  Q.  Counsel is a step up?

19  A.  Yes.  Not all the way to partner but a step up.

20  Q.  And then it says that he is going to be compensated with

21  $300,000; correct?

22  A.  That is the salary, right.

23  Q.  That does not depend on bringing in business or doing

24  anything else?

25  A.  Well, it depends on his continued good performance and so

1    on, but it is not directly connected to fees received or

2    anything like that.

3    Q.  That is what he is going to make as long as he --

4    A.  As long as he is an employee in good standing he is going

5    to make $300,000.

6    Q.  That is what he is going to get.

7           Paragraph four is he is going be eligible to

8    participate in bonus programs and that it is based on a bonus

9    here in excess of 500,000; is that right?

10   A.  I am sorry.  I didn't understand the question.

11   Q.  I didn't ask a great question.

12          First of all, it is discretionary.  What does that

13   mean?

14   A.  All bonuses are subject to the employer assessing all of

15   the data and then it's in the employer's discretion about

16   whether or not to award the bonus.

17   Q.  Someone can bring in a lot of business but if you don't

18   like something else about their performance, Bryan Cave does

19   not feel obligated to give a bonus?

20   A.  That is correct.

21   Q.  This is not a commission schedule.  This does not say if

22   you bring in X business, you will get Y?

23   A.  He was not a salesman it wasn't a commission.

24   Q.  In fact, it specifically talks about contributions to

25   servicing the existing clients of the firm; is that right?

FC26NEW6                          Alfieri - cross

1   A.  Yes, it does.

2   Q.  It also talks about extraordinary contributions of practice

3   of the group?

4   A.  Yes.

5   Q.  So it is also important that you do good work?

6   A.  Extremely.

7   Q.  And then it says if we skip to paragraph six -- I am not

8   skipping anything important.  It is important but it is

9   benefits.

10          Paragraph six, that is one that talks about

11   partnership consideration; is that right?

12   A.  Correct.

13   Q.  And am I right that Bryan Cave agreed to give Harvey

14   Newkirk accelerated consideration for partnership?

15   A.  We agreed to look at his performance in the year 2014 and

16   since he only joined us in June of 2013 that was a little

17   earlier than we would normally like.

18   Q.  That is otherwise fairly standard.  You bring someone in as

19   counsel, give them an evaluation period and determine whether

20   you will offer them a partnership in the firm?

21   A.  For those counsel who are brought in with a partnership

22   opportunity.  It is entirely possible you could -- we could

23   hire a lateral counsel and there is no partnership opportunity

24   so...

25   Q.  It also says offer is contingent upon satisfactory due

FC26NEW6                    Alfieri – cross

1    diligence checks and reference checks.  That is paragraph

2    eight.

3    A.  Yes.

4              MR. HARRIS:  Your Honor, I am going to go onto a new

5    topic.

6              THE COURT:  We'll give the jury their midafternoon

7    break.  We'll take a 15-minute break at this time.

8              (Jury excused)

9              THE COURT:  Mr. Alfieri, you can step down and we'll

10   see you in 15.

11             THE WITNESS:  Thank you.

FC26NEW6                          Alfieri - cross

```
 1                (In open court; jury not present)
 2                THE COURT:  Please be seated.
 3                How much longer do you have?
 4                MS. CHAUDHRY:  I do not have long, your Honor.  Maybe
 5   15 minutes.
 6                THE COURT:  Then we have one other government witness.
 7                MR. ADAMS:  Two, your Honor.  One is very short.
 8                THE COURT:  All right.  Now, other than the defendant,
 9   and we'll hear about that at the close of the day, what other
10   witnesses, if any, does the defense want to call?
11                MS. CHAUDHRY:  Your Honor, we would like to call Mike
12   Brown.  Should I tell you who he is?
13                THE COURT:  Sorry?
14                MS. CHAUDHRY:  Should I tell you who he is, or list
15   the names?
16                THE COURT:  Just give the names first.
17                MS. CHAUDHRY:  Mike Brown.
18                THE COURT:  Okay.
19                MS. CHAUDHRY:  John Parker, Paul Corvino, Andrew
20   Nikou.
21                THE COURT:  Sorry.  I am having trouble hearing you.
22                MS. CHAUDHRY:  Andrew Nikou.
23                THE COURT:  So four altogether?
24                MS. CHAUDHRY:  That is our current intention.
25                THE COURT:  Roughly how long?
```

FC26NEW6                        Alfieri – cross

1              MS. CHAUDHRY:  Sorry, your Honor.  The government and

2       I have not been able to reach a stipulation yet on the 3500.

3       So if we cannot, then I might call some of their agents.

4              THE COURT:  Okay.  So putting that last aspect aside,

5       roughly how long do you think those witnesses will be?

6              MS. CHAUDHRY:  A total of time would be about four

7       hours or less and that's actual time not breaks.

8              THE COURT:  You think each of them will take an hour,

9       or are you saying with the cross it will take an hour?

10             MS. CHAUDHRY:  With the cross.

11             THE COURT:  I see.  I think counsel therefore needs to

12      assume, if the defendant does not take the stand that we will

13      begin summations tomorrow afternoon and conclude them on Friday

14      morning.  So we'll talk more at the end of the day, but I just

15      wanted to get an idea of where we stood schedule-wise so I

16      could advise the jury.

17             Very good.  Thanks a lot.

18             (Recess)

19             THE COURT:  I will hand out a draft verdict form.

20             THE DEPUTY CLERK:  Can I bring in the jury?

21             THE COURT:  Please and the witness.

22             You said 15 minutes.

23             MR. HARRIS:  10 to 20, if I could have that latitude.

24             THE COURT:  Of course.  I will give you all the

25      latitude you want; but I know after I was such a great help to

FC26NEW6                    Alfieri - cross

1    you all afternoon, you will want to do it in 10.

2              MR. HARRIS:  That's fine.  I think they are going to

3    object to my first document.

4              (Continued on next page)

```
 1                    (In open court; jury present)
 2                    THE COURT:  I hope you all appreciated that I
 3       especially arranged for it to be lousy weather so you didn't
 4       mind being inside.
 5                    Go ahead, counsel.
 6       BY MR. HARRIS:
 7       Q.  Mr. Alfieri, the government showed you Government
 8       Exhibit 507, which is the invoice.
 9                    Do you recall that?
10       A.  Yes.
11                    MR. HARRIS:  Can you put that up, please.
12       Q.  Who makes the bills at Bryan Cave?
13       A.  You mean who prepares them?
14       Q.  Who prepares them?
15       A.  Probably someone in accounting.  Sometimes the secretary.
16       Q.  The accounting department has access to all the bills;
17       correct?
18       A.  I couldn't hear you.
19       Q.  Someone in the accounting department have access to all the
20       bills that get sent out?
21       A.  Yes.
22       Q.  Is the bill usually sent to the client by the lawyer in
23       charge of the case?
24       A.  Most of the time.  Sometimes there will be someone else,
25       but most of the time.
```

FC26NEW6                    Alfieri - cross

1   Q.  Do you see all the bills that go out?

2   A.  No.

3   Q.  If you wanted to, you could see a bill?

4   A.  Sure.

5          MR. HARRIS:  Can we please put up Government

6   Exhibit 513.

7   Q.  If you turn to page 7, please.  This is part of the

8   business and practice development plan you were asked some

9   questions about?

10  A.  Yes.

11  Q.  Item seven talks about Calvin Darden Senior; is that right?

12  A.  Yes.

13  Q.  And there is a bunch of other clients listed; right?

14  A.  Yes.

15  Q.  Under Calvin Darden Senior, Mr. Newkirk says that he is on

16  the board of certain companies and then he estimates the value

17  of the relationship over the next 12 to 18 months of 75,000 to

18  100,000; is that right?

19  A.  Yes.  That is what it says.

20  Q.  Thank you.

21         Mr. Alfieri, you testified that you kept generally

22  abreast -- I don't know if that was your exact word -- is it

23  fair to say you kept generally abreast of the Maxim deal?

24  A.  No, I don't think I said that.  Prior to November when we

25  had the problem with the release of the escrow funds, I was not

FC26NEW6                        Alfieri - cross

1    generally or regularly abreast.

2              (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1   Q.  Let me try again.

 2          Is it fair to say you were aware of it?

 3   A.  Absolutely.

 4   Q.  In fact, on direct you testified that you saw announcement

 5   of the deal in certain newspapers; correct?

