UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| United States of America, | : |
| | : |
| | : |
| | : |
| | : |
| v. | :  S2 14 Cr. 534 (JSR) |
| | : |
| Harvey Newkirk, | : |
| | : |
| *Defendant.* | : |
| | : |
| | : |

**MEMORANDUM OF LAW OF DEFENDANT HARVEY NEWKIRK
IN SUPPORT OF MOTIONS FOR JUDGMENT OF ACQUITTAL
UNDER FEDERAL RULE OF CRIMINAL PROCEDURE 29 (C) AND
<u>FOR A NEW TRIAL UNDER FEDERAL RULE OF CRIMINAL PROCEDURE 33</u>**

HARRIS, ST. LAURENT &
CHAUDHRY LLP
40 Wall Street, 53rd Floor
New York, New York 10005
T. (212) 785-5550
F. (212) 202-6206

*Attorneys for Defendant Harvey Newkirk*

# TABLE OF CONTENTS

I.   BACKGROUND ....................................................................................................1

   A.   Indictment .....................................................................................................1

   B.   Pretrial Proceedings ......................................................................................2

   C.   Trial................................................................................................................2

II.  THE EVIDENCE WAS INSUFFICIENT AS A MATTER OF LAW TO
     SUPPORT THE VERDICT IN THIS CASE AND A JUDGMENT OF
     ACQUITTAL SHOULD BE ENTERED ...........................................................4

   A.   The Legal Standard for Rule 29 Motions .....................................................4

   B.   Rule 29 Argument .........................................................................................5

     (i)   A Verdict Based On Conscious Avoidance Cannot Be Based On The
         Jury's Determination Of What The Defendant Should Have Known. ..............5

     (ii)  The Government's Evidence Was Insufficient To Support Guilt Based
         On Conscious Avoidance. ............................................................................8

        a.   Mr. Newkirk Did Not Mislead Investors Regarding The Restricted
           Stock. .........................................................................................................8

        b.   Mr. Newkirk Did Not Mislead Investors When He Used The
           Collateral To Solicit Loans. ......................................................................10

        c.   Mr. Newkirk Did Not Avoid Taking Steps To Verify The Accuracy
           Of The Bank Of America Statements. .......................................................12

        d.   Mr. Newkirk Did Not Ignore The Spoof E-Mail And Took Remedial
           Steps To Prevent Loss To Weinberg. ........................................................15

        e.   The Fact That Mr. Newkirk Knew Junior Had A Prior Conviction
           Does Not Mean He Turned A Blind Eye To The Fact That Junior
           Was Committing Fraud In The Maxim Deal .............................................17

III. IN THE ALTERNATIVE, THIS COURT SHOULD ORDER A NEW
     TRIAL UNDER FED. R. CRIM. P. 33 IN THE INTEREST OF JUSTICE...........18

   A.   This Court Should Order a New Trial At Which The Defense Is Allowed
       To Introduce Expert Testimony. ..................................................................19

     (i)   The Defense Expert's Testimony Would Have Been Relevant And
         Admissible Both On The Issue Of Materiality And Intent ..............................21

    (ii)   The Exclusion of the Defense Expert's Testimony Prevented the
Defense From Countering the Argument that Mr. Newkirk Had
Consciously Avoided The Fact that Junior was Engaged in Fraud..................25

  B.   The Jury Verdict Was A Manifest Injustice Against The Weight Of The
Evidence.........................................................................................................29

CONCLUSION.........................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*United States v. Barnhart,*
 979 F.2d 647 (8th Cir. 1992) ................................................................ 7

*United States v. Brooks,*
 2010 WL 291769 (E.D.N.Y. Jan 11, 2010) ................................................ 28

*United States v. Bufalino,*
 258 F.2d 408 (2d Cir. 1960)................................................................... 5

*United States v. Cassese,*
 428 F.3d 92 (2d Cir. 2005)............................................................... 4. 5

*United States v. Cavin,*
 39 F.3d 1299 (5th Cir.1994) ................................................................ 27

*United States v. D'Amato,*
 39 F.3d 1249 (2d Cir. 1994)................................................................. 5

*United States v. Ferguson,*
 246 F. 3d 129 (2d Cir. 2001)............................................................... 18

*United States v. Ferrarini,*
 219 F.3d 145 (2d Cir. 2000)............................................................ 6, 7

*United States v. Frampton,*
 382 F.3d 213 (2d Cir. 2004).................................................................. 4

*United States v. Glenn,*
 312 F.3d 58 (2d Cir. 2002)................................................................... 5

*United States v. Hernandez,*
 301 F.3d 886 (2d. Cir. 2002)................................................................. 5

*United States v. Jones,*
 393 F.3d 107 (2d Cir. 2004)................................................................. 4

*United States v. Kamdar,*
 2010 WL 883685 (W.D.N.Y. Mar. 8, 2010)............................................. 23

*United States v. Kellington,*
 217 F.3d 1084 (9th Cir. 2000) ............................................................. 28

*United States v. Kelly,*
 888 F.2d 732(11 Cir. 1989)................................................................. 28

*United States  v. Mankani,*
   738 F.2d 538 (2d Cir. 1984)..................................................................5

*United States  v. Lopac,*
   411 F.Supp.2d 350 (S.D.N.Y. 2006) ....................................................5

*United States v. Litvak,*
   808 F.3d 160 (2d Cir. 2015)..............................................22, 23, 24, 27

*United States v. Robinson,*
   2000 WL 65239 (S.D.N.Y. Jan 26, 2000) ..........................................28

*United States v. Rodriquez,*
   392 F.3d 539 (2d Cir. 2004).................................................................4

*United States v. Samaria,*
   239 F.3d 228 (2d Cir. 2001).................................................................6

*United States v. Svoboda,*
   347 F.3d 471 (2d Cir. 2003).................................................................6

*United States v. Taylor,*
   464 F.2d 240 (2d Cir. 1972).................................................................4

*United States v. Yannotti,* 4
   15 F. Supp. 2d 280 (S.D.N.Y. 2005) ...................................................5

**Statutes**

Federal Rules of Criminal Procedure 29(c) ...........................................1

Federal Rules of Criminal Procedure 29(c)(1)........................................4

Federal Rules of Criminal Procedure 33...........................................1, 18

Federal Rules of Criminal Procedure 33(a) ......................................1, 18

Defendant Harvey Newkirk respectfully submits this memorandum of law in support of his motions for judgment of acquittal under Federal Rule of Criminal Procedure 29(c) and for a new trial under Federal Rule of Criminal Procedure 33.  For the reasons stated in Mr. Newkirk's motion and in this memorandum, Mr. Newkirk's motion for judgment of acquittal should be granted.  In the alternative, Mr. Newkirk's motion for a new trial should be granted.

