UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

                         :

UNITED STATES OF AMERICA

                         :

 - v. -

                         :

HARVEY NEWKIRK,                     S2 14 Cr. 534 (JSR)

                         :

        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## GOVERNMENT'S SENTENCING SUBMISSION

PREET BHARARA
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Andrew C. Adams
Sarah E. Paul
Assistant United States Attorneys
-Of Counsel-

Harvey Newkirk, the defendant ("Newkirk" or the "defendant"), committed a sophisticated and long-running fraud to obtain loans for the purchase of Maxim Magazine (the "Maxim scheme").  Newkirk betrayed his employer; placed his subordinates' reputations and livelihoods at risk; defrauded his counterparties; and, once the Maxim scheme had collapsed, lied to law enforcement and to this Court in an effort to avoid responsibility for his criminal actions. The economic and reputational harm wrought by Newkirk's actions, coupled with the likelihood of his re-offending evidenced by his consistent and practiced dissembling, warrant a sentence below the applicable Guidelines sentencing range, but one that nevertheless includes a significant term of incarceration.

## I.      STATEMENT OF FACTS

Newkirk participated in a scheme to defraud various lenders in connection with an attempt to purchase Maxim Magazine through an entity established by Calvin R. Darden, Jr. ("Junior"), in which Newkirk held a direct financial stake.  Newkirk committed this fraud after having obtained his position at his law firm through lies regarding, among other things, the identity of his clients and his ownership interests in those clients.  Newkirk and Junior had different roles in the course of the fraud, but each acted as a necessary partner in devising and pursuing the Maxim scheme.  Newkirk's skills as an attorney were especially critical, both in creating a façade of legitimacy for himself and Junior and in attempting to prop up the Maxim scheme as it collapsed under the weight of the duo's lies and theft.

1.      *Background to the Maxim Scheme and Newkirk's Prior Knowledge of
       Junior's Fraudulent Use of Senior's Identity*

The defendant met Junior in approximately late 2008 or early 2009, following Junior's release from a term of incarceration imposed as the result of a prior financial fraud.  Tr. 838, 1223-24.  At that time, Junior and Newkirk were discussing the possibility of a business venture

involving a boxing match, which would be pursued by the Reign Entertainment Group LLC

("Reign"), a company controlled by Junior. Tr. 838. Although Junior's father, Calvin Darden

("Senior"), participated in the business of Reign by providing guidance and advice to Junior, and

by participating on telephone calls and in meetings, Senior never provided or agreed to provide

any financing for Reign's business. Tr. 839.

Since at least 2010, through at least the end of the Maxim scheme, the defendant owned

and maintained a financial stake in Reign. Tr. 844, 1342; GX 143 ("Affidavit of Loss" signed by

the defendant and referring to the defendant's right to receive a "profit participation" in Reign,

dated December 16, 2013); GX 701 ("Letter of Intent" representing "the valid and binding

obligation of [the defendant, through his entity Invictus Ventures LLC, and Reign]" to negotiate,

execute and deliver a securities purchase agreement providing for an investment by the

defendant into Reign). The defendant actively participated in generating opportunities for

investment and profit through Reign, Tr. 847; GX 704; GX 705, including through his fraudulent

efforts to close the Maxim deal.

The defendant's financial interest in Reign was not his primary means of generating

income. As of May 2013, Newkirk was employed at Bryan Cave LLP ("Bryan Cave") as

counsel to the firm. He obtained that position through a series of lies. For example, the

defendant *1*) claimed not to have had "any business relationship with any of [his] clients during

the last five years," GX 501 at 8 (false insofar as the defendant had had an extensive business

relationship with his principle client, Reign, as well as with Joshua Mailman);[1] *2*) failed to

disclose the nearly $1,000,000 in personal debt that would shortly result in a series of lawsuits,

---

[1] In the course of the defendant's case, described below, Newkirk also admitted to having held
stock and doing business with NanoScience Engineering Corporation, yet another example of
material omissions from the New Hire Questionnaire demonstrating the defendant's attempt to
hide conflicts of interest from his new employer. *See* Tr. 1966.

*id.* at 6 (a material omission in his negative response to the question, "are there any circumstances that may give rise to [any civil court actions]"); *see also* Tr. 1484 (describing lawsuits filed against the defendant in 2013); and *3*) falsely claimed that Senior (the individual, not any entity connected to Senior) was a "current client," *see* GX 513 at 7-8; *see also* PSR ¶¶ 15-16 (describing Newkirk's acceptance of service of process on behalf of Darden, Sr., and his attempt to secretly settle that same lawsuit); Tr. 501 (Q: Did you [*i.e.*, Senior] ever authorize Mr. Newkirk to represent you in your personal capacity at any time?  A: Absolutely not.").[2]

Finally, and also since approximately 2010, the defendant was aware that "Calvin R. Darden, Sr." – the name used by Newkirk and Junior to execute fraudulent contracts throughout the Maxim scheme – had been the name used to sign a $450,000 promissory note in connection with a deal that Reign had pursued.  Tr. 1973-95.  Newkirk knew, as of the inception of the Maxim scheme, that that same $450,000 loan remained outstanding, *i.e.*, that a half-million dollar promise made under the name "Calvin R. Darden, Sr." had never been repaid despite efforts by the lender to satisfy that debt.  Tr. 1973.  Newkirk never revealed the existence of that significant debt to anyone during the Maxim negotiations.  In short, Newkirk knew at the inception of the Maxim scheme that "Calvin R. Darden, Sr." was not a legitimate businessman, but a fake name used as a means of obtaining funds for Reign projects with no intention of repayment.

