IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

HARVEY NEWKIRK.

No.  14 Cr. 534 (JSR)

**DEFENDANT'S SENTENCING MEMORANDUM**

Harris, St. Laurent &
Chaudhry LLP
40 Wall Street, 53rd Floor
New York, New York 10005
Phone: 212.785.5550
Fax: 212.785.5558

Attorneys for Harvey Newkirk

# TABLE OF CONTENTS'

INTRODUCTION ............................................................................................................ 1

I. MR. NEWKIRK RAISED HIMSELF FROM MODEST CIRCUMSTANCES
   AND LED AN EXEMPLARY AND INSPIRING LIFE BEFORE HIS
   INVOLVEMENT WITH THE DARDENS .................................................................. 4

    A.   Mr. Newkirk Was A Precocious Only-Child Born into a Family of God and
   Education ........................................................................................................... 4

    B.   Mr. Newkirk Was A Star Student and Very Successful Lawyer At the Most
   Prestigious Law Firms ...................................................................................... 5

    C.   Mr. Newkirk Has Proven Himself A Devoted Father and Husband Despite
   Serious Health and Emotional Problems Experienced by Both His Wife and
   Newborn Premature Son .................................................................................. 8

    D.   The Media Beams its Spotlight on Mr. Newkirk, Leaving His Stellar Life in
   the Dark ........................................................................................................... 11

II. THE NATURE AND CIRCUMSTANCES OF THE OFFENSE ARE MITIGATING
    FACTORS FOR MR. NEWKIRK ........................................................................... 12

III. THE GUIDELINES CALCULATIONS SET FORTH IN THE PRESENTENCE
     REPORT ARE NOT CORRECT AND DESERVE LITTLE CONSIDERATION ........ 12

    A.   Mr. Newkirk Never Intended Any Loss to Accrue from his Involvement in
   the Maxim Magazine Deal .............................................................................. 13

    B.   Presently There is No Actual Permanent Loss to any Victims of the Maxim
   Magazine Fraud .............................................................................................. 15

    C.   As There is No Actual or Intended Loss, There Should Be No Enhancement
   of the Base Offense Level Under § 2B1.1 ...................................................... 16

    D.   The Sophisticated Means Enhancement Is Not Applicable to Mr. Newkirk ........... 16

    E.   Mr. Newkirk Should Receive A Mitigating Role Adjustment Based on His
   Participation in the Fraud ............................................................................... 18

    F.   Mr. Newkirk Should Not Receive An Enhancement For Abuse Of A Position
   Of Trust Or Special Skill And His Role As The Attorney Is A Mitigating, Not
   Aggravating, Factor ........................................................................................ 20

    G.   The Defense's Calculation Of The Guidelines ................................................ 22

IV.  THIS COURT SHOULD GIVE LITTLE DEFERENCE TO ANY GUIDLELINE
RANGE APPLIED TO MR. NEWKIRK WHICH IS PRIMARILY DRIVEN BY
THE LOSS TABLES IN USSG § 2B1.1 ........................................................................ 22

VI.  A SENTENCE OF PROBATION WOULD BE SUFFICIENT BUT NOT
GREATER THAN NECESSARY TO FULFILL THE STAUTORY GOALS
OF SENTENCING UNDER 18 U.S.C. § 3553(a) ........................................................ 25

A.  A Sentence of Probation will be Sufficient to Reflect the Seriousness of the
Offense, Promote Respect for the Law, Provide Just Punishment for the
Offense, and Provide Both General and Specific Deterrence ................................... 26

B.  Probation Will Afford Adequate General and Specific Deterrence to This
Type of Criminal Conduct ........................................................................................ 27

C.  Probation Will Protect the Public from Further Crimes of the Defendant ............... 27

CONCLUSION ............................................................................................................. 28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Gall v. United States,*
  552 U.S. 38 (2007).................................................................. 26, 29

*United States v. Adelson,*
  441 F. Supp. 2d 506 (S.D.N.Y. 2006) ......................................... 23

*United States v. Confredo,*
  528 F.3d 143 (2d Cir. 2008)......................................................... 14

*United States v. Emmenegger,*
  329 F. Supp. 2d 416 (S.D.N.Y. 2004) ......................................... 24

*United States v. Innarelli,*
  524 F.3d 286 (1st Cir. 2008)........................................................ 14

*United States v. Lane,*
  323 F.3d 568 (7th Cir. 2003) ....................................................... 14

*United States v. Lewis,*
  93 F. 3d 1075 (2d Cir. 1996)........................................................ 17

*United States v. Manatua,*
  647 F.3d 1048 (10th Cir. 2011) .................................................... 14

*United States v. Regensberg,*
  381 Fed Appx. 60 (2d Cir. 2010) ................................................. 17

*United States v. Stitsky,*
  536 Fed. Appx 98 (2d Cir. 2013) ................................................. 17

*United States v. Wayland,*
  549 F.3d 526 (7th Cir. 2008) ....................................................... 17

**Statutes**

18 U.S.C. § 1341 ............................................................................. 28

18 U.S.C. § 1343 ............................................................................... 1

18 U.S.C. § 3553(a) .................................................................. passim

18 U.S.C. § 3561 ............................................................................. 28

18 U.S.C. § 994(j) ................................................................................................. 25, 26

Sentencing Reform Act ......................................................................................... 25

**Other Authorities**

"Shame On You: An Analysis of Modern Shame Punishment as an Alternative to
   Incarceration," Book, Aaron S. 40 Wm. & Mary L. Rev. 653 (1998-1999) ........................... 28

"Shaming White-Collar Criminals: A Proposal for Reform of the Federal Sentencing
   Guidelines," Kahan, Dan M., Posner, Eric A. 42 J. L. & Econ. 365 (1999) ........................... 28

Frank O. Bowman III, *Sentencing High-Loss Corporate Insider Frauds After Booker*,
   20 Fed. Sent. R. 167, 169, 2008 WL 2201039 (Feb. 2008) ....................................... 24

U.S. Sentencing Commission, Statistical Information Packet, Fiscal Year 2007 ....................... 25

U.S. Sentencing Commission, Statistical Information Packet, Fiscal Year 2015 ....................... 25

U.S. Sentencing Commission, The Federal Sentencing Guidelines: A Report on the
   Operation of the Guidelines System and Short-Term Impacts on Disparity in
   Sentencing, Use of Incarceration, and Prosecutorial Discretion and Plea Bargaining
   376 Fig 14 (1991) ............................................................................... 25

U.S. Sentencing Commission, Supplementary Report on the Initial Sentencing Guidelines
   and Policy Statements, June 18, 1987, Table 2, p. 68 ................................................. 26

USSG § 2B1.1 ............................................................................................... passim

USSG § 2B1.1(10)(C) ..................................................................................... 13, 16

USSG § 2B1.1(a)(1) ........................................................................................... 13

USSG § 3B1.2 ............................................................................................... 18, 19

USSG § 3B1.3 ............................................................................................... 13, 20

USSG § 5F1.2 (2015) ......................................................................................... 28

Amendment No. 792, USSG App C (November 1, 2015) ........................................ 15, 16, 17, 18