 6   A.  Yeah, somewhere.

 7          MR. HARRIS:  Your Honor, may I approach?

 8          THE COURT:  Yes.

 9   Q.  Mr. Alfieri, showing you what's been marked for

10   identification only as Defendant's Exhibit 254, that's an email

11   from yourself to Harvey Newkirk on September 19, 2013, subject:

12   Forward Articles of Maxim Sales.

13          Do you see that?

14   A.  Yes.

15   Q.  Then there's some attachments.

16   A.  Correct.

17          MR. HARRIS:  Your Honor, I offer Defense Exhibit 254.

18          MS. PAUL:  Objection.  Hearsay.  Relevance.

19          MR. HARRIS:  Not offered for the truth.

20          THE COURT:  So the cover email is received as an

21   ordinary business record, the rest is not received.

22          MR. HARRIS:  Thank you your Honor.

23          (Defendant's Exhibit 254 received in evidence)

24          MR. HARRIS:  May I publish the cover email?

25          THE COURT:  Yes.

1        MR. HARRIS:  And then we will redact the document to

2   make sure -- thank you.  I'm just going to show the cover

3   email.

4        THE COURT:  Okay.

5        MR. HARRIS:  Thank you.

6        Can we put up the cover email please.

7   Q.  This is an email that you sent to Harvey Newkirk; is that

8   right?

9   A.  Yes.

10  Q.  You attached various articles from newspapers; is that

11  right?

12  A.  Yes.

13  Q.  Are these the articles that you were referring to in your

14  direct exam?

15  A.  I'm pretty sure.

16  Q.  That's *The Wall Street Journal* and *Bloomberg*, *Atlanta

17  Constitution* and some others?

18  A.  Those are the ones that are attached to this, yes.

19  Q.  And then you're saying:  Harvey, Alison shared these with

20  me.  Who's Alison?

21  A.  Alison is Alison Gordon, then and now a marketing and

22  business development staff person at the firm.

23  Q.  Then you say:  Just want to say congrats on the deal.

24  Let's catch up this week or next.  Is that right?

25  A.  Yes.

FC2VNEW7                        Alfieri - cross

1   Q.  And did you catch up?

2   A.  I'm sure I did.

3   Q.  Thank you.

4        You testified on direct about becoming aware about the

5   issue with the funds that had been wired to the escrow at the

6   Bodman firm; is that right?

7   A.  Yes.

8   Q.  You personally spoke with Mr. Weinberg; is that right?

9   A.  He called me, yes.

10  Q.  He called you a number of times, right?

11  A.  Oh, yes.  Over what period, yes.

12  Q.  And your emails with him?

13  A.  Pardon me?

14  Q.  And your emails with him?

15  A.  Oh, yes.

16  Q.  It was a vigorous email?

17  A.  Didn't feel strenuous.  We had a lot of emails.

18  Q.  A lot of emails.  All right.

19       And then after that, you asked that Jay Dorman become

20  involved in the Maxim deal?

21  A.  I wouldn't say after that.  I would say it was within a day

22  or two or a couple of days from when the money was wired that I

23  asked Jay to become involved in the matter.

24  Q.  Mr. Dorman was someone you trusted?

25  A.  Yes.

FC2VNEW7                    Alfieri - cross

1   Q.   You viewed Mr. Dorman as a highly competent corporate

2   attorney?

3   A.   I did and do.

4   Q.   Thereafter, Mr. Dorman tried to work to close the Maxim

5   deal; is that right?

6   A.   He did.

7   Q.   He continued to work with Harvey Newkirk to do so; is that

8   right?

9   A.   Harvey remained on the matter and I expected that he would

10   work through Jay Dorman.

11   Q.   You also contacted the -- you at Bryan Cave also contacted

12   the Secret Service about the issue with the funds?

13   A.   Almost immediately.  Some of us contacted law enforcement

14   generally, Secret Service, probably through the bank as well.

15   I think one of us may have reached out to the FBI.  We wanted

16   law enforcement to be on top of it right away.

17   Q.   And you spoke to Harvey Newkirk about that, right?

18   A.   I told him that, yeah.

19   Q.   Did all those things promptly, right?

20   A.   Yes, we did.

21   Q.   You believe that was an appropriate response?

22   A.   To involve law enforcement?  Yes.

23   Q.   To do all those things:  Add Mr. Dorman, speak to law

24   enforcement, talk to the bank, inform Mr. Newkirk.

25   A.   Yes.

FC2VNEW7                    Alfieri - cross

1    Q.  The firm could have stopped its representation of Reign or

2    the Dardens at that point, right?

3    A.  It could have withdrawn, yes.

4    Q.  The firm chose not to?

5    A.  We believe we had a client named Calvin Darden Senior.

6    Q.  Mr. Dorman thereafter would periodically keep you informed

7    of what was going on?

8    A.  Yes.

9    Q.  And send you emails and things like that?

10   A.  Periodically.

11   Q.  You were aware that Jay Dorman negotiated with Larry Dietch

12   who's the counsel for Alpha Media?

13   A.  Yes.

14         MS. PAUL:  Objection.

15   A.  Sorry.

16         THE COURT:  Sustained.

17   Q.  Were you copied on emails between Mr. Dorman and Alpha

18   Media?

19   A.  I believe I was.

20   Q.  You were also copied on emails between Mr. Dorman and the

21   McMahons or other interested parties?

22   A.  I don't know.  I don't recall sitting here now whether I

23   was.

24   Q.  You sometimes forwarded emails that had been sent to the

25   McMahons?

FC2VNEW7                          Alfieri - cross

1   A.   Probably.  I mean could have been.  That would fit

2   generally within Mr. Dorman was periodically keeping me in the

3   loop on what was going on.

4   Q.  Mr. Alfieri, am I correct that there came a time when

5   Calvin Darden Senior came to Bryan Cave and asked to be

6   provided with all of Bryan Cave's files related to the Maxim

7   deal?

8               MS. PAUL:  Objection.

9               THE COURT:  Ground.

10              MS. PAUL:  Hearsay.  Relevance.  Outside the scope.

11              THE COURT:  I thought it was his personal knowledge.

12              If you want to rephrase, if it is directed at personal

13   knowledge, otherwise I would sustain the objection.

14              MR. HARRIS:  It is and I'll rephrase, your Honor.

15              THE COURT:  Did Mr. Calvin Darden Senior meet with you

16   at some point?

17              THE WITNESS:  No.

18              THE COURT:  No.

19   BY MR. HARRIS:

20   Q.  Did an attorney for Mr. --

21              THE COURT:  Pardon?

22   Q.  Did an attorney for Mr. Calvin Darden Senior speak with you

23   at some point?

24   A.  With me?

25   Q.  Yes.

1   A.  No.

2   Q.  Do you know whether Bryan Cave provided the files on this

3   deal to Mr. Darden Senior's lawyer?

4           MS. PAUL:  Objection.  Calls for hearsay.

5           MR. HARRIS:  I believe this is personal knowledge.

6           THE COURT:  Well, were you asked at any time to

7   approve or otherwise comment on responding to a request for

8   documents on behalf of Calvin Darden Senior?

9           THE WITNESS:  I don't know that I was asked to

10  approve, but I was probably asked to comment about it.

11          THE COURT:  All right.  What was said to you and what

12  did you say in response?  Was this an email conversation, an

13  in-person conversation, or whatever?

14          THE WITNESS:  Your Honor, honestly I don't remember

15  specifically.

16          THE COURT:  All right.  Very good.

17          MR. HARRIS:  Can I ask the one question?

18          THE COURT:  There's no harm in asking.

19          MR. HARRIS:  On the same topic.

20          THE COURT:  Go ahead.

21          I have a question:  Which is harder, being a witness

22  or being a managing partner of a law firm?

23          Go ahead, counsel.

24          THE WITNESS:  Shall I answer that?

25          THE COURT:  No.

FC2VNEW7                    Alfieri - redirect

1    BY MR. HARRIS:

2    Q.  In your role as managing partner of the New York office,

3    did you approve providing documents related to the Maxim deal

4    to Calvin Darden Senior or his counsel?

5    A.  I don't know that I was asked to approve or that I really

6    needed to approve, but I'm aware that that happened.