## I.   BACKGROUND

### A.  INDICTMENT

On April 21, 2015, a federal grand jury in the Southern District of New York returned a superseding indictment charging the defendant, Harvey Newkirk, with (1) one count of conspiracy to commit wire fraud in violation of 18 U.S.C. § 1343, (2) one count of substantive wire fraud in violation of 18 U.S.C. §§ 1343 & 2; and (3) one count of aggravated identity theft in violation of 18 U.S.C. §§ 1028A & 2.  These charges arose from Mr. Newkirk's role, as an attorney at Bryan Cave LLP, in the attempted purchase of Maxim Magazine by Calvin Darden Senior and Calvin Darden Junior ("Senior" and "Junior", respectively).[1]

The government's theory of the case, as charged in Counts One and Two, is that, between May 2013 and February 2014, Junior and Mr. Newkirk conspired to make material misrepresentations to various lenders to induce them to loan millions to finance the purchase of Maxim magazine, and that Mr. Newkirk had a hidden economic interest in the deal beyond his role as an attorney.  To this end, the government alleged Mr.

---

[1] Throughout this memorandum Junior and Senior and the various entities involved in the purchase of Maxim will be referred to collectively as "the Dardens" with no distinction made for the individual partnerships formed involving the family.

Newkirk falsely claimed that he represented Senior as legal counsel and that Senior was providing financing and collateral for investor loans.  Underlying Count Three was the government's assertion that Mr. Newkirk knowingly and without legal authorization, used Senior's name as part of this scheme to obtain financing for the Maxim acquisition.

### B.  PRETRIAL PROCEEDINGS

On October 5, 2015, counsel for Mr. Newkirk informed the government that the defense intended to call an expert on mergers and acquisitions ("M&A"). In the government's motion *in limine*, dated October 12, 2015, it opposed the defense's request, arguing that the terms and techniques associated with mergers and acquisitions were not proper subjects of expert testimony, and that lay testimony was sufficient to address these topics.  In the defense's response to the government's motion, it noted, among other things, that the industry-specific duties and obligations of M&A counsel rest far outside of the ken of the average lay witness.  Thus, expert witness testimony was not merely "helpful"; it was necessary.  Response in Opposition by Harvey Newkirk, Docket Entry 61 (October 27, 2015).

### C.  TRIAL

Trial commenced on November 9, 2015.[2]  Prior to picking the jury, the Court granted the government's motion to exclude a defense expert.  Tr. at 3.  On November 25, 2015, still early in the government case, the defense renewed its motion to admit expert testimony by letter addressed to the Court,[3] and attached the Expert Report of

---

[2] All transcript references refer to the transcript of the trial and are designated "Tr."

[3] The defense simultaneously requested a mistrial or to strike certain testimony of the government's witnesses which should not have been allowed because it was impermissible expert testimony.  The Court denied these requests.

David Lallouz which provided greater detail regarding the testimony he would give at

trial. Docket Entry 75 (November 25, 2015).  The Court again denied the defense motion,

stating that:

> …I excluded the defense expert because I don't think he has
> anything to contribute to a reasonable juror that can't be obtained
> from the fact witnesses.  We are not talking about here matters
> that are so complicated or esoteric that a reasonable juror can't
> understand them without the aid of someone with special
> expertise, which is the whole basis for allowing experts under
> Rule 702.  There are some terms that may not be familiar to the
> jury, but then they get explained by the fact witnesses in everyday
> language and indeed there doesn't seem to be much dispute about
> their meaning.

Tr. at 442.

On December 4, 2015, the government rested.  Immediately, the defense moved

for a Rule 29 judgment of acquittal, which the Court denied.  Thereafter, the defense put

on a number of witnesses, including the defendant, Harvey Newkirk.  After the defense

rested, on December 9, 2015, it renewed its Rule 29 Motion for Acquittal, which the

Court denied.

Following the close of evidence, the defense noted objections to some of the

Court's proposed jury instructions.  First, the defense objected to the Court's decision,

*sua sponte*, to include the instruction on "conscious avoidance," an instruction which the

government did not request and which did not coincide with the government's theory of

the case.  Second, the defense requested a jury instruction which set forth Mr. Newkirk's

obligations as a lawyer.  Defense Letter, Docket Entry 79 (December 11, 2015).  Both the

objection to the conscious avoidance charge and the request for additional instructions

were denied.  Tr. at 2136-2139.  On December 14, 2015, the jury returned its verdict: not

guilty as to Counts One (conspiracy) and Three (aggravated identity theft) and guilty as to Count Two (substantive wire fraud).  Tr. at 2246-2247.

## II.    THE EVIDENCE WAS INSUFFICIENT AS A MATTER OF LAW TO SUPPORT THE VERDICT IN THIS CASE AND A JUDGMENT OF ACQUITTAL SHOULD BE ENTERED[4]

### A.  THE LEGAL STANDARD FOR RULE 29 MOTIONS

Federal Rule of Criminal Procedure 29(c)(1) provides that a "defendant may move for a judgment of acquittal, or renew such a motion . . . after a guilty verdict." The question is whether the government at trial introduced sufficient evidence to permit a reasonable jury to find the defendant guilty beyond a reasonable doubt.  Should the Court conclude that "upon evidence there must be a doubt in a reasonable mind, [it] must grant the motion." *United States v. Taylor*, 464 F.2d 240, 243 (2d Cir. 1972).  *United States v. Cassese,* 428 F.3d 92, 98-103 (2d Cir. 2005) (affirming on appeal the grant of a judgment of acquittal based on the failure of the government to prove that defendant acted with required *mens rea* under SEC Rule 14e-3.).  The Second Circuit has set aside jury verdicts in cases in which the government has failed to prove beyond a reasonable doubt that the defendant had the requisite knowledge or intent.  *United States v. Frampton*, 382 F.3d 213, 223 (2d Cir. 2004); *United States v. Rodriquez*, 392 F.3d 539, 548 (2d Cir. 2004); *United States v. Jones*, 393 F.3d 107, 112 (2d Cir. 2004).

A jury may make reasonable inferences from the evidence, but a conviction cannot rest on mere "speculation and surmise."  *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994).  Judgment of acquittal is appropriate when a verdict is based on

---

[4] The inclusion or omission of specific arguments in this memorandum of law should not be construed as a waiver of any argument in support of entry of judgment of acquittal or granting of a new trial by this Court or any appellate court on any ground.

unsupported inferences or improper guesswork.  *See, e.g., United States v. Hernandez*, 301 F.3d 886 (2d. Cir. 2002); *United States v. Yannotti*, 415 F. Supp. 2d 280 (S.D.N.Y. 2005).

After the Court examines the totality of the evidence in the light most favorable to the government, if it finds that there is equal or near equal support for a theory of innocence as for guilt, a judgment of acquittal is appropriate.  *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002); *United States v. Cassese,* 428 F.3d 92, 99 (2d Cir. 2005). Courts in this Circuit have granted judgments of acquittal where the inference of guilt or innocence was near equal.  *See, e.g., Glenn, 312 F.3d 58, United States v. Mankani,* 738 F.2d 538, 547 (2d Cir. 1984); *United States v. Bufalino*, 285 F.2d 408 (2d Cir. 1960).