## 2.     *The Maxim Scheme*

Beginning in 2013, in order to induce lenders to provide the $31,000,000 in capital required to close the Maxim deal, Junior and Newkirk repeatedly lied to lenders regarding

---

[2] Tellingly, prior to outset of the Maxim scheme, the defendant, in his business development plan contained in GX 513, did not identify Reign as a company controlled by Senior.  This is because Reign was controlled by Junior, as the defendant well knew.

Senior's purported willingness to personally guarantee and back the deal with his own assets. *See, e.g.*, PSR ¶¶ 9, 11, 30.

Reign, in which Newkirk held a secret profit interest, was to be the ultimate parent of the entity purchasing Maxim. The engagement letter sent to Newkirk's law firm, the bid letter sent to the company handling the Maxim bidding process, and Newkirk himself made clear that Reign was the parent company of the purchaser. *See* GX 601; GX 602; GX 603; Tr. 1282, 1323 (Tornay: "[The defendant] had described that the client was Mr. Darden Senior; and that the company that was the over – sort of the parent company was Reign Entertainment; and there would be two entities formed below it that would be involved in the acquisition."). Indeed, when Junior and Newkirk needed to pay fees to one victim of the Maxim scheme, Junior wrote a check on Reign check stock. GX 111A.

After Newkirk and Junior won the initial bid to purchase Maxim, the defendant negotiated an asset purchase agreement and multiple financial guarantees purporting to make the non-existent "Calvin R. Darden, Sr." responsible for up to $31,000,000.[3] *See, e.g.*, GX 630; Tr. 856. At no time did Senior in fact have $31,000,000 available for the guaranty of the Maxim purchase price, as the defendant was well aware. *See, e.g.*, Tr. 861. The defendant personally and purposefully created and circulated these false documents and representations in order to deceive his victims. *See* PSR ¶¶ 11, 14; *see also* Tr. 782, 791-92. The defendant provided Junior with templates to create those false statements to provide to victims of the Maxim scheme. *See* GX 168; GX 169; GX 171; Tr. 871-73. The defendant also personally participated in email

---

[3] Included among these documents was a forged "proof of funds letter" purporting to confirm that Senior had sufficient personal assets to execute the Maxim purchase. GX 630 at 107. The language of this letter is substantially identical to the language that the defendant had previously provided to Junior in connection with other Reign projects. *Compare* GX 174 *with* GX 630 at 107.

discussions regarding the content of that false personal financial statement, GX 2006, and the defendant circulated that false statement to Forefront Capital ("Forefront"), among others.  Tr. 426 (Jon Moskowitz testifying regarding the personal financial statement); GX 171 (defendant forwarding the statement to Forefront); GX 173 (December 13, 2013, email from defendant to representatives of Shane McMahon at K&L Gates LLP forwarding same).[4]  At no time did the defendant discuss these guarantees or false financial statements with Senior, who remained unaware that the defendant was misleading others into believing that Senior's personal assets were pledged in connection with his son's efforts to purchase Maxim.  PSR ¶¶ 12, 15; Tr. 501-07.

In addition to extending the promise of a personal guaranty by the non-existent "Calvin R. Darden, Sr.," the defendant orchestrated a ruse to convince Maxim's then-owner Alpha Media (and, later, Open Gate) that the Maxim purchase price would be guaranteed not only by Senior, but also by a second entity, Forefront.  GX 707 (Alpha Media sham commitment letter); Tr. 785 (Lawrence Deitch testifying regarding the sham commitment letter for Alpha Media); GX 607 at 4 (Open Gate sham commitment letter); Tr. 87-90 (James Ellis describing the sham commitment letter and Open Gate's reliance on that document).  Along with these commitment letters purporting to show Forefront's good faith intention to provide up to the full $31,000,000 purchase price, the defendant simultaneously created releases of those very commitments, which the defendant and Junior hid from Alpha Media and Open Gate, respectively.  GX 709 (Alpha Media release); GX 607 at 2 (Open Gate release); Tr. 875-882 (Junior describing both releases).  Newkirk – not Junior – conceived and orchestrated this aspect of the Maxim scheme.  *See* GXs

---

[4] The email and attachment admitted as GX 173 were sent by the defendant in December 2013, approximately two months after the stocks referred to in that statement had been pledged to Open Gate Capital ("Open Gate"), and approximately one month after Senior had expressly instructed the defendant that Senior would have nothing more to do with the Maxim deal, even in an advisory capacity, as described in more detail below.