**TABLE OF EXHIBITS**

Gupta Sentencing Memorandum ...................................................................Exhibit A

Fraud Guideline Chart.................................................................................Exhibit B

Quick Facts, Theft, Property and Fraud Offenses, United States Sentencing
    Commission ........................................................................................Exhibit C

Fraud Memo Chart....................................................................................Exhibit D

Letter from Harvey and Janie Newkirk .........................................................Exhibit 1

Letter from Willie Dennis ..........................................................................Exhibit 2

Letter from Robert Matlin..........................................................................Exhibit 3

Letter from Uche Ndemele .........................................................................Exhibit 4

Letter from Jeremy Harris..........................................................................Exhibit 5

Letter from Helen O. Sapp..........................................................................Exhibit 6

Letter from Alicia Ferriabough Taylor ..........................................................Exhibit 7

Letter from Kareem Chin............................................................................Exhibit 8

Letter from Aliya Newkirk. .........................................................................Exhibit 9

Letter from

Defendant Harvey Newkirk respectfully submits this memorandum in anticipation of his sentencing hearing, scheduled for April 21, 2016.  On December 14, 2015, a jury found Mr. Newkirk guilty of Wire Fraud in violation of 18 U.S.C. § 1343, which carries no mandatory minimum sentence. The jury acquitted Mr. Newkirk of all other charges. For the reasons set forth below, Mr. Newkirk respectfully requests a sentence of probation.

## INTRODUCTION

Harvey Newkirk was convicted before this Honorable Court of one count of wire fraud in connection with his role as the attorney for the Darden family in the attempted acquisition of Maxim Magazine.  He was acquitted of the charges of conspiring with Calvin Darden, Junior (hereinafter "Junior") to commit fraud in connection with the acquisition of Maxim.  He was also acquitted of the charge of aggravated identity theft, based on the accusation that Mr. Newkirk had used the identity of Calvin Darden, Senior (hereinafter "Senior") to engage in fraudulent activities in connection with the purchase of Maxim.

The split jury verdict only makes sense if it found that the element of knowledge required for the conviction for wire fraud was based on the legal theory of "conscious avoidance." Under this theory, Mr. Newkirk, as an attorney, turned a blind eye, while aware of a high probability that his client was providing false or fraudulent information. Because he willfully avoided discovering the truth about Junior's activities, Junior was able to continue to commit the fraud. However, there is no suggestion that Mr. Newkirk willfully planned to commit a fraud, or to permanently deprive others of money through illegal means. Nor was there evidence that he created false or fraudulent documents or deliberately made false statements to investors or lenders. His sole motivation was to close the Maxim deal.

1

Mr. Newkirk was an attorney involved in the Maxim deal acting at the direction of his clients, the Dardens. There was no convincing evidence at trial that he stood to gain any pecuniary reward from the fraud other than the legal fees which went to his law firm and some goodwill from his firm which cannot be quantified.  Because he was not an overt conspirator, there is no evidence that he consciously used his position as an attorney to facilitate Junior's fraud despite evidence that the investors and lenders relied on Mr. Newkirk's representations precisely because he was an attorney at a large prestigious firm.  Thus, while the jury found beyond a reasonable doubt the element of knowledge sufficient to support the conviction, Mr. Newkirk is less culpable for the purposes of sentencing than a defendant who purposely and overtly participated in a fraud.

Mr. Newkirk is a thirty-nine year old African-American man.  He grew up in modest circumstances, went to Cornell University and on to Columbia Law School.  From 2001-2013, Mr. Newkirk worked as an associate in large, high-pressured law firms: Thelen, Reid and Priest, K & L Gates, and finally Bryan Cave.  He is married and has three small children: ages seven, five and two.  Before the six-month period involved in this case, June, 2013 to January, 2014, when, at worst, Mr. Newkirk allowed himself to be used by Junior to commit a fraud, he led an exemplary and successful life.

Mr. Newkirk's involvement for those six months with Junior has literally destroyed everything he worked so hard throughout his life to build. His punishment began from the moment of his arrest and will continue for the rest of his life; he has been devoured by a media feeding frenzy bent on destroying his name even before his jury deliberated, and he will be stripped of his law license and barred from the practice he loved and through which he supported his family.  His family is nearly penniless now, his wife's health suffered tremendously, and his

three small children risk losing their beloved father to imprisonment.  This catastrophic reality

for Mr. Newkirk stands in the face of one undisputed fact: he never gained (nor intended to gain)

one penny from this crime.  Mr. Newkirk feels deeply that this conviction shames not only his

family, but the African American community at large.  This shame eats away at Harvey

Newkirk.

This case uniquely involves the role of an attorney involved in a transaction in which his

client is committing a fraud without his agreement and where a client is deliberately using an

attorney as a cover and enabler of his fraud.  In considering an appropriate sentence, the question

is what kind of punishment will serve as a deterrence to attorneys in the same position as Mr.

Newkirk.  The answer is that no term of jail is required to provide general deterrence to attorneys

similarly situated as Mr. Newkirk.  The humiliation and cost of a federal prosecution, and the

destruction of a respectable career and the loss of livelihood is sufficient to deter any attorney

from involvement with the fraudulent behavior of a client.

A sentence of probation for Mr. Newkirk would be sufficient but not greater than

necessary to serve the statutory purposes when all the Section 3553(a) factors are taken into

consideration as will be discussed below. In addition, public shame, the loss of his law license,

and the fact that he neither gained (nor intended to gain) anything from this offense all support a

sentence of probation.  A sentence of probation coupled with community service would be a

serious, invasive, and humiliating punishment for Mr. Newkirk. It would be sufficient to meet

the purposes of sentencing and also be in the best interest of society.

# I.

## MR. NEWKIRK RAISED HIMSELF FROM MODEST CIRCUMSTANCES AND LED AN EXEMPLARY AND INSPIRING LIFE BEFORE HIS INVOLVEMENT WITH THE DARDENS

Scores of friends and family have written sincere letters to the Court, coupling their love, respect, and appreciation for Mr. Newkirk with a plea for a non-custodial sentence.  Three themes stand out distinctly to give color to this man whom the Court must now measure: Mr. Newkirk has always selflessly helped those around him; Mr. Newkirk is an extraordinary father to his three small children; and Mr. Newkirk has been deeply shamed by this case.[1]

### A.  Mr. Newkirk Was A Precocious Only-Child Born into a Family of God and Education

Harvey and Janie Newkirk came from Florida and South Carolina, respectively, to Harlem and then the Bronx to start their family, and Harvey Kenyatta Newkirk, the defendant, was their only child. From the South, the Newkirks brought a culture of quiet humility, hard work, and a strong belief in the church and education. Both bright and hardworking people, Harvey Sr. entered the Air Force and then spent his career in banking; Janie spent most of her life in classrooms, earning several masters degrees and a PhD (earning all As until her final semester of her PhD, when she got a B+), and also ran an early education day care for children. Like his parents, Mr. Newkirk has always been a man of the book, in both senses of the word.