7              MR. HARRIS:  Your Honor, may I have one moment?

8              THE COURT:  Yes.

9              (Pause)

10             MR. HARRIS:  No further questions.

11             THE COURT:  All right.  Redirect.

12             MS. PAUL:  Yes, your Honor.

13             Can we bring up Defense Exhibit 290 please.

14   REDIRECT EXAMINATION

15   BY MS. PAUL:

16   Q.  Mr. Alfieri, you recall being asked questions about Defense

17   Exhibit 290 on cross-examination?

18   A.  I do.

19   Q.  This is the engagement letter with The Reign Entertainment

20   Group?

21   A.  Correct.

22   Q.  Now, who from Bryan Cave signed this engagement letter?

23   A.  Mr. Newkirk.

24   Q.  Did anyone else from Bryan Cave sign it?

25   A.  No.

FC2VNEW7                        Alfieri - recross

1   Q.  Now, you testified on cross-examination that the firm

2   continued with the Maxim deal even after the issue with

3   Mr. Weinberg's money because you believed you had a client in

4   Calvin Darden Senior, is that your testimony?

5   A.  Correct.

6   Q.  Why did you believe you had a client in Calvin Darden

7   Senior?

8   A.  That was the name of the client in our system.  That's how

9   our matter had been opened, with that client.  And Mr. Newkirk

10  had told me so.

11          MS. PAUL:  No further questions.

12          THE COURT:  Anything else?

13          MR. HARRIS:  Two questions.

14  RECROSS EXAMINATION

15  BY MR. HARRIS:

16  Q.  The offer letter, Bryan Cave acted as -- the offer letter

17  for Mr. Newkirk, Bryan Cave sent that letter to Mr. Newkirk;

18  correct?

19  A.  I guess we did.  I don't mean to fence with you.  I don't

20  remember, maybe he was around and we handed it to him.  I don't

21  know if we sent it.

22  Q.  Bryan Cave wrote the letter and provided it to Mr. Newkirk?

23  A.  Yes.

24  Q.  And that was the terms of the deal that Bryan Cave made

25  with Mr. Newkirk?

1    A.  It was the terms of -- the core terms of his employment,

2    yes.

3    Q.  Would the firm have turned over documents to Calvin Darden

4    Senior if the firm believed he was not the client?

5              MS. PAUL:  Objection.  Calls for speculation.

6              THE COURT:  Sustained.

7              Having now had three questions of your allotted two,

8    do you want a fourth?  Go ahead.

9    Q.  Am I right that client files are protected by

10   attorney-client privilege?

11   A.  You would want to conduct a seminar on attorney-client

12   privilege.  Not necessarily every single thing in a file is

13   protected by attorney-client privilege.  Most of it is.

14   Depends.

15   Q.  Bryan Cave does not turn over its files to anyone who asks?

16             MS. PAUL:  Objection.

17             THE COURT:  Sustained.

18   Q.  Bryan Cave would turn over -- when you were aware of the

19   turning over of the files, that was on the basis that

20   Mr. Darden had rights and was a client; correct?

21             MS. PAUL:  Objection.

22             THE COURT:  At the time that the files were turned

23   over, whom did you believe was the client?

24             THE WITNESS:  As far as I can recall, your Honor,

25   Calvin Darden Senior.

1           THE COURT:  Okay.

2           MR. HARRIS:  Thank you, your Honor.

3       No further questions.

4           THE COURT:  Okay.  Anything else?

5           MS. PAUL:  No, your Honor.

6           THE COURT:  Thank you so much.  You may step down.

7           THE WITNESS:  Thank you, your Honor.

8       (Witness excused)

9           THE COURT:  Please call your next witness.

10          MR. ADAMS:  Your Honor, we may have a stipulation

11  Mr. Harris is reviewing that would obviate one witness.

12          In the meantime, I will read another stipulation

13  because I lost the coin toss.

14          Government Exhibit 907 is a true and correct copy of

15  AT&T call records for the telephone with the call number

16  914-325-4523, which was at all times relevant to this case

17  subscribed to Bryan Cave LLP and controlled by Harvey Newkirk,

18  the defendant.

19          The information contained in Government Exhibit 907

20  was recorded by AT&T at or near the time the activities took

21  place, was kept in the regular course of AT&T's business

22  activities, and it was the regular practice of AT&T to record

23  the information.  These records reflect accurate dates and

24  times of all communications reflected therein with times

25  provided as UTC as described in Government Exhibit 102.

1     Government Exhibit 907 and this stipulation, which is

2  Government Exhibit 104, may be received into evidence as

3  government exhibits at trial.

4     And with that, the government offers Exhibits 104 and

5  907.

6     THE COURT:  Received.

7     (Government's Exhibits 104, 907 received in evidence)

8     MR. ADAMS:  Thank you, your Honor.

9     The government calls Elizabeth Garvey.

10  ELIZABETH GARVEY,

11     called as a witness by the Government,

12     having been duly sworn, testified as follows:

13     THE COURT:  Counsel.

14     MR. ADAMS:  Thank you, your Honor.

15  DIRECT EXAMINATION

16  BY MR. ADAMS:

17  Q.  Good afternoon, Ms. Garvey.

18     Where are you employed?

19  A.  Bryan Cave.

20  Q.  What is your title at Bryan Cave?

21  A.  The accounting manager of the New York office.

22  Q.  And on a day-to-day basis generally, what types of

23  activities do you supervise?

24  A.  I supervise a staff of five and we handle the billings,

25  collections, cash receipts, and escrow for the New York office.

FC2VNEW7                         Garvey - direct

1  Q.  In general, can you describe what sort of supervision you

2  have over the Bryan Cave escrow functions.

3  A.  Again, I supervise the staff that handle the day-to-day

4  operations.  I would handle some general questions that came in

5  or asking for wire information.

6  Q.  Do you have access to view the escrow account history for

7  particular clients --

8  A.  Yes.

9  Q.  -- at Bryan Cave?

10  A.  Yes.

11  Q.  Are records of monies received into Bryan Cave's escrow

12  account logged by people with knowledge of the amount of funds

13  being sent to Bryan Cave's escrow account?

14  A.  Yes.

15  Q.  Are those records maintained in the normal course of Bryan

16  Cave's business activities?

17  A.  Yes.

18  Q.  Are those records logged at the time that monies are

19  received into the Bryan Cave escrow account?

20  A.  Yes.

21  Q.  In the course of your duties, have you become familiar with

22  a client matter number for a matter associated with the

23  acquisition of *Maxim Magazine*?

24  A.  Yes.

25  Q.  Have you reviewed the Bryan Cave escrow records with

FC2VNEW7                          Garvey – direct

1    respect to that particular matter?

2    A.  Yes.

3    Q.  What have you learned regarding the amount of money

4    received by Bryan Cave's escrow account with respect to that

5    particular matter?

6    A.  It was a $5.5 million transfer into our account which we

7    held in escrow.

8    Q.  Was that $5.5 million the only money received in Bryan

9    Cave's escrow account in connection with the Maxim acquisition?

10   A.  Yes.

11             MR. ADAMS:  Your Honor, may I approach?

12             THE COURT:  Yes.

13   Q.  Ms. Garvey, do you recognize that document?

14   A.  Yes.

15   Q.  What is it?

16   A.  It is a check request requesting monies to be drawn, sent

17   out from the escrow account.

18   Q.  Who was the requester?

19   A.  Harvey Newkirk.

20             MR. ADAMS:  Your Honor, the government offers Exhibit

21   152.

22             MR. FOLEY:  No objection.

23             THE COURT:  Received.

24             (Government's Exhibit 152 received in evidence)

25   Q.  Ms. Garvey, what does this check request relate to?

1   A.  It is the monies that we held in escrow for this particular

2   matter that was being transferred out.

3   Q.  On this document, how can you tell that this relates to

4   escrow?

5   A.  You can't tell on this document, but the backup for that

6   would go with it, would show that it would be a transfer out of

7   our escrow account.

8   Q.  And what was the amount that was to be transferred out?

9   A.  535,000.

10  Q.  What was the date of the request please?

11  A.  11/12/2013.

12  Q.  What's the payee name that appears at the top right?

13  A.  Comvest Capital II LP.

14  Q.  In the course of your duties, do you also have any

15  supervisory role with respect to recording the opening of new

16  matters for the firm?

17  A.  No, that's done by our records department, opening the

18  matters.