### B.  RULE 29 ARGUMENT

The government failed to introduce sufficient evidence to prove beyond a reasonable doubt that Mr. Newkirk committed substantive wire fraud.  To sustain this conviction, the government had to prove that Mr. Newkirk knowingly and willfully—and with the intent to defraud—participated in Junior's scheme to purchase Maxim Magazine through the use of false and fraudulent material misrepresentations.

### (i)  A Verdict Based On Conscious Avoidance Cannot Be Based On the Jury's Determination of What the Defendant Should Have Known.

From its inception, the government's theory of this case was that Junior and Mr. Newkirk were active co-conspirators.  Junior testified extensively that he and Mr. Newkirk discussed the details of the fraud and Mr. Newkirk was fully aware of the false bank statements, the false guarantees, and the material misrepresentations.  The government also relied on the testimony of Senior and asserted that Mr. Newkirk knew

that Senior did not give any personal guarantees, and that Senior never authorized Mr. Newkirk to represent him.

The jury rejected the testimony of Junior and Senior when it acquitted Mr. Newkirk of Count One, conspiracy, and Count Three, aggravated identity theft. However, the jury convicted on Count Two, wire fraud.  This verdict was either based on the jury's finding that Mr. Newkirk was purposely engaged in fraud (*i.e.* actual knowledge) but did not conspire with Junior – which makes no sense in the context of the case – or more logically, that Mr. Newkirk consciously avoided learning that Junior was committing a fraud.

The conscious avoidance doctrine provides "that a defendant's knowledge of a fact required to prove the defendant's guilt may be found when the jury 'is persuaded that the defendant consciously avoided learning that fact while aware of a high probability of its existence.'"  *United States v. Svoboda*, 347 F.3d 471, 477-478 (2d Cir. 2003) (quoting *United States v. Samaria*, 239 F.3d 228, 239 (2d Cir. 2001).  In these circumstances, a conscious avoidance instruction allows a jury to find knowledge even where there is no evidence of actual knowledge.  *Svoboda*, 347 F.3d at 477-478 (citations omitted).

A conscious avoidance instruction may be given if two requirements are met:  (1) the defendant asserts the lack of some specific aspect of knowledge required for conviction, and (2) "the appropriate factual predicate for the charge exists, *i.e.* 'the evidence is such that a rational juror may reach [the] conclusion beyond a reasonable doubt . . . that [the defendant] was aware of a high probability of [the fact in dispute] and consciously avoided confirming the fact[.]'"  *Svoboda*, 347 F.3d at 480 (quoting *United States v. Ferrarini*, 219 F.3d 145, 154 (2d Cir. 2000) (internal citations omitted)).  The

second prong has two components:  (a) that the defendant was aware of a high probability of the disputed fact and (b) deliberately avoided confirming the fact.  *Id.* at 480.  The second prong may be established where "[a] defendant's involvement in the criminal offense may have been so *overwhelmingly suspicious* that the defendant's failure to question the suspicious circumstances establishes the defendant's purposeful contrivance to avoid guilty knowledge." *Id.* (citations omitted).

The Second Circuit has specifically held that conscious avoidance cannot be established when the factual context *should have* apprised the defendant of the unlawful conduct, and instead, the jury *must* find that the defendant *decided* not to learn a key fact. *Ferrarini,* 219 F.3d at 157 (citations omitted).  There is a great danger that, despite the use of the instruction's cautionary disclaimer, "the jury will be led to employ a negligence standard and convict a defendant on the impermissible ground that he *should have known* an illegal act was taking place."  *United States v. Barnhart*, 979 F.2d 647, 651 (8th Cir. 1992) (emphasis added) (citations omitted).

A finding of conscious avoidance must turn on the jury's evaluation of the defendant's subjective knowledge of the circumstances surrounding the disputed fact. The jury had to determine that Mr. Newkirk, as the attorney for the Dardens, must have known that Junior's activities were overwhelmingly suspicious and yet deliberately chose to avoid learning the truth.  As this Court stated in its jury instruction: "For example, if you find that the defendant was aware of the high probability that Calvin Ramarro Darden was lying to investors about the assets and people involved in the Maxim deal, but that the defendant, in order to remain ignorant of Ramarro's deception, deliberately chose not to inquire further, then you may find that the defendant actually understood that

Ramarro was misleading investors."  Tr. at 2212-2213.  The evidence at trial cannot

sustain a guilty verdict on that theory.

### (ii) The Government's Evidence Was Insufficient To Support Guilt Based On Conscious Avoidance.

The government alleged the following conduct as proof of Mr. Newkirk's guilt:

(1) Mr. Newkirk offered restricted stock as collateral for investor loans; (2) Mr. Newkirk

"double-pledged" the restricted stocks to multiple investors; (3) Mr. Newkirk sent fake

Bank of America account statements to investors with full knowledge that investors could

not rely upon them; (4) Mr. Newkirk ignored the "spoof" e-mail and avoided taking

remedial steps after Mr. Weinberg revealed that the "spoof" e-mail was a fraud, and (5)

Mr. Newkirk knew that Junior had a prior criminal conviction.  The limited evidence

supporting these five points is insufficient to sustain a verdict "beyond a reasonable

doubt" that Mr. Newkirk "was aware of a high probability that [Junior] lied to investors

about the assets and people involved in the Maxim deal", but he deliberately chose to

avoid learning the truth.[5]

### a. Mr. Newkirk Did Not Mislead Investors Regarding the Restricted Stock.

The government repeatedly asserted that Senior's "restricted" stock was

essentially worthless as collateral, and that Mr. Newkirk deliberately misled the seller and

potential lenders by not disclosing this fact. Tr. at 2042, 2080, 2180, 2193.  This

argument was not supported by the facts or the law.

---

[5] There were two other factors that the government argued showed Mr. Newkirk's guilt: accepting service of process on the OpenGate law suit and failure to disclose the release between Forefront and the Dardens.  Because these two facts could only have supported a finding of actual knowledge, not conscious avoidance, they are not addressed here.

In the government's case, the prosecutors paraded the seller's attorney, and a series of lenders and their attorneys before the jury who complained that Mr. Newkirk did not inform them that the stock was restricted.  Most notably, Larry Dietch bemoaned that Mr. Newkirk did not inform him that the securities were not "marketable" securities that "you could take and sell today"—a legal or market conclusion that Mr. Dietch reached after doing his own independent review of publicly available documents.  Tr. at 800-801.[6] On the basis of Mr. Dietch's testimony, the government repeatedly and incorrectly argued that the stock was not "marketable".