170, 170A (defendant directing his subordinate to research language for the secret releases); *see also* GX 3023 (including an email from the defendant to Forefront reading, in part, "I would not mention that we may raise money for the Maxim Acquisition.  They just want to hear that there is a commitment from a funded source.  If we choose to raise money or restructure our deal it should not concern them so long as we close."); GX 3027 ("[W]e should offer to Brad to sign a release that we will not try to enforce this Agreement [*i.e.*, the Alpha Media commitment letter]. . . .").

Senior was unaware that Junior and Newkirk were offering stock holdings, purportedly belonging to Senior, as collateral for loans for funds to close the Maxim deal.  Nevertheless, the defendant offered such stock holdings to lender after lender, knowing both that the stock was already promised to earlier victims and that the stock did not actually exist as it was described to those victims.  After missing the original closing date and incurring an extension fee of $1,500,000, Junior and the defendant failed to make that extension payment to Alpha Media.  Tr. 794-97.  The defendant began to negotiate with Deitch for the exchange of certain securities purportedly belonging to Senior as payment of the extension fee.  Tr. 797.  Specifically, the defendant offered to pledge three tranches of securities (in Coca-Cola Enterprises, Cardinal Health, and Target Corporation) to Alpha Media.  Tr. 800.  Deitch informed the defendant that the securities as described were not marketable and that they would be available to Senior "on his retirement as a director, to his estate on his death and other similar circumstances but they were not marketable securities that you could take and sell today, and, in fact, they were not assignable."  Tr. 800-01.

In late October, the defendant began a weekend of negotiations with Open Gate that resulted in Open Gate making a loan of approximately $3,100,000 to "Calvin R. Darden, Sr.," in

connection with the Maxim deal.  PSR ¶¶ 11, 14; *see also* GX 116.  Having already been warned by Deitch of the restrictions on Senior's stock, the defendant nevertheless set about promising that very stock to Open Gate, describing those stock holdings as "freely pledgeable."  Tr. 109; *see also* PSR ¶ 11.  The defendant, in the course of those expedited negotiations, did not disclose restrictions on those stocks to Ellis.  *Id.*  Rather, he personally certified to Ellis the content of the personal financial statement, discussed above, which purported to describe Senior's finances, despite the fact that Senior's stock options had no actual present value (contrary to the representations of the personal financial statement).  *See* GX 121; *see also* Tr. 192 ("Q:  Mr. Ellis, the certification language here [*i.e.*, at the top of GX 121] I believe you testified earlier today that this was essentially a draft; is that correct?  A:  This was the language that Harvey proposed for the certification.  Q:  Did Mr. Newkirk in fact ultimately make such a certification?  A:  Yeah.  This was it.  We discussed it.").  On the basis of the personal financial statement, the Open Gate sham certification letter (GX 607), and the defendant's personal certification, Open Gate loaned $3,100,000 to "Calvin R. Darden, Sr.," the person Open Gate understood to be Senior.  Tr. 70-72.  That is, knowing that the non-existent "Calvin R. Darden, Sr." had previously defaulted on a $450,000 note in connection with Reign's business, and knowing that this debt was never disclosed to Ellis, Newkirk falsely vouched for the accuracy of the statements that he and Junior had created.

After Open Gate funded its loan, the defendant became non-responsive to Ellis' repeated requests that "Calvin R. Darden, Sr." fulfill the obligations of the Open Gate loan agreements.  Tr. 92-93.  On October 29, 2013, Open Gate placed the defendant on notice that Open Gate was preparing to claim a breach of the loan agreement.  PSR ¶ 15; GX 124.  Open Gate had been stymied in efforts to obtain a control account at Merrill Lynch with respect to the promised (and

non-existent) shares of stock promised and certified by the defendant, and therefore remained without control over the collateral pledged to induce Open Gate to make the loan.  GX 124; Tr. 95.  On October 31, 2013, Open Gate sent the defendant a notice letter providing formal notice of default and informing the defendant of Open Gate's intention to commence foreclosure on the collateral absent an immediate repayment.  PSR ¶ 15; GX 125.