Mr. Newkirk grew up in the church, keeping in his heart a love of god and belief in serving his community; at the same time, he excelled academically, achieving the highest marks as a student through Cornell University and Columbia Law School. Despite being an exemplary student in the hardest courses, Mr. Newkirk still found time to dominate on various athletic fields—playing basketball and football competitively—and all the while give back to each of his

---

[1] *See* letters to the Court, Ex. 1-18.

communities.  He mentored and tutored other students, held elected office in his college and

fraternity, was recognized for his community service and leadership at Cornell through his

induction into the Quill and Dagger Senior Honor Society, and maintained an extremely active

role with his church. Mr. Newkirk's parents understandably have always been very proud of their

only son and his accomplishments.[2]

### B.  Mr. Newkirk Was A Star Student and Very Successful Lawyer At the Most Prestigious Law Firms

Harvey Newkirk's academic success stems directly from his true love of learning. When

he entered Columbia Law School, Harvey found that his skills in math and complex problem

solving, coupled with his interest in business, drew him to corporate law: he knew he wanted to

be a mergers and acquisitions lawyer and work on complex business deals.  Recruited directly to

Thelen Reid & Preist from Columbia, Mr. Newkirk thrived in the M & A department.

Mr. Newkirk impressed clients and colleagues.  He was a team player, extremely hard worker,

and able to focus on the smallest of details.

Indeed, the two partners with whom Mr. Newkirk began his career as a fledgling lawyer

quickly saw the star lawyer in their midst.[3]  Willie Dennis and Robert Matlin witnessed first-

hand Mr. Newkirk's accelerated learning curve, natural leadership, tireless work ethic, and the

trust that other lawyers and clients alike easily placed in him.  According to Mr. Dennis,

"Harvey's importance to the practice was often evidenced by how some of the firm's most

important and challenging clients continually asked for Harvey to be the lead associate on many

of their matters." Mr. Newkirk so impressed Mr. Dennis and Mr. Matlin that when they decided

---

[2] Ex. 1, letter from Harvey and Janie Newkirk .
[3] See Ex. 2 and 3, letters from Willie Dennis and Robert Matlin.

to move their practice to K & L Gates in 2004, Mr. Newkirk proved indispensable and they requested that he join them; he did.

Once again, Mr. Newkirk shone brightly at K & L Gates. Not only did he rise within his department as an associate whom clients specifically requested, but soon the partners began entrusting him with more and bigger responsibility.  And though his rising star legal work took considerable time, Mr. Newkirk still also earned a reputation for making extra time to mentor younger lawyers.  In a moving letter, Uche Ndemele writes of how he struggled as a baby associate and found in Mr. Newkirk not only a mentor and teacher, but also a role model and coach.

> Harvey immediately made an impression because he was highly regarded at the firm, he was intelligent, composed, and he was the first attorney I met and worked with who looked like me. In spite of his stature at the firm, Harvey also showed genuine interest in my development.  At a time when I was unsure about my abilities and my career prospects, Harvey encouraged me, mentored me, and devoted his time to address my questions, review my work, and provide insightful advice.  At a time when the returns to his investment in me was unclear, Harvey went above and beyond to help me develop important skills.  In my opinion, Harvey was a major reason why I eventually received a full-time offer of employment from the firm.[4]

Indeed, Mr. Newkirk became the man that partners called to work miracles and associates called for help when in a jam; for Mr. Newkirk, naturally gifted and kind-hearted, this role was effortless. In Mr. Dennis' words, "Harvey has always been a team player, always trying to bring out the best in the junior associates who worked with him. Despite working long hours on his own matters, Harvey always found time to give advice and assistance to junior attorneys seeking help.  Being soft spoken, patient, and highly skilled, junior associates would frequently go to him for advice."[5]

---

[4] Letter of Uche Ndemele, Ex. 4.
[5] Ex. 2.

The whole law firm at K & L Gates celebrated Mr. Newkirk's unique talents by appointing him as the head of the New York office's Associates Committee and as a member of the firmwide Associate Liaison Committee as well as nominating him for a Leadership Council for Legal Diversity Fellowship for which he was accepted.  Mr. Newkirk earned this highly valued position and honor by receiving all-star reviews and stellar recommendations from every direction. And, as Mr. Matlin writes, these glowing, positive feelings about Mr. Newkirk remain today, regardless of this conviction. "Harvey was also chosen as a scholar by my firm to act as both mentor and mentee as part of a national diversity organization that was established to enable lawyers of a diverse background to be given an opportunity to succeed.  Harvey fully committed to this endeavor and performed with distinction.  These factors all show the level of trust and respect that Harvey had garnered from a host of people from various areas over his professional career.  Despite his current situation, this trust and belief in him has not wavered."[6]

Mr. Newkirk, beloved and supported by his law firm and clients, was on the path to partnership when the economic catastrophic meteor of 2008 struck every corporate department of every law firm in America.  Nevertheless, both of Mr. Newkirk's senior partners and the managing partner of K & L Gates' New York office campaigned for Mr. Newkirk to be made a partner of the firm. Unfortunately, the economics of the corporate group prevented anyone, including Mr. Newkirk, from promotion; but nonetheless, all believed that Mr. Newkirk absolutely deserved to be a partner at K & L Gates.

Unfortunately, the fallout of the 2008 economic crisis continued in his department and eventually, compensation was cut, including Mr. Newkirk's. And that is why after ten years of

---

[6] Ex. 3.

working with the same group who loved, supported, and believed in him, Mr. Newkirk began a

job search which landed him, eventually, at Bryan Cave.

Once in the job market, Mr. Newkirk had eight interviews and received seven offers at

international law firms, five of those to be partner.  The most attractive offer for him was Bryan

Cave, which though bringing him on as Counsel, agreed to a one-year partner track and most

importantly, seemed the best platform for Mr. Newkirk to grow his business.  A creative, out-of-

the-box thinker with strong entrepreneurial instincts, Mr. Newkirk believed Bryan Cave truly

wanted to support him.  In June 2013, Mr. Newkirk joined Bryan Cave, which issued a glowing

press release about him.

### C.  Mr. Newkirk Has Proven Himself A Devoted Father and Husband Despite Serious Health and Emotional Problems Experienced by Both His Wife and Newborn Premature Son

Mr. Newkirk met Aliya Nelson, also an attorney, in 1999, and fell in love.  Eight years

later, they were married. Growing up in a rough and dysfunctional home, Aliya immediately

found in Mr. Newkirk her stable rock.  Knowing Aliya's long-standing health and depression

issues, Mr. Newkirk nonetheless asked for her hand and they began their beautiful family

together.  Childhood trauma left Aliya with serious anxiety issues which motherhood inflamed to

the point of interfering with her ability to work.  After their first child was born, Aliya left her

job and Harvey unexpectedly became the sole breadwinner of the family.  He accepted this role

enthusiastically and threw himself into the joys of fatherhood. In the words of his friend and

Columbia Law classmate, Jeremy Harris, "One need only look at the love in the eyes of his

children when they glance at Harvey to know that he is a terrific father." [7]

---

[7] Letter of Jeremy Harris, Ex. 5.