19  Q.  Do you have access to new matter litigation opening

20  records?

21  A.  Yes, I view the new matters that are opened.

22  Q.  Are you familiar with how new matters are logged by Bryan

23  Cave?

24  A.  Yes.

25  Q.  Are new matters generally opened by attorneys with actual

1    knowledge of the new matters that are being opened?

2    A.   There's a legal key system that new clients and matters are

3    entered into so that they are a new client and a matter number

4    is generated from that system.

5    Q.   Are records of new matters being opened generally kept --

6    are generally made at the time that the new matter is being

7    requested?

8    A.   Yes.

9    Q.   Are those records maintained in Bryan Cave's normal course

10   of activities?

11   A.   Yes.

12   Q.   Have you reviewed new matter records with respect to the

13   same client associated with the Maxim acquisition?

14   A.   Yes.

15   Q.   At any point was a litigation matter opened or intended to

16   be opened for that client?

17   A.   No.

18            MR. ADAMS:  No further questions, your Honor.

19            THE COURT:  Cross-examination.

20   CROSS-EXAMINATION

21   BY MR. FOLEY:

22   Q.   Good afternoon, Ms. Garvey.

23   A.   Hello.

24   Q.   My name is Jared Foley and I represent Harvey Newkirk.

25            Now, on direct examination you testified about an

1   account that $5.5 million was transferred into; correct?

2   A.  Correct.

3   Q.  This was an IOLA account; is that correct?

4   A.  Correct.

5          MR. FOLEY:  Can we please put up Government Exhibit

6   301 which is already in evidence.

7          Can you blow up the second half.

8   Q.  What exactly is an IOLA account?

9   A.  It's an account that we, the attorneys, are holding for a

10  third party, for the benefit of a third party.  It's not -- it

11  doesn't belong to the attorneys; it's for the benefit of.  And

12  then we'll hold it until we receive instructions to disburse it

13  per the attorney.

14  Q.  So these funds are held there and kept separate from the

15  firm's funds; is that correct?

16  A.  Correct.

17  Q.  Are records associated with this account, are they kept by

18  Bryan Cave; that's correct?

19  A.  Correct.

20  Q.  Are these records -- they are maintained by your office?

21  A.  Correct.

22  Q.  Who has access to these records?

23  A.  The accounting department.

24  Q.  Does anyone else -- would a partner have access to these

25  records?

1    A.  No.

2    Q.  I'd like to move on to -- I'd like to ask you some -- and

3    would the managing partner have access to those records?

4    A.  No.

5    Q.  I'd like to ask you some questions about what is the

6    process of wiring funds into that account.

7            So first off, what is the process for wiring funds

8    into an IOLA account?

9    A.  Typically, I would get a request or my staff would get a

10   request to open an escrow account.  It would need further

11   approval from the management of the firm in St. Louis, the CFO,

12   the executive committee, or the COO, before we open the

13   account.

14           Once that approval was received, then we would set up

15   the account with -- there's usually either an email from the

16   attorney explaining that they are opening up an account, we

17   need an account opened for that, or there's a form that they

18   would fill out that would explain who the client is, how much

19   money would it be expecting, and sometimes they would tell us

20   for a period of time, how long.

21   Q.  You mentioned that you might seek the approval of people

22   from the management committee, the CFO, or COO.

23   A.  COO.

24   Q.  Who is the COO?

25   A.  David Fleisher.

FC2VNEW7                         Garvey - cross

1   Q.  David Fleisher.

2            When trying to get approval to wiring funds into the

3   account, what kind of information is provided to David Fleisher

4   or the CFO, etc., before money is -- before the transfer is

5   actually approved?

6   A.  They would usually ask for who the client was, how long

7   they've been a client, what's the nature of the transaction,

8   and how much money we'd be holding and for how long.

9   Q.  So there came a point in November when Mr. Newkirk asked

10  that $5.5 million be transferred into the IOLA account;

11  correct?

12  A.  Asked for approval?

13  Q.  Yes.  He sought approval to have $5.5 million transferred

14  into the firm's IOLA account.

15  A.  Correct.

16  Q.  Did he provide the information that is typically required?

17  A.  Correct.

18  Q.  This $5.5 million, it was, in fact, moved into the IOLA

19  account; correct?

20  A.  Correct.

21  Q.  I want to move on to the process of sending a wire from the

22  IOLA account.

23            So first off, whose approval is required for this

24  process?

25  A.  Again, that's another COO or the CFO needs to approve

1    the -- once we've gotten the disbursement information that they

2    would approve, that it would be set out.  Once we got

3    confirmation from the attorney that the client has approved the

4    transfer out, then we would process the transfer or write a

5    check.

6    Q.  So first you would get approval from the COO or the CFO;

7    correct?

8    A.  Correct.

9    Q.  In what form would you get that approval?

10   A.  That would be an email because they are in St. Louis.

11   Q.  And then even after that you would seek additional approval

12   from the requesting attorney; is that correct?

13   A.  Correct.

14   Q.  In this case, isn't it true that David Fleisher approved

15   of --

16           MR. ADAMS:  Objection to form.

17           THE COURT:  Sustained as to form.

18   Q.  David Fleisher approved of the transaction?

19           MR. ADAMS:  Objection.

20           THE COURT:  That's a matter not in evidence.  You want

21   to ask her do you know of your personal knowledge who approved

22   this, you can ask that question.

23           MR. FOLEY:  Thank you, your Honor.

24   Q.  So do you know who approved of the wire transfer that you

25   mentioned on November 12th for the $5.5 million?

1          THE COURT:  Just answer that question yes or no.  Do

2     you know or do you not know.

3          THE WITNESS:  Yes.

4          THE COURT:  How do you know?  Don't tell us who, just

5     tell us how you know.

6          THE WITNESS:  By an email.

7          THE COURT:  An email sent from -- to you or that you

8     were copied on or that you saw?

9          THE WITNESS:  I saw.

10         THE COURT:  An email that was prepared in the regular

11    course of business of Bryan Cave?

12         THE WITNESS:  Correct.

13         THE COURT:  Okay.  And what did the email say?

14         Forgive me, counsel, that's what you wanted to ask.

15         MR. FOLEY:  Sure.

16    BY MR. FOLEY:

17    Q.  In addition to receiving this approval, does an attorney

18    need to fill out any paperwork for this wire to be sent?

19    A.  Yes, the check request.

20    Q.  Check requisition form.

21    A.  Mm-hmm.

22         MR. FOLEY:  Can we please put up GX 151.  I'm sorry,

23    the one that you used was 152.

24         MR. ADAMS:  Yes, but they're both in evidence.

25         MR. FOLEY:  Can you put up GX 152 please.

1   Q.  So when filling out a check requisition form, before this

2   can be processed by your department, is it necessary that the

3   requesting attorney fill in the payee name?

4   A.  Yes.

5   Q.  Is it essential that he sign?

6   A.  Yes.

7   Q.  It's essential that he also put in his timekeeper number as

8   well; correct?

9   A.  Correct.

10  Q.  What is a timekeeper number?

11  A.  It's like just a designation of what we assign every

12  attorney in the firm, just their number.

13  Q.  So all this information allows you to know exactly who is

14  requesting the wire transfer; correct?

15  A.  Correct.

16  Q.  And it's essential, of course, that they need to put in the

17  payee name, as well; correct?

18  A.  Correct.

19  Q.  Harvey Newkirk, in fact, filled out one of these check

20  requisition forms; correct?

21  A.  Correct.

22  Q.  He's not the only one who filled out a check requisition

23  form in connection with this matter, is he?

24  A.  Correct.

25  Q.  Chaeri Tornay also filled out a check requisition form; is

FC2VNEW7                        Garvey - cross

1    that correct?

2    A.   Correct.

3            MR. FOLEY:  Can we see GX 151 please.

4    Q.   This transaction was likewise approved?

5    A.   Correct.

6    Q.   Once the check requisition form is filled out, who collects

7    the form?

8    A.   Who collects --

9    Q.   Yeah, how does it get to your -- do you just walk up and

10   pick up the form?

11   A.   Well, the attorney would either send it to us, the

12   secretary would deliver it, or it would be in our office.

13   Q.   At this point does the wire go out?

14   A.   Once we've gotten the proper approvals from everybody and

15   the attorney, we would enter it into the system because

16   Citibank has an online escrow program that we would enter all

17   the information in and then we would send it out, yes.