For his part, Mr. Newkirk denied that he concealed any restrictions on the transferability of Senior's stock.  Mr. Newkirk testified that because Senior held the stock as a director of publicly traded companies the restrictions on the stock involved in the deal were public information; no one, including him, could conceal these restrictions.  Tr. at 1751.  John Parker, the general counsel for Coca-Cola Enterprises, Inc., testified consistently with Mr. Newkirk, that the restrictions came from SEC Regulations and arose from Senior's position as a director of a public company.  Tr. at 1614, 1622.  Mr. Newkirk also testified that referring to stock as "restricted" is not the same as saying it is "not marketable" since the restrictions only limited the time and circumstances under which the stock could be sold—they did not foreclose sales all together.  According to Mr. Newkirk, it was the duty of all the lenders and investors to do their own due diligence, investigate the exact restrictions on Senior's stock, and ultimately decide for themselves whether they were willing to accept the stock for collateral.  Tr. at 1751-1759.

---

[6] Mr. Wolf, who represented Forefront and the McMahons in the deal, gave his own lengthy  and confusing definition of "restricted stock" and stated that at the time of the term sheet he was not aware of these restrictions, but he did not testify that the restrictions on the stock were of material importance to him. Tr. at 725-26.

In light of the conflicting testimony on the meaning and use of restricted stock, the evidence was insufficient to support Mr. Newkirk's guilt beyond a reasonable doubt for wire fraud.[7]  Mr. Newkirk's position, that was uncontroverted, was that he did not hide the status of the stocks from the investors/lenders, that he could not have done so as Mr. Darden's status as a Director was publicly available and well known information, and it was up to the lenders to do their own due diligence and determine whether they would be willing to accept the stocks as collateral.  After all, the information about the stocks was publically available.  Nevertheless, some of the government witnesses implied that Mr. Newkirk was obligated to tell them specifically about the restrictions; and Mr. Dietch in particular did not want to accept the collateral if it was restricted.  The implication is that Mr. Newkirk offered the stock as collateral on behalf of his clients, but consciously avoided looking into the restrictions.  Nothing could be farther from the truth.  As Mr. Newkirk testified, that information was public and obvious.  Accordingly, the evidence regarding the restricted stock could not be relied on to find beyond a reasonable doubt that Mr. Newkirk engaged in fraud.

b. *Mr. Newkirk Did Not Mislead Investors When He Used The Collateral To Solicit Loans.*

The government also argued that Mr. Newkirk lied when he told different lenders they would be first in line for the pledged collateral.  Tr. at 2042, 2179.  But this allegation is not supported by the facts either.

The government put on witnesses, such as James Ellis, who testified that he believed OpenGate Capital had a perfected first priority lien on Senior's collateral, Tr. at

---

[7] As discussed below, the meaning and relevance of "restricted stock" became an issue that was disputed between the parties, is outside the ken of lay jurors, and is precisely the type of testimony that this case required and defense expert would have provided.

109, but he acknowledged that he never received a signed control letter (which is required under the UCC and provided such priority) or a personal confirmation from Mr. Newkirk. Similarly, Mark Weinberg testified that having the first lien was important to him, Tr. at 226, though he declined to lend money because he was not comfortable with the collateral. And, Mr. Newkirk—once more—never confirmed that Mr. Weinberg had a first priority lien. There was no evidence to the contrary. In fact, Mr. Newkirk testified, without contradiction, that the Weinberg loan agreement and security documents were executed by Mr. Weinberg and the Dardens without the knowledge of Mr. Newkirk. Tr. at 2000.

The government also put on testimony from investors who were offered a first priority lien on the collateral in the context of early negotiations with multiple investors. For example, Comvest Partners negotiated with the Dardens for a non-binding letter of intent to make a $14.5 million loan in connection with the Maxim deal. As part of the terms of the negotiation, which never came to fruition, Mark Hughes testified that Comvest was to have a first priority lien upon actually lending any money against Senior's shares in Coca Cola Enterprises, Target and Cardinal Health. Tr. at 305-306. Likewise, Robert Wolf, who was working for Forefront finding investors, introduced the Dardens to Melody Partners, which also demanded a first priority lien on Senior's shares before lending any money.

For his part, Mr. Newkirk testified extensively on the practice of shopping collateral as security to multiple investors in hopes of finding the best deal. Tr. at 1805. He testified that Robert Wolf had shopped the deal to three different investors and that all the term sheets included the same collateral because the borrower was hoping that one

11

person would come in and finance the entire cost of the transaction.  Tr. at 1806-07.

Mr. Newkirk explained that at no time did Comvest and OpenGate have an identical

interest in the same collateral at the same time.  Tr. at 1810-11.  Moreover, no first

priority liens were ever executed on the same assets for more than one entity.  Tr. at

1810-1813, 2001.

      In light of these facts, there is insufficient evidence to find Mr. Newkirk guilty of

conscious avoidance wire fraud on the basis that he double-pledged Senior's stock.

Mr. Newkirk testified that his handling of the pledges on the collateral was not illegal,

deceptive, or unusual.  He explained that when a deal is being shopped around, the same

collateral is frequently used, just the way a person might try to shop around to find the

best mortgage on his house.  The collateral is only double-pledged when someone

actually uses it twice for the same loan and more than one lender is given the same

priority.  That never happened here and there was no evidence to the contrary.  So, far

from consciously avoiding the truth that his clients were offering the same collateral for

the different loans, Mr. Newkirk testified that he was aware of this conduct, that this was

common practice, and totally legal.  Again, Mr. Newkirk testified that it was also the

parties' duty to do their own due diligence and conduct UCC checks, just as Mr.

Weinberg did when he discovered the OpenGate loan.  Tr. at 265-266.  So again, this

evidence cannot support a finding of guilt because it is just as consistent with innocence

as guilt.

        *c.*  *Mr. Newkirk Did Not Avoid Taking Steps to Verify the Accuracy of*
           *the Bank of America Statements.*

      The government further argued that Mr. Newkirk was guilty because he

knowingly sent forged Bank of America statements purportedly belonging to Senior to

investors and lenders.  Tr. at 2062-2066.  But this allegation is not supported by the facts revealed at trial.

On October 9, 2013, Mr. Newkirk received an e-mail from Roderick Jones (also forged by Junior) that forwarded a September Bank of America statement for an account purportedly belonging to Senior.  Tr. at 1749-50.  A month later, on November 6, Mark Weinberg sent an email to Brent Watson at Merrill Lynch informing him that he had received two of Senior's Bank of America statements, one for September and one for October, and they were both identical.  Brent Watson then sent Mr. Newkirk two emails: one forwarding the email from Mr. Weinberg and another showing the email chain of how he got the bank statements.  Tr. at 1815.  According to Mr. Newkirk, he and Watson never discussed these emails and Watson never informed him that the account listed in the Bank of America statements had been closed and was not associated with the Dardens.  Tr. at 1819-20.  It was not until November 11 that Mr. Weinberg, himself, sent an email to Mr. Newkirk about the identical bank statements.  The next day, on November 12, Mr. Weinberg called Mr. Newkirk and informed Mr. Newkirk that he planned to call Bank of America.  Tr. at 1823.  Thereafter, Mr. Newkirk received the spoof email and a storm of activity and problems followed.  Tr. at 1823.