The defendant and Junior next targeted Mark Weinberg ("Weinberg") for a loan of $5,500,000 in connection with the Maxim deal, again promising the same bogus stock holdings purportedly belonging to Senior.  PSR ¶ 17; Tr. 208, 211-12.  Weinberg sought assurance that the promised stock would be in a control account over which Weinberg held authority prior to the release of Weinberg's money to the seller of Maxim. *i.e.*, the same type of account that Newkirk and Junior had worked to deny to Open Gate.  PSR ¶¶ 17-18; Tr. 212-13 ("[A]s I said, it was essential for me to get control over these stocks to make sure that they were in [a control account].").  The defendant acknowledged the importance of that prerequisite to the release of the Weinberg funds and confirmed that he would not release those funds, then-held in a Bryan Cave escrow account, without prior consent by Weinberg.  GX 303; Tr. 216; *see also* PSR ¶ 19. On November 6, 2013, Brent Watson, a broker at Merrill Lynch, sent the defendant an email chain and attachments indicating that Weinberg had discovered that certain purported Bank of America account statements, for an account supposedly belonging to Senior, were essentially identical, *i.e.*, that the statements were fraudulent.  GX 307.[5]  Shortly thereafter, and no later than November 7, 2013, Watson spoke to the defendant and informed him that internal investigators at Bank of America had learned that the account purportedly reflected in those account statements had been closed and did not belong to Senior.  PSR ¶ 17; Tr. 407-408.  The

---

[5] Newkirk received substantially the same email from Weinberg himself on November 11, 2013. GX 313.

defendant, despite this conversation with Watson, elected to continue on with the Maxim deal. Watson also requested that the defendant obtain a release of the control account agreement provided to Weinberg, and the defendant agreed that he would assist in obtaining such a release. Tr. 417.  The defendant claimed that he had spoken with Weinberg about this bogus account, *id.*, when in fact he had not, *see* Tr. 223-24; *see also* GX 313 (Weinberg providing Newkirk with the bogus account statements on November 11, 2013).

Without receiving Weinberg's permission to release his funds to the sellers of Maxim, and without resolving the breach of the Open Gate loan, the defendant promised the same bogus stocks to another lender, Comvest, and Comvest's representatives on or about November 7, 2013.  PSR ¶ 18; *see also* GX 503 (November 7, 2013, Comvest Letter of Intent, executed by "Calvin Darden" on November 8, 2013).  On the date that the Comvest Letter of Intent was signed by Junior and forwarded by the defendant to Comvest's representative, Jonathan Moskowitz,[6] the defendant knew that the stocks underlying each of the three loans (as well as the personal guaranty of the purchase price) were worthless (as the result of restrictions on director shares) and associated with a fraudulent bank account.  The defendant nevertheless continued high-speed negotiations with Comvest, falsely representing that the bogus stock was "freely tradeable" and available to be used as collateral, and going so far as to join a telephone conference with Comvest representatives during which Junior impersonated Senior.  *See* Tr. 306, 311-13,425, 462, 900.  The defendant did this while falsely promising Weinberg that Comvest

---

[6] Moskowitz testified about his request that the signature on the Letter of Intent read "Calvin R. Darden, Sr.," whom Moskowitz understood (mistakenly) to be Senior.  After receiving the version of the Letter of Intent attached to the email in GX 503, Moskowitz called the defendant (as reflected in the telephone records contained in GX 905 at page 708, line 12589) to request that the signature be corrected.  The defendant immediately called Junior (GX 905 at 708, line 12590) and, within minutes, received from Junior a "corrected" (*i.e.*, forged) signature for the non-existent "Calvin R. Darden, Sr.," which the defendant then provided to Moskowitz.  GX 516.

would not be taking a security interest in the same bogus stocks, PSR ¶ 18; GX 312, and while hiding the fact that Weinberg's money would be the source of the deposit that the defendant and Junior planned to send to Comvest – a fact that would have risked revealing that the stock pledged to Comvest was also pledged to another lender, Weinberg. *See* Tr. 432-33.

3.    *The Weinberg Theft and Collapse of the Maxim Deal*

Newkirk knew that Weinberg's money was stolen as the "spoofed" email episode unfolded.  The defendant held Weinberg's $5,500,000 in escrow at Bryan Cave after promising Weinberg that those funds would not be released to the sellers of Maxim absent confirmation that Senior's stock had been placed in Weinberg's control account (the same account that the defendant had promised Brent Watson he would assist in closing).  On November 12, 2013, at 7:16 a.m., the defendant received an email from Weinberg attaching wiring instructions for the return of Weinberg's funds, as the pledged stock was evidently not going to be provided to Weinberg.  GX 313A.  Shortly thereafter, the defendant received a "spoofed" email purporting to be from Weinberg, but actually created by Junior, directing the defendant to release Weinberg's funds from the Bryan Cave escrow account to the sellers of Maxim.  GX 314.  Prior to sending the defendant this email, Junior had called the defendant to inform him that the defendant would be receiving "an email releasing the funds" and to instruct the defendant "not to respond to [that email] for as long as possible."  Tr. 891.  The spoofed email was designed to buy time to finish sourcing funds for the Maxim deal.  Tr. 892.  Within minutes of receiving the spoofed email and following multiple communications with Junior, PSR ¶ 20, the defendant released a portion of Weinberg's funds to Alpha Media ($4,900,000, representing the extension fee owed to Alpha Media, less $600,000 intended to cover the Comvest deposit and due diligence fees).  PSR ¶ 20. Newkirk then waited nearly two hours, until he obtained confirmation that Alpha Media had

received the stolen funds, and only after speaking again with Junior, before sending a terse reply to the spoofed email, thereby waiting to alert Weinberg to the fraud until the time that Alpha Media was already in control of Weinberg's funds.  GX 320 (reply email at 12:51 p.m.); GX 904 at "Newkirk Calls Made," Line 1145.