The Newkirks had two more children and with each one, Aliya experienced new and more severe health problems and so as their family grew, Mr. Newkirk became not only the breadwinner, but also and often the primary parent.  Mr. Newkirk's family responsibilities grew contemporaneously with his ever-expanding big firm associate hours.  But Mr. Newkirk thrived both at home and at work, always made time for church, and still spent a lot of time for mentoring others.  In fact, Mr. Newkirk has served on several community service boards (such as the YMCA), was a mentor and tutor for children through the Harlem Tutorial, and is a member of the Westchester Clubmen, which is an organization of African-American men in Westchester County, NY, dedicated to educating, supporting, and inspiring young African-American and Latino men to fulfill their dreams.

Even outside of these organizations, his community members know they can count on Mr. Newkirk when in need.  Helen O. Sapp, a senior friend of Mr. Newkirk, tells the Court: "His generosity toward me as an older woman is genuine…He would give free legal tips to help people understand simple everyday challenges without stress.  His generosity did not have a price associated with it, he was just a young man with a beautiful spirit offering Christian Love."[8]  Mr. Newkirk regularly shares his legal knowledge and business sense with others looking for guidance, without asking for a return favor, because, as his friend and fellow lawyer Alicia Ferriabough Taylor puts it, "he wants others to succeed."[9] Even more striking, Mr. Newkirk continued his usual generous, supportive habit even when facing the crushing stress of these charges and his upcoming trial.  Kareem Chin shares this with the Court: "When I was laid off in 2015, he took the time to help introduce me to his professional network in an effort to advance my job search.  All while he was dealing with a very challenging legal situation.

---

[8] Letter of Helen O. Sapp, Ex. 6.
[9] Letter of Alicia Ferriabough Taylor, Ex. 7.

Nonetheless, Harvey helped me to deal with a challenge that was minor in comparison to his own.  And in doing so, solidified for me his dedication to helping others in his community."[10]

Mr. Newkirk joined Bryan Cave when Aliya was expecting their third child. As the Court heard at trial, the third and final pregnancy proved to be the most difficult and, ultimately, threatened the life of Aliya. Their premature baby entered this world, in the midst of the Maxim transaction, and Mr. Newkirk once more showed himself to be a selfless and loving father.  For thirty-eight days, he went to the neonatal ICU, every morning and then again in the evening, to spend hours feeding, holding, and comforting his premature son.  He would then return home to care for his other two young children and convalescing wife.  This difficult personal period for Mr. Newkirk coincided with some of the most significant events in the Maxim transaction.  In February 2014, when Junior was arrested, the baby was only four months old.

As Aliya writes in her letter to the Court, she has always believed in her husband, his heart, his mind, and his innocence.[11] This incredibly strong marriage has endured Aliya's health and depression issues and a precarious premature birth.  The marriage has also survived the ruin brought on by these charges: financial loss, the unimaginable stress of a federal criminal accusation and trial, and more than all of those things, the shame of having every single person in the community (both immediate and the larger, legal community) know every single detail of their lives as published constantly by the media. "The community is small, so people speculate, gossip, and shun."[12]

---

[10] Letter of Kareem Chin, Ex. 8.
[11] See Ex. 9, letter of Aliya Newkirk.
[12] Ex. 7.

Removing Mr. Newkirk from his family would mean that Aliya would be left with no income, three small children (two with developmental issues), and her own constant and real medical and mental challenges. Aliya herself doubts that she can cope with this possible reality.

**D.  The Media Beams its Spotlight on Mr. Newkirk, Leaving His Stellar Life in the Dark**

What Harvey Newkirk spent four decades building, the media ruined in a matter of moments.  It is unclear which morsel the press found most delicious: his big name law firm, his Ivy League background, Maxim magazine, the Darden name, or some combination platter of these factors. Regardless, the media absolutely went wild for Mr. Newkirk's case, following every last detail as though this was the crime of the century. *Law 360*, the *New York Law Journal*, the *New York Post*, and *AmLaw* were but a few of the widely-read publications which intensely reported Mr. Newkirk's case on a near daily basis; during the actual trial, *Law360* did report daily.  In fact, a Google news search shows over two hundred articles about Mr. Newkirk and his trial.

Not since the days of sticking offenders in stocks on public squares has such widespread humiliation been possible, but even worse, the Internet has virtually placed Mr. Newkirk in a stock in every public square that has Internet access.  A man once well known for his giant brain, impeccable reputation, and soft speech has been permanently branded a criminal. "There has clearly been a fall from grace and the stigma and shame alone has been extremely punishing, not to mention his and Aliya's inability to do business in this community in the future."[13]

The relentless prosecution of Mr. Newkirk in the press has beaten him down psychologically, but even worse, has taken from him a bedrock of his foundation—his church.

---

[13] Ex. 7.

For a decade, Mr. Newkirk and his family prided themselves on their membership of the Abyssinian Baptist Church of Harlem, a "who's who of the elite, black community,"[14] and have now left their beloved home church for another in the Bronx; yet another victory in the media's attempt to poison Mr. Newkirk to the marrow.

## II.

### THE NATURE AND CIRCUMSTANCES OF THE OFFENSE ARE MITIGATING FACTORS FOR MR. NEWKIRK

This Court presided over the trial and is very familiar with the facts of the case. As this Court knows, Mr. Newkirk maintains his absolute innocence. However, for the purposes of sentencing, the defense contends that Mr. Newkirk was convicted of one count of wire fraud based on the theory of conscious avoidance. In the context of this case, this means that the jury found that Mr. Newkirk allowed himself to be used, and turned a blind eye, to the fraud that Junior was committing. The jury did not find, and Mr. Newkirk should not be sentenced, as if he were an overt and intentional co-conspirator who planned and executed a fraud for his own benefit. Rather, Mr. Newkirk should be sentenced for the conduct of which he was convicted: willful blindness that enabled Junior to use him in his role as an attorney to mislead and defraud investors and lenders.

## III.

### THE GUIDELINES CALCULATIONS SET FORTH IN THE PRESENTENCE REPORT ARE NOT CORRECT AND DESERVE LITTLE CONSIDERATION

This Court has repeatedly voiced its concern and criticism of the mechanical application of the federal sentencing guidelines to an individual defendant's case. The idea that the complicated uniquely human calculus of determining an appropriate sentence can be "reduced to

---

[14] Ex. 7.

the mechanical adding-up of small set of numbers artificially assigned to a few arbitrarily-selected variables wars with common sense." U.S. District Judge Jed S. Rakoff, Sentencing Memorandum and Order at 1-2, *United States v. Gupta*, No. 11 Cr. 907 (S.D.N.Y. Nov. 9, 2012), ECF No. 127 (available on PACER) (hereinafter "Gupta Sentencing Memorandum")(Exhibit A). Mr. Newkirk's case highlights the same difficulties and flaws inherent in the guideline system which this Court has identified repeatedly in other white collar cases.