18   Q.   Now, once the wire has been sent out, you receive a federal

19   reference number; is that right?

20   A.   Right.

21   Q.   What is that?

22   A.   It's a confirmation that the wire -- the money has been

23   sent into the fed system.

24   Q.   And you keep records of these federal reference numbers and

25   these transactions; is that right?

FC2VNEW7                          Garvey - cross

1   A.  Correct.

2   Q.  Is this because it's required by law that you keep a ledger

3   of IOLA transactions?

4   A.  Right.

5              MR. ADAMS:  Objection.  Irrelevant.

6              THE COURT:  Sustained.

7   Q.  Now, there's no way that an attorney can send out a $5

8   million wire without the prior approval of the chief operating

9   officer or the CFO of the managing committee; correct?

10             MR. ADAMS:  Objection.  Asked and answered.

11             THE COURT:  Sustained.

12  Q.  Harvey Newkirk, in fact, received the approval of the chief

13  operating -- of the COO and received the necessary approvals

14  from your office; is that correct?

15             MR. ADAMS:  Objection.  Asked and answered.

16             MR. FOLEY:  I'm almost there.

17             THE COURT:  Yes, it is.  I will allow it to be

18  answered one last time and then we need to move forward.

19             What's the answer?

20  A.  Can you repeat -- ask the question again?

21  Q.  So Harvey Newkirk, in fact, received the necessary

22  approvals?

23  A.  Yes.

24             THE COURT:  So far as you know.

25             THE WITNESS:  Correct.

FC2VNEW7                              Garvey - cross

1          THE COURT:  All right.

2          MR. FOLEY:  Your Honor, may I have one moment?

3          THE COURT:  Yes.

4          (Pause)

5          MR. FOLEY:  Almost there.

6   Q.  So there came a point on November 12th where Harvey Newkirk

7   contacted you and asked that the $535,000 wire to Comvest be

8   cancelled; isn't that right?

9   A.  In an email, yes, he sent an email.

10  Q.  Is it true that Harvey Newkirk also called you later on

11  that day and requested that you try to get the $4.9 million

12  wire returned to Bryan Cave?

13  A.  It was a conference call that the director of

14  administration had connected me with him that said please

15  contact the bank, yes.

16         MR. FOLEY:  I have nothing further.

17         Thank you for your time.

18         THE COURT:  All right.  Redirect.

19         MR. ADAMS:  No redirect, your Honor.

20         THE COURT:  Thank you very much.  You may step down.

21         (Witness excused)

22         THE COURT:  All right.

23         I understand the government has one final witness.

24         MR. ADAMS:  Yes, your Honor.

25         The government calls Special Agent Paul Deal.

1    PAUL DEAL,

2         called as a witness by the Government,

3         having been duly sworn, testified as follows:

4              THE COURT:  Counsel.

5              MR. ADAMS:  Thank you, your Honor.

6    DIRECT EXAMINATION

7    BY MR. ADAMS:

8    Q.  Agent Deal, where do you work?

9    A.  I am a special agent with the United States Secret Service

10   in the New York field office.

11   Q.  How long have you been with the Secret Service?

12   A.  Five years.

13   Q.  What's your role within the Secret Service?

14   A.  The secret Service has two missions.  Our first mission is

15   the protection of the President, the Vice President, our

16   dignitaries, and candidates.  And our second mission is

17   investigations.  I am the group leader of the electronic crimes

18   task force.  We investigate wire fraud, network intrusions, and

19   other financial fraud.

20   Q.  In the course of your duties have you been involved in an

21   investigation of the attempted acquisition of *Maxim Magazine*?

22   A.  Yes.

23   Q.  I direct your attention to February 12th, 2014.

24              Did there come a time that you spoke with an

25   individual named Harvey Newkirk on that day?

1    A.  Yes.

2    Q.  Do you see Mr. Newkirk in the courtroom today?

3              MS. CHAUDHRY:  We stipulate.

4              THE COURT:  So stipulated.

5    Q.  Why were you speaking with Mr. Newkirk on that day?

6    A.  He was the attorney involved in the intended purchase of

7    *Maxim Magazine*.

8    Q.  Where did you speak with Mr. Newkirk on that day?

9    A.  At the offices at Bryan Cave.

10   Q.  Prior to speaking with Mr. Newkirk, what warnings, if any,

11   did you give him?

12   A.  I gave him the 18 U.S.C. 1001 warning, which means if you

13   lie to a federal agent, you can be prosecuted for that.

14   Q.  Did he agree to speak to you after you gave him that

15   warning?

16   A.  He did.

17   Q.  Who, if anyone, did he say his client was with respect to

18   the Maxim deal?

19   A.  Calvin Darden Senior.

20   Q.  Did he discuss the content of any private conversations

21   between himself and Calvin Darden Senior during that meeting on

22   February 12th?

23   A.  He did not.  He actually claimed attorney-client privilege

24   over all those conversations.

25   Q.  Let me direct you -- was that the last time you spoke with

FC2VNEW7                          Deal - direct

1    Mr. Newkirk?

2              MS. CHAUDHRY:  Objection.

3              May we approach?

4              THE COURT:  Yes.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the side bar)

2          MS. CHAUDHRY:  Your Honor, as the Court may remember

3     from the hearing we had this summer, Mr. Newkirk was at that

4     meeting with Mary Beth Buchanan from Bryan Cave who testified

5     that she was there to assert the privilege and that she's the

6     one who asserted the privilege.

7          This is completely misleading testimony.  That is not

8     how it went down.  Both the government and this agent know

9     that.  There was already a hearing on this matter that it was

10    Bryan Cave asserting the privilege and that's why, according to

11    Bryan Cave, they were there, to assert their attorney-client

12    privilege.

13         MR. ADAMS:  I don't think that that question has any

14    intention at all with that.  What he said was he did not have

15    conversations himself about Calvin Darden Senior on the basis

16    of attorney-client privilege.

17         THE COURT:  What is it you want to get out of this

18    witness?

19         MR. ADAMS:  That the first time they met he said

20    Calvin Darden Senior is my client.

21         THE COURT:  Okay.  Is that it?

22         MR. ADAMS:  That's it.

23         THE COURT:  All right.  So why don't you just direct

24    his attention to Mr. Newkirk, say something about who was his

25    client or something like that.

1          MR. ADAMS:  That was my first question.  I'm done with

2    this.

3          THE COURT:  Okay.  So I don't see what the objection

4    was that --

5          MS. CHAUDHRY:  The question was did he assert the

6    privilege.  Completely misleading.

7          THE COURT:  Okay.  So we will strike the last question

8    and answer, but let's get on with the merits.

9          MS. CHAUDHRY:  Yes.

10          MR. ADAMS:  I'm sorry.

11          There are only a handful of documents that I will put

12    in through this witness.  But I think a few of them are state

13    court suits against Mr. Newkirk that are being offered as

14    motive evidence he's been sued just before and early in the

15    course of the Maxim deal.  They are not being put in for the

16    truth of any of the allegations other than to say he was, in

17    fact, sued and for the following amount of money that was being

18    demanded.

19          THE COURT:  Well, I'll take those as they come up --

20          MR. ADAMS:  Sure.

21          THE COURT:  -- if there are objections, but I don't

22    think we need a sidebar.

23          MS. CHAUDHRY:  I will object.

24          THE COURT:  What?

25          MS. CHAUDHRY:  I will object.  And I hope the question

 1    does not lead on that.

 2              I will object.

 3              THE COURT:  On what ground?

 4              MS. CHAUDHRY:  403, relevance of the fact that --

 5              THE COURT:  So let's take it one step at a time.

 6              If the question is have you examined court records

 7    that show or obtained certified court records that showed

 8    Mr. Newkirk was sued in connection with this, what's your

 9    objection to that?

10              MS. CHAUDHRY:  It's not relevant that he was sued.

11              THE COURT:  No, no, no.  Their claim is that it is

12    relevant to his motivation.

13              But actually let me go back, because I may have said

14    that too quickly.  How is it relevant to his motivation?

15              MR. ADAMS:  He is under extreme financial stress as a

16    result of debts that resulted in lawsuits.  It's also relevant

17    to misstatements --

18              THE COURT:  Are these suits before or after this whole

19    thing blew up?