Mr. Newkirk testified that he informed Bryan Cave of these problems.  Tr. at 1830.  On November 19, Mr. Newkirk sent an email to Vincent Alfieri, the managing partner of Bryan Cave's New York office, and Jay Dorman, the head of M&A at Bryan Cave New York, attaching the electronic copies of the identical September and October bank statements.  Tr. at 1831.  By this time, Bryan Cave had decided that Jay Dorman would take over the deal.  Tr. at 1832.  According to Mr. Newkirk, his superiors at Bryan

Cave made the decision not to use the October statement (which had only been provided to Weinberg) but to continue to use the September statement, for two reasons:  First, Senior affirmed to Mr. Newkirk that he had sent his financial statements to Junior (Tr. at 664); and second, the firm's review of public records and other stock statements verified some of the collateral shown on the September statement.  Tr. at 1831.

Thereafter, under the supervision of more senior attorneys at Bryan Cave, Mr. Newkirk sent the September bank statement to several recipients.  Mr. Newkirk sent the statement to Robert Wolf, Melody Partners and Forefront on November 19, 2013 (Tr. at 1834-35); and he sent the statement to Shane McMahon on December 9, 2013 (Tr. at 931).[8]  This was done with the full knowledge of Mr. Newkirk's superiors at Bryan Cave. Tr. at 1832.

In light of these facts, Mr. Newkirk's use of the Bank of America statement from September 2013 is insufficient to support guilt based on conscious avoidance in this case. Again, there is no evidence that Mr. Newkirk sent out what he knew were fake statements.  And Bryan Cave agreed and approved the decision to continue to use the September statement in soliciting lenders for the Maxim deal.  Rather than consciously avoiding the problem of the identical bank statements, Mr. Newkirk and his firm investigated and came to the conclusion that continuing to send the September statement was appropriate.  Whether, in hindsight, this was the correct conclusion is not, of course, the issue for a conscious avoidance determination.

---

[8] There is no evidence that Harvey Newkirk sent the bank statements to Mark Hughes of Comvest or to Comvest's advisor on the deal—Jon Moskowitz from Odeon Capital Group.  Mr. Hughes testified that he received the the bank statements from Mr. Newkirk *via* Odeon (Tr. at 307)—but this proved to be false.  Mr. Moskowitz, testified that he received the bank statement from Mickey Klein—and not Mr. Newkirk (Tr. at 471-472).

Even if the jury relied on the bank statements to find guilt by conscious avoidance, the fact that other lawyers at Bryan Cave had seen both statements and ordered Mr. Newkirk to remain in the deal negates the finding that the activity was so overwhelmingly suspicious that Mr. Newkirk must have realized the problem and took deliberate steps to avoid learning the truth. On the contrary, Mr. Newkirk took deliberate steps to verify the authenticity of the document and was reassured that he was acting properly by the senior management of a well-regarded and internationally recognized law firm. Accordingly, this evidence cannot support a finding of guilt because it is equally consistent with innocence.

      d.   *Mr. Newkirk Did Not Ignore the Spoof E-mail And Took Remedial Steps To Prevent Loss to Weinberg.*

The government presented evidence that, on November 12, 2013, Junior sent a forged e-mail to Mr. Newkirk that appeared to come from Mark Weinberg. Tr. at 889. This "spoof" e-mail authorized Bryan Cave to release $5.5 million of the investor's money from the law firm's escrow account to finance the transaction. The government alleged that Mr. Newkirk is guilty of wire fraud because, even though Mr. Newkirk was aware the e-mail was a fake, he proceeded to authorize the release of Weinberg's funds. Tr. at 2076. These allegations run contrary to facts and evidence at trial.

Weinberg testified that, on November 11, 2013, he received an email from the Dardens saying that they could not get him the kind of control over the stocks that he demanded, and that they would return his money. Tr. at 232. The following morning, on November 12, Weinberg forwarded this e-mail to Mr. Newkirk, and explained that Bryan Cave could keep his money in its escrow account for a short while longer as "show money" to help the deal go through. Tr. at 232-233. Later that morning, Weinberg called

Mr. Newkirk and told him that he planned to call Bank of America to see if he could straighten out the issue with the collateral. Then, while in flight, Weinberg received an email from Mr. Newkirk seemingly replying to an earlier message from his account that Weinberg never actually sent, and confirming the release of his funds from escrow. Tr. at 234. As Weinberg repeatedly stated, Weinberg was on an airplane, and helpless, when he learned of this spoof that released $5.5 million of his money. Weinberg testified that he e-mailed Mr. Newkirk immediately.

Mr. Newkirk emailed Weinberg back within minutes. After receiving several more e-mails from Weinberg proclaiming he was defrauded, Mr. Newkirk cancelled a wire to Comvest for $535,000 and reached out to Alpha Media to convince them to return the $4.9 million wire they had received earlier. Mr. Newkirk also reported the fraud to his superiors and discussed with them that Bryan Cave would notify Citibank, which administered the escrow account. Tr. at 1827-1830.

Because the jury declined to convict Mr. Newkirk of conspiracy, it is evident that the jury did not credit Junior's claim that he told Mr. Newkirk about the spoof email and that Mr. Newkirk knew the spoof email was fake. Rather, if the jury relied on the existence of the spoof email, it must have done so in support of a finding of conscious avoidance.

But the evidence set forth at trial was insufficient to support a finding of conscious avoidance based on Mr. Newkirk's receipt of the spoof e-mail. Rather than deliberately avoid the truth about the spoof email, Mr. Newkirk did all he could to unwind the release of Weinberg's funds, he reported the spoof to senior management, and participated in discussions with management in which he provided information that

16

would be reported to the authorities.  Moreover, Bryan Cave—like Mr. Newkirk—was well aware of the spoof email.  Nevertheless, the firm continued to represent the Dardens in the deal and in fact ordered Mr. Newkirk to continue.  Not just Mr. Newkirk and Bryan Cave, but all the players in the transaction who learned about the spoof email — including, Alpha Media, Forefront, Robert Wolf (all of whom also knew about Junior's criminal history and role in the deal) — chose to keep pursuing the deal.  Thus, the evidence regarding the spoof email is equally consistent with innocence and guilt because it did not raise concern in the eyes of any of the players here.

> e. *The Fact that Mr. Newkirk Knew Junior had a Prior Conviction Does Not Mean He Turned a Blind Eye to the Fact that Junior Was Committing Fraud in the Maxim Deal.*

The government stressed throughout the trial and argued in closing that Mr. Newkirk knew that Junior had a criminal history.  Tr. at 2071, 2199.  Mr. Newkirk testified that he knew Junior had a criminal conviction but he believed it had to do with a loan that Junior had taken to pay off a drug dealer who was blackmailing him.  Tr. at 1678.  Junior's prior conviction was not a secret to any of the participants in the Maxim deal. But Senior's presence assured both the investor/lenders and Mr. Newkirk that everything about the Maxim deal was on the up and up.