In the days after the Weinberg fiasco, the defendant provided the partnership at Bryan Cave with a false version of the events that had led to the spoofed email and stolen funds.  When asked to provide a copy of the forged Bank of America account statements, he provided Weinberg's November 11, 2013, rather than Brent Watson's November 6, 2013, email, creating the appearance that he had only been alerted to that glaring indication of fraud in the hours prior to the spoofed Weinberg email.  GX 340; *see also* Tr. 1409:19-21 (Alfieri: "Q:  Was Mr. Newkirk the person to bring those bank statements to your attention initially?  A:  No.").  Nor did the defendant inform Vincent Alfieri, at the time the Managing Partner of Bryan Cave, of the breach of the Open Gate loan agreement or of the lawsuit subsequently filed by Open Gate.  Tr. 1411.  Indeed, Bryan Cave did not learn of the Open Gate lawsuit until January of the following year.  GX 506; Tr. 1411.[7]

The defendant also hid from Bryan Cave and his counterparties the fact that Senior had fully withdrawn from any participation in the Maxim deal.  PSR ¶ 23.  In November of 2013, the defendant was expressly told by Senior that Senior would no longer play any role in the Maxim deal – advisory or otherwise – and that Senior wished to have copies of his stock statements returned to him by the defendant.  *Id.*; *see also* Tr. 1463 (testimony of Special Agent Paul Deal

---

[7] Between the filing of that lawsuit against the non-existent "Calvin R. Darden, Sr.," and Bryan Cave's discovery of the lawsuit, the defendant had informed Open Gate's counsel that he would accept service of process for "Calvin R. Darden, Sr.," that Bryan Cave would handle the lawsuit, and that the defendant was opening a new matter for that purpose (a lie as demonstrated through the testimony of Elizabeth Garvey of Bryan Cave).  *See* Gx. 128; Tr. 111-12, 1444.  *See also* PSR ¶ 22 ("Newkirk falsely represented to the law firm and others . . . that Darden Sr. was his client.").  All of these representations were lies told by Newkirk.

regarding the defendant's admission that Senior had demanded the return of his stock statements).  Nevertheless, the defendant continued to represent to potential lenders that Senior was the defendant's client and that Senior was willing to provide a personal guaranty (backed by the same bogus stock holdings) to support that financing.  PSR ¶ 23.  While continuing to make these false representations, the defendant was quietly attempting to settle the Open Gate lawsuit. GX 129 (draft settlement agreement provided to Open Gate); GX 130 (draft affidavit of confession of judgment for "Calvin R. Darden, Sr." created by the defendant); GX 153; Tr. 114-19 (Ellis describing negotiations in December 2013); Tr. 718 (testimony of Robert Wolf referring to three-month period of interaction beginning in November 2013); Tr. 1285-1300 (testimony of Shaul Greenwald on direct examination); GX 1001 (February 10, 2014, audio recording, including the defendant's false representation to Forefront that Bryan Cave had had $12,000,000 in its escrow account, ready to be applied to the Maxim purchase price).

### 4.    *Lies to Newkirk's Law Firm, Law Enforcement and the Court*

Newkirk lied to Bryan Cave and to federal investigators in the immediate fallout of the Maxim scheme, shortly after Junior's arrest.  Among other things, the defendant claimed that Senior controlled the email account "CDarden@TheReignInc.com," whereas the defendant knew that this account was, in fact, controlled by Junior.  PSR ¶ 34; GX 181.  The defendant also informed law enforcement that Senior was his client during a meeting on February 12, 2014, Tr. 1455, but later abandoned that particular lie when confronted with documents relating to the fraud, claiming instead that he merely represented the entities to the Maxim deal, rather than Senior himself.  Tr. 1464; *see also* PSR ¶ 34.

The PSR accurately reports further lies told by Newkirk in the fallout of the Maxim scheme and through the course of his prosecution.  Newkirk lied under oath at a suppression

hearing, during his failed attempt to suppress evidence provided to the Government by his former employer. As the Court found, Newkirk was told from the outset of the Government's interviews that he was *not* represented by his law firm in connection with the Government's investigation. Dkt. No. 54 at 121. His claim to the contrary at the suppression hearing did not simply represent a slip of Newkirk's memory. Prior to his arrest in this case, Newkirk consistently acted exactly as one would expect, given the firm's disclaimer, from someone who believed he was not being represented by his law firm – that is, he met with the Government (and lied) without alerting his law firm. Newkirk also did not claim to be represented by his former law firm when he was charged in this matter, at his arraignment, or at any time prior to his attempt to sue his former law firm. *See* Dkt No. 34 at 15 ("[T]hat's the first time we learned, in connection with drafting our complaint against Bryan Cave, that Bryan Cave actually represented Mr. Newkirk when the government first came to investigate this case."). Newkirk's claims in his affidavit and on the stand were lies, invented after receiving a large volume of inculpatory documents provided by his former firm and intended to hamper the prosecution of his fraud.