The presentence report (hereinafter "PSR") contains the following guideline calculation. The base offense level under USSG § 2B1.1(a)(1) is 7. PSR ¶ 42. Twenty-two points were added for an "intended loss" of $37.4 million. PSR ¶ 43. Two points were added for the use of "sophisticated means" under USSG §2B1.1(10)(C), and two additional points were added for abuse of a position of trust under USSG § 3B1.3. PSR ¶¶ 44 & 46. The total offense level pursuant to the PSR is 33. PSR ¶ 48. At criminal history category I, Level 33, the guideline range is 135-168 months.[15]

These guidelines not only fail to correctly calculate the actual range that should be applied to Mr. Newkirk's case, but vastly and grossly increase the offense level based almost solely on the amount of intended loss. This Court should not accord this calculation deference when determining the appropriate sentence for Mr. Newkirk.

**A. Mr. Newkirk Never Intended Any Loss to Accrue from his Involvement in the Maxim Magazine Deal**

The probation department calculated Mr. Newkirk's guideline using the "intended loss" figure of $37.4 million, which is based on the original purchase price of Maxim Magazine of $31

---

[15] The Government advocates for an enhancement for Obstruction of Justice; the PSR left this question to the Court. Mr. Newkirk contends that he testified (and submitted affidavits) truthfully and this enhancement is unwarranted. Defense counsel stands ready to address this issue with the Court further if requested.

million and two non-refundable extension payments for $1.5 million and one for $5.5 million for

a total of $38 million ($600,000 was returned).  PSR ¶ 30.  In terms of actual loss, the only

victim who is still owed money is OpenGate, which loaned Senior $3.1 million.  OpenGate may

well recover this money from a lawsuit pending against Senior.  Thus, it is the position of the

defense that the actual loss has not been determined and could be negligible.

   The definition of "loss" under USSG § 2B1.1 is found in Application Note 3. Prior to

2015, the definition of "intended loss" was "(I) pecuniary harm that was intended to result from

the offense."  However, courts had disagreed as to whether a subjective intent on the part of the

defendant controlled or an objective standard.  Some courts had held that the loss attributed to a

defendant must be based on the "objectively reasonable expectation of a person in his position at

the time he perpetrated the fraud, not on his subjective intentions or hopes."  *United States v.*

*Innarelli,* 524 F.3d 286, 291 (1st Cir. 2008).  *See* also *United States v. Lane,* 323 F.3d 568, 590

(7th Cir. 2003).

On the other hand, a number of other circuits, including the Second Circuit, had focused

the loss inquiry on the subjective intent of the defendant.  *See e.g*., *United States v. Confredo*,

528 F.3d 143, 152 (2d Cir. 2008) (remanding for determination of whether the defendant had

"proven a subjective intent to cause a loss of less than the aggregate amount" of the fraudulent

loan); *United States v. Manatua*, 647 F.3d 1048 (10th Cir. 2011) (holding that a subjective

inquiry is required).

The Sentencing Commission (hereinafter the "Commission") has now amended the

definition of "intended loss" in the 2015 guidelines.  Intended loss now means: "the pecuniary

harm that the defendant purposely sought to inflict . . ." USSG § 2B1.1, comment n.3(A)(ii).  In

changing the definition of "intended loss," the Commission stated:  "The amendment adopts the

14

approach taken by the Tenth Circuit by revising the commentary in Application Note 3(A)(ii) to provide that the intended loss means the pecuniary harm that 'the defendant purposely sought to inflict.'  The amendment reflects the Commission's continued belief that intended loss is an important factor in economic crime offense, but also recognizes that sentencing enhancement predicated on intended loss, rather than losses that have actually accrued, should focus more specifically on the defendant's culpability." Amendment No. 792, November 1, 2015: USSG App C.

Mr. Newkirk should not be held accountable under the guidelines for the amount of the "intended loss" because he did not have the subjective intent to purposely inflict pecuniary harm. If anything, Mr. Newkirk closed his eyes to false representations that his client, Junior, made in order to push forward the legitimate purchase of Maxim Magazine.  There is no evidence that Mr. Newkirk intended any party to lose any money and he certainly did not intend to obtain money for himself from lenders or investors.

## B. Presently There is No Actual Permanent Loss to any Victims of the Maxim Magazine Fraud

The only victim who arguably lost money was OpenGate Capital, which lent $3.1 million to Senior, who defaulted on the loan.  Andrew Nikou, the principal of OpenGate, testified clearly at trial, that he, himself, had spoken to Senior before sending the money and he spoke to Senior again after the default.  Senior admitted this, too.  Mr. Newkirk's actual involvement with the OpenGate loan was limited to preparing documents as instructed by the Dardens.

Clearly, the jury rejected Senior's testimony that he had no knowledge of this loan and that he had not authorized Mr. Newkirk to represent him.  The jury verdict confirms that Senior was well aware of this loan and of its default.  The guidelines provide that actual loss means "the reasonably foreseeable pecuniary harm that resulted from the offense." USSG § 2B1.1

Application Note 3(A).  The loss from the OpenGate loan was not reasonably foreseeable to Mr. Newkirk and he should not be held accountable for it.  In addition, OpenGate may well recover the loss.

If the Court determines that the actual loss to victims of the fraud was $3.1, then the correct guideline would be a base of 7 and 16 additional points would be added for a loss of more than $1.5 million, a level 23.  This would be six levels less than the 22 levels requested by the government for an intended loss of more than $25 million.

### C. As There is No Actual or Intended Loss, There Should Be No Enhancement of the Base Offense Level Under § 2B1.1

As argued above, Mr. Newkirk should not be held accountable under the guidelines for any amount of either intended or actual loss.  Accordingly, the Court should find the base offense level of 7, without any enhancement for additional loss, and begin the guideline determination from there.

### D. The Sophisticated Means Enhancement Is Not Applicable to Mr. Newkirk

The probation department applied the 2-point enhancement for the use of sophisticated means pursuant to USSG § 2B1.1(10)(C). The PSR concluded that the enhancement was appropriate because: "In furtherance of the scheme, Newkirk and his coconspirator used fictitious and forged documents to deceive investors in the fraud." PSR ¶ 44.