20              MR. ADAMS:  They are long before it blew up.

21              THE COURT:  So these are lawsuits relating to the

22    other matters.

23              MR. ADAMS:  They are related to a default on his

24    mortgage which put him in nearly $700,000 in debt.

25              THE COURT:  Okay.  So why isn't proof of his

FC2VNEW7                        Deal - direct

1    impecunious circumstances relevant to motivation?

2                MS. CHAUDHRY:  Your Honor, the default on the

3    mortgage, I would suggest, is a past bad act that they did not

4    give me 404(b) notice for.

5                THE COURT:  That's not a bad act.  If you think

6    defaulting on mortgages is a bad act, you haven't lived in the

7    United States very long.

8                Anyway, go on.

9                MS. CHAUDHRY:  The second thing is it's not a

10   motivation because if the government was examining the full

11   records, they would say that's been settled and paid in full.

12   There was no financial motive at the time; he had no

13   outstanding lawsuits.

14               THE COURT:  Is that true, at the time the Maxim deal

15   was --

16               MR. ADAMS:  He was sued in June and again in August.

17               THE COURT:  Sued in China?

18               MR. ADAMS:  I'm sorry.  Sued in June of 2013 by one

19   party, I think in August of 2013 by another.  One of them

20   settled in December or January of 2013, and they have re-sued

21   him in federal court almost immediately thereafter.

22               THE COURT:  I'm going to give general guidance and

23   then we need -- because we are running out of time.

24               If there is a lawsuit that was still active at the

25   time he began the Maxim deal, I will allow the fact of his

FC2VNEW7                           Deal - direct

1    being sued and for how much to be introduced.  I will not allow

2    the specific allegations of the lawsuit to be introduced.  So

3    when he raises that with respect to any lawsuit, if you are

4    quite confident that that lawsuit was settled before the

5    relevant date, then I will sustain the objection.  That's the

6    issue.

7              Let's get on with the other questioning.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1                     (In open court)

 2     BY MR. ADAMS:

 3     Q.  Agent Deal, I was just asking you about some meetings

 4     with --

 5               THE COURT:  I think I indicated at the sidebar the

 6     last question and answer are stricken.

 7               MR. ADAMS:  Yes.

 8               THE COURT:  Okay.  Go ahead.

 9     Q.  After your meeting with Mr. Newkirk on February 12th, 2014,

10     did you meet with him thereafter?

11     A.  Yes.

12     Q.  Approximately how many times?

13     A.  Four to five.

14     Q.  Let me direct you to January 22nd, 2015.

15               Did you meet with Mr. Newkirk on that day?

16     A.  Yes.

17     Q.  Where did you meet?

18     A.  The office of Stealth SME in Manhattan.

19     Q.  What did he provide you with on that day?

20     A.  He gave me a business card.

21     Q.  Can you turn to the binder in front of you to what has been

22     marked for identification as Government Exhibit 199.

23               Do you recognize that document?

24     A.  Yes.

25     Q.  What is it?

FC2VNEW7                        Deal - direct

1    A.  It's a photocopy of the business card.

2              MR. ADAMS:  The government offers Exhibit 199.

3              MS. CHAUDHRY:  Objection.  Relevance.

4              THE COURT:  Overruled.

5              (Government's Exhibit 199 received in evidence)

6    Q.  Agent Deal, according to the business card, what was Harvey

7    Newkirk's role at Stealth?

8    A.  Founder and principal.

9    Q.  During this interview on January 22nd, 2015, did you

10   discuss a falling out between Calvin Darden Junior and Calvin

11   Darden Senior?

12   A.  Yes.

13   Q.  What did Mr. Newkirk tell you about that falling out?

14   A.  That the father and son had a disagreement in November and

15   December of 2013; and that Senior Calvin Darden Senior had

16   called Mr. Newkirk and asked that certain financial documents

17   be returned to Senior.  The one specific document I remember is

18   Fidelity statements.

19             And Mr. Newkirk told me that he told Senior that he'd

20   received the documents in electronic form, so it was kind of

21   pointless to email them back.  But he did eventually mail some

22   documents back to Senior.

23   Q.  Did you meet with Mr. Newkirk again in March of 2015?

24   A.  Yes.

25   Q.  At that time did you bring anything with you?

FC2VNEW7                          Deal - direct

1   A.  Yes.

2   Q.  What did you bring with you?

3   A.  The Comvest letter of intent, the Bank of America bank

4   statements, and then an email with several questions from Mark

5   Weinberg.

6   Q.  And in this March meeting with Mr. Newkirk, who, if anyone,

7   did Mr. Newkirk claim to have represented in the Maxim deal?

8   A.  The entities which I understood to be Darden Media Group

9   and Darden Media Holdings.

10  Q.  How, if at all, was that different than what he had told

11  you previously?

12  A.  Previously he told me that he represented Calvin Darden

13  Senior.

14  Q.  Can I ask you to turn to what's been marked for

15  identification as Government Exhibit 2003.

16  A.  Okay.

17         MR. ADAMS:  One moment, your Honor.  I apologize.

18  Q.  Agent Deal, do you have what's been marked for

19  identification as Exhibit 2003?

20  A.  I do.

21  Q.  Do you recognize that document?

22  A.  Yes.

23  Q.  What is it?

24  A.  This is a summons and complaint filed in the Supreme Court,

25  State of New York, County of New York, in the action *OneWest*

FC2VNEW7                              Deal - direct

1   *Bank FSB v. Harvey Newkirk* and some other parties.

2   Q.  Can you describe how you went about obtaining that

3   document?

4              MS. CHAUDHRY:  Objection.

5              THE COURT:  Are you challenging the authenticity of

6   the document in any way?

7              MS. CHAUDHRY:  No.

8              THE COURT:  No.  Okay.

9              Sustained.  It's irrelevant.

10  Q.  Were you provided with a certified copy of this document?

11  A.  I was.

12             MR. ADAMS:  Your Honor, the government offers

13  Government Exhibit 2003.

14             MS. CHAUDHRY:  Your Honor --

15             THE COURT:  I thought what we had agreed to at sidebar

16  was that these documents were not coming in, but you could

17  elicit from the witness that Mr. Newkirk was sued, that the

18  suit was still alive at the time of the Maxim -- beginning of

19  the Maxim deal, and the amount of -- how much he was being sued

20  for and that was it.

21             So let's proceed.

22             MR. ADAMS:  Sorry, your Honor.

23  Q.  Agent Deal, have you reviewed that document?

24  A.  I have.

25  Q.  Could I ask you to turn please to the paragraph beginning

1466

FC2VNEW7                           Deal - direct

1   10.

2              THE COURT:  Do you know from your review of that

3   document how much Mr. Newkirk was being sued for?

4              THE WITNESS:  I don't know the exact amount, your

5   Honor.

6              THE COURT:  Approximate.  Does it say?

7              THE WITNESS:  It does say.

8              THE COURT:  I will take a look.

9              MS. CHAUDHRY:  May we approach again now that I've

10  seen this document?

11             THE COURT:  All right.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the side bar)

2          MS. CHAUDHRY:  Your Honor, if the government's basis

3     is that Mr. Darden was -- sorry -- Mr. Newkirk was under

4     suit --

5          THE COURT:  He's right behind you and he heard that.

6          MS. CHAUDHRY:  No, he didn't.  He's got great hearing.

7          Now this is part of his motivation for jumping into a

8     conspiracy with Calvin Darden Junior in June or July.  This is

9     a lawsuit that was not filed until August.  This is after,

10    according to Mr. Darden, they signed all the fake documents

11    pretending to be the father and this is not relevant then.

12         THE COURT:  No, no, no.

13         Your previous point was you thought all the suits had

14    been settled before the beginning of the Maxim deal and the

15    government represented that there were some that were still

16    ongoing.

17         Now you're making a different point, which is you're

18    saying, Well, this suit was initiated after the beginning of

19    the Maxim deal.  But the same motivation that the government is

20    arguing would certainly apply to any lawsuit that was filed

21    after the beginning of the Maxim deal.

22         MS. CHAUDHRY:  I don't see how Mr. -- the government

23    can argue that Mr. Newkirk had a pecuniary motive based on

24    something that happened after he joined --

25         THE COURT:  No, no.  Because I assume you're going to

FC2VNEW7                          Deal - direct

1    be arguing that because he may have heard some misinformation

2    or something like that, that doesn't show he had actual

3    knowledge of the fraud.  This comes back again to the whole

4    question, the argument the government is certainly free to

5    argue, that maybe initially he wasn't as motivated, but as time

6    went on, he was in a more desperate situation, he became more

7    motivated.  I'm not saying that's a good argument or a bad

8    argument, but I think it's an admissible argument.