Mr. Newkirk's awareness that Junior had a criminal conviction was insufficient to support the conscious avoidance verdict.  Everyone in the deal believed that Senior was involved and he vouched for Junior.  Senior's assurances alone were enough to provide comfort for both Mr. Newkirk and the other investors/lenders.  The fact of Junior's criminal conviction may have been impermissibly used by the jury to convict Mr. Newkirk on the grounds that he *should have known* that Junior was committing a fraud here.  But this fact does not support a conviction based on conscious avoidance.

Nor is the verdict supported by the "totality" of the evidence.  The evidence shows that Mr. Newkirk, in his role as the Dardens' transactional attorney, took deliberate steps, consistent with his obligations, to move the deal forward.  When there was something questionable, like the bank statements, Mr. Newkirk took steps to verify the legitimacy of the statements in conjunction with more senior attorneys at his firm.  He reported the spoof email and it was investigated by the firm and reported to the authorities.  Rather than taking deliberate steps to avoid the truth, Mr. Newkirk did everything he should have, consistent with his obligations to his client, to verify the accuracy of information.  Accordingly, this Court should reverse Mr. Newkirk's conviction for wire fraud because the evidence on which the jury relied cannot support a verdict of guilt beyond a reasonable doubt.

### III.    IN THE ALTERNATIVE, THIS COURT SHOULD ORDER A NEW TRIAL UNDER FED. R. CRIM. P. 33 IN THE INTEREST OF JUSTICE.

Federal Rule of Criminal Procedure 33(a) provides that "the court may vacate any judgment and grant a new trial if the interest of justice so requires."  In making a Rule 33 determination, "[t]he court is not required to view the evidence in the light most favorable to the government, but rather is to weigh the evidence and determine the credibility of the witnesses."  *United States v. Lopac*, 411 F.Supp.2d 350, 359 (S.D.N.Y. 2006).  A verdict may survive a Rule 29(c) motion—because a rational jury, viewing the evidence through the government's eyes, could convict—but fail to meet the Rule 33 standard because the momentum of the evidence as a whole would make a guilty verdict irrational."  *United States v. Ferguson*, 246 F. 3d 129, 139 n. 1 (2d Cir. 2001).  Rule 33 is not limited to questions which arise from the evidence admitted at trial itself.  Rather, the

question is whether allowing the guilty verdict to stand would be a manifest injustice. *Id.* at 133-34.

### A. THIS COURT SHOULD ORDER A NEW TRIAL AT WHICH THE DEFENSE IS ALLOWED TO INTRODUCE EXPERT TESTIMONY.

Prior to and during trial, the defense requested that the Court allow its expert, David Lallouz, to testify. Mr. Lallouz reviewed the deal documents related to the Maxim transaction and would have testified about the following areas: (1) the pledging of collateral to multiple secure lenders; (2) the role of lawyers in the due diligence process; (3) the role of attorneys on a deal team; (4) an entity as a client; and (4) certain specialized terms which would have included an explanation of restricted stock, perfection and priority of security interest, springing liens, releases, and pledge agreements. Mr. Lallouz noted in his report that "In the context of the rebuttal to the United States' case, I may be asked to provide further opinions as to mergers and acquisitions transactions, the role of attorneys in transactions, and other specialized terms." Decl. Ex. 1 (here and after Lallouz Report).

At the time the defense proffered this expert testimony, the government relied solely on the theory that the defendant had actual knowledge of the fraud, was going to personally benefit from the fraud, and was a knowing co-conspirator with Junior. However, due to the conscious avoidance charge, the government was able to argue an entirely new theory and the significance of expert testimony changed and was dramatically magnified. Both before and after the Court's decision to issue the conscious avoidance charge, the testimony of the expert was necessary to the issue of whether Mr. Newkirk made material misrepresentations. But because of the charge, the expert testimony became all the more critical in regard to Mr. Newkirk's intent.

The expert could have explained to the jury the technical terms involved in the Maxim deal and the usual structure of such a deal, as well as the roles of the various parties.  This testimony would prove necessary in this trial.  When the court denied the defense's request for expert testimony, it stated that:

> …I excluded the defense expert because I don't think he has anything to contribute to a reasonable juror that can't be obtained from the fact witnesses.  We are not talking about here matters that are so complicated or esoteric that a reasonable juror can't understand them without the aid of someone with special expertise, which is the whole basis for allowing experts under Rule 702.  *There are some terms that may not be familiar to the jury, but then they get explained by the fact witnesses in everyday language and indeed there doesn't seem to be much dispute about their meaning.*

Tr. at 442.  But contrary to the court's statement, terms—such as restricted stock, pledging collateral, and first priority liens—were a constant source of disagreement and contention, disputed by several witnesses, and incorrectly defined by the prosecution. The expert could have informed the jury about these terms of art which became critical in the case.

He also would have described the common level of knowledge expected from lawyers and investors operating in the realm of deals worth tens of millions of dollars. For example, an ordinary person might not understand or investigate whether a stock offered for collateral is restricted or unrestricted.  But the participants in the Maxim deal would have understood that if the stock were offered by the director of a public company, under federal law, there would have to be restrictions.

By explaining the roles and duties of attorneys in a business deal such as the Maxim acquisition, and in particular, that of a transactional lawyer such as Mr. Newkirk representing the buyer, the expert would have provided the context within which the jury

20

should have evaluated the relationships among the various parties.  The testimony would

have shed light on whether Mr. Newkirk's alleged false statements and omissions to the

counterparties were material to their decisions. The expert would have also explained: (1)

the difference between a person who has a fiduciary duty, or stands in a position of trust,

versus the counterparty in a business deal, and (2) when the lawyer for a client has a duty

to disclose a fact to a counterparty and when there is no duty.  These areas which would

have been covered by the defense expert were not within the common knowledge of the

jury.  Accordingly, they were proper subjects of expert testimony.

 In addition, the defense should not have been put in the position where the

government's witnesses were asked as lay witnesses to provide expert testimony to such

things as meanings of terms of art, or the structure of law firms.  The defendant was

entitled to put on his own expert to address these areas.  This testimony was not only a

proper subject for an expert witness, but was critical to Mr. Newkirk's defense.

### (i) The Defense Expert's Testimony Would Have Been Relevant And Admissible Both On The Issue Of Materiality And Intent.