Newkirk lied, too, when he took the stand at trial. PSR ¶ 36. Among other things, he lied by denying ever knowingly providing false information to anyone in connection with the Maxim deal. Tr. 1625. He lied by claiming that Watson had never told him that the Bank of America account statements were fraudulent. Tr. 1819. He disclaimed any responsibility for the accuracy or inaccuracy of the information in his purported client's personal financial statement, Tr. 1729, despite his personal certification to Open Gate. He lied regarding Reign's participation as the parent of the entity acquiring Maxim, claiming that Reign was wholly uninvolved with the purchasing entity and that no profits would flow to Reign. *See* Tr. 1663. He lied by claiming

that he had sold any stake he owned in Reign prior to the inception of the Maxim deal – a lie contradicted by the plain language of his own sworn Affidavit of Loss.  Tr. 1651-53.  Moreover, in contradiction of the defendant's prior lie to Bryan Cave that Senior alone controlled the email account "CDarden@TheReignInc.com," the defendant testified that he believed Senior and Junior shared that email account – a lie that the defendant told for the first time at trial.  Tr. 1673.

## II.   APPLICABLE LAW

Although *United States* v. *Booker*, 543 U.S. 220 (2005), held that the Guidelines are no longer mandatory, it also held that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing.  *Booker*, 543 U.S. at 264.  As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range" — that "should be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 49 (2007).

After determining the appropriate Guidelines sentencing range, a sentencing judge must also consider seven factors outlined in Title 18, United States Code, Section 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); the four legitimate purposes of sentencing, as set forth below, see id. § 3553(a)(2); "the kinds of sentences available," id. § 3553(a)(3); the Guidelines range itself, see id. § 3553(a)(4); any relevant policy statement by the Sentencing Commission, see id. § 3553(a)(5); "the need to avoid unwarranted sentence disparities among defendants," id. § 3553(a)(6); and "the need to provide restitution to any victims," id. § 3553(a)(7). *See Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

       (B)      to afford adequate deterrence to criminal conduct;

       (C)      to protect the public from further crimes of the defendant; and

       (D)      to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

In calculating the applicable Guidelines range and arriving at an appropriate sentence under § 3553(a), the Court may rely on any relevant facts established by the Government under a "preponderance of the evidence" standard, including facts relating to acquitted conduct. *See United States* v. *Pica*, 692 F.3d 79, 88 (2d Cir. 2012) ("A district court may treat acquitted conduct as relevant conduct at sentencing, provided that it finds by a preponderance of the evidence that the defendant committed the conduct. " (citing *United States* v. *Watts*, 519 U.S. 148, 156, (1997)).

## III.  DISCUSSION

For his own financial interest, Harvey Newkirk was willing to betray the trust of his employer, his subordinates, and his counterparties, and to lie repeatedly to investigators and this Court.  His consistent dissembling in the face of overwhelming evidence of his crime reveals him as a facile liar lacking shame, remorse, or sympathy for his many victims or the people whose reputations he gambled for his own benefit.  The need for a sentence to reflect the seriousness of this defendant's crime, coupled with the need for specific deterrence of a man who even now refuses to accept that his actions were wrongful, calls for significant term of imprisonment.

A.     Restitution

The Government seeks restitution in an amount below the intended loss amount identified

below for purposes of calculating the applicable Guidelines Sentencing Range.   First, through

his testimony and subsequent discussions with Weinberg, the Government understands that

Weinberg feels he has been made whole, including with respect to losses incurred as a result of

Newkirk's actions.  *See* Tr. 291 (testimony of Weinberg regarding post-fraud settlements).  The

Government is not, therefore, seeking restitution with respect to Weinberg's losses.  However, a

restitution order is sought to address the losses incurred by Open Gate.  Open Gate provided $3.1

million to Alpha Media as the result of the Maxim fraud; Alpha Media has not, as of this

submission, returned that $3.1 million to Open Gate.[8]  Open Gate has also expended significant

funds in the form of attorneys' fees and other expenses associated with its participation in the

prosecution and investigation of Newkirk's fraud.  *See United States* v. *Amato*, 540 F.3d 153,

160 (2d Cir. 2008).  Open Gate calculates the amount of such funds at $ 208,376.40 expended in

connection with its participation in this criminal matter (further funds have been separately

expended in connection with Open Gate's pursuit of civil remedies).

Open Gate has recouped certain moneys associated with certain claims of loss in

connection with the Maxim fraud, including claims based on a "benefit of the bargain" theory of

civil liability, *i.e.*, money that, had the Maxim deal been legitimate, Open Gate would have stood

to gain from its partial ownership of Maxim, as opposed to money lost as the result of Newkirk's

fraud (*e.g.*, interest on Open Gate's $3.1 million, had it never been sent to Newkirk and Junior).