In November 2015, the Commission amended the "sophisticated means" enhancement to emphasize that it should only be applied "if the defendant intentionally engaged in or caused conduct that constituting sophisticated means."  Amendment 792, USSG App. C (November 15, 2015). Prior to this amendment, "courts had applied this enhancement on the basis of the sophistication of the overall scheme without a determination of whether the defendant's own conduct was "sophisticated." *Id*. The Second Circuit had taken this position. *United States v.*

*Lewis*, 93 F. 3d 1075, 1083-84 (2d Cir. 1996).  In rejecting this approach, "[T]he Commission concluded that basing this enhancement on the defendant's own intentional conduct better reflects the defendant's culpability and will appropriately minimize application of this enhancement to less culpable offenders." Amendment 792, USSG App. C (November 15, 2015).

First, based on the jury verdict, Mr. Newkirk and Junior were not coconspirators. Second, the evidence was clear that Junior, together with his actual coconspirators, were solely responsible for creating the forged and fictitious documents that he passed to Mr. Newkirk.

There was no evidence that Mr. Newkirk ever created a false or fictitious document. The new guidelines emphasize that the enhancement should only apply if the defendant's intentional conduct was responsible for the sophisticated means.  Mr. Newkirk's intentional conduct was not responsible for the creation of the false and fictitious documents.

Alternatively, the use of the forged and fictitious documents in this case does not constitute "sophisticated means."  Conduct is deemed sophisticated if it "displays a greater level of planning or concealment than a typical fraud of that kind."  *United States v. Wayland*, 549 F.3d 526, 528 (7th Cir. 2008).  The Second Circuit has applied the enhancement in cases which, in addition to the use of false or fraudulent documents, the offense lasted several years, reflected very careful planning, included Ponzi scheme payments, or the creation of false marketing materials.  *See United States v. Stitsky*, 536 Fed. Appx 98, 112 (2d Cir. 2013); *United States v. Regensberg*, 381 Fed Appx. 60 (2d Cir. 2010).

In this case, the probation department applied the enhancement based solely on the creation of false and fictitious documents.  No other factors such as those the Second Circuit has found relevant in other cases existed. The fraud did not involve several years, only six months.  It certainly did not involve careful planning on the part of Mr. Newkirk, who only got involved

because he thought it was a legitimate business deal to buy Maxim Magazine.  There were no

payments made to investors to cover up the fraud.  There were no false marketing documents to

entice the public to invest.

 In short, the facts of this offense would not warrant the sophisticated means

enhancement.  But even if this Court were to find that the offense conduct constituted

sophisticated means, it is clear that Mr. Newkirk did not engage in or cause conduct constituting

sophisticated means.  Accordingly, the enhancement should not apply to Mr. Newkirk.

### E.  Mr. Newkirk Should Receive A Mitigating Role Adjustment Based on His Participation in the Fraud

The mitigating role reduction under USSG § 3B1.2 is warranted in this case.  The

Commission on November 15, 2015 amended the mitigating role guideline specifically to

expand its use by sentencing courts. Amendment 794, App. C (November 15, 2015).  As noted in

the "Reason for the Amendment," a study was conducted and found that the "mitigating role is

applied inconsistently and more sparingly than the Commission intended." *Id.* The study also

found that in economic crime cases, the mitigating role adjustment was applied in a "limited

fashion" and that otherwise eligible defendants were denied the adjustment if the defendant was

considered "integral" to the successful commission of the offense.

In amending the mitigating role guideline, the Commission specifically addressed two

issues that had arisen in the case law.  The Commission decided that in determining whether a

defendant was "substantially less culpable than the average participant," the defendant should be

compared to others involved in the criminal activity in his own case, and not be compared to the

"universe of persons participating in similar crimes." In making this clarification, the

Commission specifically rejected the position taken by the Second Circuit.  See, Amendment

794, "Reason for the Amendment."  In determining when a defendant is substantially less

18

culpable than average participants under § 3B1.2, the application notes provide that a defendant who has been held accountable for a loss amount under § 2B1.1 that "greatly exceeds the defendant's personal gain from a fraud offense or who had limited knowledge of the scope of the scheme may receive an adjustment under this guideline." USSG § 3B1.2, comment. (n.3(A)).

The Commission also makes clear in Amendment 794, that a finding that the defendant was "essential" to the offense does not "alter the requirement that . . . the court must assess the defendant's culpability relative to the average participant in the offense." The Amendment revises the commentary to emphasize that "the fact that the defendant performs an essential or indispensable role in the criminal activity is not determinative" and such a defendant may still receive the mitigating role adjustment. *Id.*

The current version of USSG § 3B1.2 provides that the determination of whether to apply the mitigating role adjustment is based on the totality of the circumstances of each case. *Id.* at comment (n. 3(C)). A non-exhaustive list of factors for the court to consider in applying the adjustment are provided, including the degree to which the defendant (1) understood the scope and structure of the criminal activity, (2) participated in planning or organizing the criminal activity, (3) exercised decision making authority, and (4) stood to benefit from the criminal activity. Other relevant factors are the nature and extent of the defendant's participation in the commission of the criminal activity including the acts the defendant performed and his responsibility and discretion. Most important, the commentary specifically states that "a defendant who does not have a proprietary interest in the criminal activity and who is simply being paid to perform certain tasks should be considered for an adjustment under this guideline."

Mr. Newkirk should receive a mitigating role adjustment. First, he is substantially less culpable than the other charged participant in the offense, Junior. Second, he did not have a

proprietary interest in the success of the fraud, and was being paid to perform the specific tasks

as the attorney.  He did not plan or organize the offense.  He did not exercise decision-making

authority, and Junior did not entrust him with discretion.  Mr. Newkirk only indirectly stood to

benefit from the criminal activity if the deal had gone through.  Whether or not he was integral to

the operation of the scheme is not determinative since Mr. Newkirk was still substantially less

culpable than the average participant in this criminal activity, that is, Junior.  Accordingly, a two-

level reduction for a mitigating role is warranted.

### F.  Mr. Newkirk Should Not Receive An Enhancement For Abuse Of A Position Of Trust Or Special Skill And His Role As The Attorney Is A Mitigating, Not Aggravating, Factor

The Presentence Report contains a two-level enhancement for abuse of a position of trust

or use of special skill in committing the offense pursuant to USSB § 3B1.3.  The defense objects

to this enhancement.  The enhancement for abuse of a position of trust or use of a special skill

presupposes that the defendant deliberately used his position of trust or skill to perpetrate the

offense.

Mr. Newkirk's involvement with this offense arose solely in connection with his role as

an attorney for the Darden family.  There is no doubt that Junior used Mr. Newkirk, and his

prestigious law firm, to create an atmosphere of legitimacy which aided Junior's criminal

activities.  The only fiduciary duty and duty of loyalty that Mr. Newkirk owed to the persons

involved in this fraud was the duty to his own client.

Mr. Newkirk did not deliberately use his position as an attorney, or his special skills, to

facilitate the fraud.  In fact, he was used by Junior precisely for his status as an attorney and his

skills.  What the jury verdict reflects is not that Mr. Newkirk deliberately committed a fraud, but

that Mr. Newkirk turned a blind eye to the fraud, that is, that at some point during his work for

Junior, he became aware of a high probability that Junior was committing a fraud, but continued to work on the transaction.