9            MR. ADAMS:  It's also our position that you don't get

10   sued for this amount of money overnight.

11           THE COURT:  In any event, you have, between you,

12   successfully guaranteed that we are going to go over to

13   tomorrow with this witness since it's five minutes of five.

14           Now, I really need to know now, other than the ruling

15   that I will consider argument on on whether there's

16   admissibility of the boxing thing, is Mr. Newkirk taking the

17   stand or not?

18           MS. CHAUDHRY:  Right now, yes.  We want to know what

19   your ruling would be.

20           THE COURT:  I understand it's contingent on my ruling.

21           MS. CHAUDHRY:  Yes.

22           THE COURT:  I understand that.

23           MS. CHAUDHRY:  We're very interested.

24           THE COURT:  I just want to know so I can know what to

25   tell the jury.

1           Okay.  All right.

2               (In open court)

3           THE COURT:  All right.

4           So ladies and gentlemen, although we are down to the

5    last government witness, we're not going to be able to quite

6    finish him today because of some issues that have come up.  And

7    you would have to come back tomorrow anyway because your work

8    is just beginning.

9           But tomorrow, just to give you a heads-up, we will

10   conclude the government's last witness.  At that point we'll

11   take a break of about a half hour because of legal motions I

12   have to deal with that come up after one side has concluded its

13   argument.  Then, depending on those motions, there may or may

14   not be a defense case.  If we go forward with the defense case,

15   then it will probably at least be the remainder of most of the

16   day, it may go into Friday.  I can't really tell you yet about

17   the schedule beyond tomorrow, but you will be here all

18   tomorrow.

19          So have a very good evening.  We will see you at 9

20   o'clock tomorrow and see you then.

21              (Jury excused)

22              (Continued on next page)

23

24

25

Fc26new8

1        THE COURT:  You may step down.  We will see you

2   tomorrow.

3        (Witness excused)

4        THE COURT:  Counsel, you want to go back to your

5   tables and please be seated.

6        MS. CHAUDHRY:  I am going to request since these are

7   documents the government is planning to offer in their case in

8   chief that these are Rule 16 and not --

9        THE COURT:  I am sorry?

10       MS. CHAUDHRY:  That these are documents that are using

11  in their case in chief, I would request they be provided to me

12  as part of Rule 16 and not provided after the witnesses take

13  the stand.

14       MR. ADAMS:  I believe they were provided several days

15  ago.

16       THE COURT:  So I suggest that that is such an

17  important controversy that you go outside and duke it out.

18       Now let's turn to things of more relevance.  So I have

19  been informed by counsel for Mr. Newkirk that it is his

20  intention to take the stand subject to changing his mind if

21  depending on the ruling I am about to make after hearing the

22  argument on the admissibility or not of what we've been calling

23  the boxing matter.  Let me make clear that I think this is not

24  a rule 404 matter at all.  It is a rule 608(b) and a Rule 403

25  matter.  Under 608(b) a witness can be cross-examined about

Fc26new8

1    specific instances of conduct if these are probative of his

2    character for truthfulness.  Clearly the boxing match stuff is

3    probative of his character for truthfulness or untruthfulness

4    as the case may be.  On the other hand under 403 I can exclude

5    evidence if the relevance is substantially outweighed by the

6    prejudice or confusion or waste of time or the like.  So let me

7    hear briefly from counsel for the defendant and the government

8    and then I will rule.

9              I have another matter that I have to take as soon as

10   we finish here.

11             Anything from the defense?

12             MS. CHAUDHRY:  Your Honor, first of all, if the boxing

13   allegations come in, not only will there be an extreme

14   prejudice here because then the government's 404(b) motion

15   works and the jury hears that according to Mr. Darden Junior

16   that Junior and Mr. Newkirk have been in cahoots and on a

17   defrauding spree for years and that this is their trademark

18   fraud.

19             In order to combat it, and this is what we raised

20   within our papers, there will be a trial within a trial.  Just

21   as we showed in this case that Mr. Darden Junior was running

22   some frauds at once, even within the Maxim deal, and some of

23   them were on Mr. Newkirk, that would be the same thing we have

24   to say here and some of the exhibits I had offered and offered

25   to introduce in a redaction show that that during the alleged

Fc26new8

1   boxing scheme in which the government says they were in cahoots

2   and that the government alleges that Mr. Newkirk knew that

3   Mr. Darden Senior was not actually involved, Mr. Darden Junior

4   is sending him letters pretending to be from the dad inviting

5   him to dinner.

6          In addition, it is an actually very complicated

7   corporate legal issue of the following.  What the government

8   has done is introduced into evidence a letter of intent between

9   Invictus Pugilist LL something and Reign Entertainment.  Anyone

10  with any knowledge of transactional law knows a letter of

11  intent is not a closing deal document.  It is just a letter of

12  intent that sets out the terms of potential deal.  This are

13  subsequent documents that show that -- well, one, if you

14  actually read it, what it shows is that at time Invictus

15  Pugilist had an interest in a particular deal that Reign was

16  doing, not that it had an interest in Reign.  It has never been

17  the case that Mr. Newkirk had an interest in Reign.  As the

18  Court is well aware, when companies do deals, they often make

19  subcompanies and then that subcompany does the deal to limit

20  liability and shield the current corporation.  After that

21  letter of intent was entered, there is subsequent legal

22  documents that exist that will show that interest that

23  Mr. Newkirk's company had in that deal, never in Reign, but in

24  that dial with Reign were then transferred to Josh Mailman who

25  bought Mr. Newkirk out and at that time --

Fc26new8

1          THE COURT:  I am sorry.  All of this goes to I think a

2     different point.  I've already allowed the government to get

3     into Reign and the prior events to the extent they bear on

4     motivation and if your argument is that you think the

5     motivation is refuted by other documents, of course that is

6     something you can bring out when Mr. Newkirk takes the stand.

7          All we're dealing now with is whether the government

8     can cross-examine Mr. Newkirk if he takes the stand about

9     things that in their view would allow the jury to infer that he

10    had entered into a fraudulent scheme in connection or had

11    assisted in a fraudulent scheme in connection with the boxing

12    transaction or had made false statements in connection with the

13    boxing transaction.  That is what we're dealing with.

14         So let me hear from the government.  We'll come back

15    to defense counsel.

16         MR. ADAMS:  Your Honor, I think it is just as simple

17    as that.  It would be questions about whether or not

18    Mr. Newkirk and Calvin Darden Junior agreed to steer

19    conversations.

20         THE COURT:  When did this all occur?  Early 2011, late

21    2010.  It was not included in your indictment, but are you

22    saying there is a statute of limitations problem or are you

23    saying you just chose not to include it?

24         MR. ADAMS:  It is something that came into light

25    through the investigation of Mr. Newkirk.  We think it is

Fc26new8

1   actually direct evidence as we laid out in our motion *in limine*

2   of his knowledge with respect to the Maxim scheme.  Again, the

3   dates and the lack of other witnesses, we made a decision about

4   what to charge and what not to charge.  It doesn't mean that

5   evidence from 2011 that Calvin Darden Senior needs to be

6   specifically excluded from conversations about a personal

7   guarantee or conversations about using the fake name Calvin R.

8   Darden Senior even as far back as 2011 aren't relevant

9   specifically to the Maxim deal.  It goes directly to

10   Mr. Newkirk's knowledge that the Maxim deal itself was a sham.

11           THE COURT:  Let's go back to defense counsel.  What

12   else did you want to say?

13           MS. CHAUDHRY:  Your Honor, the other thing I want to

14   say is first the government is wrong.  It is June of 2010, not

15   2011.  Second their claim that they only recently learned about

16   it is not true because Mr. Newkirk in meeting with the

17   government, which he did five times, told them himself that he

18   had done this deal or tried to do this deal with Calvin Darden

19   Senior in explaining to the government how it is that he knew

20   him and what his basis was for believing that he was now

21   involved in this deal because he had done prior deals with him.