 If allowed, the expert testimony would have addressed the structure of the Maxim

deal and the role of attorneys in such a deal.  Specifically, the expert would have testified

that in a complex transaction such as the Maxim deal, each investor/lender would have

his own team of lawyers, accountants, business advisors, etc., to conduct due diligence on

the party seeking the investment or loan.  Generally, it would be the job of the transacting

party performing due diligence to verify the assets and determine whether there were

liens on the collateral.  But, the role of the attorney is more limited in the nature of

someone facilitating the transfer of information among the parties rather than an analyst

or certifier of the information which is being provided by his/her own client.  In an arm's-

length transaction such as the Maxim deal, counterparty lenders independently verify the collateral that will secure their investment.  The expert would have testified concerning the nature of an arm's-length transaction and the duty of attorneys to make disclosures to potential investors/lenders as well as to maintain the confidentiality of their client's interests and strategies.

The expert would also have explained what it means when a stock is "restricted" and how the party performing the due diligence would go about verifying the status of the collateral.  The expert would have explained that pledging collateral to multiple secured creditors within the context of putting a deal together is proper and common.  Moreover, he would have explained that each transacting party has an affirmative duty to investigate the publically available sources for liens against that collateral.

The Second Circuit has a very liberal and expansive view of the use of expert testimony, particularly in criminal trials.  In *United States v. Litvak,* 808 F.3d 160 (2d Cir. 2015), the district court excluded expert testimony offered by the defense where the defendant, a broker, had been charged with securities fraud based on representations he had made to buyers of residential mortgage-backed securities ("RMBS") regarding how much his firm had paid for them.  The victims/investors had testified for the government that the statements of the defendant regarding the price his firm had paid for RMBS was "important" to them in their buying decision.  The excluded defense expert would have testified that in the market for trading RMBS, consideration of the statements of the sell-side salesman or traders, such as the defendant, concerning the value of the RMBS or the price at which the broker/dealer acquired the RMBS are not relevant or material to how much the buyer is willing to pay.

The Second Circuit reversed the conviction in *Litvak,* holding that it was error for the district court to exclude the expert testimony because it would have been highly relevant to the issue of materiality, the central issue in the case. *Id*. at 182. This was particularly true because the market for RMBS was different than the traditional security markets and unlikely to be within the common understanding of the jurors. The expert would have testified that the price the buyer is willing to pay is determined by the buyer itself, using its own computer models, and is almost always decided before even approaching a dealer like Litvak. *Id.*

The Court found that with this information from the expert, the jury could have reasonably found that the misrepresentations by the defendant were, in fact, not material to the decisions of the buyers. Without this expert testimony, the defendant was left in an "untenable position" where he could not introduce evidence either that the specific statements at issue were not important to a reasonable investor or the types of statements at issue are generally not important to a reasonable investor. *Id.* at 183. Exclusion of the expert testimony left the defendant only with the "victims" of his conduct as sources of potential testimony on this issue, "an odd limitation where the jury is to evaluate materiality in an objective manner."[9] *Id*. at 183-84 (citations omitted). Holding this error was not harmless because materiality was the central issue in the case, the Second Circuit reversed the defendant's conviction. *Id*. at 184.

In the instant case, the proffered testimony of the expert would have been relevant

---

[9] The government in this case also put on through its lay witnesses information about the practice and structure of law firms, as well as the definition of many technical market terms involving loans and stocks which would not be within the ordinary understanding of the jury. In fact, due to the omission of the defense expert in this case, the government was allowed to make arguments which have no basis in fact or law, for example, the meaning of "restricted stock" and that restricted stock is unavailable for use as collateral.

to the materiality element of the wire fraud.  In a mail or wire fraud prosecution, "the materiality requirement is met if the matter at issue is of importance to a reasonable person in making a decision about a particular matter or transaction." *United States v. Kamdar*, 2010 WL 883685, at *8 (W.D.N.Y. Mar. 8, 2010).  As in *Litvak,* and contrary to this Court's ruling here, the Maxim deal and the roles of the parties to the transaction, as well as the terms of art, were not within the common knowledge of the jury.

The investors/lenders testified that they expected the financial documents they received from Mr. Newkirk to be "accurate", implying that they were relying on Mr. Newkirk's obligation as the lawyer for the Dardens to certify that the documents regarding the Dardens' assets were authentic and verified.  For example, Ellis testified that Mr. Newkirk did not tell OpenGate about the restricted stock offered as collateral, implying that it was Mr. Newkirk's obligation to conduct due diligence on his client's collateral.  This runs counter to the industry standard where parties to an arm's-length transaction such as the Maxim deal are not expected to rely on the offering party's representations, but rather conduct their own due diligence.  Tr. at 108.  Likewise, Mr. Moskowitz testified that he expected Mr. Newkirk to be responsible for disclosure of possible liens on the collateral.  Tr. at 487.  Mr. Wolf testified that he relied on the information provided by Mr. Newkirk and expected it to be accurate.  Tr. at 780-81.  And the gist of Mr. Dietch's testimony was also that Mr. Newkirk misled him by not fully disclosing all of the different restrictions on Senior's stock, although it was readily verifiable by public documents and in fact, should have been obvious to any investor/lender in the Maxim deal.

The defense expert would have explained that parties to an arm's-length

transaction such as the Maxim deal do not rely on the offering parties' representations but conduct their own due diligence on collateral and liens.  The expert would also have explained the routine, obvious, and public fact that Senior's stock would be "restricted" as he was a director of the public companies whose stock was offered; and that it is each party's duty to verify and investigate the stock and determine its worth and whether it is acceptable collateral for them.  The expert would have informed the jury that running a UCC check for existing liens on collateral is routine and no party would rely on the borrower's own representations regarding the existence of other secured interests in the offered collateral.  None of this was within the common knowledge of the jury and all of it would have been relevant to the issues in the case.

Thus, the expert testimony was critical to the jury's evaluation as to whether the alleged omissions and misrepresentations made by Mr. Newkirk to various "victims" were material.  The exclusion of the expert testimony on the issue of materiality was error and was not harmless.

### (ii) The Exclusion of the Defense Expert's Testimony Prevented the Defense From Countering the Argument that Mr. Newkirk Had Consciously Avoided The Fact that Junior was Engaged in Fraud.

In this case, the jury's determination that Mr. Newkirk had the requisite knowledge and intent to support conscious avoidance could only have been based on the jury's view of the duties and obligations Mr. Newkirk had as the transactional lawyer for the Dardens.  However, the jury had no expert testimony to objectively set forth the roles and obligations of attorneys involved in the Maxim Transaction.  Moreover, the jury may have impermissibly found Mr. Newkirk guilty because it believed he *should have known*

25

something illegal was taking place, rather than that there was a high probability that fraud was being committed, but he consciously avoided finding out the truth.

As reflected in the expert's report (Lallouz Report, ¶¶ 17-21), the expert would have testified that lawyers in transactions have a minor role in addressing 'due diligence' of their client's documents, and, instead, focus their due diligence efforts on the parties on the other side of the transaction.  Moreover, it is understood that lawyers who do participate in due diligence aimed at their clients do so in a purely ministerial way and are not and cannot be expected to independently investigate the *bona fides* of signatures or financial statements.  Lallouz Report. ¶ 21 .