Regardless of any recoupment through any source, the plain language of 18 U.S.C. § 3664

precludes a set-off for any recovery, even assuming that the recovery would address the same

---

[8] The Government takes no position as to any claims to repayment that Open Gate may have
against Alpha Media, or as to any defenses to repayment that Alpha Media may have.

loss incurred as a result of Newkirk's fraud.  18 U.S.S.C. § 3664(f)(1)(B) ("In no case shall the fact that a victim has received or is entitled to receive compensation with respect to a loss from insurance or any other source be considered in determining the amount of restitution."). Although § 3664(j)(1) provides that, in the event that such compensation has been paid by any source to the victim of a crime, the Court shall order that restitution "be paid" to that source of compensation, but only after all restitution has been paid to any victims of the offenses.  In this case, Open Gate takes the position that it has not been compensated for the $3.1 million loan, even as it has received repayment for claims as to other lost opportunities.  While the Court must order that restitution be paid to any source of compensation for amounts attributable to the defendant, § 3664(j)(1), the statute's use of the passive voice leaves open the question of "by whom" such payment must "be paid."  Thus, the Government seeks a restitution order requiring the repayment of $3,308,376.40 to Open Gate by Newkirk (jointly and severally with any obligation later imposed on Junior), coupled with a provision that Open Gate forward payment to any source of compensation that has already provided coverage for losses covered under §§ 3663A and 3664.  Such an order addresses Newkirk's mandatory restitution obligations, while providing a basis for any source of compensation to Open Gate to seek a set-off against amounts already provided to Open Gate, if appropriate.  A proposed order of restitution is attached hereto as Exhibit A.

B.      *Guidelines Calculation*

The Probation Office accurately calculates Newkirk's Guidelines sentencing range, apart from that Office's decision to take no position as to the inclusion of two additional offense levels for obstruction of justice.  The predominate factor in determining Newkirk's offense level is the applicable loss amount.  Although the Government is not seeking a sentence within the resultant Guidelines range, the applicable loss amount is nevertheless correctly identified by the Probation Office:  intended loss of $37.4 million. PSR ¶ 30 (setting forth the calculation of intended loss). The Guidelines require the use of the greater of intended and actual loss.  U.S.S.G. § 2B1.1, App. Note 3(A).  In this case, the actual loss was the total amount of funds provided by Open Gate and stolen from Weinberg, *i.e.*, $3.1 million and $4.9 million, respectively, for a total of $8 million. The specifically intended loss, however, was the $37.4 reflecting the ultimate purchase price for Maxim and associated fees and penalties incurred by Newkirk and Junior.

Newkirk deserves no credit for his claim that some of this amount might have been repaid to the victim-lenders had the Maxim deal closed.  *See United States* v. *Confredo*, 528 F.3d 143, 151-52 (2d Cir. 2008) ("*Confredo I*") (remanding for consideration as to whether a defendant met his burden of rebutting the Government's established intended loss figure through evidence of a subjective intent that he would cause a lesser amount of loss based on the possible repayment of fraudulently obtained loans); *see also United States* v. *Confredo*, 458 Fed. App'x 69, 72 (2d Cir. 2012) (summary order) (upholding the District Court's rejection of the defendant's attempt, following *Confredo I*'s remand, to establish a loss amount less than the face value of the fraudulent loans).  The evidence at trial firmly established that Newkirk and Junior were wholly unconcerned with the concept of repayment of debts owed to their victims:  they

entered into the Maxim scheme having already defaulted on a prior Reign obligation in the amount of $450,000 in 2010 and they defaulted on the Open Gate obligation in the midst of the Maxim scheme.  Their intent was clearly to obtain funds to buy a company for their own gain, without a care as to when, how, or whether their victims would be repaid.

The Probation Office also correctly assessed additional offense level points on the basis of Newkirk's use of sophisticated means and his breach of a position of private trust.  With respect to sophisticated means, Newkirk used forged financial instruments, misleading transactional documents, and complex financial transactions to mask his fraud.  The Maxim scheme was repetitive (insofar as Newkirk and Junior attempted and re-attempted their scheme, with progressive attempts to improve their methods) and involved extensive coordination between Newkirk and Junior.  The use of false and forged documents, the ability and willingness to repeat a fraud on multiple new victims, and the need for complex coordination are the hallmarks of sophisticated means.  *See United States* v. *Fofanah*, 765 F.3d 141, 146-47 (2d Cir. 2014).