It is under this unique set of circumstances that Mr. Newkirk's status as an attorney is a mitigating factor, and a significant one. Because an attorney, unlike a business partner, a co-investor, a joint venturer, or any other participant in an acquisition (legitimate or not) is ethically bound to follow the lawful directives of his or her client. As a result, a lawyer in Mr. Newkirk's position is similarly situated to the hypothetical "frog in a pot of slowly heating water": he must remain in the pot (and continue his work as an attorney) until the moment suddenly arrives when he must jump free whatever the cost.

Mr. Newkirk's role as an attorney does not make him more blameworthy than a lay defendant because this exact crime is only *sui generis* to attorneys. Mr. Newkirk did not set out to commit a fraud. He did not create false documents. He worked at Bryan Cave. There was substantial evidence at trial that other attorneys in the firm knew of the suspicious goings on in the Maxim deal, but made the decision to continue the representation. There is no evidence that Mr. Newkirk deliberately used his position to try to steal money from the investors and lenders, or deliberately mislead them. In fact, the only possible motivation that Mr. Newkirk could have had for turning a blind eye to Junior's activities was to bring the Maxim deal to fruition, not to defraud investors and lenders.

More important, it is precisely because Mr. Newkirk is an attorney that the conviction in this case is all the more devastating and humiliating. He held a position of respect in his family and community which has been destroyed by this conviction. He will receive an automatic disbarment and never be able to practice law again. This in itself is a severe punishment. It not only takes away his primary source of income, but destroys a career he has spent many years and

21

countless hours building.  To a man like Harvey Newkirk, who raised himself up from modest

circumstances, to practice law at some of the most prestigious firms in the country, losing his

career is a blow from which he will never recover.  The damage to his life, to his family, and to

his reputation are factors which this Court should take into consideration in fashioning an

appropriate sentence.

### G.  The Defense's Calculation Of The Guidelines

The defense's calculations of the guidelines are as follows:  If no additional loss is added

to the base offense level, Mr. Newkirk would begin at level 7.  He would receive a 2-point

reduction for a mitigating role.  The final offense level would be 5 and the range at criminal

history category I is 0-6.

If the Court concludes that Mr. Newkirk should receive 16 points for a loss of $3.1

million, the base offense level would be 23 with a 2-point reduction for a mitigating role.  At

level 21, category I, the range is 37-46.  If the higher figure of $37.4 million is used, the offense

level would be 27 minus two for a mitigating role, for a guideline range of 57-71.

## IV.

## THIS COURT SHOULD GIVE LITTLE DEFERENCE TO ANY GUIDLELINE RANGE APPLIED TO MR. NEWKIRK WHICH IS PRIMARILY DRIVEN BY THE LOSS TABLES IN USSG § 2B1.1

As this Court and many others have recognized, the loss table for fraud offenses found in

USSG § 2B1.1, is not based on empirical data and is entitled to little deference.   See, e.g., Gupta

Sentencing Memorandum, Exhibit A at 4.  The drastic and unsupported rise in offense levels

based on loss from 1987 to the present is demonstrated in Exhibit B, which shows the guideline

ranges for Mr. Newkirk's offense from 1987 to the present. The chart is divided into three

sections: loss of $37.4 million, loss of $3.1 million, and no additional loss over the base offense

level.  The calculations include the enhancements for sophisticated means and abuse of trust.  In 1987, the range for a loss of $37.4 million would have been 30-37 months.  In 2003 and today, it is 135-168 months.  For a loss of $3.1 million, the range in 1987 would have been 27-33 months, in 2003, 87-108 and today, it is 70-87 months.  In 1987, if no additional loss were added to Mr. Newkirk's base offense level, the range would have been 2-8 months; in 2003 and today it is 15-21 months.  This represents between a 300% -700% increase in the penalties between 1987 and 2003.  In discussing this ratcheting up of the fraud guidelines in the Gupta Sentencing Memorandum, this Court asked: "Was such a crime really 500% worse in 2003 than it was in 1987?  Had any of the factors that underlie rational sentencing so radically changed as to warrant such a huge increase?"  Gupta Sentencing Memorandum. Exhibit A at 4.

This Court found that the Commission, reacting to Congressional pressure to increase the penalties for persons convicted of massive frauds, had chosen to rely primarily on one factor as the grounds for increased punishment: the monetary loss of gain involved in the offense.  *Id.* at. 4.  "By making a Guideline sentence turn, for all practical purposes on this single factor, the Sentencing Commission effectively ignored the statutory requirement that federal sentencing take many factors into account, see 18 U.S.C. § 3553(a), and by contrast, effectively guaranteed that many such sentences would be irrational on their face."  *Id.* at 4-5 (guideline range based primarily on loss determined to be 78-97 months, court imposed a 24-month sentenced based on other Section 3553(a) factors.).

Moreover, while the amount of "loss" is the primary determinant of the offense level for fraud offenders, loss is a highly imperfect measure of the seriousness of the offense.  *See United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006) (criticizing "the inordinate emphasis that the Sentencing Guidelines place in fraud on the amount of actual or intended

financial loss" without any explanation of "why it is appropriate to accord such huge weight to [this] factor[ ]"). The amount of loss is often "a kind of accident" and thus "a relatively weak indicator of [ ] moral seriousness . . . or the need for deterrence." *See United States v. Emmenegger*, 329 F. Supp. 2d 416, 427-28 (S.D.N.Y. 2004).

The irrationality of the fraud guidelines has been consistently recognized by this Court and others.[16] From 2010-2014, the rate of "within range" sentences for § 2B1.1 offenses has steadily decreased from 56% to 46.1%. See, Quick Facts, Theft, Property and Fraud Offenses, United States Sentencing Commission, available at www.ussc.gov/Quick–Facts. Exhibit C. The rate of non-government sponsored below-range sentences also increased from 23.3% in 2010 to 28.6% in 2014. *Id.*

Exhibit D is a chart that includes a sample of fraud cases from districts across the country, many of which involved losses far greater than in this case, in which defendants received sentences substantially below the guideline ranges applicable in those cases. As here, none of the defendants in those cases received a departure based on cooperation and many were convicted after trial. This Court should take into account the national sentencing trend exemplified by the Commission's data and this chart in fashioning an appropriate sentence for Mr. Newkirk.