22           As for 608 the government is suggesting that they get

23   to ask questions and then the question is it.  If that is the

24   way the Court is going, then I don't think they get to bring in

25   any other documents.  If Mr. Newkirk says no, that is where we

Fc26new8

1    are.

2            THE COURT:  So I find this an interesting but

3    essentially a close call.  On the one hand the reason I kept

4    out this material in the government's direct case

5    notwithstanding that the Second Circuit takes a so-called

6    inclusive view of what is admissible under Rule 404(b) is that

7    I fear that it had the potential to be more confusing than

8    enlightening and that it also had the tendency that Mr. Newkirk

9    could conceivably be convicted not because of proof on what he

10   was charged with but because of proof of some other scheme.

11   Those considerations are not irrelevant to the present inquiry,

12   but the standards are different and the considerations are

13   different.

14            Because the government says that it believes it can

15   proof, and some of what I have seen in this regard suggests

16   that it is at least plausible, that the government's proof

17   could be viewed by the jury as putting the lie to some of the

18   positions that Mr. Newkirk through his counsel has in effect

19   raised through their questions of government witnesses and the

20   like regarding the scheme that is charged.  In effect what the

21   government is arguing is that Mr. Newkirk's knowledge of

22   Mr. Darden Junior and his practices was very much informed by

23   what had occurred previously and that therefore it would be

24   artificial in the extreme not to be able to bring that out.

25            I think that much as my personal predilections might

1    be to encourage any witness and any defendant to take the stand

2    because I think it advances the search for the truth, the case

3    law here and the whole thrust of prior cases involving Rule 608

4    strongly suggest that when a defendant takes the stand,

5    evidence like this is routinely admitted.  So if he takes the

6    stand, I will allow him to be questioned about the boxing deal.

7         Now, in light of that I will give defense counsel the

8    opportunity to discuss with their client whether he still wants

9    to take the stand or not and you need to let the government

10   know the answer tonight by 9:00 tonight.

11        MS. CHAUDHRY:  Your Honor, may I ask a question?  I

12   had marked some exhibits that were precluded earlier.  The

13   witnesses who would have laid a foundation are gone.  Those

14   would be Mr. Darden Senior, Mr. Darden Junior.  Mr. Darden

15   Senior did say in fact when he looked at those, yes, that is my

16   e-mail address.  I would ask if the government is allowed to

17   bring this up to be able to introduce those documents.

18        THE COURT:  Fist of all, I think you should consult

19   the government because they may agree to that.  If they don't

20   agree, I may allow you to recall those witnesses for that very

21   limited purpose.  So I think that is a fair request on your

22   part.

23        I would encourage the government to see if they can

24   reach agreement on that with you.

25        MS. CHAUDHRY:  Your Honor, actually an issue for us we

Fc26new8

1    need some clarity on as to Mr. Newkirk's decision.  The

2    government has issued a subpoena for him and his testimony and

3    addition for documents for him to provide if he does testify.

4    We have been trying to work with the government on what the

5    scope of these are and at this time we have not reached an

6    agreement and we don't know if the Court wants to address that.

7            THE COURT:  I don't think I have time to address it

8    because in addition to other matter, I have to leave at 5:30

9    for Columbia where I teach.  I will take that matter up first

10   thing tomorrow morning before we bring in the jury.

11           MS. CHAUDHRY:  Would you like us to submit the

12   subpoena to you?

13           THE COURT:  That will be helpful.  I want to be clear

14   just before I let you go today, at 9:00 defense counsel will

15   e-mail the government and also the Court with their final

16   decision on whether Mr. Newkirk is going to take the stand or

17   not.  If Mr. Newkirk is not going to take the stand, then you

18   should deal with the quite real possibility that summations

19   might begin tomorrow after we have the other defense witnesses

20   before we set the time limits.  If we get down to 5:00 and the

21   summations are not over, they will continue on Friday morning.

22           After the government rests, I will give you my ruling

23   on the charge.  I thank you both for your submissions, but I

24   will tell you in advance since you may want to do some

25   preparation at night if Mr. Newkirk decides not to take the

Fc26new8

1    stand that while you have requested some word changes here and

2    there, there will be no material changes in my charge.

3    Substantively it is going to remain pretty much the way you saw

4    it.  I will hear final argument on that after the government

5    rests.

6         If of course Mr. Newkirk is going to take the stand

7    that seems self-evident we will not get to summations probably

8    until Monday or Tuesday because we're not sitting on Monday.

9         MS. CHAUDHRY:  Your Honor, you mentioned before Juror

10   No. 1 being unavailable until 10:30.  We would be fine with

11   that since they will be deliberating or hearing the end of my

12   closing.

13        THE COURT:  What is the government's view?

14        MR. ADAMS:  We agree.

15        THE COURT:  That is fine.  Whenever days we sit next

16   week, we'll sit beginning at 10:30 and go to 5:00, which will

17   be Tuesday.  Their deliberations may go beyond that of course.

18        Very good.  If you don't mind, you can come back and

19   get your stuff in 15 minutes, but I need to deal with this

20   other matter right now.

21        (Adjourned to December 3, 2015 at 9:00 a.m.)

22

23

24

25

```
 1                        INDEX OF EXAMINATION

 2   Examination of:                              Page

 3   CALVIN R. DARDEN JR.

 4   Redirect By Mr. Adams  . . . . . . . . . . .1235

 5   Recross By Ms. Chaudhry  . . . . . . . . . .1270

 6   Redirect By Mr. Adams  . . . . . . . . . . .1280

 7   Recross By Ms. Chaudhry  . . . . . . . . . .1282

 8   Redirect By Mr. Adams  . . . . . . . . . . .1283

 9   Recross By Ms. Chaudhry  . . . . . . . . . .1283

10   SHAUL GREENWALD

11   Direct By Ms. Paul . . . . . . . . . . . . .1285

12   Cross By Mr. Harris  . . . . . . . . . . . .1305

13   Redirect By Ms. Paul . . . . . . . . . . . .1318

14   CHAERI TORNAY

15   Direct By Ms. Paul . . . . . . . . . . . . .1321

16   Cross By Mr. Harris  . . . . . . . . . . . .1345

17   Redirect By Ms. Paul . . . . . . . . . . . .1384

18   Recross By Mr. Harris  . . . . . . . . . . .1386

19   VINCENT ALFIERI

20   Direct By Ms. Paul . . . . . . . . . . . . .1389

21   Cross By Mr. Harris  . . . . . . . . . . . .1417

22   Redirect By Ms. Paul . . . . . . . . . . . .1436

23   Recross By Mr. Harris  . . . . . . . . . . .1437

24   ELIZABETH GARVEY

25   Direct By Mr. Adams  . . . . . . . . . . . .1440
```

SOUTHERN DISTRICT REPORTERS, P.C.
                  (212) 805-0300

1    Cross By Mr. Foley . . . . . . . . . . . . . .1444

2    PAUL DEAL

3    Direct By Mr. Adams  . . . . . . . . . . . . .1454

4                       GOVERNMENT EXHIBITS

5    Exhibit No.                              Received

6     162    . . . . . . . . . . . . . . . . . . .1236

7     2008   . . . . . . . . . . . . . . . . . . .1253

8     176    . . . . . . . . . . . . . . . . . . .1255

9     2009   . . . . . . . . . . . . . . . . . . .1264

10    2010   . . . . . . . . . . . . . . . . . . .1269

11    151    . . . . . . . . . . . . . . . . . . .1337

12    170    . . . . . . . . . . . . . . . . . . .1338

13    170A   . . . . . . . . . . . . . . . . . . .1340

14    143    . . . . . . . . . . . . . . . . . . .1344

15    181    . . . . . . . . . . . . . . . . . . .1415

16    104, 907 . . . . . . . . . . . . . . . . . .1440

17    152    . . . . . . . . . . . . . . . . . . .1442

18    199    . . . . . . . . . . . . . . . . . . .1463

19                       DEFENDANT EXHIBITS

20    Exhibit No.                              Received

21    426, 427 . . . . . . . . . . . . . . . . . .1309

22    430    . . . . . . . . . . . . . . . . . . .1311

23    761    . . . . . . . . . . . . . . . . . . .1358

24    759    . . . . . . . . . . . . . . . . . . .1378

25    760    . . . . . . . . . . . . . . . . . . .1379

290   . . . . . . . . . . . . . . . . . .1418

254   . . . . . . . . . . . . . . . . .1429