This was crucial information for the jury because the verdict was based on the notion that Mr. Newkirk, as the lawyer for the Dardens, had to have known that there was a fraud because it was his job to assure that the documents he was providing to the investors/lenders were accurate.  The expert would have explained that the duty to investigate and to do due diligence lay with the lenders/investors—not with Mr. Newkirk. The expert would have made clear to the jury that the role of a transactional lawyer in this kind of deal was to organize and facilitate the sharing of documents and to negotiate the legal terms of the deal, not to do his own due diligence on his own client.  The jury was also left with the false notion that Mr. Newkirk had a special duty to, and a position of trust with, the investors and lenders, when in fact, the lenders were counterparties to Mr. Newkirk's client, either had their own counsel, or were themselves attorneys (or both), and were going to conduct their own due diligence. The expert testimony would have clarified for the jury what the duties and obligations of Mr. Newkirk were to his own client as opposed to the counterparty investors and lenders.  The expert could have

also testified as to whether Mr. Newkirk and his firm had taken reasonable steps consistent with their obligations to verify the authenticity of the bank statements and similar documents they received from their clients.

In *Litvak*, the district court also excluded expert testimony regarding the "arm's-length nature of the relationship between a broker-dealer and the counterparty [which] was relevant to prove that Mr. Litvak was not acting as agent for the counterparties." *Litvak*, 808 F.3d at 186. The Court found that although the role of an agent versus principal was not an element of the offense, it did bear on "materiality and fraudulent intent" and that exclusion of expert witness testimony on this point was error. *Id.* at 187. Based on the victim's testimony, the jury might have been led to believe that the defendant Litvak was acting as an agent of the victim, in which case his misstatements would have been more important as they would have come from someone in a position of trust vis-à-vis the investor. The Court stated, "The nature of Litvak's relationship with the alleged victims formed the context in which the jury had to consider whether the portfolio managers and traders who testified reflected the views of a reasonable investor; this portion of [the expert's] proposed testimony would have supported Litvak's materiality defense and could have rebutted [the victim's] testimony." *Id.*, at 187-88.

Expert testimony has been found to be admissible in cases, as here, in which the duties and obligations of defendants who are attorneys are relevant to the charges, in particular when the charges arise out of the representation of a client. In *United States v. Cavin*, 39 F.3d 1299, 1309 (5th Cir. 1994), the defendant was an attorney who was accused of conspiracy to defraud because of his failure to disclose fraud committed by his insurance company client. The Fifth Circuit found the district court committed error by

excluding the testimony of a defense expert on the ethical constraints under which a lawyer operates in the regulatory area.  The Court found that the expert's testimony would have shed light on the defendant's intent by answering questions such as:  "Under what circumstances is a lawyer who represents a client in reporting to a regulatory agency, as here, obliged to divulge potentially damaging facts? . . . How active a role does the lawyer play in the reporting process: is he a background advisor or the spokesperson? Is the context such that the [regulatory] agency likely would be misled without disclosure of the damaging fact? Would the omission mislead because of a statement by the lawyer or because of an oversight by the agency?"  *Id.* at 1308-09.  *See, e.g., United States v. Kellington*, 217 F.3d 1084 (9th Cir. 2000) (testimony of expert in legal ethics who testified that a lawyer is bound by the duty of loyalty to do what the client requests unless he knows the conduct to be illegal was relevant to the defendant/lawyer's state of mind).  *United States v. Kelly*, 888 F.2d 732 (11th Cir. 1989) (testimony regarding the ethical and professional standards of behavior for lawyers is relevant in evaluating criminal intent where lawyer was charged with conspiring with client to distribute cocaine.)

The expert testimony offered by the defense in this case, which would have touched on the areas of the structure of law firms and the duties of lawyers, is similar to the testimony often offered by the government and routinely admitted in criminal prosecutions to explain the structure of companies and organizations as well as the duties and relationships of members of such organizations.  *See, e.g.*, *United States v. Brooks*, 2010 WL 291769, at * 4 (E.D.N.Y. Jan 11, 2010) ("Courts generally permit expert corporate governance testimony.  But, experts are restricted to explaining general

corporate governance concepts, such as setting forth the respective roles of a corporation's directors and officers, the nature of an officer's fiduciary duties to the corporation, or the concept of parent-subsidiary corporate separateness . . ."); *United States v. Robinson*, 2000 WL 65239 at * 3 (S.D.N.Y. Jan 26, 2000) (expert testimony offered by government to explain the structure and features of 'prime bank' fraud schemes and the roles of the participants in the scheme to refute defendant's claim to be innocent bystander.)

In this case, it was error for this Court to exclude the expert testimony which would have shed light on Mr. Newkirk's role at Bryan Cave and the role of the firm, on Mr. Newkirk's duty as the transactional lawyer representing the Dardens, and on his and Bryan Cave's obligations to investigate their own client. Given the verdict of the jury, that Mr. Newkirk consciously avoided learning the truth about Junior's activities, the testimony of the expert was crucial to dispel the notion that Mr. Newkirk, as part of his job, had an ethical and legal obligation to confirm and verify his own clients' financial documents before passing them on to counterparties in an arm's-length transaction. Without this evidence, the jury was left only with the view of the victims, and Mr. Newkirk's own testimony as to how he viewed his own obligations. This was an untenable position.

This Court should grant Mr. Newkirk a new trial at which the defense expert would be allowed to testify.

### B. THE JURY VERDICT WAS A MANIFEST INJUSTICE AGAINST THE WEIGHT OF THE EVIDENCE.

Mr. Newkirk's acquittal of the conspiracy and aggravated identity theft counts demonstrate that the jury disregarded the testimony of both Junior and Senior, and found

that Mr. Newkirk did not have actual knowledge of the fraud and did not knowingly join

a conspiracy to commit fraud.  When the remainder of the evidence is analyzed as set

forth in this memorandum in support of the request for the Rule 29 (c) motion,

Mr. Newkirk's conviction for substantive wire fraud, based on a theory of conscious

avoidance, is not supported by the evidence and was a manifest injustice.  This Court

should grant Mr. Newkirk a new trial on Count Two.

## CONCLUSION

For all the reasons stated, defendant Harvey Newkirk respectfully requests that

the Court grant all the relief requested in these Rule 29 and 33 motions, together with

such other and further relief as the Court deems appropriate.

DATED:      New York, New York
            January 28, 2015

                                    Respectfully submitted:


                        _____/s/_____

                        Priya Chaudhry
                        Beth Farber
                        Jared Foley
                        HARRIS, ST. LAURENT,
                        & CHAUDHRY LLP
                        40 Wall Street, 53rd Floor
                        New York, New York 10005
                        (212) 785-5550
                        priya@sc-harris.com

                        *Attorneys for Defendant Harvey Newkirk*