Section 3B1.3 of the Guidelines provides for a two-level enhancement to a defendant's offense level if that defendant "abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense."  In this case, Newkirk abused such a position in many respects.  First, he abused the discretion invested in him by his employer after obtaining his employment through a series of material lies. "[T]he primary trait that distinguishes" a position of trust from other positions is "the extent to which the position provides the freedom to commit a difficult-to-detect wrong." *United States* v. *Viola*, 35 F.3d 37, 45 (2d Cir. 1994) (internal quotation marks omitted).  In this case, Newkirk abused the trust of his employer and subordinates.  The independence provided to Newkirk by his employer, who

viewed him (as a result of his own representations) as a senior attorney capable of handling matters on behalf of his long-time "client," Senior, was instrumental in Newkirk's ability to perpetrate the Maxim scheme.  His freedom in drafting fraudulent contracts, his free reign over the escrow account used to commit theft from Weinberg, his power over subordinates like Tornay, each provided Newkirk with the ability to keep secret his wide ranging fraud.  *See United States* v. *Laljie*, 184 F.3d 180, 195 (2d Cir. 1999) ("[W]e have upheld application of the enhancement to, for example, the chairperson of a corporation's board of directors, whose high position of authority, lack of supervision, and unlimited check-writing power facilitated her embezzlement of corporate funds; to the treasurer of a homeowners' association who embezzled association funds; to an airline's junior station agent whose position provided him with the airline's computer access code, which he used to issue to himself tickets that he thereafter used or traded to others for property or cash; and to a postal worker whose position differed from that of ordinary postal employees in that it gave him access to a locked, caged area used to house registered mail, gave him the combination to the safe in that area, and thereby gave him access to large amounts of cash without . . . tight accounting controls." (internal quotation marks and citations omitted)).

Newkirk also properly incurs a two-point enhancement for obstruction of justice, pursuant to U.S.S.G. § 3C1.1.  As set forth above, Newkirk's testimony at the suppression hearing before this Court is not plausibly characterized as a mere slip of the defendant's memory or difference of perception.  He acted at all times prior to his belated "realization" in the summer of 2015 in a manner perfectly consistent with his subjective understanding that his former employer was not his counsel, just as representatives of his employer had warned him.  He lied on the stand and in his affidavit in support of his suppression motion, and, once he had been

confronted with witness after witness who contradicted his lie, he invented a new false story on the witness stand, claiming that he had been represented civilly, but not criminally.  Newkirk also lied extensively on the stand at trial, including in his testimony regarding his knowledge of Senior's victimization and his own financial interest in Reign and other companies that he claimed as his "clients."  His testimony, and his lies to investigating agents prior to his prosecution, all reflect a "willful attempt to obstruct justice," warranting the two-point enhancement.  U.S.S.G. § 3C1.1, App. Note. 2.

In sum, Newkirk's applicable offense level is 35, his Criminal History Category is I, and his applicable Guidelines sentencing range is 168 to 210 months' imprisonment.

### C.     The § 3553(a) Factors Call for a Significant Term of Incarceration

The Government acknowledges that the Guidelines sentencing range in this case, driven predominately by Newkirk's intended loss amount, results in an overly punitive term of incarceration.  However, the aspects of Newkirk's fraud subject that result in the specific enhancements set forth above nevertheless reflect the seriousness of Newkirk's offense and the need for a significant term of imprisonment.  Newkirk was driven by greed.  He corruptly gained status as a trustworthy legal advisor, and used that status to betray his employer, his subordinates, and his counterparties.  He caused financial difficulties for many victims, and in doing so risked the reputations of dozens of attorneys and businesspersons.  After being caught, he lied to investigators.  After being charged, he lied on the stand.  After taking the stand, he attacked witness after witness, accusing those whose testimony most damaged him of perjury.  And since his conviction, Newkirk's attitude has changed not at all.  He is without remorse or sympathy for his victims, and he continues to dissemble in the face of incontrovertible evidence of his fraud.

Each of the § 3553(a) factors call for significant punishment in the face of such conduct. The nature and circumstances of the offense, as set forth above, plainly warrant a significant sentence.  The need to promote respect for the law and the reflect the seriousness of this crime, as well as to afford adequate general deterrence for this type of crime, also call for a significant term of incarceration.  Frauds committed in secret by sophisticated actors with unannounced financial incentives, like the fraud committed by Newkirk, require substantial punishment in order to condemn the corruption of complex financial transactions and to discourage others from attempting to emulate Newkirk in the future.  Finally, the public remains in need of protection from Newkirk in the future.  This is not a case where a defendant recognizes that he has committed a crime and will endeavor to avoid repeating his mistakes.  To the contrary, Newkirk continues to claim that he did nothing wrong, and that his accusers are liars.  Only a stiff sentence will instill in Newkirk a recognition that the costs of his actions are outweighed by the potential penalties he faces when caught.  Without such a sentence, the defendant will continue to believe that his interests will be best served through fraud.

## CONCLUSION

For the reasons set forth above, the Government respectfully submits that a significant

term of imprisonment should be imposed on the defendant, Harvey Newkirk.

Dated:  April 14, 2016

                                     Respectfully submitted,

                                     PREET BHARARA

                                     United States Attorney for the

                                     Southern District of New York

By:      /s/ Andrew C. Adams

                                     Andrew C. Adams

                                     Sarah E. Paul

                                     Assistant United States Attorneys