---

[16] "[S]ince *Booker*, virtually every judge faced with a top-level corporate fraud defendant in a very large fraud has concluded that sentences called for by the Guidelines were too high. This near unanimity suggests that the judiciary sees a consistent disjunction between the sentences prescribed by the Guidelines for cases like these and the fundamental requirement of Section 3553(a) that judges imposes sentences 'sufficient, but not greater than necessary' to comply with its objectives." Frank O. Bowman III, *Sentencing High-Loss Corporate Insider Frauds After Booker*, 20 Fed. Sent. R. 167, 169, 2008 WL 2201039, at *4 (Feb. 2008)

# VI.

## A SENTENCE OF PROBATION WOULD BE SUFFICIENT BUT NOT GREATER THAN NECESSARY TO FULFILL THE STAUTORY GOALS OF SENTENCING UNDER 18 U.S.C. § 3553(a)

The guideline system, as developed originally by the Commission, failed to follow Congressional directives or past practice in which probation was recognized as a suitable and appropriate sentence for first-time offenders convicted of non-violent crimes.  In passing the Sentencing Reform Act (SRA), Congress viewed probation as a distinct type of criminal punishment with an independent value, not as an extraordinary gift of leniency only to be given in the most unusual circumstances.   In Section 994(j) Congress provided:

> The Commission shall insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense . . .

The Commission utterly rejected the past practice of probation in formulating the guidelines.  In 1984, approximately 48% of all federal defendants received probation while 6.2% received probation in 2007.[17]  For fraud offenders, in 2007, 10.7% received probation and confinement, and 17.7% received probation only.[18]  For fraud offenders sentenced in 2015, 14.7% received probation only, 7.4% received probation and home confinement.[19]  In the case of

---

[17] U.S. Sentencing Commission, 2 The Federal Sentencing Guidelines: A Report on the Operation of the Guidelines System and Short-Term Impacts on Disparity in Sentencing, Use of Incarceration, and Prosecutorial Discretion and Plea Bargaining 376 fig 14(1991)

[18] U.S. Sentencing Commission, Statistical Information Packet, Fiscal Year 2007. Available at http://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2007/nys07.pdf

[19] U.S. Sentencing Commission, Statistical Information Packet, Fiscal Year 2015.

fraud, prior to the guidelines, 59% of the defendants received probation.[20]

In *Gall v. United States*, 552 U.S. 38, 59 (2007), the Supreme Court recognized that probation can be an appropriate sentence in any case regardless of the advisory guideline level so long as it is not otherwise prohibited by law. *Id.* at 59. The Court also noted that probation is a punishment involving substantial deprivations of and restrictions on defendants' liberties. Such limitations include the ability of a person under the sentence of probation to move freely or change jobs. Likewise, someone on probation is under supervision which requires, among other things, reporting and permitting unannounced home visits by probation officers. *Id.* at 48. These are not trivial conditions and substantially affect the probationer's freedom. The decision in *Gall* echoes and affirms Congress' original intention expressed in 18 U.S.C. 994(j) that the guidelines should reflect the general appropriateness of imposing a sentence other than imprisonment in a case involving a first offender who has not committed a violent or otherwise serious crime.

**A. A Sentence of Probation will be Sufficient to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment for the Offense, and Provide Both General and Specific Deterrence**

The devastating consequences of a federal criminal conviction for wire fraud are in and of themselves, without a term of prison, enough in this case to reflect the seriousness of the offense and promote respect for the law. As outlined above, the conviction in this case has already and will have in the future such dire consequences in Mr. Newkirk's life, that just punishment for the offense has been accomplished.

---

[20] U.S. Sentencing Commission, Supplementary Report on the Initial Sentencing Guidelines and Policy Statements, June 18, 1987, Table 2, p. 68 available at http://www.fd.org/pdf_lib/Supplementary%20Report.pdf.

**B. Probation Will Afford Adequate General and Specific Deterrence to This Type of Criminal Conduct**

A sentence of probation would satisfy the need for both general and specific deterrence. First, as to general deterrence, Mr. Newkirk's extraordinarily high publicity case has already been a cautionary tale to all lawyers who have even the faintest suspicion about the behavior of their client. Who amongst us wants to see his or her name appear daily in *Law360* as an accused and disgraced member of the bar? Further, as a criminal conviction for wire fraud, even without any intended loss or gain to the defendant, strips both a lawyer's reputation and his or her law license, no lawyer would seriously consider repeating the conduct for which Mr. Newkirk was convicted. It is surely all disastrous downside with no potential reward.

Second, as to specific deterrence, Mr. Newkirk is facing automatic disbarment upon sentencing and even if the press had spared him the sweeping notoriety, he shall never be in a position to repeat the conduct here. Thus imprisonment would be entirely unnecessary to deter Mr. Newkirk in the future.

**C. Probation Will Protect the Public from Further Crimes of the Defendant**

Mr. Newkirk is an established law-abiding citizen. He is neither a repeat offender nor a career criminal. On the contrary, he is a hard-working person who comes from a close family of hard-workers who have never faced the possibility of a family member serving time in jail. A sentence of probation for a person like Mr. Newkirk—who wants only to be a father to his children—will certainly deter him from even the thought of future criminal conduct.

Further, shame significantly deters defendants from recidivism.[21]  As discussed above, well before this Court pronounces its sentence on Mr. Newkirk, the press has already significantly punished him and his family by ruthlessly shaming him.

There is no reason to believe that Mr. Newkirk poses a risk of recidivism, let alone to conclude that incarceration is necessary to deter or contain him from future criminal conduct. On the contrary, aside from this six-month period in his life, Mr. Newkirk has proven to be an extremely impressive, productive person and promises this Court to continue that unblemished life.

Mr. Newkirk is statutorily eligible for a sentence of between one and five years' probation.  *See* 18 U.S.C. § 1341, §3561.  A sentence of probation may include conditions such as home confinement, as a substitute for imprisonment, which if implemented reasonably would permit a defendant to continue in his gainful employment and family responsibilities.  *See* U.S.S.G. § 5F1.2 (2015).

## CONCLUSION

Where the arbitrary arithmetic of the fraud guidelines run amok of common sense, this Court should focus its lens on the other § 3553(a) factors to take an accurate measure of the man standing ready for sentence.  When Mr. Newkirk's life is measured against the crime for which he stands convicted, a sentence of probation is entirely appropriate.

For the foregoing reasons, defense counsel respectfully submit that in Mr. Newkirk's case there is "sufficiently compelling" justification for a sentence below the advisory Guideline range,

---

[21] *See, e.g.,* "Shame On You: An Analysis of Modern Shame Punishment as an Alternative to Incarceration," Book, Aaron S. 40 Wm. & Mary L. Rev. 653 (1998-1999); "Shaming White-Collar Criminals: A Proposal for Reform of the Federal Sentencing Guidelines," Kahan, Dan M., Posner, Eric A. 42 J. L. & Econ. 365 (1999)

*Gall*, 552 U.S. at 50, that a noncustodial sentence would be "sufficient, but not greater than necessary" to comply with the purposes of sentencing under 18 U.S.C. § 3553(a), and that a custodial sentence would be a greater than necessary punishment.

Respectfully submitted,

Priya Chaudhry
Priya@sc-harris.com

Beth Farber
farber@sc-harris.com

Harris, St. Laurent &
Chaudhry LLP
40 Wall Street, 53rd Floor
New York, New York 10005
Phone: 212.785.5550
Fax: 212.785.5558

Attorneys for Harvey Newkirk

Date submitted: April 14, 2016